```
18:00   1              IN THE UNITED STATES DISTRICT COURT
                       FOR THE NORTHERN DISTRICT OF TEXAS
        2                        DALLAS DIVISION

        3

             NETSPHERE, INC., ET AL.     (     Number 3: 09-CV-0988-F
        4         Plaintiff,             (
                                         (
        5    vs.                         (
                                         (
        6                                (
                                         (
        7    JEFFREY BARON, ET AL.       (
                                         (
18:00   8         Defendant.            (     June 19, 2009

        9    _____

       10

       11                        Status Conference
                       Before the Honorable Royal Furgeson

       12    _____

       13    A P P E A R A N C E S:

       14    For the Plaintiff:          JOHN W. MACPETE
                                         LOCKE LORD BISSELL & LIDDELL LLP
       15                                2200 Ross, Suite 2200
                                         Dallas, Texas 75201
       16                                Phone: 214/740-8662
                                         Email: jmacpete@lockelord.com
       17
             For the Defendant:          Caleb Rawls
       18                                Godwin Pappas & Ronquillo PC
                                         1201 Elm Street, Suite 1700
       19                                Dallas, Texas 75270-2041
                                         Phone:  214/939-8697
       20
                                         James Bell
       21                                Bell & Weinstein
                                         6440 N. Central Expwy, Suite 615
       22                                Dallas , TX 75206
                                         Phone:  214/293-2263
       23

       24    Reported by:                Cassidi L. Casey
                                         1100 Commerce Street, Rm 15D6L
       25                                Dallas, Texas 75242
                                         Phone:  214-354-3139
```

```
18:00   1                   P R O C E E D I N G S:

        2            THE COURT:  Thank you very much.  Please be

        3    seated.  Welcome.  Mr. Frye, will you please call the

        4    case.

        5            MR. FRYE:  Netsphere, Inc., et al. versus

        6    Jeffrey Baron, et al., Cause Number 3:09-CV-0988-F.

        7            THE COURT:  Could I have announcements for the

        8    plaintiff.

        9            MR. MACPETE:  Yes, your Honor, John MacPete of

       10    Locke Lord on behalf of the plaintiffs, Netsphere.  I have

       11    with me my client Munish Krishan as well as other

       12    representatives of Netsphere here.

       13            MR. RAWLS:  Caleb Rawls on behalf of Jeffrey

       14    Baron.  Mr. Baron is here with me as well as well as Mr.

07:01  15    Bell.

       16            THE COURT:  Excellent.  Glad to have all of you

       17    here.  Well, Mr. MacPete, tell me how we're doing. Come to

       18    the podium, if you would.

       19            MR. MACPETE:  Your Honor, we have a couple of

       20    preliminary matters we were hoping to take up with the

       21    Court.

       22            MR. RAWLS:  We have three total Mr. Rawls tells

       23    me.  They have to do with the protective order that the

       24    parties have agreed to, counsel have signed off on.  And

       25    if I could approach, I would like to present that to the
```

07:01   1   Court and see if the Court is willing to sign that as

  2   well.

  3              THE COURT:  Certainly.  Agreed?

  4              MR. RAWLS:  Yes.

  5              MR. MACPETE:  Yes.

  6              THE COURT:  Pretty standard.

  7              MR. MACPETE:  Yes, it's a two-level

  8   confidentiality agreement.  There is a highly confidential

  9   category, your Honor, which would require only outside

  10   counsel's eyes to see trade secrets and that kind of

  11   business information of the respective parties.

  12              THE COURT:  Well, I can see the lawyers have

  13   been working hard.  You even spelled my name right which

  14   doesn't happen very often.  Here you go, Mr. Frye.  Go

07:03  15   ahead.

  16              MR. MACPETE:  The second administrative matter

  17   we have is when we filed a TRO, your Honor, we originally

  18   filed with Judge Lynn an agreed motion to seal.  It was

  19   agreed between the parties, and that was because the

  20   settlement agreement which is the subject of this lawsuit

  21   is a confidential agreement, and it contains important

  22   trade secrets and other sensitive business information

  23   from the parties.  In addition, the issues that have come

  24   up with respect to the settlement agreement also required

  25   the disclosure of that kind of information.

07:03  1          Judge Lynn granted that agreed motion to seal,
       2   and she allowed our TRO papers to be filed under seal.
       3   Subsequent to that, she sealed the transcript of that
       4   hearing.  But her law clerk indicated that your Honor
       5   would have to essentially take up the issue of either
       6   sealing the whole case or other pieces of this where there
       7   was going to be a discussion of the settlement agreement
       8   or the sensitive business information.
       9          Yesterday, while we were sort of in deposition
      10   and discussing the discovery problems, there was a motion
      11   to dismiss that was filed by other counsel on behalf of
      12   the defendants, and it had certain exhibits attached to it
      13   which included the settlement agreement and some other
      14   confidential business information, and apparently that was
07:04 15   erroneously filed, not under seal, without a request for a
      16   sealing.  The counsel that are here in the courtroom and I
      17   have conferred, and we have agreed that the case because
      18   it surrounds this settlement agreement with that
      19   confidential business information -- and the settlement
      20   agreement itself being confidential -- that we would move
      21   the Court jointly to seal this proceeding, the entire
      22   case, because I think there is no way to sort of discuss
      23   things that aren't going to be confidential and trade
      24   secrets of the business without it being under seal, and
      25   that's pretty much what this whole case is about.

07:05 1          THE COURT:  Well, it's a problem to seal court

2      proceedings, and you know, to seal court filings.  We are

3      open courts.  In other words, you are telling me in this

4      whole case I have to close and lock the courtroom and I

5      have to seal everything that is said in this Court and I

6      have to seal everything that's filed in this Court.  And

7      that's not going to work.  So you are going to have to

8      figure out something else about that.  Now, I don't mind

9      sealing the confidentiality order, and I don't mind

10     sealing certain discreet parts of the pleadings.  But for

11     example, you know, to just seal everything is

12     unacceptable.  So you are going to have to figure out a

13     way to do this that it does not put the entire case under

14     seal, including this courtroom under seal.  It's not

07:06 15     acceptable.  So I am going to leave it to the parties to

16     do that.  But if you can't come up with something, the

17     only thing I am going to seal is the settlement agreement.

18     I will open up all pleadings and everything else.

19          You are going to have to figure that out, and

20     I'll work with you on it, and it's a balance.  But just

21     seal everything about this case -- the pleadings, the

22     courtroom, the transcripts -- that's not going to work.

23     So I am going to tell the lawyers, either you figure it

24     out or the only thing I'm sealing is the settlement

25     agreement.

07:06   1              MR. MACPETE:  Okay, your Honor, we understand,
        2    and we'll try to work on something that's more narrowly
        3    tailored.  At this point, your Honor, the most immediate
        4    problem we have is that motion to dismiss that was filed
        5    yesterday without a request --
        6              THE COURT:  Who find the motion, another party
        7    to the case?
        8              MR. MACPETE:  No, it was other counsel for the
        9    defendants.  Maybe I ought to let Mr. Rawls speak to that
        10   because my information is limited.
        11             THE COURT:  Mr. Rawls and Mr. Bell, do you not
        12   represent all the Defendants here?
        13             MR. RAWLS:  Your Honor, the defendants' chief
        14   counsel is Anthony Vitullo, who appears on the signing of
07:07   15   all the pleadings right now.  I don't work for him, but I
        16   did a lot of contract work for him.  It's Mr. Bell's law
        17   office.  So I guess there is three sets of lawyers
        18   representing Mr. Baron.  Yesterday, Mr. Bell and I were at
        19   Mr. MacPete's office from 8:30 a.m. to 10:30 p.m. trying
        20   to work something out.  During that time the motion to
        21   dismiss was modified, finished off I guess and filed by
        22   attorneys and Mr. Vitullo at Fee Smith.  Just on my
        23   Blackberry, I was unable to look it over very well at all,
        24   and I was unaware that it was not being filed under seal,
        25   and I was unaware at any point until Mr. MacPete told me

07:08    1    that the settlement agreement was attached.  So I

         2    apologize -- I guess on their behalf -- and on defendant's

         3    behalf that happened.  It was a mistake, and we are at an

         4    agreement that at a minimum the settlement agreement

         5    attached should be sealed, and if the Court's agreed, the

         6    entire motion.

         7              THE COURT:  Where is Mr. Vitullo?

         8              MR. RAWLS:  He's on vacation.  Coming back

         9    sometime today.  I think he would be back in the wee hours

        10    Saturday morning.

        11              THE COURT:  Is the motion to dismiss also -- I

        12    guess -- The parties seem to believe that we're going to

        13    lock the courtroom door and have this entire matter

        14    decided in secret.

07:09   15              MR. RAWLS:  That's clearly unacceptable to the

        16    Court, and Mr. MacPete and I will confer as soon as we

        17    finish today and figure out something more palatable and

        18    acceptable to the Court.  Both sides are equally concerned

        19    about the sensitive nature of the information contained in

        20    the settlement agreement, and to the extent this case is

        21    about enforcing that agreement and so it's very difficult

        22    to keep that information out of the pleadings and just

        23    seal the MOU, that's our concern right now.

        24              THE COURT:  Let me ask you and I may have missed

        25    this.  Was the complaint, the temporary restraining order,

07:10 1 the preliminary injunction -- Are they all under seal.

2    MR. RAWLS:  I believe that's the case.  There

3 was an agreed motion, and then Judge Lynn signed that

4 order, and so the TRO and the exhibits were I believe

5 filed under seal.

6    THE COURT:  And the complaint itself?

7    MR. MACPETE:  The complaint itself, your Honor,

8 is not filed under seal.  We were extremely vague about

9 what the terms of the settlement agreement were

10 purposefully because it wasn't being filed under seal, and

11 it did not have the settlement agreement as an attachment.

12 So I wanted to make sure the record was clear.

13    THE COURT:  The motion to dismiss, is it vague,

14 very specific or just the exhibits that are attached?

07:10 15    MR. MACPETE:  To be honest with you, your Honor,

16 I haven't had time to read it yet.  I was told by people

17 in my office that it had not been filed under seal and the

18 settlement agreement was an attachment, and I don't have

19 an assessment of how detailed it was about the terms.  But

20 I'm obviously concerned that it is detailed.

21    THE COURT:  Does anybody have a copy of the

22 motion to dismiss that is here?

23    MR. BELL:  No, I don't, your Honor.

24    MR. RAWLS:  We worked fourteen hours yesterday,

25 I should have brought a copy this morning.  That was my

CASSIDI L. CASEY, CSR, 214-354-3139
UNITED STATES DISTRICT COURT

07:11 1   mistake.

2         THE COURT:  Well, you guys have worked very

3   hard.  I'm proud of you, and I'm not here to reproach hard

4   working lawyers.

5         MR. BELL:  Your Honor, if we confer with Mr.

6   MacPete, we could do a motion to strike the pleading or

7   seal it and file something similar on Monday if he is

8   agreeable.  Figure out a way to rectify whatever damage

9   has been caused by an oversight on the part of the law

10   firms on our side.  So we're willing to do whatever the

11   Honorable Court would ask us to do.

12         THE COURT:  I think that's probably not a bad

13   idea.  Why don't we do this.  I'll just take a verbal

14   motion to strike the pleadings and to remove the pleadings

07:12 15   from the Court.  And I think we'll check with the clerk's

16   office after this is over and see if we can get that done

17   and you can file something Monday or Tuesday.  Is there

18   any deadline here?

19         MR. BELL:  I think we have a deadline, your

20   Honor.  It was yesterday.

21         THE COURT:  To file a motion to dismiss?

22         MR. BELL:  Yes, your Honor, the 20th day.  But

23   we can get it filed through the Court, through the

24   district -- I don't know how it works in terms of the ECF

25   filing system.  But possibly the better thing to do would

07:12  1   be to bring it down to the courthouse.  That way it's not

       2   out on the internet, and it's part of you all's internal

       3   system.

       4          THE COURT:  Why don't we stop a minute.  Can you

       5   get on EM/ECF here?  Let us see if we can find it on

       6   EM/ECF and see what it says.

       7          MR. BELL:  So your Honor is aware, it is out on

       8   PACER right now, and there is -- And I think Mr. MacPete

       9   could address some of the concerns, but it's out on PACER

      10   right now, and I think he's unopposed to us getting it

      11   struck and sealing it and refiling it without prejudice.

      12          MR. MACPETE:  I am.  I will agree on the record

      13   to their motion to strike that motion to dismiss, and I

      14   will agree they can file another one and for it to be

07:13 15   under seal without prejudice.

      16          THE COURT:  Okay.  Do me a favor.  We'll have to

      17   check with the Clerk's Office to see how this works.

      18          THE COURT:  While we're doing that, Mr. MacPete

      19   had a third matter to take up.

      20          MR. MACPETE:  Yesterday at the end of the

      21   evening, Mr. Rawls called me and said that his client had

      22   raised an issue with respect to the order that had been

      23   issued by Judge Lynn.  Let me see if I can lay out what

      24   they say their problem is.  There is a uniform dispute

      25   resolution procedure which can be utilized by a trademark

07:16   1   holder when there is a dispute about whether a domain name

  2   infringes their trademark.  Uniform dispute resolution

  3   procedure.  And it's something provided for by ICANN which

  4   is the US government body that oversees the internet.  And

  5   so a trademark holder can file a UDRP, and it's decided by

  6   an experienced trademark lawyer whether the domain name

  7   violates the trademark holder's rights and if the

  8   arbitrator, if you will, determines that's the case, the

  9   only result that comes out is an order to the registrar to

 10   transfer the domain name from the domain holder to the

 11   trademark company.  So those orders will periodically come

 12   out, and the registrar is required by ICANN rules to

 13   essentially change the who-is information which is like

 14   record title for the domain name, and that's maintained by

07:17  15   the registrar.  So one of the orders Judge Lynn entered at

 16   our request is the registrar be prohibited from altering

 17   in any way the records he has about domain names on his

 18   registrar, and that's because the vast majority --

 19   probably 99.5 percent on the registrar are domain names

 20   owned by my client or were owned by my client and at issue

 21   in this case.

 22        Mr. Rawls last night raised with me the

 23   potential problem of what happens if a UDRP order comes to

 24   the registrar which basically directs him to change the

 25   recorded title from the domain holder whoever that may be

07:17 1    to a trademark owner.  That would technically be a

2    violation of Judge Lynn's order, and so we need some kind

3    of a modification or understanding of what we're supposed

4    to do.  What I told him at the time what I believed Judge

5    Lynn would have told him if this issue was raised at the

6    TRO hearing is to talk to Mr. MacPete first and see if you

7    can work it out, and if not, we'll do something to modify

8    the order.  What I told him last night is I understand the

9    process and that if they got such an order and he came to

10   me, I would be happy to agree that was an appropriate

11   change to the who-is information and not a violation of

12   the Court's order.  So that's essentially the issue we

13   have.  That's my proposal for how we would deal with it.

14   I will let Mr. Rawls tell the Court anything else he wants

07:18 15   about that.

16            THE COURT:  Doesn't someone have to trigger this

17   process?  It's not done automatically, is it?

18            MR. MACPETE:  No, it has to be triggered by the

19   registrar after he has received an order as a result of

20   this process.  It's a very verifiable thing.  In other

21   words, the registrar gets the order, and Mr. Rawls could

22   show me the order.  Here is the name on which the recorded

23   title needs to be changed.  And I see it and that's fine.

24   And everybody would essentially agree that is an

25   appropriate change and not a violation of the Court's

07:19  1    order on TRO.

       2              THE COURT:  There doesn't seem to be anything in

       3    the motion to dismiss that is -- that you know would

       4    violate a trade secret.  Is everything filed in every

       5    court in every jurisdiction under complete seal?

       6              MR. BELL:  No, your Honor.

       7              MR. MACPETE:  No.  The underlying state court

       8    cases have not been filed under seal.  But that's also

       9    probably because the history of that case -- and it kind

      10    of ended up being the lead of the three cases that were

      11    involved in the underlying lawsuit -- is because no

      12    discovery was ever taken in that case.  So that case is

      13    about as virgin as this case is because essentially what

      14    happened is the cases got filed, there was a lot of

07:23 15    procedural maneuvering about which case would go first and

      16    that sort of thing, and at the end of that we ended up

      17    with about four mediations and face-to-face negotiations

      18    between the parties.  And ultimately the last negotiations

      19    resulted after twenty-three hours in the settlement

      20    agreement that's at issue in this case.  So there really

      21    wasn't a need for there to be a sealing order because

      22    nothing substantive was ever discussed in that court.

      23              THE COURT:  And why -- Apparently there have

      24    been lawsuits filed -- I'm reading the motion to

      25    dismiss -- all over the place.  What's the purpose of so

07:24  1     much litigation?

       2              MR. MACPETE:  I'll give you a little bit of

       3     background on that, your Honor.  Back in November of 2006,

       4     my client, Manila Industries, Inc., had a portfolio of

       5     domain names which had about 7,00 domain and .com names.

       6              THE COURT:  Your client owned all of those

       7     names?

       8              MR. MACPETE:  Yes, sir.  And Mr. Baron and

       9     Ondova, the defendants in this case, were the registrar

      10     for all of those names.  And so of course, they are the

      11     party that maintains the record title; that is, the who-is

      12     information we have just been talking about.  At some

      13     point in 2005

      14              THE COURT:  Can the owner not be the registrar?

07:25 15              MR. MACPETE:  The registrar is not supposed to

      16     be the owner, by ICANN rules.  And I'd say it's not an

      17     absolute prohibition.  The idea that I had was the

      18     registrar himself was not supposed to warehouse names.  So

      19     it's probably not an absolute prohibition, and in fact,

      20     Mr. Baron and Ondova had a small portfolio of their own

      21     names, about two or three thousand names that he operated.

      22              THE COURT:  And Mr. Baron and Ondova have to go

      23     through some process where they are certified as a

      24     registrar?

      25              MR. MACPETE:  It's referred to as accredited.

07:26 1     That's true.  They go through a process and get

2     accredited, and he's allowed to serve as a registrar, and

3     the registrar, your Honor, if you will, is essentially a

4     middle person between the operator and .com and .net.

5     Maybe we will back up.  And if I'll telling your Honor

6     things you already know --

7           THE COURT:  You are not.

8           MR. MACPETE:  The way the domain name works is

9     say you have JudgeFurgeson.com and you want to register

10    the name.  Ultimately, you get the name from VeriSign.

11    You don't contract with them directly.

12          THE COURT:  That's an acronym?

13          MR. MACPETE:  V-e-r-i-S-i-g-n.

14          THE COURT:  What is VeriSign?

07:27 15         MR. MACPETE:  It's the registry operator of the

16    .com and .net registry.

17          THE COURT:  For the whole world?

18          MR. MACPETE:  Yes, sir.  So if you want to buy

19    JudgeFurgeson.com you have to go to a registrar and

20    register the domain name, and it will cost you essentially

21    $7.02 plus fee the registrar charges you as their fee.

22          THE COURT:  And so VeriSign certifies people

23    like Mr. Baron?

24          MR. MACPETE:  It's actually ICANN that does that

25    and that's the government agency that is the regulatory

07:27  1    body for the internet.

        2            THE COURT:  Okay.

        3            MR. MACPETE:  And then he essentially interfaces

        4    with the registry operators for the registries he

        5    represents.

        6            THE COURT:  Okay.

        7            MR. MACPETE:  Let's say that John MacPete wants

        8    to go to JudgeFurgeson.com.  I will type in that name in

        9    my browser window and a query will go out from my computer

     10    to VeriSign because it's a .com name.  And VeriSign has a

     11    database which says, okay, JudgeFurgeson.com is registered

     12    at Ondova, and Ondova servers are at this particular

     13    location, and it will essentially forward the inquiry on,

     14    and then it goes to Ondova's base, and you as the owner of

07:28 15    the domain name will have told him my web page is actually

     16    hosted on this server.

     17            THE COURT:  That's a --

     18            MR. MACPETE:  Example of what the address would

     19    look like.  And that will route my inquiry on to a server

     20    which is hosting your web page, and it comes up on the

     21    screen.  That's essentially how the domain names work.  So

     22    what happened is sometime in 2005, Mr. Baron approached my

     23    client and said, Hey, you have a business that makes money

     24    from advertising revenues by operating these hundreds of

     25    thousands of domain names, and that makes a lot of money,

07:29  1    an I have been told that there is an economic development

2    program in the U.S. Virgin Islands, and if you go down

3    there and site your business there and employ local

4    people, you can get a 90 percent tax credit on your

5    income.  That might be a really good thing for you, and

6    maybe we could go in business together, go down to the

7    U.S. Virgin Islands and take advantage of this tax credit.

8    So they hired a joint lawyer and worked on trying to

9    negotiate a joint business.  Ultimately they weren't

10    successful in reaching an agreement about who would

11    control that joint business because the two individuals

12    involved have very different views about how to handle the

13    trademark lawsuits which are an inevitable result of

14    having a large portfolio of domain names, and these domain

07:30  15    names were registered by my client with a computer program

16    that registers them automatically.  So no human being was

17    involved in deciding which names to register and actually

18    registering them.  They have a fairly sophisticated

19    trademark filter today to register domain names, but that

20    doesn't catch everything that may be a domain name.

21    That's a trademark problem.

22          Anyway, after the negotiations essentially fell

23    through and the joint order was withdrawn for conflict of

24    interest because the two parties couldn't agree, there was

25    then a dispute about whether they had done enough for the

07:30  1    deal to go through.  Mr. Baron took the position that the

2    deal had gone through, and my clients took the position

3    that it had not, and on November 13 of 2006, Mr. Baron

4    decided to engage in self-help.

5         THE COURT:  There was no lawsuit filed to

6    resolve this dispute?

7         MR. MACPETE:  No, there was no lawsuit filed at

8    that time.  And what happened was as the registrar --

9    Remember, I told you that he has that database that has

10   the address for all the domain names would go that have

11   our web pages with our advertising, and then the

12   advertisers send us the money.

13        On November 13, 2006, Mr.  Baron went to his

14   database which he physically has control over, and he

07:31 15   changed the addresses from where web traffic would go for

16   our domain names -- from the web pages owned by my

17   clients -- to web pages owned by someone else who then

18   paid representatives of Mr. Baron.  So on the space of

19   twenty-four hours on November 13, 2006 he took down our

20   entire business and diverted all the revenues from that

21   business to these other on the theory he was somehow the

22   owner because this Virgin Islands deal had gone through

23   and he had the right to send that stuff down to the U.S.

24   Virgin Islands.

25        THE COURT:  When you sign up with the registrar,

07:32  1       there is a contract?

       2                   MR. MACPETE:  There is, your Honor.

       3                   THE COURT:  And so Mr. Baron doesn't file a

       4       lawsuit of any kind, breach of contract or whatever?

       5                   MR. MACPETE:  No, he did not.  But while he was

       6       engaged in the process of taking down all of our web

       7       pages, he went to the Dallas state court and filed a

       8       declaratory judgment lawsuit, and in that declaratory

       9       judgment lawsuit, he initially alleged that he was just

      10       the registrar and that he wasn't really sure who he was

      11       supposed to take orders from because he had claims from

      12       his representatives in the U.S. Virgin Islands that said

      13       they were the owner of the domain names as a result of

      14       this failed negotiated transaction, and he had my clients

07:32 15       on the other hand saying they were the owners and who he

      16       was supposed to take direction from.  So he originally

      17       asked the state court for a declaratory judgment about who

      18       was the owner.  My clients figured out very quickly that

      19       their domain names were being hijacked, and they hired me,

      20       and I filed a lawsuit in California federal court --

      21       that's where my clients are sited -- for the hijacking of

      22       their domain names, and that's the Central District of

      23       California.  So after that, we went to the parties working

      24       with Mr. Baron and filed their own declaratory lawsuit in

      25       the U.S. Virgin Islands.  So those are the original three

07:33 1    cases, and all of those cases really revolved around who

2    owned the domain names that were originally registered by

3    my client.  That portfolio referred to as the Manilla

4    Portfolio.  Then there were various proceedings, removals

5    to federal court here.  Other parties were brought into

6    the state court lawsuit that had been monetizing the

7    domains after they were taken from my client.  So it's a

8    very complex and factually complex litigation.

9              In the end we had a 23-hour mediation on April

10   26, and we did reach a mediated settlement agreement, and

11   that settlement agreement is essentially what this lawsuit

12   is about.  And if you will give me a second, your Honor.

13   May I approach?  We have a copy of the settlement

14   agreement for you.

07:34 15             THE COURT:  Apparently I have it here.

16             THE COURT:  Lots of interlineations, right.

17             MR. MACPETE:  Yes.  It's not the prettiest

18   document in the world as you might imagine, your Honor,

19   after twenty-three straight hours of mediation.

20             THE COURT:  Okay.  I do have a copy.

21             MR. MACPETE:  Thank you, your Honor.  Some key

22   points to this, your Honor, are really on Page 4.  If you

23   look at the first writing after all the lines that have

24   been crossed out, it says "This settlement agreement is

25   intended to be a full and final settlement agreement."

```
07:35   1              THE COURT:  Page 4?

        2              MR. MACPETE:  Yes, sir.

        3              THE COURT:  Okay.  The Page 4 I see here is all

        4       in handwriting.

        5              MR. MACPETE:  I'm sorry, your Honor.  I think

        6       that may be miscopied.  I think the original basically has

        7       the first page looks like this.  The second page is typed

        8       in and interlineated.

        9              THE COURT:  I have a second page that looks like

       10       this.

       11              MR. MACPETE:  That's actually the fourth page,

       12       your Honor.

       13              THE COURT:  That's the fourth page?  I guess it

       14       was misfiled.  I'm reading on the fourth page.

07:36  15              MR. MACPETE:  On the fourth page the first

       16       typewritten portion of it is what I was reading from.

       17       This settlement agreement is intended to be a full and

       18       final settlement agreement containing all material terms,

       19       even though the parties may -- which is permissive --

       20       prepare a more formal settlement document, release

       21       language and dismissal papers.  So on April 26 the

       22       underlying litigations were all settled.  If your Honor

       23       turns to page --

       24              THE COURT:  That was the case in the Virgin

       25       Islands, the case in California and the state court case
```

07:36  1  here in Texas?

2  MR. MACPETE:  That's correct, your Honor.  If

3  you turn to Page 2 which is the typewritten and

4  handwritten page, the key provision here is in Paragraph

5  3.  Paragraph 3 says "Within fourteen days, the Manilla

6  Portfolio," which was the portfolio being fought about in

7  the underlying litigation, "will be split fifty-fifty

8  between the parties," the plaintiffs and the defendants in

9  this lawsuit, and that will be done by basically taking

10  the entire portfolio and alphanumericizing it and dividing

11  it into an even pile.  So you get a complete random split

12  of the portfolio.  And then there provides a coin flip

13  between the parties to determine which pile each party

14  gets.

07:37  15  After April 26 -- actually Before I say that,

16  your Honor, if you will turn to Paragraph 7.  Paragraph 7

17  says Manila, my clients, defend existing trademark

18  litigation against the Manila Portfolio and indemnifies

19  Jeff -- that's Mr. Baron -- and Ondova from their

20  liability for those cases.  At the settlement agreement

21  was entered into, there were about seven existing

22  trademark lawsuits that related to the Manila Portfolio

23  and under the settlement agreements my clients and myself

24  were directed to essentially take over the direction of

25  the defense of those cases and ultimately be responsible

07:38  1      for settling them or otherwise litigating them, as the

2      case may be.

3              So after the settlement agreement was entered

4      into, we began to perform that obligation, and there is a

5      trademark lawyer in Florida whose name is Mr. Herrera, and

6      he has been handling the third-party trademark litigation

7      prior to the settlement.  So we left Mr. Herrera in the

8      case, but Mr. Herrera has been taking direction from me,

9      and we have actually settled a number of those trademark

10     cases that existed when the settlement agreement was

11     entered into.

12             About two weeks after the settlement agreement

13     was entered into, Mr. Baron apparently decided he didn't

14     like this deal anymore, and he started to refuse to

07:39  15     actually perform.

16             THE COURT:  By refusing to perform, what does he

17     do?

18             MR. MACPETE:  The first thing is April 29 --

19     Three days after this document was entered into, my client

20     escalated the split, and if you look at Paragraph 3, your

21     Honor, at the bottom of it there is a handwritten

22     interlineation that says "names subject to the lawsuit,"

23     singular, list created by Manila.  And we were supposed to

24     come up with what the Manila was.  It was our portfolio.

25     We registered it.  We were to come up with the list and do

07:39  1    alphanumericizing and come up with the split, and we did

2    that on the 29th.  Computer programmers from Manila are

3    here and alphanumericized the list, and it was split and

4    escalated to the parties upon April 29.

5         In addition on April 29, if your Honor will look

6    at Paragraph 9, it says "All parties will seek an agreed

7    order from the Court directing VeriSign to transfer

8    Manila's half of the portfolio to a registrar picked by

9    Manila within ten days."  So the idea here basically was

10   you do the split, you flip the coin to figure out which

11   pile Manila gets, and then an agreed order is going to be

12   submitted to the state court to direct the registrar to

13   transfer our half of the domain names from Mr. Baron's

14   registrar to the registrar our choice.

07:40 15        When Mr. Baron started directing his lawyers not

16   to comply with the settlement agreement, they essentially

17   took the position that we're not going to accept the list

18   that you used to split the domain names.  And the ironic

19   thing about that, your Honor, is that in negotiations with

20   Mr. Baron and Ondova last year, he provided a list which

21   he said was his best effort to have a complete list of the

22   Manila Portfolio from his perspective.  When he turned it

23   over, he said it may not be entirely accurate, may have

24   some third-party customer names on it and/or one or two

25   names I own.  But this is my best effort to come up with a

07:41  1    list.  And as you might imagine, your Honor, there is not

       2    a great deal of trust between the respective clients.  Mr.

       3    Baron does not trust my clients at all, and my clients

       4    don't trust him at all.  So what we ultimately did is we

       5    said rather than use our own list, which of course Mr.

       6    Baron is going to conclude is somehow a trick and

       7    inaccurate, we'll use his list because we naively believed

       8    if we used his list that would be noncontroversial, and

       9    the settlement agreement would be achieved in a timely

      10    fashion.  And what my clients ultimately want is to have

      11    the split occur and the businesses separated and everybody

      12    to be able to go on with their lives apart.  So even

      13    though they didn't agree Mr. Baron's list was entirely

      14    accurate and has names belonging to my client which are

07:42 15    not included on it, they ultimately made the business

      16    decision that it was better to use the list and not fight

      17    about the names missing than to have a big argument about

      18    adding to it or using their own list.

      19           Surprisingly, he then instructed his lawyers to

      20    not agree to his list.  His lawyers took the position that

      21    they had the right under Paragraph 3 to come up with the

      22    list of Manila domain names and to perform the split.  So

      23    we waited the fourteen days in the settlement agreement to

      24    see what we would actually get and we got nothing.  And

      25    then I think on the 16th day after the settlement

07:43    1    agreement, he did propose a list.  Not a split.  Not the

2    alphanumericizing.  But he sent over intense urging from

3    his counsel who finally sent over a list.  And the problem

4    with his list at that point, your Honor, is that at the

5    time he turned over the list, there were 659,000 and

6    change domain names total that were registered on his

7    registrar.  That would include the small number of

8    third-party customers he has, his individual domain names

9    which belong to him and our names.  The list that he sent

10    over through his counsel sixteen days after the settlement

11    agreement was executed had 670,000 domain names on it.  So

12    the instance we got the list and knew what the numbers

13    were, we knew it was inaccurate because it had more names

14    than he had on his registry.  An analysis of his list

07:44   15    ultimately produced the conclusion that there were over

16    13,000 domain names on that list which are not registered

17    at his registry.  In fact, most of those domain names are

18    not registered at any registry, meaning they are available

19    currently today for the public to pick them up.

20            The other significant thing about Mr. Baron's

21    new list was that it left off 9,928 domain names which had

22    been on the list that he produced in negotiations last

23    year.  And all of those names were correctly spelled, and

24    they meant something.  And of course, your Honor hasn't

25    seen any kind of a printout of this portfolio, but I

07:44   1   represent to the Court if we had the stacks of papers that

         2   would be required to look at all of these names, what your

         3   Honor would see is the portfolio is arduously composed of

         4   names that are misspelled or names and numbers that don't

         5   mean anything and that sort of thing, and one out of every

         6   25 is a correctly spelled name that might mean something,

         7   and as you imagine, your Honor, correctly spelled names

         8   that mean something are more valuable than a name like 123

         9   XYZ.  So that's 9,900 names clearly represented -- Bless

        10   you, your Honor.

        11            THE COURT:  So that brought you to this Court.

        12            MR. MACPETE:  That brought us to this Court.

        13   That was clearly a cherry-picked list of names which he

        14   was trying to avoid being part of the split.

07:45  15            THE COURT:  By the way, were all the lawsuits

        16   dismissed?

        17            MR. MACPETE:  No, they weren't dismissed, and

        18   the reason they weren't dismissed is because of that

        19   VeriSign order.  So the way the settlement agreement was

        20   supposed to work is, first, you have the split, and then

        21   you have the coin flip to determine which pile belongs to

        22   which company, and then there was to be a submission to

        23   the state court on the VeriSign order.  So the state court

        24   needed to essentially remain open so that the Court was

        25   available to issue the order on VeriSign and have those

07:46  1    domain names transferred.

       2           THE COURT:  Why wasn't this case just taken back

       3    to the state court.

       4           MR. MACPETE:  It wasn't taken back to the state

       5    court, your Honor, because these parties are divers.  My

       6    clients are in California, and Mr. Baron is located here

       7    in Texas, and we felt more comfortable having this

       8    contract enforced in federal court, and we had a right to

       9    come in to this Court and ask for relief, and that's what

      10    we did.

      11           THE COURT:  Had the state court judge done much

      12    in this case?

      13           MR. MACPETE:  No.  In fact, there hadn't been

      14    any really substantive hearings prior to the entry of the

07:47 15    settlement agreement.  There have been some scheduling

      16    order hearings.  No discovery had been exchanged.  So the

      17    state court really didn't have any sort of background that

      18    was relevant anymore than this Court would.

      19           THE COURT:  So they weren't anymore advantaged

      20    than this Court will be?

      21           MR. MACPETE:  That's correct.

      22           THE COURT:  Okay.

      23           MR. MACPETE:  And I direct you to what's

      24    actually Page 3, which is the one with all the handwriting

      25    on it.  If you look at Paragraph 16, Paragraph 16 says

07:47 1    "dismissal with prejudice of the Texas case, California

2    case and U.S. Virgin Islands case once the court order is

3    granted and transfer by VeriSign is complete."  So you can

4    see, your Honor, it was contemplated those courts were

5    going to remain open, not because anything was going to be

6    done in the underlying litigation but for the purposes of

7    having those domains transferred, and then those cases

8    would be dismissed.  What's happened is those cases

9    haven't been dismissed because the defendants have refused

10   to essentially perform the coin flip and otherwise move

11   forward with the predicate before a motion to dismiss

12   those cases with prejudice can be filed.

13          Where we are currently in the state court, in

14   the underlying proceeding there is an open state court

07:48 15   matter with no live causes of action.  If your Honor will

16   look back on Page 1, Paragraph 8, it provides for

17   immediate complete releases of all parties with a specific

18   carve out for another piece of litigation which isn't

19   relevant to what we're talking about here today.  So we

20   have a state court case with no live causes of action.

21          And the other things that were happening

22   essentially is the domain names come up for renewal every

23   day.  These names were registered on different days over

24   the course of an entire year, the entire portfolio.  So

25   every day you have domain names coming up.  And the way

07:49   1   that works is you have to pay the $7.02 to ICANN to renew

        2   the domain name.  And that bill goes to the registrar.  So

        3   Ondova sends a the amount to VeriSign takes it out to pay

        4   for the renewal.  After the settlement agreement was

        5   entered into, the defendants stopped performing the

        6   settlement agreement because within fourteen days there

        7   should have been a split and each side would have been

        8   paying for the domain names which they ended up being the

        9   owner.  But prior to that, the registrar was basically

     10   tasked with paying for those domain names, and that's

     11   essentially in Paragraph 10, your Honor, if you look on

     12   the first page.

     13              THE COURT:  Let me stop you a minute.  It looks

     14   like to me one of the problems we have is we need to

07:50 15   secure these domain names.  Is that right?

     16              MR. MACPETE:  That's correct.

     17              THE COURT:  The parties disagree about what's

     18   going on.  Why can't I appoint a receiver to find a

     19   registrar and require all the domain names to be given to

     20   the receiver to be put with another registrar?  What would

     21   be a problem with that until we get this thing resolved?

     22              MR. MACPETE:  I think that would be a very

     23   cumbersome procedure, your Honor.

     24              THE COURT:  Let me tell you.  It may be a

     25   cumbersome procedure, but this is crazy.  This litigation

07:50  1    is literally crazy.  Mr. Baron is just apparently throwing

2    these domain names every which way.  You guys don't want

3    him to, but you are at his mercy, so to speak, and yet you

4    don't want to secure these domain names because apparently

5    no order or agreement according to your story will stop

6    Mr. Baron.  He's going to do what he wants to do

7    regardless of the agreements or orders.  If that's the

8    case, you know, looks like to me as long as these domain

9    names are -- According to your story, as long as they are

10   in his possession it doesn't make a difference what a

11   court does or what an agreement says.

12            MR. MACPETE:  I wouldn't want to represent to

13   the Court that it's my belief he is going to violate the

14   TRO Judge Lynn issued.  I guess I believe in the system,

07:51 15   and I think he is going to obey that order, and as Judge

16   Lynn put it, if he doesn't, he would be prosecuted to the

17   fullest extent of the law.

18            THE COURT:  Of course, this is my case now, and

19   of course, judges don't like their orders not followed,

20   and if they are not followed, it's contempt.  You can fine

21   people a million dollars a day.  You can put people in

22   jail, do all sorts of things.  So I understand your view

23   is that Mr. Baron will secure these names and not do

24   anything with them until we get this matter resolved, but

25   I don't know if he has the wherewithal to withstand

07:52  1    contempt orders in the millions of dollars.  I don't know

2    what the value of these domain names are, but I imagine

3    they are incredibly valuable.

4              MR. MACPETE:  They are around -- I guess I would

5    say under the pendancy of the underlying litigation there

6    was a Rule 11 agreement entered into between Mr. Baron and

7    Ondova and the U.S. parties in the underlying litigation,

8    and as a result of that agreement he was paid 5.6 million

9    dollars during the course of the underlying litigation.  I

10   don't know what he has done with that money, your Honor,

11   but I think in the end if I were so bold to violate this

12   court's order, I think there is some funds there somewhere

13   to pay that kind of a contempt order.  But I don't think

14   we're going to go there, your Honor and I'm hopeful this

07:53 15   problem is going to get resolved at our preliminary

16   injunction hearing on July 1st because I think the main

17   problem that we have had is we haven't had the split

18   accomplished.  So there has been a split after the

19   performance agreement stopped about who is supposed to be

20   paying for the domain names prior to the split under the

21   settlement agreement.  We think that's a responsibility of

22   the registrar.  Nothing in the settlement agreement

23   suggests anybody else is supposed to pay it, and if your

24   Honor will look at Paragraph 10, Paragraph 10 says "any

25   monetization money received by any of the parties for

07:54  1   monetization of the Manila Portfolio before transfer of
       2   Manila's half of the portfolio to Manilla will be split
       3   fifty-fifty."  That's gross.  It doesn't provide for the
       4   deduction of any expenses.  And there are other
       5   agreements, this Rule 11 I told you about, where things
       6   will be split fifty-fifty.  So they know how to draft an
       7   agreement that says those expenses come off the top before
       8   any money is split.  And essentially, your Honor, that was
       9   gross, and the registrar was going to be tasked with
      10   paying the legals until the split was two-fold.  Number
      11   one, it provided incentive for him to get the split done
      12   as fast as he could, and it was supposed to be done in
      13   fourteen days, and he wouldn't pay very much renewal fees
      14   within that time period.

07:55 15           The second reason, as I told your Honor, under
      16   Paragraph 7 we took on the much greater financial burden
      17   of handling the seven trademark litigations that are out
      18   there, including a litigation from the University of Texas
      19   in which there is a claim of statutory damages for
      20   cyberspying of over four million dollars.  So in the
      21   relative weighing of what his responsibilities were going
      22   to be before the split and our financial responsibilities,
      23   we took on a lot more responsibility than he did.  But
      24   now, subsequent to the deal being entered into, he's
      25   saying, no, no, I don't like that and you should pay for

07:56  1   half of the expenses prior to the split, and he's been

 2   holding us hostage because, as you figured out, he has his

 3   figure on the nuclear button.

 4           THE COURT:  Well, my goal is to maintain the

 5   status quo.  In other words, to protect the domain names.

 6   That's my first goal.  Let me talk to Mr. Rawls or Mr.

 7   Bell for a minute.

 8           MR. BELL:  May I approach, your Honor?

 9           THE COURT:  Sure.  Is Mr. Baron going to protect

10   the domain names pending this litigation?  That's my

11   question.

12           MR. BELL:  Absolutely, your Honor.

13           THE COURT:  There is an order in place that

14   needs to be more specific.  I will just say those names

07:57 15   are to be maintained in a proper order with payments made

16   to do the proper renewals and so forth until this

17   litigation is complete or another kind of order is

18   entered.  And that's the order.  And you are telling me

19   that Mr. Baron is committed to maintain the domain names

20   in an appropriate way and protect them in an appropriate

21   way until some other order is entered by the Court.  Is

22   that correct.

23           MR. BELL:  Prior to answering that question, Mr.

24   MacPete had about thirty minutes to give you a little

25   bit --

07:58 1              THE COURT:  I understand.  I'm trying to make

2        sure the status quo is maintained.

3              MR. BELL:  I understand and if I can give you

4        some background that will be helpful.

5              THE COURT:  It would be.  And I'll give you a

6        chance to speak.  All I'm saying is the status quo is

7        going to be maintained.

8              MR. BELL:  With a qualifier.

9              THE COURT:  What is that?

10             MR. BELL:  You have to make the distinction

11       between Ondova, a registrar, and Jeff Baron who happens to

12       be the president but also beneficial owner through a bunch

13       of complicated trusts.  So is Munish Krishan.  And Mr.

14       MacPete represented to the Court that Mr. Baron had 5.6

07:58 15       million dollars.  Munish got 4.3 I believe according to

16       representations made.  But having said that, it's the

17       burden of the registrants, not the registrar, to pay for

18       renewal fees, and there is a provision in ICANN that says

19       you cannot as a registrar -- You cannot be paying for

20       registrant fees.  If you were running for state judge, the

21       registrar can't pay your renewals.  You need to pay, like

22       Go Daddy, Ondova, etcetera.  So forcing Mr. Baron to pay,

23        -- Essentially what they are trying to do is make Mr.

24       Baron make a capital contribution to Ondova or some kind

25       of a bridge loan to float these renewal fees.

07:59    1          THE COURT:  How much are the renewal fees?

         2          MR. BELL:  $7.00 per domain.  So I would -- I

         3     think counsel and I can agree -- It sounds like my client

         4     is a big thief in the middle of the night when I have

         5     about 107 pages right now I can show your Honor, including

         6     some other stuff, that would unequivocally without a

         7     doubt -- if we had an evidentiary hearing right here and

         8     now would -- cut Mr. MacPete's argument in half, and if I

         9     put his client on the stand you are going to hear the

        10     entire truth, and he has a lot more to hide than Mr.

        11     Baron.  I can show you now.  I'm waiting for the

        12     deposition of Mr. Krishan.  I just want to make sure, your

        13     Honor, before we cast a bad light on my client -- And you

        14     know, Mr. MacPete, I understand his argument, but there is

08:00   15     several things, very, very material things, that undercut

        16     his argument, and I understand this Honorable Court's

        17     concern -- pay, I need to protect the four corners of this

        18     MOU which contains these domain names.

        19          THE COURT:  I just need to protect the property.

        20          MR. BELL:  I agree, your Honor.

        21          THE COURT:  And so we're going to have a hearing

        22     on what day?

        23          MR. BELL:  I believe it's July 1st.

        24          THE COURT:  So between now and July 1st, I just

        25     need to protect the property.  How many and what

08:01  1   dollars -- How much in dollars are we talking about

2   between now and July 1st to pay the renewal fees?

3            MR. BELL:  I'm not sure of the exact amount.

4   But let me give you kind of a little background to that

5   question.  That's a really good question, your Honor.

6   During the TRO hearing with Judge Lynn, part of this TRO

7   was Mr. Baron and Ondova are these bad guys and running

8   this enterprise, and they got the nuclear button and this

9   and that and he's the bleeding domain names.  They rushed

10  into federal court.  Meanwhile, there is a state court

11  proceeding they could file a motion to enforce and in fact

12  has been a motion to enforce.  This MOU that you have in

13  front of you has been filed in state court, and there are

14  live pleadings in state court.  There was the California

08:02 15  court, Virgin Islands twice.  They appealed to a

16  California court and lost.  Lost in California court.

17  This is like the fifth, sixth, seventh -- I don't know how

18  many times they have run in federal court.  We have a

19  state case that's still live and pending that we can get

20  this thing resolved.

21           THE COURT:  Does the state court judge have a

22  hearing before I do?

23           MR. BELL:  I believe it's July 10th, your Honor.

24  And it's a motion to enforce.  And the case has been

25  pending on the docket for two or three years because they

08:02   1    have a bunch of these procedural backgrounds.

        2            THE COURT:  There a TRO or preliminary

        3    injunction pending in state court?

        4            MR. BELL:  No, your Honor, but we agree to the

        5    same order in state court.  With respect to judicial

        6    comity, I understand that they think they can bring it in

        7    this Court.  I think all of this can get resolved in the

        8    state court, and we can agree to a restraining order in

        9    the state court that's somewhat parallel to the order in

        10   this Court.

        11           Let me go back to my earlier point.  During the

        12   TRO when they rushed us -- When Mr. Baron, the thief in

        13   the middle of the night, has his finger on the nuclear

        14   button and deleting the domain names -- They ran into

08:03   15   Judge Lynn's court and said you got to stop domain names.

        16   By the way, we gave them plenty of warning.  We need money

        17   to keep these registration names, and they didn't do it.

        18   And Judge Lynn in a second -- I can give it to her.  She

        19   picked it up quick, and said, Hey, if Baron and Ondova are

        20   deleting domain names that are part of this portfolio

        21   before the split and coin flip, why don't you give them to

        22   the plaintiffs?

        23           And I said -- I don't have a problem with that,

        24   your Honor.  I don't have a problem with that.  And then

        25   they came back and said No, no, no, your Honor, a lot of

08:04   1    them are tied to trademarks.  He might give us a bunch of

  2    trademark names and our philosophies are different --

  3            THE COURT:  Your proposal was -- the only reason

  4    he was deleting the domain names was because he didn't

  5    have money to register them?

  6            MR. BELL:  Let's back up.  We have to make a

  7    qualifier.  Ondova is the registrar, a limited liability

  8    company --

  9            THE COURT:  Okay.  Regardless.  Somebody didn't

10    have the money.

11            MR. BELL:  Ondova cannot pay.  It's in the red

12    and doesn't have the money to pay for these registration

13    fees.

14            THE COURT:  Gee whiz, fellows, let's pay for

08:05 15    these things, keep these domain names -- Your suggestion

16    is instead of paying for them, Mr. Baron and Ondova just

17    transfer them over to Mr. MacPete's client?

18            MR. BELL:  Pending the coin flip and performance

19    and the underlying state court action, in order to keep

20    Ondova afloat.  They are already in the red with VeriSign

21    who's basically the God of .com and the .net registries.

22    And what he went in and did is, hey, try to figure out

23    what names are making a dollar because there is a business

24    between them, and I got plenty of evidence to show that

25    and e-mails, and you want to see it now or we can do it at

08:06 1   the PI hearing --

2          THE COURT:  I guess you guys -- I'm sorry.  You

3   and Mr. MacPete are both telling me more than I want to

4   know.  My question is how do we maintain the status quo.

5   You are saying Ondova doesn't have money.  And so he's

6   going to keep releasing these names as they come up for

7   renewal.

8          MR. BELL:  No, based on the past deletions there

9   is enough money in there to keep Judge Lynn's order in

10  place.  And basically what Judge Lynn and -- And Mr.

11  MacPete can correct me if I'm wrong.  But Judge Lynn said,

12  hey, two parts.  One, if you don't want the domain names,

13  Mr. Baron or Ondova, you can't afford to pay for them,

14  give them to the defendant.  The defendant didn't want

08:06 15  them.  They didn't want that liability, and we would have

16  taken them out of the portfolio and given them the coin

17  flip.  They would have gotten more.  I was okay with it.

18  But did they want that?  No.  So what they decided to do

19  was -- Judge Lynn asked me how many do you anticipate

20  deleting in order to keep VeriSign from canceling the

21  contract with Ondova who is the registrar?  And that puts

22  in question the whole portfolio.  That's really the issue

23  before the Court.  I said after those deletions there is

24  $2,500 to $7,500 that would possibly be deleted in between

25  now and the PI hearing, and I believe that's still the

08:07  1    case today.  And with respect to any domain names we

2    delete, we have to give the defendants a right of first

3    refusal, a 24 hour advance, right of first refusal on

4    whether or not they want to take those domains, but I

5    offered to give it to them anyway.

6              THE COURT:  That's about $52,000.

7              MR. BELL:  Twenty-five --

8              THE COURT:  $7,500 maximum at $7 a piece.

9              MR. BELL:  Yes.  So there is no irreparable --

10   That gets back to the whole irreparable harm thing.

11             THE COURT:  But if you lose the domain names,

12   that's the harm.

13             MR. BELL:  I agree, but we were willing to give

14   them to them.

08:08  15             THE COURT:  I'm glad.  For them that can't reach

16   any agreements, nobody wants to do what the other side

17   wants to do.  They don't want to take the names.  They

18   don't want to release the name.  You don't want to keep

19   the names.

20             MR. BELL:  We want to keep the names and work

21   with the client.

22             THE COURT:  You are litigating in three

23   different courts.

24             MR. BELL:  Four.

25             THE COURT:  And you want to work together?  I'm

08:08   1    having a hard time.

        2           MR. BELL:  I think we need to be locked in a

        3    room over the weekend and nail this out and get it done,

        4    and these people need to go on their separate ways.

        5           THE COURT:  There is no question about that.

        6           MR. BELL:  Put us in the jail.  I will sit in

        7    jail over the weekend, your Honor.

        8           THE COURT:  First of all, my main goal right now

        9    is to protect the property that's at issue, and if we've

        10   got $52,000 or something -- Say we've got $50,000 that we

        11   need to protect the property between now and July 1st.

        12   Somebody is going to have to pay that money, and we'll

        13   worry about what happens later.

        14          MR. RAWLS:  Your Honor, I think maybe I can give

08:09  15    the Court a short answer to answer the Court's question.

        16          THE COURT:  What is the answer?

        17          MR. RAWLS:  I don't know why the order that

        18   Judge Lynn made would not satisfy everyone between now and

        19   July the 1st.  I think Mr. MacPete -- the ever maybe it

        20   wasn't an order he would have drafted or me bullet it will

        21   protect the property.  The court asked how well protect

        22   the property between now and July 1st.

        23          THE COURT:  How.

        24          MR. RAWLS:  I represented to Judge Lynn that

        25   some of these names that were being deleted because there

08:10   1    was no money to pay because it's registrants hadn't paid

2    Ondova.  They were selected because they were worthless.

3    123 XYZ is not making money.  There was a complaint when

4    that was deleted, and that led to the TRO.  And Judge Lynn

5    said if they are not worth anything, give them to them.

6    And there was a problem and Judge Lynn fixed that and said

7    if you want to delete any names -- And our guess was 7,500

8    in that period.  She said up to 7,500 names.  During

9    business hours on a weekday if you were going to do that,

10   give them notice and then within 24 hours not to end on a

11   weekend or outside of business hours they have that much

12   time to basically step in and say we want those names, and

13   if that was going to happen, they would have to contact

14   the registrar of their choice which would contact Ondova

08:11  15    and arrange for the transfer and they would pay the

16   registration for the renewal fee.  We're saying they are

17   not worth anything.  They are costing us money.

18            THE COURT:  Mr. MacPete, is that working?

19            MR. MACPETE:  Yes, your Honor, and we're fine

20   with the order.  Mr. Bell was re-arguing the order because

21   he doesn't like the notion that we're picking and

22   choosing, but there is a reason for that and that's

23   because there are names which are currently under these

24   UDRP processes or cease and desist letters or actual

25   litigation from a trademark owner, and there is a species

08:11  1    of cyber squatting liability called --

       2              THE COURT:  Please, you guys know so much more

       3    than I do.  Judge Lynn put an order in place.  It will

       4    work.  Both sides agree.

       5              MR. BELL:  Yes, your Honor, absolutely.  I don't

       6    think your Honor needs to modify that order, and I'm okay

       7    with it, and I believe Mr. MacPete is as well.

       8              THE COURT:  You realize that order is an order

       9    of the Court.  So any failure to comply with that order is

      10    contempt, punishable by lots of dollars, punishable by

      11    possible jail, death.

      12              MR. BELL:  And death.

      13              MR. RAWLS:  The only part about that that I

      14    would ask the Court is to give us a ruling on the earlier

08:12 15    issue that Mr. MacPete raised.  There is this UDRP issue

      16    where my client has no choice if he wants to keep his

      17    accreditation with ICANN to change the registrant

      18    information, who owns the names.  And apparently there is

      19    another process that doesn't involve UDRP where a third

      20    party asserts a trademark claim to a name, and my client

      21    in that situation also has no choice, and basically this

      22    arises out of Judge Lynn's order on Friday that Mr.

      23    MacPete's client is concerned that my client would get in

      24    there to alter the date to alter the split.  They were

      25    concerned about alteration of data.  Judge Lynn said

08:13  1    nothing is going to be changed, no documents, nothing.  At

       2    that time that seemed reasonable, but I didn't understand

       3    at that time this technical property.  So we're asking

       4    this Court to enter Judge Lynn's order regarding the 24

       5    hour period of time that we have agreed is acceptable with

       6    the caveat that would allow my client to keep his

       7    accreditation where he hasn't changed a third party.

       8         THE COURT:  Is Mr. MacPete willing to defend

       9    that, defend --

      10         MR. RAWLS:  Mr. MacPete only raised the UDRP

      11    issue where there is an order issued by ICANN afterwards.

      12         THE COURT:  I understand he has a lawyer, Mr.

      13    Herrera, if I remember the name, who's defending all

      14    trademark issues.  Shouldn't you just give those over to

08:14 15    Mr. MacPete to defend, if I'm understanding you correctly?

      16         MR. BELL:  Your Honor, I think I can provide a

      17    little clarification.  There are third parties other than

      18    what Mr. Baron is a beneficiary and Mr. Krishan.  There

      19    are other people that say "You charge too much, too less,

      20    We want our domain name."  Maybe, like Judge Furgeson.

      21    You say, "I don't want Ondova to be my register anymore.

      22    GoDaddy.com is offering them for $2.99.  I want you to

      23    transfer them."  So somebody like your Honor would get on

      24    and say "Ondova you are charging too much, We want these

      25    domains transferred to Go Daddy."  If we don't comply with

08:15  1    your order, we're subjecting ourselves to liability, and

2    oh, by the way, we're subject to losing this ICANN

3    accreditation and to the extent that we're putting Ondova

4    in a precarious position because there is a potential risk

5    that Ondova is going to lose its ICANN accreditation which

6    would result, by the way, in putting the domain names at

7    risk.  So we need to act.

8              THE COURT:  So you are talking about names that

9    are not owned?

10             THE COURT:  Nothing seems simple in this case,

11   but couldn't somebody say this name is not on the list and

12   do what you need do?

13             MR. BELL:  Absolutely.  We will provide a copy,

14   and they can verify it and triple verify.  Whatever.  We

08:16 15   need to be able to act in due course, save our ICANN

16   accreditation and say what is consistent with the four

17   corners of that memorandum of understanding.

18             THE COURT:  What's the problem with that, Mr.

19   MacPete?

20             MR. MACPETE:  I'm not exactly sure what he's

21   proposing, your Honor.

22             THE COURT:  Apparently he is saying you don't

23   own it.  I come in and I own my domain name and he has

24   registered it, and I say I want to take this to a new

25   registrar.  You wouldn't have a problem with that, would

08:16  1    you?

       2            MR. MACPETE:  I wouldn't, and I think if they

       3    showed us a copy of the instruction from the customer to

       4    me, there would be no issue.  That's fine.  Same thing

       5    with the UDRP.  I don't think the TRO needs to be

       6    modified.  I think counsel can work on this cooperatively

       7    and show me the thing, and if there is an issue because

       8    they show me something that I think there is a problem --

       9    something untoward going on -- we can approach the Court.

      10            THE COURT:  But if you don't own it, it can't be

      11    under the restraining order.

      12            MR. MACPETE:  The restraining order is with

      13    respect to his entire registrar and the reason for that

      14    is, your Honor, the vast majority of the names of the

08:17 15    registrar are ours, but there is a dispute between the

      16    parties because Mr. Baron has been asserting he doesn't

      17    agree to the list he produced last year.  And remember,

      18    your Honor, he is the one that maintains this who-is

      19    database, which is the record title information for these

      20    domain names.  The reason I asked Judge Lynn for the order

      21    she gave me is because if he changes a name which is

      22    currently listed as Manila as the owner and he changes the

      23    registrar information to be Tom Jones and he registers Tom

      24    Jones at Email.com and sends an e-mail saying transfer

      25    this to Go Daddy he can cheat and take names which should

08:18  1    be split off the registrar.

       2          THE COURT:  But he is going to give you notice

       3    and evidence of the request by the third-party owner.

       4          MR. MACPETE:  I'm fine with that, your Honor.

       5          MR. BELL:  I want some clarification.  Is the

       6    burden on them to run down to the courthouse and say no,

       7    no, no?  Or is the burden on me to come --

       8          THE COURT:  The burden is on them.

       9          MR. BELL:  Okay.

      10          THE COURT:  You give them the notice.  I will be

      11    here next week, and so I guess, you know, I may see you

      12    twenty times next week.

      13          MR. MACPETE:  You probably won't see us at all.

      14    I imagine most of this is not going to be controversial,

08:19 15    and the number is about 500 out of 650,000 names.  I'm

      16    happy to have this procedure, and I think we understand he

      17    is going to give me evidence before they do anything, and

      18    if I'm okay, I will tell them that.  And if I have a

      19    problem, I will see your Honor.

      20          THE COURT:  Come to me.

      21          MR. BELL:  There is a couple of things I didn't

      22    agree with, but for the most part -- I would ask the Court

      23    right now based on it sounds like a total quagmire -- We

      24    have been in California court.  Mr. MacPete is licensed in

      25    California, and so am I.  Don't hold that against us.

08:19  1         THE COURT:  I like California.  Wish they had a

2      better system of governance, but I like California.

3            MR. BELL:  We're in a little bit of a quagmire,

4      and I think the best thing to do would be to order us

5      right now -- It sounded like I was quasi-joking, but we

6      need to get into a room and get this knocked out, and

7      we're ready, willing and able to perform in contravention

8      of Mr. MacPete's representation, and I'm not saying he

9      misrepresented.  We're ready willing and able to perform.

10     We want the case off the docket.  There is a state court

11     motion pending.  A motion to enforce in that court and I

12     don't believe, with all due respect to the Court, the

13     state court has jurisdiction on this.

14           THE COURT:  They do and I have jurisdiction,

08:20 15    too.  So I'll tell you what.  I am going to stay in this

16     case through the preliminary injunction, and there is an

17     order entered.  Nobody can violate it.  Anybody violates

18     it, you are all paying big dollars.  Not only corporately

19     but personally also.  You want to challenge the court

20     order, I have the marshals behind me.  I can come to your

21     house, pick you up, put you in jail.  I can seize your

22     property, do anything I need to do to enforce my orders.

23     I'm telling you don't screw with me.  You are a fool, a

24     fool, a fool, a fool to screw with a federal judge, and if

25     you don't understand that, I can make you understand it.

08:21   1   I have the force of the Navy, Army, Marines and Navy

        2   behind me.  There is a lot of playing games.  Both sides

        3   are probably completely complicit.  But it's time to

        4   resolve this.  If you don't want to resolve it, I can put

        5   you in jail.  I can hold you six months, twelve months,

        6   eighteen months, and I can do that, and if you want me to

        7   do it, I will be glad to do it, but you need to be serious

        8   about this.  There is a problem here that I do not

        9   understand.  It's really beyond my comprehension, and I

     10   actually am not a completely dumb person.  So you need to

     11   get this resolved.

     12           MR. BELL:  I have been on the case eight days.

     13   So I'm not entirely complicit.

     14           THE COURT:  Everybody is to blame.  When you get

08:22 15   up in the morning look in the mirror.  Everybody is to

     16   blame here.  I'm going to hear you on the 1st, if I have

     17   to, but in the meantime, there needs to be two adults, one

     18   on each side, that figures this out.

     19           MR. BELL:  Do you think, your Honor -- I mean I

     20   would make an oral motion before the honorable court maybe

     21   to order a mediation and get this thing out and off your

     22   docket.

     23           THE COURT:  There is no question that's what

     24   needs to be done.  Apparently, there is a lot of money to

     25   be had here.  Let's not be greedy.  Let's get this done

08:22  1    and figure it out.  I'm not going to order you to do

2    anything.  You can do absolutely nothing until you show up

3    on the first.  But on the 1st, the door is shut, and

4    everything ends, and I am going to enter orders that

5    nobody may like.  It may not be good for anybody.  I may

6    actually appoint a receiver and ask the receiver at the

7    expense of all the parties to find a new registrar.  I'll

8    order Ondova and Mr. Baron to put every domain he's got in

9    with the new registrar.  I'll have the new registrar

10    protect these names, and then we'll just wait for a trial

11    in five or six years and go from there.  So you know,

12    there is things I can do.  I'm sure the receiver won't

13    cost more than two or three hundred thousand dollars,

14    maybe half a million.  But I know you have the money

08:23 15    because these things are valuable.

16         MR. BELL:  I think that's the low end.

17         THE COURT:  A million dollars.  I'm sure there

18    is a good receiver out there that would love to have this.

19    So at any rate, you know -- You know, don't give us what

20    you think is your rightful interests.  But I'm telling

21    you, the Court's are going to resolve this.  You are not

22    going to resolve ex parte or at a whim.  The courts are

23    going to resolve it, and if you don't like what the courts

24    do, we can pick you up on the street and put you in jail.

25    That's the way it works.  So it's time to get serious here

08:24  1    and time to understand that once the Court steps in,

       2    that's it, and I've got this case, and I'm keeping it.  So

       3    you want to screw with me, have at it.  But I can put you

       4    in jail, and I will do it, and I can also take all of your

       5    money away from you.  I can look at all of your financial

       6    statements.  I can take every penny you've got if I think

       7    you are doing stuff that's unlawful, illegal, fraudulent

       8    and whatever.  So let's don't test me here.  And at the

       9    same time if you think you are right, litigate it.

      10    Litigate it to the cows come in, but don't screw with the

      11    courts.

      12            That's where we are, Mr. Bell.  You don't have

      13    to do anything this weekend.  You can play all next week,

      14    but on the 1st something is going to happen.

08:25 15            MR. BELL:  If I may.

      16            THE COURT:  Sure.

      17            MR. BELL:  How much time do we have for the

      18    preliminary injunction hearing?

      19            THE COURT:  A day.

      20            MR. BELL:  Right now, unless we can get this

      21    thing resolved which is my intention, I think Mr. MacPete

      22    would agree we can bang it out over the weekend.  I have

      23    just gotten on the case.  My client is going to appear.  I

      24    would ask that you order the plaintiff, especially Mr.

      25    Munish, to appear as well.

08:26  1          THE COURT:  It would be a mistake not to appear.

       2     People don't want to appear, that is fine.  But I don't

       3     hear their testimony, I don't hear their side of the

       4     story, their chance of winning gets diminished greatly.

       5          MR. BELL:  I just want to make sure that Mr.

       6     Krishan is going to be here, and I'm worried my subpoena

       7     is going to be ineffective.

       8          THE COURT:  If you have a subpoena that you have

       9     served for people to be here on the 1st, I'll send the

      10     Army out.

      11          You guys are spending lots of money that you

      12     might be able to use in a more profitable way.

      13          MR. BELL:  I agree.  I'm trying to bang

      14     everybody over the head.  I think Mr. MacPete is, too.  We

08:26 15     want to bang this out.  We really do.  In good faith,

      16     trying to work it out and get this case done without

      17     judicial intervention.

      18          THE COURT:  Just remember this is not a

      19     self-help problem.  This is a court problem, a lawsuit

      20     problem.  So anybody decides they can go and help

      21     themselves to some remedy, you have a problem, come to

      22     court.  No self-help.  Somebody doing something because

      23     there is a problem, I'm here.  I'll be here all next week

      24     if there is a problem.  If somebody needs money to pay for

      25     these things, whatever, whatever, let's work it out.

08:27   1           MR. BELL:  I agree, your Honor.

       2           THE COURT:  You know for grown people -- I guess

       3  this is what happens when money is at stake.  People

       4  completely lose their understanding of how things are to

       5  operate, but you can't do that, and just so everybody

       6  understands where we are, understands what my authority

       7  is, my authority is to make sure we have the rule of law

       8  in effect, and that means people just can't go start doing

       9  things they want to do regardless of contracts or

     10  agreements or court orders or whatever.  That's for both

     11  sides.

     12           Okay, Mr. Bell, sounds like you are ready to do

     13  something constructive.

     14           MR. BELL:  I'm going to do my best.

08:28 15           THE COURT:  Now, I am going to enter an order or

     16  you guys can prepare me a order placing -- not the

     17  defendant's motion to dismiss.  That will not be put under

     18  seal.  But all attachments to the motion to dismiss will

     19  be put under seal.

     20           MR. MACPETE:  Thank you, your Honor.

     21           MR. BELL:  Your Honor, did you say the

     22  defendants were responsible for that order?

     23           THE COURT:  Work it out.  Get Mr. MacPete to

     24  prepare it and approve it to you and send it to me.  He

     25  can e-mail it to Mr. Frye, and he'll copy it off, and I'll

08:29 1    sign it.

2              THE COURT:  Mr. MacPete.

3              MR. MACPETE:  As I told you yesterday on the

4    phone, these lawyers are not the problem, and I appreciate

5    Mr. Bell's representations to the Court that he wants to

6    work with counsel and he wants to get something resolved

7    without the necessity of the Court intervening.  With all

8    due respect to Mr. Bell, this is the seventh set of

9    attorneys in this case for Mr. Baron.

10             THE COURT:  That's fine.  But I'm the judge now,

11   and you are under my jurisdiction, and it's just a fool

12   that decides they are going to ignore a federal judge.

13   There are about 650 of us around the country, and you

14   can't hide.

08:29 15            So let's work this out.  Make sure the property

16   is protected, and nobody has to resolve anything.  I'll be

17   glad to do it.

18             MR. MACPETE:  We appreciate that, your Honor.

19   With respect to the state court because I want the court

20   to have the full picture of sort of what's been going on

21   post-settlement, there have been three TRO proceedings

22   which were brought by Mr. Baron and Ondova in the

23   underlying state court case.  All three of those TRO's

24   were denied.  In fact, at the temporary injunction hearing

25   which was held about two Fridays ago, his Honor Judge

08:30  1    Hoffman in the state court indicated that he thought the

       2    TRO's being brought by Mr. Baron were inappropriate

       3    procedures, and it was his view that probably the proper

       4    thing to happen is for his case to be dismissed and

       5    everybody to come here in the one court that had a

       6    pleading seeking to enforce the settlement agreement and

       7    get it done here.  That was what Judge Hoffman said in the

       8    state court.  They are correct that the U.S. Virgin Island

       9    parties have subsequently filed a motion to enforce the

      10    settlement agreement in state court.  With all due respect

      11    to those parties, that is an in appropriate procedure

      12    under Texas law.  It's clear you cannot file a motion to

      13    enforce and have the court decide that in some kind of a

      14    summary fashion.  You have to file a new lawsuit for

08:31 15    breach of the settlement agreement.  They are the

      16    plaintiffs in the state court, and Mr. Baron and Ondova

      17    have not filed a new complaint, even asserting -- an

      18    amended complaint even asserting a breach of the

      19    settlement agreement or asking for a declaratory judgment

      20    with respect to the settlement agreement or anything like

      21    that.

      22            THE COURT:  Do I not have all the parties at

      23    stake in this case?

      24            MR. MACPETE:  There are the U.S. Virgin Island

      25    parties who are parties to the settlement agreement, and

08:31 1    it's my understanding that they are currently

2    contemplating whether they are going to intervene in this

3    lawsuit.

4              THE COURT:  Why didn't you bring them in

5    initially?

6              MR. MACPETE:  To be honest with you, your Honor,

7    I didn't know how to do that.  They haven't breached the

8    settlement agreement.  They have been performing, and so I

9    didn't know how procedurally to get them in because we're

10   obviously the plaintiff because we're being aggrieved by

11   the breach that we allege the defendants have engaged in,

12   and they are not a defendant because they are not in

13   breach, and I don't represent them.  So I didn't really

14   know what to do.

08:32 15             THE COURT:  Well, you are in touch with their

16   lawyers, right?

17             MR. MACPETE:  I am, and that's how I know that

18   they are currently contemplating intervening in this

19   particular matter to essentially protect their interests.

20             THE COURT:  Well, they should be encouraged to

21   do so.

22             MR. MACPETE:  I have.  Because obviously they

23   have the same interest we do in having the settlement

24   agreement enforced, and I know their client would like for

25   the underlying litigation to be dismissed, and it hasn't

08:32   1    happened yet because the state court under the settlement

        2    agreement has to be able to sign that order against

        3    VeriSign to transfer the domain names, but I know the U.S.

        4    Virgin Island client is very interested in seeing that

        5    litigation dismissed.

        6              THE COURT:  That's fine.  Anything else from

        7    you?

        8              MR. MACPETE:  Actually we have given you a lot

        9    of background, and I know you are pressed for time.  You

       10    said you had an engagement at 9:30.  But we haven't talked

       11    about the discovery problems.  Can we come back a little

       12    later today?

       13              THE COURT:  No, let's go straight through.

       14              MR. MACPETE:  I appreciate that.

08:33  15              MR. BELL:  I have a hearing in another court by

       16    eleven.

       17              THE COURT:  I think I can knock out the

       18    discovery problems very quickly.

       19              MR. BELL:  Your Honor, may I approach for one

       20    housecleaning issue?

       21              THE COURT:  Why don't you and Mr. MacPete both

       22    approach, and we can with talk about discovery.

       23              MR. BELL:  I have one housekeeping issue I

       24    wanted to discuss before we get into the merits of the

       25    issue.

08:39 1        THE COURT:  That would be fine.

2              MR. BELL:  With respect to the plaintiff's TRO,

3        I don't have an issue with it.  The application or

4        anything.  But under the Federal Rules, there are three

5        plaintiffs, and there is a verification that I think is in

6        Manilla's file, and the plaintiff who brought the TRO is

7        Munish Krishan individually, and I don't have a

8        verification from him, and I'd like the Court to order him

9         -- The TRO is brought on his behalf -- order him to

10       verify his pleadings under oath in accordance with the

11       Federal Rules of Civil Procedure to the extent the Court

12       would accommodate my question.

13             THE COURT:  Okay.  Thank you.

14             MR. MACPETE:  Your Honor, I don't think that's

08:39 15 necessary.  We submitted sufficient evidence with our

16       motion, and obviously if that evidence is insufficient,

17       the court is going to rule against our motion on July 1st,

18       but I don't think Mr. Bell gets to dictate who my

19       witnesses are going to be or how I present my evidence.

20             THE COURT:  He's talking about a verified

21       complaint?

22             MR. MACPETE:  We don't have a verified

23       complaint.  I'm not even sure what he's talking about in

24       terms of verification.

25             THE COURT:  Cite me the federal rule that says

08:40  1    an application for TRO --

       2              MR. BELL:  I think --

       3              THE COURT:  I'm surprised we're having this

       4    problem.

       5              MR. BELL:  I have it here.  Number 7 in O'Connor

       6    on I think it's Page 80.

       7              THE COURT:  "TRO must be accompanied by verified

       8    affidavit or complaint."  I take it Mr. MacPete, you say

       9    that you have filed a declaration under penalty of

      10    perjury?

      11              MR. MACPETE:  Yes.  And what Mr. Bell's problem

      12    is he wants to dictate who my witness is.  If my witness

      13    was Mr. Munish Krishan and he provided the affidavit and

      14    complaint that shows -- What he wants to do is say Mr.

08:42 15    Krishan has to be the declarant, and there is no

      16    requirement, and I think it's inappropriate for him to try

      17    to dictate who my witnesses are.

      18              THE COURT:  It doesn't say that it must be by an

      19    affidavit or verified complaint as to all parties.

      20              MR. BELL:  That's true.  But there is different

      21    parties.  I think Munish is the corporate rep for Manila

      22    and Netsphere.  He can't possibly testify in a TRO

      23    personal knowledge of what Munish Krishan is alleging and

      24    Munish Krishan is one of the movant's in this TRO who has

      25    personal knowledge of what's been the four corners of this

08:43   1    TRO.

       2          THE COURT:  Well, let me do this.  You file by

       3    Monday -- You file a motion to strike or whatever motion

       4    you want and show me in the complaint what must be

       5    verified by the other party, and I'll look at it on the

       6    pleadings.  Here you go, Kevin.  Give me a written motion

       7    with authority with what you think is not appropriately

       8    covered in the TRO.  Then I will take it from there.

       9          THE COURT:  Okay.  Mr. MacPete.

     10          MR. MACPETE:  One thing Mr. Bell said which I

     11    think we needed to clear up with the Court had to do with

     12    Ondova, and you remember that he was suggesting to the

     13    Court that Ondova was just the registrar and Mr. Baron is

     14    the beneficial owner of these domain names and Mr. Krishan

08:44  15    is the beneficial owner of these domain names.  And with

     16    all due respect to Mr. Bell, the issue of who the actual

     17    owner is prior to the settlement agreement actually being

     18    performed is a highly contested issue or it was in the

     19    underlying cases.  For instance, your Honor, in the fifth

     20    amended petition which was filed in the underlying state

     21    case, Ondova, not Mr. Baron, took the position that Ondova

     22    was the owner of the entire portfolio.  So with all due

     23    respect to Mr. Bell, if you listen to the plaintiffs in

     24    this case, your Honor, they will tell you that prior to

     25    the settlement agreement they owned the whole portfolio.

08:45  1    If you listen to Mr. Baron, he would tell you that Munish

2    owns half of it, and I own half of it, and if you talk to

3    Mr. Baron at other times will he would say Ondova owns the

4    whole thing.  It's a hotly contested here.  So the issue

5    of the registrar being a third party is not a complete

6    picture, your Honor.

7            THE COURT:  Of course, I don't understand this

8    process.  You know, when I talk about ownership of

9    property it means that somebody has their name on the

10   property.  Apparently it's not that simple.

11           MR. MACPETE:  Well, it's not that simple here,

12   your Honor, because of the self-help that occurred in the

13   underlying case.  If you looked at what the recorded title

14   to the domain names was on November 12, 2006 record title

08:46 15   to the domain names at issue was in Manila Industries,

16   Inc. and during the underlying litigation, Mr. Baron on

17   his own, went into his database records and changed the

18   record titleholder on all of our domain names or most of

19   them to set up the company he set up with somebody, called

20   TIPA, Texas Internationl Property Associates.

21           THE COURT:  I guess this is a paper trail, and I

22   can see all of it, and I can hear Mr. Baron's explanation

23   for what authority he had to do what he did.

24           MR. MACPETE:  Well, the difficulty with that,

25   your Honor, is unfortunately there is not a good audit

63

08:46  1    trail because the registrar is the only one that has the

2    records, and there is not sort of an historical

3    independent database that has this, and that's part of the

4    reason why we asked Judge Lynn not to change this who-is

5    information because he can disguise what happened, because

6    he's the only one who has these records.  I don't want to

7    delve too much.

8              THE COURT:  I take it that you all believe that

9    he won't violate a court order.

10             MR. MACPETE:  I believe your Honor has made it

11   clear what the consequence would be if he were to violate

12   this Court's order.

13             MR. MACPETE:  And I'm comfortable that we're

14   protected at the moment.  That being said, let's get to

08:47 15   the discovery problem we're having.  At the TRO hearing --

16   The final one in front of Judge Lynn because we did three

17   telephone conferences at the end of day.  At the final

18   one, Judge Lynn granted the TRO, and she was asked by Mr.

19   Bell to permit -- Mr. Bell asked the Court to order that

20   he get depositions of my three clients on three days'

21   notice and that he get document requests responded to on a

22   three-day notice for those three depositions.  And Judge

23   Lynn granted that request, and she made it mutual and

24   indicated I would have the right to take the deposition of

25   Mr. Baron individually and Ondova's corporate

08:48   1      representative on three days' notice and to have document

      2      requests responded to on three days' notice.  And the

      3      discovery period was due to start Monday of this week at

      4      8:00 a.m.

      5            THE COURT:  But the problem I understand is the

      6      document request.

      7            MR. MACPETE:  That is the problem.  So on Monday

      8      at 8:00 a.m., I got deposition notices at the same time I

      9      served deposition notices and document requests.  And the

    10      document requests I got from the defendant were 267

    11      requests long, and as I think your Honor characterized on

    12      the telephone yesterday that was more of a blunderbuss

    13      than a rifle shot.  The document requests I served were

    14      14.  And I understood when we were talking about expedited

08:49 15      discovery that we needed a rifle shot, that there is a

    16      limit of what people were to turn around in three days.

    17      So I asked very specifically for the documents which I

    18      thought I would need to prepare for the preliminary

    19      injunction, and then I got on the phone with Mr. Rawls,

    20      and we had a very frank discussion, very cooperative

    21      discussion, on Monday about what specific documents I

    22      thought I needed because I was aware that they are

    23      relatively new to the case and he may not have been

    24      familiar with the various sources of documents that fell

    25      within the categories I asked for.

08:49   1        At that time I also invited him to tell me

        2   specifically what documents he thought he needed, and I

        3   was very clear.  I said the Court was clear.  You are

        4   going to get discovery.  You are entitled to discovery,

        5   and you were not going to get jammed in preparing for the

        6   preliminary injunction.  So I will give you the documents

        7   that you need, but you need to tell me what they are.

        8   Because with 267 requests, most of them were outside the

        9   scope of the discovery that Judge Lynn ordered.  I said I

       10   need some guidance from you.  He said okay.  I'm not sure

       11   what I am going to need yet and could I have an idea of

       12   what you think is going to be relevant, and I said yes, I

       13   do.  And he asked me at that time if I would send him an

       14   e-mail the next day which listed the documents I was going

08:50  15   to voluntarily produce which I thought were relevant to

       16   their defense of the preliminary injunction.  I did that

       17   and had 14 categories of documents which I said I was

       18   going to be producing which I thought were relevant and I

       19   invited him in that e-mail to send me a response that says

       20   if there were any other documents which I hadn't

       21   identified -- and I certainly wasn't going to represent

       22   that I had got everything that he might think was

       23   relevant -- that I was willing to produce those things

       24   within the scope of discovery if he would just identify.

       25        On Tuesday, we had several conversations, but he

08:51  1   was not able to respond to that request for anything

2   further he needed, and then on Wednesday we probably spent

3   most of the day together trying to work out various

4   agreements on the order of discovery and that sort of

5   thing, but he was still unable to tell me what documents

6   he needed besides the ones I identified I was going to

7   produce.

8          THE COURT:  And so you still haven't resolved

9   the issue, and they still want 267 documents.

10          MR. MACPETE:  That's not even really the

11   documents.  We get to the deposition at ten o'clock.  His

12   client is supposed to sit for a deposition and my client

13   is supposed to sit for a deposition.  We agreed that we

14   would sit down prior to those depositions starting and

08:51 15   talk about where we are in terms of document production,

16   and at that time he was still not able to tell me that he

17   had a need for anything I had already produced.

18          THE COURT:  So there has been some limited

19   production by both sides?

20          MR. MACPETE:  We haven't exchanged, but we have

21   told each other what we have and are ready to produce.  So

22   he told me what he wasn't going to produce.  And I'll get

23   to that in a minute because that's what I need your help

24   on.

25          After that meeting which probably took an hour,

CASSIDI L. CASEY, CSR, 214-354-3139
UNITED STATES DISTRICT COURT

08:52  1    hour and a half, the defendants and their client went away

       2    and stayed in the room for about two or three hours

       3    working on any other documents that they thought they were

       4    going to need.  Essentially, what I had been asking them

       5    to do for the past three days, and they came up with a

       6    list, your Honor, between them and their client after

       7    spending hours of our deposition time doing what should

       8    have been done days earlier and said these are the things

       9    we think we need that weren't on your list Tuesday, Mr.

      10    MacPete.

      11            And after we got together and talked about it,

      12    there are ten items on this list and counsel amongst

      13    ourselves agreed that four of them weren't relevant and

      14    that one of them didn't have any documents that would be

08:53 15    responsive.  One of them I had already agreed I was

      16    actually going to produce.  And then the other two

      17    basically were things which I was willing to produce but

      18    were back in California because my people have flown here

      19    to comply with the Court's order to give depositions on

      20    Thursday.  And so I would get it to them as quickly as I

      21    could, but I was hamstrung, given they hadn't responded

      22    and asked for this earlier in the week.

      23            So that's where we are I think with respect to

      24    the documents they need from me.  I think we have pretty

      25    much agreed that I am providing the documents I said I was

08:53  1    going to provide them, and I will give them the other

2    documents they asked for as soon as I can get somebody in

3    California to prepare it.

4           So turning to the document request that I sent

5    to Mr. Baron, the first problem that we have is we had

6    document requests that specifically asked for the

7    financial information related to Mr. Baron individually,

8    and as we just got done talking about, your Honor, it's

9    all over the map about who in the underlying case was the

10   owner of these domain names.  So when Mr. Bell says it

11   should be the registrant that pays this instead of the

12   registrar.  Well it's not clear who the registrant is.

13   It's not been performed.  Then we will know.  But before

14   that, all you have is different allegations in the

08:54  15   underlying litigation and no clarity on who's actually,

16   quote, the owner.  So ultimately the registrar -- who's

17   one of the underlying claimants saying they own the whole

18   thing -- is the person that gets the bill from VeriSign

19   and ICANN, and the settlement doesn't say anything other

20   than the registrar paying the expenses, but they have

21   alleged it's supposed to be Mr. Baron and Mr. Krishan.

22   And as I read to the Court yesterday on the phone the

23   portion of the transcript in front of Judge Lynn in which

24   Mr. Bell represented in his view the registrant, the

25   people paying the fees are Mr. Baron and Mr. Krishan.

08:55   1   That being said, it made sense for me obviously to send
2   the document requests I did saying give me the personal
3   financial information of Mr. Baron because Mr. Baron has
4   claimed in the underlying litigation that he is the owner
5   of the domain names, and his counsel has represented to
6   Judge Lynn that he is one of the people who's supposed to
7   be paying for them.
8        And in fact, as I told your Honor, Mr. Baron and
9   Ondova were paid over 5.6 million dollars during the
10   pendency of the underlying litigation.  So when he comes
11   to this Court and says Ondova cannot pay for these domain
12   names and it's going bankrupt and domain names are going
13   to be lost, the veracity of that statement needs to be
14   tested.  And in our complaint, your Honor --
08:56  15        THE COURT:  Mr. Bell is taking the position that
16   Mr. Krishan is the owner and Mr. Baron is the owner.
17        MR. MACPETE:  That's correct, your Honor.
18   That's what he told Judge Lynn.  It's on Page 17 of the
19   transcript from the TRO hearing.  And he indicated that --
20   He said it's on the registrant's side which is Mr.
21   MacPete's clients and Mr. Baron, the beneficial owners, to
22   pay for the registration fees.  That's what he represented
23   to Judge Lynn.  That's what his client was telling him
24   last Friday.  I understand that his client is now telling
25   him something different and we're going to hear some kind

08:57  1          of a retreat from what was represented to Judge Lynn.

       2                 MR. BELL:  Your Honor, I need to fall on my

       3          sword.  Last Friday I was almost as confused as you are.

       4          Just to clarify, Baron individually -- Jeff Baron

       5          individually has never claimed ownership of the domains.

       6          Ondova has because it is like the noteholder -- If I own a

       7          house and I have a mortgage on it and I don't pay it, the

       8          noteholder has what right to foreclose on the home.  Same

       9          deal here.  The registrants weren't paying for the renewal

      10          fees, and so one of Ondova's contentions in the underlying

      11          state litigation was if you don't pay the registration

      12          fees we get to foreclose on your domain names, and that's

      13          part of the contract, and I can put that before the Court.

      14          Did I misstate something to Judge Lynn?  Yes, your Honor,

08:58 15          I did and I was just getting all the facts last week.  But

      16          did I say he was a beneficial owner?  The answer is, yes,

      17          but I made a mistake.  For that I'm sorry.  It was not

      18          intentional, registrant, registrars, everything was

      19          confusing to me.  And I probably misspoke, and I think

      20          additionally Mr. MacPete can attest that we sounded alike

      21          and talked over each other in that hearing, and we had a

      22          little bit of an issue with respect to the court reporter.

      23          But Mr. Baron has never personally or individually taken

      24          the position that he owns the domains personally.  I

      25          understand that he's about to make the argument alter ego.

08:59  1    It's in his complaint.  He's talking about corporate

      2    minutes and corporate books.  I'm a speaker at one of the

      3    Advance CLE Seminars on corporations, and nowhere in the

      4    Code does it talk about an LLC having to maintain

      5    corporate books and records, and in fact, that's one of

      6    the precise reasons why the legislature adopted the

      7    Uniform Limited Liability Company Act.  So their blanket

      8    allegation to try and pierce a corporate veil, alter ego,

      9    whatever the case may be, is a little bit disingenuous.

     10    You need to lay the proper predicate and prove that up,

     11    but at this point in time Jeff Baron has never claimed

     12    interest in the domain names.  The analogy would be a

     13    lender did take an interest in the domain names, just for

     14    clarification.

09:00 15              THE COURT:  Okay.  Let me look at the prayer

     16    here.  You've asked that we proceed -- that I proceed with

     17    the division of the domain names using the methodology set

     18    forth in the settlement agreement, execute and submit to

     19    the Court an agreed order where the Court will instruct

     20    VeriSign to effect the transfer of the shared Manila

     21    domain names to a registrar designated by Manila.

     22    Otherwise, comply with the terms of the settlement

     23    agreement, impose a constructive trust for the benefit of

     24    the Netsphere parties over all revenue generated by the

     25    defendant through their unlawful conversion, granting

```
09:01  1    Netsphere parties all relief.  So you are here to enforce

       2    the settlement agreement, correct?

       3            MR. MACPETE:  That's correct, your Honor.  The

       4    reason the financial issue is relevant, remember the TRO

       5    and preliminary injunction related to deleting domain

       6    names, and there was an absolute representation to the

       7    Court -- represented to Judge Lynn and your Honor here --

       8    that Ondova doesn't have money and Ondova can't pay for

       9    these domain names, and that's why Ondova should not be

      10    allowed to delete domain names and that's an issue they

      11    put in issue.  It's not true, your Honor.  He got 5.6

      12    million dollars during the underlying litigation, and he

      13    has the money to pay for the renewals.  They are not

      14    shooting straight with the court when they say Ondova is

09:01 15    bankrupt and can't pay.

      16            THE COURT:  Well, let me ask you this.  Mr. Bell

      17    says that under the agreement between Netsphere and Ondova

      18    you have to pay for the renewals of these domain names,

      19    your client.

      20            MR. MACPETE:  We don't have an agreement with

      21    Ondova, your Honor.

      22            THE COURT:  Who do you have an agreement with?

      23            MR. MACPETE:  We don't.

      24            THE COURT:  When you sign up with the registrar

      25    there is no agreement?
```

09:02   1           MR. MACPETE:  There was originally a

     2   registration agreement with Mr. Baron pre-underlying

     3   litigation.

     4           MR. BELL:  I'm sorry.  You can go right now on

     5   Budgetnames.com.  The agreement is actually on line if you

     6   would like to look at it.

     7           MR. MACPETE:  That's actually not the agreement

     8   we had because we had a specially --

     9           THE COURT:  When you signed up with somebody to

    10   register your domain names, there must have been a

    11   contract then, correct?

    12           MR. MACPETE:  There was a contract then,

    13   correct.

    14           THE COURT:  And that was between Netsphere and

09:03  15   Ondova?

    16           MR. MACPETE:  No, actually it was between Manila

    17   and Ondova.  And that was pre-underlying litigation.  So

    18   pre the last two and a half years in which we haven't had

    19   control or record title to our domain names.

    20           THE COURT:  At some point that agreement was

    21   vitiated.

    22           MR. MACPETE:  I think essentially by Mr. Baron

    23   when he took the domains in self-help back in November of

    24   2006.

    25           THE COURT:  Well, I don't know if there was an

74

09:03   1    underlying contract and assuming for the moment that you

2    are correct that Ondova Limited Company breached that

3    contract, that doesn't vitiate the contract.  It means

4    he's liable for damages.  The problem is the settlement

5    agreement hasn't been complied with.

6             MR. MACPETE:  That's true, your Honor.  What

7    we're talking about is whether or not Ondova as the

8    registrar who gets the bill from VeriSign and ICANN

9    actually has the resources to pay for those domain names,

10    and Mr. Bell preempted me because I was going to direct

11    your Honor to Paragraph 12 of our complaint.

12             THE COURT:  Okay.

13             MR. MACPETE:  As he told you, we allege in

14    Paragraph 12 of the complaint that Mr. Baron is the alter

09:04 15    ego of Ondova and liable for the acts of Ondova.

16    "Recognition of privilege of separate existence would

17    promote an injustice and gravitate against the plaintiff

18    because Mr. Baron has dominated and controlled Ondova as

19    follows:"  And then we go into a number of different acts,

20    only one of which is he hasn't adhered to the proper

21    corporate formalities for Ondova.  He has used the funds

22    of Ondova for personal things and a number of other

23    things.  The one thing I do agree with what Mr. Bell says

24    is I have properly alleged it, and I am entitled to get

25    discovery about this particular issue, and Mr. Baron has

09:05   1    decided on his own -- And so this is not counsel's

2    problem.  Mr. Baron has decided on his own that he doesn't

3    have to produce the financial documents which I asked for

4    under expedited discovery order from Judge Lynn because in

5    his personal opinion they are not relevant because he

6    doesn't think he's personally liable for paying those

7    domain name expenses.  That's a hotly contested issue, and

8    I'm entitled to discovery on it, and Mr. Baron's judgment

9    about what is relevant is, with all due respect, not

10    relevant here.  That's the first issue we're having is his

11    refusal to turn over to counsel and ultimately to me the

12    personal financial documents which I have requested, and

13    obviously that's going to include the wire transfer

14    receipts and everything else on this 5.6 million, plus his

09:06 15    other assets, which are going to demonstrate to the Court

16    that the representation he asked his counsel to make that

17    he and Ondova are unable to pay the renewal fees are

18    false.

19          MR. BELL:  Your Honor, if I may respond.  In the

20    complaint it says Baron is the President and Chief

21    Executive Officer of Ondova.  Mr. MacPete made the

22    representation this is only one issue with respect to

23    referring to corporations versus LLC's.  First of all,

24    there are no officers and no directors of an LLC.  There

25    are members and managers.

09:07  1                Now, with respect to B, he also represented to

       2      the Court in all the three years of litigation or four

       3      years and millions of dollars spent with Locke Lidell and

       4      Sapp that no discovery was taken.  Now, how does he know

       5      that Baron has commingled funds and other assets as a

       6      convenience to assist in evading obligations of Ondova?

       7      Ondova is a separate entity and Texas law recognizes that.

       8                And C, he says Baron has failed to adhere to

       9      corporate formalities for Ondova.  Last I checked State of

       10     Texas created this hybrid of LLC precisely for the reason

       11     that LLC does not have to comply with corporate

       12     formalities.  That's one of the main reasons to get around

       13     from the piercing the corporate veil standard that Mr.

       14     MacPete is alleging.  That's one of the issues.  He made a

09:08  15     representation to the Court there was only one.

       16                Here is Number 3.  Maintain minutes and/or

       17     adequate records.  That's not part of the Texas Business

       18     and Organizations Code.

       19                D, Baron diverted funds or other assets to

       20     Ondova.  Well, if there is no discovery taken despite the

       21     millions of dollars in legal fees, how can you make that

       22     blanket allegation?

       23           MR. MACPETE:  I'll be happy to tell you that,

       24     your Honor.  Mr. Baron has domain names of his own.  He

       25     licensed those domain names to my client Netsphere in the

09:08  1    underlying litigation.  For a long time he refused to

2    actually take delivery, if you will, of the money he was

3    owed under the licensing agreement by Netsphere, and what

4    he does is used Netsphere CFO as his personal paymaster,

5    and he asked her to pay personal expenses on his behalf

6    out of the money that was supposed to be paid to Ondova on

7    its domain name.  So on that, I am going to have to find

8    out what other things he has done in terms of using the

9    company money for his personal expenses, but I already

10    have evidence under my control that that behavior was

11    going on.

12            MR. BELL:  I made the representation that Ondova

13    is in the red.  And basically what they are trying to do,

14    it's a red herring and straw man argument put together,

09:09 15    and what they are essentially trying to do is -- It would

16    be like your Honor having a corporation, and your wife and

17    you individually.  You having a corporation or LLC.

18    Basically what he's trying to do is force you and your

19    wife to make a capital contribution to the entity to float

20    expenses or get a bridge loan which Ondova has done at

21    usurious interest rates to keep this thing afloat, and the

22    evidence will show that.  But to go beyond -- It would be

23    like asking for your financial records to force you to

24    make a capital contribution to you and your wife's

25    entities, and that's not appropriate, your Honor.  I don't

09:10  1    have an affirmative pleading other than the motion to

       2    dismiss.  The representation I made to the Court is Ondova

       3    is in the red and on the verge of bankruptcy.  And it's

       4    completely different from that of the plaintiffs, and Mr.

       5    MacPete will talk about this in a second.  He's going to

       6    refuse to produce Mr. Krishan's personal financial

       7    records.  Is that still your position?

       8            MR. MACPETE:  Of course, it's still my position.

       9            MR. BELL:  Your Honor, may I approach?

      10            THE COURT:  Let me talk to you for a minute.

      11    For the purposes of this enforcement of the settlement

      12    agreement, just for the purposes of enforcement, explain

      13    to me why we need this information, Mr. MacPete, for the

      14    purposes of the preliminary injunction.  I realize that he

09:11 15    said he didn't have the money.  But as I understand it --

      16    And Mr. Bell may be wrong here.  But I remember Mr. Bell

      17    saying any renewal fees have to be paid not by the

      18    registrar but by the owner.

      19            MR. MACPETE:  That's right and in the underlying

      20    litigation, your Honor, Mr. Baron personally claimed that

      21    he was the owner, and he also claimed on behalf of the

      22    corporation Ondova, whatever we're calling it, that Ondova

      23    was the owner.  So he had two essentially inconsistent

      24    positions in the underlying litigation.  But one of those

      25    positions was that he was the owner of 50 per cent of the

09:12  1    portfolio.  He, Mr. Baron, not Ondova.  And what he's been

2    doing here is hiding behind the corporate entity while he

3    essentially has been running everything.  As Mr. Bell

4    represented -- And I guess this was wrong when he said it.

5    Mr. Baron is the President of Ondova and I guess there are

6    no presidents of LLC's.  So I guess that was wrong.  But

7    I'm going off of what he has represented to the Court and

8    what's been represented in the underlying litigation.

9            THE COURT:  I'm almost to saying there is no

10    exchange of documents, zip, zero.  So we're not going to

11    do the financial statements right now.  You can ask him

12    all of those questions.  Neither side gets the financial

13    statements.  What else?

14            MR. MACPETE:  Then, your Honor, there is another

09:12 15    category of documents, and this has to do with the

16    database which is maintained by the registrar of the

17    record title, and that's information which he is required

18    to maintain.  It's actually public record.  So by ICANN

19    Rules you have to be able to go in and put in the domain

20    name and pull up that information.  And he's required

21    every week to electronically send a file to a third-party

22    escrow company.  So if there was an earthquake or fire or

23    something happened to his computers, that information is

24    backed up somewhere else.  It's publicly available

25    information, and it's information which he has to

09:13 1    specifically ask for.  Mr. Rawls represented to me that he

2    was not able to produce that information in time for his

3    deposition.  And there has been different representations

4    by different counsel about whether he actually had the

5    information.  So counsel prior to Mr. Rawls represented he

6    didn't have that information and was unable to produce it.

7    That story has now changed, but nevertheless I didn't have

8    the information to be able to take his deposition

9    yesterday, and that information is critical in figuring

10   out the problems with the list that had been alleged by

11   Mr. Baron in actually coming up with an appropriate list,

12   if you will.  If we go back to kind of the fundamental

13   problem of we've got a pile of domain names and under the

14   settlement agreement they need to be divided, you heard,

09:14 15   your Honor, earlier in this hearing there are three basic

16   categories of names on his registrar.  There are a small

17   number -- probably 300 or less -- people unaffiliated with

18   the parties here who happened to register a domain name at

19   his registrar.  Then about 3,00 he registered before he

20   ever met us.

21            THE COURT:  Excuse me.  It seems the great

22   problem we have here is getting some concurrence on what

23   is in the portfolio.

24            MR. MACPETE:  That's right, your Honor.

25            MR. MACPETE:  And to figure that out, we have to

09:15 1    have this who-is information.  That's basically where I

2    was heading.  We needed to have this who-is information

3    because that will then allow the counsel at least to weed

4    out the small number of clients who are third-party

5    clients and not part of this dispute at all.  Because

6    obviously those names should not be split or transferred

7    anywhere because they don't belong to any of the parties.

8          THE COURT:  Well, my view is anything that

9    relates to identifying the correct portfolio is subject to

10   discovery.  Why wouldn't that be the case, Mr. Rawls?

11         MR. RAWLS:  My client has some amount of his own

12   customers which he doesn't want his opponents to get their

13   hands on.

14         THE COURT:  The lawyers have a confidentiality

09:15 15   agreement.  That would be between the lawyers.

16         MR. BELL:  As long as it's mutual.  They've got

17   14 employees; we've got one.  I think they've got better

18   access to this information, a lot of this information than

19   we do.  Oh, by the way, they made the representation to

20   the Court, your Honor, that they were the original

21   registrant.  So they should have this information.

22         THE COURT:  So you want me to enter an order

23   saying we're going with their list and they will put it in

24   numerical order, and that's fine with you guys.

25         MR. BELL:  No, I don't think --

09:16   1          MR. MACPETE:  We would be happy with that.

        2     That's a matter of the relief we asked for on preliminary

        3     injunction, but if we could have it by agreement that

        4     would be great.

        5          THE COURT:  Give them anything that relates to

        6     what is in the portfolio is discoverable.

        7          MR. BELL:  I agree.  As long as it's subject

        8     to -- There is an issue with respect to violating federal

        9     laws and state federal criminal laws and state criminal

       10     laws.

       11          THE COURT:  You have a confidentiality order

       12     signed by the Court.  You ought to be safe.  And you

       13     shouldn't be violating any laws, and that would be

       14     entitled to highly confidential designation, eyes only,

09:17  15     for the lawyers.

       16          MR. BELL:  Very good.

       17          MR. RAWLS:  Your Honor, the who-is information

       18     that Mr. MacPete is asking about, I want to make sure --

       19     And I think the Court is on the perfect right track as far

       20     as helping us figure out what the portfolio is.  That has

       21     been the deal breaker for this deal.  This memorandum

       22     doesn't define it.  So everything has broken down from

       23     there.  But I do want to have some better direction about

       24     exactly what my client is going to have to produce in this

       25     expedited manner.  My client has represented to me that

09:17  1    the business Ondova which we will represent he is not the

       2    alter ego of used to have employees, programmers,

       3    administrators, office space.  The litigation has put so

       4    much pressure on the business it has one employee, and

       5    that's Mr. Baron, and apparently the document situation is

       6    very unwieldy.  And "chaos" might be the better term.  At

       7    least, that's what's represented to me.

       8            THE COURT:  How is Mr. Baron making these

       9    decisions about what is and what is not in the portfolio?

      10            MR. RAWLS:  I know he has had some assistance

      11    from a potential business partner who was in Texas for a

      12    while and no longer around.

      13            THE COURT:  Well, surely the registrar has some

      14    obligation here.  Declare bankruptcy.  You know, I'm

09:18 15    looking at this like a trustee.  A trustee is taken under

      16    certain obligations to maintain and protect property.  I

      17    would think the registrar is something like a trustee.  It

      18    has to maintain and protect property.  If it can't do

      19    that, unless it fails to do so, it needs to find somebody

      20    else to do this.  You know these are important things.  So

      21    I mean it's kind of alarming that you have a registrar

      22    whose obligation is to register and protect and renew this

      23    property.  They don't even know what the property is.

      24            MR. BELL:  Your Honor, real quick.  If Ondova

      25    was getting paid, we would be able to do it.  Ondova is

09:19  1    not getting paid to do the registrar thing.

       2              MR. MACPETE:  5.6 million dollars during the

       3    underlying --

       4              THE COURT:  If we have money problems, I can

       5    solve those.  I can have Mr. Baron and Mr. Krishan put in

       6    $25,000 a piece into the registry.  I don't know what the

       7    money problems are.  $50,000 a piece.  They are parties

       8    here so I can have them put in all the money I need to,

       9    $100,000 a piece into your --

      10              MR. BELL:  The registry of the Court?

      11              THE COURT:  No, into your funds.

      12              MR. MACPETE:  Your Honor, there is an easy way

      13    to solve the money problem, and it's provided in the

      14    settlement agreement.  These names are out there now

09:20 15    making money, maybe not much under Mr. Baron's control.

      16    But under the settlement agreement, that money is supposed

      17    to be divided between the parties fifty-fifty and that

      18    hasn't been done.

      19              THE COURT:  Who is getting it?

      20              MR. MACPETE:  A third-party monetization

      21    company, and that money has not been able to be dispersed

      22    because the defendants are refusing to issue the

      23    instruction to Hit Farm to give half to them and a half to

      24    us, and then there is other companies making money off

      25    these names by Mr. Baron.  He is -- We don't know what has

85

09:20  1    happened to that money.

       2              THE COURT:  How much money do I need right now

       3    to get this done?  How much money?

       4              MR. MACPETE:  The answer is, your Honor, nobody

       5    knows.

       6              THE COURT:  $100,000, $200,000?

       7              MR. MACPETE:  We don't know.

       8              THE COURT:  Half a million dollars?

       9              MR. MACPETE:  What we suggest is you issue an

      10    order that the defendants direct the monetization company

      11    who are monetizing or who are monetizing the names to

      12    interplead the funds into this Court, and the Court will

      13    have the money that's supposed to be divided under the

      14    settlement agreement, and the parties can come in and talk

09:21 15    about what ought to be done with that money.

      16              THE COURT:  It's a cumbersome process to put

      17    money in the registry of the Court.  You have a trust

      18    account?

      19              MR. MACPETE:  I do, your Honor.

      20              THE COURT:  Why don't we do that?  If we can't

      21    do that, Mr. Baron and Mr. Krishan are going to put

      22    $200,000 in your trust funds.  If we got money problems, I

      23    can solve the money problems.  We will put money in the

      24    trust funds and pay out what needs to be paid out.

      25              MR. MACPETE:  And $325,000 at least being held

09:22  1      by Hit Farm, and if the defendants essentially issue a

       2      directive along with me, they will wire that money in my

       3      trust account.  That's a perfect solution.

       4           MR. RAWLS:  The money problem is that we need to

       5      renew the names.  It's that simple.  And right now my

       6      understanding is the money that's being made off them from

       7      the advertising clicks and all of that is not enough to do

       8      that.  Mr. MacPete's clients want to take --

       9           THE COURT:  You told me $7,500.  That's $50,000.

      10      That's not correct --

      11           MR. RAWLS:  If we're just talking about the time

      12      period between now and the hearing, we have taken care of

      13      the money problem for that.

      14           THE COURT:  Why can't you give the information

09:22 15      on the portfolio?

      16           MR. BELL:  That's like 650,000 domain names.

      17      It's a big difference.

      18           MR. RAWLS:  We can give them information, Judge.

      19      I just want to limit the scope of it to tell me client

      20      exactly what he has to do.  I'm being told it's going to

      21      take time.  First of all, Judge, yesterday I got just as

      22      one chunk of documents those twelve hundred documents that

      23      represented only a small portion of names deleted before

      24      Judge Lynn's order.  I don't know exactly where these

      25      documents are.  And I don't know generally where they are.

09:23  1     This is a document-intensive case, data-intensive case

       2     printed out in some places and electronically in other

       3     places.  And without staff and programmers, my client is

       4     telling me he's going to have a hard time coming up with

       5     the broad categories they are asking for.  They want to --

       6     Believe me, I want to know what it is.

       7            THE COURT:  Your client can't tell us that?  He

       8     is the registrar and can't tell us what is in this

       9     portfolio.

      10            MR. MACPETE:  Your Honor, Judge Lynn had the

      11     same incredulity that you had, and she said, Mr. Bell,

      12     Either your client can produce it or I will issue an order

      13     that lets the plaintiff with all of their programmers and

      14     experts figure it out.  And if that's the answer, we'll be

09:24 15     happy to go over there and figure it out.

      16            MR. BELL:  For the most part, I will have to

      17     confer with my client.  But as a general rule, I don't

      18     have a problem with the concept.  They also own a

      19     registrar, and we've got some trade secret stuff like I'm

      20     sure he would disagree for us to go over to theirs.  I

      21     think my client would be agreeable to a neutral, and they

      22     would be agreeable to pull that information.

      23            THE COURT:  This doesn't make any sense.  For

      24     the registrar not to have a list of the portfolio.  It

      25     doesn't make any sense.  If he doesn't have the list and

09:25  1    he can't do the list, I'm sending them over.  I'll do what

2    Judge Lynn suggests.  So you either give him a list of

3    their portfolio, and if you don't have a list, I'm sending

4    people over to your computer.

5         MR. RAWLS:  Would the Court be amenable to

6    allowing us a reasonable amount of time, say, by the end

7    of today to make a decision about which of those things is

8    going to happen?  If they are going to get to do it, there

9    is not going to be a risk of client information.  If his

10   clients do it the, highly confidential part doesn't apply.

11        THE COURT:  That is true it doesn't apply.  But

12   it's not sensible for the registrar not to know what the

13   portfolio is.  As I say, he has to protect the property.

14   If he can't even know what the property is, that's a

09:26 15   problem.  Let me tell you, I don't mind sending a third

16   party over.  It would be at your expense, and Mr. Baron

17   will put the money into Mr. MacPete's account, whatever

18   that is, and I'll send the third party over, and we'll put

19   the third party under a highly confidential agreement, and

20   Mr. Baron will put the money in Mr. MacPete's account and

21   that's it.

22        MR. MACPETE:  Your Honor, this is a stall

23   tactic.  I'm not accusing these lawyers.  They were not

24   getting the story from their client.  These files are

25   electronic.  Every week he has to send out an electronic

09:26 1    file.  The idea that he doesn't have it, as your Honor

2    said, is ludicrous.  He has it in an electronic form, and

3    he doesn't want to produce it.  So he's telling his

4    lawyers he doesn't have it or not able to produce it, and

5    that's not true.  When we were in state court and dealing

6    with the prior lawyers, we all agreed this who-is

7    information needs to be produced.  That's how we get to

8    the bottom of what was a third-party customer name and

9    what needed to be split.  But they weren't able to get

10    their client to turn over the information, and so we

11    subpoenaed it from Iron Mountain, and he ordered the prior

12    lawyers to quash the subpoena so we couldn't get the

13    information.

14          THE COURT:  Do you have the capacity within your

09:27 15    law firm to do this?

16          MR. MACPETE:  Your Honor, to be honest I have no

17    idea whether anybody at my law firm can do it, and I know

18    my clients can do it.  If your Honor orders that he would

19    produce it or my clients get access, I feel confident he

20    is going to turn it over.

21          MR. RAWLS:  And I just want to know what we're

22    talking about, the who-is information.  I don't know all

23    the information necessary to pry the parties with the

24    basis of what the list is or isn't.  But whatever I want

25    to do is do it in a reasonable way.  Especially under the

09:28  1     time constraints.  So if we're talking about the who-is

       2     information and the last file he had to send to Iron

       3     Mountain that has the information in it, we can do that.

       4              MR. MACPETE:  Well, your Honor, I have three

       5     other things that are related to that.  He asked a good

       6     question.  Number one, we need the who-is information.

       7     That's essentially the record title stuff on all the

       8     domain names on his registrar so that we can sort out

       9     which are third-party customers and which are the names at

      10     issue.

      11              Second, I need a list of the domain names that

      12     he deleted, and Judge Lynn specifically said in the

      13     transcript that was something he was going to produce or

      14     she was going to give us access to his computers to figure

09:28 15     out.

      16              MR. RAWLS:  That's printed out.

      17              THE COURT:  Okay.

      18              MR. MACPETE:  Third, I need the financial

      19     information about what the domain names have been doing.

      20     He's been operating this stuff and not giving the money

      21     over under the settlement agreement, and we don't have any

      22     access to the data he's been getting about what money is

      23     earned and where it's going, and we need that.

      24              THE COURT:  And that's collected where?

      25              MR. MACPETE:  It's collected at the monetization

09:29   1    company, and in most circumstances he would have a log in

        2    at the monetization company that will allow him to log

        3    in --

        4                THE COURT:   So that would be ordering him to

        5    give authority to the monetization company to produce the

        6    information?

        7                MR. MACPETE:   Actually the easy way would be for

        8    him to give us the passwords for the various monetization

        9    companies that he's currently using, and we can get in and

        10   download the information.

        11               MR. BELL:   That's assuming he's using a

        12   monetization, and that's not the case.

        13               THE COURT:   Well, he can give them the codes,

        14   and if he is not using it, there will be nothing there.

09:30   15   Can you do that, Mr. MacPete?

        16               MR. RAWLS:   So it would be confidential?

        17               MR. MACPETE:   It's about their names.

        18               MR. RAWLS:   That would assume we have a list

        19   that we have already pared down.

        20               THE COURT:   I tell you, the problem is these are

        21   all things in the defendant's possession.  The defendant

        22   should have these in readily identifiable form.  If the

        23   defendant doesn't, I have to take extraordinary steps.

        24   All of this would be under the confidentially order, not

        25   under the highly confidential order, and your clients

09:30   1   cannot use this information for improper purposes at all.

2            MR. MACPETE:  Understood.  We would want it to

3        be confident.  It shouldn't be highly confidential.

4            THE COURT:  You can prepare the order, but I am

5        going to give you the who-is information, and I am going

6        to give you -- You already have the deleted names

7        information.  I am going to give you the information from

8        the monetization companies by giving you the passwords

9        codes and so forth.  I am going to give you that.

10           MR. MACPETE:  In addition to that, your Honor,

11       they represented to Judge Lynn that the names they deleted

12       were names that were worthless, not making much money.

13       That obviously means they had some kind of records or

14       reports or something from which he made the decision that

09:31  15   these are the bad names that I want to get rid of.  My

16       clients don't agree with that representation to the Court,

17       but we need to get his document on which he based the

18       decision to delete these domain names and see what he was

19       relying on when he told the Court these were bad names.

20       That's not the information we have.  So we need those

21       reports as well.

22           THE COURT:  You'll get those.  By three o'clock

23       this afternoon.  If Mr. Baron says he doesn't have the

24       ability to produce that information, then I'll send your

25       people in.

09:32 1            MR. RAWLS:  Your Honor, that question by my

2       client may depend on the date it is to be done by.  By

3       next Monday as opposed to Wednesday, depending on the

4       deposition going forward, that could affect his answer.

5            MR. MACPETE:  That was part of the reason why we

6       were here.  I was supposed to have his deposition

7       yesterday.  I had a court reporter waiting for hours and

8       videographer waiting for hours.  Some of them they said

9       we'll give you some of these documents, but you can't have

10      them until next Wednesday.  And I think they are still

11      going to ask the Court that their depositions are not

12      going until next Wednesday.

13           THE COURT:  Well, I will order all of that

14      information produced Tuesday by three o'clock in the

09:32 15      afternoon.  If it's not -- And by the way, you have to

16      make the decision by today at three, and if you make the

17      decision I can't do it by Tuesday at four, then we're

18      sending in Mr. MacPete's clients.

19           MR. MACPETE:  And I guess to the extent that

20      means we're going to start up with the deposition

21      schedules with their depositions next Wednesday, I come to

22      the last problem of we obeyed the court order.  We

23      listened to Judge Lynn.  We did what she asked us to do.

24      I produced my clients on three days' notice, and my

25      clients all live in California.  So I have four people

09:33  1   that had to fly out here to give corporate or individual

2   depositions pursuant to their notice at the last minute,

3   and that cost thousands of dollars in plane tickets.  And

4   yesterday when we should have been taking depositions with

5   documents, instead we were sitting around talking about

6   whether Mr. Baron felt like his personal financial

7   documents were relevant.  And I have court reporter time

8   and videographer time that got wasted.  Yesterday on the

9   phone you said what I am going to do is assess cost or

10   maybe order the depositions be taken in California.  I'm

11   not sure which way your Honor wants to go with that.  But

12   I would ask either as a result of the defendants having to

13   have this stuff moved on when we complied with the order

14   at great expense, that we be compensated for our

09:34 15   attorneys' fees and court reporter and videographer fees

16   and the travel costs or in the alternative that you order

17   these depositions to take place at my offices in

18   California so my clients don't have to incur the travel

19   expenses again.  But I would still be asking the Court to

20   order the time wasted yesterday reimbursed.

21          THE COURT:  Well, I'm not going to make a

22   decision about assessing cost.

23          MR. BELL:  Just so it's fair, may I say

24   something?  I had a deposition of Munish Krishan, and I

25   was ready, willing and able to perform on that, and I

09:35  1    haven't seen any documents.  I'm out money on

2    videographers, and I could have taken a certificate of

3    nonappearance, and I didn't because they were working it

4    out.  So we're out plenty of money, too.  I have had a

5    case, your Honor, with Judge Ramirez, and they are the

6    plaintiffs in this case, and because they are the

7    plaintiffs, they filed in the Northern District of Texas.

8    There is plenty of case law that the plaintiff even though

9    they are out-of-state residents, because they chose

10    this -- and I think it's Emkey versus Compana.

11         THE COURT:  You know, guys, you are arguing

12    about the shape of the table.  We're going to do the

13    depositions here, but could be somebody is going to pay a

14    lot of money before this is over about the cost.  We'll

09:35 15    take all the depositions.  Been a lot of expense.  People

16    are just completely spending treasurer in this case beyond

17    words.  This is why we're probably going to kill

18    litigation in this nation.  This is a great example of

19    why, because we can't agree to the shape of the table.

20         MR. BELL:  I say you hold us in contempt and

21    force us to the jail and beat us until --

22         THE COURT:  You do what you want to do.  I never

23    require people to do what they don't want to do.  If you

24    want to sit down and resolve the case, do.  If not, that's

25    fine.

09:36   1          MR. RAWLS:  I understand the Court is not going

2      to make a ruling on cost, but while I have the

3      opportunity, I think it's important that the Court

4      understand that I as an officer -- I have never been

5      before you.  I became involved in this lawsuit Friday

6      morning just in time for the first of three telephonic

7      hearings with Judge Lynn in which all of this was granted

8      and ordered.  And since then I have done nothing else but

9      try to figure this out.  And as soon as this Court moved

10     the hearing, I immediately tried to get the depositions

11     moved, and by that time it was already too late by a

12     matter of hours on the plaintiff's plane time.  I think I

13     made it clear that we needed more time to get the

14     documents done.  I don't want the Court to think I have

09:37  15     been stalling on behalf of anyone because I have not.

16          THE COURT:  You sound like you are good lawyers

17     an good guys an working hard but we have to break through

18     this.  Somewhere or another we have to figure out how to

19     resolve this case or get it in a position that a judge can

20     resolve this case.  If you don't want to do anything

21     between now and the 1st, except argue with each, that's

22     fine.  But on the 1st somebody is going to make a

23     decision, and you can do whatever you want.  My view is

24     we're going to take the depositions here.  I don't want

25     anybody to be calling me about this portfolio issue.  Mr.

09:38  1    MacPete gets what he wants, and if he doesn't get it on

       2    the portfolio issue, which is the crucial issue here, then

       3    there will be hell to pay.  And if you guys say we can't

       4    do it, then I'm sending his people in there.  That's fine.

       5    We can do it either way.  Judge Lynn made a good decision

       6    on that.

       7              MR. RAWLS:  With regard to giving them access or

       8    directing the monetization company to tell them how much

       9    money has been made on these names, my understanding is --

      10    And I don't know what all information they have.  I think

      11    there are only certain accounts that Ondova is a party to,

      12    and I don't know that they can instruct --

      13              THE COURT:  You are not going to instruct.  You

      14    are going to give the passwords so they can go directly.

09:39 15              MR. BELL:  I'd ask, your Honor, that they not

      16    interfere in any way with any money getting directed and

      17    the Court freeze whatever monies, if any, in any accounts.

      18              THE COURT:  Well, let me tell you, that money is

      19    not going out to inappropriate parties or anything.  I

      20    take it the monetization companies are just holding that

      21    money.

      22              MR. MACPETE:  We don't know, your Honor.  He's

      23    been moving these things around.  So your Honor is fully

      24    clear on what the situation is.

      25              THE COURT:  It's final.  You got the access

09:39  1    codes to all monetization companies that have anything to

2    do with your portfolio.  So you get all the access codes,

3    period, exclamation point.  And if Mr. Baron needs to do

4    something personally to call the companies, he's ordered

5    to do so.  He's ordered to make sure that you have access

6    to all the monetization companies.

7              MR. MACPETE:  Thank you, your Honor.  With

8    respect to the money that's currently being held, is the

9    Court ordering that the parties are going to --

10             THE COURT:  If they are just holding the

11   monies -- They are reputable, legitimate people -- we

12   don't have to worry about them doing something stupid.

13             MR. RAWLS:  I agree.

14             MR. MACPETE:  With respect to Hit Farm, your

09:40  15   Honor, I agree with that, and Mr. Cantner (phonetic) is

16   representing Hit Farm, and he's been working with all the

17   counsel.  So I'm comfortable with that.  There are two

18   other parking companies who have essentially refused to

19   agree that money is not going to be distributed to him

20   without our consent, and we have had to sue both of those

21   companies.  We have a state court lawsuit in California

22   against one and a federal court lawsuit in California

23   against the second.

24             THE COURT:  That is not an injunction issue.

25   That's just a damage issue.  If the money is being sent to

09:41  1    the wrong places, then, you know, that's a damage issue.

       2            MR. BELL:  Your Honor, I'd like to get their

       3    pass codes.  This is according to my client.  They've got

       4    a million dollars at Google.  Google is holding a million

       5    dollars in monetization funds, and I'd like to be able to

       6    get whatever information there is to that that relates to

       7    the portfolio.

       8            MR. RAWLS:  If that's true, we would like that

       9    because the settlement agreement requires a true-up of all

      10    monetary funds during the litigation.

      11            MR. MACPETE:  Your Honor, please go back to look

      12    at the settlement agreement because the settlement says in

      13    Paragraph 56 fifty-fifty true up of all monies paid during

      14    the litigation.  It's not all monetization monies at any

09:42 15    time in the past.  This Google money that they are talking

      16    about is something that's pre-litigation, pre-underlying

      17    litigation and not dealt with in the settlement agreement

      18    at all.  So we're trying to get a free fishing expedition

      19    of, hey, let's see what their clients may have at Google.

      20    It's got to be mutual.

      21            THE COURT:  No, no, it doesn't have to be mutual

      22    always.  As I understand Ondova is the registrar and

      23    directs the monetization companies to hold certain monies

      24    that come com from the portfolio.

      25            Now, what is the Google money?  Explain to me

09:42  1    how Ondova has some interest in the Google money?

 2          MR. BELL:  Because pursuant to the MOU, Google

 3    was one of the monetization companies -- When the

 4    parties -- When Baron and Krishan were partners and Ondova

 5    was serving as the registrant.

 6          THE COURT:  I understand there is --

 7          MR. BELL:  Basically during the life of the

 8    underlying litigation, there is a million dollars being

 9    held at Google that was made off of my clients' money and

10    their client.  And they are holding a million bucks and

11    trying to hide the ball from us.  So we want to make sure

12    that we get that information as well, your Honor.

13          THE COURT:  Show me in the MOU what we're

14    talking about.  It says here, after all monies held by

09:44 15    USVI entities -- And the US entities are HCB LLC; RIM LLC;

16    Simple Solutions LLC; Search Guide LLC; Blue Horizons LLC;

17    Four Points LLC; Novapoint, Inc.; and Iguana, Inc.

18          MR. BELL:  Paragraph 10.  It says "Any

19    monetization money" -- that would include Google --

20    "received by any of the parties," and they've got an

21    exclusive contract with Google with part of our money as

22    well of the Manila Portfolio which we're talking about

23    will be split fifty-fifty.  That means Google money, your

24    Honor.

25          MR. MACPETE:  Your Honor, with all due respect,

09:45  1    Mr. Bell is confused.  If you remember the underlying

       2    litigation started with Mr. Baron engaging in self-help

       3    and taking down our domain names, and he has operated our

       4    domain names from November 13, 2006 to today.  So there is

       5    no Google monetization revenues for him to get any

       6    discovery about.  I have nothing to produce because --

       7            THE COURT:  Excuse me.  Mr. MacPete, tell me

       8    what is the Google money.

       9            MR. MACPETE:  I'm not sure what his client is

      10    talking about, your Honor.  Like I said, we haven't had

      11    our domain names to monetize since the date he hijacked

      12    them.

      13            MR. BELL:  Your Honor, I want to be clear about

      14    this hijacking issue.

09:45 15            THE COURT:  What are the Google funds that you

      16    are talking about?  They come from the portfolio?

      17            MR. BELL:  They have been holding many -- Google

      18    has been holding money that the portfolio generated for

      19    the last couple of years.  That's number one.

      20            THE COURT:  Google has been holding money that

      21    the portfolio -- the Manila portfolio generated for the

      22    last couple of years.

      23            MR. BELL:  I need to clarify something real

      24    quick.  I think this might help you understand.  These

      25    guys were partners despite what Mr. MacPete said.

09:46 1          THE COURT:  They had a partnership agreement.

2          MR. MACPETE:  No.

3          MR. BELL:  The Search Guide Agreement.  I got

4     plenty of evidence on that.  But Mr. Krishan and Netsphere

5     and Manila sold their whole Manila portfolio for 4.2

6     million dollars to the USSI parties, and Mr. MacPete can

7     tell you -- How much did you get?  3.7 million dollars for

8     selling the portfolio.

9          MR. MACPETE:  He's arguing the underlying

10     litigation about whether the deal in the Virgin Islands

11     occurred or not.

12          THE COURT:  Give me an account of the Google

13     money under seal, and I'll take a look at it.

14          MR. MACPETE:  I don't have any to give you.

09:47 15     He's not making sense.  We haven't had the names since

16     November 13, 2006.

17          THE COURT:  Is there any money generated from

18     the domain names into some Google account?

19          MR. MACPETE:  And I don't have any of that

20     information.  If he wants to get discovery from Google,

21     that's fine.

22          THE COURT:  I'm asking you.  They are making the

23     representations.  You don't know whether there is at any

24     time during this time that the Manila Portfolio generated

25     money that is held in some way by Google?

09:48  1                    MR. MACPETE:  I think what he's talking about,

2       your Honor -- And it's nothing we had anything to do with.

3       Is when the portfolio was originally hijacked the first

4       monetization company that Mr. Baron sent the domains to

5       was a company called Oversea.com, and that's a

6       monetization company that uses a Google feed to make money

7       on domain names.  After the domain names were hijacked

8       because we were at Manila and Netsphere, those names were

9       licensed to Google.  So when Mr. Baron engaged in

10      self-help, he breached those agreements.  Google was

11      understandably pissed about the fact those names were

12      taken away.  So Google had a contract with Oversea, and

13      when Google found out that Oversea was now monetizing

14      names which Google already had under a license from my

09:49 15      clients -- I know this from second or third hand -- Google

16      told Oversea you don't have the right to monetize these

17      names.  So you have this in breach of our agreement with

18      Netsphere.  So we're not paying you.  And I understand

19      there is a lawsuit between the Virgin Island parties with

20      the Oversea Company about the payment of the money.  We

21      don't have an account at Google.  We didn't have anything

22      to do with Google telling them they weren't going to pay.

23      If he wants discovery about whether Oversea or Google has

24      the money, I'm cool with that, but I don't have the

25      documents.

09:50  1          MR. BELL:  Can I get the contract with Google

2     and whatever passwords they have, if any?

3          THE COURT:  Address it to me.  Address all

4     comments to me.

5          THE COURT:  What about Oversea?  What do you

6     have with Oversea?

7          MR. MACPETE:  We weren't the ones who did that.

8     He was the -- He has whatever pass codes or whatever that

9     was with Oversea.  That was being done in derogation of

10     our license rights.

11          THE COURT:  What is your contract with Google?

12          MR. MACPETE:  We have a contract with Google

13     that allows Netsphere to monetize third-party domain names

14     through Google's absence program.  And it's nothing to do

09:50  15     with this here.  All this is the defendant trying to

16     harass my clients with getting their confidential contract

17     with Google which has a penalty of death if you turn it

18     over to anybody.

19          THE COURT:  I'm entering an order that you let

20     me see Netsphere's contract with Google under seal in

21     camera, and I'll see what this has to do with this.

22     Otherwise, I wouldn't require anything to be done about

23     that.  So give me that by next Tuesday at ten o'clock.

24          MR. MACPETE:  Key point to remember.  After

25     November 13, 2006 we didn't have control of the portfolio,

09:51  1   and we didn't get any of the money.

       2           THE COURT:  You can attach an advisory with your

       3   in camera submission to me giving me whatever explanation

       4   you want.

       5           MR. RAWLS:  Your Honor, if we're finished

       6   talking with Mr. MacPete, the documents he wants from my

       7   client I am going to defer to Mr. Bell on any additional

       8   documents that he may want from the plaintiffs.

       9           THE COURT:  Okay.  What else, Mr. MacPete?

      10           MR. MACPETE:  I think that's it for the most

      11   part.  Let's hear what Mr. Bell has to say.

      12           THE COURT:  Mr. Bell.

      13           MR. BELL:  I'll talk to Mr. MacPete.  I have to

      14   commend him.  That 279 RFP is probably too much, but I

09:52 15   have to give it to him.  211 of them were done from Locke

      16   Lord.  They were so good I had to use them, but fifty of

      17   them were basically contention RFP's, and there have been

      18   allegations in this TRO talking about -- and it's brought

      19   up on behalf of every single plaintiff individually, and I

      20   understand you don't want to give out financial records,

      21   and we're okay with that.  But I need the corporations's

      22   financial records, and I think Mr. MacPete is agreeable to

      23   that because they are claiming the result is Netsphere

      24   parties are on the verge of bankruptcy, and anything

      25   having to do with the revenues, damages, anything like

09:53 1    that, irreparable harm.  Other than Munish's personal

2    records.

3           THE COURT:  I'm here to talk about what you

4    haven't agreed upon.

5           MR. BELL:  Yes, we're good.

6           THE COURT:  So if you have agreed on it, I don't

7    need to talk to you about it.

8           MR. BELL:  I wanted to make sure that was still

9    in play, your Honor.

10          THE COURT:  Anything else?

11          MR. BELL:  No, permission to withdraw, your

12   Honor.

13          THE COURT:  Permission to leave the battlefield.

14          MR. BELL:  May we be excused, your Honor?

09:53 15          THE COURT:  I want to see where we are in regard

16   to the depositions now.

17          MR. MACPETE:  Two things, your Honor, with

18   respect to that who-is information, a lot of that

19   information is kept electronically, and if it's kept

20   electronically, then I want it in electronic form.  If he

21   prints out 50,000 pages, I can't do anything with it.

22          THE COURT:  Electronic form is fine.

23          MR. MACPETE:  And your Honor indicated now under

24   West Texas Rules.

25          THE COURT:  If you can't agree, plaintiff gets

09:54  1    to take Mr. Baron's deposition first, and defendants get

       2    to take Mr. Krishan's deposition and whoever else is next.

       3    So you will do it in a series.

       4            MR. MACPETE:  Appreciate it.

       5            MR. BELL:  Your Honor, are we saying the

       6    depositions are going to start probably on Wednesday, is

       7    what I'm assuming?

       8            THE COURT:  That's what I'm assuming.

       9            MR. BELL:  That's the 25th.  I think we've got

      10    probably two, three, five -- I think we can get it in done

      11    in time.

      12            THE COURT:  Nobody is going to be resting on any

      13    weekends I don't think.

      14            MR. BELL:  Just real quick.  A couple of things

09:55 15    I need to go over my client wants produced.  If what

      16    Mr. -- I think I will be two more minutes, your Honor, if

      17    you don't mind.  It just got brought to my attention.  If

      18    they were the alleged owners and we hijacked it, I would

      19    like to get any registration or renewal information from

      20    them that's possible in an electronic format as well.

      21            THE COURT:  Well, in regard to portfolio

      22    information, both of you ought to be -- For example, you

      23    have a portfolio you think you own, Mr. MacPete.  That

      24    portfolio information and the domain names on that should

      25    be given to the other side.

09:55  1        MR. MACPETE:  I have told them that we were

       2  giving them that, and it has to be produced in electronic

       3  form?

       4        THE COURT:  Yes, everything in electronic form.

       5  Anything involving the portfolio of the Manila needs to be

       6  produced going both ways.

       7        MR. BELL:  With respect to money received from

       8  the disputed domain names from them, all revenues and

       9  checks, I would like those produced.  They are saying

      10  there are none, but I'd like to make sure --

      11        THE COURT:  Well, you are talking about since

      12  November of 2008 or --

      13        MR. BELL:  No, since 2004 is when these parties

      14  allegedly went into business together.  They are going to

09:56 15  have a lot of the Google information.  At one point, I

      16  think the portfolio was making 22, 24 million dollars a

      17  year when everybody was happy.

      18        MR. MACPETE:  This is a complete fishing

      19  expedition from the underlying litigation.  Their party

      20  has been directing the lawyers to try to reopen the

      21  litigation in the state court, and he asked for this

      22  discovery in the state court, and the judge told them no.

      23  This is an attempt --

      24        THE COURT:  Right now as far as I'm concerned,

      25  financial information is not going to be discovered by

09:57 1    either side.  I'm talking about -- I'm here being asked to

2    look at the settlement and MOU, and that's all I'm looking

3    at.

4              MR. BELL:  Your Honor, I think right now I'll

5    pass.

6              THE COURT:  Okay.

7              MR. MACPETE:  Thank you, your Honor.  We

8    appreciate your time today.  I'm sorry we went past your

9    9:30.

10             THE COURT:  I know you are working hard, but at

11   some point we have to do this and get the discovery done

12   and get the depositions taken and then show up here on the

13   1st.  It's not going to be an easy thing for me to try to

14   resolve this, but I am going to do the best I can.  My

09:58 15   main view is I take it this portfolio is valuable.  And so

16   if nothing else can be done, as I say, I can put all the

17   names in a receivership and put them under some other

18   registration, and then, you know, we can wait and see what

19   happens.  I don't know how much that will cost or

20   whatever.  But I want you to know my goal is protect this

21   stuff and not let it get lost in cyberspace.

22             MR. MACPETE:  Your Honor, if we're not able to

23   get the settlement agreement moving under the relief we

24   requested at the preliminary injunction, we will support

25   your idea that all the names should be given to a receiver

09:58   1    and have them operated by the receiver so they can be

  2    protected.  But I'm hoping we can get the settlement

  3    agreement moving with the lawyers -- and they are working

  4    hard -- or by a preliminary injunction.  But if not, a

  5    receiver is a good idea.

  6             THE COURT:  It may be at some point I could be

  7    challenged about deciding the injunction.  Then I can use

  8    my inherent powers, you know, to preserve the status quo

  9    and preserve the property and just wait for a damage suit.

10    I have some alternatives here that I can use.  But I don't

11    want everybody to think that if, for example, I don't

12    enter the injunction -- maybe it's not clear to me -- but

13    I am going to protect this property.  It's under my

14    jurisdiction.  I'm going to protect it and it seems

09:59 15    valuable to me, and as I say, we don't want it lost.

16    Don't think I am without any bullets in my gun because I'm

17    not.  So it seems to me in everybody's's best interest --

18    less expensive and everything else -- to figure out a way

19    to resolve the case.  If you can't, you'll come here.  No

20    self-help by anybody.  I'll keep this case under my

21    jurisdiction for ten years, and we'll let a receiver skim

22    everything off the top that the receiver needs to skim and

23    the registrar needs to take, and whatever is left, I will

24    put that in the registry of the Court, and you guys, may

25    be by 2050 I'll distribute it.  So at any rate, if there

10:00   1   is any value here, let's preserve it, and there sure ought

2   to be enough value to go around, and if there is not, a

3   receiver can tell me so five years from now.

4         MR. MACPETE:  That's exactly what we want.  We

5   thank you very much.

6         MR. BELL:  We're going to do our best to bang it

7   out.

8         THE COURT:  I saw three good lawyers today.  I

9   know that three good lawyers will do their best.  You

10   acquitted yourself well and I know you have been working

11   hard, but I wanted the clients here to let them know what

12   the deal is.  And I'm not going to let this stuff

13   disappear in cyberspace.  I am going to take charge of it

14   and save the value for whomever needs it, and if we have

10:01   15   to have a receiver every four or five years, if you agree

16   to a fifty-fifty split, I can dole the money out every

17   five years or something.  I'll get the receiver to kind of

18   do a numbers split, and I'll see which money goes with

19   which numbers and take it from there.  At any rate, the

20   maintain thing is the rule of law needs to prevail in this

21   matter.  It's very important.  We're all bound by the rule

22   of law, and if not, life is chaos and that's bad, and I

23   don't have the feeling with so many lawsuits and arguments

24   that we're making progress with the rule of law, and

25   that's my goal, and I think I can do it.  One way or the

10:02   1    other, I think I can do it.  Just remember, I do have

2    access to the Army, Navy, Marines and Air Force.

3           MR. MACPETE:  One last thing, your Honor.  My

4    clients reminded me that the deleted domain list that Mr.

5    Rawls said is 1,200 pages and that is something I think

6    electronically --

7           THE COURT:  Everything is to be exchanged

8    electronically.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T I O N

 2

 3      I, Cassidi L. Casey, certify that during the

 4   proceedings of the foregoing-styled and -numbered cause, I

 5   was the official reporter and took in stenotypy such

 6   proceedings and have transcribed the same as shown by the

 7   above and foregoing Pages 1 through 113 and that said

 8   transcript is true and correct.

 9

10      I further certify that the transcript fees and format

11   comply with those prescribed by the court and the Judicial

12   Conference of the United States.

13

14

15                        s/Cassidi L. Casey

16                        _____
                          CASSIDI L. CASEY
                          UNITED STATES DISTRICT REPORTER
17                        NORTHERN DISTRICT OF TEXAS
                          DALLAS DIVISION
18                        CSR NUMBER 1703

19

20

21

22

23

24

25
```

**< Dates >**
**April 26** 20:9, 21:21, 22:15
**April 29** 23:18, 24:4, 24:5
**July 1st** 32:16, 36:23, 36:24, 37:2, 42:11, 42:22, 59:17
**June 19, 2009** 1:15
**November 12, 2006** 62:14
**November 13** 18:3
**November 13, 2006** 18:13, 18:19, 101:4, 102:16, 104:25
**$100,000** 84:9, 85:6
**$2,500** 40:24
**$2.99.** 45:22
**$200,000** 85:6, 85:22
**$25,000** 84:6
**$325,000** 85:25
**$50,000** 42:10, 84:7
**$50,000.** 86:9
**$52,000** 42:10
**$52,000.** 41:6
**$7** 41:8
**$7,500** 40:24, 41:8
**$7,500.** 86:9
**$7.00** 36:2
**$7.02** 15:21, 30:1
**-numbered** 113:4
**.com** 14:5, 15:4, 15:16, 16:10, 39:21
**.net** 15:16, 39:21


**< 0 >**
**09-CV-0988-F** 1:6, 2:6


**< 1 >**
**1** 29:16, 113:7
**1,200** 112:5
**10** 30:11, 32:24
**10.** 100:18
**107** 36:5
**10:30** 6:19
**10th** 37:23
**11** 32:6, 33:5
**1100** 1:45
**113** 113:7
**12** 74:11, 74:14
**1201** 1:33
**123** 27:8, 43:3
**13,000** 26:16

**14** 65:17, 81:17
**14.** 64:14
**15D6L** 1:45
**16** 28:25
**16th** 25:25
**17** 69:18
**1700** 1:33
**1703** 113:21
**1st** 42:19, 50:16, 51:3, 52:14, 53:9, 96:21, 96:22, 109:13


**< 2 >**
**2** 22:3
**2004** 108:13
**2005** 14:13, 16:22
**2006** 14:3, 18:3
**2006.** 73:24
**2008** 108:12
**2050** 110:25
**20th** 9:22
**211** 105:15
**214-354-3139** 1:47
**214/293-2263** 1:41
**214/740-8662** 1:28
**214/939-8697** 1:35
**22** 108:16
**2200** 1:26
**23-hour** 20:9
**24** 41:3, 43:10, 45:4, 108:16
**25** 27:6
**25th** 107:9
**267** 64:10, 65:8, 66:9
**279** 105:14
**29th** 24:2


**< 3 >**
**3** 1:6, 2:6, 22:5, 23:20, 25:21, 28:24
**3,00** 80:19
**3.** 22:5, 76:16
**3.7** 102:7
**300** 80:17


**< 4 >**
**4** 21:1, 21:3
**4.** 20:22
**4.2** 102:5

**4.3** 35:15


**< 5 >**
**5.6** 32:8, 35:14, 69:9, 72:11, 75:14, 84:2
**50** 78:25
**50,000** 106:21
**500** 48:15
**56** 99:13


**< 6 >**
**615** 1:39
**6440** 1:39
**650** 55:13
**650,000** 48:15, 86:16
**659,000** 26:5
**670,000** 26:11


**< 7 >**
**7** 22:16, 33:16, 60:5
**7,00** 14:5
**7,500** 43:7, 43:8
**7.** 22:16
**75201** 1:27
**75206** 1:40
**75242** 1:46
**75270-2041** 1:34


**< 8 >**
**8** 29:16
**80.** 60:6
**8:00** 64:4, 64:8
**8:30** 6:19


**< 9 >**
**9** 24:6
**9,900** 27:9
**9,928** 26:21
**90** 17:4
**99.5** 11:19
**9:30.** 58:10, 109:9


**< A >**
**a.m.** 6:19, 64:4, 64:8

**ability** 92:24
**able** 25:12, 46:15, 49:7, 49:9, 53:12, 58:2, 66:1, 66:16, 79:19, 80:2, 80:8, 83:25, 84:21, 89:4, 89:9, 94:25, 99:5, 109:22
**above** 113:7
**absence** 104:14
**absolute** 14:17, 14:19, 72:6
**Absolutely** 34:12, 44:5, 46:13, 51:2
**accept** 24:17
**acceptable** 5:15, 7:18, 45:5
**access** 81:18, 89:19, 90:14, 90:22, 97:7, 97:25, 98:2, 98:5, 112:2
**accommodate** 59:12
**accompanied** 60:7
**accomplished** 32:18
**accordance** 59:10
**According** 31:5, 31:9, 35:15, 99:3
**account** 85:18, 86:3, 88:17, 88:20, 102:12, 102:18, 103:21
**accounts** 97:11, 97:17
**accreditation** 44:17, 45:7, 46:3, 46:5, 46:16
**accredited** 14:25, 15:2
**accurate** 24:23, 25:14
**accusing** 88:23
**achieved** 25:9
**acquitted** 111:10
**acronym** 15:12
**Act** 46:7, 46:15, 71:7
**action** 29:15, 29:20, 39:19
**acts** 74:15, 74:19
**actual** 43:24, 61:16
**Actually** 15:24, 16:15, 17:17, 21:11, 22:15, 23:9, 23:15, 25:24, 28:24, 50:10, 51:6, 58:8, 61:17, 67:16, 68:15, 73:5, 73:7, 73:16, 74:9, 77:2, 79:18, 80:4, 80:11, 91:7
**adding** 25:18
**addition** 3:23, 24:5, 92:10
**additional** 105:7
**additionally** 70:20
**Address** 10:9, 16:18, 18:10, 104:3

**addresses** 18:15
**adequate** 76:17
**adhere** 76:8
**adhered** 74:20
**administrative** 3:16
**administrators** 83:3
**adopted** 71:6
**adults** 50:17
**Advance** 41:3, 71:3
**advantage** 17:7
**advantaged** 28:19
**advertisers** 18:12
**advertising** 16:24, 18:11, 86:7
**advisory** 105:2
**affect** 93:4
**affidavit** 60:8, 60:13, 60:19
**affirmative** 78:1
**afford** 40:13
**afloat** 39:20, 77:21
**afternoon** 92:23, 93:15
**afterwards** 45:11
**agency** 15:25
**aggrieved** 57:10
**ago** 55:25
**agree** 10:12, 10:14, 12:10, 12:24, 17:24, 25:13, 25:20, 36:3, 36:20, 38:4, 38:8, 41:13, 44:4, 47:17, 48:22, 52:22, 53:13, 54:1, 74:23, 82:7, 92:16, 95:19, 98:13, 98:15, 98:19, 106:25, 111:15
**agreeable** 9:8, 87:21, 87:22, 105:22
**Agreed** 2:24, 3:3, 3:18, 3:19, 4:1, 4:17, 7:5, 8:3, 24:6, 24:11, 45:5, 66:13, 67:13, 67:15, 67:25, 71:19, 89:6, 106:4, 106:6
**agreement.** 20:25
**agreements** 22:23, 31:7, 33:5, 41:16, 54:10, 66:4, 103:10
**ahead** 3:15
**Air** 112:2
**AL** 1:6, 1:13, 2:5, 2:6
**alarming** 83:21
**alike** 70:20
**allegation** 71:8, 76:22
**allegations** 68:14, 105:18

**allege** 57:11, 74:13
**alleged** 19:9, 68:21, 74:24, 80:10, 107:18
**allegedly** 108:14
**alleging** 60:23, 76:14
**allow** 45:6, 81:3, 91:2
**allowed** 4:2, 15:2, 72:10
**allowing** 88:6
**allows** 104:13
**almost** 70:3, 79:9
**alphanumericized** 24:3
**alphanumericizing** 22:10, 24:1, 26:2
**already** 15:6, 39:20, 66:17, 67:15, 77:9, 91:19, 92:6, 96:11, 103:14
**alter** 44:24, 70:25, 71:8, 74:14, 83:2
**alteration** 44:25
**altering** 11:16
**alternative** 94:16
**alternatives** 110:10
**amenable** 88:5
**amended** 56:18, 61:20
**amongst** 67:12
**amount** 30:3, 37:3, 81:11, 88:6
**analogy** 71:12
**analysis** 26:14
**and/or** 24:24, 76:16
**announcements** 2:7
**answer** 42:15, 42:16, 70:16, 85:4, 87:14, 93:4
**answering** 34:23
**Anthony** 6:14
**anticipate** 40:19
**Anybody** 8:21, 32:23, 49:17, 51:5, 53:20, 89:17, 96:25, 104:18, 110:20
**Anyway** 17:22, 41:5
**apart** 25:12
**apologize** 7:2
**Apparently** 4:14, 13:23, 20:15, 23:13, 31:1, 31:4, 44:18, 46:22, 50:24, 62:10, 83:5
**appealed** 37:15
**appear** 52:23, 52:25, 53:1, 53:2
**appears** 6:14

**application** 59:3, 60:1
**apply** 88:10, 88:11
**appoint** 30:18, 51:6
**Appreciate** 55:4, 55:18, 58:14, 107:4, 109:8
**approach** 2:25, 20:13, 34:8, 47:9, 58:19, 58:22, 78:9
**approached** 16:22
**appropriate** 12:10, 12:25, 34:20, 56:11, 77:25, 80:11
**appropriately** 61:7
**approve** 54:24
**arbitrator** 11:8
**arduously** 27:3
**argue** 96:21
**arguing** 95:11, 102:9
**argument** 25:17, 36:8, 36:14, 36:16, 70:25, 77:14
**arguments** 111:23
**arises** 44:22
**Army** 50:1, 53:10, 112:2
**around** 20:1, 32:4, 55:13, 64:16, 76:12, 83:12, 94:5, 97:23, 111:2
**arrange** 43:15
**asserting** 47:16, 56:17, 56:18
**asserts** 44:20
**assess** 94:9
**assessing** 94:22
**assessment** 8:19
**assets** 75:15, 76:5, 76:19
**assist** 76:6
**assistance** 83:10
**Associates** 62:20
**assume** 91:18
**assuming** 74:1, 91:11, 107:7, 107:8
**attach** 105:2
**attached** 4:12, 7:1, 7:5, 8:14
**attachment** 8:11, 8:18
**attachments** 54:18
**attempt** 108:23
**attention** 107:17
**attest** 70:20
**attorneys** 6:22, 55:9, 94:15
**audit** 62:25
**authority** 54:6, 54:7, 61:7, 62:23, 91:5
**automatically** 12:17, 17:16

**available** 26:18, 27:25, 79:24
**avoid** 27:14
**aware** 10:7, 64:22
**away** 52:5, 67:1, 103:12


**< B >**
**Back** 7:8, 7:9, 14:3, 15:5, 28:2, 28:4, 29:16, 38:11, 38:25, 39:6, 41:10, 58:11, 67:18, 73:23, 80:12, 99:11
**backed** 79:24
**background** 14:3, 28:17, 35:4, 37:4, 58:9
**backgrounds** 38:1
**bad** 9:12, 36:13, 37:7, 92:15, 92:19, 111:22
**balance** 5:20
**ball** 100:11
**bang** 52:22, 53:13, 53:15, 111:6
**bankrupt** 69:12, 72:15
**bankruptcy** 78:3, 83:14, 105:24
**base** 16:14
**based** 40:8, 48:23, 92:17
**basic** 80:15
**Basically** 11:24, 21:6, 22:9, 24:9, 30:9, 39:21, 40:10, 43:12, 44:21, 67:17, 77:13, 77:18, 81:1, 100:7, 105:17
**basis** 89:24
**battlefield** 106:13
**beat** 95:21
**became** 96:5
**began** 23:4
**behalf** 2:10, 2:13, 4:11, 7:2, 7:3, 59:9, 77:5, 78:21, 96:15, 105:19
**behavior** 77:10
**behind** 49:20, 50:2, 79:2
**belief** 31:13
**Believe** 7:12, 8:2, 8:4, 31:14, 35:15, 36:23, 37:23, 40:25, 44:7, 49:12, 63:8, 63:10, 87:6
**believed** 12:4, 25:7
**Bell** 1:37, 1:38, 2:15, 6:11, 6:16, 6:18, 34:7, 43:20, 52:12, 54:1, 54:12, 55:5, 55:8, 59:18, 60:11, 61:10,

61:16, 61:23, 63:19, 68:10, 68:24, 69:15, 72:16, 74:10, 74:23, 78:16, 79:3, 87:11, 101:1, 105:7, 105:11, 105:12
**belong** 26:9, 81:7
**belonging** 25:14
**belongs** 27:21
**beneficial** 35:12, 61:14, 61:15, 69:21, 70:16
**beneficiary** 45:18
**benefit** 71:23
**besides** 66:6
**best** 24:21, 24:25, 49:4, 54:14, 109:14, 110:17, 111:6, 111:9
**better** 9:25, 25:16, 49:2, 81:17, 82:23, 83:6
**beyond** 50:9, 77:22, 95:16
**big** 25:17, 36:4, 49:18, 86:17
**bill** 30:2, 68:18, 74:8
**BISSELL** 1:25
**bit** 14:2, 34:25, 49:3, 70:22, 71:9
**Blackberry** 6:23
**blame** 50:14, 50:16
**blanket** 71:7, 76:22
**bleeding** 37:9
**Bless** 27:9
**Blue** 100:16
**blunderbuss** 64:12
**body** 11:4, 16:1
**bold** 32:11
**books** 71:2, 71:5
**bottom** 23:21, 89:8
**bound** 111:21
**breach** 19:4, 56:15, 56:18, 57:11, 57:13, 103:17
**breached** 57:7, 74:2, 103:10
**break** 96:17
**breaker** 82:21
**bridge** 35:25, 77:20
**bring** 10:1, 38:6, 57:4
**broad** 87:5
**broken** 82:22
**brought** 8:25, 20:5, 27:11, 27:12, 55:22, 56:2, 59:6, 59:9, 105:18, 107:17
**browser** 16:9
**bucks** 100:10
**Budgetnames** 73:5

**bullet** 42:20
**bullets** 110:16
**bunch** 35:12, 38:1, 39:1
**burden** 33:16, 35:17, 48:6, 48:7, 48:8
**Business** 3:11, 3:22, 4:8, 4:14, 4:19, 4:24, 16:23, 17:3, 17:6, 17:9, 17:11, 18:20, 18:21, 25:15, 39:23, 43:9, 43:11, 76:17, 83:1, 83:4, 83:11, 108:14
**businesses** 25:11
**button** 34:3, 37:8, 38:14
**buy** 15:18


**< C >**
**Caleb** 1:31, 2:13
**California** 19:20, 19:23, 21:25, 28:6, 29:1, 37:14, 37:16, 48:24, 48:25, 49:1, 49:2, 67:18, 68:3, 93:25, 94:10, 94:18, 98:21, 98:22
**call** 2:3, 98:4
**called** 10:21, 44:1, 62:19, 103:5
**calling** 78:22, 96:25
**camera** 104:21, 105:3
**canceling** 40:20
**Cantner** 98:15
**capacity** 89:14
**capital** 35:24, 77:19, 77:24
**care** 86:12
**carve** 29:18
**cases** 13:8, 13:10, 13:14, 20:1, 22:20, 22:25, 23:10, 29:7, 29:8, 29:12, 61:19
**CASEY** 1:44, 113:3, 113:15, 113:17
**CASSIDI** 1:44, 113:3, 113:17
**cast** 36:13
**catch** 17:20
**categories** 64:25, 65:17, 80:16, 87:5
**category** 3:9, 79:15
**Cause** 2:6, 113:4
**caused** 9:9
**causes** 29:15, 29:20
**caveat** 45:6
**cease** 43:24

**cent** 78:25
**Central** 1:39, 19:22
**certain** 4:12, 5:10, 83:16, 97:11, 99:23
**Certainly** 3:3, 65:21
**certificate** 95:2
**certified** 14:23
**certifies** 15:22
**certify** 113:3, 113:10
**CFO** 77:4
**challenge** 49:19
**challenged** 110:7
**chance** 35:6, 53:4
**change** 11:13, 11:24, 12:11, 12:25, 26:6, 44:17, 63:4
**changed** 12:23, 18:15, 45:1, 45:7, 62:17, 80:7
**changes** 47:21, 47:22
**chaos** 83:6, 111:22
**characterized** 64:11
**charge** 45:19, 111:13
**charges** 15:21
**charging** 45:24
**cheat** 47:25
**check** 9:15, 10:17
**checked** 76:9
**checks** 108:9
**cherry-picked** 27:13
**Chief** 6:13, 75:20
**choice** 24:14, 43:14, 44:16, 44:21
**choosing** 43:22
**chose** 95:9
**chunk** 86:22
**circumstances** 91:1
**Cite** 59:25
**Civil** 59:11
**claim** 33:19, 44:20
**claimants** 68:17
**claimed** 69:4, 70:5, 71:11, 78:20, 78:21
**claiming** 105:23
**claims** 19:11
**clarification** 45:17, 48:5, 71:14
**clarify** 70:4, 101:23
**clarity** 68:15
**CLE** 71:3
**clear** 8:12, 56:12, 61:11, 63:11, 65:3, 68:12, 96:13,

97:24, 101:13, 110:12
**clearly** 7:15, 27:9, 27:13
**Clerk** 4:4, 9:15, 10:17
**clicks** 86:7
**clients** 18:2, 18:17, 19:14, 19:18, 19:21, 22:17, 22:23, 25:2, 25:3, 25:10, 28:6, 63:20, 69:21, 81:4, 81:5, 86:8, 88:10, 89:18, 89:19, 91:25, 92:16, 93:18, 93:24, 93:25, 94:18, 99:19, 100:9, 103:15, 104:16, 111:11, 112:4
**close** 5:4
**Code** 71:4, 76:18
**codes** 91:13, 92:9, 98:1, 98:2, 99:3, 104:8
**coin** 22:12, 24:10, 27:21, 29:10, 38:21, 39:18, 40:16
**collected** 90:24, 90:25
**com** 16:8, 73:5, 99:24
**comes** 11:9, 11:23, 16:20, 69:10
**comfortable** 28:7, 63:13, 98:17
**Coming** 7:8, 29:25, 80:11, 87:4
**comity** 38:6
**commend** 105:14
**comments** 104:4
**Commerce** 1:45
**commingled** 76:5
**committed** 34:19
**Compana** 95:10
**companies** 84:24, 91:9, 92:8, 97:20, 98:1, 98:4, 98:6, 98:18, 98:21, 99:23, 100:3
**Company** 11:11, 27:22, 39:8, 62:19, 71:7, 74:2, 77:9, 79:22, 84:21, 85:10, 91:1, 91:2, 91:5, 97:8, 103:4, 103:5, 103:6, 103:20
**compensated** 94:14
**complaint** 7:25, 8:6, 8:7, 43:3, 56:17, 56:18, 59:21, 59:23, 60:14, 60:19, 61:4, 69:14, 71:1, 74:11, 74:14, 75:20
**complaint.** 60:8
**complete** 13:5, 22:11, 24:21,

29:17, 34:17, 62:5, 108:18
**complete.** 29:3
**completely** 50:3, 50:10, 54:4, 78:4, 95:16
**complex** 20:8
**complicated** 35:13
**complicit** 50:3, 50:13
**complied** 74:5, 94:13
**comply** 24:16, 44:9, 45:25, 67:19, 71:22, 76:11, 113:11
**composed** 27:3
**comprehension** 50:9
**Computer** 16:9, 17:15, 24:2, 88:4
**computers** 79:23, 90:14
**concept** 87:18
**concern** 7:23, 36:17
**concerned** 7:18, 8:20, 44:23, 44:25, 108:24
**concerns** 10:9
**conclude** 25:6
**conclusion** 26:15
**concurrence** 80:22
**confer** 7:16, 9:5, 87:17
**Conference** 1:20, 113:12
**conferences** 63:17
**conferred** 4:17
**confident** 89:19, 92:3
**confidential** 3:8, 3:21, 4:14, 4:19, 4:20, 4:23, 82:14, 88:10, 88:19, 91:16, 91:25, 92:3, 104:16
**confidentiality** 3:8, 5:9, 81:14, 82:11
**confidentially** 91:24
**conflict** 17:23
**confused** 70:3, 101:1
**confusing** 70:19
**consent** 98:20
**consequence** 63:11
**consistent** 46:16
**constraints** 90:1
**constructive** 54:13, 71:23
**contact** 43:13, 43:14
**contained** 7:19
**containing** 21:18
**contains** 3:21, 36:18
**contemplated** 29:4
**contemplating** 57:2, 57:18
**contempt** 31:20, 32:1, 32:13,

44:10, 95:20
**contention** 105:17
**contentions** 70:10
**contested** 61:18, 62:4, 75:7
**contract** 6:16, 15:11, 19:1, 19:4, 28:8, 40:21, 70:13, 73:11, 73:12, 74:1, 74:3, 100:21, 103:12, 104:1, 104:11, 104:12, 104:16, 104:20
**contracts** 54:9
**contravention** 49:7
**contribution** 35:24, 77:19, 77:24
**control** 17:11, 18:14, 73:19, 77:10, 84:15, 104:25
**controlled** 74:18
**controversial** 48:14
**convenience** 76:6
**conversations** 65:25
**conversion** 71:25
**cool** 103:24
**cooperative** 64:20
**cooperatively** 47:6
**copy** 8:21, 8:25, 20:13, 20:20, 46:13, 47:3, 54:25
**corners** 36:17, 46:17, 60:25
**corporate** 60:21, 63:25, 71:1, 71:2, 71:5, 71:8, 74:21, 76:9, 76:11, 76:13, 79:2, 94:1
**corporately** 49:18
**corporation** 77:16, 77:17, 78:22
**corporations** 71:3, 75:23, 105:21
**correct** 22:2, 28:21, 30:16, 34:22, 40:11, 56:8, 69:17, 72:2, 72:3, 73:11, 73:13, 74:2, 81:9, 86:10, 113:8
**correctly** 26:23, 27:6, 27:7, 45:15
**cost** 15:20, 51:13, 94:3, 94:9, 94:22, 95:14, 96:2, 109:19
**costing** 43:17
**costs** 94:16
**counsel** 2:24, 3:10, 4:11, 4:16, 6:8, 6:14, 26:3, 26:10, 36:3, 47:6, 55:6, 67:12, 69:5, 75:1, 75:11, 75:16, 80:4,

80:5, 81:3, 98:17
**country** 55:13
**couple** 2:19, 48:21, 101:19, 101:22, 107:14
**course** 14:10, 25:5, 26:24, 29:24, 31:18, 31:19, 32:9, 46:15, 62:7, 78:8
**courthouse** 10:1, 48:6
**courtroom** 4:16, 5:4, 5:14, 5:22, 7:13
**courts** 5:3, 29:4, 41:23, 51:22, 51:23, 52:11
**covered** 61:8
**cows** 52:10
**crazy** 30:25, 31:1
**created** 23:23, 76:10
**credit** 17:4, 17:7
**criminal** 82:9
**critical** 80:9
**crossed** 20:24
**crucial** 97:2
**CSR** 113:21
**cumbersome** 30:23, 30:25, 85:16
**currently** 26:19, 29:13, 43:23, 47:22, 57:1, 57:18, 91:9, 98:8
**customer** 24:24, 47:3, 89:8
**customers** 26:8, 81:12, 90:9
**cut** 36:8
**cyber** 44:1
**cyberspace** 109:21, 111:13
**cyberspying** 33:20

**< D >**
**Daddy** 35:22, 47:25
**Daddy.** 45:25
**DALLAS** 1:3, 1:27, 1:34, 1:40, 1:46, 19:7, 113:20
**damage** 9:8, 98:25, 99:1, 110:9
**damages** 33:19, 74:4, 105:25
**data** 44:25, 90:22
**data-intensive** 87:1
**database** 16:11, 18:9, 18:14, 47:19, 62:17, 63:3, 79:16
**date** 44:24, 93:2, 101:11
**day** 9:22, 25:25, 29:23,

29:25, 31:21, 36:22, 52:19, 63:17, 65:14, 66:3
**days** 22:5, 23:19, 25:23, 26:10, 29:23, 30:6, 33:13, 50:12, 63:20, 64:1, 64:2, 64:16, 67:5, 67:8, 93:24
**days.** 24:9
**deadline** 9:18, 9:19
**deal** 12:13, 18:1, 18:2, 18:22, 23:14, 25:2, 33:24, 70:9, 82:21, 102:10, 111:12
**dealing** 89:5
**dealt** 99:17
**death** 44:11, 44:12, 104:17
**decide** 56:13
**decided** 7:14, 11:5, 18:4, 23:13, 40:18, 75:1, 75:2
**decides** 53:20, 55:12
**deciding** 17:17, 110:7
**decision** 25:16, 88:7, 92:14, 92:18, 93:16, 93:17, 94:22, 96:23, 97:5
**decisions** 83:9
**declarant** 60:15
**declaration** 60:9
**declaratory** 19:8, 19:17, 19:24, 56:19
**Declare** 83:14
**deduction** 33:4
**defend** 22:17, 45:8, 45:9, 45:15
**Defendant** 1:15, 1:31, 7:2, 40:14, 54:17, 57:12, 64:10, 71:25, 91:21, 91:23, 104:15
**Defendants** 4:12, 6:9, 6:12, 6:13, 14:9, 22:8, 29:9, 30:5, 41:2, 54:22, 57:11, 67:1, 84:22, 85:10, 86:1, 94:12, 107:1
**defending** 45:13
**defense** 22:25, 65:16
**defer** 105:7
**define** 82:22
**delete** 41:2, 43:7, 72:10, 92:18
**deleted** 40:24, 42:25, 43:4, 86:23, 90:12, 92:6, 92:11, 112:4
**deleting** 38:14, 38:20, 39:4, 40:20, 72:5

**deletions** 40:8, 40:23
**delivery** 77:2
**delve** 63:7
**demonstrate** 75:15
**denied** 55:24
**depend** 93:2
**depending** 93:3
**deposition** 4:9, 36:12, 63:24, 64:8, 64:9, 66:11, 66:12, 66:13, 67:7, 80:3, 80:8, 93:4, 93:6, 93:20, 94:24, 107:1, 107:2
**depositions** 63:20, 63:22, 66:14, 67:19, 93:11, 93:21, 94:2, 94:4, 94:10, 94:17, 95:13, 95:15, 96:10, 96:24, 106:16, 107:6, 109:12
**derogation** 104:9
**designated** 71:21
**designation** 82:14
**desist** 43:24
**despite** 76:20, 101:25
**detailed** 8:19, 8:20
**determine** 22:13, 27:21
**determines** 11:8
**development** 17:1
**dictate** 59:18, 60:12, 60:17
**difference** 31:10, 86:17
**different** 17:12, 29:23, 39:2, 41:23, 60:20, 68:14, 69:25, 74:19, 78:4, 80:3, 80:4
**difficult** 7:21
**difficulty** 62:24
**diminished** 53:4
**direct** 24:12, 28:23, 74:10, 85:10
**directed** 22:24, 97:16
**directing** 24:7, 24:15, 97:8, 108:20
**direction** 19:16, 22:24, 23:8, 82:23
**directive** 86:2
**directly** 15:11, 97:14
**directors** 75:24
**directs** 11:24, 99:23
**disagree** 30:17, 87:20
**disappear** 111:13
**disclosure** 3:25
**discoverable** 82:6
**discovered** 108:25

**discovery** 4:10, 13:12, 28:16, 58:11, 58:18, 58:22, 63:15, 64:3, 64:15, 65:4, 65:9, 65:24, 66:4, 74:25, 75:4, 75:8, 76:4, 76:20, 81:10, 101:6, 102:20, 103:23, 108:22, 109:11
**discreet** 5:10
**discuss** 4:22, 58:24
**discussed** 13:22
**discussing** 4:10
**discussion** 4:7, 64:20, 64:21
**disguise** 63:5
**disingenuous** 71:9
**dismiss** 4:11, 6:4, 6:21, 7:11, 8:13, 8:22, 9:21, 10:13, 13:3, 13:25, 29:11, 54:17, 54:18, 78:2
**dismissal** 21:21, 29:1
**dismissed** 27:16, 27:17, 27:18, 29:8, 29:9, 56:4, 57:25, 58:5
**dispersed** 84:21
**dispute** 10:24, 11:1, 11:2, 17:25, 18:6, 47:15, 81:5
**disputed** 108:8
**distinction** 35:10
**distribute** 110:25
**distributed** 98:19
**DISTRICT** 1:1, 1:2, 9:24, 19:22, 95:7, 113:18, 113:19
**divers** 28:5
**diverted** 18:20, 76:19
**divided** 80:14, 84:17, 85:13
**dividing** 22:10
**DIVISION** 1:3, 71:17, 113:20
**docket** 37:25, 49:10, 50:22
**document** 20:18, 21:20, 23:19, 63:21, 64:1, 64:6, 64:9, 64:10, 64:13, 66:15, 68:4, 68:6, 69:2, 83:5, 92:17
**document-intensive** 87:1
**documents** 45:1, 64:17, 64:21, 64:24, 65:2, 65:6, 65:14, 65:17, 65:20, 66:5, 66:9, 66:11, 67:3, 67:14, 67:24, 67:25, 68:2, 75:3, 75:12, 79:10, 79:15, 86:22, 86:25, 93:9, 94:5, 94:7, 95:1, 96:14, 103:25, 105:6, 105:8

**doing** 2:17, 10:18, 52:7, 53:22, 54:8, 67:7, 79:2, 90:19, 98:12
**dole** 111:16
**dollar** 39:23
**dollars** 31:21, 32:9, 33:20, 35:15, 37:1, 44:10, 51:13, 51:17, 69:9, 72:12, 76:3, 76:21, 84:2, 85:8, 94:3, 99:4, 99:5, 100:8, 102:6, 102:7, 108:16
**dollars.** 32:1, 49:18
**domains** 20:7, 29:7, 41:4, 45:25, 70:5, 70:24, 73:23, 103:4
**dominated** 74:18
**done** 9:16, 12:17, 17:25, 22:9, 28:11, 29:6, 32:10, 33:11, 33:12, 42:3, 50:24, 50:25, 53:16, 56:7, 67:8, 68:8, 77:8, 77:20, 84:18, 85:3, 85:15, 93:2, 96:8, 96:14, 104:9, 104:22, 105:15, 107:10, 109:11, 109:16
**door** 7:13, 51:3
**doubt** 36:7
**down** 10:1, 17:2, 17:6, 18:19, 18:23, 19:6, 48:6, 66:14, 82:22, 91:19, 95:24, 101:3
**download** 91:10
**draft** 33:6
**drafted** 42:20
**due** 46:15, 49:12, 55:8, 56:10, 61:16, 61:22, 64:3, 75:9, 100:25
**dumb** 50:10
**During** 6:20, 32:9, 37:6, 38:11, 43:8, 62:16, 69:9, 72:12, 84:2, 99:10, 99:13, 100:7, 102:24, 113:3

**< E >**
**e-mail** 47:24, 54:25, 65:14, 65:19
**e-mails** 39:25
**earlier** 38:11, 44:14, 67:8, 67:22, 80:15
**earned** 90:23

**earthquake** 79:22
**easy** 84:12, 91:7, 109:13
**ECF** 9:24
**economic** 17:1
**effect** 54:8, 71:20
**effort** 24:21, 24:25
**ego** 70:25, 71:8, 74:15, 83:2
**eight** 50:12
**eighteen** 50:6
**Either** 4:5, 5:23, 87:12, 88:2, 94:12, 97:5, 109:1
**Electronic** 88:25, 89:2, 106:20, 106:22, 107:20, 108:2, 108:4
**electronically** 79:21, 87:2, 106:19, 106:20, 112:6, 112:8
**eleven.** 58:16
**Elm** 1:33
**EM/ECF** 10:5, 10:6
**Email** 1:29
**Email.com** 47:24
**Emkey** 95:10
**employ** 17:3
**employee** 83:4
**employees** 81:17, 83:2
**encouraged** 57:20
**end** 10:20, 13:16, 20:9, 32:11, 43:10, 51:16, 63:17, 88:6
**ended** 13:10, 13:16, 30:8
**ends** 51:4
**enforce** 37:11, 37:12, 37:24, 49:11, 49:22, 56:6, 56:9, 56:13, 72:1
**enforced** 28:8, 57:24
**enforcement** 78:11, 78:12
**enforcing** 7:21
**engage** 18:4
**engaged** 19:6, 57:11, 103:9
**engagement** 58:10
**engaging** 101:2
**enough** 17:25, 40:9, 86:7, 111:2
**enter** 45:4, 51:4, 54:15, 81:22, 110:12
**entered** 11:15, 22:21, 23:3, 23:11, 23:13, 23:19, 30:5, 32:6, 33:24, 34:18, 34:21, 49:17
**entering** 104:19

**enterprise** 37:8
**entire** 4:21, 5:13, 7:6, 7:13, 18:20, 22:10, 29:24, 36:10, 47:13, 61:22
**entirely** 24:23, 25:13, 50:13
**entities** 77:25, 100:15
**entitled** 65:4, 74:24, 75:8, 82:14
**entity** 76:7, 77:19, 79:2
**entry** 28:14
**equally** 7:18
**erroneously** 4:15
**escalated** 23:20, 24:4
**escrow** 79:22
**Especially** 52:24, 89:25
**Essentially** 4:5, 11:13, 12:12, 12:24, 13:13, 15:3, 15:20, 16:3, 16:13, 16:21, 17:22, 20:11, 22:24, 24:16, 27:24, 29:10, 29:22, 30:11, 33:8, 35:23, 57:19, 67:4, 73:22, 77:15, 78:23, 79:3, 86:1, 90:7, 98:18
**ET** 1:6, 1:13, 2:5, 2:6
**etcetera** 35:22
**evading** 76:6
**evening** 10:21
**Everybody** 12:24, 25:11, 50:14, 50:15, 53:14, 54:5, 56:5, 108:17, 110:11
**everybody's** 110:17
**everyone** 42:18
**Everything** 5:5, 5:6, 5:11, 5:18, 5:21, 13:4, 17:20, 51:4, 65:22, 70:18, 75:14, 79:3, 82:22, 108:4, 110:18, 110:22, 112:7
**evidence** 39:24, 48:3, 48:17, 59:15, 59:16, 59:19, 77:10, 77:22, 102:4
**evidentiary** 36:7
**ex** 51:22
**exact** 37:3
**exactly** 46:20, 82:24, 86:20, 86:24, 111:4
**Example** 5:11, 16:18, 95:18, 107:22, 110:11
**Excellent** 2:16
**except** 96:21
**exchange** 79:10

**exchanged** 28:16, 66:20, 112:7
**exclamation** 98:3
**exclusive** 100:21
**Excuse** 80:21, 101:7
**excused** 106:14
**execute** 71:18
**executed** 26:11
**Executive** 75:21
**exhibits** 4:12, 8:4, 8:14
**existed** 23:10
**existence** 74:16
**existing** 22:17, 22:21
**expedited** 64:14, 75:4, 82:25
**expedition** 99:18, 108:19
**expense** 51:7, 88:16, 94:14, 95:15
**expenses** 33:4, 33:7, 34:1, 68:20, 75:7, 77:5, 77:9, 77:20, 94:19
**expensive** 110:18
**experienced** 11:6
**experts** 87:14
**Explain** 78:12, 99:25
**explanation** 62:22, 105:3
**Expwy** 1:39
**extent** 7:20, 31:17, 46:3, 59:11, 93:19
**extraordinary** 91:23
**extremely** 8:8
**eyes** 3:10, 82:14

**< F >**
**face-to-face** 13:17
**fact** 14:19, 26:17, 28:13, 37:11, 55:24, 69:8, 71:5, 103:11
**facts** 70:15
**factually** 20:8
**failed** 19:14, 76:8
**fails** 83:19
**failure** 44:9
**fair** 94:23
**fairly** 17:18
**faith** 53:15
**fall** 70:2
**false** 75:18
**familiar** 64:24
**far** 82:19, 108:24

**Farm** 84:23, 86:1, 98:14, 98:16
**fashion** 25:10, 56:14
**fast** 33:12
**favor** 10:16
**Federal** 19:20, 20:5, 28:8, 37:10, 37:18, 49:24, 55:12, 59:4, 59:11, 59:25, 82:8, 82:9, 98:22
**Fee** 6:22, 15:21, 43:16
**feed** 103:6
**feel** 89:19
**feeling** 111:23
**fees** 33:13, 35:18, 35:20, 35:25, 36:1, 37:2, 39:13, 68:25, 69:22, 70:10, 70:12, 75:17, 76:21, 78:17, 94:15, 113:10
**fell** 17:22, 64:24
**fellows** 39:14
**felt** 28:7, 94:6
**fifth** 37:17, 61:19
**fifty** 105:16
**fifty-fifty** 22:7, 84:17, 99:13, 111:16
**fifty-fifty.** 33:3, 33:6, 100:23
**fight** 25:16
**Figure** 5:8, 5:12, 5:19, 5:23, 7:17, 9:8, 24:10, 34:3, 39:22, 51:1, 80:25, 82:20, 87:14, 87:15, 90:14, 96:9, 96:18, 110:18
**figured** 19:18, 34:2
**figures** 50:18
**figuring** 80:9
**file** 9:7, 9:17, 9:21, 10:14, 11:5, 19:3, 37:11, 56:12, 56:14, 59:6, 61:2, 61:3, 79:21, 89:1, 90:2
**filed** 3:17, 3:18, 4:2, 4:11, 4:15, 5:6, 6:4, 6:21, 6:24, 8:5, 8:8, 8:10, 8:17, 9:23, 13:4, 13:8, 13:14, 13:24, 18:5, 18:7, 19:7, 19:20, 19:24, 29:12, 37:13, 56:9, 56:17, 60:9, 61:20, 95:7
**files** 88:24
**filing** 9:25
**filings** 5:2
**filter** 17:19

**final** 20:25, 21:18, 63:16, 63:17, 97:25
**finally** 26:3
**financial** 33:16, 33:22, 52:5, 68:7, 69:3, 72:4, 75:3, 75:12, 77:23, 78:6, 79:11, 79:12, 90:18, 94:6, 105:20, 105:22, 108:25
**find** 6:6, 10:5, 30:18, 51:7, 77:7, 83:19
**fine** 12:23, 31:20, 43:19, 47:4, 48:4, 53:2, 55:10, 58:6, 59:1, 81:24, 95:25, 96:22, 97:4, 102:21, 106:22
**finger** 38:13
**finish** 7:17
**finished** 6:21, 105:5
**fire** 79:22
**firm** 89:15, 89:17
**firms** 9:10
**First** 12:6, 13:15, 20:23, 21:7, 21:15, 23:18, 27:20, 30:12, 34:6, 41:2, 41:3, 42:8, 51:3, 68:5, 75:10, 75:23, 86:21, 96:6, 103:3, 107:1
**fishing** 99:18, 108:18
**five** 51:11, 107:10, 111:3, 111:15, 111:17
**fixed** 43:6
**flip** 22:12, 24:10, 27:21, 29:10, 38:21, 39:18, 40:17
**float** 35:25, 77:19
**Florida** 23:5
**flown** 67:18
**fly** 94:1
**followed** 31:19, 31:20
**follows** 74:19
**fool** 49:23, 49:24, 55:11
**Force** 50:1, 77:18, 77:23, 95:21, 112:2
**forcing** 35:22
**foreclose** 70:8, 70:12
**foregoing** 113:7
**foregoing-styled** 113:4
**form** 89:2, 91:22, 106:20, 106:22, 108:3, 108:4
**formal** 21:20
**formalities** 74:21, 76:9, 76:12
**format** 107:20, 113:10

**forth** 34:16, 71:18, 92:9
**forward** 16:13, 29:11, 93:4
**fought** 22:6
**found** 103:13
**Four** 13:17, 33:20, 36:17, 46:16, 60:25, 67:13, 76:2, 93:17, 93:25, 100:17, 111:15
**Four.** 41:24
**fourteen** 8:24, 22:5, 25:23, 30:6, 33:13
**fourth** 21:11, 21:13, 21:14, 21:15
**frank** 64:20
**fraudulent** 52:7
**free** 99:18
**freeze** 97:17
**Friday** 44:22, 69:24, 70:3, 96:5
**Fridays** 55:25
**front** 37:13, 63:16, 68:23
**Frye** 2:3, 2:5, 3:14, 54:25
**full** 20:25, 21:17, 55:20
**fullest** 31:17
**fully** 97:23
**fundamental** 80:12
**funds** 32:12, 74:21, 76:5, 76:19, 84:11, 85:12, 85:22, 85:24, 99:5, 99:10, 101:15
**Furgeson** 1:21, 45:20


< G >
**games** 50:2
**gave** 38:16, 47:21
**Gee** 39:14
**general** 87:17
**generally** 86:25
**generated** 71:24, 101:18, 101:21, 102:17, 102:24
**gets** 12:21, 22:14, 24:11, 41:10, 53:4, 59:18, 68:18, 74:8, 79:12, 97:1, 106:25
**getting** 10:10, 70:15, 80:22, 83:25, 84:1, 84:19, 88:24, 90:22, 97:16, 104:16
**given** 30:19, 40:16, 58:8, 67:21, 107:25, 109:25
**giving** 90:20, 92:8, 97:7, 105:3, 108:2
**Glad** 2:16, 41:15, 50:7, 55:17

**goal** 34:4, 34:6, 42:8, 109:20, 111:25
**God** 39:21
**Godaddy.com** 45:22
**Godwin** 1:32
**Google** 99:4, 99:15, 99:19, 99:25, 100:1, 100:2, 100:9, 100:19, 100:21, 100:23, 101:5, 101:8, 101:15, 101:17, 101:20, 102:12, 102:18, 102:20, 102:25, 103:6, 103:9, 103:10, 103:12, 103:13, 103:14, 103:15, 103:21, 103:22, 103:23, 104:1, 104:11, 104:12, 104:14, 104:17, 104:20, 108:15
**gotten** 40:17, 52:23
**governance** 49:2
**government** 11:4, 15:25
**granted** 4:1, 29:3, 63:18, 63:23, 96:7
**granting** 71:25
**gravitate** 74:17
**great** 25:2, 80:21, 82:4, 94:14, 95:18
**greater** 33:16
**greatly** 53:4
**greedy** 50:25
**gross** 33:3, 33:9
**grown** 54:2
**guess** 6:17, 6:21, 7:2, 7:12, 21:13, 31:14, 32:4, 40:2, 43:7, 48:11, 54:2, 62:21, 79:4, 79:5, 79:6, 93:19
**guidance** 65:10
**Guide** 100:16, 102:3
**gun** 110:16
**guys** 9:2, 31:2, 37:7, 40:2, 44:2, 53:11, 54:16, 81:24, 95:11, 96:17, 97:3, 101:25, 110:24


< H >
**Half** 24:8, 24:13, 33:2, 34:1, 36:8, 51:14, 62:2, 67:1, 73:18, 84:23, 85:8
**hamstrung** 67:21
**hand** 19:15, 103:15
**handle** 17:12

**handling** 23:6, 33:17
**hands** 81:13
**handwriting** 21:4, 28:24
**handwritten** 22:4, 23:21
**happen** 3:14, 43:13, 52:14, 56:4, 88:8
**happened** 7:3, 13:14, 16:22, 18:8, 29:8, 58:1, 63:5, 79:23, 80:18, 85:1
**happening** 29:21
**happens** 11:23, 35:11, 42:13, 54:3, 109:19
**happy** 12:10, 48:16, 76:23, 82:1, 87:15, 108:17
**harass** 104:16
**hard** 3:13, 9:3, 42:1, 87:4, 96:17, 109:10, 110:4, 111:11
**harm** 41:10, 41:12, 106:1
**HCB** 100:15
**he'll** 54:25
**head** 53:14
**heading** 81:2
**hear** 36:9, 50:16, 53:3, 62:22, 69:25, 105:11
**heard** 80:14
**hearing** 4:4, 12:6, 32:16, 36:7, 36:21, 37:6, 37:22, 40:1, 40:25, 52:18, 55:24, 58:15, 63:15, 69:19, 70:21, 80:15, 86:12, 96:10
**hearings** 28:14, 28:16, 96:7
**held** 55:25, 85:25, 98:8, 100:9, 100:14, 102:25
**hell** 97:3
**help** 53:20, 66:23, 101:24
**helpful** 35:4
**helping** 82:20
**Herrera** 23:5, 23:7, 23:8, 45:13
**herring** 77:14
**hide** 36:10, 55:14, 100:11
**hiding** 79:2
**highly** 3:8, 61:18, 82:14, 88:10, 88:19, 91:25, 92:3
**hijacked** 19:19, 101:11, 103:3, 103:7, 107:18
**hijacking** 19:21, 101:14
**hired** 17:8, 19:19
**historical** 63:2
**history** 13:9

**Hit** 84:23, 86:1, 98:14, 98:16
**Hoffman** 56:1, 56:7
**hold** 48:25, 50:5, 95:20, 99:23
**holder** 11:1, 11:5, 11:7, 11:10, 11:25
**holding** 34:2, 97:20, 98:10, 99:4, 100:10, 101:17, 101:18, 101:20
**home** 70:8
**honest** 8:15, 57:6, 89:16
**Honorable** 1:21, 9:11, 36:16, 50:20
**hopeful** 32:14
**hoping** 2:20, 110:2
**Horizons** 100:16
**hostage** 34:2
**hosted** 16:16
**hosting** 16:20
**hotly** 62:4, 75:7
**hour** 41:3, 45:5, 66:25, 67:1
**hours** 7:9, 8:24, 13:19, 18:19, 20:19, 43:9, 43:10, 43:11, 67:2, 67:7, 93:7, 93:8, 96:12
**house** 49:21, 70:7
**housecleaning** 58:20
**housekeeping** 58:23
**human** 17:16
**hundred** 51:13, 86:22
**hundreds** 16:24
**hybrid** 76:10

**< I >**
**I.** 48:25
**ICANN** 11:3, 11:12, 14:16, 15:24, 30:1, 35:18, 44:17, 45:11, 46:2, 46:5, 46:15, 68:19, 74:8, 79:18
**idea** 9:13, 14:17, 24:9, 65:1, 89:1, 89:17, 109:25, 110:5
**identifiable** 91:22
**identified** 65:21, 66:6
**identify** 65:24
**identifying** 81:9
**ignore** 55:12
**Iguana** 100:17
**illegal** 52:7
**imagine** 20:18, 25:1, 27:7,

32:2, 48:14
**immediate** 6:3, 29:17
**immediately** 96:10
**important** 3:21, 83:20, 96:3, 111:21
**impose** 71:23
**improper** 92:1
**in.** 92:25
**inaccurate** 25:7, 26:13
**inappropriate** 56:2, 60:16, 97:19
**Inc.** 1:6, 2:5, 14:4, 62:16, 100:17
**incentive** 33:11
**include** 26:7, 75:13, 100:19
**included** 4:13, 25:15
**including** 5:14, 33:18, 36:5
**income** 17:5
**inconsistent** 78:23
**incredibly** 32:3
**incredulity** 87:11
**incur** 94:18
**indemnifies** 22:18
**independent** 63:3
**indicated** 4:4, 56:1, 63:24, 69:19, 106:23
**individual** 26:8, 94:1
**individually** 59:7, 63:25, 68:7, 70:4, 70:5, 70:23, 77:17, 105:19
**individuals** 17:11
**Industries** 14:4, 62:15
**ineffective** 53:7
**inevitable** 17:13
**infringes** 11:2
**inherent** 110:8
**initially** 19:9, 57:5
**injunction** 8:1, 32:16, 38:3, 49:16, 52:18, 55:24, 64:19, 65:6, 65:16, 72:5, 78:14, 82:3, 98:24, 109:24, 110:4, 110:7, 110:12
**injustice** 74:17
**inquiry** 16:13, 16:19
**instance** 26:12, 61:19
**instead** 39:16, 68:11, 94:5
**instruct** 71:19, 97:12, 97:13
**instructed** 25:19
**instruction** 47:3, 84:23
**insufficient** 59:16

**intended** 20:25, 21:17
**intense** 26:2
**intention** 52:21
**intentional** 70:18
**interest** 17:24, 57:23, 71:12, 71:13, 77:21, 100:1, 110:17
**interested** 58:4
**interests** 51:20, 57:19
**interfaces** 16:3
**interfere** 97:16
**interlineated** 21:8
**interlineation** 23:22
**interlineations** 20:16
**internal** 10:2
**InternationI** 62:20
**internet** 10:2, 11:4, 16:1
**interplead** 85:12
**intervene** 57:2
**intervening** 55:7, 57:18
**intervention** 53:17
**invited** 65:1, 65:19
**involve** 44:19
**involved** 13:11, 17:12, 17:17, 96:5
**involving** 108:5
**Iron** 89:11, 90:2
**ironic** 24:18
**irreparable** 41:9, 41:10, 106:1
**Island** 56:8, 56:24, 58:4, 103:19
**Islands** 17:2, 17:7, 18:22, 18:24, 19:12, 19:25, 21:25, 29:2, 37:15, 102:10
**issued** 10:23, 31:14, 45:11
**issues** 3:23, 45:14, 76:14
**items** 67:12
**itself** 4:20, 8:6, 8:7

**< J >**
**jail** 31:22, 42:6, 42:7, 44:11, 49:21, 50:5, 51:24, 52:4, 95:21
**James** 1:37
**jammed** 65:5
**Jeff** 22:19, 35:11, 70:4, 71:11
**Jeffrey** 1:13, 2:6, 2:13
**jmacpete@lockelord.com**

1:29
**John** 1:24, 2:9, 16:7
**joint** 17:8, 17:9, 17:11, 17:23
**jointly** 4:21
**Jones** 47:23, 47:24
**Judgefurgeson** 16:8
**Judgefurgeson.com** 15:9, 15:19, 16:11
**judges** 31:19
**judgment** 19:8, 19:9, 19:17, 56:19, 75:8
**Judicial** 38:5, 53:17, 113:11
**July** 37:23, 42:19
**jurisdiction** 13:5, 49:13, 49:14, 55:11, 110:14, 110:21

**< K >**
**keep** 7:22, 38:17, 39:15, 39:19, 40:6, 40:9, 40:20, 41:18, 41:20, 44:16, 45:6, 77:21, 110:20
**keeping** 52:2
**kept** 106:19
**Kevin** 61:6
**Key** 20:21, 22:4, 104:24
**kill** 95:17
**kind** 3:10, 3:25, 12:2, 13:9, 19:4, 26:25, 32:13, 34:17, 35:24, 37:4, 56:13, 69:25, 80:12, 83:21, 92:13, 111:17
**knock** 58:17
**knocked** 49:6
**knowledge** 60:23, 60:25
**knows** 85:5
**Krishan** 2:11, 35:13, 36:12, 45:18, 53:16, 59:7, 60:13, 60:15, 60:23, 60:24, 61:14, 68:21, 68:25, 69:16, 78:6, 84:5, 85:21, 94:24, 100:4, 102:4, 107:2

**< L >**
**L.** 1:44, 113:3, 113:15, 113:17
**language** 21:21
**large** 17:14
**Last** 11:22, 12:8, 13:18, 24:20, 26:22, 47:17, 69:24,

70:3, 70:15, 73:18, 76:9, 90:2, 93:22, 94:2, 101:19, 101:22, 112:3
**late** 96:11
**later** 42:13, 58:12
**law** 4:4, 6:16, 9:9, 31:17, 54:7, 56:12, 76:7, 89:15, 89:17, 95:8, 111:20, 111:22, 111:24
**laws** 82:9, 82:10, 82:13
**lawsuit** 3:20, 13:11, 18:5, 18:7, 19:4, 19:8, 19:9, 19:20, 19:24, 20:6, 20:11, 22:9, 23:22, 53:19, 56:14, 57:3, 96:5, 98:21, 98:22, 103:19
**lawsuits** 13:24, 17:13, 22:22, 27:15, 111:23
**lawyer** 11:6, 17:8, 23:5, 45:12
**lawyers** 3:12, 5:23, 6:17, 9:4, 24:15, 25:19, 25:20, 55:4, 57:16, 81:14, 81:15, 82:15, 88:23, 89:4, 89:6, 89:12, 96:16, 108:20, 110:3, 111:8, 111:9
**lay** 10:23, 71:10
**lead** 13:10
**least** 81:3, 83:7, 85:25
**leave** 5:15, 106:13
**led** 43:4
**left** 23:7, 26:21, 110:23
**legal** 76:21
**legals** 33:10
**legislature** 71:6
**legitimate** 98:11
**lender** 71:13
**less** 45:19, 80:17, 110:18
**letters** 43:24
**Liability** 22:20, 39:7, 40:15, 44:1, 46:1, 71:7
**liable** 74:4, 74:15, 75:6
**license** 103:14, 104:10
**licensed** 48:24, 76:25, 103:9
**licensing** 77:3
**LIDDELL** 1:25
**Lidell** 76:3
**life** 100:7, 111:22
**light** 36:13
**limit** 64:16, 86:19
**Limited** 6:10, 39:7, 66:18,

71:7, 74:2
**line** 73:5
**lines** 20:23
**listed** 47:22, 65:14
**listen** 61:23, 62:1
**listened** 93:23
**literally** 31:1
**Litigate** 52:9, 52:10
**litigating** 23:1, 41:22
**litigation** 14:1, 20:8, 22:7, 22:18, 23:6, 29:6, 29:18, 30:25, 32:5, 32:7, 32:9, 33:18, 34:10, 34:17, 43:25, 57:25, 58:5, 62:16, 68:15, 69:4, 69:10, 70:11, 72:12, 73:3, 73:17, 76:2, 77:1, 78:20, 78:24, 79:8, 83:3, 95:18, 99:10, 99:14, 99:17, 100:8, 101:2, 102:10, 108:19, 108:21
**litigations** 21:22, 33:17
**little** 14:2, 34:24, 37:4, 45:17, 49:3, 58:11, 70:22, 71:9
**live** 29:15, 29:20, 37:14, 37:19, 93:25
**lives** 25:12
**LLC** 71:4, 75:23, 75:24, 76:10, 76:11, 77:17, 79:6, 100:15, 100:16, 100:17
**LLP** 1:25
**loan** 35:25, 77:20
**local** 17:3
**located** 28:6
**location** 16:13
**lock** 5:4, 7:13
**Locke** 1:25, 2:10, 76:3, 105:15
**locked** 42:2
**log** 91:1, 91:2
**long** 31:8, 31:9, 64:11, 77:1, 81:16, 82:7
**longer** 83:12
**look** 6:23, 16:19, 20:23, 23:20, 24:5, 27:2, 28:25, 29:16, 30:11, 32:24, 50:15, 52:5, 61:5, 71:15, 73:6, 99:11, 102:13, 109:2
**looked** 62:13
**looking** 83:15, 109:2

**looks** 21:7, 21:9, 30:13, 31:8
**Lord** 1:25, 2:10, 105:16
**lose** 41:11, 46:5, 54:4
**losing** 46:2
**Lost** 37:16, 69:13, 109:21, 110:15
**lot** 6:16, 13:14, 16:25, 33:23, 36:10, 38:25, 50:2, 50:24, 58:8, 81:18, 95:14, 95:15, 106:18, 108:15
**Lots** 20:16, 44:10, 53:11
**love** 51:18
**low** 51:16
**ludicrous** 89:2

**< M >**
**main** 32:16, 42:8, 76:12, 109:15
**Maintain** 34:4, 34:19, 40:4, 71:4, 76:16, 79:18, 83:16, 83:18, 111:20
**maintained** 11:14, 34:15, 35:2, 35:7, 79:16
**maintains** 14:11, 47:18
**majority** 11:18, 47:14
**man** 77:14
**managers** 75:25
**maneuvering** 13:15
**Manila** 14:4, 22:17, 22:18, 22:22, 23:23, 23:24, 24:2, 24:8, 24:9, 24:11, 24:22, 25:22, 33:1, 33:2, 47:22, 60:21, 62:15, 71:20, 71:21, 73:16, 100:22, 101:21, 102:5, 102:24, 103:8, 108:5
**Manilla** 20:3, 22:5, 33:2, 59:6
**manner** 82:25
**map** 68:9
**Marines** 50:1, 112:2
**marshals** 49:20
**material** 21:18, 36:15
**matter** 3:16, 7:13, 10:19, 29:15, 31:24, 57:19, 82:2, 96:12, 111:21
**matters** 2:20
**maximum** 41:8
**mean** 27:5, 27:6, 27:8, 50:19, 83:21
**meaning** 26:18

**means** 54:8, 62:9, 74:3, 92:13, 93:20, 100:23
**meant** 26:24
**meantime** 50:17
**Meanwhile** 37:10
**mediated** 20:10
**mediation** 20:9, 20:19, 50:21
**mediations** 13:17
**meeting** 66:25
**members** 75:25
**memorandum** 46:17, 82:21
**mercy** 31:3
**merits** 58:24
**met** 80:20
**methodology** 71:17
**middle** 15:4, 36:4, 38:13
**million** 31:21, 32:8, 33:20, 35:15, 51:17, 69:9, 72:12, 75:14, 84:2, 85:8, 99:4, 100:8, 100:10, 102:6, 102:7, 108:16
**million.** 51:14
**millions** 32:1, 76:3, 76:21
**mind** 5:8, 5:9, 88:15, 107:17
**minimum** 7:4
**minute** 10:4, 30:13, 34:7, 66:23, 78:10, 94:2
**minutes** 34:24, 71:2, 76:16, 107:16
**mirror** 50:15
**miscopied** 21:6
**misfiled** 21:14
**misrepresented** 49:9
**missed** 7:24
**missing** 25:17
**misspelled** 27:4
**misspoke** 70:19
**misstate** 70:14
**mistake** 7:3, 9:1, 53:1, 70:17
**modification** 12:3
**modified** 6:21, 47:6
**modify** 12:7, 44:6
**moment** 63:14, 74:1
**Monday** 9:7, 9:17, 61:3, 64:3, 64:7, 64:21, 93:3
**monetary** 99:10
**monetization** 32:25, 33:1, 84:20, 85:10, 90:25, 91:2, 91:5, 91:8, 91:12, 92:8, 97:8, 97:20, 98:1, 98:6, 99:5,

99:14, 99:23, 100:3, 100:19, 101:5, 103:4, 103:6
**monetize** 101:11, 103:16, 104:13
**monetizing** 20:6, 85:11, 103:13
**monies** 97:17, 98:11, 99:13, 99:14, 99:23, 100:14
**months** 50:5, 50:6
**morning** 7:10, 8:25, 50:15, 96:6
**mortgage** 70:7
**motion** 3:18, 4:1, 4:10, 6:4, 6:6, 6:20, 7:6, 7:11, 8:3, 8:13, 8:22, 9:6, 9:14, 9:21, 10:13, 13:3, 13:24, 29:11, 37:11, 37:12, 37:24, 49:11, 50:20, 54:17, 54:18, 56:9, 56:12, 59:16, 59:17, 61:3, 61:6, 78:1
**MOU** 7:23, 36:18, 37:12, 100:2, 100:13, 109:2
**Mountain** 89:11, 90:3
**movant** 60:24
**move** 4:20, 29:10
**moved** 94:13, 96:9, 96:11
**moving** 97:23, 109:23, 110:3
**MR. RAWLS** 2:13, 2:22, 3:4, 6:13, 7:8, 7:15, 8:2, 8:24, 42:14, 42:17, 42:24, 44:13, 45:10, 81:11, 82:17, 83:10, 86:4, 86:11, 86:18, 88:5, 89:21, 90:16, 91:16, 91:18, 93:1, 96:1, 97:7, 98:13, 99:8, 105:5
**Munish** 2:11, 35:13, 35:15, 52:25, 59:7, 60:13, 60:21, 60:23, 60:24, 62:1, 94:24, 106:1
**mutual** 63:23, 81:16, 99:20, 99:21
**myself** 22:23

**< N >**
**N.** 1:39
**nail** 42:3
**naively** 25:7
**name** 3:13, 11:1, 11:6, 11:10, 11:14, 12:22, 15:8, 15:10, 15:20, 16:8, 16:10,

16:15, 17:20, 23:5, 27:6,
27:8, 30:2, 41:18, 44:20,
45:13, 46:11, 46:23, 47:21,
62:9, 75:7, 77:7, 79:20,
80:18, 89:8
**name.** 45:20
**narrowly** 6:2
**nation** 95:18
**nature** 7:19
**Navy** 50:1, 112:2
**necessary** 59:15, 89:23
**necessity** 55:7
**needed** 27:24, 61:11, 64:15,
64:22, 65:2, 66:2, 66:6, 81:2,
89:9, 96:13
**needs** 12:23, 34:14, 44:6,
47:5, 50:17, 50:24, 53:24,
69:13, 83:19, 85:24, 89:7,
98:3, 108:5, 110:22, 110:23,
111:14, 111:20
**negotiate** 17:9
**negotiated** 19:14
**negotiations** 13:17, 13:18,
17:22, 24:19, 26:22
**Neither** 79:12
**net** 15:4
**Netsphere** 1:6, 2:5, 2:10,
2:12, 60:22, 71:24, 72:1,
72:17, 73:14, 76:25, 77:3,
77:4, 102:4, 103:8, 103:18,
104:13, 104:20, 105:23
**neutral** 87:21
**nevertheless** 80:7
**new** 26:21, 46:24, 51:7, 51:9,
56:14, 56:17, 64:23
**next** 48:11, 48:12, 52:13,
53:23, 65:14, 93:3, 93:10,
93:12, 93:21, 104:23, 107:2
**night** 11:22, 12:8, 36:4,
38:13
**No.** 13:7, 28:13, 40:18,
102:2, 108:22
**Nobody** 41:16, 49:17, 51:5,
55:16, 85:4, 107:12
**nonappearance** 95:3
**noncontroversial** 25:8
**none** 108:10
**NORTHERN** 1:2, 95:7,
113:19
**noteholder** 70:6, 70:8

**Nothing** 13:22, 25:24, 32:22,
45:1, 46:10, 51:2, 91:14,
96:8, 101:6, 103:2, 104:14,
109:16
**notice** 43:10, 48:2, 48:10,
63:21, 63:22, 64:1, 64:2,
93:24, 94:2
**notices** 64:8, 64:9
**notion** 43:21
**Novapoint** 100:17
**November** 14:3, 73:23,
108:12
**nowhere** 71:3
**nuclear** 34:3, 37:8, 38:13
**NUMBER** 1:6, 2:6, 23:9,
26:7, 33:10, 48:15, 60:5,
74:19, 74:22, 76:16, 80:17,
81:4, 90:6, 101:19, 113:21
**numbers** 26:12, 27:4,
111:18, 111:19
**numerical** 81:24


**< O >**

**o'clock** 66:11, 92:22, 93:14,
104:23
**O'connor** 60:5
**oath** 59:10
**obey** 31:15
**obeyed** 93:22
**obligation** 23:4, 83:14, 83:22
**obligations** 76:6, 83:16
**obviously** 8:20, 57:10,
57:22, 59:16, 69:1, 75:13,
81:6, 92:13
**occur** 25:11
**occurred** 62:12, 102:11
**offered** 41:5
**offering** 45:22
**Office** 6:17, 6:19, 8:17, 9:16,
10:17, 83:3
**Officer** 75:21, 96:4
**officers** 75:24
**offices** 94:17
**official** 113:5
**often** 3:14
**Okay** 6:1, 10:16, 16:2, 16:6,
16:11, 20:20, 21:3, 28:22,
39:9, 40:17, 44:6, 48:9,
48:18, 54:12, 59:13, 61:9,

65:10, 71:15, 74:12, 90:17,
105:9, 105:21, 109:6
**once** 29:2, 52:1
**One** 10:14, 11:15, 24:24,
27:5, 28:24, 30:14, 33:11,
40:12, 47:18, 50:17, 56:5,
58:19, 58:23, 60:24, 61:10,
63:1, 63:6, 63:16, 63:18,
67:14, 67:15, 68:17, 69:6,
70:10, 71:2, 71:5, 74:20,
74:23, 75:22, 76:12, 76:14,
78:24, 83:4, 86:22, 90:6,
98:22, 100:3, 108:15, 111:25,
112:3
**one.** 76:15, 81:17, 101:19
**ones** 66:6, 104:7
**open** 5:3, 5:18, 27:24, 29:5,
29:14
**operate** 54:5
**operated** 14:21, 101:3, 110:1
**operating** 16:24, 90:20
**operator** 15:4, 15:15
**operators** 16:4
**opinion** 75:5
**opponents** 81:12
**opportunity** 96:3
**opposed** 93:3
**oral** 50:20
**ordered** 65:9, 89:11, 96:8,
98:4, 98:5
**ordering** 91:4, 98:9
**orders** 11:11, 11:15, 19:11,
31:7, 31:19, 32:1, 49:22,
51:4, 54:10, 89:18
**Organizations** 76:18
**original** 19:25, 21:6, 81:20
**originally** 3:17, 19:16, 20:2,
73:1, 103:3
**Otherwise** 23:1, 29:10,
71:22, 104:22
**ought** 6:9, 82:12, 85:15,
107:22, 111:1
**ourselves** 46:1, 67:13
**out-of-state** 95:9
**outside** 3:9, 43:11, 65:8
**Oversea** 103:12, 103:13,
103:16, 103:20, 103:23,
104:5, 104:6, 104:9
**Oversea.com** 103:5
**oversees** 11:4

**oversight** 9:9
**owed** 77:3
**own** 14:20, 19:24, 24:25, 25:5, 25:18, 46:23, 47:10, 62:2, 62:17, 68:17, 70:6, 75:1, 75:2, 76:24, 81:11, 87:18, 107:23
**owned** 11:20, 14:6, 18:16, 18:17, 20:2, 46:9, 61:25
**owner** 12:1, 14:14, 14:16, 16:14, 18:22, 19:13, 19:18, 30:9, 35:12, 43:25, 47:22, 48:3, 61:14, 61:15, 61:17, 61:22, 68:10, 68:16, 69:4, 69:16, 70:16, 78:18, 78:21, 78:23, 78:25
**owners** 19:15, 69:21, 107:18
**ownership** 62:8, 70:5
**owns** 44:18, 62:2, 62:3, 70:24


< P >
**p.m.** 6:19
**PACER** 10:8, 10:9
**Page** 16:15, 16:20, 20:22, 21:1, 21:3, 21:7, 21:9, 21:11, 21:13, 21:14, 21:15, 21:23, 22:3, 22:4, 28:24, 29:16, 30:12, 60:6, 69:18
**Pages** 18:11, 18:16, 18:17, 19:7, 36:5, 106:21, 112:5, 113:7
**paid** 18:18, 32:8, 43:1, 69:9, 77:6, 78:17, 83:25, 84:1, 85:24, 99:13
**palatable** 7:17
**paper** 62:21
**papers** 4:2, 21:21, 27:1
**Pappas** 1:32
**Paragraph** 22:4, 22:5, 22:16, 23:20, 24:6, 25:21, 28:25, 29:16, 30:11, 32:24, 33:16, 74:11, 74:14, 99:13, 100:18
**parallel** 38:9
**pared** 91:19
**parking** 98:18
**part** 9:9, 10:2, 27:14, 37:6, 38:20, 44:13, 48:22, 63:3, 70:13, 76:17, 81:5, 87:16,

88:10, 93:5, 100:21, 105:11
**parte** 51:22
**particular** 16:12, 57:19, 74:25
**partner** 83:11
**partners** 100:4, 101:25
**partnership** 102:1
**parts** 5:10, 40:12
**party** 6:6, 14:11, 22:13, 44:20, 45:7, 61:5, 62:5, 88:16, 88:18, 88:19, 97:11, 108:19
**pass** 99:3, 104:8, 109:5
**passwords** 91:8, 92:8, 97:14, 104:2
**past** 40:8, 67:5, 99:15, 109:8
**pay** 30:1, 30:3, 32:13, 32:23, 33:13, 33:25, 35:17, 35:21, 35:22, 36:17, 37:2, 39:11, 39:12, 39:14, 40:13, 42:12, 43:1, 43:15, 53:24, 69:11, 69:22, 70:7, 70:11, 72:8, 72:13, 72:15, 72:18, 74:9, 75:17, 77:5, 85:24, 95:13, 97:3, 103:23
**paying** 30:8, 30:10, 32:20, 33:10, 35:19, 39:16, 49:18, 68:20, 68:25, 69:7, 70:9, 75:6, 103:18
**paymaster** 77:4
**payment** 103:20
**payments** 34:15
**pays** 68:11
**PC** 1:32
**penalty** 60:9, 104:17
**pendancy** 32:5, 69:10
**Pending** 34:10, 37:19, 37:25, 38:3, 39:18, 49:11
**penny** 52:6
**People** 8:16, 15:22, 17:4, 31:21, 42:4, 45:19, 53:2, 53:9, 54:2, 54:3, 54:8, 64:16, 67:18, 68:25, 69:6, 80:17, 88:4, 92:25, 93:25, 95:15, 95:23, 97:4, 98:11
**per** 36:2, 78:25
**percent** 11:19, 17:4
**perfect** 82:19, 86:3
**perform** 23:4, 23:15, 23:16, 25:22, 29:10, 49:7, 49:9,

94:25
**performance** 32:19, 39:18
**performed** 61:18, 68:13
**performing** 30:5, 57:8
**period** 33:14, 43:8, 45:5, 64:3, 86:12, 98:3
**periodically** 11:11
**perjury** 60:10
**Permission** 106:11, 106:13
**permissive** 21:19
**permit** 63:19
**person** 15:4, 50:10, 68:18
**personal** 60:23, 60:25, 69:2, 74:22, 75:5, 75:12, 77:4, 77:5, 77:9, 78:6, 94:6, 106:1
**personally** 49:19, 70:23, 70:24, 75:6, 78:20, 98:4
**perspective** 24:22
**petition** 61:20
**philosophies** 39:2
**Phone** 1:28, 1:35, 1:41, 1:47, 55:4, 64:19, 68:22, 94:9
**phonetic** 98:15
**physically** 18:14
**PI** 40:1, 40:25
**pick** 26:19, 49:21, 51:24
**picked** 24:8, 38:19
**picking** 43:21
**picture** 55:20, 62:6
**piece** 29:18, 41:8, 84:6, 84:7, 84:9
**pieces** 4:6
**pierce** 71:8
**piercing** 76:13
**pile** 22:11, 22:13, 24:11, 27:21, 80:13
**pissed** 103:11
**place** 13:25, 34:13, 40:10, 44:3, 94:17
**places** 87:2, 87:3, 99:1
**placing** 54:16
**Plaintiff** 1:7, 1:24, 2:8, 52:24, 57:10, 59:2, 59:6, 74:17, 87:13, 95:8, 96:12, 105:19, 106:25
**plaintiffs** 2:10, 22:8, 38:22, 56:16, 59:5, 61:23, 78:4, 95:6, 95:7, 105:8
**plane** 94:3, 96:12
**play** 52:13, 106:9

**playing** 50:2
**pleading** 9:6, 56:6, 78:1
**pleadings** 5:10, 5:18, 5:21, 6:15, 7:22, 9:14, 37:14, 59:10, 61:6
**Please** 2:2, 2:3, 44:2, 99:11
**plenty** 38:16, 39:24, 95:4, 95:8, 102:4
**plus** 15:21, 75:14
**podium** 2:18
**point** 6:3, 6:25, 14:13, 26:4, 71:11, 73:20, 104:24, 108:15, 109:11, 110:6
**point.** 38:11, 98:3
**Points** 20:22, 100:17
**portion** 21:16, 68:23, 86:23
**position** 18:1, 18:2, 24:17, 25:20, 46:4, 61:21, 69:15, 70:24, 78:7, 78:8, 96:19
**positions** 78:24, 78:25
**possession** 31:10, 91:21
**possible** 44:11, 107:20
**possibly** 9:25, 40:24, 60:22
**post-settlement** 55:21
**potential** 11:23, 46:4, 83:11
**powers** 110:8
**prayer** 71:15
**pre** 73:18
**pre-litigation** 99:16
**pre-underlying** 73:2, 73:17, 99:16
**precarious** 46:4
**precise** 71:6
**precisely** 76:10
**predicate** 29:11, 71:10
**preempted** 74:10
**prejudice** 10:11, 10:15, 29:1, 29:12
**preliminary** 2:20, 8:1, 32:15, 38:2, 49:16, 52:18, 64:18, 65:6, 65:16, 72:5, 78:14, 82:2, 109:24, 110:4
**prepare** 21:20, 54:16, 54:24, 64:18, 68:3, 92:4
**preparing** 65:5
**prescribed** 113:11
**present** 2:25, 59:19
**preserve** 110:8, 110:9, 111:1
**President** 35:12, 75:20, 79:5
**presidents** 79:6

**pressed** 58:9
**pressure** 83:4
**prettiest** 20:17
**Pretty** 3:6, 4:25, 67:24
**prevail** 111:20
**printed** 87:2, 90:16
**printout** 26:25
**prints** 106:21
**Prior** 23:7, 28:14, 30:9, 32:20, 34:1, 34:23, 61:17, 61:24, 66:14, 80:5, 89:6, 89:11
**privilege** 74:16
**probably** 9:12, 11:19, 13:9, 14:19, 48:13, 50:3, 56:3, 66:2, 66:25, 70:19, 80:17, 95:17, 105:14, 107:6, 107:10
**problem** 5:1, 6:4, 10:24, 11:23, 17:21, 26:3, 30:21, 32:15, 32:17, 38:23, 38:24, 43:6, 46:18, 46:25, 47:8, 48:19, 50:8, 53:19, 53:20, 53:21, 53:23, 53:24, 55:4, 60:4, 60:11, 63:15, 64:5, 64:7, 68:5, 74:4, 75:2, 80:13, 80:22, 84:13, 86:4, 86:13, 87:18, 88:15, 91:20, 93:22
**problems** 4:10, 30:14, 58:11, 58:18, 80:10, 84:4, 84:7, 85:22, 85:23
**procedural** 13:15, 38:1
**procedurally** 57:9
**Procedure** 10:25, 11:3, 30:23, 30:25, 48:16, 56:11, 59:11
**procedures** 56:3
**proceed** 71:16
**proceeding** 4:21, 29:14, 37:11
**proceedings** 5:2, 20:4, 55:21, 113:4, 113:6
**process** 12:9, 12:17, 12:20, 14:23, 15:1, 19:6, 44:19, 62:8, 85:16
**processes** 43:24
**produce** 65:15, 65:23, 66:7, 66:21, 66:22, 67:16, 67:17, 75:3, 78:6, 80:2, 80:6, 82:24, 87:12, 89:3, 89:4, 89:19, 90:13, 91:5, 92:24, 101:6

**produced** 26:15, 26:22, 47:17, 66:17, 89:7, 93:14, 93:24, 107:15, 108:2, 108:6, 108:9
**producing** 65:18
**production** 66:15, 66:19
**profitable** 53:12
**program** 17:2, 17:15, 104:14
**programmers** 24:2, 83:2, 87:3, 87:13
**progress** 111:24
**prohibited** 11:16
**prohibition** 14:17, 14:19
**promote** 74:17
**proper** 34:15, 34:16, 56:3, 71:10, 74:20
**properly** 74:24
**Property** 36:19, 36:25, 42:9, 42:11, 42:21, 42:22, 45:3, 49:22, 55:15, 62:9, 62:10, 62:20, 83:16, 83:18, 83:23, 88:13, 88:14, 110:9, 110:13
**proposal** 12:13, 39:3
**propose** 26:1
**proposing** 46:21
**prosecuted** 31:16
**protect** 34:5, 34:9, 34:20, 36:17, 36:19, 36:25, 42:9, 42:11, 42:21, 51:10, 57:19, 83:16, 83:18, 83:22, 88:13, 109:20, 110:13, 110:14
**protected** 55:16, 63:14, 110:2
**protective** 2:23
**proud** 9:3
**prove** 71:10
**provide** 33:3, 45:16, 46:13, 68:1
**provided** 11:3, 24:20, 33:11, 60:13, 84:13
**provides** 22:12, 29:16
**providing** 67:25
**provision** 22:4, 35:18
**pry** 89:23
**public** 26:19, 79:18
**publicly** 79:24
**pull** 79:20, 87:22
**punishable** 44:10
**purpose** 13:25
**purposefully** 8:10

**purposes** 29:6, 78:11, 78:12, 78:14, 92:1
**pursuant** 94:2, 100:2
**Put** 5:13, 30:20, 31:16, 31:21, 36:9, 42:6, 44:3, 49:21, 50:4, 51:8, 51:24, 52:3, 54:17, 54:19, 70:13, 72:11, 77:14, 79:19, 81:23, 83:3, 84:5, 84:8, 85:16, 85:21, 85:23, 88:17, 88:18, 88:20, 109:16, 109:17, 110:24
**puts** 40:21
**putting** 46:3, 46:6

**< Q >**
**quagmire** 48:23, 49:3
**qualifier** 35:8, 39:7
**quash** 89:12
**quasi-joking** 49:5
**query** 16:9
**question** 34:11, 34:23, 37:5, 40:4, 40:22, 42:5, 42:15, 50:23, 59:12, 90:6, 93:1
**questions** 79:7
**quick** 38:19, 83:24, 101:24, 107:14
**quickly** 19:18, 58:18, 67:20
**quo** 34:5, 35:2, 35:6, 40:4, 110:8
**quote** 68:16

**< R >**
**raised** 10:22, 11:22, 12:5, 44:15, 45:10
**Ramirez** 95:5
**ran** 38:14
**random** 22:11
**rate** 51:19, 110:25, 111:19
**rates** 77:21
**rather** 25:5
**Rawls** 1:31, 2:13, 2:22, 6:9, 6:11, 10:21, 11:22, 12:14, 12:21, 34:6, 64:19, 80:1, 80:5, 81:10, 112:5
**re-arguing** 43:20
**reach** 20:10, 41:15
**reaching** 17:10

**read** 8:16, 68:22
**readily** 91:22
**reading** 13:24, 21:14, 21:16
**ready** 49:7, 49:9, 54:12, 66:21, 94:25
**real** 83:24, 101:23, 107:14
**realize** 44:8, 78:14
**really** 13:20, 17:5, 19:10, 20:1, 20:22, 28:14, 28:17, 37:5, 40:22, 50:9, 53:15, 57:13, 66:10
**reason** 27:18, 33:15, 39:3, 43:22, 47:13, 47:20, 63:4, 72:4, 76:10, 93:5
**reasonable** 45:2, 88:6, 89:25
**reasons** 71:6, 76:12
**receipts** 75:14
**received** 12:19, 32:25, 100:20, 108:7
**receiver** 30:18, 30:20, 51:6, 51:12, 51:18, 109:25, 110:1, 110:5, 110:21, 110:22, 111:3, 111:15, 111:17
**receivership** 109:17
**Recognition** 74:16
**recognizes** 76:7
**record** 8:12, 10:12, 11:14, 14:11, 47:19, 62:14, 62:18, 73:19, 79:17, 79:18, 90:7
**recorded** 11:25, 12:22, 62:13
**records** 11:17, 62:17, 63:2, 63:6, 71:5, 76:17, 77:23, 78:7, 92:13, 105:20, 105:22, 106:2
**rectify** 9:8
**red** 39:11, 39:20, 77:13, 77:14, 78:3
**referred** 14:25, 20:3
**referring** 75:23
**refiling** 10:11
**refusal** 41:3, 75:11
**refuse** 23:14, 78:6
**refused** 29:9, 77:1, 98:18
**refusing** 23:16, 84:22
**regard** 97:7, 106:15, 107:21
**regarding** 45:4
**Regardless** 31:7, 39:9, 54:9
**register** 15:9, 15:20, 17:17, 17:19, 39:5, 45:21, 73:10,

80:18, 83:22
**registered** 16:11, 17:15, 20:2, 23:25, 26:6, 26:16, 26:18, 29:23, 46:24, 80:19
**registering** 17:18
**registers** 17:16, 47:23
**registrant** 35:20, 44:17, 68:11, 68:12, 68:24, 69:20, 70:18, 81:21, 100:5
**registrants** 35:17, 43:1, 70:9
**registrars** 70:18
**registration** 38:17, 39:12, 43:16, 69:22, 70:11, 73:2, 107:19, 109:18
**registries** 16:4, 39:21
**registry** 15:15, 15:16, 16:4, 26:14, 26:17, 26:18, 84:6, 84:10, 85:17, 110:24
**regulatory** 15:25
**reimbursed** 94:20
**related** 22:22, 68:7, 72:5, 90:5
**relates** 81:9, 82:5, 99:6
**relative** 33:21
**relatively** 64:23
**release** 21:20, 41:18
**releases** 29:17
**releasing** 40:6
**relevant** 28:18, 29:19, 65:12, 65:15, 65:18, 65:23, 67:13, 72:4, 75:5, 75:9, 75:10, 94:7
**relief** 28:9, 72:1, 82:2, 109:23
**relying** 92:19
**remain** 27:24, 29:5
**remedy** 53:21
**Remember** 18:9, 45:13, 47:17, 53:18, 61:12, 72:4, 78:16, 101:1, 104:24, 112:1
**reminded** 112:4
**removals** 20:4
**remove** 9:14
**renew** 30:1, 83:22, 86:5
**renewal** 29:22, 30:4, 33:13, 35:18, 35:25, 36:1, 37:2, 40:7, 43:16, 70:9, 75:17, 78:17, 107:19
**renewals** 34:16, 35:21, 72:13, 72:18
**reopen** 108:20

**rep** 60:21
**Reported** 1:44
**REPORTER** 70:22, 93:7,
94:7, 94:15, 113:5, 113:18
**reports** 92:14, 92:21
**represent** 6:12, 27:1, 31:12,
57:13, 65:21, 83:1
**representation** 49:8, 72:6,
75:16, 75:22, 76:15, 77:12,
78:2, 81:19, 92:16
**representations** 35:16, 55:5,
80:3, 102:23
**representative** 64:1
**representatives** 2:12, 18:18,
19:12
**represented** 27:9, 35:14,
42:24, 68:24, 69:5, 69:22,
70:1, 72:7, 76:1, 79:4, 79:7,
79:8, 80:1, 80:5, 82:25, 83:7,
86:23, 92:11
**representing** 6:18, 98:16
**represents** 16:5
**reproach** 9:3
**reputable** 98:11
**request** 4:15, 6:5, 11:16,
48:3, 63:23, 64:6, 66:1, 68:4
**requested** 75:12, 109:24
**requests** 63:21, 64:2, 64:9,
64:10, 64:11, 64:13, 65:8,
68:6, 69:2
**require** 3:9, 30:19, 95:23,
104:22
**required** 3:24, 11:12, 27:2,
79:17, 79:20
**requirement** 60:16
**requires** 99:9
**residents** 95:9
**resolution** 10:25, 11:2
**resolve** 18:6, 50:4, 51:21,
51:22, 51:23, 55:16, 95:24,
96:19, 96:20, 109:14, 110:19
**resolved** 30:21, 31:24,
32:15, 37:20, 38:7, 50:11,
52:21, 55:6, 66:8
**resources** 74:9
**respect** 3:24, 10:22, 38:5,
41:1, 47:13, 49:12, 55:8,
55:19, 56:10, 56:20, 59:2,
61:16, 61:23, 67:23, 70:22,
75:9, 75:22, 76:1, 82:8, 98:8,

98:14, 100:25, 106:18, 108:7
**respective** 3:11, 25:2
**respond** 66:1, 75:19
**responded** 63:21, 64:2,
67:21
**response** 65:19
**responsibilities** 33:21, 33:22
**responsibility** 32:21, 33:23
**responsible** 22:25, 54:22
**responsive** 67:15
**resting** 107:12
**restraining** 7:25, 38:8,
47:11, 47:12
**result** 11:9, 12:19, 17:13,
19:13, 32:8, 46:6, 94:12,
105:23
**resulted** 13:19
**retreat** 70:1
**revenue** 71:24
**revenues** 16:24, 18:20,
101:5, 105:25, 108:8
**revolved** 20:1
**RFP** 105:14, 105:17
**rid** 92:15
**rifle** 64:13, 64:15
**rightful** 51:20
**rights** 11:7, 104:10
**RIM** 100:15
**risk** 46:4, 46:7, 88:9
**Rm** 1:45
**Ronquillo** 1:32
**room** 42:3, 49:6, 67:2
**Ross** 1:26
**route** 16:19
**Royal** 1:21
**Rule** 32:6, 33:5, 54:7, 59:17,
59:25, 87:17, 111:20, 111:21,
111:24
**Rules** 11:12, 14:16, 59:4,
59:11, 79:19, 106:24
**ruling** 44:14, 96:2
**run** 37:18, 48:6
**running** 35:20, 37:7, 79:3
**rushed** 37:9, 38:12


**< S >**
**s/cassidi** 113:15
**safe** 82:12
**Sapp** 76:4

**satisfy** 42:18
**Saturday** 7:10
**save** 46:15, 111:14
**saw** 111:8
**saying** 19:15, 33:25, 35:6,
40:5, 43:16, 46:22, 47:24,
49:8, 68:17, 69:2, 78:17,
79:9, 81:23, 107:5, 108:9
**says** 10:6, 16:11, 20:24,
22:5, 22:17, 23:22, 24:6,
28:25, 31:11, 32:24, 33:7,
35:18, 59:25, 65:19, 68:10,
69:11, 72:17, 74:23, 75:20,
76:8, 92:23, 99:12, 100:14,
100:18
**schedules** 93:21
**scheduling** 28:15
**scope** 65:9, 65:24, 86:19
**screen** 16:21
**screw** 49:23, 49:24, 52:3,
52:10
**seal** 3:18, 4:1, 4:2, 4:15,
4:21, 4:24, 5:1, 5:2, 5:5, 5:6,
5:11, 5:14, 5:17, 5:21, 6:24,
7:23, 8:1, 8:5, 8:8, 8:10, 8:17,
9:7, 10:15, 13:5, 13:8, 54:18,
54:19, 102:13, 104:20
**sealed** 4:3, 7:5
**sealing** 4:6, 4:16, 5:9, 5:10,
5:24, 10:11, 13:21
**Search** 100:16, 102:3
**seated** 2:3
**Second** 3:16, 20:12, 21:7,
21:9, 33:15, 38:18, 78:5,
90:11, 98:23, 103:15
**secret** 7:14, 13:4, 87:19
**secrets** 3:10, 3:22, 4:24
**secure** 30:15, 31:4, 31:23
**seeing** 58:4
**seek** 24:6
**seeking** 56:6
**seem** 7:12, 13:2
**seemed** 45:2
**seems** 46:10, 80:21, 110:14,
110:17
**seen** 26:25, 95:1
**seize** 49:21
**selected** 43:2
**self-help** 18:4, 53:19, 53:22,
62:12, 73:23, 101:2, 103:10,

110:20
**selling** 102:8
**Seminars** 71:3
**send** 18:12, 18:23, 53:9, 54:24, 65:13, 65:19, 69:1, 79:21, 88:18, 88:25, 90:2, 92:24
**sending** 88:1, 88:3, 88:15, 93:18, 97:4
**sends** 30:3, 47:24
**sense** 69:1, 87:23, 87:25, 102:15
**sensible** 88:12
**sensitive** 3:22, 4:8, 7:19
**sent** 26:2, 26:3, 26:9, 68:4, 98:25, 103:4
**separate** 42:4, 74:16, 76:7
**separated** 25:11
**series** 107:3
**serious** 50:7, 51:25
**serve** 15:2
**served** 53:9, 64:9, 64:13
**server** 16:16, 16:19
**servers** 16:12
**serving** 100:5
**set** 55:8, 62:19, 71:17
**sets** 6:17
**settled** 21:22, 23:9
**settling** 23:1
**seven** 22:21, 33:17
**seventh** 37:17, 55:8
**several** 36:15, 65:25
**shape** 95:12, 95:19
**shared** 71:20
**shooting** 72:14
**short** 42:15
**shot** 64:13, 64:15
**Shouldn't** 45:14, 82:13, 92:3
**Show** 12:22, 36:5, 36:11, 39:24, 47:7, 47:8, 51:2, 61:4, 77:22, 100:13, 109:12
**showed** 47:3
**shown** 113:6
**shows** 60:14
**shut** 51:3
**side** 9:10, 30:7, 41:16, 50:18, 53:3, 69:20, 79:12, 107:25, 109:1
**sides** 7:18, 44:4, 50:2, 54:11, 66:19

**sign** 3:1, 18:25, 55:1, 58:2, 72:24
**signed** 2:24, 8:3, 73:9, 82:12
**significant** 26:20
**signing** 6:14
**similar** 9:7
**Simple** 46:10, 62:10, 62:11, 86:5, 100:16
**single** 105:19
**singular** 23:23
**sir** 14:8, 15:18, 21:2
**sit** 42:6, 66:12, 66:13, 66:14, 95:24
**site** 17:3
**sited** 19:21
**sitting** 94:5
**situation** 44:21, 83:5, 97:24
**six** 50:5, 51:11
**sixteen** 26:10
**sixth** 37:17
**skim** 110:21, 110:22
**small** 14:20, 26:7, 80:16, 81:4, 86:23
**Smith** 6:22
**sold** 102:5
**solution** 86:3
**Solutions** 100:16
**solve** 84:5, 84:13, 85:23
**Somebody** 39:9, 42:12, 45:23, 46:11, 53:22, 53:24, 62:9, 62:19, 68:2, 73:9, 83:19, 95:13, 96:22
**somehow** 18:21, 25:6
**someone** 12:16, 18:17
**sometime** 7:9, 16:22
**somewhat** 38:9
**Somewhere** 32:12, 79:24, 96:18
**soon** 7:16, 68:2, 96:9
**sophisticated** 17:18
**sorry** 21:5, 40:2, 70:17, 73:4, 109:8
**sort** 4:9, 4:22, 13:16, 27:5, 28:17, 55:20, 63:2, 66:4, 90:8
**sorts** 31:22
**sound** 96:16
**sounded** 49:5, 70:20
**sounds** 36:3, 48:23, 54:12
**sources** 64:24
**space** 18:18, 83:3

**speaker** 71:2
**specially** 73:8
**species** 43:25
**specific** 8:14, 29:17, 34:14, 64:21
**specifically** 64:17, 65:2, 68:6, 80:1, 90:12
**spelled** 3:13, 26:23, 27:6, 27:7
**spending** 53:11, 67:7, 95:16
**spent** 66:2, 76:3
**split** 22:7, 22:11, 23:20, 24:1, 24:3, 24:10, 24:18, 25:11, 25:22, 26:1, 27:14, 27:20, 30:7, 32:17, 32:18, 32:20, 33:2, 33:6, 33:8, 33:10, 33:11, 33:22, 34:1, 38:21, 44:24, 48:1, 81:6, 89:9, 100:23, 111:16, 111:18
**squatting** 44:1
**stacks** 27:1
**staff** 87:3
**stake** 54:3, 56:23
**stall** 88:22
**stalling** 96:15
**stand** 36:9
**standard** 3:6, 76:13
**start** 54:8, 64:3, 93:20, 107:6
**started** 23:14, 24:15, 101:2
**starting** 66:14
**statement** 69:13
**statements** 52:6, 79:11, 79:13
**STATES** 1:1, 113:12, 113:18
**Status** 1:20, 34:5, 35:2, 35:6, 40:4, 110:8
**statutory** 33:19
**stay** 49:15
**stayed** 67:2
**stenotypy** 113:5
**step** 43:12
**steps** 52:1, 91:23
**stop** 10:4, 30:13, 31:5, 38:15
**stopped** 30:5, 32:19
**story** 31:5, 31:9, 53:4, 80:7, 88:24
**straight** 20:19, 58:13, 72:14
**straw** 77:14
**Street** 1:33, 1:45, 51:24
**strike** 9:6, 9:14, 10:13, 61:3

struck 10:11
stuff 18:23, 36:6, 52:7, 87:19, 90:7, 90:20, 94:13, 109:21, 111:12
stupid 98:12
subject 3:20, 23:22, 46:2, 81:9, 82:7
subjecting 46:1
submission 27:22, 105:3
submit 71:18
submitted 24:12, 59:15
subpoena 53:6, 53:8, 89:12
subpoenaed 89:11
Subsequent 4:3, 33:24
subsequently 56:9
substantive 13:22, 28:14
successful 17:10
sue 98:20
sufficient 59:15
suggest 85:9
suggesting 61:12
suggestion 39:15
suggests 32:23, 88:2
suit 110:9
Suite 1:26, 1:33, 1:39
summary 56:14
support 109:24
supposed 12:3, 14:15, 14:18, 19:11, 19:16, 23:23, 27:20, 32:19, 32:23, 33:12, 66:12, 66:13, 68:21, 69:6, 77:6, 84:16, 85:13, 93:6
surely 83:13
surprised 60:3
Surprisingly 25:19
surrounds 4:18
sword 70:3
system 9:25, 10:3, 31:14, 49:2


< T >
table 95:12, 95:19
tactic 88:23
tailored 6:3
talked 58:10, 67:11, 70:21
tasked 30:10, 33:9
tax 17:4, 17:7
technical 45:3
technically 12:1

telephone 63:17, 64:12
telephonic 96:6
tells 2:22
temporary 7:25, 55:24
ten 24:9, 66:11, 67:12, 104:23, 110:21
term 83:6
terms 8:9, 8:19, 9:24, 21:18, 59:24, 66:15, 71:22, 77:8
test 52:8
tested 69:14
testify 60:22
testimony 53:3
TEXAS 1:2, 1:27, 1:34, 1:46, 22:1, 28:7, 29:1, 33:18, 56:12, 62:20, 76:7, 76:10, 76:17, 83:11, 95:7, 106:24, 113:19
theirs 87:20
them. 45:23
themselves 53:21
theory 18:21
They've 81:16, 81:17, 99:3, 100:20
thief 36:4, 38:12
Third 10:19, 44:19, 45:7, 45:17, 62:5, 88:15, 88:18, 88:19, 90:18, 103:15
third-party 23:6, 24:24, 26:8, 48:3, 79:21, 81:4, 84:20, 89:8, 90:9, 104:13
thirty 34:24
though 21:19, 25:13, 95:8
thousand 14:21, 51:13
thousands 16:25, 94:3
Three 2:22, 6:17, 13:10, 14:21, 19:25, 23:19, 37:25, 41:22, 51:13, 55:21, 55:23, 59:4, 63:16, 63:20, 63:22, 64:1, 64:2, 64:16, 67:2, 67:5, 76:2, 80:15, 90:4, 92:22, 93:14, 93:16, 93:24, 96:6, 107:10, 111:8, 111:9
three-day 63:22
throwing 31:1
Thursday 67:20
tickets 94:3
tied 39:1
timely 25:9
TIPA 62:20

title 11:14, 11:25, 12:23, 14:11, 47:19, 62:13, 62:14, 73:19, 79:17, 90:7
titleholder 62:18
today 7:9, 7:17, 17:19, 26:19, 29:19, 41:1, 58:12, 88:7, 93:16, 101:4, 109:8, 111:8
together 17:6, 41:25, 66:3, 67:11, 77:14, 108:14
Tom 47:23
took 18:1, 18:2, 18:19, 24:17, 25:20, 33:16, 33:23, 61:21, 66:25, 73:23, 113:5
top 33:7, 110:22
total 2:22, 26:6, 48:23
touch 57:15
track 82:19
trade 3:10, 3:22, 4:23, 13:4, 87:19
trademark 10:25, 11:2, 11:5, 11:6, 11:7, 11:11, 12:1, 17:13, 17:19, 17:21, 22:17, 22:22, 23:5, 23:6, 23:9, 33:17, 39:2, 43:25, 44:20, 45:14
trademarks 39:1
traffic 18:15
trail 62:21, 63:1
transaction 19:14
transcribed 113:6
transcript 4:3, 68:23, 69:19, 90:13, 113:8, 113:10
transcripts 5:22
transfer 11:10, 24:7, 24:13, 29:3, 33:1, 39:17, 43:15, 45:23, 47:24, 58:3, 71:20, 75:13
transferred 28:1, 29:7, 45:25, 81:6
travel 94:16, 94:18
treasurer 95:16
trial 51:10
trick 25:6
tried 96:10
trigger 12:16
triggered 12:18
triple 46:14
TRO 3:17, 4:2, 8:4, 12:6, 13:1, 31:14, 37:6, 38:2,

38:12, 43:4, 47:5, 55:21, 55:23, 56:2, 59:2, 59:6, 59:9, 60:1, 60:7, 60:22, 60:24, 61:1, 61:8, 63:15, 63:18, 69:19, 72:4, 105:18
**true** 15:1, 60:20, 72:11, 74:6, 88:11, 89:5, 99:8, 99:13, 113:8
**true-up** 99:9
**trust** 25:2, 25:3, 25:4, 71:23, 85:17, 85:22, 85:24, 86:3
**trustee** 83:15, 83:17
**trusts** 35:13
**truth** 36:10
**try** 6:2, 39:22, 60:16, 71:8, 96:9, 108:20, 109:13
**trying** 6:19, 17:8, 27:14, 35:1, 35:23, 53:13, 53:16, 66:3, 77:13, 77:15, 77:18, 99:18, 100:11, 104:15
**Tuesday** 9:17, 65:25, 67:9, 93:14, 93:17, 104:23
**turn** 22:3, 22:16, 64:16, 75:11, 89:10, 89:20, 104:17
**turned** 24:22, 26:5
**turning** 68:4
**turns** 21:23
**twelve** 50:5, 86:22
**twenty** 48:12
**Twenty-five** 41:7
**twenty-four** 18:19
**twenty-three** 13:19, 20:19
**twice** 37:15
**Two** 14:21, 17:11, 17:24, 23:12, 24:24, 37:25, 40:12, 50:17, 51:13, 55:25, 67:2, 67:16, 73:18, 78:23, 98:17, 106:17, 107:10, 107:16
**two-fold** 33:10
**two-level** 3:7
**TX** 1:40
**type** 16:8
**typed** 21:7
**typewritten** 21:16, 22:3


**< U >**
**UDRP** 11:5, 11:23, 43:24, 44:15, 44:19, 45:10, 47:5
**Ultimately** 13:18, 15:10,

17:9, 22:25, 25:4, 25:10, 25:15, 26:15, 68:16, 75:11
**unable** 6:23, 66:5, 75:17, 80:6
**unacceptable** 5:12, 7:15
**unaffiliated** 80:17
**unaware** 6:24, 6:25
**undercut** 36:15
**underlying** 13:7, 13:11, 21:22, 22:7, 29:6, 29:14, 32:5, 32:7, 32:9, 39:19, 55:23, 57:25, 61:19, 61:20, 62:13, 62:16, 68:9, 68:15, 68:17, 69:4, 69:10, 70:10, 72:12, 74:1, 77:1, 78:19, 78:24, 79:8, 84:3, 100:8, 101:1, 102:9, 108:19
**understand** 6:1, 12:8, 31:22, 35:1, 35:3, 36:14, 36:16, 38:6, 45:2, 45:12, 48:16, 49:25, 50:9, 52:1, 62:7, 64:5, 69:24, 70:25, 78:15, 96:1, 96:4, 99:22, 100:6, 101:24, 103:18, 105:20
**understandably** 103:11
**understanding** 12:3, 45:15, 46:17, 54:4, 57:1, 86:6, 97:9
**understands** 54:6
**Understood** 64:14, 92:2
**unequivocally** 36:6
**unfortunately** 62:25
**Uniform** 10:24, 11:2, 71:7
**UNITED** 1:1, 113:12, 113:18
**University** 33:18
**unlawful** 52:7, 71:25
**unless** 52:20, 83:19
**unopposed** 10:10
**until** 6:25, 30:21, 31:24, 33:10, 34:16, 34:21, 51:2, 93:10, 93:12, 95:21
**untoward** 47:9
**unwieldy** 83:6
**urging** 26:2
**uses** 103:6
**using** 25:18, 71:17, 77:8, 91:9, 91:11, 91:14
**USSI** 102:6
**usurious** 77:21
**USVI** 100:15
**utilized** 10:25

**< V >**
**V-e-r-i-s-i-g-n** 15:13
**vacation** 7:8
**vague** 8:8, 8:13
**valuable** 27:8, 32:3, 51:15, 109:15, 110:15
**value** 32:2, 111:1, 111:2, 111:14
**various** 20:4, 64:24, 66:3, 91:8
**vast** 11:18, 47:14
**veil** 71:8, 76:13
**veracity** 69:13
**verbal** 9:13
**verge** 78:3, 105:24
**verifiable** 12:20
**verification** 59:5, 59:8, 59:24
**verified** 59:20, 59:22, 60:7, 60:19, 61:5
**verify** 46:14, 59:10
**Verisign** 15:10, 15:14, 15:22, 16:10, 24:7, 27:19, 27:23, 27:25, 29:3, 30:3, 39:20, 40:20, 58:3, 68:18, 71:20, 74:8
**versus** 2:5, 75:23, 95:10
**videographer** 93:8, 94:8, 94:15
**videographers** 95:2
**view** 31:22, 56:3, 68:24, 81:8, 96:23, 109:15
**views** 17:12
**violate** 13:4, 31:13, 32:11, 49:17, 63:9, 63:11
**violates** 11:7, 49:17
**violating** 82:8, 82:13
**violation** 12:2, 12:11, 12:25
**Virgin** 13:13, 17:2, 17:7, 18:22, 18:24, 19:12, 19:25, 21:24, 29:2, 37:15, 56:8, 56:24, 58:4, 102:10, 103:19
**vitiate** 74:3
**vitiated** 73:21
**Vitullo** 6:14, 6:22, 7:7
**voluntarily** 65:15
**vs** 1:9

**< W >**

**W.** 1:24
**wait** 51:10, 109:18, 110:9
**waited** 25:23
**waiting** 36:11, 93:7, 93:8
**wanted** 8:12, 58:24, 106:8, 111:11
**wants** 12:14, 16:7, 31:6, 41:16, 41:17, 44:16, 55:5, 55:6, 60:12, 60:14, 94:11, 97:1, 102:20, 103:23, 105:6, 107:15
**warehouse** 14:18
**warning** 38:16
**wasted** 94:8, 94:20
**ways** 42:4, 108:6
**web** 16:15, 16:20, 18:11, 18:15, 18:16, 18:17, 19:6
**Wednesday** 66:2, 93:3, 93:10, 93:12, 93:21, 107:6
**wee** 7:9
**weed** 81:3
**week** 48:11, 48:12, 52:13, 53:23, 64:3, 67:22, 70:15, 79:21, 88:25
**weekday** 43:9
**weekend** 42:3, 42:7, 43:11, 52:13, 52:22
**weekends** 107:13
**weeks** 23:12
**weighing** 33:21
**Weinstein** 1:38
**Welcome** 2:3
**West** 106:24
**Whatever** 9:8, 9:10, 19:4, 46:14, 52:8, 53:25, 54:10, 61:3, 71:9, 78:22, 88:17, 89:24, 96:23, 97:17, 99:6, 104:2, 104:8, 105:3, 109:20, 110:23
**wherewithal** 31:25
**whether** 11:1, 11:6, 17:25, 41:4, 57:2, 74:7, 80:4, 89:17, 94:6, 102:10, 102:23, 103:23
**whim** 51:22
**whiz** 39:14
**who-is** 11:13, 12:11, 14:11, 47:18, 63:4, 81:1, 81:2, 82:17, 89:6, 89:22, 90:1, 90:6, 92:5, 106:18

**whoever** 11:25, 107:2
**whole** 4:6, 4:25, 5:4, 15:17, 40:22, 41:10, 61:25, 62:4, 68:17, 102:5
**whomever** 111:14
**wife** 77:16, 77:19, 77:24
**willing** 3:1, 9:10, 41:13, 45:8, 49:7, 49:9, 65:23, 67:17, 94:25
**window** 16:9
**winning** 53:4
**wire** 75:13, 86:2
**Wish** 49:1
**withdraw** 106:11
**withdrawn** 17:23
**Within** 22:5, 24:9, 30:6, 33:14, 43:10, 64:25, 65:24, 89:14
**without** 4:15, 4:24, 6:5, 10:11, 10:15, 36:6, 53:16, 55:7, 87:3, 98:20, 110:16
**withstand** 31:25
**witness** 60:12
**witnesses** 59:19, 60:17
**words** 5:3, 12:21, 34:5, 95:17
**Work** 5:7, 5:20, 5:22, 6:2, 6:15, 6:16, 6:20, 12:7, 16:21, 27:20, 41:20, 41:25, 44:4, 47:6, 53:16, 53:25, 54:23, 55:6, 55:15, 66:3
**worked** 8:24, 9:2, 17:8
**working** 3:13, 9:4, 19:23, 43:18, 67:3, 95:3, 96:17, 98:16, 109:10, 110:3, 111:10
**works** 9:24, 10:17, 15:8, 30:1, 51:25
**world** 15:17, 20:18
**worried** 53:6
**worry** 42:13, 98:12
**worth** 43:5, 43:17
**worthless** 43:2, 92:12
**writing** 20:23
**written** 61:6

**< X >**

**XYZ** 27:9, 43:3

**< Y >**

**year** 24:20, 26:23, 29:24, 47:17, 108:17
**years** 37:25, 51:11, 73:18, 76:2, 76:3, 101:19, 101:22, 110:21, 111:3, 111:15, 111:17
**Yesterday** 4:9, 6:5, 6:18, 8:24, 9:20, 10:20, 55:3, 64:12, 68:22, 80:9, 86:21, 93:7, 94:4, 94:8, 94:20
**yourself** 111:10

**< Z >**

**zero.** 79:10
**zip** 79:10