IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NETSPHERE, INC., | § | |
| MANILA INDUSTRIES, INC., AND | § | |
| MUNISH KRISHAN, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:09-CV-0988-F |
| | § | |
| JEFFREY BARON AND | § | |
| ONDOVA LIMITED COMPANY, | § | |
| | § | |
| DEFENDANTS. | § | |

**THE RECEIVER'S REPORT OF WORK PERFORMED
IN JUNE AND THE FIRST TWO WEEKS OF JULY 2011[1]**


Respectfully submitted,

*/s/ Barry M. Golden*
Barry M. Golden
Texas State Bar No. 24002149
Peter L. Loh
Texas Bar Card No. 24036982
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas  75201
(214) 999.4667 (facsimile)
(214) 999.3000 (telephone)
bgolden@gardere.com
ploh@gardere.com

**ATTORNEYS FOR THE
RECEIVER, PETER S. VOGEL**

---

[1] This report discusses work performed from June 1 through July 15, 2011.

# TABLE OF CONTENTS

A.     What will it take to complete the goals of the Receivership?................................................2

    1.     The Receivership's total anticipated liquid assets total $2,230,039.89. .................4

         a.     The Receivership estate has cash-on-hand of $382,789.89. ........................4

         b.     The Receiver anticipates obtaining domain name revenue in July 2011 totaling $138,600. .................................................................................4

         c.     The Receiver has negotiated tentative domain name sales of $1,258,650.00...............................................................................................4

         d.     The Receivership estate has non-exempt stock of approximately $450,000.00...............................................................................................7

    2.     The Receivership's anticipated liabilities total $870,237.19. .................................7

         a.     The Receivership will fund the Former Baron Attorney claims totaling $870,237.19. .................................................................................7

         b.     The Court has announced its intention to grant fee applications totaling $188,918.40. .................................................................................9

         c.     The Court has additional fee applications pending before it totaling $266,012.71...............................................................................................10

         d.     Estimated additional fee applications through July 31, 2011 will likely total approximately $465,000.00. .....................................................11

         e.     The Receiver anticipates paying expenses through July 31, 2011 totaling $5,810.14. .......................................................................................12

         f.     The Receiver anticipates paying Renewal Fees through July 31, 2011 totaling $14,200.00. .......................................................................12

         g.     The Receiver anticipates paying operating expenses through July 31, 2011 totaling $29,600.00. .......................................................13

         h.     The Court has announced its intention to award the Trustee fees from the Receivership estate totaling $379,761.18....................................13

         i.     The Receiver anticipates paying $0 to Carrington.....................................13

         j.     The Receiver anticipates paying $0 to Mr. Barrett. ..................................14

B.    Work that the Receiver performed in June and the first two weeks of July 2011 relating to identifying, accessing, and managing the Receivership Assets........................15

    1.    Work relating to identifying the Receivership Assets. ..........................................15

        a.    The Receiver continued attempting to identify Receivership Assets through communications.....................................................................15

        b.    The Receiver continued attempting to identify Receivership Assets through document collection....................................................................17

            i.    The Receiver continued attempting to identify Receivership Assets through document collection of non-privileged documents. ....................................................................................17

            ii.    The Receiver continued attempting to identify Receivership Assets through document collection of privileged documents. ....................................................................................20

        c.    The Receiver continued attempting to identify Receivership Assets through extending his jurisdictional reach. .................................................21

    2.    Work relating to accessing the Receivership Assets...............................................21

        a.    The Receiver previously obtained access to Baron Funds........................22

        b.    In June and the first two weeks of July 2011, the Receiver maintained access to the LLC Funds. ........................................................23

            i.    The Court instructed the Receiver to attempt to determine Mr. Schepps' purported authority to represent the LLCs. .............24

            ii.    The Receiver interviewed the then-Manager of the LLCs and the attorneys for the LLCs regarding Mr. Schepps' purported authority to represent the LLCs.....................................25

            iii.    Mr. Schepps filed a report full of gibberish. .................................25

            iv.    During the first part of his interview with the Receiver, Mr. Schepps refused to answer questions or provide evidence demonstrating Mr. Schepps' authority to represent the LLCs. ............................................................................................25

            v.    During the second part of the interview, Mr. Schepps failed to appear.........................................................................................26

            vi.    The Receiver filed an Advisory Report with the Court. ................27

vii.    Mr. Baron appealed CDM Services and Mr. Baron's other entities as being Receivership Parties. .............................................28

viii.    During the third part of the interview, Mr. Schepps still refused to discuss his authority to represent the LLCs. .................28

ix.    Mr. Baron appealed the Court's December 17, 2010, order clarifying the Receivership as including the LLCs.......................30

x.    The Receiver eventually had to become involved in the appeal of the December 17, 2010, order clarifying the Receivership as including the LLCs. .............................................31

c.    In June and the first two weeks of July 2011, the Receiver obtained access to additional funds from Netsphere. .................32

d.    In June and the first two weeks of July 2011, the Receiver obtained access to additional funds from monetizers. ..............................33

e.    The Receiver made efforts to access additional funds.............................39

3.    Work relating to managing the Receivership Assets. ............................................40

a.    The Receiver managed the Baron Funds. ...................................................40

i.    The Receiver managed the accounts for the Baron Funds............40

1)    The Receiver continued investigating insurance issues. ................................................................................40

2)    The Receiver sought permission from the Court to use stocks and IRAs as a source to fund disbursements from unpaid attorneys. .............................41

3)    The Court stated that it would not rule on the motion yet. ........................................................................41

4)    Mr. Baron asserted Fifth Amendment protection. .............41

5)    Mr. Baron filed a brief in opposition. ..............................42

6)    The Receiver filed a reply...................................................43

7)    The Court indicated it would deny the motion to liquidate stocks...................................................................43

8)    The Receiver filed the Stock-Only Motion.......................43

ii. Disbursements of the Baron Funds. ...............................................44

iii. Mr. Baron objected to certain motions for reimbursement and fee applications.......................................................................57

iv. Mr. Baron appealed all of the Court-ordered disbursements.........58

b. The Receiver managed the LLC Funds. ..................................................60

i. The Receiver managed the potential LLC revenues relating to domain name sales. ...................................................................61

1) The Court granted the Receiver's motion for permission sell domain names. ..........................................61

2) Notwithstanding the Court's order permitting the Receiver to sell domain names, Mr. Harbin refused to cooperate with the sale of domain names. ....................61

3) Mr. Nelson has assumed the management of the LLCs. ..................................................................................62

4) The Receiver moved for the temporary appointment of Mr. Nelson as manager of the LLCs.............................63

5) The Receiver moved for Mr. Nelson's permanent appointment as manager of the LLCs. ..............................64

6) The Receiver began an independent audit. ......................64

7) The Receiver began implementing the protocol for selling domain names.......................................................65

8) The Receiver moved for approval for the sale of domain names. ..................................................................66

9) The Receiver discussed the sale of domains at the April 28, 2011 Hearing. ...................................................68

10) The Court initially order the Receiver to give Mr. Baron a domain-name-sales information but later announced its intention to grant the Receiver's motion to reconsider such order.......................................68

11) The Receiver began implementing his strategy for potentially selling domain names to resolve UDRP claims. ..............................................................................69

12)    Mr. Baron is attempting to stop the sale of domain names through an appeal....................................................70

13)    Mr. Baron is attempting to stop the sale of domain names by replacing Mr. Nelson with another Manager who will not sell domain names. ........................70

ii.    The Receiver managed the LLC expenses.....................................71

1)    The Receiver managed payments to the registrar, including renewals/deletions of domain names. ...............72

i)    The Court ordered the Receiver to delete all Money Losing Domain Names. ...........................72

ii)    Mr. Harbin advised the Receiver of Money Losing Domain Names that the Receiver should ask for permission not to delete.................73

iii)    The Receiver instructed the Registrar to delete the Money Losing Domain Names that were not Future Profitable Names. ................74

iv)    The Receiver asked the Court for permission to allow the Receiver to renew certain Money Losing Domain Names that were Future Profitable names. ........................................74

v)    The Court gave the Receiver permission to renew certain Money Losing Domain Names that were Future Profitable names. ............75

vi)    In February, the Receiver responded to Mr. Baron's challenge relating to the renewal of certain Money Losing Domain Names. ................75

vii)    The Receiver filed a response to the emergency motion relating to the renewal of certain Money Losing Domain Names. ................75

viii)    The Court held a hearing on the emergency motion relating to the renewal of certain Money Losing Domain Names. ...........................76

ix)    During the first part of the interview, Mr. Harbin admitted that he actually had no objections to the culling protocol...........................77

x)     The Receiver began the work to ask the Court for permission to allow the Receiver to renew additional Money Losing Domain Names that were Future Profitable names. ...........78

xi)     Mr. Baron would not consent to the next motion to renew his own domain names...............79

xii)     The Receiver filed third, fourth, fifth, sixth, seventh, and eighth motions for the renewal of money losing domain names. ...........................79

xiii)     The Receiver made payments to the registrar. ................................................................81

2)     The Receiver managed payments for operations expenses. ...........................................................83

i)     The Receiver filed motions for disbursements and made disbursements. ..............83

ii)     Mr. Baron objected to three of these fee applications. ..........................................................93

iii)     Mr. Baron appealed the orders.............................94

iv)     Mr. Baron filed an emergency motion relating to disbursements from the LLC Funds to pay professional fees..............................96

v)     Mr. Baron is still fighting.....................................96

3)     The Receiver managed potential UDRP issues. ...............97

4)     A UDRP complainant has appeared and objected to the Receiver's motion to clarify the Receiver Order. ........98

c.     The Receiver received confirmation of the propriety of his fund management, and Mr. Baron fought that, too. ...........................................99

d.     The Receiver sought and received the Court's permission for reimbursement of his additional personal funds. ........................................99

i.     The Receiver sought reimbursement of personal funds................99

ii.     Mr. Baron filed a response.........................................................100

iii.     The Receiver filed a reply.........................................................100

iv.     Mr. Baron filed a motion for a surreply. .......................................100

v.     The Receiver filed a response to the motion for a surreply. ........100

vi.     The Court ruled in favor of the Receiver. ...................................100

vii.     Mr. Baron is still fighting. ............................................................101

C.     Work relating to identifying and resolving claims of Mr. Baron's unpaid attorneys ......101

1.     The Receiver collected evidence to make his Assessment. ................................102

2.     The Receiver made an Assessment. ................................................................111

3.     The Receiver filed the Assessment and Three Motions to Approve the Assessment and Disbursements of Former Attorney Claims. ............................116

4.     Mr. Baron Responded and Objected to the Assessments. ...................................118

5.     The Receiver Served the Former Baron Attorneys with the Motions to Approve Assessment and Disbursement of Former Attorney Claims. ...............119

6.     The Receiver Notified the Former Baron Attorneys of the Hearing (and Re-Settings of the Hearing) on the Motions to Approve the Assessments. .........119

7.     Mr. Baron objected to the Receiver's assessment. .............................................121

8.     The Court ordered that it would only consider evidence at the hearing on the claims of Former Baron Attorneys. ...............................................................122

9.     The Court heard evidence on the fee claims of the Former Baron Attorneys. ...................................................................................................122

10.     Mr. Baron attempted to admit evidence the day of the April 28, 2011, hearing. ......................................................................................................123

11.     The Receiver submitted proposed findings of fact, conclusions of law, and order on the assessment and disbursement of attorneys' fees. .............................124

12.     Mr. Baron attempted to admit evidence after the April 28, 2011, hearing. .........124

13.     Stan Broome notices Mr. Baron's deposition and moves for sanctions against Mr. Schepps. ......................................................................................125

14.     The Court imposed a $400/hour fee cap. ..........................................................126

15.     The Receiver filed his fourth motion for assessment and disbursement of attorneys' fees claims. ..........................................................................................126

16.    The Court approved the Receiver's proposed Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Attorney Claims. ...................................................................127

17.    Carrington objected to the Fourth Motion to Approve Assessment and Disbursement of Former Attorney Claims [Corrected Version]........................127

18.    Mr. Barrett filed an application for his fees. ......................................................128

D.    Work relating to tax filings on behalf of certain Receivership Parties ...........................128

    1.    The March 15, 2011, tax deadline. .......................................................................128

    2.    The April 18, 2011 tax deadline. ..........................................................................129

    3.    The June 30, 2011 Tax Deadline. .........................................................................129

E.    Work relating to responding to Mr. Baron's various manufactured emergencies. ..........130

    1.    The housing emergency. .......................................................................................131

    2.    The automobile emergency. ..................................................................................132

    3.    The insurance emergency. .....................................................................................132

    4.    The medical emergency. ........................................................................................133

    5.    The Receiver has continued to try and provide for Mr. Baron's mental health. ....................................................................................................................136

    6.    The Domain Jamboree Emergency. ......................................................................137

    7.    The Receiver has continued to provide Mr. Baron with daily-living expenses. .............................................................................................................138

    8.    The Hire More Attorneys Emergency. ..................................................................138

F.    Work relating to managing issues concerning the Ondova bankruptcy .........................138

    1.    Work relating to conferring with Martin Thomas. ...............................................139

    2.    Work relating to filing fee applications for Martin Thomas. ...............................140

G.    The Receiver notified Former Baron Attorneys of developments in the case ................140

H.    Work relating to Complying with the Court's Fifth Circuit Filing Order ......................145

I.    Work relating to reporting to this Court .........................................................................147

Just like in the last week of April 2011 and May 2011, the Receiver and his counsel at Gardere Wynne Sewell LLP performed a tremendous amount of work in June and the first two weeks of July 2011 in order to comply with the obligations set forth in the Receivership Order. This work included, among other things, (A) working to minimize the cost of the Receivership, (B) identifying, gaining access to, and managing the Receivership Assets, for the eventual purpose of paying claims of Mr. Jeffrey Baron's unpaid attorneys, (C) resolving the claims of Former Baron Attorneys seeking reimbursement for unpaid fees from the Receivership Estate, (D) handling tax filings on behalf of certain Receivership Parties, (E) responding to Mr. Baron's various manufactured emergencies, (F) dealing with issues relating to the Ondova Limited Company ("Ondova") bankruptcy, (G) keeping the Former Baron Attorneys apprised of developments in this case, (H) complying with the Court's order directing the parties to file pending motions with the Fifth Circuit, and (I) reporting to this Court.

Like with the work that the Receiver performed in November 2010, December 2010, January 2011, February 2011, March 2011, April 2011, and May 2011, the work perform in June and the first two weeks of July 2011 was often extremely complex, time-intensive, and requiring cooperation from various Receivership Parties.  Unfortunately, and just like in November 2010, December 2010, January 2011, and February 2011, March 2011, April 2011, and May 2011, at every turn in June and the first two weeks of July 2011, Mr. Baron and his agents obstructed the Receiver's efforts, thereby requiring the Receiver to spend exponentially more time and resources than would otherwise have been necessary.  Thus, while the Receiver completed much of the work he had hoped to during June and the first two weeks of July 2011, that work, nonetheless, required substantial time and a monumental effort (specifically 40.5 hours spent by the Receiver and 203.1 hours collectively spent by his Gardere counsel in June and the first two

weeks of July 2011).  Details of the work for June and the first two weeks of July 2011 follow in this *Receiver's Report of Work Performed in June and the First Two Weeks of July 2011* (the "Report").

**A.      What will it take to complete the goals of the Receivership?**

This answer remains the same as previous months: more cash.  On July 12, 2011, the Receiver filed *The Receiver's Notice of the Receivership's Projected Financial Picture as of July 31, 2011* (the "July 31 Financial Picture").  [Docket No. 642.]  Because disbursements have been made and no cash collected by the Receivership in the week between the filing of the July 31 Financial Picture and this Report, the Receivership's financial outlook remains the same as reported in the July 31 Financial Picture:

**RECEIVERSHIP'S PROJECTED FINANCIAL PICTURE AS OF JULY 31, 2011**

| ANTICIPATED LIQUID ASSETS | | ANTICIPATED LIABILITIES | |
|---|---|---|---|
| **Cash-on-Hand—Baron and LLC accounts** (*see* Section A.1.): | $382,789.89 | **Former Attorney Claims** (*see* Section B.1): | $870,237.19 |
| **Anticipated Domain Name Revenue in 7/31/11** (*see* Section A.2): | $138,600.00 | **Fee Applications—already ordered by the Court in the** *Advisory* (*see* Section B.2): | $188,918.40 |
| **Domain Name Sales—if purchasers do not back out due to delay** (*see* Section A.3): | $1,258,650.00 | **Fee Applications—pending before the Court** (*see* Section B.3): | $266,012.71 |
| **Stock Sale—if the Court grants the Receiver's motion to cash out the stocks** (*see* Section A.4): | $450,000.00 | **Anticipated Additional Fee Applications through 7/31/11— not yet filed** (*see* Section B.4): | $465,000.00 |
| | | **Anticipated Receivership Expenses through 7/31/11** (*see* Section B.5): | $5,810.14 |
| | | **Renewal Fees for Domain Names through 7/31/11** (*see* Section B.6): | $14,200.00 |
| | | **Operating Expenses through 7/31/11** (*see* Section B.7): | $29,600.00 |
| | | **Trustee's Fees—already ordered by Court in the** *Advisory* (*see* Section B.8): | $379,761.18 |
| | | **Carrington Fees—assuming the Court denies the** *Carrington Motion for Fees* **and instructs Carrington to collect through the Ondova estate** (*see* Section B.9): | $0.00 |
| | | **Barrett Fees—assuming the Court denies the** *Barrett Motion for Fees* **and instructs Mr. Barrett to seek payment from Mr. Baron post-Receivership** (*see* Section B.10): | $0.00 |
| **TOTAL ANTICIPATED LIQUID ASSETS:** | $2,230,039.89 | **TOTAL ANTICIPATED LIABILITIES:** | $2,219,539.62 |

A more detailed description of the Receivership's financial picture, specifically its anticipated liquid assets and anticipated liabilities, follows.

### 1.      The Receivership's total anticipated liquid assets total $2,230,039.89.

#### a.      *The Receivership estate has cash-on-hand of $382,789.89.*

The Receivership estate currently holds $90,466.07 in funds from Mr. Baron's personal accounts and funds obtained from Plaintiff Netsphere under the global settlement agreement in this matter.   An account belonging to Receivership Party Quantec, LLC currently holds $249,060.72, while an account belonging to Receivership Party Novo Point, LLC currently holds $43,263.10.   Thus, the Receivership estate currently has $382,789.89 cash-on-hand.   Details of such cash collected, including during June and the first two weeks of July 2011, are included further down in the Report.

#### b.      *The Receiver anticipates obtaining domain name revenue in July 2011 totaling $138,600.*

As described further down in the Report, the Receiver has been successful in diverting domain-name-revenue streams from various monetizers to the Receivership estate.   [Docket No. 601 at pp. 32-36.]   In July 2011, the Receiver anticipates diverting an additional $138,600.00 to the Receivership estate.   Details of the domain-name revenue that the Receiver has diverted to the Receivership estate to date, including during June and the first two weeks of July 2011, are contained in a chart further down in the Report.

#### c.      *The Receiver has negotiated tentative domain name sales of $1,258,650.00.*

The Court initially permitted the sale of domains through its *Order Granting the Receiver's Omnibus Motion to Permit Sales of Domain Names*.   [Docket No. 288.]   Mr. Baron is

appealing that order.  [Docket No. 340.]  Through two separate motions, the Receiver has proposed the sales of $1,258,650.00 worth of domain names.[2]  [Docket Nos. 424 and 581].

On June 20, 2011, the Court notified the parties it has stayed the Receiver's motions to sell specific domain names (among other matters in the Receivership) pending resolution of Mr. Baron's appeal of various orders with the Fifth Circuit.  [Docket No. 616.]  This is another example of Mr. Baron impeding the Receiver's progress toward paying the former attorney claims and bringing the Receivership to a conclusion.

At the April 28, 2011, hearing in this matter, Mr. Gary Schepps, Mr. Baron's attorney, raised the possibility of Mr. Baron getting a loan with the domains as collateral.  Presumably, the loan would allow Mr. Baron and the Baron-related entities to keep the domains and still pay off the Former Baron Attorneys.  Mr. Schepps also referred to the need to know which domains the Receiver was planning on selling.  For the sake of brevity, the Receiver will not recount here in detail all the actions he took in response to Mr. Schepps' proposal; such details are included further down in the Report.

In sum, when the Court issued its *Order Regarding Baron's Request to Research Financing Options* and ordered that the Receiver provide Mr. Baron with the identity of the names he was negotiating to sell and the proposed sale prices, the Receiver filed a *Sealed Ex Parte Motion for Reconsideration of Order Regarding Mr. Baron's Request to Research Financing Options.*  [Docket Nos. 558 and 581.]  The Receiver argued that he had investigated the possibility of a loan but found it to be financially implausible.  [Docket No. 581.]  The

---

[2] In a brief [Docket No. 337] and a transcribed meeting on March 4, 2011, Mr. Baron claimed that there is an additional source—$2 million that Elizabeth Schurig (his former attorney) stole from him and $4 million that the Plaintiff also stole from him.  [Transcript of Court Ordered Meeting, March 4, 2011, at 81:3-83:8.]  The Receiver investigated these claims and reported to Mr. Baron in writing that he had found no evidence to substantiate the charges.  [Docket No. 375 at p. 5 n.4; Docket No. 416 at pp.35-36 n.7; Docket No. 425 at p. 4 n.8.]  Thus far, Mr. Baron has provided no evidence to support these serious allegations of criminal felonies, including whether such claims would be barred by the releases in the global settlement agreement.

Receiver also discussed how Mr. Baron had access to all of the domain names—not just the ones the Receiver planned to sell—if he wanted to explore a loan using the names as collateral.  [*Id*.] The Receiver explained the deserved fear he had in releasing just the names to be sold on the grounds that Mr. Baron would likely try to scuttle the deals before consummation and/or retaliate against the buyers.  [*Id*.]  Finally, the Receiver explained the precise methodology for valuing and selling the names concluding that the private sales he had negotiated were the best possible way to generate sufficient funds to conclude the Receivership.  [*Id*.]

Mr. Baron responded to the *Receiver's Motion for Reconsideration of Order Regarding Mr. Baron's Request to Research Financing Options*.  [Docket No. 607.]  Mr. Baron accused the Receiver of improperly advocating his positions to the Court, victimizing Mr. Baron, and distorting the nature of Mr. Baron's filings.  [*Id*.]

However, on July 1, 2011, the Court issued its *Advisory* "regarding how it intends to manage this case going forward . . . [a]ssuming the matter will eventually be back at the district court level."  [Docket No. 630.]  The Court stated in its *Advisory* that it intends to permit the Receiver's proposed sales of $1,258,650.00 worth of domain names, as well as grant the Receiver's motion to reconsider.  [*Id*.]

Thus, the Receiver has already begun the process of negotiating sales for domain names. In fact, the Receiver has $1,251,400.00 worth of contracts executed by the prospective buyers. Upon the Court's approval, the Receiver will execute the same contracts himself and complete the sale and transfer of the domains.  A number of potential purchasers, however, have threatened not to complete the sales due to the delay.  The July 31 Financial Picture's  analysis, however, assumes a best-case scenario, meaning that the Receiver successfully completes all of the sales.  More details regarding the Receiver's tentative domain-name sales, including a

summary of the work the Receiver performed regarding such sales during June and the first two weeks of July 2011, are included further down in the Report.

> d.   The Receivership estate has non-exempt stock of approximately $450,000.00.

After withdrawing his motion to cash out both the IRA's and the non-exempt stock [Docket No. 632], on July 7, 2011, the Receiver filed *The Receiver's Motion to Permit Liquidation of Non-Exempt Stocks—But Not the Liquidation of the IRA's* (the "Stock-Only Motion"), requesting permission to cash out approximately $450,000.00 in non-exempt stock. [*See* Docket No. 640 at Exs. 2-3.]  The Court has not yet ruled on the Stock-Only Motion.  This analysis assumes a best-case scenario, meaning that the Court grants the Stock-Only Motion.  A more detailed discussion of the Receiver's work related to obtaining permission to cash out the non-exempt stock, including work performed during June and the first two weeks of July 2011, is included further down in the Report.

> **2.    The Receivership's anticipated liabilities total $870,237.19.**

> a.   *The Receivership will fund the Former Baron Attorney claims totaling $870,237.19.*

Based on declarations that the Receiver received and submitted to the Court, in *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 396], *The Receiver's Second Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 400], and *The Receiver's Third Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 411] (collectively, the "Former Attorney Claim Motions"), the claims from the unpaid attorneys of Mr. Baron total $1,453,270.35 (a detailed chart breaking this amount down by each claimant can be found further down in this Report).  Of that amount, the Receiver understands that the Trustee will be paying $457,266.58 from the Ondova estate.  The Receiver has also not proposed disbursement of a portion

($2,750.00) of the claim of one unpaid attorney of Mr. Baron.  [*See infra* note 32.]  That left unpaid attorney claims before the Receiver of $988,551.93.

On April 28, 2011, the Court admitted into evidence 25 declarations from the Former Baron Attorneys.[3]  On May 6, 2011, the Court denied the Receiver's Former Attorney Claim Motions without prejudice and instructed the Receiver to institute a fee cap of $400 for any attorneys whose Former Attorney Claims consisted of hourly fees in excess of $400 (the "Fee Cap").  [Docket No. 527.]  Accordingly, on May 13, 2011, the Receiver filed his *Fourth Motion to Approve Assessment and Disbursement of Attorney Claims [Corrected Version]* which applied the Fee Cap to the Former Attorney Claims resulting in a reduction of $140,501.28 (the "Fourth Attorney Claim Motion").  [Docket No. 569.][4]  The same day the Receiver accompanied this filing with his submission to the Court via e-mail of his *Findings of Fact, Conclusions of Law, and Order on Assessment of Attorney Claims [Corrected Version]* (the "Findings of Fact").[5]  On May 13, 2011, the Receiver notified the parties and the Former Baron Attorneys of this submission via email.  [Docket No. 570.]  As described in the Fourth Attorney Claim Motion and the Findings of Fact, the Receiver moved for approval and assessment of $870,237.19 to pay the claims of the Former Baron Attorneys.  [Docket No. 569.]  On May 18, 2011, the Court executed

---

[3] The Declaration of Robert Garrey was inadvertently not admitted into evidence at the hearing on April 28, 2011 (the "Garrey Declaration").  [*See* Docket No. 569 at p. 10 n. 3, p. 23 at n. 33.]  However, the Receiver previously filed such declaration as part of *The Receiver's First Assessment Regarding Former Baron Attorneys* and *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims.*  [*See* Docket No. 399 at Appx. 803.]  Mr. Garrey also appeared at the hearing on April 28, 2011, and made himself available for examination by Mr. Baron.  Finally, Mr. Baron did not offer evidence to controvert the Garrey Declaration.  As a result, the Garrey Declaration was deemed admitted and considered by the Court in its *Findings of Fact, Conclusions of Law, and Order on Assessment of Attorney Claims.*  [Docket No. 575 at p. 13 n. 4.]

[4] *The Receiver's Fourth Motion to Approve Assessment and Disbursement of Attorney Claims [Corrected Version]* supplants and replaces the version filed on May 11, 2011, which contained mathematical errors.  [Docket No. 562.]

[5] The Receiver's *Findings of Fact, Conclusions of Law, and Order on Assessment of Attorney Claims [Corrected Version]* completely supplants and replaces the original version filed May 11, 2011, which contained mathematical errors.  [Docket No. 563.]

the Findings of Fact and approved $870,237.19 in payment to the Former Baron Attorneys upon the Receiver's acquisition of sufficient cash.  [Docket No. 575.]

A more detailed discussion of the Receiver's work relating to the claims of the Former Baron Attorneys is included further down in this Report.

> b.    *The Court has announced its intention to grant fee applications totaling $188,918.40.*

As stated above, on July 1, 2011, the Court issued its *Advisory* "regarding how it intends to manage this case going forward . . . [a]ssuming the matter will eventually be back at the district court level."  [Docket No. 630 at p. 1.]  In the *Advisory*, the Court announced its intention to grant the following fee applications, totaling $188,918.40:

- $5,000.00 pursuant to *The Receiver's Fourth Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 593];

- $2,787.50 pursuant to *The Receiver's Sixth Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 602];

- $4,433.88 pursuant to *The Receiver's Ninth Application Cox Fee Application* [Docket No. 603];

- $40,530.00 (75% of the requested fees) pursuant to *The Receiver's Seventh Receiver Fee Application* [Docket No. 605]; and

- $136,167.02 (75% of the requested fees) pursuant to *The Receiver's Seventh Gardere Fee Application*.  [Docket No. 606].

[Docket No. 630 at p. 2.]  These fee applications were filed by the Receiver during June and the first two weeks of July 2011; thus, details regarding such fee applications are included further down in the Report.

        c.    *The Court has additional fee applications pending before it totaling $266,012.71.*

In addition to the $188,918.40 in fee applications that, according to the *Advisory*, the Court intends to grant, the following fee applications (totaling $266,012.71) are pending before the Court:

- $13,822.27 pursuant to *The Receiver's Third Receiver Fee Application* (unpaid amounts incurred in January 2011) [Docket Nos. 323, 387];

- $30,838.66 pursuant to *The Receiver's Third Gardere Fee Application* (unpaid amounts incurred in January 2011) [Docket Nos. 324, 386];

- $20,881.25 pursuant to *The Receiver's Fourth Receiver Fee Application* (unpaid amounts incurred in February 2001) [Docket Nos. 417, 429];

- $40,860.05 pursuant to *The Receiver's Fourth Gardere Fee Application* (unpaid amounts incurred in February 2011) [Docket Nos. 418, 427];

- $13,068.90 pursuant to *The Receiver's Fifth Receiver Fee Application* (unpaid amounts incurred in March 2011) [Docket Nos. 490, 532];

- $38,748.97 pursuant to *The Receiver's Fifth Gardere Fee Application* (unpaid amounts incurred in March 2011) [Docket Nos. 491, 533];

- $7,087.50 pursuant to *The Receiver's Sixth Receiver Fee Application* (unpaid amounts incurred between April 1-22, 2011) [Docket Nos. 492, 534];

- $19,955.60 pursuant to *The Receiver's Sixth Gardere Fee Application* (unpaid amounts incurred between April 1-22, 2011) [Docket Nos. 493, 535];

- $13,510.50 pursuant to *The Receiver's Seventh Receiver Fee Application* (unpaid amounts incurred between April 23-May 31, 2011) [Docket Nos. 605, 630.];

- $45,389.01 pursuant to *The Receiver's Seventh Gardere Fee Application* (unpaid amounts incurred between April 23-May 31, 2011) [Docket Nos. 606, 630.];

- $5,000.00 pursuant to *The Receiver's Fifth Application for Reimbursement of Fees Incurred by Martin Thomas* [*see* Docket No. 640 at Ex. 1], filed with the Fifth Circuit pursuant to this Court's *Order Directing Parties to File Pending Motions with the U.S. Court of Appeals for the Fifth Circuit* [Docket No. 616]; and

- $16,850.00 pursuant to *The Receiver's Fifth Application for Reimbursement of Fees Incurred by Damon Nelson* [*see* Docket No. 629 at Ex. A.], filed with the

Fifth Circuit pursuant to this Court's *Order Directing Parties to File Pending Motions with the U.S. Court of Appeals for the Fifth Circuit* [Docket No. 616].

Details regarding these pending fee applications are included further down in the Report.

> d. *Estimated additional fee applications through July 31, 2011 will likely total approximately $465,000.00.*

The following are ***estimated*** fee applications (with estimated amounts totaling $465,000.00) that the Receiver foresees filing with the Court for work performed through July 31, 2011:

- $12,500.00 pursuant to *The Receiver's Fifth Eckels Fee Application* (for amounts incurred in May and June 2011);

- $50,000.00 pursuant to *The Receiver's Second Grant Thornton Fee Application* (for amounts incurred in May and June 2011);

- $30,000.00 pursuant to *The Receiver's Eighth Receiver Fee Application* (for amounts incurred in June 2011);

- $80,000.00 pursuant to *The Receiver's Eighth Gardere Fee Application* (for amounts incurred in June 2011);

- $8,000.00 pursuant to *The Receiver's Tenth Cox Fee Application* (for amounts incurred in June 2011);

- $4,000.00 pursuant to *The Receiver's Seventh Application for Reimbursement of Fees Incurred by Thomas Jackson* (for amounts incurred in June 2011);

- $16,000.00 pursuant to *The Receiver's Sixth Application for Reimbursement of Fees Incurred by Damon Nelson* (for amounts incurred in June 2011);

- $50,000.00 pursuant to *The Receiver's Ninth Receiver Fee Application* (for amounts incurred in July 2011);

- $150,000.00 pursuant to *The Receiver's Ninth Gardere Fee Application* (for amounts incurred in July 2011);

- $5,000.00 pursuant to *The Receiver's Sixth Application for Reimbursement of Fees Incurred by Martin Thomas* (for amounts incurred in July 2011);

- $6,500.00 pursuant to *The Receiver's Sixth Eckels Fee Application* (for amounts incurred in July 2011);

- $25,000.00 pursuant to *The Receiver's Third Grant Thornton Fee Application* (for amounts incurred in July 2011);

- $8,000.00 pursuant to *The Receiver's Eleventh Cox Fee Application* (for amounts incurred in July 2011);

- $4,000.00 pursuant to *The Receiver's Eighth Application for Reimbursement of Fees Incurred by Thomas Jackson* (for amounts incurred in July 2011); and

- $16,000.00 pursuant to *The Receiver's Seventh Application for Reimbursement of Fees Incurred by Damon Nelson* (for amounts incurred in July 2011).

  e.    *The Receiver anticipates paying expenses through July 31, 2011 totaling $5,810.14.*

Before July 31, 2011, the Receiver will disburse $5,000.00 to Mr. Baron for his daily-living expenses for August 2011.  Additionally, the Receiver has an outstanding invoice of $810.14 for copy expenses related to his recent (and multiple) Fifth Circuit filings of pending motions pursuant to this Court's *Order Directing Parties to File Pending Motions with the U.S. Court of Appeals for the Fifth Circuit.*  [Docket No. 616.]  Details regarding the expenses that the Receiver has paid from the Receivership estate to date, including during June and the first two weeks of July 2011, are included in a chart further down in the Report.

  f.    *The Receiver anticipates paying Renewal Fees through July 31, 2011 totaling $14,200.00.*

As explained further down in the Report, domain names (such as the ones registered by Quantec, LLC and Novo Point, LLC (collectively, the "LLCs")) require an annual renewal fee to be paid to the registrar (the "Renewal Fees").  Failure to pay Renewal Fees will lead to forfeiting the registration and control over the domain names.  Renewal Fees for certain domain names are due by the end of July 2011.  The Manager of the LLCs, Damon Nelson [*see* Docket No. 473], anticipates that such Renewal Fees will total $14,200.00.  Details regarding the Renewal Fees that the Receiver has paid from the Receivership estate to date, including during June and the first two weeks of July 2011, are included further down in the Report.

g.   *The Receiver anticipates paying operating expenses through July 31, 2011 totaling $29,600.00.*

Mr. Nelson keeps the Receiver apprised of the LLCs' expenses.  Below is a chart of LLC expenses (with an estimated total of $29,600.00) that Mr. Nelson has forecasted through July 31, 2011 (excluding payments of Renewal Fees, which is discussed in the previous section):

| Recipient | Amount | Type |
|---|---|---|
| Peter Wall, Programmer for the LLCs | $25,600.00 | Programmer Fees |
| Quasar Services, LLC | $1,000.00 | Rent and Wireless Internet Expenses |
| Domain Name Appraiser | $3,000.00 | Domain Name Appraisal for Potential Domain Name Sales |
| **TOTAL:** | **$29,600.00** | |

Details regarding the LLC's operating expenses that the Receiver has paid from the Receivership estate to date, including during June and the first two weeks of July 2011, are included in a chart further down in the Report.

h.   *The Court has announced its intention to award the Trustee fees from the Receivership estate totaling $379,761.18.*

On April 19, 2011, the Trustee filed the *Motion of Daniel J. Sherman, Chapter 11 Trustee for Ondova Limited Company, for Reimbursement of Fees and Expenses from the Receivership Estate*, requesting that the Trustee be paid $379,761.18 from the Receivership Assets.  [Docket No. 467.]  In its *Advisory*, the Court announced its intention to grant the motion.  [Docket No. 630 at p. 2.]

i.   *The Receiver anticipates paying $0 to Carrington.*

On June 15, 2011, a former Baron law firm, Carrington, Coleman, Sloman & Blumenthal, LLP ("Carrington") filed a *Motion for Reconsideration or Alter or Amend the Findings of Fact, Conclusions of Law, and Order on Assessment of Attorney Claims*.  [Docket

No. 613.][6]  Carrington alleges that it is entitled to payment of its former attorney claim in the amount of $224,223.27 from the Receivership Assets.  [*Id.*]  The Receiver responded to the motion on three grounds.  [Docket Nos. 633 and 634.]  First, the Receiver noted that the Trustee had already promised to pay Carrington from the Ondova estate.  [*Id.*]  Second, Carrington had never once taken issue with the Receiver's request that he not have to pay Carrington.  [*Id.*]  Third, the Receiver does not have the available cash to cover Carrington's claim (see above), and the Trustee does.  [*Id.*]  Mr. Baron also filed his own response to Carrington's motion.  [Docket No. 639.]

In its *Advisory*, the Court stated that it "will evaluate the merits" of the Carrington motion.  [Docket No. 630.]  The July 31 Financial Picture's analysis, however, assumes that Carrington's motion will be denied and the Court will instruct Carrington to seek payment from the Ondova estate (in which it already filed a claim which the Trustee allowed in full).  Having already granted the Trustee's request for $379,761.18 (see above), if the Court were also to grant the motion to pay Carrington's bankruptcy claim of $224,233.27, the Receivership liabilities would drown the liquid assets.

> j.      *The Receiver anticipates paying $0 to Mr. Barrett.*

Peter Barrett is a Former Baron Attorney—but not one in the sense as typically discussed in the Receivership.  Mr. Barrett served as one of Mr. Baron's attorneys during the course of the Receivership and has since withdrawn.  [Docket No. 457.]  On July 6, 2011, Mr. Barrett filed a fee application seeking $55,166.50.  [Docket No. 637.]  Approval of this fee application, of course, would add to the Receivership's growing list of obligations.  The July 31 Financial

---

[6] CCSB also filed a "conditional" notice of appeal with the Fifth Circuit appealing the Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Former Attorney Claims.  [Docket No. 614.]

Picture's analysis, however, assumes that the Barrett Motion for Fees will be denied and the Court will instruct Mr. Barrett to seek payment from Mr. Baron post-Receivership.

**B.      Work that the Receiver performed in June and the first two weeks of July 2011 relating to identifying, accessing, and managing the Receivership Assets.**

In order to accomplish the goal of paying the unpaid-attorney claims, the Receiver must accomplish two major tasks:

First Task:  Identify, gain access to, and manage the Receivership Assets—both cash and non-cash amounts.

Second Task:  Identify and work with Mr. Baron's unpaid attorneys to collect evidence relating to their claims.

This section of the report (Section B) will discuss the first task (and a separate section of the Report (Section C) will discuss the second task).

**1.      Work relating to identifying the Receivership Assets.**

The sections of the Report below detail the Receiver's work in identifying the monies, assets, and funds and, specifically, the work the Receiver performed in June and the first two weeks of July 2011 relating to attempting to identify Receivership Assets through: (a) communications, (b) document collection, and (c) extending the Receiver's jurisdictional reach.

*a.      The Receiver continued attempting to identify Receivership Assets through communications.*

Throughout June and the first two weeks of July 2011, the Receiver continued communicating with (or at least attempting to communicate with) numerous individuals for the purpose of, among other things, identifying the Receivership Assets.  The Receiver continued attempting to identify Receivership Assets through communications with Mr. Baron.

One of the three current methods for acquiring cash to fill the Delta is to collect funds from the Cook Islands (while the other two involve (a) liquidating the stocks and IRAs and (b) selling domain names).  Obtaining cash from the Cook Islands would arguably be the most ideal

source of funds, since, for example, it would presumably not create the same potential tax complexities with cashing out IRAs or require the resources to be expended in selling domain names (along with the reduction in monetizer fees for the LLCs once those domain names are gone).

In order to collect information about and gain access to the money in the Cook Islands, the Receiver has—since December 2010—been seeking an Order requiring Mr. Baron to cooperate. Details are set forth in the January Receiver Report. [Docket No. 321 at pp. 3-5, 49-41.] On February 10, 2011, the Court ordered that Messrs. Baron and Schepps meet with the Receiver and his counsel for as long a time as reasonably necessary to answer each and every question relating to the identity and location of all the Receivership Assets, including those in the Cook Islands. [Docket No. 318.] The Court stated to the Receiver that "I want you to ask Mr. Baron every question you have to ask him about his financial holdings that you think he has with regard to the information he has withheld from you . . . I want to know every financial holding that Mr. Baron has and every financial holding shall be placed under the Receiver, every holding." [Transcript of *Emergency Motion to Clarify and Further Emergency Relief Before the Honorable Royal Furgeson*, February 10, 2011, at p. 24.]

Messrs. Baron and Schepps continued to block the Receiver's attempts to obtain this information regarding Receivership Assets. In the third part of a three-part interview which was conducted during a Court ordered meet and confer, on March 4, 2011, the Receiver continued the interview with Messrs. Schepps and Baron. [Transcript of Court Ordered Meeting, March 4, 2011, at pp. 1-5.] Unfortunately, neither Mr. Baron nor Mr. Schepps changed their position and refused to provide any information relating Receivership Assets, including the offshore accounts. [*Id.* at 10:13-16, 11:13-16, 11:23-12:10] This meeting constituted a face-to-face conference in

the Court's jury room on the Receiver's potential *Motion to Enforce Court's Order Requiring that Mr. Baron Provide to the Receiver Information and Access to Receivership Assets*, which Mr. Baron opposes. [*Id.* at 12:21-22, 15:3-8.]

Mr. Baron still has not provided the Receiver with any information concerning offshore accounts.

> b.    *The Receiver continued attempting to identify Receivership Assets through document collection.*

In June and the first two weeks of July 2011, the Receiver continued his efforts to collect information and documents identifying monetary funds.  As the Receiver noted in the January and February 2011 Receiver Reports, a number of individuals from whom the Receiver sought information and documents provided the requested information and documents easily, while others—especially those reporting to Mr. Baron—did everything possible not to cooperate and to obstruct the Receiver.   [Docket Nos. 321 and 416.]   There are two general categories of document collection that the Receiver specifically pursued and will be discussed below: (i) non-privileged documents, and (ii) privileged documents.

> i.    <u>The Receiver continued attempting to identify Receivership Assets through document collection of non-privileged documents.</u>

The Receiver previously organized for each of the individuals from whom the Receiver requested information and documents, the types of documents and information each of them provided to the Receiver (along with what types of documents and information the Receiver believes to be deficient).   Details are set forth in the January and February 2011 Receiver Reports.   [Docket No. 321 at pp. 5-15; Docket No. 416 at pp. 13-15.]   To be efficient, the Receiver will not repeat that in this Report.  Instead, the Receiver will merely report on the status of the remaining work to be done.

Importantly, the Court should note that these efforts are targeted at obtaining cash from the Cook Islands—which is the alternative to having to cash out stocks and IRAs or sell as many domain names.

| Name | Description of individual's involvement | Documents and information not yet provided to Receiver |
|---|---|---|
| Adrian Taylor | Former Manager of Southpac Trust Ltd. | Documents related to accounts held by The Village Trust and related entities. |
| Brian Mason | Manager of Southpac Trust Ltd. | Documents related to accounts held by The Village Trust and related entities. |
| Elizabeth Schurig | Former attorney for certain Receivership Parties | Documents related to Mr. Baron, the LLCs, The Village Trust and related entities, to which Ms. Schurig claims privilege. |
| Gary Schepps | Counsel for Mr. Baron | Documents related to accounts held by The Village Trust and related entities. |
| | | Information related to Mr. Schepps' alleged retention as attorney for the LLCs. |
| | | Documents related to Mr. Baron's relationship with The Village Trust and related entities and Mr. Baron's communications with Mr. Harbin and Fabulous.com. |
| | | Specific examples of documents that Mr. Schepps, as counsel for Mr. Baron, has failed to provide the Receiver include all Mr. Baron's correspondence (including, without limitation, e-mails, letters, and faxes) with (1) Tine Faasili Ponia, Narida Crocombe, Brian Mason, Adrian Taylor, David McNair, The Village Trust, Southpac Trust, Ltd., Asiaciti Trust Pacific Limited, or anyone acting on behalf of the foregoing individuals or entities, (2) Jeff Harbin, Thomas Jackson, or anyone acting on behalf of Messrs. Harbin or Jackson, and (3) Mike Robertson, Ben Stewart, Susan Horton, Peter Stevenson, or anyone acting on behalf of Fabulous.com or the foregoing individuals. |
| | | Documents relating to the funds that Mr. Baron alleges Ms. Schurig and Mr. Munish Krishan misappropriated. |

| Name | Description of individual's involvement | Documents and information not yet provided to Receiver |
|---|---|---|
| Jeff Baron | Subject of Receivership | Documents related to accounts held by The Village Trust and related entities.<br><br>Documents related to Mr. Baron's relationship with The Village Trust and related entities and his communications with Mr. Harbin and Fabulous.com.<br><br>Specific examples of documents that Mr. Baron has failed to provide the Receiver include all correspondence (including, without limitation, e-mails, letters, and faxes) with (1) Tine Faasili Ponia, Narida Crocombe, Brian Mason, Adrian Taylor, David McNair, The Village Trust, Southpac Trust, Ltd., Asiaciti Trust Pacific Limited, or anyone acting on behalf of the foregoing individuals or entities, (2) Jeff Harbin, Thomas Jackson, or anyone acting on behalf of Messrs. Harbin or Jackson, and (3) Mike Robertson, Ben Stewart, Susan Horton, Peter Stevenson, or anyone acting on behalf of Fabulous.com or the foregoing individuals.<br><br>Documents relating to the $2 million that Mr. Baron alleges Ms. Schurig misappropriated.<br><br>Documents relating to the $4 million that Mr. Baron alleges Mr. Munish Krishan misappropriated. |
| Jeff Hall | Former attorney for Mr. Baron | Documents related to Mr. Baron to which Mr. Hall claims privilege. |
| Jeff Harbin | Manager of the LLCs | His entire file of documents (privileged and unprivileged) relating to the LLCs. |
| Thomas Jackson | Counsel for the LLCs | His entire file of documents (privileged and unprivileged) relating to the LLCs. |
| Tine Faasili Ponia | General Counsel for Southpac Trust Ltd. | Documents related to accounts held by The Village Trust and related entities. |

| Name | Description of individual's involvement | Documents and information not yet provided to Receiver |
|------|------|------|
| Narida Crocombe | Ms. Ponia's apparent replacement as General Counsel for Southpac Trust Ltd. | Documents related to accounts held by The Village Trust and related entities. |

In June and the first two weeks of July 2011, the Receiver continued to follow up, where necessary, with certain of these individuals to conduct interviews (or additional interviews) and collect information and documents (or additional information and documents).  In June and the first two weeks of July 2011, the Receiver continued to implement a portion of the plan to exhaust these individuals as sources for documents and information regarding identification of the Receivership Assets.

      ii.    <u>The Receiver continued attempting to identify Receivership Assets through document collection of privileged documents.</u>

As previously reported in his January and February 2011 Receiver Reports, certain individuals maintain relevant information and documents concerning the identification of additional Receivership Assets (*e.g.*, Ms. Schurig, former counsel to certain Receivership Parties, and Mr. Hall, former counsel to Mr. Baron).  [Docket Nos. 321, 416.]  These individuals, however, did not produce this information because of attorney-client privilege concerns.  The Receiver previously conducted research supporting the notion that: (a) the Receiver is entitled under the Receivership Order to obtain the privileged documents and (b) obtaining the privileged documents will not waive the privilege except as to the Receiver (*i.e.*, no global waiver).  In February 2011, the Receiver conducted additional analysis.  The Receiver is still considering filing a motion with the Court seeking an order compelling these individuals to produce the purportedly privileged information.  Ultimately, the Receiver hopes that these privileged

documents contain information relating to the identity and ability to access cash in the Cook Islands although the sale of domain names and cashing out of stocks appear to be the more viable strategy.

      *c.*     *The Receiver continued attempting to identify Receivership Assets through extending his jurisdictional reach.*

The Receiver retained local counsel in 16 foreign jurisdictions to assist with locating and accessing assets.  [Docket No. 343.]  On March 7, 2011, the Receiver notified the Court of these retentions.  [*Id.*]  Further, Mr. Baron appealed the Court's *Order Granting the Receiver's Motion to Restart 10-Day Clock to File Miscellaneous Actions*.  [Docket Nos. 293, 340.]  Given how routine it is for courts, in their discretion, to grant motions to restart the 10-day clock for filing miscellaneous actions, the fact that Mr. Baron is appealing this order is a microcosm of his obtrusive and pointless tactics.  He wants nothing more than to obstruct the Receiver and thereby drive up litigation costs.

**2.**     **Work relating to accessing the Receivership Assets.**

In the January and February 2011 Receiver Reports, the Receiver discussed how he successfully ***identified*** 32 accounts totaling approximately $3.9 million (combining cash, stocks, IRAs, etc.), (a) approximately $3 million of which is attributable to Mr. Baron's individual accounts (the "Baron Funds"—which contained at one point approximately $980,000.00 but which, by the end of March 2011, will likely be fully disbursed even prior to paying unpaid-attorney claims) and (b) approximately $900,000.00 of which is attributable to accounts in the names of the LLCs (the "LLC Funds").  [Docket Nos. 321, 416.]  In the January and February 2011 Receiver Reports, the Receiver also discussed how, in addition to the Baron Funds and the LLC Funds, the Receiver also ***identified*** revenue streams from Netsphere ("Netsphere Stream") and revenue streams from various monetizers ("Monetizer Streams").  [Docket No. 321, 416.]

Identifying and accessing funds, however, are two completely different projects—especially when Mr. Baron and his agents were doing everything in their power to prevent the latter from occurring.  The sections of the Report below will detail the Receiver's work relating to (a) obtaining access to Baron Funds, (b) maintaining access to LLC Funds, (c) obtaining access to additional amounts from the Netsphere Stream, (d) obtaining access to additional amounts from the Monetizer Stream, and (e) performing additional efforts to access additional funds.  Although a discussion of the 28 U.S.C. § 754 filings would be equally apropos here as it is in section B.1.c above, the discussion would be redundant; thus, the Receiver will not repeat that discussion below.

a.    *The Receiver previously obtained access to Baron Funds.*

As the Receiver reported in the January and February 2011 Receiver Reports, the Receiver previously accessed Baron Funds of approximately $1.9 million (counting both cash accounts, and accounts containing stocks, IRAs, etc.).   [Docket No. 321 and 416.]  As the January and February 2011 Receiver Reports also note, the cash accounts alone total approximately $980,000.00.  [*Id.*]  The January 2011 Receiver Report breaks down those cash accounts in specific detail, and for efficiency sake, need not be repeated here.  [Docket No. 321.]

In June and the first two weeks of July 2011, the Receiver did not access any additional accounts (although he did access additional funds from the Netsphere Stream and Monetizer Stream).  But in order to take a snapshot of the current cash situation, along with details regarding the Receivership's anticipated liquid assets and anticipated liabilities, please see section A of this Report—which, in a nutshell, states that (1) the Receivership's total anticipated liquid assets, which include (i) cash-on-hand of approximately $382,000, (ii) anticipated domain-revenue in July 2011 of approximately $138,000, (iii) anticipated domain-name sales of approximately $1,260,000, and (iv) non-exempt stock of approximately $450,000, total

approximately $2,230,000; and (2) the Receivership's total anticipated liabilities, which include (i) Former Baron Attorney claims of approximately $870,000, (ii) approximately $189,000 in fee applications that the Court has announced its intention to grant, (iii) approximately $266,000 in additional fee applications currently pending before the Court, (iv) approximately $465,000 in estimated additional fee applications for work performed through July 31, 2011, (v) approximately $6,000 in Receivership expenses through July 31, 2011, (vi) approximately $14,000 in Renewal Fees through July 31, 2011, (vii) approximately $30,000 in LLC operating expenses through July 31, 2011, and (viii) approximately $380,000 for the Trustee's fee application that the Court has announced its intention to grant, for a total of approximately $2,220,000.

> b.    *In June and the first two weeks of July 2011, the Receiver maintained access to the LLC Funds.*

As described in some detail in the December 2010 Receiver Report, the LLCs funds are not the ideal option for funding the unpaid-attorney claims, since most of the cash appears earmarked to pay (a) domain-name renewal fees, (b) employee salaries, (c) attorney fees of current LLCs attorneys, and (d) other operations and management expenses.  In short, the LLC funds are needed simply to keep the LLCs operating.

Although the Receiver may or may not use the LLC Funds directly to fund disbursements to the unpaid attorneys of Mr. Baron, the LLC Funds are still extremely important.  As described above, the most likely and viable source for funding the disbursements to the unpaid attorneys of Mr. Baron is through the sale of domain names that the LLCs hold and that the LLC Funds are being used to maintain.

The January 2011 Receiver Report provided substantial details in describing the Receiver's work in initially accessing the LLC Funds and maintaining such access, including (1)

the LLC status of the LLCs on the eve of Receivership, (2) Mr. Baron's initial round of manipulations in November and December 2010, (3) the Receiver's fight for access to the LLC Funds in December 2010, (4) the Receiver's initial victory in gaining access to the LLC Funds in December 2010, (5) Mr. Baron's attempt to strip the Receiver of his access to the LLC Funds and other LLC assets through Mr. Jackson's efforts in January 2011, and (6) Mr. Baron's attempt to strip the Receiver of his access to the LLC Funds and other assets through Mr. Schepps in January 2011—*i.e.*, by appealing an order that the LLC attorneys, Messrs. Jackson and Cox, sponsored to this Court.  [Docket No. 321 at pp. 23-33.][7]

The February 2011 Receiver Report described in detail the Receiver's investigation into CDM Services, LLC, the entity Mr. Schepps claimed hired him to represent Novo Point, LLC and Quantec, LLC (the "LLCs").  [Docket No. 416 at pp. 20-27.]  For the Court's benefit, the Receiver will recount in some detail the almost three month long saga to determine how Mr. Schepps derives his authority to represent the LLCs.

           i.        The Court instructed the Receiver to attempt to determine Mr. Schepps' purported authority to represent the LLCs.

On January 25, 2011, the Receiver filed *The Receiver's Emergency Motion for Gary Schepps to Show Authority to Represent the LLCs*.  [Docket No. 248.]  In that motion, the Receiver requested that the Court instruct Mr. Schepps to present evidence demonstrating his authority to represent the LLCs.  On February 4, 2011, the Court issued its *Order Granting the Receiver's Emergency Motion for Gary Schepps to Show Authority to Represent the LLCs*. [Docket No. 291.][8]  At a hearing on February 10, 2011 [Docket No. 265], the Court ordered

---

[7] In addition, in February 2011, Mr. Jackson filed an emergency motion that, in essence, sought to reduce the Receiver's access to the management and operations of the LLCs, which was discussed in Section B.3.b.ii.1.vi-viii. of the February 2011 Receiver Report, relating specifically to sale of domain names.

[8] On March 3, 2011, Mr. Baron appealed this order.  [Docket No. 341.]

Messrs. Schepps, Barrett, and Baron to appear at a transcribed meeting with the Receiver on February 17, 2011 and answer the Receiver's questions and present evidence demonstrating his authority to represent the LLCs.  [Docket No. 318.]

> ii.    The Receiver interviewed the then-Manager of the LLCs and the attorneys for the LLCs regarding Mr. Schepps' purported authority to represent the LLCs.

The day before the meeting with Mr. Schepps, on February 16, 2011, the Receiver interviewed Messrs. Harbin, Jackson, and Cox.  [Docket No. 331 at p. 2.]  All three of those individuals stated that they (1) never heard of CDM Services, LLC., (2) did not believe that CDM Services, LLC had oversight authority for the LLCs, (3) did not believe and were not aware of any Cook Islands management with oversight authority over the LLCs that supervised the LLCs, and (4) understood that Mr. Schepps was not the attorney for the LLCs.  [Transcript of Court Ordered Meeting, February 16, 2011, at 79:21-80:5, 240:24-244:12.]

> iii.   Mr. Schepps filed a report full of gibberish.

The next day, on February 17, 2011, and a few hours before the meeting between Messrs. Schepps, Barrett, and Baron, and the Receiver, Mr. Schepps filed a disclosure with the Court purportedly answering all of the authority issues.  [Docket No. 320.]  But the disclosure did not answer any questions at all.  The disclosure states that Mr. Schepps was hired to represent the LLCs by someone named "Narida Crocombe."  [*Id.*]  But it says nothing else.

> iv.    During the first part of his interview with the Receiver, Mr. Schepps refused to answer questions or provide evidence demonstrating Mr. Schepps' authority to represent the LLCs.

At the meeting on February 17, 2011, Mr. Schepps refused to answer any questions about the authority issue.  [Docket No. 333 at pp. 3, 17-21, 26.]  As just a few examples, Mr. Schepps refused to discuss even the most basic concepts such as (1) when he first spoke to the individual who allegedly engaged his services, (2) when he became the attorney for the LLCs, and (3)

whether he entered into an engagement agreement to become attorney for the LLCs.  [*Id.* at 20.]
Mr. Schepps claimed that this material was all protected by the attorney-client privilege and that
the Court had not ordered him to disclose this sort of information.  [*Id.*]  Here is a sampling of
what occurred at the Court ordered Meeting:

> MR. GOLDEN:  I just want to be clear about this.  You will not tell the receiver the first time you ever spoke to Narida Crocombe. That's your position?
>
> MR. SCHEPPS:  I'm going to assert the attorney/client privilege.  That's correct.. . .
>
> MR. GOLDEN:  Do you have a contract with CDM Services, LLC?
>
> MR. SCHEPPS:  Objection; attorney/client privilege.
>
> MR. GOLDEN:  To whether you have a contract?  What is your authority to represent Quantec, LLC and Novo Point, LLC?  What's your authority?
>
> MR. SCHEPPS:  I have an attorney/client agreement . . .
>
> MR. GOLDEN:  Then explain to us, go ahead in narrative form, what your connection is to Quantec, LLC and Novo Point, LLC since you purport to represent them.
>
> MR. SCHEPPS:  I'm appellate counsel for Quantec, LLC and Novo Point, LLC.

[*Id.* at 21.]

> v.   <u>During the second part of the interview, Mr. Schepps failed to appear.</u>

As set forth in Section C.1.e of the February 2011 Receiver Report, Mr. Schepps
prematurely ended the first part of the interview and agreed to continue the interview on
February 23, 2011.  [Transcript of Court Ordered Meeting, February 17, 2011 at 155:1-10.]  On
the day of the second part of the interview, February 23, 2011, however, neither Mr. Schepps nor
Mr. Baron appeared.  [Transcript of Court Ordered Meeting, February 23, 2011 at 5:3-11:2,

23:15-245:9.]   However, Mr. Baron's other attorney, Mr. Barrett, did attend.  [*Id.* at 12:8-11,

14:11-12.]   The Receiver interviewed Mr. Barrett and asked about Mr. Schepps' purported

authority to represent the LLCs.  [*Id.* at 197:11-199:2, 227:15-25.]  Mr. Barrett stated that he had

no information regarding that topic:

> MR. LOH:            And you don't know the circumstances under which CDM
>                     Services, LLC presumes to have authority or control over
>                     Quantec, LLC or Novo Point, LLC?
>
> MR. BARRETT:        No, no, I don't.
>
> MR. LOH:            And by virtue of that fact, you don't have – you don't
>                     understand -- you don't have any knowledge of the facts or
>                     circumstances under which Mr. Schepps presumes to have
>                     been hired by CDM Services, LLC to represent Novo
>                     Point, LLC and Quantec, LLC?
>
> MR. BARRETT:        No, sir.

[*Id.* at 227:15-25.]

### vi.   The Receiver filed an Advisory Report with the Court.

On February 28, 2011, the Receiver filed the *Receiver's Advisory Statement Regarding*

*Attempts to Resolve Issues with Jeffrey Baron and Gary Schepps* and its supporting appendix

[Docket No. 333].   This Advisory contained, among other things, a summary and evidence

relating to Messrs. Baron and Schepps' disregard of the Court's specific instructions from the

February 10, 2011, hearing and refusal to answer questions relating to his purported authority to

represent the LLCs.   Again, this is significant.   Mr. Schepps is claiming that he has authority to

act on behalf of the LLCs—which are the holders of the domain names.   Since selling the

domain names looks like the best solution to covering the Delta, it is very important to

understand who is the counsel with power to file motions to stop such sales.

vii.   <u>Mr. Baron appealed CDM Services and Mr. Baron's other entities as being Receivership Parties.</u>

On March 3, 2011, Mr. Baron filed a notice of appeal of the *Order Granting the Receiver's Third Motion to Clarify the Receiver Order* and the *Order Granting The Receiver's Fourth Motion to Clarify the Receiver Order*. [Docket No. 340.] Recall that the Orders provide, among other things, that all of the Cook Island entities (Southpac Trust Limited, CDM Services, etc.) are Receivership Parties. On March 4, 2011, Mr. Schepps complained during a transcribed meeting that the Court cannot make the Receivership Order a "moving target," adding new parties along the way (presumably, since, by doing so, the Court has frustrated Mr. Baron's efforts to manipulate the Receivership Order by simply changing entity names or creating new entities). [Transcript of Court Ordered Meeting, March 4, 2011, at 47:18-48:4.]

viii.   <u>During the third part of the interview, Mr. Schepps still refused to discuss his authority to represent the LLCs.</u>

At the third face-to-face meeting, at the March 4, 2011 meet-and-confer, the Receiver continued the interview with Mr. Schepps. Unfortunately, Mr. Schepps did not change his position that everything relating to his authority falls under attorney-client privilege. For example, here are some questions that in response, Mr. Schepps claimed the attorney-client privilege:

MR. LOH:        Mr. Schepps, is it your position that an individual named Narida Crocombe, C-r-o-c-o-m-b-e, hired you on behalf of CDM Services, LLC?

MR. SCHEPPS:    Objection; attorney/client privilege.

MR. LOH:        So you will not answer that question?

MR. SCHEPPS:    I will not answer the question.

MR. LOH:        Did Ms. Crocombe sign anything when she hired you?

MR. SCHEPPS:         Objection -- I will not answer the question -- attorney/client privilege.

MR. LOH:             Did you sign anything when you took on the representation?

MR. SCHEPPS:         Objection; attorney/client privilege.

MR. LOH:             How do you know that Ms. Crocombe has the authority on behalf of CDM Services, LLC to hire you to represent Novo Point, LLC and Quantec, LLC?

MR. SCHEPPS:         We're going to object to that also on the attorney/client privilege basis.

MR. LOH:             When did you find out that Ms. Crocombe supposedly had the authority on behalf of CDM Services, LLC to hire you to represent Novo Point, LLC and Quantec, LLC.

MR. SCHEPPS:         I'm going to object to that on the basis of attorney/client privilege, also.

MR. LOH:             Do you have a copy of the retention letter or retention agreement that you have?

MR. SCHEPPS:         I'm going to object to that, also; attorney/client privilege.

MR. LOH:             Who told you that Narida Crocombe had the authority to hire you to represent --

MR. SCHEPPS:         Is this some kind of an inquisition or is this a meet and confer before we file -- you file a motion?

MR. GOLDEN:          You just asked for what specific questions we want answered.. . .

MR. LOH:             You asked us what information we wanted. I'm going to --

MR. SCHEPPS:         Well, then I'm not giving you any information. It's attorney/client privileged.

[*Id.* at 19:6-21:6.]  This meeting constituted a face-to-face conference on the Receiver's potential

*Motion to Require Gary Schepps to Show Further Evidence of Authority to Represent Quantec,*

*LLC and Novo Point, LLC.*  Mr. Schepps is opposed.  This evidence will also be used by the

Receiver in opposing Mr. Schepps' motion [Docket No. 472] to obtain un-redacted copies of *The*

*Receiver's Motion to Approve Sale of Specific Domain Names and Confirm Propriety of Sales Protocol* [Docket No. 425] (*i.e.*, Mr. Schepps would only have standing to make the motion if he were to represent the LLCs, which he does not).

Despite his failure to show authority to represent the LLCs, on March 11, 2011, Mr. Schepps submitted a letter brief to the Court, stating that "[t]he folks in the Cook Islands are very concerned that the receiver is racing against the Court's show cause order and actively attempting to liquidate [LLC] assets."  [Docket No. 357 at p. 1.]  Additionally, Mr. Schepps stated that that "[t]he management company in the Cook Islands . . . have selected a replacement for [former-LLC manager] Mr. Harbin to run the operations of the [LLCs]."  [*Id.* at p. 2]  Mr. Schepps—again, without providing any evidence—asserted that "[t]he companies retained me . . ." and proceeded to brief his position that the LLCs should not be treated as Receivership Parties. [*Id.* at pp. 2-7.]

> ix.     <u>Mr. Baron appealed the Court's December 17, 2010, order clarifying the Receivership as including the LLCs.</u>

On March 21, 2011, Mr. Baron filed a *Motion to Stay Order Placing Novo Point, LLC and Quantec, LLC Into Receivership*.  Importantly, Mr. Schepps in a subsequent letter to the Fifth Circuit asserted that the ***Receiver*** was the appellee in this appeal.  [Docket No. 415 at p. 8.] The implications of this are obvious.  Mr. Baron was yet again attempting to bog down the Receivership—this time in an appeal to the Fifth Circuit.  The Receiver was and remains aware of his objectives and battling Mr. Baron in the Fifth Circuit is not one of them.  So, the Receiver drafted a letter dated March 23, 2011, explaining his position that the Trustee was the proper appellee.  [Docket No. 415 at pp. 4-5.]  The Receiver noted the following in the letter:

- The Trustee moved this Court for the appointment of a Receiver;

- The order appointing the receiver should have but did not specify that the LLCs were always meant to be Receivership Parties; and

- The Receiver moved for clarification of the order appointing receiver that it always included the LLCs—not for additional relief.

[Docket No. 415 at pp. 4-5.] The Fifth Circuit denied Mr. Baron's motion, and the Receiver avoided becoming party and involved in appellate practice before the Fifth Circuit at that time. [Docket No. 441.]

x. <u>The Receiver eventually had to become involved in the appeal of the December 17, 2010, order clarifying the Receivership as including the LLCs.</u>

On May 13, 2011, the Fifth Circuit notified the Receiver by letter that it considered the Receiver—not the Trustee—to be the appellee in Mr. Baron's appeal of the December 17, 2010, order on behalf of the LLCs. The Fifth Circuit stated in the May 13, 2011 letter that the Receiver's appellee brief was due May 23, 2011, along with a motion requesting permission to file the brief out of time. (The appellee brief was actually due May 3, 2011, but the Receiver did not file one because the Trustee had filed its appellee brief instead on the grounds that the Trustee was the actual appellee.) So, on May 19, 2011, the Receiver appeared in the Fifth Circuit Court of Appeals for the limited purpose of asking the Court to extend the deadline for filing the appellee brief. The Receiver argued that the extension will allow the Fifth Circuit to consider the Trustee's motion requesting that the Court allow him to appear as the appellee in the appeal of the December 17, 2010, order. On May 24, 2011, the Receiver notified this Court of its filings with the Fifth Circuit in a notice. [Docket No. 585.]

In addition to the appeal above (which is docketed with the Fifth Circuit as consolidated case nos. 10-11202 and 11-10113), Messrs. Baron and Schepps have named the Receiver as

appellee in three other appeals from this matter (docketed as case nos. 11-10290, 11-10390, and 11-10501). Accordingly, the Receiver and his counsel have had to file appearances in each of these appeals and spend time monitoring each of the dockets.

> c.    In June and the first two weeks of July 2011, the Receiver obtained access to additional funds from Netsphere.

In the January and February 2011 Receiver Reports, the Receiver discussed prior efforts at diverting Netsphere funds from The Village Trust (their original destination that is inaccessible to the Receiver) to a domestic account (their new destination that is accessible to the Receiver). [Docket No. 321 at pp. 41-42; Docket No. 416 at pp. 27-28.] To be efficient, the Receiver will not repeat that in this Report. Instead, the Receiver will note what occurred only in June and the first two weeks of July 2011.

In June and the first two weeks of July 2011, the Receiver succeeded in diverting additional Netsphere funds in the amount of $32,768.23. Here is a chart showing the December 1, 2010 through July 15, 2011 diverted revenues from Netsphere.

| Date | Amount | Original Destination | Diverted Destination |
|------|--------|----------------------|----------------------|
| Dec. 12, 2010 | $14,740.31 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| Jan. 5, 2011 | $15,000.00 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| Jan. 5, 2011 | $6,449.21 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| Feb. 3, 2011 | $8,308.23 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |

| Date | Amount | Original Destination | Diverted Destination |
|---|---|---|---|
| March 3, 2011 | $10,725.86 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| March 7, 2011 | $18,000.00 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| April 5, 2011 | $29,165.97 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| May 5, 2011 | $14,485.89 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| June 6, 2011 | $8,305.77 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| July 1, 2011 | $15,000.00 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| July 5, 2011 | $9,462.46 | The Village Trust | Receiver's account at Comerica Bank exclusively for payments under the Netsphere Stream |
| **TOTAL** | **$149,643.70** | | |

> d.      *In June and the first two weeks of July 2011, the Receiver obtained access to additional funds from monetizers.*

The Receiver understands that prior to the issuance of the Receiver Order, Mr. Harbin (former Manager of the LLCs) and/or Ms. Schurig (former counsel to certain Receivership Parties, including the LLCs) provided instructions to various monetizers to direct the Monetizer Stream outside of the country (and, thereby, outside the jurisdiction of U.S. courts and the

I.R.S.).  In order to access the Monetizer Streams, the Receiver attempted to divert the Monetizer Stream from The Village Trust (their original destination that in inaccessible to the Receiver) to domestic accounts (their new destination that is accessible by the Receiver) (the "Monetizer Diversion"). The sections of the Report below will detail the Receiver's work in continuing his efforts to enforce the Monetizer Diversion.

In the January and February 2011 Receiver Reports, the Receiver detailed how, (a) in December 2010, the Receiver successfully obtained access to $181,763.86 worth of funds derived from the Monetizer Stream, (b) in January 2011, the Receiver successfully obtained access to another $167,156.58 worth of funds derived from the Monetizer Stream [Docket No. 321 at pp. 43-45], (c) in February 2011, the Receiver successfully obtained access to another $170,766.37 worth of funds derived from the Monetizer Stream.  [Docket No. 416 at pp. 29-30.] In the March/April Receiver Report, the Receiver detailed how he successfully obtained access to another $163,460.15 worth of funds derived from the Monetizer Stream in March and the first part of April 2011.  [Docket No. 479 at pp. 28-30.]   In the April/May Receiver Report, the Receiver detailed how he successfully obtained access to another $271,634.13 worth of funds derived from the Monetizer Stream in the last week of April 2011 and May 2011.  [Docket No. 601 at pp. 32-36.]  To be efficient, the Receiver will not repeat such details in this Report. Instead, the Receiver will note what occurred only in June and the first two weeks of July 2011, as described below.

In June and the first two weeks of July 2011, the Receiver successfully obtained access to another $238,493.78 worth of funds derived from the Monetizer Stream.  Details are below, including the funds from the Monetizer Stream the Receiver accessed from December 2010 through July 15, 2011.

| Monetizer | Month | LLC Client | Amount of Funds |
|---|---|---|---|
| Hitfarm.com | December 2010 | Quantec, LLC | $131,844.68 |
| | January 2011 | Quantec, LLC | $119,748.07 |
| | February 2011 | Quantec, LLC | $126,030.76 |
| | March 2011 | Quantec, LLC | $107,938.28 |
| | April 2011 | Quantec, LLC | $111,271.67 |
| | May 2011 | Quantec, LLC | $95,150.99 |
| | June 2011 | Quantec, LLC | $97,245.18 |
| | First Two Weeks of July 2011 | Quantec, LLC | $0.00 |
| | December 2010 | Novo Point, LLC | $32,605.20 |
| | January 2011 | Novo Point, LLC | $28,652.25 |
| | February 2011 | Novo Point, LLC | $29,983.90 |
| | March 2011 | Novo Point, LLC | $27,385.26 |
| | April 2011 | Novo Point, LLC | $26,623.60 |
| | May 2011 | Novo Point, LLC | $23,861.24 |
| | June 2011 | Novo Point, LLC | $25,436.55 |
| | First Two Weeks of July 2011 | Novo Point, LLC | $0.00 |
| Namedrive LLC | December 2010 | Quantec, LLC | $8,447.11 |
| | January 2011 | Quantec, LLC | $7,206.51 |
| | February 2011 | Quantec, LLC | $6,575.62 |
| | March 2011 | Quantec, LLC | $6,237.74 |
| | April 2011 | Quantec, LLC | $6,970.24 |
| | May 2011 | Quantec, LLC | $5,855.52 |
| | June 2011 | Quantec, LLC | $5,803.33 |
| | First Two Weeks of July 2011 | Quantec, LLC | $6,167.50 |

| Monetizer | Month | LLC Client | Amount of Funds |
|---|---|---|---|
| Parked.com, Ltd. | December 2010 | Quantec, LLC | $1,263.90 |
| | January 2011 | Quantec, LLC | $1,921.00 |
| | February 2011 | Quantec, LLC | $1,704.50 |
| | March 2011 | Quantec, LLC | $660.02 |
| | April 2011 | Quantec, LLC | $1,190.25 |
| | May 2011 | Quantec, LLC | $864.66 |
| | June 2011 | Quantec, LLC | $937.36 |
| | First Two Weeks of July 2011 | Quantec, LLC | $471.31 |
| SEDO.com, LLC | December 2010 | Quantec, LLC | $0.00 |
| | January 2011 | Quantec, LLC | $1,720.00 |
| | February 2011 | Quantec, LLC | $1,720.00 |
| | March 2011 | Quantec, LLC | $0.00 |
| | April 2011 | Quantec, LLC | $225.00 |
| | May 2011 | Quantec, LLC | $0.00 |
| | June 2011 | Quantec, LLC | $79,589.44 |
| | First Two Weeks of July 2011 | Quantec, LLC | $15,129.32 |
| | December 2010 | Novo Point, LLC | $382.34 |
| | January 2011 | Novo Point, LLC | $335.17 |
| | February 2011 | Novo Point, LLC | $393.53 |
| | March 2011 | Novo Point, LLC | $337.86 |
| | April 2011 | Novo Point, LLC | $515.45 |
| | May 2011 | Novo Point, LLC | $444.35 |
| | June 2011 | Novo Point, LLC | $443.52 |
| | First Two Weeks of July 2011 | Novo Point, LLC | $414.08 |

| Monetizer | Month | LLC Client | Amount of Funds |
|---|---|---|---|
| Trellian Ltd. / Above.com | December 2010 | Quantec, LLC | $7,220.63 |
| | January 2011 | Quantec, LLC | $6,437.73 |
| | February 2011 | Quantec, LLC | $4,358.06 |
| | March 2011 | Quantec, LLC | $3,780.07 |
| | April 2011 | Quantec, LLC | $4,393.49 |
| | May 2011 | Quantec, LLC | $2,708.37 |
| | June 2011 | Quantec, LLC | $2,897.98 |
| | First Two Weeks of July 2011 | Quantec, LLC | $0.00 |
| Domainsponsor.com | December 2010 | Novo Point, LLC | $0.00 |
| | January 2011 | Novo Point, LLC | $1,135.85 |
| | February 2011 | Novo Point, LLC | $0.00 |
| | March 2011 | Novo Point, LLC | $0.00 |
| | First Part of April 2011 | Novo Point, LLC | $1,233.96 |
| | May 2011 | Novo Point, LLC | $0.00 |
| | June 2011 | Novo Point, LLC | $0.00 |
| | First Two Weeks of July 2011 | Novo Point, LLC | $0.00 |
| Firstlook.com | December 2010 | Quantec, LLC | $0.00 |
| | January 2011 | Quantec, LLC | $0.00 |
| | February 2011 | Quantec, LLC | $0.00 |
| | March 2011 | Quantec, LLC | $3,666.19 |
| | April 2011 | Quantec, LLC | $0.00 |
| | May 2011 | Quantec, LLC | $0.00 |
| | June 2011 | Quantec, LLC | $0.00 |
| | First Two Weeks of July 2011 | Quantec, LLC | $0.00 |

| Monetizer | Month | LLC Client | Amount of Funds |
|---|---|---|---|
| New.net | December 2010 | Quantec, LLC | $0.00 |
| | January 2011 | Quantec, LLC | $0.00 |
| | February 2011 | Quantec, LLC | $0.00 |
| | March 2011 | Quantec, LLC | $0.00 |
| | April 2011 | Quantec, LLC | $0.00 |
| | May 2011 | Quantec, LLC | $0.00 |
| | June 2011 | Quantec, LLC | $3,958.16 |
| | First Two Weeks of July 2011 | Quantec, LLC | $0.00 |
| | **DECEMBER 2010** | | $181,763.86 |
| | **JANUARY 2011** | | $167,156.58 |
| | **FEBRUARY 2011** | | $170,766.37 |
| | **MARCH 2011** | | $150,005.42 |
| | **APRIL 2011** | | $156,203.73 |
| | **MAY 2011** | | $128,885.13 |
| | **JUNE 2011** | | $216,311.52 |
| | **FIRST TWO WEEKS OF JULY 2011** | | $22,182.26 |
| | **COLLECTIVE TOTAL** | | **$1,193,274.87** |

e.      *The Receiver made efforts to access additional funds.*

As previously stated in the January 2011 Receiver Report, the Receiver gained access to 20 accounts totaling approximately $1.9 million in Baron Funds (including cash and non-cash amounts like stocks and IRAs).  [Docket No. 321 at pp. 20-23.]  To be efficient, this Report will not repeat those details.  Instead, this report will discuss (i) the four accounts containing Baron Funds that the Receiver has not yet accessed (the "Domestic Accounts"), and (ii) The Village Trust Account (for which the Receiver does not yet know the amounts contained therein).  The Receiver discusses both below.

In the January 2011 Receiver Report, the Receiver detailed how, despite Mr. Baron's lack of cooperation, (a) the Receiver gained access to 4 out of the 8 remaining Domestic Accounts the Receiver has discovered and (b) the Receiver obtained some information about the other 4 Domestic Accounts.  [Docket No. 321 at pp. 45-48.]  In the February 2011 Receiver Report, the Receiver also recounted Mr. Baron's refusal to cooperate and provide information concerning an IRA account in his name.   [Docket No. 416 at p. 31.]   The same report also detailed the Receiver's efforts to obtain information from Mr. Baron concerning overseas funds in the Cook Islands or elsewhere.  [*Id*. at pp. 8-9, 32.]  Mr. Baron refused to cooperate.

In June and the first two weeks of July 2011, the Receiver learned a few more details about The Village Trust Account.  On June 20, 2011, Mr. Baron emailed one of the Former Baron Attorneys—Ms. Schurig—for information concerning a foreign account held at Hong Kong Shanghai Banking Corporation ("HSBC") bank in Hong Kong.[9]  Ms. Schurig informed the Receiver that the account at HSBC was established to hold funds belonging to The Village Trust. The Receiver promptly initiated an investigation into whether any other Receivership Parties

---

[9] Why Mr. Baron was asking for this information will be discussed in more detail below as part of the section on tax filings for the Receivership Parties.

holds an interest in the HSBC account.  As described in *The Receiver's Sealed Supplemental Notice of Intent Not to Make FBAR Filings*, the Receiver promptly contacted HSBC to inform it of the Receivership and inquire as to the ownership details of such account.  [Docket No. 628.] These efforts are ongoing.

### 3.      Work relating to managing the Receivership Assets.

In addition to identifying and then accessing the Receivership Assets, the Receiver has been managing those assets.  The sections of the Report below will detail the Receiver's work relating to: (a) management of the Baron Funds, (b) management of the LLC Funds, (c) the Receiver's motion to confirm propriety regarding fund management, and (d) the Receiver's motion to seek reimbursement of additional amounts he personally expended.

#### a.      *The Receiver managed the Baron Funds.*

##### i.      The Receiver managed the accounts for the Baron Funds.

There will be a discussion in the sections directly below of how the Receiver managed the accounts for the Baron Funds, including (1) investigating insurance issues, and (2) managing issues surrounding Mr. Baron's IRAs.  Details follow.

###### 1)      The Receiver continued investigating insurance issues.

The aggregate amounts residing in the mirror accounts at Comerica Bank have, at times, exceeded the FDIC insurance level of $250,000.  Previously, the Receiver asked Comerica Bank to provide information as to how the Receiver could confirm that the funds are treated as being deposited with multiple subsidiaries that have banking licenses, *i.e.*, utilizing the Certificate of Deposit Account Registry Service ("CDARS"),[10] so that the FDIC insurance applies even if the funds, in the aggregate, substantially exceed $250,000.  Comerica Bank provided the Receiver

---

[10] When investors place a large deposit with a CDARS network member, that institution uses the CDARS program to places funds into CDs issued by other members of the CDARS network to protect large investments above the FDIC insurance level of $250,000.

with information on its "CD Placement Program" that would allow the mirror accounts CDARS protection. In February 2011, the Receiver considered whether to utilize this program and concluded it was not necessary since if the Court were to grant the pending fee applications, the aggregate funds at Comerica Bank will drop below $250,000. At present, this continues to be the case, as the aggregate funds at Comerica Bank have dropped below $250,000.

2)  <u>The Receiver sought permission from the Court to use stocks and IRAs as a source to fund disbursements from unpaid attorneys.</u>

On February 9, 2011, the Receiver filed *The Receiver's Omnibus Motion to Permit Cashing Out of Stocks and IRAs*. [Docket No. 309.] In the motion, the Receiver noted that there will be insufficient cash on hand to fund disbursements to the unpaid attorneys, and the Receiver has not succeeded in obtaining cash from the Cook Islands. Thus, as an alternative to selling domain names, the Receiver sought permission to cash out stocks and IRAs.

3)  <u>The Court stated that it would not rule on the motion yet.</u>

At a hearing on February 10, 2011, the Court indicated that it would not yet rule on the motion to cash out the stocks and IRAs—and instead, wanted to see the Receiver's progress in again seeking to obtaining cash from the Cook Islands (which ultimately failed because Mr. Baron refused to answer any questions). [Docket No. 416 at p. 34.]

4)  <u>Mr. Baron asserted Fifth Amendment protection.</u>

On February 17, 2011, the Receiver asked Mr. Baron questions about his stocks and IRAs. Mr. Baron refused to respond—asserting Fifth Amendment protection. For the sake of brevity, the Receiver will not recount that exchange here again as it already appears in the February 2011 Receiver Report. [*Id.* at p. 31, 34-36.]

5)     <u>Mr. Baron filed a brief in opposition.</u>

On March 2, 2011, Mr. Baron filed a brief in opposition.  [Docket No. 337.]  The brief is strange, to say the least.  Among other things, it offers inapposite law, fails to point out current and on-point law, and makes a number of criminal accusations against the Plaintiff and Mr. Baron's former counsel.  The Receiver addressed each of these issues in his *Motion to Extend Deadline to File Reply in Support of the Receiver's Omnibus Motion to Permit Cashing Out of Stocks and IRA's*:

- *Failure to address central issue.* Mr. Baron's response brief does not address the cashing out of Mr. Baron's non-exempt stock totaling approximately $450,000.

- *Inapposite law.*  Mr. Baron's response brief relies on <u>Booth v. Clark</u>, a case from 1855, literally more than a century before the creation of IRAs.  Importantly, Mr. Baron neglects to mention that <u>Booth</u> held that a Receiver could take into his possession any property which equity required.  [Docket No. 375 at p. 3.]  Mr. Baron also relied on <u>In re: Youngblood</u> which discussed whether a bankruptcy court—not a receiver—could take possession of IRAs.  [*Id.*]

- *Omission of on-point law.*  Mr. Baron's response also fails to address the Fifth Circuit's 2010 decision, <u>Janvey v. Alguire</u>, which holds that a receiver may, indeed, cash out IRAs funded through fraud.  [*Id.* at p. 4]  The <u>Janvey</u> decision is especially applicable in this instance because Mr. Baron has asserted his Fifth Amendment privilege in response to numerous questions about his IRA holdings thereby triggering an inferential rebuttal of fraud.  [*Id.*]

- *Bizarre red herrings.*  Mr. Baron's response also asserted that instead of liquidating his IRAs, the Receiver should access $2M in allegedly stolen cash from Elizabeth Schurig, a former Baron attorney, and $4M in allegedly stolen cash from Munish Krishnan.  The Receiver asked Mr. Baron in writing to provide evidence to support these allegations, respond to Ms. Schurig's statements rebutting the claims, and respond to the language in the global settlement agreement which appears to preclude such claims anyway.  [Docket No. 375 at Exhibit B.]

The Court ultimately granted the Receiver's motion and extended the deadline to file the reply. [Docket No. 383.]  The new deadline was May 16, 2011.  [*Id.*]

6)      The Receiver filed a reply.

On May 11, 2011, the Receiver filed his *Reply in Support of His Motion to Permit Liquidation of Non-Exempt Stocks—But Not the Liquidation of IRA's.* [Docket No. 560.]  In the reply, the Receiver explained that the Receiver's proposed private sales of domain names might not be sufficient to satisfy the Receivership's liabilities.  [*Id.*]  Thus, sale of $450,000 in non-exempt stocks might be necessary.  [*Id.*]  However, Mr. Baron would still retain $1.4 million in individual retirement accounts.  [*Id.*]

7)      The Court indicated it would deny the motion to liquidate stocks.

On July 1, 2011, the Court issued an *Advisory* notifying the parties of how it intended to rule on outstanding motions pending resolution of certain appeals before the Fifth Circuit. [Docket No. 630.]  The Court stated it would deny the Receiver's motion to permit liquidation of stocks.  [*Id.*]  The Receiver, then, withdrew the motion.  [Docket No. 632.]  The Receiver, nevertheless, continues to believe there is a legal basis for the liquidation of both IRA and non-IRA stock accounts and that such liquidation may be the only way to generate enough funds to pay the claims of the Former Baron Attorneys.

8)      The Receiver filed the Stock-Only Motion.

On July 7, 2011, the Receiver filed the Stock-Only Motion, briefly discussed above in Section A.  [Docket No. 640 at Ex. 2.]  In the Stock-Only Motion, the Receiver seeks to liquidate up to approximately $450,000 of non-exempt stocks, but *not* to liquidate any of the IRAs.  [*Id.*] As reflected in the July 31 Financial Picture, the Receiver will need to liquidate non-exempt stocks in order to fully satisfy the Receivership estate's liabilities.  [Docket No. 646.]  As stated in the Stock-Only Motion, liquidating the non-exempt stocks should prevent the need to liquidate

IRAs.  [Docket No. 640 at Ex. 2.]  Further, Mr. Baron seems to concede that the non-exempt stocks are an appropriate source for funding Receivership liabilities.  [*Id.*]

ii.   <u>Disbursements of the Baron Funds.</u>

In June and the first two weeks of July 2011, and depending on the nature of the Baron Funds, the Receiver either made disbursements or filed motions to make disbursements. Specifically, and as described previously, since the beginning of the Receivership—and including June and the first two weeks of July 2011—the Receiver disbursed $63,260.78 from the Baron Funds for expenses including such things as Mr. Baron's daily-living expenses, Mr. Baron's insurance expenses, Mr. Baron's counseling expenses, copy expenses for documents requested by Mr. Schepps, transcription costs for hearings and Court-ordered meetings, expenses related to Receivership Party Domain Jamboree, LLC, and expenses related to document production from institutions holding Receivership Assets.   A total of $6,096.56 of this $63,260.78 was disbursed in June and the first two weeks of July 2011.  In addition, and as described previously, the Receiver has disbursed $961,789.93 from the Baron Funds for Court-ordered disbursements since the beginning of the Receivership.  Because the Court did not order any disbursements during June and the first two weeks of July 2011, none of this $961,789.93 was disbursed during such timeframe.  $425,859.23 in fee applications for work performed by the Receiver and his counsel in January through May 2011, as well as fee applications for Mr. Thomas totaling $10,000, are currently pending before the Court.   The Court has already announced its intention to grant $176,697.02 of the $425,859.23 in fees to the Receiver and his counsel, as well as $5,000 of the $10,000 in fees to Mr. Thomas.  [Docket No. 630.]  Lastly, and as also described previously, after the filing of this Report, the Receiver intends to file applications with the Court seeking another $102,521.96 for fees incurred due to work performed by the Receiver and his counsel during June and the first two weeks of July 2011.  Details of all

three categories—disbursements for Mr. Baron's expenses, disbursements per Court Orders, and

proposed disbursements per Court Order are detailed below.

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Dec. 2, 2010 | $1,000.00 | Daily-Living Expenses | Receiver's personal funds |
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Dec. 8, 2010 | $2,600.00 | Daily-Living Expenses | Receiver's Account holding Netsphere Funds |
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Dec. 20, 2010 | $400.00 | Daily-Living Expenses | Receiver's Account holding Netsphere Funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Dec. 20, 2010 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Dec. 21, 2010 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Dec. 29, 2010 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Dec. 30, 2010 | $4,000.00 | Daily-Living Expenses | Receiver Account holding Woodforest Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Comerica Bank | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Jan. 6, 2011 | $100.00 | Open Receiver Accounts | Receiver's personal funds |
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | Feb. 4, 2011 | $4,000.00 | Daily-Living Expenses | Receiver Account holding Woodforest Funds |
| Receiver | *Order Granting the Receiver's First Application for Reimbursement of Fees and Expenses Incurred by the Receiver* [Docket No. 275] | *The Receiver's First Application for Reimbursement of Fees and Expenses Incurred by the Receiver* [Docket No. 192] | Feb. 4, 2011 | $16,900.00 | Receiver Fees | Receiver Account holding Woodforest Funds |
| Gardere | *Order Granting the Receiver's First Application for Reimbursement of Fees and Expenses Incurred by Gardere Wynne Sewell LLP* [Docket No. 276] | *The Receiver's First Application for Reimbursement of Fees and Expenses Incurred by Gardere Wynne Sewell LLP* [Docket No. 193] | Feb. 4, 2011 | $24,324.50 | Receiver's Counsel Fees | Receiver Account holding Woodforest Funds |
| Receiver and Receiver Account holding Netsphere Funds | *Order Granting the Receiver's Motion for Order Confirming Propriety of Fund Management* [Docket No. 279] | *The Receiver's Motion for Order Confirming Propriety of Fund Management* [Docket No. 199] | Feb. 4, 2011 | $1,300.00 | Reimbursement for Baron Daily-Living Expenses and Fees to Open Receiver Accounts | Receiver Account holding Woodforest Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| James Eckels | *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Receivership Professional James M. Eckels* [Docket No. 278] | *The Receiver's First Application for Reimbursement of Fees Incurred by Receivership Professional James M. Eckels* [Docket No. 196] | Feb. 4, 2011 | $6,937.50 | Receivership Professional Fees | Receiver Account holding Woodforest Funds |
| Receiver | *Order Granting the Receiver's Motion for Reimbursement of Additional Personal Funds* [Docket No. 284] | *The Receiver's Motion for Reimbursement of Additional Personal Funds* [Docket No. 221] | Feb. 4, 2011 | $900.00 | Reimbursement for Fees to Open Receiver Accounts | Receiver Account holding Woodforest Funds |
| Gardere | *Order Granting the Receiver's Second Gardere Fee Application* [Docket No. 294] | *The Receiver's Second Gardere Fee Application* [Docket No. 258] | Feb. 4, 2011 | $157,729.41 | Receiver's Counsel Fees | Receiver Account holding Woodforest Funds |
| Receiver | *Order Granting the Receiver's Second Receiver Fee Application* [Docket No. 295] | *The Receiver's Second Receiver Fee Application* [Docket No. 259] | Feb. 4, 2011 | $77,480.00 | Receiver Fees | Receiver Account holding Ameritrade Funds |
| Peter Barrett | *Order Denying Emergency Motion for Independent Medical Examination for Jeffrey Baron* [Docket No. 220 at p. 2] | *The Receiver's Emergency Motion for Independent Medical Examination for Jeffrey Baron* [Docket No. 208] | February 21, 2011 | $135.00 | Reimbursement for Payment of Counseling Fees to LifeWorks Counseling Center | Receiver Account holding Ameritrade Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| United Healthcare | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | February 24, 2011 | $972.84 | Mr. Baron's medical insurance from January 1- March 31, 2011 | Receiver Account holding Ameritrade Funds |
| Pinnacle Corp. | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | February 24, 2011 | $123.72 | Mr. Baron's dental insurance from January 1- March 31, 2011 | Receiver Account holding Ameritrade Funds |
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | February 28, 2011 | $5,000.00 | Daily-Living Expenses | Receiver Account holding Ameritrade Funds |
| Peter Barrett | *Order Denying Emergency Motion for Independent Medical Examination for Jeffrey Baron* [Docket No. 220 at p. 2] | *The Receiver's Emergency Motion for Independent Medical Examination for Jeffrey Baron* [Docket No. 208] | March 1, 2011 | $125.00 | Reimbursement for Payment of Counseling Fees to LifeWorks Counseling Center | Receiver Account holding Ameritrade Funds |
| James Eckels | *Order Granting the Receiver's Second Eckels Fee Application* [Docket No. 363] | *The Receiver's Second Eckels Fee Application* [Docket No. 314] | March 15, 2011 | $10,400.00 | Professional Fees | Receiver Account holding Ameritrade Funds |
| Former Special Master | *Order Granting the Receiver's Special Master Fee Application* [Docket No. 365] | *The Receiver's Special Master Fee Application* [Docket No. 325] | March 15, 2011 | $17,066.20 | Special Master Fees | Receiver Account holding Ameritrade Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Martin Thomas | *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 367] | *The Receiver's First Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 327] | March 15, 2011 | $15,285.52 | Fees and expenses as Mr. Baron's Bankruptcy Attorney | Receiver Account holding Ameritrade Funds |
| Local Counsel | *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Local Counsel* [Docket No. 368] | *The Receiver's First Application for Reimbursement of Fees Incurred by Local Counsel* [Docket No. 344] | March 15, 2011 | $10,943.43 | Receiver's Local Counsel Fees | Receiver Account holding Ameritrade Funds |
| Gary Lyon | *Order Granting the Receiver's First Lyon Fee Application* [Docket No. 371] | *The Receiver's First Lyon Fee Application* [Docket No. 348] | March 15, 2011 | $10,825.00 | Professional Fees | Receiver Account holding Ameritrade Funds |
| Receiver | *Order Granting in Part the Receiver's Third Receiver Fee Application* [Docket No. 387] | *The Receiver's Third Receiver Fee Application* [Docket No. 323] | March 16, 2011 | $41,446.80 (*$13,822.27 still pending*) | Receiver Fees | Receiver Account holding Ameritrade Funds |
| Gardere | *Order Granting in Part the Receiver's Third Gardere Fee Application* [Docket No. 386] | *The Receiver's Third Gardere Fee Application* [Docket No. 324] | March 16, 2011 | $92,516.15 (*$30,838.66 still pending*) | Receiver's Counsel Fees | Receiver Account holding Ameritrade Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| United Healthcare | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | March 17, 2011 | $972.84 | Mr. Baron's medical insurance from April 1-June 31, 2011 | Receiver Account holding Ameritrade Funds |
| Pinnacle Corp. | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | March 17, 2011 | $123.72 | Mr. Baron's dental insurance from April 1-June 31, 2011 | Receiver Account holding Ameritrade Funds |
| Peter Barrett | *Order Denying Emergency Motion for Independent Medical Examination for Jeffrey Baron* [Docket No. 220 at p. 2] | *The Receiver's Emergency Motion for Independent Medical Examination for Jeffrey Baron* [Docket No. 208] | March 22, 2011 | $125.00 | Reimbursement for Payment of Counseling Fees to LifeWorks Counseling Center | Receiver Account holding Ameritrade Funds |
| Elite Document Tech. | *Order Appointing Receiver* [Docket No. 130] | N/A | March 22, 2011 | $380.89 | Vendor Services—reformatting of Attorney Declarations per Mr. Schepps' request | Receiver Account holding Ameritrade Funds |
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | March 24, 2011 | $5,000.00 | Daily-Living Expenses | Receiver Account holding Capital One Bank funds |
| Bank of America | *Order Appointing Receiver* [Docket No. 130] | N/A | March 29, 2011 | $80.91 | Fees for production of documents related to account holding Receivership Assets | Receiver Account holding Capital One Bank funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Depo Texas, Inc. | Court's Order from the Bench Hearing on *Emergency Motion to Clarify and Further Emergency Relief Before the Honorable Royal Furgeson*. February 10, 2011 | N/A | March 29, 2011 | $14,671.44 | Transcription Costs for Court-ordered meetings | Receiver Account holding Capital One Bank funds |
| Receiver | *Order Granting In Part the Receiver's Fourth Receiver Fee Application* [Docket No. 429] | *The Receiver's Fourth Receiver Fee Application* [Docket No. 417] | April 1, 2011 | $62,643.75 (*$20,881.25 still pending*) | Receiver Fees | Receiver Account holding Capital One Bank funds |
| Gardere | *Order Granting in Part the Receiver's Fourth Gardere Fee Application* [Docket No. 427] | *The Receiver's Fourth Gardere Fee Application* [Docket No. 418] | April 1, 2011 | $122,518.14 (*$40,860.05 still pending*) | Receiver's Counsel Fees | Receiver Accounts holding Woodforest and Las Colinas FCU Funds |
| Martin Thomas | *Order Granting the Receiver's Second Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 464] | *The Receiver's Second Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 426] | April 20, 2011 | $5,000.00 | Fees as Mr. Baron's Bankruptcy Attorney | Receiver Account holding Capital One Bank funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | April 28, 2011 | $5,000.00 | Daily-Living Expenses | Receiver Account holding |
| Receiver | *Order Granting in Part the Receiver's Fifth Receiver Fee Application* [Docket No. 532] | *The Receiver's Fifth Receiver Fee Application* [Docket No. 490] | May 10, 2011 | $39,206.70 (*$13,068.90 still pending*) | Receiver Fees | Receiver Account holding Ameritrade Funds |
| Gardere | *Order Granting in Part the Receiver's Fifth Gardere Fee Application* [Docket No. 533] | *The Receiver's Fifth Gardere Fee Application* [Docket No. 491] | May 10, 2011 | $116,246.89 (*$38,748.97 still pending*) | Receiver's Counsel Fees | Receiver Account holding Ameritrade Funds |
| Receiver | *Order Granting in Part the Receiver's Sixth Receiver Fee Application* [Docket No. 534] | *The Receiver's Sixth Receiver Fee Application* [Docket No. 492] | May 10, 2011 | $21,262.50 (*$7,087.50 still pending*) | Receiver Fees | Receiver Account holding Ameritrade Funds |
| Gardere | *Order Granting in Part the Receiver's Sixth Gardere Fee Application* [Docket No. 535] | *The Receiver's Sixth Gardere Fee Application* [Docket No. 493] | May 10, 2011 | $59,866.77 (*$19,955.60 still pending*) | Receiver's Counsel Fees | Receiver Account holding Ameritrade Funds |
| Gary Lyon | *Order Granting the Receiver's Second Lyon Fee Application* [Docket No. 531] | *The Receiver's Second Lyon Fee Application* [Docket No. 489] | May 11, 2011 | $5,637.50 | Professional Fees | Receiver Account holding Woodforest Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| James Eckels | *Order Granting the Receiver's Third Eckels Fee Application* [Docket No. 536] | *The Receiver's Third Eckels Fee Application* [Docket No. 494] | May 11, 2011 | $12,475.00 | Professional Fees | Receiver's Account holding Netsphere Funds |
| Martin Thomas | *Order Granting the Receiver's Third Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 539] | *The Receiver's Third Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 504] | May 11, 2011 | $5,000.00 | Fees as Mr. Baron's Bankruptcy Attorney | Receiver's Account holding Netsphere Funds |
| Grant Thornton | *Order Granting the Receiver's First Grant Thornton Fee Application* [Docket No. 540] | *The Receiver's First Grant Thornton Fee Application* [Docket No. 505] | May 11, 2011 | $19,217.69 | Fees for tax advice | Receiver's Account holding Netsphere Funds |
| James Eckels | *Order Granting the Receiver's Fourth Eckels Fee Application* [Docket No. 543] | *The Receiver's Fourth Eckels Fee Application* [Docket No. 512] | May 11, 2011 | $1,400.00 | Professional Fees | Receiver Account holding Woodforest Funds |
| Local Counsel | *Order Granting the Receiver's Second Application for Reimbursement of Fees Incurred by Local Counsel* [Docket No. 538] | *The Receiver's Second Application for Reimbursement of Fees Incurred by Local Counsel* [Docket No. 500] | May 16, 2011 | $7,198.48 | Receiver's Local Counsel Fees | Receiver Account holding Ameritrade Funds |
| Depo Texas, Inc. | *Order Appointing Receiver* [Docket No. 130] | N/A | May 3, 2011 | $1,296.38 | Transcription of March 4, 2011 meet-and-confer between the parties | Receiver Account holding American Century Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| CT Corp. Systems | *Order Appointing Receiver* [Docket No. 130] | N/A | May 3, 2011 | $278.00 | Registered Agent Fees for Receivership Party Domain Jamboree, LLC | Receiver Account holding American Century Funds |
| Palmer Reporting Services | *Order Appointing Receiver* [Docket No. 130] | N/A | May 17, 2011 | $213.40 | Transcription of April 25, 2011 bankruptcy hearing before the Honorable Stacey Jernigan | Receiver Account holding Ameritrade Funds |
| Court Reporter | *Order Appointing Receiver* [Docket No. 130] | N/A | May 17, 2011 | $561.00 | Transcription of April 28, 2011 evidentiary hearing | Receiver Account holding Ameritrade Funds |
| ICANN | *Order Appointing Receiver* [Docket No. 130] | *See the Receiver's Notice of Payment of Fees Related to Domain Jamboree's ICANN Accreditation* [Docket No. 587] | May 17, 2011 | $5,104.08 | Fees related to Domain Jamboree, LLC's ICANN accreditation | Receiver's Account holding Netsphere Funds |
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | May 31, 2011 | $5,000.00 | Daily-Living Expenses | Receiver Account holding Ameritrade Funds |
| Receiver | N/A (although the Court announced its intention to grant 75% of the requested fees in this motion in its *Advisory* [Docket No. 630]) | *The Receiver's Seventh Receiver Fee Application* [Docket No. 605] | N/A (motion currently pending before the Court) | *$54,040.00 (pending)* | Receiver Fees | Remaining Baron Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Gardere | N/A (although the Court announced its intention to grant 75% of the requested fees in this motion in its *Advisory* [Docket No. 630]) | *The Receiver's Seventh Gardere Fee Application* [Docket No. 606] | N/A (motion currently pending before the Court) | *$181,012.02 (pending)* | Receiver's Counsel Fees | Remaining Baron Funds |
| Martin Thomas | N/A (although the Court announced its intention to grant this motion in its *Advisory* [Docket No. 630]) | *The Receiver's Fourth Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 593] | N/A (motion currently pending before the Court) | *$5,000.00 (pending)* | Fees as Mr. Baron's Bankruptcy Attorney | Remaining Baron Funds |
| United Healthcare | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | June 28, 2011 | $972.84 | Mr. Baron's medical insurance from July 1-September 31, 2011 | Receiver Account holding Ameritrade Funds |
| Pinnacle Corp. | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | June 28, 2011 | $123.72 | Mr. Baron's dental insurance from July 1-September 31, 2011 | Receiver Account holding Ameritrade Funds |
| Mr. Baron | *Order Appointing Receiver* [Docket No. 130 at pp. 6-8] | N/A | June 29, 2011 | $5,000.00 | Daily-Living Expenses | Receiver Account holding Ameritrade Funds |

| Recipient | Court Order Permitting Disbursement | Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Martin Thomas | N/A (motion currently pending before the Court) | *The Receiver's Fifth Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 640 at Ex. 1] | N/A (motion currently pending before the Court) | *$5,000.00 (pending)* | Fees as Mr. Baron's Bankruptcy Attorney | Remaining Baron Funds |
| Receiver | N/A (motion being filed subsequent to this Report) | *The Receiver's Eighth Receiver Fee Application* (amounts incurred in June and last two weeks of July 2011) | N/A (motion being filed subsequent to this Report) | *$28,350.48* | Receiver Fees | Remaining Baron Funds |
| Gardere | N/A (motion being filed subsequent to this Report) | *The Receiver's Eighth Gardere Fee Application* (amounts incurred in June and last two weeks of July 2011) | N/A (motion being filed subsequent to this Report) | *$74,171.48* | Receiver's Counsel Fees | Remaining Baron Funds |

iii.   <u>Mr. Baron objected to certain motions for reimbursement and fee applications.</u>

Mr. Baron objected to the following motions for reimbursement and fee applications, all mentioned in the chart above describing the Receiver's disbursements:

- *The Receiver's First Application for Reimbursement of Fees and Expenses Incurred by the Receiver* [Docket No. 236];

- *The Receiver's First Application for Reimbursement of Fees and Expenses Incurred by Gardere Wynne Sewell LLP* [Docket No. 236];

- *The Receiver's First Application for Reimbursement of Fees Incurred by Receivership Professional James Eckels* [Docket No. 244];

- *The Receiver's Motion for Order Confirming Propriety of Fund Management* [Docket No. 245];

- *The Receiver's Motion for Reimbursement of Additional Personal Funds* [Docket No. 261];

- *The Receiver's Second Application for Reimbursement of Fees Incurred by Receivership Professional James Eckels* [Docket No. 352];

- *The Receiver's Third Receiver Fee Application* [Docket No. 373]; and

- *The Receiver's Third Gardere Fee Application* [Docket No. 373].

Nevertheless, the Court granted these motions and applications, and the Receiver made the ordered disbursements. Mr. Baron also objected to the following fee applications which the Court has yet to rule on but, in its *Advisory*, announced its intention to grant (at least partially):

- *The Receiver's Seventh Receiver Fee Application* [Docket No. 605]; and

- *The Receiver's Seventh Gardere Fee Application* [Docket No. 606].

[Docket Nos. 627, 630.]

     iv. <u>Mr. Baron appealed all of the Court-ordered disbursements.</u>

On March 3, 2011, Mr. Baron appealed all Court-ordered disbursements from the Baron Funds that had been issued as of that date. [Docket Nos. 340 and 341.] During a transcribed meeting on March 4, 2011, Mr. Schepps stated that should Mr. Baron win on appeal, all of those disbursements are to be disgorged—meaning that the Receiver and his professionals would have worked for months for free, the typical scenario for professionals who have worked for Mr. Baron. [Transcript of Court Order Meeting, March 4, 2011, at 120:6-14.] On April 11, 2011, Mr. Baron appealed all the Court ordered disbursements on the chart above that had been ordered since his previous March 3, 2011 appeals. [Docket No. 449.] On May 18, 2011, Mr. Baron appealed all of the Court ordered disbursements of Baron Funds ordered since his previous appeals. [Docket No. 576.]

In sum, Mr. Baron appealed the following orders:

- *Order Granting the Receiver's First Application for Reimbursement of Fees and Expenses Incurred by the Receiver* [Docket No. 275];

- *Order Granting the Receiver's First Application for Reimbursement of Fees and Expenses Incurred by Gardere Wynne Sewell LLP* [Docket No. 276];

- *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Receivership Professional James M. Eckels* [Docket No. 278];

- *Order Granting the Receiver's Motion for Order Confirming Propriety of Fund Management* [Docket No. 279];

- *Order Granting the Receiver's Motion for Reimbursement of Additional Personal Funds* [Docket No. 284];

- *Order Granting the Receiver's Second Gardere Fee Application* [Docket No. 294];

- *Order Granting the Receiver's Second Receiver Fee Application* [Docket No. 295];

- *Order Granting the Receiver's Second Eckels Fee Application* [Docket No. 363];

- *Order Granting the Receiver's Special Master Fee Application* [Docket No. 365];

- *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 367];

- *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Local Counsel* [Docket No. 368];

- *Order Granting the Receiver's First Lyon Fee Application* [Docket No. 371];

- *Order Granting in Part the Receiver's Third Gardere Fee Application* [Docket No. 386];

- *Order Granting in Part the Receiver's Third Receiver Fee Application* [Docket No. 387];

- *Order Granting in Part the Receiver's Fourth Gardere Fee Application* [Docket No. 427];

- *Order Granting In Part the Receiver's Fourth Receiver Fee Application* [Docket No. 429];

- *Order Granting the Receiver's Second Thomas Fee Application* [*Docket No.* 464];

- *Order Granting the Receiver's Second Lyon Fee Application* [Docket No. 531];

- *Order Granting in Part the Receiver's Fifth Receiver Fee Application* [Docket No. 532];

- *Order Granting in Part the Receiver's Fifth Gardere Fee Application* [Docket No. 533];

- *Order Granting in Part the Receiver's Sixth Receiver Fee Application* [Docket No. 534];

- *Order Granting in Part the Receiver's Sixth Gardere Fee Application* [Docket No. 535];

- *Order Granting the Receiver's Third Eckels Fee Application* [Docket No. 536];

- *Order Granting the Receiver's Second Application for Fee Incurred by Local Counsel* [Docket No. 538];

- *Order Granting the Receiver Third Thomas Fee Application* [Docket No. 539];

- *Order Granting the Receiver's First Grant Thornton Fee Application* [Docket No. 540]; and

- *Order Granting the Receiver's Fourth Eckels Fee Application* [Docket No. 543].

  b.    *The Receiver managed the LLC Funds.*

As described in some detail in the December 2010 Receiver Report, the LLCs' Funds are not the ideal option for funding the unpaid-attorney claims, since most (if not all) of the cash is earmarked to pay (a) domain-name renewal fees, (b) employee salaries, (c) attorney fees of current LLCs attorneys, and (d) other operations and management expenses.  At least to date, the bulk of the LLC Funds are needed simply to keep the LLCs operating.

As also stated above, although the Receiver may or may not use the LLC Funds—including either the cash on hand in the LLC accounts or the Monetizer Stream—directly to fund disbursements to the unpaid attorneys of Mr. Baron, the LLC Funds are still extremely important.  As described above, a more likely source for funding the disbursements to the unpaid

attorneys of Mr. Baron is through the sale of domain names that the LLCs hold and otherwise the LLC Funds are being used to maintain the LLCs.  That is what the discussion below involves.

       i.      <u>The Receiver managed the potential LLC revenues relating to domain name sales.</u>

           1)     <u>The Court granted the Receiver's motion for permission sell domain names.</u>

As stated previously, in order to cover the Receivership's anticipated liabilities described above, the Receiver will likely need to sell selective domain names.  To that end, on January 24, 2010, the Receiver filed *The Receiver's Omnibus Motion to Permit Sales of Domain Names*. [Docket No. 242.]  In that motion, the Receiver sought an order allowing the Receiver to utilize the option of selling domain names in order to fund disbursements to the unpaid attorneys of Mr. Baron.

On February 4, 2011, the Court issued its *Order Granting the Receiver's Omnibus Motion to Permit Sales of Domain Names.*  [Docket No. 288.]  On March 3, 2011, Mr. Baron filed a notice of appeal to the Fifth Circuit of that order.  [Docket No. 341.]

           2)     <u>Notwithstanding the Court's order permitting the Receiver to sell domain names, Mr. Harbin refused to cooperate with the sale of domain names.</u>

The February 2011 Receiver Report chronicled Mr. Harbin's (the former manager of the LLCs) refusals to entertain potentially lucrative offers for the purchase of domain names in the LLCs' portfolios and his emergency motion on Super Bowl Sunday to stop the sales.  [Docket No. 416 at pp. 45-50.]  The February 2011 Receiver Report also detailed the Court-ordered face-to-face meetings between the Receiver and Mr. Harbin, Mr. Harbin's abrupt resignation, and the Receiver's appointment of Damon Nelson as manager of the LLCs.  [*Id.* at pp. 51-53.]  So, the Receiver will not recount those details here.

3)      <u>Mr. Nelson has assumed the management of the LLCs.</u>

Following Mr. Harbin's abrupt resignation in February 2011, the Receiver diligently worked with Mr. Nelson regarding the transition of duties from Mr. Harbin to Mr. Nelson—especially in the context of preparing to sell domain names.  Since becoming the Manager of the LLCs, Mr. Nelson has, among other things, performed the following tasks:

- Worked with Mr. Harbin to complete the transition for management of the LLCs;

- Audited the electronic books and records of the LLCs, and reconciled such records with bank statements for the same;

- Audited the LLCs' accounts with the monetizers to ensure security over the same;

- Audited the LLCs' monetizers' reports to confirm receipt of the LLCs' funds;

- Coordinated with the LLCs' programmer on reporting by the LLCs' monetizers;

- Coordinated with Messrs. Cox and Eckels concerning the deletion and retention of domain names expiring in January, through the first two weeks of July 2011; and

- Attended and participated in the Court Ordered Meetings on February 16, 2011 [Transcript of Court Ordered Meeting, February 16, 2011, at 7:8-9] and February 17, 2011 [Transcript of Court Ordered Meeting, February 17, 2011, at 6:8-9]; and

- Worked to collect all LLC materials and documents from Mr. Harbin and all current and former counsel for the LLCs.

[Docket No. 377 at pp. 4-5.]

In June and the first two weeks of July 2011, Mr. Nelson's work largely concerned the sale of domain names:

- Responding to over numerous inquiries concerning potential purchases of domain names ranging in price from $100 to more than $900,000;

- Using his protocol for valuing and selling domain names, conducted negotiations for the sale of additional domains as inquiries are received;

- Working to maintain the commitments of buyers who had executed sale agreements for the purchase of domain names yet have grown impatient with the delay in the sale and transfers of the names themselves; and

- Supervising the efforts of domain name brokers who are soliciting interest from potential purchasers.

    4)    <u>The Receiver moved for the temporary appointment of Mr. Nelson as manager of the LLCs.</u>

On March 11, 2011, the Court held a hearing on various issues (all of which will be discussed through this report). At the hearing, the Receiver's notified the Court of his appointment of Mr. Nelson as interim manager of the LLCs succeeding Mr. Harbin. [Transcript of *Status Conference Before Honorable Royal Furgeson*, March 11, 2011, at 7:17-8:9, 45:19-25.] The Court instructed the Receiver to file a motion the same day requesting confirmation of the appointment. [*Id*. at 42:25-43:8.]

The Receiver, then, filed his *Motion for Order Confirming Appointment of Damon Nelson as Interim Manager of the LLCs*. [Docket No. 358.] The Receiver recounted Mr. Harbin's abrupt resignation on February 21, 2011, and his decision to install Mr. Nelson the same day. [*Id*. at p. 1.] The Receiver also explained Mr. Nelson's unique credentials which include, without limitation, the following:

- Hired by Jeff Baron to manage Ondova Limited Company from 2009 through 2010;

- Consultation with the Receiver and Trustee over retention and deletion of domain names; and

- Extensive experience in web design, online marketing, search engine optimization, and pay per click modeling.

[*Id*. at p. 2.] On March 11, 2011, the Court granted the Receiver's motion and ordered that:

- the appointment of Mr. Nelson as interim manager of the LLCs was proper;

- Mr. Nelson would remain as interim manager until further order of the Court; and

- the Receiver would file a motion for Mr. Nelson's permanent appointment by March 18, 2011.

[Docket No. 362.]  On April 11, 2011, Mr. Baron appealed this order.  [Docket No. 449.]

> 5)  The Receiver moved for Mr. Nelson's permanent appointment as manager of the LLCs.

Per the Court's order, on March 16, 2011, the Receiver filed his *Motion to Appoint Damon Nelson as Permanent Manager of the LLCs and for Turnover of LLC Materials to Damon Nelson*.  [Docket No. 377.]  The Receiver's basis for such a motion was, in sum:

- The need for Mr. Nelson's assistance in the sale of domain names to raise cash to pay Mr. Baron's former attorneys due to the unavailability (at least for now) of funds from other sources such as Cook Islands and stocks and IRAs;

- Mr. Nelson's qualifications to serve as the permanent manager; and

- Mr. Nelson's capable service as the interim manager of the LLCs.

[Docket No. 377 at pp. 3-6.]  On April 22, 2011, the Court issued its *Order Granting the Receiver's Motion to Appoint Damon Nelson as Permanent Manager of the LLCs and for Turnover of LLC Materials to Damon Nelson*.  [Docket No. 473.]  Under this Order, Mr. Nelson will be working to collect all LLC materials and documents, including those communication for which the LLCs maintain an attorney-client privilege (*e.g.*, e-mails between Messrs. Harbin and Jackson), from Mr. Harbin and all current and former counsel for the LLCs (including, without limitation, Messrs. Jackson, Eckels, Cox, and Chesnin, and Ms. Schurig).  Such materials and documents will assist Mr. Nelson in his position as manager of the LLCs.

Mr. Baron appealed the order granting Mr. Nelson's permanent appointment.  [Docket No. 576.]

> 6)  The Receiver began an independent audit.

In order to confirm that the Receiver is aware of all of the Receivership Assets under the LLCs, especially in the wake of Mr. Harbin's sudden departure, the Receiver engaged an auditor. The Receiver's designated outside auditor, Grant Thornton [Docket No. 313], have performed a

preliminary audit of the LLCs' books and records going back to September 2010. Specifically, Grant Thornton performed the following tasks:

- Reviewed the LLCs' agreements with the Monetizers;

- Reviewed QuickBooks accounting database and other documents and materials related to the LLCs' finances;

- Analyzed the LLCs' revenue and expenses;

- Reviewed documents related to The Village Trust's relationship with the LLCs, including bank statements for LLC wire transfers to The Village Trust;

- Performed bank reconciliations for the LLCs in order to identify and address any discrepancies;

- Communicated with Ms. Schurig about the LLCs' books and records; and

- Communicated with the Receiver's counsel regarding the status of the audit.

Starting in March 2011, Grant Thornton has also conducted monthly reviews of the LLCs' expenditures and income. Those monthly reviews continue to date. So far, Grant Thornton has not detected any irregularities in the LLCs' finances.

       7) <u>The Receiver began implementing the protocol for selling domain names.</u>

The Receiver has worked extensively with Mr. Nelson to prepare a specific process for determining what domain names to sell, marketing those domain names, and ultimately holding an auction or other sale. Mr. Nelson completed a memorandum discussing a detailed protocol for valuing domain names and different methods for selling them, including live auction, private sale, or brokered transaction. After completing that memorandum, the Receiver and Mr. Nelson began implementing the protocol set forth in the memorandum through, among other things, negotiations with potential purchasers of domain names. As stated above, the initial goal is to sell enough domain names to generate cash sufficient to pay the Former Baron Attorneys and the remaining liabilities for the Receivership.

8)      The Receiver moved for approval for the sale of domain
         names.

On April 1, 2011, the Receiver filed his *Sealed Motion to Approve Sale of Specific Domain Names and Confirm Propriety of Sales Protocol*. [Docket No. 424.] In the motion, the Receiver explained in detail the Receivership Parties' liabilities, *i.e.* attorneys' fees owed to former attorneys of Mr. Baron, pending fee applications before the Court, and estimated future expenses. [*Id.* at pp. 2-5] The Receiver estimated that these liabilities will be approximately $2 million by April 30, 2011. [*Id.* at p. 1] The Receiver then outlined the amount of cash the Receivership Parties expect to have on hand by the same time—about $900,000. [*Id.* at pp. 1, 3-4.] The Receiver explained there would be a shortfall of a little over $1 million. [Docket No. 424 at p. 5.]

The Receiver then asked for approval to proceed with the sales of 24 domain names registered currently by the LLCs. [*Id.* at p. 7.] The proceeds from the sales could cover the shortfall between the Receivership Parties' liabilities and expected cash on hand at the end of the Receivership. [*Id.*] The Receiver's motion was supported by the *Declaration of Damon Nelson*, which explained Mr. Nelson's protocol for valuing and selling the 24 domain names, also filed on April 1, 2011. [Docket No. 424.] The Receiver served redacted copies of the *Sealed Motion to Approve Sale of Specific Domain Names and Confirm Propriety of Sales Protocol* and the *Declaration of Damon Nelson* on Messrs. Schepps, Barrett, and Baron on April 1, 2011, the same date they were filed. The Receiver redacted the portions of these filings that identified the specific 24 names and their tentative, non/final sales prices in order to prevent any potential interference with the potential purchasers of the domain names prior to the consummation of the proposed sales.

The Receiver later filed *The Receiver's Second Sealed Motion to Approve the Sale of Specific Domain Names*, requesting permission to proceed with the sales of an additional 26 domain names registered by the LLCs.  [Docket No. 480.]  As with the first motion requesting permission to sell specific domain names, the proceeds from such sales could cover the shortfall between the Receivership's liquid assets and anticipated liabilities.  The second motion was also supported by a declaration from Mr. Nelson.  [Docket No. 481 at Ex. A.]  The Receiver served redacted copies of the *Second Sealed Motion to Approve Sale of Specific Domain Names* and the appendix thereto on Messrs. Schepps and Baron on April 25, 2011, the same date they were filed.  The Receiver redacted the portions of these filings that identified the specific 26 names and their tentative, non/final sales prices in order to prevent any potential interference with the potential purchasers of the domain names prior to the consummation of the proposed sales.

On April 22, 2011, Mr. Baron filed his *Response, Objection, Motion for Leave to File, and Motion for Relief with Respect to Receiver Motion on Secret Domain Name Liquidation Hidden from the Public* [Docket No. 472], arguing against the sale of domain names (both as a general matter and as specifically proposed by the Receiver) and complaining that Mr. Baron should be provided with an un-redacted copy of the Receiver's *Sealed Motion to Approve Sale of Specific Domain Names and Confirm Propriety of Sales Protocol*.  The same day, April 22, 2011, the Court requested that the Receiver respond to Mr. Baron's motion by April 26, 2011. [Docket No. 475.]

Accordingly, the Receiver prepared such a response in his *Response to Motion for Relief with Respect to Receiver Motion on Secret Domain Name Liquidations Hidden from the Public*. [Docket No. 483.]  The Receiver pointed out that Mr. Baron lacked standing to try to dictate how and if the LLCs sold domain names because the LLCs were not under his control.   [*Id.*]

Furthermore, Mr. Baron had done nothing to demonstrate his supposed authority to control the LLCs. [*Id.*] Moreover, distribution of the domain names up for sale would allow Mr. Baron to disrupt their potential sales and cause irreparable harm to the Receivership. [*Id.*] Finally, the method of sale Mr. Baron suggested in his motion, *i.e.* hiring an expert to market the names, would actually cost the Receivership more money due to the time and resources needed to implement such a plan. [Docket No. 483.]

9)   <u>The Receiver discussed the sale of domains at the April 28, 2011 Hearing.</u>

At the hearing on April 28, 2011, the Receiver offered Mr. Nelson to testify about the protocol that he used to value the domains and the different options he investigated for their sale, *i.e.* private sale, auction, etc. [Transcript of April 28, 2011, hearing at 95:7-20.] Mr. Schepps, then, raised the possibility of obtaining a loan with the domain names as collateral. [*Id.* at 99:14-18.] The Receiver expressed his willingness to discuss a loan with Mr. Baron and provide him information on the domains needed for a loan. [*Id.* at 103:15-18.]

However, since Mr. Schepps failed to ever respond to the Receiver's request to jointly investigate loans, the Receiver conducted his own independent investigation into the possibility of a loan which he discusses above at Section A.1.c.

10)   <u>The Court initially order the Receiver to give Mr. Baron a domain-name-sales information but later announced its intention to grant the Receiver's motion to reconsider such order.</u>

On May 9, 2011, the Court issued its *Order Regarding Baron's Request to Research Financing Options*, ordering the Receiver to give Mr. Baron a list of the specific domain names that the Receiver has proposed to sell and the current asking price for each name. [Docket No. 558.] Shortly thereafter, the Receiver filed *The Receiver's Sealed Ex Parte Motion for Reconsideration of Order Regarding Mr. Baron's Request to Research Financing Options.*

[Docket No. 581.]  The Receiver argued that he had investigated the possibility of a loan but found it to be financially implausible.  [Docket No. 581.]  The Receiver also discussed how Mr. Baron had access to all of the domain names—not just the ones the Receiver planned to sell—if he wanted to explore a loan using the names as collateral.  [*Id.*]  The Receiver explained the deserved fear he had in releasing just the names to be sold on the grounds that Mr. Baron would likely try to scuttle the deals before consummation and/or retaliate against the buyers.  [*Id.*]  Finally, the Receiver explained the precise methodology for valuing and selling the names concluding that the private sales he had negotiated were the best possible way to generate sufficient funds to conclude the Receivership.  [*Id.*]

On June 9, 2011, Mr. Baron responded to the Receiver's motion to reconsider.  [Docket No. 607.]  Mr. Baron accused the Receiver of improperly advocating his positions to the Court, victimizing Mr. Baron, and distorting the nature of Mr. Baron's filings.  [*Id.*]  Despite Mr. Baron's response, on July 1, 2011, the Court issued its *Advisory* and stated its intention to grant the Receiver's Motion to reconsider, as well as his two motions for permission to sell specific domain names.  [Docket No. 630.]

> 11)   <u>The Receiver began implementing his strategy for potentially selling domain names to resolve UDRP claims.</u>

In a separate section below, there is a discussion of the work the Receiver performed relating to Uniform Domain-Name Dispute-Resolution Policy (UDRP) claims[11]—including sending letters to claimants regarding the Receiver Order's stay on prosecuting claims or

---

[11]  The UDRP was established by the Internet Corporation for Names and Numbers (ICANN). (*See* http://www.icann.org/en/udrp/udrp.htm.) Under the UDRP, disputes alleged to have arisen from inappropriate registrations of domain names may be addressed by expedited arbitration that the holder of trademark rights initiates by filing a complaint with an ICANN-approved  dispute-resolution service provider, such as the World Intellectual Property Organization ("WIPO") or National Arbitration Forum ("NAF"). (*Id.*)

enforcing judgments or transfers.  [*See* Docket No. 130 at p. 12.]  In those letters, the Receiver also offered to negotiate for the sale of the domain names at issue.

> 12)   Mr. Baron is attempting to stop the sale of domain names through an appeal.

As mentioned above, on March 3, 2011, Mr. Baron appealed the *Order Granting the Receiver's Omnibus Motion to Permit Sales of Domain Names* to the Fifth Circuit.  [Docket No. 341.]  On July 6, 2011, Mr. Baron also filed an objection to *The Receiver's Sealed Second Motion to Approve the Sale of Specific Domain Names*.  [Docket No. 638.]  Clearly, Mr. Baron does not want the Court to instruct the Receiver to sell domain names to fund disbursements for the unpaid-attorney claims and is concerned that it is inevitable given the Court's *Advisory* stating that the motions for approval of sales would be granted.

> 13)   Mr. Baron is attempting to stop the sale of domain names by replacing Mr. Nelson with another Manager who will not sell domain names.

On March 4, 2011, the Receiver met with Messrs. Schepps and Baron at a face-to-face conference, and meet and confer.  [Transcript of Court Ordered Meeting, March 4, 2011, at pp. 1-5.]  During the conference, the Receiver sought to confer on the Receiver's (at that time) forthcoming motion for a Court order requiring Mr. Harbin and counsel for the LLCs to turn over all the LLCs' materials to Mr. Nelson (later filed as Docket No. 377).  [*Id.* at 46:16-56:2.]

The Receiver explained that the motion would confirm the appointment of Mr. Nelson as the Manager of the LLCs and require Mr. Harbin and all present and former counsel for the LLCs to turn over to Mr. Nelson all materials of the LLCs—including both non-privileged and privileged materials.  [*Id.* at 47:3-14.]  Mr. Schepps stated that Mr. Baron would oppose the motion because, they believed Mr. Nelson to be—in Mr. Schepps' words—a "faux manager." [*Id.* at 47:18-48:4.]  There are three interesting points:

- First, Mr. Schepps said the real "legal" Manager of the LLCs was CDM Services, LLC. [*Id.* at 48:13-15.] When the Receiver asked for a name or a phone number of the "Legal Manager" so the Receiver could speak with this person, however, Mr. Schepps claimed that the name and phone number were both attorney-client privileged material. [*Id.* at 50:18-51:3.]

- Second, Mr. Schepps contended that Mr. Nelson was the sole reason why Ondova went into bankruptcy and that Mr. Nelson "ran" the company "into the ground." [*Id.* at 54:2-19.] The Court, however, recently noted that Mr. Baron decided to put Ondova into bankruptcy "for the improper purpose of avoiding the contempt hearing before this Court." [Docket No. 268.]

- Finally, Mr. Schepps stated that Mr. Baron and he might propose some alternative candidates to serve as "operations" Manager of the LLCs—presumably agents of Mr. Baron (like Mr. Harbin) who will refuse to sell domain names, let alone cooperate with the Receiver at all. [Transcript of Court Ordered Meeting, March 4, 2011, at 49:10-52:5.] To date, Mr. Baron has not made any proposals for a new manager.

Despite Messrs. Baron and Schepps' opposition, on April 22, 2011, the Court issued its *Order Granting the Receiver's Motion to Appoint Damon Nelson as Permanent Manager of the LLCs and for Turnover of LLC Material to Damon Nelson*. [Docket No. 473.]

Furthermore, just prior to the April 28, 2011, hearing in this matter, one of the LLCs' attorneys, Mr. Jackson, received an instruction via e-mail from the trustee for The Village Trust in the Cook Islands. On April 27, 2011, Ms. Narida Crocombe, general counsel for the Southpac Trust, the trustee for the Village Trust, instructed Mr. Jackson to "[p]revent the sale of the domain name assets of the LLCs" and to "[o]btain a list from the receiver of the domain names they are seeking to liquidate." This is further evidence that Mr. Baron (or his agents, at least) are actively trying to disrupt the Receiver's efforts.

ii.    The Receiver managed the LLC expenses.

The sections below discuss the Receiver's work in managing the LLC expenses—all of which are necessary to maintain the domain names, including those that the Receiver will likely be selling in order to fund the disbursements to the unpaid attorneys. The specific expenses that

the Report will discuss below include the (1) registrar payments, (2) operations expenses, and (3) potential expenses through legal claims.

> 1)  The Receiver managed payments to the registrar, including renewals/deletions of domain names.

Payments to the registrar and the renewals/deletions of domain names go hand-in-hand. The Receiver understands that, in order to attract Internet users to websites to click-through and generate Monetizer Revenue, there must be domain names.  In addition, there must be domain names to sell in order to pay for the Receivership's anticipated liabilities, including the claims of the Former Baron Attorneys.

The Receiver also understands that the domain names require an annual renewal fee to be paid to the registrar (defined above as the "Renewal Fees").  Failure to pay the Renewal Fees will lead to forfeiting the registration and control over the domain names, which would, in turn, (a) reduce or eliminate certain streams of assets flowing in from the monetizers, and (b) perhaps lead to the non-renewal or deletion of domain names that the Receiver could otherwise have sold to increase cash and pay the Receivership's anticipated liabilities.

In order to be profitable, domain names need to generate revenue **_at least_** greater than the cost of the Renewal Fees (plus certain overhead costs, like salaries for the LLC Manager and programmers, rent, etc.) ("Profitable Domain Names").  Some of the domain names are already Profitable Domain Names.  Others are not Profitable Domain Names ("Money Losing Domain Names").  Both of those categories can be derived through a statistical analysis of profitability.

> i)  The Court ordered the Receiver to delete all Money Losing Domain Names.

On December 16, 2010, the LLCs filed an *Emergency Motion to Compel Deletion of Domain Names*.  [Docket Nos. 174-75.]  The next day, December 17, 2010, at the courthouse, the Receiver and counsel for the LLCs negotiated for several hours.  At the close of the

negotiations, the Court issued an agreed order instructing the Receiver not to renew _**any**_ Money

Losing Domain Names.  [Docket No. 177.]

> ii)   Mr. Harbin advised the Receiver of Money Losing Domain Names that the Receiver should ask for permission not to delete.

After the entry of this agreed order requiring non-renewal of all Money Losing Domain

Names, a team of individuals, including Messrs. Cox and Eckels, led by Mr. Harbin

(collectively, to be referred to simply as "Mr. Harbin") advised the Receiver of a third category

(or more like a sub-category) of domain names—Money Losing Domain Names that, because of

certain characteristics, _**might someday**_ be Profitable Domain Names ("Future Profitable Domain

Names").[12]  Mr. Harbin explained that Future Profitable Domain Names include one or more of

the following characteristics: (1) relatively high traffic (specifically, over 100 "uniques," _i.e._,

visits to a single webpage per year), (2) positive length of the domain name with a shorter

domain name translating to higher value, (3) positive "look and feel" of the domain name

meaning its appeal to the human eye and ear (_i.e._, the domain name is catchy, humorous and/or

functional), (4) positive spelling of the domain name, specifically the absence of uncommon

misspellings, (5) positive "keyword relevance" of the domain name, meaning its containing

commonly searched words, (6) high Google.com search-ranking statistics of the domain name

with a higher ranking translating to higher value, and/or (7) strong _**potential**_ name branding

value and highly sought web search term.  [Docket No. 306 at pp. 12-13.]

---

[12] The Receiver wondered why Mr. Harbin did not advise him of this sub-category before allowing his counsel to propose to the Court an agreed order requiring deletion of all Money Losing Domain Names.  Had Mr. Harbin been present at the December 17, 2010 hearing (which the Receiver was surprised he was not), this extra step could likely have been avoided.

        iii)    <u>The Receiver instructed the Registrar to delete the Money Losing Domain Names that were not Future Profitable Names.</u>

Mr. Harbin asked that the Receiver start out by deleting the Money Losing Domain Names that were not Future Profitable Domain Names (and later, deal with the Future Profitable Domain Names). In compliance with the Court's agreed order and Mr. Harbin's recommendation, the Receiver coordinated the non-renewal/deletion of the Money Losing Domain Names that were not Future Profitable Domain Names. [*Id.* at p. 13.]

        iv)    <u>The Receiver asked the Court for permission to allow the Receiver to renew certain Money Losing Domain Names that were Future Profitable names.</u>

On January 24, 2011, the Receiver filed a *Joint Verified Motion to Renew Certain Money Losing Domain Names*. [Docket No. 243.] In this motion, which Mr. Harbin verified, the Receiver noted that (1) the Court previously ordered that the Receiver not pay to renew ***any*** Money-Losing Domain Names [Docket No. 177], (2) the Court also previously ordered that the Receiver take actions necessary to preserve the Receivership Assets [Docket No. 130], (3) the Receiver has since been advised that complying with both orders simultaneously is impossible, and (4) to fix this problem, the Receiver asked that the Court specifically require the Receiver to renew ***certain*** Money-Losing Domain Names—*i.e.*, the Future Profitable Domain Names.[13]

---

[13] The Receiver prepared and originally intended to file an *Appendix in Support of the Joint Verified Motion to Renew Certain Money Losing Domain Names*. The appendix was to be comprised of confidential, proprietary, and sensitive information related to certain domain names that are valuable Receivership Assets. On December 30, 2010, the Receiver filed the *Receiver's Motion for Leave to File Documents Under Seal*. [Docket No. 194.] On February 3, 2011, the Court issued its *Order Granting the Receiver's Motion for Leave to File Documents Under Seal* [Docket No. 277], which would allow the Receiver to file the appendix under seal. But before the Receiver had an opportunity to file the appendix under seal, on February 4, 2011, the Court issued its *Order Granting Joint Verified Motion to Renew Certain Money Losing Domain Names*—thereby mooting the need for the Receiver to file the appendix. [Docket No. 289.] In an effort to make Mr. Baron and his counsel fully aware of the domain names that were being renewed and not renewed, on February 16, 2011, the Receiver sent them an unfiled copy of the appendix.

v)      The Court gave the Receiver permission to renew certain Money Losing Domain Names that were Future Profitable names.

On February 4, 2011, the Court issued its *Order Granting Joint Verified Motion to Renew Certain Money-Losing Domain Names*. [Docket No. 289.]  In the Order, the Court ordered the Receiver to instruct the domain name registrar to renew the 16,170 domain names as determined by, among others, Mr. Harbin, whose registrations expired in November 2010 and annual revenues do not exceed the costs of their annual registrations.

vi)     In February, the Receiver responded to Mr. Baron's challenge relating to the renewal of certain Money Losing Domain Names.

Even though Mr. Harbin spearheaded the entire process of domain name renewal and deletion, on February 6, 2011, without conferring with the Receiver, Mr. Harbin (through Mr. Jackson and likely at the direction of Mr. Baron) filed an *Emergency Motion* to, among other things, change the protocol relating to determinations of renewals and deletions of domain names. [Docket No. 269.]  This appeared to be another tactic by Mr. Baron to take control of the LLCs and, thus, the domain names, and thereby stop the Receiver from selling any of those domain names.  As stated below, the Receiver prevailed—although at a substantial cost of time and resources.

vii)    The Receiver filed a response to the emergency motion relating to the renewal of certain Money Losing Domain Names.

On February 9, 2011, the Receiver filed *The Receiver's Response to Jeffrey Baron's Thirteenth Emergency Since Entry of the Receivership* [Docket No. 306]—which he filed shortly after filing his *Appendix in Support of The Receiver's Response to Jeffrey Baron's Thirteenth Emergency Since Entry of the Receivership* [Not Docketed, but Filed Under Seal]. In the response, the Receiver argued that:  (a) the Receiver has already sought, obtained, and followed

Mr. Harbin's recommendations for all of the LLCs' domain name renewals and non-renewals., (b) The Court has already issued two orders specifically adopting Mr. Harbin's recommendations on what domain names to renew and what domain names to delete, [Docket Nos. 177 and 243], and (c) the Receiver will continue seeking (and likely following) Mr. Harbin's recommendations (since Mr. Harbin was still the Manager of the LLCs at the time) for future renewals and non-renewals, and to the extent his recommendations contravene a Court Order, the Receiver will file a motion with the Court for guidance on how to proceed.  [Docket No. 306.]

> viii)   The Court held a hearing on the emergency motion relating to the renewal of certain Money Losing Domain Names.

On February 10, 2011, the Court held a hearing on, among other things, the motion to modify the protocol for renewing and deleting domain names.  At the hearing, the Court recognized the failure of Mr. Jackson to confer with the Receiver before filing Mr. Baron's emergency motion, and the Court therefore denied the motion.  [Docket No. 315.]  The Court also ordered Mr. Harbin to meet face-to-face with the Receiver at the Court Ordered Meeting.  [Transcript of *Emergency Motion to Clarify and Further Emergency Relief Before the Honorable Royal Furgeson*, February 10, 2011, at 17:5-9, 18:19-19:2, 22:14-21.]  The topics for the Court Ordered Meeting were to include, among other things, protocol for renewing and deleting domain names.  [*Id.* at 15:1-15, 18:2-3, 19:6-8, 45:17-20.]  Specifically the Court ordered that the Court Ordered Meeting commence on February 16, 2011 [*Id.* at 17:6-7], and continue until such time that the Receiver was satisfied that the Receiver received answers to all of the meeting topics, including protocol for renewing and deleting domain names.  [*Id.* at 17:8-9 ("Mr. Harbin and Mr. Vogel are going to meet within the next seven days . . . and they are going to meet if it takes twenty-four days until they work this out.").]

ix)    During the first part of the interview, Mr. Harbin admitted that he actually had no objections to the culling protocol.

In a surprising twist, and especially after the filing of the emergency motion ten days earlier, at the meeting on February 16, 2011, Mr. Harbin repeatedly acknowledged that everything the Receiver had been doing in terms of preparing to renew or delete domain names was correct.  Here are samples of that discussion:

[MR. LOH:]       Do you agree with the statement that the receiver has impaired, impeded, or otherwise disturbed the ability of the -- any of the receivership parties to pay maintenance costs on thousands of -- of assets?  And I'm assuming he means the domain names.. . . We'll start with the LLCs.

[MR. HARBIN:]    No, I don't believe the receiver has impeded the LLCs.

[MR. LOH:]       So in your mind, the receiver has done his duty, for lack of a better term, to maintain the domain names that the LLCs own?

[MR. HARBIN:]    Yes.

[MR. LOH:]       Do you believe that -- do you agree with [Mr. Schepps'] statement that -- that losses have been suffered by the LLCs in the millions of presumably dollars, U.S. dollars?

[MR. HARBIN:]    No, I don't agree with that.. . .

[MR. LOH:]       Sitting here today, Mr. Harbin, and going back all the way to the beginning of the receivership, so I guess almost three months, are there any actions undertaken by the receiver that you didn't agree with or have felt have damaged the LLCs in any way? . . .

[MR. HARBIN:]    I don't believe that the receiver has done anything to impede the ability of the LLCs to maintain the names that they hold or to renew those names.  I think we've done a very -- I think you and your team and the things that I've been involved with as well, I think we've done a good job of -- of deciding which names were to be deleted as well as which ones were to be maintained on a month-by-month basis. . . .

| | |
|---|---|
| [MR. GOLDEN:] | Since the time the receivership began, has any domain name been renewed by the LLCs that you disagree with the decision to renew it? |
| MR. HARBIN: | Not a specific name that I'm aware of, no. |
| MR. GOLDEN: | And to flip it around, since the time that the receivership began, is there any domain names that have not been renewed that you disagree with the decision not to renew it? |
| MR. HARBIN: | No. |
| MR. GOLDEN: | So in short, you would agree that all domain names in the LLCs that have been renewed and not renewed since the beginning of the receivership are decisions that you're comfortable with? |
| MR. HARBIN: | Yes.  I've been comfortable with it, yes. |
| MR. GOLDEN: | And in fact, you have been involved with all of those? |
| MR. HARBIN: | Yes, I have.. . . |
| MR. GOLDEN: | And no domain names have expired that we didn't want to expire? |
| MR. HARBIN: | Not to my knowledge. |

[Transcript of Court Ordered Meeting, February 16, 2011 at 83:11-88:13, 89:2-4.]  So, it appeared that the "dispute" over the culling of the domain names had ended.  Unfortunately, that would not be the case—as described below.

x)  <u>The Receiver began the work to ask the Court for permission to allow the Receiver to renew additional Money Losing Domain Names that were Future Profitable names.</u>

On March 16, 2011, the Receiver filed the *Second Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 382], asking the Court to specifically require the Receiver to renew 19,312 Future Profitable Domain Names that expired in December 2010. Because the appendix in support of this motion was filed under seal, the Receiver delivered

hand-delivered a CD containing a copy of the appendix to Mr. Schepps, and mailed CDs containing copies of the appendix to Messrs. Baron and Barrett.  On March 22, 2011, the Court issued its *Order Granting the Second Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 403], allowing such renewal.

> xi)   <u>Mr. Baron would not consent to the next motion to renew his own domain names.</u>

In March 2011, Mr. Baron again unsurprisingly attempted to interfere.  Specifically, on March 4, 2011, the Receiver held a face-to-face conference relating to this motion—a motion that the Receiver emphasized was endorsed by four different professionals who directly or indirectly reported to Mr. Baron prior to the Receivership:  (1) Mr. Harbin (former LLC Manager since prior the Receivership) (2) Mr. Cox (LLC attorney since prior to the Receivership), (3) Mr. Eckels (former LLC attorney from prior to the Receivership), and (4) Mr. Nelson (former manager of Ondova).  [Transcript of Court Ordered Meeting, March 4, 2011, at 38:20-46:15.]  Despite the universal endorsement of all of these people (whom Mr. Baron apparently thought prior to the Receivership were qualified to make this sort of determination), and even though the motion is actually one in Mr. Baron's absolute best interest (*i.e.*, allowing the non-deletion of certain of his domain names that are potential money makers), Mr. Baron would not consent to the motion.  [*Id.*]

> xii)   <u>The Receiver filed third, fourth, fifth, sixth, seventh, and eighth motions for the renewal of money losing domain names.</u>

On March 17, 2011, the Receiver filed the *Third Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 389], asking the Court to specifically require the Receiver to renew 11,286 Future Profitable Domain Names that expired in January 2011.  Because the appendix in support of this motion was filed under seal, the Receiver hand-delivered

a CD containing a copy of the appendix to Mr. Schepps, and mailed CDs containing copies of the appendix to Messrs. Baron and Barrett.  On March 22, 2011, the Court issued its *Order Granting the Third Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 404], allowing such renewal.

Also on March 17, 2011, the Receiver filed the *Fourth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 391], asking the Court to specifically require the Receiver to renew 17,207 Future Profitable Domain Names that expired in February 2011.  Because the appendix in support of this motion was filed under seal, the Receiver hand-delivered a CD containing a copy of the appendix to Mr. Schepps, and mailed CDs containing copies of the appendix to Messrs. Baron and Barrett.  On March 22, 2011, the Court issued its *Order Granting the Fourth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 405], allowing such renewal.

On April 15, 2011, the Receiver filed the *Fifth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 452], asking the Court to specifically require the Receiver to renew 6,371 Future Profitable Domain Names that expired in March 2011.  Because the appendix in support of this motion was filed under seal, the Receiver hand-delivered a CD containing a copy of the appendix to Mr. Schepps, and mailed CDs containing copies of the appendix to Messrs. Baron and Barrett.  On April 18, 2011, the Court issued its *Order Granting the Fifth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 460], allowing such renewal.

On June 2, 2011, the Receiver filed the *Sixth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 599], asking the Court to specifically require the Receiver to renew 5,840 Future Profitable Domain Names that expired in May 2011.  Because

the appendix in support of this motion was filed under seal, the Receiver hand-delivered a CD containing a copy of the appendix to Mr. Schepps, and mailed CDs containing copies of the appendix to Mr. Baron. This sixth motion is currently pending before the Court. However, in its *Advisory*, the Court announced its intention to grant this sixth motion. [Docket No. 630.]

On June 15, 2011, the Receiver filed his *Seventh Joint Verified Motion to Renew Money-Losing Domain Names.* [Docket No. 611.] The motion asks the Court to specifically require the Receiver to renew 5,840 Future Profitable Domain Names that expired in April 2011. Because the appendix in support of this motion was filed under seal, the Receiver e-mailed copies of such appendix to Messrs. Baron and Schepps. This seventh motion is currently pending before the Court. However, in its *Advisory*, the Court announced its intention to grant this seventh motion. [Docket No. 630.]

On July 12, 2011, the Receiver filed his *Eighth Joint Verified Motion to Renew Money-Losing Domain Names.* [Docket No. 643 at Ex. 1.] The motion asks the Court to specifically require the Receiver to renew 7,013 Future Profitable Domain Names that expired in June 2011. Because the appendix in support of this motion was filed under seal, the Receiver mailed copies of such appendix to Messrs. Baron and Schepps. This eighth motion is currently pending before the Court.

The Receiver is currently working on evaluating the domains whose registrations expire in July 2011 and which ones of those are worthy of retaining as opposed to deleting under the same criteria described above and employed since December 2010.

xiii)   <u>The Receiver made payments to the registrar.</u>

All of the decisions relating to renewing and deleting domain names trigger from the fact that the domain names—if not deleted—require annual renewal fees. In June and the least two

weeks of July 2011, the Receiver continued managing the process of paying the renewal fees to

the registrar.  Below is a chart detailing the payments made to the registrar in December 1, 2010

through July 15, 2011.

| Date of Payment to Registrar | Number of Domain Names Renewed | Number of Domain Names Not Renewed | Amounts Paid to Registrar for Domain Name Renewal | Amounts Saved by Not Renewing Certain Money-Losing Domain Names |
|---|---|---|---|---|
| December 20, 2010 | 26,318 .coms and 17 .nets[14] | 14,905 | $200,639.72 | $113,576.10 |
| January 18, 2011 | 22,334 .coms and 3,681 .nets | 16,453 | $191,093.16 | $125,371.86 |
| February 8, 2011 | 32,738 .coms and 2 .nets | 3,554 | $249,474.92 | $27,081.48 |
| March 1, 2011 | 17,386 .coms and 5 .nets | 10,258 | $132,471.62 | $78,165.96 |
| April 4, 2011 | 14,681 .coms and 0 .nets | 4,360 | $111,869.22 | $33,223.20 |
| May 7, 2011 | 10,882 .coms and 0 .nets | 2,199 | $82,920.84[15] | $16,756.38 |
| June 1, 2011 | 17,341 .coms and 0 .nets | 6,351 | $132,138.00[16] | $48,394.62 |
| **TOTALS:** | 141,680 .coms and 3,705 .nets | 58,080 | $1,100,607.48 | $442,569.60 |

---

[14] The annual cost of domain name renewal per ".com" is $7.62; the cost per ".net" is $5.68.

[15] In May 2011, the registrar advised the Receiver that the LLCs had accumulated a reserve balance with the registrar that exceeded the $82,920.84 renewal fee for May 2011.  Accordingly, and at the recommendation of the LLCs' manager, Mr. Nelson, the Receiver instructed the registrar to pay for the May 2011 renewal fees using the LLCs' reserve balance.

[16] In June 2011, the registrar advised the Receiver that the LLCs had accumulated a reserve balance with the registrar that exceeded the $132,138.00 renewal fee for June 2011.  Accordingly, and at the recommendation of the LLCs' manager, Mr. Nelson, the Receiver instructed the registrar to pay for the June 2011 renewal fees using the LLCs' reserve balance.

2)      The Receiver managed payments for operations expenses.

i)      The Receiver filed motions for disbursements and made disbursements.

Since the beginning of the Receivership—and including June and the first two weeks of July 2011—the Receiver disbursed $1,250,948.19 from the LLC Funds for operating expenses such employee salaries, rent and internet expenses for Quasar Services, LLC's office space, bank wire transfer fees, domain name appraisal fees, and domain name renewal fees, as well as copy expenses related to Grant Thornton's audit.   A total of $196,327.02 of this $1,250,948.19 was disbursed in June and the first two weeks of July 2011.   In addition, since the beginning of the Receivership the Receiver disbursed $196,699.09 for Court-ordered disbursements (which were payments to LLC attorneys, Messrs. Cox and Jackson, former-Receivership Professional and now-Permanent Manager of the LLCs, Mr. Nelson, and Receivership Professionals Grant Thornton).   Because the Court did not order any disbursements during June and the first two weeks of July 2011, none of this $196,699.09 was disbursed during such timeframe.   Below are details of both categories—disbursements for expenses and disbursements per Court Orders.

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Fabulous.com | *Order Appointing Receiver* [Docket No. 130] | N/A | Dec. 20, 2010 | $200,639.72 | Dec. 2010 Domain Name Renewal Fees | Quantec Fabulous.com registrant account |
| Fabulous.com | *Order Appointing Receiver* [Docket No. 130] | N/A | Jan. 18, 2011 | $191,093.16 | Jan. 2011 Domain Name Renewal Fees | Quantec, LLC account at Compass Bank |

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | Jan. 31, 2011 | $3,000.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | Jan. 31, 2011 | $3,000.00 | Programmer Fees | Novo Point, LLC account at Compass Bank |
| Jeffrey Harbin | *Order Appointing Receiver* [Docket No. 130] | N/A | Jan. 31, 2011 | $10,010.36 | Management Fees and reimbursement for expenses | Quantec, LLC account at Compass Bank |
| Jeffrey Harbin | *Order Appointing Receiver* [Docket No. 130] | N/A | Jan. 31, 2011 | $3,903.26 | Management Fees and reimbursement for expenses | Novo Point, LLC account at Compass Bank |
| Josh Cox | *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Receivership Professional Joshua Cox* [Docket No. 274] | *The Receiver's First Application for Reimbursement of Fees Incurred by Receivership Professional Joshua Cox* [Docket No. 190] | Feb. 7, 2011 | $7,187.50 | Professional Fees | Novo Point, LLC account at Compass Bank |

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Josh Cox | *Order Granting the Receiver's Second Application for Reimbursement of Fees Incurred by Receivership Professional Joshua Cox* [Docket No. 283] | *The Receiver's Second Application for Reimbursement of Fees Incurred by Receivership Professional Joshua Cox* [Docket No. 217] | Feb. 7, 2011 | $7,343.75 | Professional Fees | Novo Point, LLC account at Compass Bank |
| Josh Cox | *Order Granting the Receiver's Third Joshua Cox Fee Application* [Docket No. 292] | *The Receiver's Third Joshua Cox Fee Application* [Docket No. 256] | Feb. 7, 2011 | $5,125.00 | Professional Fees | Novo Point, LLC account at Compass Bank |
| Fabulous.com | *Order Appointing Receiver* [Docket No. 130] | N/A | Feb. 8, 2011 | $249,474.92 | Feb. 2011 Domain Name Renewal Fees | Quantec, LLC and Novo Point, LLC accounts at Compass Bank |
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | Feb. 9, 2011 | $3,000.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | Feb. 9, 2011 | $3,000.00 | Programmer Fees | Novo Point, LLC account at Compass Bank |
| Josh Cox | *Order Granting the Receiver's Fourth Joshua Cox Fee Application* [Docket No. 297] | *The Receiver's Fourth Joshua Cox Fee Application* [Docket No. 266] | Feb. 10, 2011 | $4,906.25 | Professional Fees | Novo Point, LLC account at Compass Bank |

THE RECEIVER'S REPORT OF WORK PERFORMED
IN JUNE AND THE FIRST TWO WEEKS OF JULY 2011

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|-----------|---------------------------------------------|-------------------------------------|------|--------|------|--------|
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | Feb. 16, 2011 | $3,000.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Fabulous.com | *Order Appointing Receiver* [Docket No. 130] | N/A | Mar. 1, 2011 | $132,471.62 | March 2011 Domain Name Renewal Fees | Quantec, LLC account at Compass Bank |
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | Mar. 10, 2011 | $14,280.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Josh Cox | *Order Granting the Receiver's Fifth Joshua Cox Fee Application* [Docket No. 369] | *The Receiver's Fifth Joshua Cox Fee Application* [Docket No. 346] | Mar. 14, 2011 | $7,697.50 | Professional Fees | Novo Point, LLC account at Compass Bank |
| Thomas Jackson | *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 366] | *The Receiver's First Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 327] | Mar. 15, 2011 | $17,930.50 | Attorney Fees | Quantec, LLC account at Compass Bank |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | Mar. 15, 2011 | $80.00 | Wire Transfer Fees | Quantec, LLC account at Compass Bank |

THE RECEIVER'S REPORT OF WORK PERFORMED
IN JUNE AND THE FIRST TWO WEEKS OF JULY 2011

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Thomas Jackson | *Order Granting the Receiver's Second Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 370] | *The Receiver's Second Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 347] | Mar. 17, 2011 | $20,523.00 | Attorney Fees | Quantec, LLC account at Compass Bank |
| Damon Nelson | *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 384] | *The Receiver's First Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 372] | Mar. 22, 2011 | $11,499.59 | Management and Professional Fees | Quantec, LLC account at Compass Bank |
| Elite Document Tech. | *Order Appointing Receiver* [Docket No. 130] | N/A | Mar. 22, 2011 | $501.74 | Copy Expenses related to Grant Thornton's Audit | Novo Point, LLC account at Compass Bank |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | Mar. 31, 2011 | $90.00 | Wire Transfer Fees | Novo Point, LLC account at Compass Bank |
| Quasar Services LLC | *Order Appointing Receiver* [Docket No. 130] | N/A | Mar. 31, 2011 | $825.00 | Rent and Wireless Internet expenses | Novo Point, LLC account at Compass Bank |
| Fabulous.com | *Order Appointing Receiver* [Docket No. 130] | N/A | Apr. 4, 2011 | $111,869.22 | April 2011 Domain Name Renewal Fees | Quantec, LLC account at Compass Bank |

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | Apr. 15, 2011 | $12,670.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | Apr. 15, 2011 | $181.00 | Wire Transfer Fees | Quantec, LLC account at Compass Bank |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | Apr. 15, 2011 | $46.00 | Wire Transfer Fees | Novo Point, LLC account at Compass Bank |
| Damon Nelson | *Order Granting the Receiver's Second Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 463] | *The Receiver's Second Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 436] | Apr. 20, 2011 | $17,675.00 | Management and Professional Fees | Quantec, LLC account at Compass Bank |
| Thomas Jackson | *Order Granting the Receiver's Third Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 462] | *The Receiver's Third Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 439] | Apr. 20, 2011 | $5,702.50 | Attorney Fees | Quantec, LLC account at Compass Bank |
| Josh Cox | *Order Granting the Receiver's Sixth Joshua Cox Fee Application* [Docket No. 461] | *The Receiver's Sixth Joshua Cox Fee Application* [Docket No. 446] | Apr. 20, 2011 | $9,687.50 | Professional Fees | Novo Point, LLC account at Compass Bank |

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Domain Name Appraiser | *Order Appointing Receiver* [Docket No. 130] | N/A | Apr. 25, 2011 | $1,349.70 | Domain name appraisal for potential sale of domain names | Novo Point, LLC account at Compass Bank |
| Quasar Services LLC | *Order Appointing Receiver* [Docket No. 130] | N/A | Apr. 29, 2011 | $400.00 | Rent and Wireless Internet expenses | Quantec, LLC account at Compass Bank |
| Fabulous.com | *Order Appointing Receiver* [Docket No. 130] | N/A | May 7, 2011 | $82,920.84 | May 2011 Domain Name Renewal Fees | LLCs' reserve balance at Fabulous.com (*see infra* Note 15) |
| Thomas Jackson | *Order Granting the Receiver's Fourth Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 529] | *The Receiver's Fourth Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 487] | May 13, 2011 | $2,960.00 | Attorney Fees | Quantec, LLC account at Compass Bank |
| Josh Cox | *Order Granting the Receiver's Seventh Joshua Cox Fee Application* [Docket No. 530] | *The Receiver's Seventh Joshua Cox Fee Application* [Docket No. 488] | May 12, 2011 | $6,588.21 | Professional Fees | Novo Point, LLC account at Compass Bank |
| Damon Nelson | *Order Granting the Receiver's Third Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 537] | *The Receiver's Third Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 496] | May 12, 2011 | $13,463.39 | Management Fees | Quantec, LLC account at Compass Bank |

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Grant Thornton | *Order Granting the Receiver's First Grant Thornton Fee Application* [Docket No. 540] | *The Receiver's First Grant Thornton Fee Application* [Docket No. 505] | May 13, 2011 | $30,216.91 | Fees for Auditing and Tax Services | Quantec, LLC account at Compass Bank |
| Grant Thornton | *Order Granting the Receiver's First Grant Thornton Fee Application* [Docket No. 540] | *The Receiver's First Grant Thornton Fee Application* [Docket No. 505] | May 13, 2011 | $20,455.99 | Fees for Auditing and Tax Services | Novo Point, LLC account at Compass Bank |
| Damon Nelson | *Order Granting the Receiver's Fourth Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 542] | *The Receiver's Fourth Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 511] | May 12, 2011 | $3,375.00 | Management Fees | Quantec, LLC account at Compass Bank |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | May 16, 2011 | $203.00 | Wire Transfer Fees | Quantec, LLC account at Compass Bank |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | May 16, 2011 | $38.00 | Wire Transfer Fees | Novo Point, LLC account at Compass Bank |
| Quasar Services, LLC | *Order Appointing Receiver* [Docket No. 130] | N/A | May 20, 2011 | $824.95 | Rent, Wireless Internet expenses, and account maintenance fees | Quantec, LLC account at Compass Bank |

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Josh Cox | *Order Granting the Receiver's Eighth Joshua Cox Fee Application* [Docket No. 573] | *The Receiver's Eighth Joshua Cox Fee Application* [Docket No. 547] | May 20, 2011 | $1,572.50 | Professional Fees | Novo Point, LLC account at Compass Bank |
| Thomas Jackson | *Order Granting the Receiver's Fifth Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 574] | *The Receiver's Fifth Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 548] | May 20, 2011 | $2,789.00 | Attorney Fees | Quantec, LLC account at Compass Bank |
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | May 25, 2011 | $12,000.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | May 26, 2011 | $12,000.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Domain Name Appraiser | *Order Appointing Receiver* [Docket No. 130] | N/A | May 31, 2011 | $1,754.73 | Domain name appraisal for potential sale of domain names | Novo Point, LLC account at Compass Bank |
| Fabulous.com | *Order Appointing Receiver* [Docket No. 130] | N/A | June 1, 2011 | $132,138.00 | June 2011 Domain Name Renewal Fees | LLCs' reserve balance at Fabulous.com (*see infra* Note 16) |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | June 15, 2011 | $205.00 | Wire Transfer Fees | Quantec, LLC account at Compass Bank |

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | June 15, 2011 | $15.00 | Wire Transfer Fees | Novo Point, LLC account at Compass Bank |
| Quasar Services, LLC | *Order Appointing Receiver* [Docket No. 130] | N/A | June 24, 2011 | $1,000.00 | Rent and Wireless Internet expenses | Quantec, LLC account at Compass Bank |
| Fabulous.com | *Order Appointing Receiver* [Docket No. 130] | N/A | June 28, 2011 | $37,117.02 | July 2011 Domain Name Renewal Fees | Quantec, LLC account at Compass Bank |
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | July 8, 2011 | $12,830.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Peter Wall | *Order Appointing Receiver* [Docket No. 130] | N/A | July 8, 2011 | $12,818.00 | Programmer Fees | Quantec, LLC account at Compass Bank |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | July 15, 2011 | $135.00 | Wire Transfer Fees | Quantec, LLC account at Compass Bank |
| Compass Bank | *Order Appointing Receiver* [Docket No. 130] | N/A | July 15, 2011 | $69.00 | Wire Transfer Fees | Novo Point, LLC account at Compass Bank |

| Recipient | Name of Court Order Permitting Disbursement | Name of Motion Seeking Disbursement | Date | Amount | Type | Source |
|---|---|---|---|---|---|---|
| Thomas Jackson | N/A (although the Court announced its intention to grant this motion in its *Advisory* [Docket No. 630]} | *The Receiver's Sixth Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 602] | N/A | *$2,787.50* | Attorney Fees | Quantec, LLC account at Compass Bank |
| Josh Cox | N/A (although the Court announced its intention to grant this motion in its *Advisory* [Docket No. 630]) | *The Receiver's Ninth Joshua Cox Fee Application* [Docket No. 603] | N/A | *$4,433.88* | Professional Fees | Novo Point, LLC account at Compass Bank |
| Damon Nelson | N/A (motion is currently pending before the Court) | *The Receiver's Fifth Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 629 at Ex. A] | N/A | *$16,850.00* | Management Fees | Quantec, LLC account at Compass Bank |

    ii)  <u>Mr. Baron objected to three of these fee applications.</u>

Mr. Baron objected to *The Receiver's Second Application for Reimbursement of Fees Incurred by Receivership Professional Joshua Cox* mentioned in the chart above describing the Receiver's disbursements.  [Docket No. 231.]  Mr. Jackson objected to the same fee application on behalf of the LLCs.  [Docket No. 228.]  Nevertheless, the Court granted this application, and the Receiver made the ordered disbursement.  [Docket No. 283.]

On June 27, 2011, Mr. Baron objected to *The Receiver's Ninth Cox Fee Application* [Docket No. 603] and *The Receiver's Sixth Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 602.] [Docket No. 627.] Nevertheless, the Court announced, in its *Advisory*, that it intends to grant these applications. [Docket No. 630.]

iii)   Mr. Baron appealed the orders.

On March 3, 2011, Mr. Baron appealed all Court-ordered disbursements listed in the chart above that had been ordered by that date. [Docket No. 341.] During a transcribed meeting on March 4, 2011, Mr. Schepps stated that should Mr. Baron win on appeal, all of those disbursements are to be disgorged—meaning that individuals for whom these disbursements were made would have worked for months for free, the typical scenario for professionals who have worked for Mr. Baron. [Transcript of Court Order Meeting, March 4, 2011, at 120:6-14.] On April 11, 2011, Mr. Baron appealed all the Court-ordered disbursements in the chart above that had been ordered since his previous March 3, 2011 appeals. [Docket No. 449.] On May 18, 2011, Mr. Baron appealed all of the Court ordered disbursements on the chart above ordered since his previous appeals. [Docket No. 576.] In sum, Mr. Baron has appealed the following orders:

- *Order Granting the Receiver's Application for Reimbursement of Fees Incurred by Receivership Professional Joshua Cox* [Docket No. 274];

- *Order Granting the Receiver's Second Application for Reimbursement of Fees Incurred by Receivership Professional Joshua Cox* [Docket No. 283];

- *Order Granting the Receiver's Third Cox Fee Application* [Docket No. 292];

- *Order Granting the Receiver's Fourth Cox Fee Application* [Docket No. 297];

- *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 366];

- *Order Granting the Receiver's Fifth Cox Fee Application* [Docket No. 369];

- *Order Granting the Receiver's Second Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 370];

- *Order Granting the Receiver's First Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 384];

- *Order Granting the Receiver's Sixth Cox Fee Application* [Docket No. 461];

- *Order Granting the Receiver's Third Jackson Fee Application* [Docket No. 462];

- *Order Granting the Receiver's Second Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 463];

- *Order Granting the Receiver's Fourth Jackson Fee Application* [Docket No. 529];

- *Order Granting the Receiver's Seventh Cox Fee Application* [Docket No. 530];

- *Order Granting the Receiver's Third Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 537];

- *Order Granting the Receiver's First Grant Thornton Fee Application* [Docket No. 540];

- *Order Granting the Receiver's Fourth Application for Reimbursement of Fees Incurred by Damon Nelson* [Docket No. 542];

- *Order Granting the Receiver's Eighth Cox Fee Application* [Docket No. 573]; and

- *Order Granting the Receiver's Fifth Jackson Fee Application* [Docket No. 574].

[Docket Nos. 341, 449, and 576.]

On May 24, 2011, the Court issued its *Order Regarding Baron's Notice of Appeal to the United States Court of Appeals for the Fifth Circuit (Doc. No. 576)* [Docket No. 586], "advis[ing] the parties that it [sic] is STAYED from taking further action in the various matters involved in" Mr. Baron's May 18, 2011 appeal. [Docket No. 576.] Mr. Schepps is using the appeal, and the Court's "stay" order, as a basis to try and shut down the entire Receivership. Specifically, he filed a *Motion for Leave to File: Motion to Stay Receivership Pending Appeal* [Docket No. 590], *Motion for Leave to File: Motion to Stay or Vacate Injunction and Civil*

*Lockdown of Jeff Baron* [Docket No. 591], and *Motion for Leave to File: Motion for an Expedited Ruling on the Stay Motions [Docs 590 and 591]*. [Docket No. 592.] The Receiver has resisted devoting valuable time and resources to frivolous motions such as these. Ultimately, the Court denied all three of these motions. [Docket Nos. 596, 597, and 598.]

Mr. Baron is undeterred. On June 22, 2011, Mr. Baron again filed motion to stay the receivership with the Fifth Circuit and notified this Court as such. [Docket No. 617.] The Fifth Circuit notably denied the motion and admonished Mr. Baron for his practice of filing frivolous motions. [Docket No. 624.]

iv)   <u>Mr. Baron filed an emergency motion relating to disbursements from the LLC Funds to pay professional fees.</u>

Even though the Receiver repeatedly told Messrs. Jackson and Harbin—in writing and through court filings—that virtually all professional fees would be coming out of non-LLC funds, on February 6, 2011, without conferring with the Receiver, Mr. Harbin (through Mr. Jackson and likely at the direction of Mr. Baron) filed an *Emergency Motion* to, among other things, challenge disbursements of LLC Funds to pay for professional fees—namely, Mr. Cox, who was the LLCs' own attorney! [Docket No. 269.] This appeared to be another tactic by Mr. Baron to take control of the LLCs and thus the domain names, and thereby stop the Receiver from selling any of those domain names. The Receiver prevailed—although at a substantial cost of time and resources—as explained in detail in the February 2011 Receiver Report. [Docket No. 416 at pp. 69-71.]

v)   <u>Mr. Baron is still fighting.</u>

As mentioned above, on March 3, April 11, and May 18, 2011, Mr. Baron appealed all of the Court ordered disbursements relating to the LLCs. [Docket Nos. 341, 349, and 576.] In other words, Mr. Baron wishes for Messrs. Cox and Eckels—lawyers whom he hired prior to the

Receivership—and Mr. Jackson—another lawyer for the LLCs—not to receive a cent. Typical behavior by Mr. Baron to refuse to pay lawyers after they work for him.

3) <u>The Receiver managed potential UDRP issues.</u>

All registrars must follow the UDRP. As described above, under the UDRP, disputes alleged to have arisen from inappropriate registrations of domain names may be addressed by expedited arbitration that the holder of trademark rights initiates by filing a complaint with an ICANN-approved dispute-resolution service provider, such as WIPO or NAF. The LLCs are currently facing a number of threatened and actual UDRP claims and, potentially, lawsuits relating to allegations of "Cybersquatting"[17] (collectively, the "UDRP Claims"). The Receivership Order, however, provides that during the pendency of the Receivership, claimants are prohibited from "commencing, prosecuting, continuing, entering, or enforcing any of the UDRP Claims (the "UDRP Claims Stay")." [Docket No. 130 at p. 12].

The Receiver views his work in this area as maintaining the status quo, including accomplishing the following goals: (1) keeping track of all the UDRP Claims, (2) advising the claimants and the tribunals of the UDRP Claims Stay, (3) avoiding default awards on the UDRP Claims and consequential transfers of domain names (especially the more valuable domain names and the domain names that could serve as a source for funding the Delta), (4) avoiding money damages and potential liability for attorneys' fees, and (5) potentially negotiating favorable settlements during the pendency of the UDRP Claims Stay.

With those goals in mind, in June and the first two weeks of July 2011, the Receiver continually (a) updated his chart of all the actual and threatened UDRP Claims, and (b) continued preparing and sending letters to claimants and tribunals involved in the UDRP Claims,

---

[17] The term "Cybersquatting" refers to Lanham Act violations under the 1999 Anti-Cybersquatting Consumer Protection Act, where individuals allegedly intentionally violate trademarks by registering domain names.

(i) advising them of the UDRP Claims Stay and (ii) offering, as an alternative, to negotiate possible settlements that could involve sales of the domain names at issue. This chart identifies domain names, which will necessarily cause disclosure of who owns them—information which is typically kept confidential for privacy and other reasons. As a result, the chart tracking the status of the Receiver's work in this area will be filed separately from this Report under seal, pursuant to the Court's *Order Granting the Receiver's Motion for Leave to File Documents Under Seal*. [Docket No. 277.] Sufficed to say, this is one area that has been quite time-consuming—regardless of the endless hijinks of Mr. Baron—since this is substantial part of maintaining the LLCs.

4) <u>A UDRP complainant has appeared and objected to the Receiver's motion to clarify the Receiver Order</u>.

The registrars for domains are often "privacy services" or entities designed to conceal the true registrar for a domain. Privacy services prevent undue harassment and other unwanted contact from outside groups interested in the domain. The domains in the LLCs' portfolios are no different. They privacy services, too.

One UDRP complainant refused to recognize the stay or any offers to resolve his complaint. This complainant protested that the domain he was complaining about had a privacy service listed as its registrar which was not a Receivership Party and, thus, not subject to the stay. To remedy this, the Receiver filed his *Fifth Motion to Clarify the Receiver Order* as also including this entity as part of the Receivership. [Docket No. 609.] On June 27, 2011, the complainant, Amica Mutual Insurance Company objected to the Receiver's motion to clarify and appeared in the litigation. [Docket Nos. 618, 622, 623, and 626.] Nevertheless, the Court, in its *Advisory*, announced its intention to grant the Receiver's *Fifth Motion to Clarify the Receiver Order*. [Docket No. 630.]

      c.     *The Receiver received confirmation of the propriety of his fund management, and Mr. Baron fought that, too.*

On January 3, 2011, the Receiver filed *The Receiver's Motion for Order Confirming Propriety of Fund Management*, along with a supporting appendix. [Docket Nos. 199-200.] In this motion, the Receiver sought clarification of the Receivership Order that it was appropriate to provide Mr. Baron with funds for personal living expenses from funds originally heading to The Village Trust or from the Receiver's own personal funds. Details of this motion and the subsequent briefing that followed are discussed at length in the January and February 2011 Receiver Reports. [Docket No. 321 at pp. 76-80; Docket No. 416 at pp. 73-74.]

Specifically, on February 4, 2011, the Court issued its *Order Denying Jeffrey Baron's Motion to Strike the Receiver's Motion for Order Confirming Propriety of Fund Management [Doc#199]*. [Docket No. 290.] The Court also issued its *Order Granting the Receiver's Motion for Order Confirming Propriety of Fund Management*. [Docket No. 279.] On March 3, 2011, Mr. Baron filed a notice appealing the *Order Granting the Receiver's Motion for Order Confirming Propriety of Fund Management*. [Docket No. 340.] Presumably, Mr. Baron wants to see the Receiver not only be forced to disgorge his fees for his work over the past few months but also disgorge the reimbursements from his own personal expenditures. In other words, Mr. Baron wants the Receiver not just to work for free but also to spend some of the Receiver's personal monies as well.

      d.     *The Receiver sought and received the Court's permission for reimbursement of his additional personal funds.*

      i.     <u>The Receiver sought reimbursement of personal funds.</u>

On January 12, 2011, the Receiver filed the *Receiver's Motion for Reimbursement of Additional Personal Funds*. [Docket No. 221.] Details of this motion are contained in the

January Receiver report and, for purposes of efficiency, will not be repeated here. [Docket No. 321 at pp.80-82.]

ii.     Mr. Baron filed a response.

On February 2, 2011, Mr. Baron filed *Appellants' Joint Response to Receiver's Motion for Reimbursement of Additional Personal Funds*. [Docket No. 261.] In short, the brief introduced the question of whether a Receiver may maintain funds in private bank accounts, as opposed to the Court's registry.

iii.    The Receiver filed a reply.

On February 3, 2011, the Receiver filed *The Receiver's Reply in Support of His Motion for Reimbursement of Additional Personal Funds*. [Docket No. 262.] In short, the brief provided authority for why the Receiver may maintain funds in private bank accounts.

iv.     Mr. Baron filed a motion for a surreply.

On February 4, 2011, Mr. Baron filed the *Appellants' Joint Motion for Leave and Sur-reply to Receiver's Motion for Reimbursement of Additional Personal Funds [Doc#221]*. [Docket No. 263.] This pleading contained *non-sequiturs* and failed to respond to the authorities cited by the Receiver in his reply.

v.      The Receiver filed a response to the motion for a surreply.

On February 4, 2011, the Receiver filed *The Receiver's Response to Jeffrey Baron's Motion for Leave to File Surreply*. [Docket No. 267.] This response noted that Mr. Baron's motion for leave contained *non-sequiturs* and failed to respond to the authorities cited by the Receiver in his reply.

vi.     The Court ruled in favor of the Receiver.

Based on the aforementioned briefing, the Court issued its *Order Granting the Receiver's Motion for Reimbursement of Additional Personal Funds* [Docket No. 284] and *Order Denying*

*the Joint Motion for Leave to File a Sur-reply to Receiver's Motion for Reimbursement of Personal Funds.* [Docket No. 296.]

vii.   <u>Mr. Baron is still fighting.</u>

The fight did not end in the District Court. On March 3, 2011, Mr. Baron filed a notice of appeal of the *Order Granting the Receiver's Motion for Reimbursement of Additional Personal Funds.* [Docket No. 340.]

## C. Work relating to identifying and resolving claims of Mr. Baron's unpaid attorneys.

As stated at the beginning of Section B of this Report, in order to accomplish the goal of recommending disbursements of Receivership Assets to fund claims for unpaid attorneys, the Receiver must accomplish two major tasks:

First Task: Identify, gain access to, and manage the Receivership Assets.

Second Task: Identify and work with Mr. Baron's unpaid attorneys to collect evidence relating to their claims.

This prior section of the report (Section B) discussed the first task. The section below (Section C) will discuss the second task.

Mr. Baron and the other Receivership Parties (as defined in various Court orders [Docket Nos. 130, 176, 272 and 287])[18] (collectively, "Baron") engaged a enormous number of lawyers, accepted their services but failed to pay them (the "Former Attorney Claims"). The Court asked the Receiver to collect evidence to make his assessment of the Former Attorney Claims and then make that assessment (his "Assessment"). [Transcript of *Emergency Motion to Clarify and*

---

[18] On March 3, 2011, Mr. Baron appealed the Court's Order Granting the Receiver's Third Motion Clarify the Receiver Order adding Iguana Consulting, LLC, Diamond Key, LLC, Quasar Services, LLC, Javelina, LLC, HCB, LLC, a Delaware limited liability company, HCB, LLC, a U.S. Virgin Islands limited liability company, Realty Investment Management, LLC, a Delaware limited liability company, Realty Investment Management, a U.S. Virgin Islands limited liability company, Blue Horizon Limited Liability Company, Simple Solutions, LLC, Asiatrust Limited, Southpac Trust Limited, Stowe Protectors, Ltd., and Royal Gable 3129 Trust as Receivership Parties. [Docket No. 340.]

*Further Emergency Relief Before the Honorable Royal Furgeson*, February 10, 2011, at 40.]  In February 2011, the Receiver collected (1) the evidence he reviewed in order to make his Assessment, and (2) made his Assessment.  In March 2011, the Receiver filed his Assessment and, subsequently, motions for the Court's approval of such Assessment.

      **1.**    **The Receiver collected evidence to make his Assessment.**

As the Receiver previously reported to the Court, the Receiver sent letters to attorneys and firms whom the Receiver understands to maintain Former Attorney Claims.  [Docket No. 254.]  The letters requested that the attorneys and firms provide the Receiver with sworn declarations supporting the Former Attorney Claims.  [*Id*.]  Shortly after transmitting these letters, one of Mr. Baron's former firms contacted the Receiver to inform him that Mr. Schepps was interfering with the Receiver's efforts to obtain the former attorneys' sworn declarations supporting the Former Attorney Claims.  Specifically, this firm forwarded an e-mail it had received from Mr. Schepps, which contained the following language:

TO WHOM IT MAY CONCERN:

IF YOU HOLD ANY ATTORNEY-CLIENT OR OTHER PRIVILEGED MATTER WITH RESPECT TO JEFFREY BARON, AND HAVE BEEN SOLICITED BY A "RECEIVER" TO DISCLOSE THE INFORMATION PLEASE ACCEPT THIS NOTICE THAT:

It is our legal opinion that the senior district judge purporting to create a receivership over Mr. Baron is acting without subject matter jurisdiction. Moreover, the purported receivership was entered without notice, hearing, or supporting affidavits, and was entered without any supporting findings. The order is currently being appealed and the senior district judge has been divested of jurisdiction over the purported receivership order.

This letter is to put you on notice that Mr. Baron does not authorize waiver of his attorney-client privilege, and so that you may perform your due diligence in relation to your legal obligations.

Most sincerely,

/s/ Gary Schepps

Appellate Counsel for Mr. Baron

Because Mr. Schepps blind-copied all addressees of this e-mail, the Receiver cannot be certain of the number of recipients.  The Receiver can only assume that Mr. Schepps sent this threatening e-mail to every unpaid former attorney with a Former Attorney Claim.

Despite Messrs. Baron and Schepps' interference, in response to the Receiver's letter requesting sworn declarations, 26 attorneys and firms have stated they maintain Former Attorney Claims and submitted sworn declarations to the Receiver.[19]

---

[19] The declarations vary in level of detail.  Prior to February 10, 2011, the Receiver requested that the declarations (a) attach a copy of all engagement agreements relating to the Former Attorney Claims, (b) attach a copy of all invoices relating to the Former Attorney Claims, and (c) contain a host of other relevant information. [Docket No. 254.] On February 10, 2011, the Court held a hearing and addressed, among other things, the *Motion of Carrington, Coleman, Sloman & Blumenthal, L.L.P. for Protection, Direction, and Determination of Applicable Privilege Issues, and Brief in Support*.  [Docket No. 311.]  At the hearing, the Court declared the information to be produced to the Receiver in support of the Former Attorney Claims need only include detail indicating, by month or week (as applicable), (i) timekeeper, (ii) hours billed, (iii) billing rates, and (iv) resulting fees due and unpaid. [*Transcript of Emergency Motion to Clarify and Further Emergency Relief Before the Honorable Royal Furgeson,*

On March 17, 2011, the Receiver filed *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 396] and a supporting appendix. [Not Docketed, but Filed Under Seal.]   The supporting appendix contains 25 of the 26 declarations.  Because this appendix was filed under seal, on March 18, 2011, the Receiver hand-delivered a CD containing a ".pdf formatted" (.pdf) copy of the appendix, and mailed a copy of the same CD to Messrs. Baron and Barrett.   On March 18, 2011, the Receiver filed *The Receiver's Second Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 400] and a supporting appendix.   [Not Docketed, but Filed Under Seal.]   The supporting appendix contains the remaining (*i.e.*, the 26th) declaration.  Because this appendix was filed under seal, on the same day, March 18, 2011, the Receiver e-mailed a .pdf copy of the appendix to Messrs. Schepps, Baron, and Barrett.  Finally, on March 24, 2011, the Receiver filed *The Receiver's Third Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 411] and a supporting appendix.   [Not Docketed, but Filed Under Seal.] The supporting appendix contains Additional Evidence relating to one of the Former Attorney Claims included in *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 396.]  Because this appendix was filed under seal, on the same day, March 24, 2011, the Receiver e-mailed a .pdf copy of the appendix to Messrs. Schepps, Baron, and Barrett.

Below is a chart of the 26 Former Attorney Claims that were included in *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 396], *The Receiver's Second Motion to Approve Assessment and Disbursement of Former Attorney*

---

February 10, 2011, at 30-41.]  On February 22, 2011, the Court issued its *Order Granting Motion for Protection, Direction, and Determination of Applicable Privilege Issues*, memorializing the same instruction.  [Docket No. 326.]

*Claims* [Docket No. 400], and *The Receiver's Third Motion to Approve Assessment and Disbursement of Former Attorney Claims.* [Docket No. 411.]

| FIRM/ ATTORNEY NAME | TIME KEEPER | HOURS BILLED | BILLING RATES | RESULTING FEES DUE AND UNPAID PER TIMEKEEPER | EXPENSES | RESULTING AMOUNT DUE AND UNPAID |
|---|---|---|---|---|---|---|
| **Pronkse & Patel P.C.** | GMP | 430.4 | $550.00/hr. | $236,720.00 | $1,413.20 | $241,912.70 |
| | CWS | 2.0 | $225.00/hr. | $2,925.00 | | |
| | JPK | 1.1 | $160.00/hr. | $176.00 | | |
| | LDW | 2.5 | $85.00/hr. | $212.50.00 | | |
| | SLM | 4.0 | $100.00/hr. | $400.00 | | |
| | VLD | 0.2 | $330.00/hr. | $66.00 | | |
| | **TOTAL:** | 451.2 | $533.02/hr. | $240,499.50 | | |
| **Carrington, Coleman, Sloman & Blumenthal, LLP** | D. Coale | 667.1 | $222.50/hr. | $148,429.75 | $19,605.52 | $224,233.27[20] |
| | P. Smith | 206.5 | $182.50/hr. | $37,686.25 | | |
| | L. Barton | 536.1 | $127.50/hr. | $68,340 | | |
| | M. Grynwald | 34.7 | $182.50/hr. | $6,332.75 | | |
| | K. Hinson | 65.7 | $215.00/hr. | $14,125.50 | | |
| | K. Willis | 27.6 | $50.00/hr. | $1,380.00 | | |
| | G. Cannaday | 7.6 | $235.00/hr. | $1,786.00 | | |
| | E. Porterfield | 4.7 | $140.00/hr. | $658.00 | | |
| | D. Benham | 20.1 | $120.00/hr. | $2,412.00 | | |
| | D. Stroh | 6.3 | $182.50/hr. | $1,149.75.00 | | |
| | Others | 19.4 | $119.30/hr. | $2,314.42.00 | | |
| | **TOTAL:** | 1595.8 | $178.36/hr. | $284,627.66 | | |
| **Aldous Law Firm/ Rasansky Law Firm** | C. Aldous | n/a | 35% contingency fee arrangement | $200,000.00 | $0.00 | $200,000.00 |
| | J. Rasansky | | | | | |

---

[20] According to its Declaration and the exhibits attached thereto, the total amount billed by Carrington, Coleman, Sloman & Blumenthal, LLP ("Carrington Coleman") was $304,233.18. [Docket 396 at p. 9 n.8.] Carrington Coleman, however, received a $80,000.00 payment from Baron, reducing its Former Attorney Claim to $224,233.27. [*Id.*]

| FIRM/ ATTORNEY NAME | TIME KEEPER | HOURS BILLED | BILLING RATES | RESULTING FEES DUE AND UNPAID PER TIMEKEEPER | EXPENSES | RESULTING AMOUNT DUE AND UNPAID |
|---|---|---|---|---|---|---|
| **Schurig Jetel Beckett Tackett** | M. Barsi | 22.0 | $220.00/hr. | $4,840.00 | $509.55 | $117,377.81[21] |
| | E. Collins | 14.2 | $150.00/hr. | $2,130.00 | | |
| | A. Jetel | 17.4 | $375.00/hr. | $6,525.00 | | |
| | A. Jetel | 0.2 | $475.00/hr. | $95.00 | | |
| | J. Jones | 102.3 | $190.00/hr. | $19,437.00 | | |
| | J. Jones | 3.3 | $210.00/hr. | $693.00 | | |
| | M. Rosenblatt | 123.8 | $220.00/hr. | $27,236.00 | | |
| | B. Ross | 171.1 | $180.00/hr. | $30,798.00 | | |
| | B. Ross | 7.4 | $185.00/hr. | $1,369.00 | | |
| | E. Schurig | 6.9 | $0.00/hr. | $0.00 | | |
| | E. Schurig | 163.2 | $575.00/hr. | $93,840.00 | | |
| | E. Schurig | 0.4 | $585.00/hr. | $234.00 | | |
| | D. Sellers | 15.6 | $200.00/hr. | $3,120.00 | | |
| | J. Strohmeyer | 4.6 | $220.00/hr. | $1,012.00 | | |
| | C. Beckett | 30.6 | $575.00/hr. | $17,595.00 | | |
| | D. Pederson | 4.7 | $150.00/hr. | $705.00 | | |
| | A. Daniel | 3.9 | $100.00/hr. | $390.00 | | |
| | D. Morgan | 0.5 | $175.00/hr. | $87.50 | | |
| | R. Rath | 4.3 | $150.00/hr. | $645.00 | | |
| | Law Clerk | 0.6 | $25.00/hr. | $15.00 | | |
| | **TOTAL:** | 673.9 | $298.14/hr. | $200,409.00 | | |

[21] According to its Declaration and the exhibits attached thereto, as of June 2010, the total amount billed by Schurig Jetel Beckett Tackett ("SJBT") from May through September 2010 was $200,918.55.  (Docket No. 396 at p. 10 n.9.]  During that period, however, SJBT received $83,540.26 in payments from Baron, reducing the amount due and owing to $117,377.81.  [*Id.*]

| FIRM/ ATTORNEY NAME | TIME KEEPER | HOURS BILLED | BILLING RATES | RESULTING FEES DUE AND UNPAID PER TIMEKEEPER | EXPENSES | RESULTING AMOUNT DUE AND UNPAID |
|---|---|---|---|---|---|---|
| **Powers Taylor, LLP** | M. Taylor | 186.85 | $175.00/hr. | $32,698.75 | $0.00 | $78,058.50 |
| | M. Taylor | 39.28 | $115.00/hr. | $1,564.00 | | |
| | L. Logan | 13.6 | $120.00/hr. | $12,144.00 | | |
| | L. Logan | 74.6 | $240.00/hr. | $17,904.00 | | |
| | A. Johnson | 101.2 | $350.00/hr. | $13,748.00 | | |
| | **TOTAL:** | 415.53 | $187.85/hr. | $78,058.75 | | |
| **Gary G. Lyon** | G. Lyon | 933.45 | $80.67/hr. | $75,304.28 | $75,304.28 | $75,922.22[22] |
| **Dean Ferguson** | D. Ferguson | 239.35 | $300.00/hr. | $71,805.00 | $2,080.00 | $73,885.00[23] |
| **Friedman & Feiger, LLP** | I. Freeman | 1.33 | $130.00/hr. | $172.40 | $1,913.20 | $59,578.37 |
| | J. Krause | 1.72 | $400.00/hr. | $686.81 | | |
| | J. Matheus | 70.04 | $130.00/hr. | $9,105.11 | | |
| | L. Friedman | 23.16 | $600.00/hr. | $13,894.33 | | |
| | R. Lurich | 96.59 | $350.00/hr. | $33,806.52 | | |
| | **TOTAL:** | 192.84 | $299.03/hr. | $57,665.17[24] | | |

[22] This amount includes unpaid fees incurred **_prior_** to the commencement of the Receivership. Since the commencement of the Receivership, the Receiver has submitted a separate fee application for this attorney because this attorney is a Receivership Professional. [*See* Docket Nos. 317, 348.]

[23] Upon information and belief, Mr. Dean Ferguson and one or more Former Baron Attorneys might also be bringing claims against Mr. Baron, and possibly other Receivership Parties, alleging claims under the Racketeer Influenced and Corrupt Organizations Action (a/k/a RICO) and other statutes. This Assessment is not intended to address any such claims.

[24] Friedman & Feiger, LLP alleges that "[i]n attempting to collect the [unpaid attorney's fees and expenses], Friedman & Feiger incurred reasonable and necessary attorney's fees in the amount of $9,883.87." [Docket No. 396 at p. 11 n.12.] Because such collection efforts were performed by Friedman & Feiger, LLP in-house, its Resulting Fees Due and Unpaid per Timekeeper and its Expenses include this $9,883.87, resulting in a total Former Attorney Claim of $59,578.37. [*Id.*]

| FIRM/ ATTORNEY NAME | TIME KEEPER | HOURS BILLED | BILLING RATES | RESULTING FEES DUE AND UNPAID PER TIMEKEEPER | EXPENSES | RESULTING AMOUNT DUE AND UNPAID |
|---|---|---|---|---|---|---|
| Bickel & Brewer[25] | J. Bickel | 74.0 | $900.00/hr. | $66,600.00 | $7,785.93 | $59,547.63[26] |
| | G. Teeter | 2.1 | $500.00/hr. | $1,050.00 | | |
| | **TOTAL:** | 76.1 | $888.96/hr. | $67,650.00 | | |
| Robert J. Garrey | B. Garrey | n/a | Flat fees of $8,500.00/month for Nov. 2010, $11,000.00/month for Dec. 2010 and Jan. 2011, and completion bonus of $7,000.00. | $37,500.00 | $0.00 | $52,275.00[27] |

---

[25] The Receiver understands that Bickel & Brewer contends that, under Bickel & Brewer's engagement agreement with Baron, an entity called Rivercruise Investments Limited and/or an individual named Gregg McNair guaranteed Baron's payment of Bickel & Brewer's legal fees and expenses. [Docket No. 396 at p. 12 n.13.] The Receiver also understands that Bickel & Brewer contends that, by submitting its Declaration to the Receiver and the Receiver submitting its Former Attorney Claim, it is not waiving any claim it may have against Rivercruise Investments Limited and/or Mr. McNair.

[26] According to its Declaration and the exhibits attached thereto, as of February 2008, Bickel & Brewer was owed a total of $74,566.64 in unpaid fees and expenses. [*Id.* p. 12 n.14.] Bickel & Brewer, however, received a $27,804.30 payment from Baron, reducing the amount due and owing to $46,762.34. [*Id.*] This amount, combined with the $869.29 in unpaid expenses incurred by Bickel & Brewer in March and April 2008, totals $47,631.63 in attorney fees and expenses that Bickel & Brewer alleges as due and owing. [*Id.*] Additionally, Bickel & Brewer alleges that it is owed $11,916.00 in fees and expenses incurred while seeking collection of this $47,631.63 in unpaid fees and expenses, resulting in a total Former Attorney Claim of $59,547.63. [*Id.*]

[27] In addition to the $37,500.00 of unpaid amounts, Mr. Garrey declares, "To date, I have incurred attorney's fees of $5,000.00 and expenses in the amount of $400.00 in connection with my lawsuit against the Clients." [*Id.* at p. 12 n. 15.] He also declares, "On February 21, 20100 [*sic*], I began employment at another law firm. Had the Clients honored their Agreement, I would have been paid through January 31, 2011. Thus, I am seeking to recover the value of the three weeks' salary: $9,375.00 for purposes of this claim." [*Id.*] Thus, his Former Attorney Claim totals $52,275.00. [*Id.*]

| FIRM/ ATTORNEY NAME | TIME KEEPER | HOURS BILLED | BILLING RATES | RESULTING FEES DUE AND UNPAID PER TIMEKEEPER | EXPENSES | RESULTING AMOUNT DUE AND UNPAID |
|---|---|---|---|---|---|---|
| **Hohmann, Taube & Summers, LLP** | E.Taube | 60.5 | $500.00/hr. | $30,350.00 | $1,305.62 | $44,649.37[28] |
| | M.Taylor | 20.0 | $390.00/hr. | $7,800.00 | | |
| | A.M. Jezisek | 2.0 | $100.00/hr. | $200.00 | | |
| | S. Savala | 1.25 | $75.00/hr. | $93.75 | | |
| | **TOTAL:** | 83.75 | $457.84/hr. | $38,343.75 | | |
| **West & Associates, LLP** | C. Capua | 86.50 | $475.00/hr. | $41,087.50 | $20.50 | $41,120.50 |
| | L. Davis | 0.10 | $125.00/hr. | $12.50 | | |
| | **TOTAL:** | 86.60 | $474.60/hr. | $41,100.00 | | |
| **Michael B. Nelson, Inc.** | M. Nelson | 73.02 | $500.00/hr. | $42,585.81 | $0.00 | $31,085.81[29] |
| **Mateer & Shaffer, LLP** | R. Shaffer | 91.2 | $300.00/hr. | $27,358.50 | $3,471.90 | $30,897.90 |
| | K.V. Dine | 0.9 | $75.00/hr. | $67.50 | | |
| | **TOTAL:** | 92.1 | $297.79/hr. | $27,426.00 | | |
| **Broome Law Firm, PLLC** | S. Broome | 107.7 | $320.00/hr. | $34,464.00 | $1,005.65 | $28,373.46[30] |
| | P. Rogers | 22.0 | $125.00/hr. | $2,750.00 | | |
| | **TOTAL:** | 129.7 | $286.92/hr. | $37,214.00 | | |

[28] Hohmann, Taube & Summers, LLP alleges that "[w]e have expended over $5,000 in time related to attending hearings for the purpose of collecting the outstanding amounts." [*Id.* at p. 13 n. 16.] Thus, its Former Attorney Claim, consisting of this $5,000.00, plus $38,343.75 in unpaid fees, plus $1,305.62 in unpaid expenses, equals $44,649.37.

[29] According to its Declaration and the exhibits attached thereto, the total amount billed by Michael B. Nelson, Inc. was $42,585.81. [Docket No. 396 at p. 13 n.17. Michael B. Nelson, Inc., however, received payments totaling $11,500.00 from Baron, reducing its Former Attorney Claim to $31,085.81. [*Id.*]

[30] This amount reflects the discount and monthly finance charge per Broome Law Firm, PLLC's engagement letter with Baron. [*Id.* at p. 13 n. 18.]

THE RECEIVER'S REPORT OF WORK PERFORMED
IN JUNE AND THE FIRST TWO WEEKS OF JULY 2011                                    Page 109

| FIRM/ ATTORNEY NAME | TIME KEEPER | HOURS BILLED | BILLING RATES | RESULTING FEES DUE AND UNPAID PER TIMEKEEPER | EXPENSES | RESULTING AMOUNT DUE AND UNPAID |
|---|---|---|---|---|---|---|
| **Fee, Smith, Sharp & Vitullo, LLP** | A. Vitullo | 61.0 | $350.00/hr. | $21,350.00 | $153.60 | $27,674.86[31] |
| | W. Black | 1.8 | $225.00/hr. | $405.00 | | |
| | A. Jariwala | 10.0 | $75.00/hr. | $750.00 | | |
| | M. Spurgeon | 4.4 | $75.00/hr. | $330.00 | | |
| | **TOTAL:** | 77.2 | $295.79/hr. | $22,835.00 | | |
| **Reyna Hinds & Crandall** | J. Crandall | 28.3 | $300/hr. | $8,490.00 | $441.84 | $11,681.84[32] |
| **Jones, Otjen & Davis** | S. Jones | 25.25 | $350.00/hr. | $8,837.50 | $88.52 | $11,638.52 |
| | A.B. Feeback | 12.5 | $175.00/hr. | $2,187.50 | | |
| | N. Babbitt | 3.0 | $175.00/hr. | $525.00 | | |
| | **TOTAL:** | 40.75 | $283.44/hr. | $11,550.00 | | |
| **Hitchcock Evert LLP** | J. Cone | 22.6 | $450.00/hr. | $10,170.00 | $31.69 | $10,201.69 |
| **David L. Pacione** | D. Pacione | n/a | Flat fee of $8,000.00/month | $10,000.00 | $18.30 | $10,018.30 |
| **Shaver Law Firm** | S. Shaver | n/a | Flat fee of $9,500.00/month | $6,500.00 | $0.00 | $6,500.00 |
| **Jeffrey T. Hall** | J. Hall | n/a | Flat fee of $15,000.00/month | $5,000.00 | $0.00 | $5,000.00 |
| **Sidney B. Chesnin** | S. Chesnin | n/a | Flat fee of $10,000.00/month | $4,952.60 | $0.00 | $4,952.60 |

[31] Fee, Smith, Sharp & Vitullo, LLP alleges that it is owed $4,686.26 in fees and expenses incurred while seeking collection of the $22,988.60 in unpaid fees and expenses. [*Id.* at p. 14 n.19.] Thus, its Former Attorney Claim equals $27,674.86.

[32] Reyna Hinds & Crandall is asserting a Former Attorney Claim of $11,681.84. However, as explained in *The Receiver's Third Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 411], Reyna Hinds & Crandall has only provided the Receiver with Evidence for $8,931.84 of that $11,681.84. As a result, the Receiver has concluded that there exists *prima facie* evidence supporting $8,931.84 of such $11,681.84 Former Attorney Claim and, absent evidence to the contrary, such Former Attorney Claim should be partially paid in the amount of $8,931.84. [*Id.* at p. 4.]

| FIRM/ ATTORNEY NAME | TIME KEEPER | HOURS BILLED | BILLING RATES | RESULTING FEES DUE AND UNPAID PER TIMEKEEPER | EXPENSES | RESULTING AMOUNT DUE AND UNPAID |
|---|---|---|---|---|---|---|
| **James M. Eckels** | J. Eckels | n/a | Flat fee of $7,000.00/month | $4,112.50 | $0.00 | $4,112.50[33] |
| **Kevin F. D'Amour, P.C.** | M. Stewart | 9.5 | $205.00/hr. | $1,947.50 | $0.00 | $1,947.50 |
| **Joshua E. Cox** | J. Cox | n/a | Flat fee of $4,750.00/month | $586.00 | $39.00 | $625.00[34] |
| | | | | **TOTAL:** | | **$1,453,270.35** |

## 2.    The Receiver made an Assessment.

The Receiver reviewed more than a thousand pages of declarations and exhibits and considered the Former Attorney Claims of the attorneys and firms submitting the aforementioned 26 declarations.  For 22 of the 26 Former Attorney Claims, the Receiver concluded that there exists *prima facie* evidence and, absent evidence to the contrary, should be paid (at least partially).  Details are summarized below, demonstrating the amounts of the disbursements proposed by the Receiver (which collectively total  $993,253.77).

---

[33] This amount includes unpaid fees incurred ***prior*** to the commencement of the Receivership.  Since the commencement of the Receivership, the Receiver has submitted separate fee applications for this attorney, because this attorney is a Receivership Professional.  [*See* Docket Nos. 188, 190, 217, 256, and 266.]

[34] This amount includes unpaid fees incurred ***prior*** to the commencement of the Receivership.  Since the commencement of the Receivership, the Receiver has submitted separate fee applications for this attorney, because this attorney is a Receivership Professional.  [*See* Docket Nos. 189, 196, 314.]

| FIRM/ ATTORNEY NAME | AMOUNT OF FORMER ATTORNEY CLAIM | PROPOSED DISBURSEMENT | AMOUNT NOT PROPOSED FOR DISBURSEMENT | REASON FOR NON-PROPOSAL OF DISBURSEMENT (IF APPLICABLE) |
|---|---|---|---|---|
| **Pronkse & Patel P.C.** [*Sealed Appendix Relating to the Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Not Docketed but Filed Under Seal] at Exhibit A, Appx. 1-61.] | $241,912.70 | $241,912.70 | $0.00 | n/a |
| **Carrington, Coleman, Sloman & Blumenthal, LLP** [*Id.* at Exhibit B, Appx. 62-65.] | $224,233.27 | $0.00 | $224,233.27 | The Trustee for Ondova Limited Company ("Ondova") has advised the Receiver that this claim will be paid through the Ondova bankruptcy estate. |
| **Aldous Law Firm / Rasansky Law Firm (joint venture)** [*Id.* at Exhibit C, Appx. 66-85.] | $200,000.00 | $0.00 | $200,000.00 | The Trustee for Ondova has advised the Receiver that this claim will be paid through the Ondova bankruptcy estate. |
| **Schurig Jetel Beckett Tackett** [*Id.* at Exhibit D, Appx. 86-669.] | $117,377.81 | $117,377.81 | $0.00 | n/a |
| **Powers Taylor, LLP** [*Id.* at Exhibit E, Appx. 670-722.] | $78,058.50 | $78,058.50 | $0.00 | n/a |
| **Gary G. Lyon** [*Id.* at Exhibit F, Appx. 723-42.] | $75,922.22 | $75,922.22 | $0.00 | n/a |

| FIRM/ ATTORNEY NAME | AMOUNT OF FORMER ATTORNEY CLAIM | PROPOSED DISBURSEMENT | AMOUNT NOT PROPOSED FOR DISBURSEMENT | REASON FOR NON-PROPOSAL OF DISBURSEMENT (IF APPLICABLE) |
|---|---|---|---|---|
| **Dean Ferguson** [*Id.* at Exhibit G, Appx. 743-57.] | $73,885.00 | $73,885.00 | $0.00 | n/a |
| **Friedman & Feiger, LLP** [*Id.* at Exhibit V, Appx. 1178-1262.] | $59,578.37 | $59,578.37 | $0.00 | n/a |
| **Bickel & Brewer** [*Id.* at Exhibit H, Appx. 758-802.] | $59,547.63 | $59,547.63 | $0.00 | n/a |
| **Robert J. Garrey** [*Id.* at Exhibit I, Appx. 803-18.] | $52,275.00 | $52,275.00 | $0.00 | n/a |
| **Hohmann, Taube & Summers, LLP** [*Id.* at Exhibit J, Appx. 819-867.] | $44,649.37 | $44,649.37 | $0.00 | n/a |
| **West & Associates, LLP** [*Sealed Appendix Relating to the Receiver's Second Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Not Docketed but Filed Under Seal] at Exhibit A, Appx. 1-58.] | $41,120.50 | $41,120.50 | $0.00 | n/a |

| FIRM/ ATTORNEY NAME | AMOUNT OF FORMER ATTORNEY CLAIM | PROPOSED DISBURSEMENT | AMOUNT NOT PROPOSED FOR DISBURSEMENT | REASON FOR NON-PROPOSAL OF DISBURSEMENT (IF APPLICABLE) |
|---|---|---|---|---|
| **Michael B. Nelson, Inc.**<br><br>[*Sealed Appendix Relating to the Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Not Docket but Filed Under Seal] at Exhibit K, Appx. 868-902.] | $31,085.81 | $31,085.81 | $0.00 | n/a |
| **Mateer & Shaffer, LLP**<br><br>[*Id.* at Exhibit L, Appx. 903-931.] | $30,897.90 | $0.00 | $30,897.90 | The Trustee for Ondova has advised the Receiver that this claim will be paid through the Ondova bankruptcy estate. |
| **Broome Law Firm, PLLC**<br><br>[*Id.* at Exhibit M, Appx. 932-70.] | $28,373.46 | $28,373.46 | $0.00 | n/a |
| **Fee, Smith, Sharp & Vitullo, LLP**<br>[*Id.* at Exhibit N, Appx. 971-1007.] | $27,674.86 | $27,674.86 | $0.00 | n/a |
| **Reyna Hinds & Crandall**<br><br>[*Sealed Appendix Relating to the Receiver's Third Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Not Docket but Filed Under Seal] at Exhibit A, Appx. 1-10.] | $11,681.84 | $8,931.84 | $2,750.00 | As stated above, this firm only submitted Evidence to the Receiver for $8,931.84 of its $11,681.84 Former Attorney Claim.  (*See supra* note 32.) |

| FIRM/ ATTORNEY NAME | AMOUNT OF FORMER ATTORNEY CLAIM | PROPOSED DISBURSEMENT | AMOUNT NOT PROPOSED FOR DISBURSEMENT | REASON FOR NON-PROPOSAL OF DISBURSEMENT (IF APPLICABLE) |
|---|---|---|---|---|
| **Jones, Otjen & Davis**<br><br>[*Sealed Appendix Relating to the Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Not Docketed but Filed Under Seal] at Exhibit O, Appx. 1008-31.] | $11,638.52 | $11,638.52 | $0.00 | n/a |
| **Hitchcock Evert LLP**<br><br>[*Id.* at Exhibit P, Appx. 1032-83.] | $10,201.69 | $10,201.69 | $0.00 | n/a |
| **David L. Pacione**<br><br>[*Id.* at Exhibit Q, Appx. 1084-1116.] | $10,018.30 | $10,018.30 | $0.00 | n/a |
| **Shaver Law Firm**<br><br>[*Id.* at Exhibit R, Appx. 1117-32. | $6,500.00 | $6,500.00 | $0.00 | n/a |
| **Jeffrey T. Hall**<br><br>[*Id.* at Exhibit X, Appx. 1269-74.] | $5,000.00 | $5,000.00 | $0.00 | n/a |
| **Sidney B. Chesnin**<br><br>[*Id.* at Exhibit S, Appx. 1133-1144.] | $4,952.60 | $4,952.60 | $0.00 | n/a |
| **James M. Eckels**<br><br>[*Id.* at Exhibit T, Appx. 1145-70.] | $4,112.50 | $4,112.50 | $0.00 | n/a |

| FIRM/ ATTORNEY NAME | AMOUNT OF FORMER ATTORNEY CLAIM | PROPOSED DISBURSEMENT | AMOUNT NOT PROPOSED FOR DISBURSEMENT | REASON FOR NON-PROPOSAL OF DISBURSEMENT (IF APPLICABLE) |
|---|---|---|---|---|
| Kevin F. D'Amour, P.C. [*Id.* at Exhibit Y, Appx. 1275-95.] | $1,947.50 | $0.00 | $1,947.50 | The Declaration submitted by this firm to the Receiver indicates that its sole client was Ondova. Therefore, the Receiver has forwarded its declaration and related materials to the Trustee for Ondova, so the Trustee can determine if this firm's Former Attorney Claim should be paid (including whether the claim is time-barred). |
| Joshua E. Cox [*Id.* at Exhibit U, Appx. 1170-77.] | $625.00 | $625.00 | $0.00 | n/a |
| TOTAL: | $1,453,270.35 | $993,253.77 | $460,016.58 | |

### 3.   The Receiver filed the Assessment and Three Motions to Approve the Assessment and Disbursements of Former Attorney Claims.

At the hearing on February 10, 2011, the Court instructed the Receiver to provide a draft of this Assessment to Mr. Baron's counsel, Mr. Schepps, and wait seven days for Mr. Schepps to provide the Receiver with objections. [Transcript of *Emergency Motion to Clarify and Further Emergency Relief Before the Honorable Royal Furgeson*, February 10, 2011, at pp. 40-41.] On February 28, 2011, the Receiver provided a draft of this Assessment to Mr. Gary Schepps.

On March 4, 2011, the Receiver agreed with Mr. Schepps that (a) on March 7, 2011, the Receiver may file the Assessment without Mr. Baron's objections and (b) the Receiver will not object to a motion by Mr. Baron for an extension of 20 more days to file objections. [Transcript of Court Ordered Meeting, March 4, 2011, at 59:8-72:18.] Accordingly, on March 7, 2011, the Receiver filed *The Receiver's First Assessment Regarding Former Baron Attorneys* [Docket No. 349] and a supporting appendix. [Not Docketed, but Filed Under Seal.] Because the supporting

appendix (which contained sworn declarations from Mr. Baron's unpaid former attorneys, detailing their Former Attorney Claims) was filed under seal, on the same day, March 7, 2011, the Receiver sent a copy of the appendix to Messrs. Schepps, Baron, and Barrett via e-mail.  At the March 11, 2011 hearing, the Court instructed the Receiver to "convert" *The Receiver's First Assessment Regarding Former Baron Attorneys* "into something that's not as assessment but is a motion to approve the fees."  [Transcript of *Status Conference Before the Honorable Royal Furgeson*, March 11, 2011, at 32:7-14.]

Accordingly, as mentioned above, on March 17, 2011, the Receiver filed *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 396] and a supporting appendix [Not Docketed, but Filed Under Seal], which pertained to  25 of the 26 Former Attorney Claims.  Because this appendix was filed under seal, on March 18, 2011, the Receiver hand-delivered a CD containing a .pdf copy of the appendix, and mailed a copy of the same CD to Messrs. Baron and Barrett.  On March 18, 2011, the Receiver filed *The Receiver's Second Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 400] and a supporting appendix [Not Docketed, but Filed Under Seal], which pertained to the remaining (*i.e.*, the 26th) Former Attorney Claim.  Because this appendix was filed under seal, on the same day, March 18, 2011, the Receiver e-mailed a .pdf copy of the appendix to Messrs. Schepps, Baron, and Barrett.  Lastly, on March 24, 2011, the Receiver filed *The Receiver's Third Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 411] and a supporting appendix.  [Not Docketed, but Filed Under Seal.]  The supporting appendix contains Additional Evidence relating to one of the Former Attorney Claims included in *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 396.]  Because this appendix was filed under seal, on the same day, March

24, 2011, the Receiver e-mailed a .pdf copy of the appendix to Messrs. Schepps, Baron, and Barrett.

### 4.     Mr. Baron Responded and Objected to the Assessments.

On March 7, 2011, in his *Response and Objection to 1000+ Page Document Dump*, Mr. Baron objected to the declarations and supporting materials of the Former Baron Attorneys submitted to support their claims for unpaid fees.  [Docket No. 351.]  Mr. Baron claimed he was the victim of a "document dump" and that he needed additional time and resources (*i.e.*, an expert and "experienced counsel") to assist him in review of the materials.  [*Id.* at pp. 1-4.]  Mr. Baron then took some unsubstantiated swipes at a few of the former attorneys.[35]  [*Id.* at pp. 5-7.]

The next day, March 8, 2011, the Receiver responded and set the record straight in his *Response to Jeffrey Baron's Motions Relating to the Assessment*.  [Docket No. 354.]  The Receiver did not perform a "document dump" on Mr. Baron.  The Receiver pointed out that courts have found a "document dump" to have occurred when hundreds of thousands or even millions of pages of materials are produced without any culling for relevance.  [Docket No. 354 at p. 2.]  The Receiver produced 1,201 pages which are all relevant to the issue of unpaid fees in an organized fashion.  [*Id.*]  Furthermore, it is Mr. Baron who hired the attorneys making the claims and previously received the materials constituting the "document dump" in the course of their representation of him in the form of invoices and bills.  [*Id.* at p. 3.]  So, none of it should come as a surprise.

The Receiver also noted that he was working to accommodate Mr. Baron's requests concerning reproduction and organization of the documents.  [*Id.* at p. 5.]  The Receiver's third

---

[35] Mr. Schepps has also taken some unsubstantiated swipes at the same attorneys, including in his April 1, 2011, letter brief to the Court in which he stated, "I am ashamed of the attorneys working so hard to subvert the constitution for the jingle of silver."  [Docket No. 423.]

party professional specializing in document reproduction and organization called Mr. Schepps to discuss his requests. [Docket No. 354 at p. 6.] Not surprisingly, Mr. Schepps ignored the call and, instead, decided to waste the Receiver and the Court's time with a frivolous motion. [*Id.*]

The Receiver also noted that the Court ordered Mr. Baron to respond to the assessment within seven days—the Receiver did not receive a response from Mr. Baron in this time period. [*Id.* at p. 6.] In fact, the Receiver stated on the record at the parties' face to face conference on March 4, 2011, that he did <u>not</u> oppose an extension of time for Mr. Baron to review the materials submitted with the assessment. [*Id.* at p. 7.]

Lastly, the Receiver noted that he did not oppose any of the other relief Mr. Baron sought including hiring an expert to review the assessment, order requiring discovery on the Former Baron Attorneys' claims, and allowance for jury trials of the claims. [*Id.* at pp. 8-9.]

### 5. The Receiver Served the Former Baron Attorneys with the Motions to Approve Assessment and Disbursement of Former Attorney Claims.

On March 18, 2011, the Receiver served the first *Motion to Approve Assessment and Disbursement of Former Attorney Claims* on the Former Baron Attorneys. [Docket No. 413.] On March 18, 2011, the Receiver served his *Second Motion to Approve Assessment and Disbursement of Former Attorney Claims* on the Former Baron Attorney, Mr. Craig Capua. [*Id.*] On March 24, 2011, the Receiver served his *Third Motion to Approve Assessment and Disbursement of Former Attorney Claims* on the Former Baron Attorney, Ms. Jeanne Crandall. [*Id.*]

### 6. The Receiver Notified the Former Baron Attorneys of the Hearing (and Re-Settings of the Hearing) on the Motions to Approve the Assessments.

The Court originally, on March 21, 2011, set the hearing on *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 396], *The Receiver's Second Motion to Approve Assessment and Disbursement of Former Attorney Claims*

[Docket No. 400], and *The Receiver's Third Motion to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 411] for April 11, 2011.  Accordingly, the Receiver notified all of the Former Baron Attorneys who submitted declarations in support of unpaid fees of this hearing.  [Docket No. 414.]  On April 4, 2011, the Court reset the Receiver's motions for approval of disbursements to the Former Baron Attorneys for April 20, 2011 [Docket No. 430] and then again for April 25, 2011.  [Docket No. 433.]  On April 8, 2011, the Receiver notified the Former Baron Attorneys of the Court's re-setting of the hearing for April 25, 2011, and Mr. Baron's filing of a response to the motions for disbursements for unpaid fees [Docket No. 443], which is discussed below.  [Docket No. 444.]

On April 18, 2011, Mr. Baron filed his *Motion for Leave to File: Expedited Motion to Reset April 25 Hearing Date* [Docket No. 454], which the Court granted [Docket No. 456], requesting the Receiver to respond by April 20, 2011.  Mr. Baron's motion requested to reset the April 25 hearing on the grounds that his counsel, Mr. Schepps, could not attend due to the religious holiday of Passover.  [Docket No. 454.]  The next day, April 19, 2011, the Receiver filed his *Response to Expedited Motion to Reset April 25 Hearing Date* and noted for the Court that he had previously presented a plan to end the Receivership by April 30 and that the April 25 hearing was critical to that goal.  [Docket No. 465.]  The Receiver also noted Mr. Baron's repeated efforts to terminate the Receivership through Fifth Circuit appeals, motions to the district court, and letters to the district judge.  [*Id.*]  Thus, the Receiver requested that the Court deny Mr. Baron's request to reset the April 25 hearing or, in the alternative, reset the hearing for another date on or before April 29, 2011.  [*Id.*]  Ultimately, the Court granted Mr. Baron's motion to reset the April 25 hearing but, in accordance with the Receiver's request, reset the hearing for April 28, 2011.  [Docket No. 469.]  On April 21, 2011, the Receiver notified the

Former Baron Attorneys of the Court's re-setting of the hearing for April 28, 2011 and Mr. Baron's filing of the amended response [Docket No. 445], which is discussed below.  [Docket No. 470.]

### 7.    Mr. Baron objected to the Receiver's assessment.

On April 8, 2011, Mr. Baron filed his original response to the Receiver's motions for disbursements for unpaid fees.  [Docket No. 443.]  Mr. Baron's response largely contained legal argument and unsworn factual allegations.  [*Id*.]  On April 9, 2011, Mr. Baron filed an *Amended Response, Objection, Motion for Leave to File, and Motion for Relief With Respect to Receiver Assessment of Former Attorney Claims*.  [Docket No. 445.]  The amended response simply added another argument concerning whether this Court has subject matter jurisdiction to proceed with the receivership pending Mr. Baron's appeals of the original order appointing the Receiver.  [*Id.*]  The amended response also makes certain allegations about Mr. Baron's fee arrangement with Stan Broome and his law firm Broome Law Firm, pllc.  [*Id.*]  Specifically, Mr. Baron alleges that his fees with Mr. Broome were capped at $10,000 per month and Mr. Broome violated the rules of ethics and committed malpractice.  [*Id*.]

Mr. Broome responded with his *Limited Reply to Jeff Baron's Response and Objection*. [Docket No. 478.]  Mr. Broome argued that Mr. Baron's fees were never capped at $10,000 a month but rather Mr. Baron would never pay more than $10,000 a month with excess fees and expenses rolling over to the next month's bill.  [*Id*.]  Mr. Broome also challenges the allegations of ethical violations and malpractice.  [*Id.*]

On April 13, 2011, the Receiver served a subpoena on Mr. Baron, through Mr. Schepps, directing Mr. Baron to appear for testimony at the hearing on the Receiver's motions for approval of disbursements to the Former Baron Attorneys.

**8.      The Court ordered that it would only consider evidence at the hearing on the claims of Former Baron Attorneys.**

In its order originally setting the hearing for April 11, 2011, the Court stated that "[a]ny opposition to the Court approving the former attorney claims detailed in the Motions must be addressed at the hearing through an evidentiary presentation" and "[m]ere objections without evidentiary support will not be considered."   [Docket No. 408.]   The Court reiterated these instructions as applying to the reset April 28, 2011 hearing when it issued its *Advisory Regarding April 28th Hearing* on April 22, 2011.  [Docket No. 474.]

On April 25, 2011, the Receiver notified the Former Baron Attorney's of the Court's *Advisory Regarding April 28th Hearing*.  [Docket No. 477.]  Because the Court had ordered it would only consider ***evidence*** in evaluating the claims of Former Baron Attorneys [Docket Nos. 408, 474], the Receiver did not respond to the legal argument or unsworn factual allegations contained in Mr. Baron's response and amended response to the Receiver's motions for disbursements for unpaid fees.  [Docket Nos. 443 and 445.]  On April 22, 2011, the Receiver's counsel reached out to Mr. Schepps, proposing that the Receiver and his counsel, Mr. Schepps, and the Trustee and his counsel conduct a conference call to discuss the procedural aspects of the April 28, 2011 hearing and, possibly, submit a joint proposal on such issues to the Court. However, the Receiver never heard from Mr. Schepps.

**9.      The Court heard evidence on the fee claims of the Former Baron Attorneys.**

At the hearing on April 28, 2011, the Receiver offered into evidence 25 of the 26 declarations attached previously to the Receiver's *Motion to Approve Assessment and Disbursement of Former Attorney Claims*,  *Second Motion to Approve Assessment and Disbursement of Former Attorney Claims,* and the *Third Motion to Approve Assessment and*

*Disbursement of Former Attorney Claims.*[36]   Additionally, various Former Baron Attorneys appeared at the hearing and made themselves available for cross-examination by Mr. Baron.  Mr. Baron did not cross-examine any of the Former Baron Attorneys and offered no evidence to controvert the declarations admitted into evidence by the Court.  The Court took the evidence under consideration for ruling.

### 10. Mr. Baron attempted to admit evidence the day of the April 28, 2011, hearing.

On April 28, 2011, Mr. Baron submitted his *Filing of Hearing Evidence.*  [Docket No. 499.]  The filing contained a declaration from Mr. Schepps in which he stated that he was not qualified to handle a trial on the merits of the claims of the Former Baron Attorneys, did not have adequate assistance to do so, and not received payment for his work.  [*Id.*]  In fact, at the last Court ordered meet and confer on March 4, 2011, the Receiver was open to allowing Mr. Schepps to retain additional legal help to prepare to defend against the claims of the Former Baron Attorneys.  [Docket No. 479 at pp. 108-09.]  However, Mr. Schepps did not follow up with the Receiver on his request.  [*Id.*]

Mr. Baron also submitted a declaration as part of the same filing in which he complained about fees certain Former Baron Attorneys charged him.  [Docket No. 499.]  At the April 28, 2011, however, Mr. Baron withdrew this declaration when faced with the possibility of being cross-examined on it.

---

[36] The Declaration of Robert Garrey was inadvertently not admitted into evidence at the hearing on April 28, 2011 (the "Garrey Declaration").  [*See* Docket No. 569 at p. 10 n. 3, p. 23 at n. 33.]  However, the Receiver previously filed such declaration as part of *The Receiver's First Assessment Regarding Former Baron Attorneys* and *The Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims.*  [*See* Docket No. 399 at Appx. 803.]  Mr. Garrey also appeared at the hearing on April 28, 2011, and made himself available for examination by Mr. Baron.  Finally, Mr. Baron did not offer evidence to controvert the Garrey Declaration.  As a result, the Garrey Declaration was deemed admitted and considered by the Court in its *Findings of Fact, Conclusions of Law, and Order on Assessment of Attorney Claims.*  [Docket No. 575 at p. 13 n. 4.]

**11.     The Receiver submitted proposed findings of fact, conclusions of law, and order on the assessment and disbursement of attorneys' fees.**

On May 4, 2011, the Receiver submitted to the Court his proposed Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Former Attorney Claims (the "Proposed Findings"). [Docket No. 514.] The Proposed Findings recount the events of the April 28, 2011, hearing and articulate the Court's equitable powers to make the assessment and award the fees to the Former Baron Attorneys. The Proposed Findings also order the disbursement of monies to pay the claims as cash becomes available to the Receivership.

**12.     Mr. Baron attempted to admit evidence after the April 28, 2011, hearing.**

On May 1, 2011, Mr. Baron filed his *Post Trial Brief: Specific Evidence Based Defenses.* Among other things, in that pleading, Mr. Baron charged that the Receiver did not provide him with the declaration for the Former Attorney Claim of Reyna Hinds & Crandall. [Docket No. 502.] The Receiver responded to this allegation in his *Notice of Mr. Baron's Erroneous Statement Regarding Evidence of Former Attorney Claim of Reyna, Hinds & Crandall* and pointed out that the Receiver had, in fact, provided Mr. Baron with this declaration. [Docket No. 517.]

On May 5, 2011, Mr. Baron moved for leave to file a response to the Receiver's notice concerning the declaration of Former Attorney Claim of Reyna, Hinds & Crandall. [Docket No. 520.] The Court, though, denied the motion. [Docket No. 545.]

On May 3, 2011, Mr. Baron filed his *Motion for Leave to File: Motion to Supplement Record with Newly Discovered Evidence.* [Docket No. 507.] Mr. Baron points to e-mails from Gary Lyon and Mark Taylor which supposedly discredit their claims. [*Id*.] Mr. Schepps, Mr. baron's lawyer, claimed he was too busy to discover and submit the evidence in time for the hearing. On May 6, 2011, the Court denied this motion. [Docket No. 541.]

On May 5, 2011, Mr. Baron filed his *Motion for Leave to File: Second Motion to Supplement Record with Newly Discovered Evidence.* [Docket No. 519.] Mr. Baron again complained about Gary Lyon's fees and language included in the Receiver's proposed findings of fact, conclusions of law, and order which allegedly demonstrated his lack of impartiality. [*Id.*] On May 6, 2011, the Court denied this motion. [Docket No. 544.]

On May 6, 2011, Mr. Baron filed his *Motion for Leave to File*: *Third Motion to Supplement Record with Newly Discovered Evidence*. [Docket No. 523.] In this motion, Mr. Baron charged that the Receiver "solicited" Jeanne Crandall, a Former Baron Attorney, to make a false claim for unpaid fees. [*Id.*] Mr. Baron, then, again complained about the claims of Former Baron Attorneys, Gary Lyon, Stan Broome, and Gerrit Pronske. [*Id.*] On May 6, 2011, the Court denied this motion. [Docket No. 550.]

On May 6, 2011, Mr. Baron responded with his *Motion for Leave to File Sur-Reply to Broome's False, Misleading, and Fraudulent Reply*. [Docket No. 522.] The Court denied this motion. [Docket No. 549.]

### 13. Stan Broome notices Mr. Baron's deposition and moves for sanctions against Mr. Schepps.

On May 9, 2011, Mr. Broome served Mr. Baron (through Mr. Schepps) a notice of deposition on May 11, 2011. [Docket No. 552.] Mr. Broome sought to depose Mr. Baron on the allegations he made in his *Amended Response and Objection* and *Motion for Leave to File Sur-reply to Broome's False, Misleading, and Fraudulent Reply and Affidavit* and various other topics. [Docket Nos. 445 and 552.] The Receiver offered the offices of his law firm, Gardere Wynne Sewell LLP, for the deposition and attended. On May 10, 2011, Mr. Baron moved for leave to file a motion to quash the subpoena. [Docket No. 555.] Mr. Baron and Mr. Schepps did not appear and Mr. Broome made a record of the non-appearance. The Court granted the motion

for leave and ordered Mr. Broome to respond to the motion to quash by May 13, 2011. [Docket No. 559.] On May 12, 2011, Mr. Broome responded and moved to compel the deposition of Mr. Baron. [Docket Nos. 564 and 565.] Mr. Broome also moved for sanctions against Mr. Schepps. [Docket No. 566.]

On May 18, 2011, the Court denied Mr. Broome's motion to compel Mr. Baron's deposition and the motion for sanctions against Mr. Schepps. [Docket Nos. 578 and 579.]

### 14. The Court imposed a $400/hour fee cap.

On May 6, 2011, the Court issued its *Order Denying Without Prejudice Receiver's Motion to Approve Assessment and Disbursement of Former Attorney Claims*. [Docket No. 527.][37] The Court ordered the Receiver to impose a $400/hour fee cap on the claims of the Former Baron Attorneys and re-calculate the claims (the "Fee Cap"). [*Id.*]

### 15. The Receiver filed his fourth motion for assessment and disbursement of attorneys' fees claims.

The Receiver complied with the Court's order and re-calculated the claims of the Former Baron Attorneys with the Fee Cap. The Receiver filed his *Fourth Motion to Approve Assessment and Disbursement of Former Attorney Claims [Corrected Version]*.[38] [Docket No. 569.] After application of the Fee Cap and other reductions (i.e., assumption of the claim of the Former Baron Attorney by the trustee), the Receiver requested permission to disburse $870,237.19 to satisfy the claims of the Former Baron Attorneys. [*Id.*] On May 13, 2011, the Receiver also

---

[37] On May 18, 2011, the Court clarified this order and ruled that the fee cap only applied to those claims "the Receiver had moved to approve in *The Receiver's Fourth Motion to Approve Assessment and Disbursement of Former Attorney Claims*." [Docket No. 580.] The $400/hour cap did not apply to the Receiver, his counsel, or the Receivership professionals performed on behalf of the Receiver. [*Id.*] The Court also ruled that it was not making a determination with regard to any Former Baron Attorneys who charged and ***received*** payment for fees in excess of $400/hour. [*Id.*]

[38] This filing corrected minor typographical and mathematical errors in the original filing located at Docket No. 562.

submitted revised proposed *Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Former Attorney Claims.*  [Docket No. 570.]

16.  **The Court approved the Receiver's proposed Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Attorney Claims.**

On May 18, 2011, the Court approved the Receiver's *Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Attorney Claims.*  [Docket No. 575.]  As part of the Order, the Receiver was responsible for collecting waivers from the Former Baron Attorneys waiving and releasing any potential punitive claims against Baron as well as (if applicable) claims for the amounts lost to due to the Fee Cap in return for the disbursement of funds.  [*Id.*]  The waivers are subject to being voided and disregarded in the event Mr. Baron brings claims against the Former Baron Attorneys for malpractice.  [*Id.*]

As of May 27, 2011, the Receiver had received all 22 waivers from the Former Baron Attorneys eligible to receive payment per the Receiver's *Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Attorney Claims.*  [Docket No. 589.]  As described in further detail in this report, the Receiver now is focused on acquiring the cash needed to make the disbursements.  On June 15, 2011, Mr. Baron appealed the Court's *Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Attorney Claims.*  [Docket No. 614.]

17.  **Carrington objected to the *Fourth Motion to Approve Assessment and Disbursement of Former Attorney Claims [Corrected Version].***

On May 18, 2011, Former Baron Attorneys Carrington, Coleman, Sloman & Blumenthal, LLC (defined above as "Carrington") objected to the Receiver's fourth motion for assessment of attorneys' fees.  [Docket No. 572.]  Carrington objected to the Receiver not including Carrington as one of the attorneys who would be included in disbursements from the Receivership estate.

[*Id.*]  The Receiver did not include Carrington based on the repeated statements of the Trustee that Carrington's claim would be paid from the bankruptcy estate.

As mentioned in Section A, on June 15, 2011, Carrington moved the Court to reconsider its *Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Attorney Claims.*  [Docket No. 613.]  Carrington argued that the Trustee may not have sufficient funds to pay its claims and that Ondova and Mr. Baron individually are jointly and severally liable to Carrington.  [*Id.*]  On July 5, 2011, the Receiver responded and noted that 1) the Trustee had previously promised to Carrington; 2) Carrington never objected to the Receiver leaving it off of his motions for assessment and disbursement of money for the Former Baron Attorneys; and 3) the Receiver probably will not have sufficient cash to pay Carrington.  [Docket No. 633.]

### 18.    Mr. Barrett filed an application for his fees.

As mentioned in Section A, Mr. Peter Barrett is a Former Baron Attorney—but not one in the sense as typically discussed in the Receivership.  Mr. Barrett served as one of Mr. Baron's attorneys during the course of the Receivership and has since withdrawn.  [Docket No. 457.]  On July 6, 2011, Mr. Barrett filed a fee application seeking $55,166.50.  [Docket No. 637.]  Approval of this fee application, of course, would add to the Receivership's growing list of obligations.

### D.    Work relating to tax filings on behalf of certain Receivership Parties.

### 1.    The March 15, 2011, tax deadline.

In the March/April Receiver Report, the Receiver detailed his efforts to comply with a March 15, 2011, deadline for tax filing for Receivership Parties The Village Trust, Novo Point, Inc., Quantec, Inc., and Iguana Consulting, Inc.  [Docket No. 479]  For the sake of brevity, the Receiver will not recount his efforts to comply with this deadline but state that he filed Form 7004 on behalf of the Village Trust but made no filings on behalf of Novo Point, Inc., Quantec,

Inc., and Iguana Consulting, Inc. due to their Mutual Release and Settlement Agreement with the Plaintiffs.

### 2.     The April 18, 2011 tax deadline. [39]

Grant Thornton then advised the Receiver that additional tax filings were due on April 18, 2011 for Mr. Baron, The Village Trust, Daystar Trust, Belton Trust, and Royal Gable 3129 Trust.   The Receiver then set out to gather the necessary information to make the necessary filings.

The March/April Receiver Report details the efforts of a Former Baron Attorney, Ms. Schurig, and her firm of Schurig Jetel Beckett Tackett, to assist the Receiver with these tax filings.  [Docket No. 479 at pp. 99-103.]  For the sake of brevity, the Receiver will not repeat those details in this report.  A summary of the events follows.  When Mr. Baron discovered that Ms. Schurig was assisting the Receiver, he contacted her threatening to retaliate if she cooperated.  [*Id.*]  The Receiver, then, filed a motion to compel Ms. Schurig's cooperation. [Docket No. 431.]  Ultimately, not even Ms. Schurig was able to provide the Receiver with the information he needed to make the filings—only Mr. Baron could help.  Predictably, Mr. Baron refused to cooperate, and the Receiver moved the Court for an order confirming the propriety of not making tax filings on behalf of Receivership Parties The Village Trust, Daystar Trust, Belton Trust, and Royal Gable 3129 Trust.  The Court granted the motion.  [Docket No. 435.]

### 3.     The June 30, 2011 Tax Deadline.

On June 30, 2011, entities and individuals with an interest in foreign bank accounts with more than $10,000 US had to make a filing notifying the IRS of the existence of such accounts (an "FBAR Filing").  So, the Receiver undertook an investigation to determine whether any

---

[39] The deadline for tax filings was April 18, 2011, this year due to the fact that a Washington, D.C., holiday, Emancipation Day celebrating the freeing of the slaves, fell on April 15, 2011.

Receivership Parties had interests in such accounts and, thus, needed to make the FBAR Filing. As described above, on June 20, 2011, Mr. Baron contacted Elizabeth Schurig for information regarding an account held at HSBC in Hong Kong.  Ms. Schurig provided Mr. Baron with information, and the Receiver proceeded to investigate whether he needed to make an FBAR filing for this account.  The Receiver determined he did not.  Here's why.

The Receiver learned that Asiaciti Trust Pacific Limited, which is not a Receivership Party, established the HSBC account for the purpose of holding funds for The Village Trust. [Docket No. 628.]  (According to Ms. Schurig, Asiaciti Trust Pacific Limited is an affiliate of Asiaciti Trust, The Village Trust's original trustee.)  However, The Village Trust is a "grantor" trust which means that any trust assets for tax purposes are reflected on Mr. Baron's personal tax return.  [*Id.*]  Previously, the Court had ruled that Mr. Baron was responsible for his own personal tax returns.  [Docket No. 442.]  So, the Receiver is not responsible for making the FBAR filing for the HSBC account based on the information available to him.  [*Id.*]

Furthermore, due to Mr. Baron's overall lack of cooperation regarding his foreign holdings, the Receiver is not aware of any other foreign accounts in which other Receivership Parties have an interest.  Mr. Baron's lack of cooperation, *i.e.* refusal to answer basic questions about his finances, is well chronicled in this report *supra*, previous Receiver reports, and other filings with the Court.  [*See, e.g.,* Docket No. 333; Docket No. 416 at pp. 8-9, 31-32; Docket No. 601 at pp. 14-16.]  The Receiver's condensed analysis in this regard is also detailed in his *Sealed Notice of Intent Not to Make FBAR Filings* and As described in *Sealed Supplemental Notice of Intent Not to Make FBAR Filings*.  [Docket Nos. 619-20, 628.]

**E.  Work relating to responding to Mr. Baron's various manufactured emergencies.**

If Mr. Baron needs something from the Receiver, Mr. Baron knows perfectly well that he may contact the Receiver at any time.  But the truth is that Mr. Baron does not really need

anything from the Receiver.  Instead, what Mr. Baron craves is attention from this Court—presumably, under the misguided theory that if Mr. Baron were to become so obnoxious and bothersome to the Court, perhaps the Court would simply terminate the Receivership just to be done with him.  Since the Receivership commenced, Mr. Baron declared 13 separate emergencies with this Court—not counting the numerous ones he recently filed with the Fifth Circuit and which the Fifth Circuit denied swiftly.[40]  In addition, emergencies relating to the LLCs have been previously discussed above.  For efficiency sake, neither of these categories of emergencies will be repeated here.  Instead, the discussion below will relate only to the emergencies relating to (1) housing, (2) automobile, (3) insurance coverage, (4) medical care, (5) Mr. Baron's mental health, (6) daily living expenses, and (7) hiring attorneys.

### 1.    The housing emergency.

The Receiver detailed Mr. Baron's supposed need for emergency relief in the February 2011 Receiver Report.  [Docket No. 416 at pp. 91-99.]  So, there is no need to repeat it here except to state that Mr. Baron on March 4, 2011, the Receiver and Messrs. Baron and Schepps continued the Court Ordered Meeting.  Mr. Baron did not bring a lease with him, nor did he complain about his housing situation.  Further since the March 4, 2011 Court Ordered Meeting, Messrs. Baron and Schepps have continued to consistently ignore the Receiver's follow-up requests that they provide the Receiver with the lease to sign.  Specifically, the Receiver sent follow-up requests on March 17, 18, and 21, 2011.  There is nothing new to report with regard to this manufactured emergency.

---

[40]  For 12 of the 13 district-court emergencies, Mr. Baron (individually or through his LLCs) filed emergency motions. [Docket Nos. 137, 138, 141, 144, 157, 165, 174, 175, 232, 237, 264, and 269.]  For the other emergency regarding medical coverage, Mr. Baron chose not to file an emergency motion. Instead, he just had his counsel call the Court directly, forcing the Trustee to make a filing on an expedited basis.  [Docket No. 240.]  Details of most of these emergencies are discussed in detail in the January 2011 Receiver Report.  [Docket No. 321 at pp. 87-101].  However, on March 3, 2011, Mr. Baron appealed one order denying his *Emergency Motion to Clarify or Modify January 7, 2011, Order*.  [Docket No. 340.]

## 2.     The automobile emergency.

The Receiver detailed Mr. Baron's supposed emergency need for a new automobile in the February 2011 Receiver Report.  [Docket No. 416 at pp. 99-105.]  So, the Receiver will not recount it again here for the sake of brevity.  The Receiver's only update to this situation is that on March 4, 2011, the Receiver and Messrs. Baron and Schepps continued the Court Ordered Meeting.  [Transcript of Court Ordered Meeting, March 4, 2011, at pp. 1-5.]  At the meeting, Mr. Schepps admitted that to this day, Mr. Baron has still not picked out a car, although unsurprisingly Mr. Schepps did request that the Receiver simply write a check for the $20,000.00 payable to Mr. Schepps that would presumably be used for a car if he ever found one.  [*Id.* at 145:2-149:11.]  Importantly, since the March 4, 2011 Court Ordered Meeting, Messrs. Baron and Schepps have continued to consistently disregard the Receiver's follow-up attempts to assist in the purchase of an automobile for Mr. Baron.  Specifically, the Receiver made such follow-up attempts on March 15, 16, and 18, 2011.

Nevertheless, Mr. Baron still alleged that the Receiver was impeding his access to a car.  On May 3, 2011, Mr. Schepps filed a letter with the Court charging *inter alia* that the Receiver had still not provide Mr. Baron with a car.  [Docket No. 508.]  As the record clearly reflects, the Receiver is ready, willing, and able to provide him with a new car.  Mr. Baron, however, has refused to contact the Receiver to make the necessary arrangements.

## 3.     The insurance emergency.

The February 2011 Receiver Report details Mr. Baron's supposed emergency need for medical insurance.  [Docket No. 416 at pp. 105-07.]  So, the Receiver will not repeat that account here except to state that he continues to pay for Mr. Baron's COBRA health insurance and dental insurance.  On March 17, 2011, the Receiver wrote two checks—one to Pinnacle Corporation for $123.72 (covering Mr. Baron's dental coverage costs from April 1, 2011 through

June 31, 2011) and the second to UnitedHealthcare for $972.84 (covering Mr. Baron's medical coverage costs from April 1, 2011 through June 30, 2011)—and sent the checks to the two respective plan administrators.  These payments were made using the Receivership Assets to which the Receiver had obtained access to date, and specifically funds formerly residing at TD Ameritrade, Account No. [REDACTED], under Jeffrey Baron's name, and which are now residing at Comerica Bank in Dallas, Texas, under the Receiver's name.  Courtesy copies of these checks and letters were sent to Messrs. Baron, Schepps and Barrett the same day, March 17, 2011.

On June 28, 2011, the Receiver paid for Mr. Baron's health insurance premiums for July 1, 2011 through September 31, 2011.  Specifically, on June 28, 2011, the Receiver wrote two checks—one to Pinnacle Corporation for $123.72 (covering Mr. Baron's dental coverage costs from July 1, 2011 through September 31, 2011) and the second to UnitedHealthcare for $972.84 (covering Mr. Baron's medical coverage costs from July 1, 2011 through September 31, 2011)— and sent the checks to the two respective plan administrators.  These payments were made using the Receivership Assets to which the Receiver had obtained access to date, and specifically funds formerly residing at TD Ameritrade, Account No. [REDACTED], under Jeffrey Baron's name, and which are now residing at Comerica Bank in Dallas, Texas, under the Receiver's name.  Courtesy copies of these checks and letters were sent to Messrs. Baron and Schepps the same day, June 28, 2011.  The Receiver notified this Court of these insurance premium payments. [Docket No. 635.]

### 4.     The medical emergency.

The February 2011 Receiver Report recounted Mr. Baron's supposed need for emergency medical attention—therapy sessions to treat depression, in particular.  [Docket No. 416 at pp. 109-18.]  Notably, the February 2011 Receiver Report detailed how Mr. Baron's counsel, Mr.

Barrett, told the receiver during a court-ordered face to face meeting on February 22, 2011, that Mr. Baron's pleadings with the Fifth Circuit, Mr. Baron's February 16, 2011 Declaration, and various e-mails from Mr. Schepps to the Receiver concerning Mr. Baron's medical condition were "incorrect," "misleading," "untrue," "false," or "lies." [*Id.* at pp. 116-18.]   Further, the February 2011 Receiver Report detailed how "Mr. Baron still has not provided the Receiver with the name of any private therapist to whom the Receiver should write checks, the name of a nurse to care for Mr. Baron, the name of any drugs he wants purchased, or anything related to medical needs," despite the Receiver's attempts to provide assistance.  [*Id.* at p. 118 n.36.]

On April 1, 2011, Mr. Schepps sent the Receiver's counsel, Mr. Golden, a cryptic and accusatory e-mail, referencing "the incredible damage your handling of the receivership has caused to Jeff physically."  Additionally, Mr. Schepps asserted that "[f]or his upcoming surgery[, Mr. Baron] needs some pre-surgery diagnostics which are not covered the insurance because of the deductible" and that "[w]e need $2,000.00 to cover these immediately, in order not to delay treatment for Jeff."  Mr. Schepps closed the e-mail by stating, in the same accusatory manner, "I expect you will not play games at this point with Jeff's health."

Mr. Golden responded to Mr. Schepps' e-mail within 15 minutes, stating that he was "not aware of any damage [his] representation of the Receiver, Peter S. Vogel, has caused to Mr. Baron physically" and asking Mr. Schepps to provide "such details."  Mr. Golden also stated that he "was not aware that Mr. Baron was scheduled for upcoming surgery" and "was not aware that Mr. Baron needs pre-surgery diagnostics."  Mr. Golden reminded Mr. Schepps that three days earlier, on March 29, 2011, the Receiver sent Mr. Baron a check for $5,000.00 to cover, among other things, medical expenses.  (*See* Section E.6 below.)  Mr. Golden asked Mr. Schepps to advise as to whether Mr. Baron received such check, and if so, whether that amount would be

sufficient to pay for the referenced $2,000.00 in pre-surgery diagnostics for Mr. Baron. Lastly, Mr. Golden asked that Mr. Schepps "[p]lease also provide the name of the medical provider to whom Mr. Baron is requesting that the Receiver write an additional $2,000.00 check and the address of the medical provider."

On May 6, 2011, Mr. Baron filed a letter with the Court claiming he was supposed to have surgery the on April 29, 2011 (the day after the April 28, 2011 hearing) but did not because the Receiver refused him the $2,000 he needed for it. [Docket No. 524.] The Receiver immediately filed a letter of his own to set the record straight. [Docket No. 525.] The Receiver established his repeated efforts to provide Mr. Baron with the necessary funds subject to him giving the Receiver certain information, *i.e.* the name of the treating physician and his/her address. [*Id.*] (The Receiver is reluctant to hand money to Mr. Baron indiscriminately out of fear he will use the money for the prohibited purpose of hiring more lawyers. [Docket No. 150.]) The Receiver also pointed out that on April 28, 2011, he gave Mr. Baron his monthly allowance of $5,000. [Docket No. 526.] This one day prior to the allegedly scheduled surgery. So, unless, he spent all $5,000 in a 24 hours period, he should have had plenty of money for the surgery the next day.

The same day—May 6, 2011—the Court addressed Mr. Baron and the Receiver's letter briefs. [Docket No. 551.] The Court ruled that Mr. Baron should "send the Receiver, in writing, the name and address of his medical provider, with a statement of the required procedure" should he continue to need the requested $2,000. [*Id.*] Predictably, like with all other Baron emergencies, the Receiver has not heard another word about it.

5.      **The Receiver has continued to try and provide for Mr. Baron's mental health.**

The February 2011 Receiver Report detailed the Receiver's efforts to insure Mr. Baron was receiving proper mental health care with a therapist.  [*Id.* at pp. 111-18.]  For the sake of brevity, the Receiver will not recount the entirety of his efforts.  Nevertheless, the Receiver took note of the fact that Mr. Baron's chosen therapist, Dr. Randy Ingram, was not submitting confidential reports on Mr. Baron's progress per the Court's order at Mr. Baron's request. [Docket Nos. 220, 333.]  At a face to face conference with the Receiver on March 4, 2011, Mr. Schepps expressed concern that Dr. Ingram's reports would not remain confidential once filed with the Court and served on the Receiver.  [Transcript of Court Ordered Meeting, March 4, 2011, at 32:25-38:13.]

So, on March 11, 2011, at a status conference with the Court, the Receiver mentioned the failure of Dr. Ingram to submit reports.  [Transcript of *Status Conference Before Honorable Royal Furgeson*, March 11, 2011, at 50:3-19.]  The Court expressed its desire to continue to make mental health treatment available to Mr. Baron and instructed the Receiver to file a motion to modify the original order requiring Mr. Baron to attend therapy and submit reports.  [*Id.* at 50:22-51:14.]  So, on March 18, 2011, the Receiver filed his *Sealed Motion to Modify the Court's Order Regarding Submission of Confidential Therapy Reports*.  [Docket No. 398.]  In this motion, the Receiver asked the Court to modify the order to, among other things, allow Mr. Baron to submit therapy reports to just the Court (and not the Receiver) and to address the possibility that Mr. Baron was instructing his treating therapist not to submit reports. [*Id.* at pp. 6-7.]  On March 22, 2011, the Court issued its *Order Granting the Receiver's Sealed Motion to Modify the Court's Order Regarding Submission of Confidential Therapy Reports*.  [Docket No. 407.]

On March 30, 2011, the Receiver asked the Court in a sealed request to redact to portions of the transcript from the March 11, 2011, status conference with the Court which dealt with Mr. Baron's mental health treatment.[41]  [Docket No. 422.]  On April 1, 2011, the Court granted the request.  [Docket No. 428.]

There is nothing new to report regarding Mr. Baron's mental health.

### 6.    The Domain Jamboree Emergency.

On May 3, 2011, Mr. Baron filed a letter with the Court charging that the Receiver had allowed registration fees for Domain Jamboree, a Receivership Party and domain name registrar, to go unpaid and neglected other maintenance issues.  [Docket No. 508.]  The significance was that ICANN which governs the internet was going to take Domain Jamboree's registrar accreditation away to its great expense.  This was the first time the Receiver had heard of this problem even though Mr. Baron had known of the expiration date for month he failed to notify the Court until it was an emergency.

The Receiver immediately contact Mr. Schepps and repeatedly asked for information to resolve the accreditation and maintenance issues.  [Docket No. 587.]  Initially, Mr. Schepps ignored the Receiver.  [*Id.*]  Finally, he provided a portion of the information, and the Receiver found out the rest through independent investigation.  [*Id.*]  Ultimately, the Receiver paid the outstanding registration fees and also resolved the other maintenance issues.  [*Id.*]

The Receiver changed the contact information for Domain Jamboree, LLC to that of Mr. Nelson.  Previously, the contact information was that of an individual unknown to the Receiver

---

[41]  From March 15-23, 2011, the court reporter posted on the Court's ECF system *Notices of Filing of Official Electronic Transcripts* for the December 17, 2010, January 4, 2010, February 10, 2011, and March 11, 2011 hearings.  [Docket Nos. 374, 394-95, 409-10.]  Each notice reminded the parties of "their duty to review the transcript" and the procedure for submitting redaction requests.  Accordingly, the Receiver's counsel reviewed the relevant transcripts for necessary redactions, but redaction was only necessary for the transcript of the March 11, 2011 status conference.

who (along with Mr. Baron) refused to respond to ICANN's attempts to make contact.  This failure to respond to ICANN precipitated this "emergency."

7.      **The Receiver has continued to provide Mr. Baron with daily-living expenses.**

On June 29, 2011, the Receiver had a cover letter, along with a check for $5,000 made out to Mr. Baron, hand-delivered to Mr. Schepps' office.  On the same day, June 29, 2011, the Receiver e-mailed courtesy copies of such letter and check to Messrs. Baron and Schepps.

8.      **The Hire More Attorneys Emergency.**

The February 2011 Receiver Report details Mr. Baron's alleged emergency need to hire more lawyers.  [Docket No. 416 at pp. 118-20.]  For the sake of brevity, the Receiver that recounting here except to say that on March 4, 2011, the Receiver conferred with Mr. Baron and his counsel regarding their requests to hire more attorneys.  [Transcript of Court Ordered Meeting, March 4, 2011, at 149:12-22.]  The Receiver and the Plaintiff stated that they would not oppose a motion for more attorneys.  [*Id.* at 152:22-153:23.]  The Trustee stated that he would, but he would be amenable to discussing the issue further on the phone.  [*Id.* at 151:23-152:19.]  On April 8, 2011, Mr. Baron filed his *Amended Response, Objection, Motion for Leave to File, and Motion for Relief with Respect to Receiver Assessment of Former Attorney Claims*, requesting, in part, that the Court "require the receiver to . . . provide funding for the employment of trial counsel and legal assistants to assist in investigating and responding to the claims."  [Docket No. 445 at pp. 14-17.]

The Receiver remains ready to assist Mr. Baron with whatever housing needs he has.

F.      **Work relating to managing issues concerning the Ondova bankruptcy.**

In June and the last two weeks of July 2011, the Receiver performed two types of work relating to the management of issues concerning the Ondova bankruptcy:  (1) work relating to

conferring with Mr. Baron's bankruptcy counsel, Mr. Thomas, and (2) preparing a fee application for Mr. Thomas.

### 1.      Work relating to conferring with Martin Thomas.

The Receiver understands that Mr. Thomas' involvement in this case is to represent Mr. Baron's personal interests in the bankruptcy proceeding.  [Transcript of *Emergency Motion to Clarify and Further Emergency Relief Before the Honorable Royal Furgeson*, February 10, 2011, 38:6-7, 41:24-42:5.]  In June and the first two weeks of July 2011, the Receiver continued to work with Mr. Thomas regarding issues pending in the bankruptcy case include (a) evaluating and objecting to claims, (b) evaluating whether to convert the bankruptcy from a Chapter 11 into a Chapter 7 liquidation or dismiss it after the creditors are paid in full, (c) monitoring complete performance of all parties under the Mutual Settlement and Release Agreement, (d) evaluating and responding to the various attorney fee disputes, (e) evaluating and objecting to fee applications, and (f) defending show cause orders.

To date, Mr. Baron has time and again refused to file objections to specific fee applications while routinely appealing those applications approved by the Court.  (*See* Sections B.3.a.iv and B.3.b.ii.2.iii above.)  Although Mr. Baron is now complaining about the fees of the Trustee's counsel at Munsch Hardt Kopf & Harr, PC, Mr. Baron has specifically failed to object to such fees.  The burden to object to such fees belongs to Mr. Baron.  Additionally, this Court has informed the Receiver that it is concerned with the amount of fees surrounding the work of the Receivership.  [*See* Transcript of *Status Conference Before the Honorable Royal Furgeson*, March 11, 2011, at 5:11-14.]

Additionally, Mr. Baron refuses to speak with the Receiver to make him aware of Mr. Baron's specific concerns about the fees of the Trustee's counsel at Munsch Hardt Kopf & Harr, PC.  Instead, Mr. Baron claims the Receiver has a conflict due to its supposed relationship with

the Trustee.  However, Mr. Baron knows how to object to fee applications [*see, e.g.,* Docket Nos. 352, 373], which would be the proper course to object to the fees of the Trustee's counsel at Munsch Hardt Kopf & Harr, PC.

2.      **Work relating to filing fee applications for Martin Thomas.**

Mr. Thomas receives $5,000.00 per month for representing Mr. Baron in the bankruptcy proceeding.  [Docket Nos. 327 and 426.]  As documented above in the Report, on June 1, 2011, the Receiver filed *The Receiver's Fourth Application for Reimbursement of Fees Incurred by Martin Thomas*, relating to Mr. Thomas' fees incurred in May 2011.  [Docket No. 593.] Likewise, on July 6, 2011, the Receiver filed *The Receiver's Fifth Application for Reimbursement of Fees Incurred by Martin Thomas*, relating to Mr. Thomas' fees incurred in June 2011.  [Docket No. 640 at Ex. 1.]  While both of these fee applications are currently pending before the Court, the Court, in its *Advisory*, announced its intention to grant *The Receiver's Fourth Application for Reimbursement of Fees Incurred by Martin Thomas*.  [Docket No. 630.]

G.      **The Receiver notified Former Baron Attorneys of developments in the case.**

In addition to other notifications described above, on multiple occasions, the Receiver notified the Former Baron Attorneys regarding developments in the case, particularly those related to the assessment and disbursement of former attorney claims.  On May 9, 2011, the Receiver transmitted copies of the following filings to the Former Baron Attorneys:

- *Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Former Attorney Claims [Corrected Version]* [Docket No. 514];

- *The Receiver's Transcript Order re: Evidentiary Hearing on April 28, 2011* [Docket No. 516];

- *The Receiver's Notice of Mr. Baron's Erroneous Statement Regarding Evidence of Former Attorney Claim of Reyna, Hinds & Crandall* and *Appendix Relating to the Receiver's Notice of Mr. Baron's Erroneous Statement Regarding Evidence of*

*Former Attorney Claim of Reyna, Hinds & Crandall* [Docket Nos. 517 and 517-1];

- *Motion for Leave to File: Second Motion to Supplement Record with Newly Discovered Evidence* [Docket No. 518];

- *Motion for Leave to File: Second Motion to Supplement Record with Newly Discovered Evidence and Declaration of Gary Schepps* [Docket Nos. 519 and 519-1];

- *Motion for Leave to File: Motion to Strike Receiver's Erroneous "Notice" of Allegedly Erroneous Statement Regarding Evidence of Former Attorney Claims* [Docket No. 520];

- *Motion for Leave to File: Sur-Reply to Stan Broome's False, Misleading, and Fraudulent Reply [Doc 478] and Affidavit [Doc 478-1]* [Docket No. 522];

- *Motion for Leave to File: Third Motion to Supplement Record with Newly Discovered Evidence* and *Declaration of Jeffrey Baron* [Docket Nos. 523, 523-1, and 523-2];

- *Order Denying Without Prejudice Receiver's Motions to Approve Assessment and Disbursement of Former Attorney Claims* [Docket No. 527];

- *Order Denying Motion for Leave to File Motion to Supplement Record with Newly Discovered Evidenc*e [Docket No. 541];

- *Order Denying Motion for Leave to File Motion to Supplement Record with Newly Discovered Evidence* [Docket No. 544];

- *Order Denying Motion for Leave to File Motion to Strike Receiver's Erroneous "Notice" of Allegedly Erroneous Statement Regarding Evidence of Former Attorney Claims* [Docket No. 545];

- *Order Denying Motion for Leave to File Sur-Reply to Stan Broome's False, Misleading, and Fraudulent Reply [Doc 478] and Affidavit [Doc 478-1]* [Docket No. 549]; and

- *Order Denying Motion for Leave to File Third Motion to Supplement Record with Newly Discovered Evidence* [Docket No. 550].

[Docket No. 553.]  The same day, the Receiver transmitted a copy of *Stanley D. Broome's Notice of Deposition of Jeff Baron and Subpoena Duces Tecum* [Docket No. 552] to the Former Baron Attorneys concerning Mr. Broome's attempts to take discovery from Mr.  Baron.  [Docket

No. 554.]  On May 19, 2011, the Receiver transmitted to the Former Baron Attorneys a copy of the *Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Former Attorney Claims* and notified them of their obligations to execute a waiver per paragraph 35 of the same no later than May 28, 2011.  [Docket No. 584.]  On May 23, 2011, sent a reminder e-mail to the Former Baron Attorneys regarding the deadline for execution of the waiver.  [*Id.*]  From May 24-27, 2011, the Receiver was in contact with certain Former Baron Attorneys concerning execution of the waivers.

On June 2, 2011 the Receiver transmitted copies of the following filings to the Former Baron Attorneys:

- *Notice of Appeal to the United States Court of Appeals for the Fifth Circuit* [Docket No. 576];

- The Court's *Order Regarding Baron's Notice of Appeal to the United States Court of Appeals for the Fifth Circuit* [Docket No. 586];

- *Motion for Leave to File: Motion to Stay Receivership Pending Appeal* [Docket No. 590];

- *Motion for Leave to File Motion: Motion to Stay or Vacate Injunction and Civil Lockdown of Jeff Baron* [Docket No. 591]; and

- *Motion for Leave to File: Motion for an Expedited Ruling on the Stay Motions [Docs 590 and 591]*[Docket No. 592].

[Docket Nos. 594 and 595.]

On June 10, 2011, the Receiver transmitted copies of the following filings to the Former Baron Attorneys:

- *Order Denying Motion for Leave to File Motion to Stay Receivership Pending Appeal* [Docket No. 596];

- *Order Denying Motion for Leave to File Motion to Stay or Vacate Injunction and Civil Lockdown of Jeff Baron* [Docket No. 597]; and

- *Order Denying Motion for Leave to File Motion for an Expedited Ruling on the Stay Motions [Docs 590 and 591].*  [Docket No. 598.]

[Docket No. 610.]

On June 24, 2011, the Receiver transmitted copies of the following filings to the Former

Baron Attorneys:

- *Motion to Reconsider or to Alter or Amend and Brief in Support*, filed by Carrington, Coleman, Sloman & Blumenthal, L.L.P. [Docket No. 613];

- *Conditional Notice of Appeal*, filed by Carrington, Coleman, Sloman & Blumenthal, L.L.P. [Docket No. 614]; and

- the Court's *Order Directing Parties to File Pending Motions with the U.S. Court of Appeals for the Fifth Circuit*.  [Docket No. 616.]

[Docket No. 621.]

On July 6, 2011, the Receiver transmitted copies of the following filings to the Former

Baron Attorneys:

- *Motion for Stay of Receivership and Civil Lockdown Order Based Upon Recent Developments*, filed by Messrs. Baron and Schepps in Fifth Circuit Case No. 10-11202 (consolidated with No. 11-10113);

- *Notice of Filing in Fifth Circuit Court of Appeals*, filed by Messrs. Baron and Schepps [Docket No. 617];

- *Order* denying Mr. Baron's *Motion for Stay of Receivership and Civil Lockdown Order Based Upon Recent Developments*, issued by the Fifth Circuit in Case No. 10-11202 (consolidated with No. 11-10113);

- *The Receiver's Response to Mr. Baron's Notice of his Latest Frivolous Motion at the Fifth Circuit* [Docket No. 624];

- *The Receiver's Notice of Compliance with Court's Order Regarding Fifth Circuit Filings* [Docket No. 629];

- *Motion of Appellant for Extension of Time to File Principal Briefs*, filed by Messrs. Baron and Schepps in Fifth Circuit Case No. 11-10289;

- *Motion of Appellant for Extension of Time to File Principal Briefs*, filed by Messrs. Baron and Schepps in Fifth Circuit Case No. 11-10290;

- *Motion of Appellant for Extension of Time to File Principal Briefs*, filed by Messrs. Baron and Schepps in Fifth Circuit Case No. 11-10390;

- *Letter Brief Opposing Motions of Appellant for Extension of Time to File Principal Briefs*, filed by the Trustee for Ondova Limited Company in Fifth Circuit Case Nos. 11-10289, 11-10290, and 11-10390;

- *Order* issued in Fifth Circuit Case No. 11-10289, granting in part the *Motion of Appellant for Extension of Time to File Principal Briefs*;

- *Order* issued in Fifth Circuit Case No. 11-10290, granting in part the *Motion of Appellant for Extension of Time to File Principal Briefs*;

- *Order* issued in Fifth Circuit Case No. 11-10390, granting in part the *Motion of Appellant for Extension of Time to File Principal Briefs*;

- *Advisory*, issued by the Court [Docket No. 630];

- *Supplemental Advisory*, issued by the Court [Docket No. 631];

- *The Receiver's Response to Carrington's Motion to Reconsider or to Alter or Amend* [Docket No. 633]; and

- *Appendix in Support of the Receiver's Response to Carrington's Motion to Reconsider or to Alter or Amend.* [Docket No. 634.]

[Docket No. 636.]

On July 13, 2011, the Receiver transmitted copies of the following filings to the Former

Baron Attorneys:

- *Objection to Ex-Parte Motion [Doc 480] to Sell Undisclosed Assets in Private Sales*, filed by Messrs. Baron and Schepps [Docket No. 638];

- *Response to Carrington Coleman Motion to Be Given Jeff Baron's Money Without Trial*, filed by Messrs. Baron and Schepps [Docket No. 639];

- *Trustee's Motion for Expedited Disposition of Case Numbers 10-11202 and 11-10113 and Other Relief*, filed by the Trustee in Fifth Circuit Case No. 10-11202 (consolidated with No. 11-10113);

- *The Receiver's Notice of Trustee's Motion for Expedited Disposition Filed in the Fifth Circuit* [Docket No. 641];

- *Motion of Appellants' for Extension of Time to File Reply Briefs*, filed by Messrs. Baron and Schepps in Fifth Circuit Case No. 10-11202 (consolidated with No. 11-10113);

- *Order* granting Messrs. Baron and Schepps' *Motion of Appellants' for Extension of Time to File Reply Briefs*, issued by the Fifth Circuit in Case No. 10-11202 (consolidated with No. 11-10113); and

- *The Receiver's Notice of the Receivership's Projected Financial Picture as of July 31, 2011* [Docket No. 642.]

[Docket No. 644.]

## H.   Work relating to Complying with the Court's Fifth Circuit Filing Order.

On June 20, 2011, the Court issued its *Order Directing Parties to File Pending Motions with the U.S. Court of Appeals for the Fifth Circuit* (the "Fifth Circuit Filing Order"). Docket No. 616.] The Receiver understands the Fifth Circuit Filing Order to apply (1) to not only pending motions, but also appendices filed in support of such pending motions, and (2) not only those pending motions (and related appendices) that were filed prior to the date of the Fifth Circuit Filing Order, but also prospectively to motions (and appendices) brought after such date. Accordingly, in complying with the Fifth Circuit Filing Order, the Receiver has filed the following with the Fifth Circuit:

- *The Receiver's Motion to Permit Cashing Out of Stocks and IRA's* [Docket No. 309];

- *The Receiver's Sealed Motion to Approve Sale of Specific Domain Names and Confirm Propriety of Sales Protocol* [Docket No. 425];

- *The Receiver's Second Sealed Motion to Approve Sale of Specific Domain Names* [Docket No. 480];

- *Sealed Appendix in Support of the Receiver's Second Sealed Motion to Approve Sale of Specific Domain Names* [Docket No. 481];

- *The Receiver's Sealed Ex Parte Motion for Reconsideration of Order Regarding Mr. Baron's Request to Research Financing Options* [Docket No. 581];

---

[2] The Receiver filed the *Declaration of Damon Nelson* (the "Declaration") contemporaneously with and in support of *The Receiver's Sealed Motion to Approve Sale of Specific Domain Names and Confirm Propriety of Sales Protocol*. [Docket Nos. 424 and 425.] So, the Receiver filed the Declaration with the Fifth Circuit even though it was not in and of itself a motion for relief.

- *Sealed Ex Parte Appendix in Support of the Receiver's Sealed Ex Parte Motion for Reconsideration of Order Regarding Mr. Baron's Request to Research Financing Options* [Docket No. 582];

- *The Receiver's Fourth Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 593];

- *Sixth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 599];

- *Sealed Appendix to the Sixth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 600];

- *The Receiver's Sixth Application for Reimbursement of Fees Incurred by Thomas Jackson* [Docket No. 602];

- *The Receiver's Ninth Cox Fee Application* [Docket No. 603];

- *The Receiver's Seventh Receiver Fee Application* [Docket No. 605];

- *The Receiver's Seventh Gardere Fee Application.* [Docket No. 606];

- *Motion Filed Under Seal—the Receiver's Fifth Motion to Clarify the Receiver Order* [Docket No. 609];

- *Seventh Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 611];

- *Sealed Appendix to the Seventh Joint Verified Motion to Renew Certain Money-Losing Domain Names.* [Docket No. 612];

- this Court's *Advisory* [Docket No. 630] and *Supplemental Advisory* [Docket No. 631];

- *The Receiver's Notice of Withdrawal of the Receiver's Omnibus Motion to Permit Cashing Out of Stocks and IRA's* [Docket No. 632];

- *The Receiver's Fifth Application for Reimbursement of Fees Incurred by Damon Nelson* [629 at Ex. A];

- *The Receiver's Fifth Application for Reimbursement of Fees Incurred by Martin Thomas* [Docket No. 640 at Ex. 1];

- *The Receiver's Motion to Permit Liquidation of Non-Exempt Stocks—But  Not the Liquidation of the IRA's* [Docket No. 640 at Ex. 2];

- *Appendix to the Receiver's Motion to Permit Liquidation of Non-Exempt Stocks— But* Not *the Liquidation of the IRA's* [Docket No. 640 at Ex. 3];

- *Eighth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 643 at Ex. 1]; and

- *Sealed Appendix in Support of the Eighth Joint Verified Motion to Renew Certain Money-Losing Domain Names* [Docket No. 643 at Ex. 2].

The Receiver filed notice of such filings with this Court.  [Docket Nos. 629, 640, 643.]

**I.      Work relating to reporting to this Court.**

The Receiver has already mentioned numerous *Notices* filed with this Court.  In addition to those aforementioned *Notices*, the Receiver performed additional work in June and the first two weeks of July 2011 to keep the Court apprised of relevant developments.  On July 8, 2011, a *Notice of Trustee's Motion for Expedited Disposition Filed in the Fifth Circuit*.  [Docket No. 641.]  On July 14, 2011, the Receiver notified the Court that he had filed a copy of the July 31 Financial Picture with the Fifth Circuit.  [Docket No. 646.]  Lastly, in June and the first two weeks of July 2011, the Receiver performed work relating to preparing this Report.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document was served via the Court's ECF system on all counsel of record on July 19, 2011.

*/s/ Peter L. Loh*
Peter L. Loh