IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NETSPHERE, INC., | § | |
| MANILA INDUSTRIES., INC., AND | § | |
| MUNISH KRISHNAN | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:09-CV-0988-F |
| | § | |
| JEFFREY BARON AND | § | |
| ONDOVA LIMITED COMPANY, | § | |
| | § | |
| DEFENDANTS. | § | |

## THE RECEIVER'S SECOND MOTION TO ENFORCE STAY

The Receiver Order stays all proceedings challenging the ownership rights of the Receivership's primary assets—the domain names.  Certain international tribunals (under the auspices of ICANN) charged with determining ownership rights of domain names have—in violation of the Receiver Order—issued default judgments relating to several domain names. These default judgments purport to instruct the domain Registrar controlling these domain names (also under the auspices of ICANN) to transfer them out of the Receivership estate and into the hands of third parties.  The Receiver requests an order enforcing the Receiver Order by ordering (a) that these default judgments be declared void based on the Receivership stay, (b) the Registrar (Fabulous.com) disregard the default judgments and not transfer these domain names, and (c) ICANN to re-transfer back to the Receivership estate any of these domain names already transferred pursuant to the default judgments.

## I.
## BACKGROUND FACTS REGARDING
## THE PARTIES AT ISSUE

**A.      Background of the UDRP process.**

*1.      What is ICANN?*

The Internet Corporation for Assigned Names and Numbers ("ICANN") is a non-profit organization charged with insuring the security, stability, and operation of the Internet including the registration of Internet domain names.  (*See* http://www.icann.org.)  ICANN "governs the assignment of Internet domain names, the allocation of Internet Protocol (IP) address space, and management of the Domain Name System (DNS) and Internet 'root' server."  *Parisi v. Netlearning, Inc.*, 139 F.Supp.2d 745, 746 n.2 (E.D. Va. 2001).

*2.      What are the UDRP, WIPO, and NAF?*

ICANN established the Uniform Domain Dispute Resolution Policy ("UDRP").  (*See* http://www.icann.org/en/udrp.htm;  Docket No. 737-1 at ¶¶ 5, 13 (ICANN "adopted," "promulgate[d]," and "approve[d]" the UDRP.)  The UDRP allows the alleged holder of trademark rights an expedited process to resolve disputes over supposedly offending domain names.  The complainant initiates the arbitration through filing a complaint with an ICANN-approved tribunal such as the World Intellectual Property Organization ("WIPO") or the National Arbitration Forum ("NAF") (collectively, the "Tribunals").  [*See* Docket No. 737-1 at ¶¶ 8, 11-12.]

*3.      What is Fabulous.com?*

A registrar is an entity accredited by ICANN to manage the reservation of domain names in accordance the policies of the UDRP.  Fabulous.com is an ICANN-approved registrar.  (*See* Exhibit A, the Declaration of Novo Point, LLC and Quantec, LLC's (collectively, the "LLCs")

Manager Damon Nelson, at ¶ 20; *see also* http://www.icann.org/en/ registrars/accreditation.htm.) Fabulous.com is the Registrar for all of the LLCs' domain names.  (Ex. A at ¶ 20.)  Registrars are contractually obligated to abide by the UDRP decisions of ICANN-approved arbiters like WIPO and NAF.  (*Id.*; *see also* Docket No. 737-1 at ¶ 14.)  However, as ICANN itself admits, a registrar may ***disregard*** a UDRP decision by an ICANN-approved arbiter when ordered to do so by a court of competent jurisdiction.  [Docket No. 737 at pp. 5-6.]

**B.      Background of the control over the domain names at issue.**

       *1.      The Receiver controls Receivership Assets.*

The *Order Appointing Receiver* (the "Receiver Order") grants the Receiver "exclusive control" over certain "Receivership Parties" and all of the assets held by those Receivership Parties, *i.e.*, the "Receivership Assets."  [Docket No. 124 at pp. 1-3; Docket No. 724]  On December 17, 2010, the Court issued its *Order Granting the Receiver's Motion to Clarify Receiver Order with Respect to Novo Point, LLC and Quantec, LLC* and stated that "the Receiver's definition of Receivership Parties has always included Novo Point, LLC."  [Docket No. 176; Docket No. 724]  Accordingly, the assets (*i.e.*, domain names) of Novo Point, LLC and Quantec, LLC (collectively, the "LLCs") are Receivership Assets.  [Docket No. 724.]

       *2.      The Domain Names at Issue are Receivership Assets.*

Here, the initial issue is whether the domain names at issue are assets of the LLCs, and therefore, Receivership Assets.  Indeed, the domain names at issue are assets of the LLCs, and therefore, Receivership Assets.  (Ex. A at ¶ 6.)

## II.
## BACKGROUND FACTS OF THE
## VIOLATIONS OF THE STAY

**A.     The Receivership Order stays proceedings regarding the domain names at issue.**

The Receiver Order states that the UDRP actions involving the domain names at issue are stayed as of November 24, 1010—the date of the Receiver Order:

> [D]uring the pendency of the receivership ordered herein, all other persons and entities . . . are hereby stayed from taking any action to establish or enforce any claim, right, or interest . . . against . . . [a] Receivership Party [or] any of their . . . assets . . . including . . . [c]ommencing, prosecuting, continuing, entering, or enforcing any suit or proceeding . . ..

(the "Stay").  [Docket No. 124 at pp. 12-13; *see* also Docket No. 724.]  Accordingly, any action brought pursuant to the UDRP to "establish or enforce any claim, right or interest" against any of the domain names at issue is stayed during the pendency of the Receivership.  [Docket No. 724.]

**B.     In violation of the Stay, defaults were issued regarding the domain names at issue.**

During the pendency of the Stay—and, in most cases, after the Tribunals even acknowledged the existence of the Receivership Order and the Stay—thirteen default judgments have been issued on the domain names at issue pursuant to the UDRP.  (True and correct copies of the thirteen default decisions, defined herein as the "Default Decisions," are attached as Exhibits A-2 – A-14.)  The chart below summarizes the Default Decisions:

| Exhibit | Tribunal | Case Style | Case No. | Date Default Issued | Domain Name(s) at Issue |
|---------|----------|------------|----------|---------------------|-------------------------|
| **A-2** | WIPO | *Weta Digital Ltd. v. Texas International Property Associates ("TIPA")* | D2010-1692 | 12/10/10 | wetafx.com |
| **A-3** | WIPO | *Public Storage v. TIPA* | D2010-1782 | 12/20/10 | publicstorge.com<br>publicstroagejob.com<br>pulicstorage.com<br>puplicstorage.com |

| Exhibit | Tribunal | Case Style | Case No. | Date Default Issued | Domain Name(s) at Issue |
|---|---|---|---|---|---|
| **A-4** | NAF | *Fandango, Inc. and Daily Candy, Inc. v. TIPA* | FA1358961 | 12/23/10 | dailycand.com dailycandi.com dailycandychicago.com dailycandynyc.com fanngo.com, jandango.com jobfandango.com |
| **A-5** | WIPO | *Apple, Inc. v. Oakwood Services, Inc.* | D2010-1917 | 12/28/10 | aplle.com |
| **A-6** | NAF | *HBI Branded Apparel Enterprises, LLC and HBI Branded Apparel Limited, Inc. v. URDMC, LLC ("URDMC")* | FA1012001361369 | 1/18/11[1] | leghanesbali.com |
| **A-7** | WIPO | *Johnson & Johnson, Inc. and Korres S.A. v. TIPA* | D2010-1996 | 1/19/11 | korresproducts.com |
| **A-8** | WIPO | *Eli Lilly and Company v. TIPA* | D2010-1985 | 2/7/11 | zigris.com |
| **A-9** | WIPO | *Amica Mutual Insurance Company v. TIPA and URDMC* | D2010-2144 | 2/7/11 | amicains.com |
| **A-10** | WIPO | *Ariens Company v. URDMC* | D2010-2216 | 2/7/11 | gravelymowers.com |
| **A-11** | WIPO | *Judah Smith v. Whois Privacy Service Ltd. and URDMC* | D2011-0397 | 4/18/11 | judahsmith.com |
| **A-12** | WIPO | *American Woodmark Corporation v. Whois Privacy Services Pty Ltd., TIPA, and URDMC* | D2011-0804 | 6/28/11 | americanwoodmark cabinetry.com |
| **A-13** | WIPO | *Eli Lilly and Company v. URDMC* | D2011-0715 | 7/6/11 | lilycares.com |
| **A-14** | WIPO | *I-TO-I International Products, Limited v. Quantec, LLC/Novo Point, LLC* | D2011-1492 | 11/24/11 | itoitravel.com |

The Default Decisions are in violation of the Stay. Indeed, this Court recently abated a similar such UDRP proceeding—regarding funnygames.com—for the very purpose of stopping the issuance of a similar such default decision and to preserve the Stay. [Docket No. 724.]

---

[1] While this decision on its face reflects a decision date of January 18, 2010, this was a typographical error since the decision was actually entered on January 18, 2011. (Ex. A at ¶ 11.)

**THE RECEIVER'S SECOND MOTION TO ENFORCE STAY**                                                          5

## III.
## THE COURT'S AUTHORITY AND
## ABILITY TO ENFORCE THE STAY

**A.      The Court has the authority to void the improper UDRP defaults.**

A large body of authority exists supporting the notion that a federal district court may issue an order voiding a UDRP decision.   *See, e.g.*, *Barcelona.com v. Excelentisimo Ayuntamiento*, 330 F.3d 617, 625 (4th Cir. 2003) (the UDRP "process is not intended to interfere with or modify any 'independent resolution' by a court of competent jurisdiction"); *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 26 (1st Cir. 2001) ( "[T]he judicial outcome will override the UDRP one."); *Weber-Stephen Prods. Co. v. Armitage Hardware & Bldg. Supply, Inc.,* No. 00-C-1738, 2000 WL 562470, at *2 (N.D. Ill. May 3, 2000) (federal courts are "not bound by the outcome of the ICANN administrative proceedings"); *Eurotech v. Cosmos European Travels Aktiengesellschaft*, 213 F.Supp.2d 612, 617 n.10 (E.D. Va. 2002) (ICANN administrative proceeding not entitled to any deference by federal court).   ICANN policy itself comports with these holdings, as the UDRP "explicitly anticipates that judicial proceedings will continue under various nations' laws applicable to the parties." *Barcelona.com*, 330 F.3d at 625; *see also Sallen*, 273 F.3d at 227 ("[T]he UDRP explicitly contemplates independent review in national courts . . .."); UDRP ¶ 3(b) at http://www.icann.org/dndr/udrp/policy.htm (Oct. 24, 1999) (stating that the Registrar will "cancel, transfer or otherwise make changes to domain name registrations" upon its "receipt of an order from a court . . . of competent jurisdiction, requiring such action").   In this case, the Court should apply that authority and issue an order voiding the Default Decisions.

**B.    The Court has the ability to prevent or reverse the Tribunals' domain transfers that violated the Stay.**

Fabulous.com is the registrar of the domain names at issue.   (Ex. A at ¶ 20.) Fabulous.com operates under the auspices of and is licensed by ICANN.   (*Id.*; *see also* Docket No. 737-1 at ¶¶ 6, 14.[2])   Registrars like Fabulous.com are contractually obligated to abide by the UDRP decisions issued by the Tribunals.   (Ex. A at ¶ 20.[3])   Indeed, in a recent filing in this case, ICANN has sworn that:

> The Registrar Accreditation Agreement that ICANN enters into with each ICANN-approved registrar requires the registrar to comply with the UDRP.. . . To the extent that a registrar fails to comply with the UDRP, ICANN may deem the registrar in breach of its agreement.

[Docket No. 737-1 at ¶ 14.]   So, when a Tribunal issues a Default Decision adverse to the LLCs that a domain name should be transferred to the complainant in the dispute, Fabulous.com is obligated by ICANN policy to transfer the domain name.   (*Id.*; Ex. A at ¶ 20; Docket No. 737 at p. 5.)   In all of the Default Decisions, a Tribunal is purportedly instructing Fabulous.com to transfer the domain names at issue from the LLCs (*i.e.*, the Receivership estate) to a third party. (Ex. A at ¶ 21; *see also* Exs. A-2 – A-14.)

However, according to the holdings in *Barcelona.com*, *Sallen*, and *Weber-Stephen*, as well as Paragraph 3(b) of the UDRP itself, Fabulous.com has the ability to disregard the Default

---

[2] *See also Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 20 (1st Cir. 2001) (noting that ICANN "accredit[s]" registrars); *Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 296 n.2 (2d Cir. 2002) ("A domain name 'registrar' is one of several entities licensed by the Internet Corporation of Assigned Names and Numbers . . .."); *3M Co. v. Christian Invs. LLC*, No. 1:11-CV-627, 2011 WL 3678144, at *2 n.4 (W.D. Va. Aug. 19, 2011) (noting that ICANN "authorize[s]" registrars); *Transamerica Corp. v. Moniker Online Servs. LLC*, 672 F.Supp.2d 1353, 1357 (S.D. Fla. 2009) ("To engage in domain name registration, a registrar is required to enter into agreements with ICANN . . . ."); *Balsam v. Tucows Inc.*, No. CV-09-03585, 2009 WL 3463923, at *1 (N.D. Cal. Oct. 23, 2009) ("ICANN requires all registrars to sign the Registrar Accreditation Agreement ('RAA') with ICANN.").

[3] *See also* UDRP ¶ 3(b) at http://www.icann.org/dndr/udrp/policy.htm (Oct. 24, 1999) (stating that the registrar will cancel or transfer the domain name upon the registrar's "receipt of an order from a[n] . . . arbitral tribunal . . . requiring such action").

---

Decisions and not transfer the domain names at issue upon order of this Court.  (*See also* Ex. A at ¶ 22.)  More importantly, ICANN, itself, has conceded this point in a recent filing in this case:

> In the event a court of competent jurisdiction orders Fabulous.com not to transfer [a defaulted domain name], and Fabulous.com complies with that order, whether or not a UDRP decision says that the domain name should be transferred, Fabulous.com would still be deemed in compliance with the UDRP and its Registrar Accreditation Agreement with ICANN.

[Docket No. 737 at pp. 5-6.]   Further, for any domain name that might have already been transferred to a third party pursuant to a Default Decision, ICANN has the ability to immediately re-transfer such domain name back to the LLCs (*i.e.*, the Receivership estate).  (Ex. A at ¶ 22; *see also* Docket No. 737-1 at ¶ 14 (ICANN claims that "the only 'enforcement' action that ICANN is authorized to undertake with respect to the UDRP comes ***after*** a decision is issued by WIPO (or whichever dispute resolution provider is hearing a complaint).").)

**C.    This Court may enforce the Stay during the pendency of appeals of the Receiver Order.**

The Fifth Circuit has ruled that an appeal's effect of divesting jurisdiction from a district court is not absolute.  *Farmhand, Inc. v. Anel Eng'g Indus., Inc.*, 693 F.2d 1140, 1145 (5th Cir. 1982).   "The district court maintains jurisdiction as to matters not involved in the appeal" and maintains a "continuing duty to maintain a status quo."  *Id.* at 1145-46 (quoting *Hoffman v. Beer Drivers & Salesmen's Local*, 536 F.2d 1268, 1276 (9th Cir. 1976)).   Furthermore, this Court recently recognized that it maintains jurisdiction to enforce the Stay during the pendency of the appeal:

> The Court recognizes that actions in this matter are stayed pending resolution by the U.S. Court of Appeals for the Fifth Circuit. But the ownership of [a Receivership domain name] as a Receivership Asset is not at issue in any of Mr. Baron's appeals (Case Nos. 10-11202, 11-10113, 11-10289, 11-10290, 11-10390, and 11-10501). Safeguarding the ownership over [a Receivership domain name] as a Receivership Asset and enforcing the UDRP Stay preserves the status quo of the Receivership. [Moreover,] . . . "the district court maintains jurisdiction as to matters not involved in [an] appeal" . . . and the district court maintains a

"continuing duty to maintain a status quo," *Farmhard, Inc.v. Anel Eng'g Indus., Inc.,* 693 F.2d 1140, 1145-46 (5th Cir. 1982).

[Docket No. 724.]

Here, the LLCs' ownership of the domain names at issue is not a question in any of Mr. Baron's appeals to the Fifth Circuit.  Further, safeguarding the LLCs' ownership over the domain names at issue and enforcing the Stay preserves—rather than modifies—the status quo (or at least what the status quo was at the time when the Court entered the Stay in the first place).

## IV.
## REQUESTED RELIEF

Based on the foregoing, the Receiver requests that the Court enter an order that:

(1)    The Default Decisions are Void based on the Stay;

(2)    Fabulous.com shall immediately disregard the Default Decisions and not transfer the domain names at issue until and unless it receives further order by this Court (the "Instruction");

(3)    For any of the domain names at issue that might have already transferred prior to the issuance of this Order pursuant to a Default Decision, that ICANN immediately re-transfer them back to the Receivership estate (the "Retransfer");

(4)    Within two days of the issuance of this Order, Fabulous.com shall file notice with this Court confirming that it has complied with this Order and performed the Instruction; and

(5)    Within two days of the issuance of this Order, ICANN shall file notice with this Court confirming that it has complied with this Order and performed the Retransfer.

Respectfully submitted,

*/s/ Barry M. Golden*
Barry M. Golden
Texas State Bar No. 24002149
Peter L. Loh
Texas Bar Card No. 24036982
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas  75201
(214) 999-4667 (facsimile)
(214) 999-3000 (telephone)
bgolden@gardere.com
ploh@gardere.com

**ATTORNEYS FOR THE RECEIVER,
PETER S. VOGEL**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record on December 13, 2011.

*/s/ Peter L. Loh*
Peter L. Loh

## CERTIFICATE OF CONFERENCE

The undersigned certifies that counsel for the Receiver attempted to confer via e-mail on December 12, 2011, with regard to the foregoing motion with counsel for Jeffrey Baron, the Plaintiffs, the Trustee Daniel J. Sherman, ICANN, and Fabulous.com regarding the relief requested herein.  Counsel for ICANN indicated that ICANN is opposed to the relief requested. Counsel for the other parties did not state a position with regard to the relief requested. Therefore, the Receiver presents the motion for the Court's consideration.

*/s/ Peter L. Loh*
Peter L. Loh

# EXHIBIT A

## DECLARATION OF DAMON NELSON

I, Damon Nelson, state and declare as follows:

1.      I have over 20 years of experience in computer programming, web design, and Internet business.

2.      I served 18 months as the registrar for the domain names at issue as part of the bankruptcy proceedings for Ondova Limited Company ("Ondova").   My duties at Ondova included responding to hundreds of Uniform Domain Name Dispute Resolution Policy ("UDRP") actions, cease and desist demands, and complaints of trademark infringement.

3.      I also manage my own domain name portfolio of approximately 400 domains containing websites for e-commerce, video, blogs, and "domain parking" and consults with clients concerning their online marketing campaigns and website designs.

4.      I hold Bachelor of Science and Masters in Business Administration degrees from Texas A&M University with specific course emphasis in engineering, computer programming, marketing, and investing.

5.      I am the Permanent Manager of Novo Point, LLC and Quantec, LLC (the "LLCs"), having been so appointed by the United States District Court for the Northern District of Texas (the "Court") in the matter styled *Netsphere, Inc., et al. v. Jeffrey Baron, et al.*, Civil Action No. 3:09-CV-0988-F (the "Lawsuit").

6.      The LLCs are the true registrants, *i.e.* owners, of the domains listed in Exhibit A-1 attached to this Declaration (the "Domains at Issue").

7.      On or about December 10, 2010, I became aware of the World Intellectual Property Organization's ("WIPO") administrative panel decision in the matter styled *Weta Digital Ltd. v. Texas International Property Associates ("TIPA")*, Case No. D2010-1692, issued in accordance with the Uniform Name Dispute Resolution Policy ("UDRP"), and regarding the

DECLARATION OF DAMON NELSON                                         PAGE 1

ownership and other rights relating to the domain wetafx.com, one of the Domain Names at Issue (the "Weta Decision"). A true and correct copy of the Weta Decision is attached hereto as Exhibit A-2.

8.     On or about December 20, 2010, I became aware of WIPO's administrative panel decision in the matter styled *Public Storage v. TIPA*, Case No. D2010-1782, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domains publicstorge.com, publicstroagejob.com, pulicstorage.com, and puplicstorage.com, which are some of the Domain Names at Issue (the "Public Storage Decision"). A true and correct copy of the Public Storage Decision is attached hereto as Exhibit A-3.

9.     On or about December 23, 2010, I became aware of the National Arbitration Forum's ("NAF") decision in the matter styled *Fandango, Inc. and Daily Candy, Inc. v. TIPA*, Case No. FA1358961, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domains dailycand.com, dailycandi.com, dailycandychicago.com, dailycandynyc.com, fanngo.com, jandango.com, and jobfandango.com, which are some of the Domain Names at Issue (the "Fandango/Daily Candy Decision"). A true and correct copy of the Fandango/Daily Candy Decision is attached hereto as Exhibit A-4.

10.     On or about December 28, 2010, I became aware of WIPO's administrative panel decision in the matter styled *Apple, Inc. v. Oakwood Services, Inc.*, Case No. D2010-1917, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain aplle.com, one of the Domain Names at Issue (the "Apple Decision"). A true and correct copy of the Apple Decision is attached hereto as Exhibit A-5.

11.     On or about January 18, 2011, I became aware of NAF's decision in the matter styled *HBI Branded Apparel Enterprises, LLC and HBI Branded Apparel Limited, Inc. v.*

*URDMC, LLC ("URDMC")*, Case No. FA1012001361369, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain leghanesbali.com, one of the Domain Names at Issue (the "HBI Apparel Decision"). A true and correct copy of the HBI Apparel Decision is attached hereto as Exhibit A-6. While the HBI Apparel Decision on its face reflects a decision date of January 18, 2010, the decision was actually entered on January 18, 2011.

12.     On or about January 19, 2011, I became aware of the WIPO's administrative panel decision in the matter styled *Johnson & Johnson, Inc. and Korres S.A. v. TIPA*, Case No. D2010-1996, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain korresproducts.com, one of the Domain Names at Issue (the "Johnson & Johnson Decision"). A true and correct copy of the Johnson & Johnson Decision is attached hereto as Exhibit A-7.

13.     On or about February 7, 2011, I became aware of WIPO's administrative panel decision in the matter styled *Eli Lilly and Company v. TIPA*, Case No. D2010-1985, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain zigris.com, one of the Domain Names at Issue (the "First Eli Lilly Decision"). A true and correct copy of the First Eli Lilly Decision is attached hereto as Exhibit A-8.

14.     On or about February 7, 2011, I became aware of WIPO's administrative panel decision in the matter styled *Amica Mutual Insurance Company v. TIPA and URDMC*, Case No. D2010-2144, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain amicains.com, one of the Domain Names at Issue (the "Amica Decision"). A true and correct copy of the Amica Decision is attached hereto as Exhibit A-9.

15.     On or about February 7, 2011, I became aware WIPO's administrative panel decision in the matter styled *Ariens Company v. URDMC*, Case No. D2010-2216, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain gravelymowers.com, one of the Domain Names at Issue (the "Ariens Decision").  A true and correct copy of the Ariens Decision is attached hereto as Exhibit A-10.

16.     On or about April 18, 2011, I became aware of WIPO's administrative panel decision in the matter styled *Judah Smith v. Whois Privacy Service Ltd. and URDMC*, Case No. D2011-0397, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain judahsmith.com, one of the Domain Names at Issue (the "Smith Decision"). A true and correct copy of the Smith Decision is attached hereto as Exhibit A-11.

17.     On or about June 28, 2011, I became aware of WIPO's administrative panel decision in the matter styled *American Woodmark Corporation v. Whois Privacy Services Pty Ltd., TIPA, and URDMC*, Case No. D2011-0804, issued in accordance with the UDRP, and regarding     the     ownership     and     other     rights     relating     to     the     domain americanwoodmarkcabinetry.com, one of the Domain Names at Issue (the "American Woodmark Decision").   A true and correct copy of the American Woodmark Decision is attached hereto as Exhibit A-12.

18.     On or about July 6, 2011, I became aware of WIPO's administrative panel decision in the matter styled *Eli Lilly and Company v. URDMC*, Case No. D2011-0715, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain lilycares.com, one of the Domain Names at Issue (the "Second Eli Lilly Decision").  A true and correct copy of the Second Eli Lilly Decision is attached hereto as Exhibit A-13.

19.     On or about November 24, 2011, I became aware of WIPO's administrative panel decision in the matter styled *I-TO-I International Products, Limited v. Quantec, LLC/Novo Point, LLC*, Case No. D2011-1492, issued in accordance with the UDRP, and regarding the ownership and other rights relating to the domain itoitravel.com, one of the Domain Names at Issue (the "I-TO-I Decision"). A true and correct copy of the I-TO-I Decision is attached hereto as Exhibit A-14. The Weta Decision, Public Storage Decision, Fandango/Daily Candy Decision, Apple Decision, HBI Apparel Decision, Johnson & Johnson Decision, First Eli Lilly Decision, Amica Decision, Ariens Decision, Smith Decision, American Woodmark Decision, Second Eli Lilly Decision, and I-TO-I Decision (*i.e.*, Exs. A-2 – A-14) are hereafter collectively referred to as the Default Decisions.

20.     A domain Registrar is an ICANN-licensed organization which manages the reservation of domain names in accordance with ICANN policies. A company called Fabulous.com is the Registrar for all of the Novo Point, LLC and Quantec, LLC domain names (including the Domains at Issue). Registrars are contractually obligated to abide by the UDRP decisions of ICANN-approved arbiters like WIPO and NAF. So, when WIPO or NAF issues a Default Decision adverse to the LLCs that a Domain Name at Issue should be transferred to the complainant in the dispute, Fabulous.com is obligated by ICANN Policy to transfer the Domain Name at Issue.

21.     In all of the Default Decisions, Fabulous.com is being instructed by either WIPO or NAF to transfer one or more of the Domain Names at Issue from the LLCs to a third party.

22.     I believe that Fabulous.com, upon receipt of an order from this Court directing it to do so, can disregard the Default Decisions and not transfer the Domain Names at Issue from the LLCs to a third party. I also believe that, for any Domain Name at Issue that might have



already been transferred pursuant to a Default Decision, ICANN could immediately re-transfer such Domain Name at Issue back to the LLCs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 12, 2011.

Damon Nelson

# Exhibit A-1

## Domain Names at Issue

wetafx.com

publicstorge.com

publicstroagejob.com

pulicstorage.com

puplicstorage.com

dailycand.com

dailycandi.com

dailycandychicago.com

dailycandynyc.com

fanngo.com

jandango.com

jobfandango.com

aplle.com

leghanesbali.com

korresproducts.com

zigris.com

amicains.com

gravelymowers.com

judahsmith.com

americanwoodmarkcabinetry.com

lilycares.com

itoitravel.com

# Exhibit A-2

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Weta Digital Ltd. v. Texas International Property Associates

## Case No. D2010-1692

### 1. The Parties

The Complainant is Weta Digital Ltd., of Wellington, New Zealand, represented by Michael McNeil, United States of America.

The Respondent is Texas International Property Associates of Dallas, Texas, United States of America.

### 2. The Domain Name and Registrar

The disputed domain name, <wetafx.com> (the "Domain Name") is registered with Compana LLC/Budgetnames.com (the "Registrar").

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on October 6, 2010. On October 7, 2010, the Center transmitted, by email, to the Registrar a request for registrar verification in connection with the Domain Name. On October 8, 2010, the Registrar transmitted by email to the Center its verification response confirming that the Respondent is listed as the registrant and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified the Respondent of the Complaint, and the proceedings commenced on October 22, 2010. In accordance with the Rules, paragraph 5(a), the due date for Response was November 11, 2010. No Response was filed with the Center. The Center issued a Notice of Respondent Default on November 12, 2010.

The Center appointed Tony Willoughby as the sole panelist in this matter on November 19, 2010. The Panel finds that it was properly constituted. The Panel has submitted the Statement of

Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

On reading the papers submitted in this case, the Panel found that there were certain assertions in the Complaint, which, while likely to be accurate, were unsupported by any documentary evidence. On November 30, 2010 the Panel issued a procedural order addressed to the Complainant to elicit whether any relevant supporting evidence was available to support the Complainant's contentions. The Complainant responded on December 3, 2010 providing the supporting evidence requested. The Respondent was given an opportunity to file a submission in response, but did not do so.

On or about December 5, 2010, the Center became aware that the publicly available InterNic information, indicated that the Domain Name was now registered with Fabulous.com and no longer Compana LLC/Budgetnames.com. On December 6, 2010, Fabulous.com confirmed that it had become the Registrar of Record for the Domain Name.[1]

The original date for the decision was December 3, 2010 and extended by way of the procedural order to December 10, 2010. Regrettably, the Panel was inconvenienced by severe weather conditions and the date for the decision has had to be further extended to at least, December 12, 2010.

## 4. Factual Background

The Complainant was incorporated in New Zealand on December 2, 1992. Together with its associated companies the Complainant is world renowned for its work on visual effects for the film industry, having won Oscars for its work in 2001, 2002 and 2003 on *The Lord of the Rings* trilogy and winning again in 2005 for *King Kong* and in 2009 for *Avatar*.

A well-known film industry abbreviation for "effects", "special effects" or "visual effects" is "'fx".

The Complainant is the registrant of the domain name, <wetafx.co.nz>, which was first registered on June 10, 1997.

The Complainant is licensed to use the following registered trade mark, namely New Zealand trade mark registration number 735806, filed on September 19, 2005, WETA (word) for goods and services in classes 20, 21, 41 and 42, which is registered in the name of its associated company, Weta Workshop Limited of Wellington New Zealand[2].

The Domain Name was registered on May 17, 2005 and is connected to a parking page featuring links to a variety of sites ranging from "female libido" to "protective helmets".

## 5. Parties' Contentions

### A. Complainant

The Complainant contends that the Domain Name is identical or confusingly similar to a trade mark in which it has rights, that the Respondent has no rights or legitimate interests in respect of the Domain Name and that the Domain Name was registered and is being used in bad faith.

## B. Respondent

The Respondent has not filed a Response.

## 6. Discussion and Findings

### A. General

According to paragraph 4(a) of the Policy, for this Complaint to succeed in relation to the Domain Name, the Complainant must prove each of the following, namely that:

(i) The Domain Name is identical or confusingly similar to a trade mark or service mark in which the Complainant has rights; and

(ii) The Respondent has no rights or legitimate interests in respect of the Domain Name; and

(iii) The Domain Name was registered and is being used in bad faith.

### A. Identical or Confusingly Similar

The Domain Name comprises "weta", "fx" and the generic ".com" domain suffix.

WETA is a New Zealand registered trade mark of Weta Workshop Limited and "fx'" is a standard film industry abbreviation for "effects", "special effects" or "visual effects", the field of activity in which the Complainant has established a significant reputation evidenced by its having won Oscars for its work in 2001, 2002 and 2003 on *The Lord of the Rings* trilogy, in 2005 for *King Kong* and in 2009 for *Avatar*.

Is WETA a trade mark in which the Complainant has rights?

The Complainant has produced the necessary evidence to demonstrate to the satisfaction of the Panel that it has registered trade mark rights in respect of the mark WETA by way of its license from its associated company, Weta Workshop Limited, to use the New Zealand registered trade mark details of which are set out in section 4 above.

However, in the view of the Panel, it is unnecessary for the Complainant to rely upon its registered rights. It is apparent from the evidence before the Panel that, at least 2003, the Complainant had built up a substantial reputation and goodwill in the film industry under and by reference to the name "Weta." "Weta" is the distinctive element of the name under which the Complainant been trading since the 1990s. The Panel selects the year 2003 simply because the Panel is satisfied that by that year, with its third Oscar win, "Weta" would have been a very well-

known name in the film industry. Moreover, since 1997 the Complainant had been using its domain name <wetafx.co.uk> for its website.

## B. Rights or Legitimate Interests

"Weta" is a Maori word given to various species of insects endemic to New Zealand. Had the Respondent's website solely concerned itself with New Zealand insects (or indeed any other topic justifiably associated with the word/mark "weta"), then, subject to one qualification, discussed below, the Respondent might not have had too much difficulty in demonstrating relevant rights or legitimate interests in respect of the Domain Name.

However, the Domain Name features in addition to the word/mark "Weta" the film industry abbreviation "fx", the abbreviation for "effects" or "special effects" or "visual effects", which is precisely the Complainant's specialist field of activity. Additionally, as previously indicated,, the Domain Name replicates the Complainant's domain name apart from the generic domain suffix.

In the absence of any alternative explanation from the Respondent (the Respondent has not responded), the Panel is satisfied that the Respondent selected the Domain Name for the trade mark value of the name and with a view to attracting Internet users to its website in the hope and expectation that those visitors would earn for it pay-per-click or other referral income by way of the advertising links.

Although it is true that the New Zealand trade mark registration referred to in section 4 above post-dates registration of the Domain Name, the Panel is satisfied that the Complainant and its associated companies had acquired unregistered trade mark rights long before that date. (See Part 6(A) *supra.).* In the view of the Panel it is inconceivable that the Respondent would have selected the Domain Name without knowledge of and intent to trade off of the Complainant and its distinguished reputation in the field of visual effects.

The Panel finds that the Respondent has no rights or legitimate interests in respect of the Domain Name.

## C. Registered and Used in Bad Faith

By way of the same reasoning applied in Part 6(B), regarding the Respondent's lack of rights or legitimate interests in the Domain Name, the Panel is satisfied that the Domain Name was registered and is being used in bad faith within the meaning of paragraph 4(b)(iv) of the Policy.

## 7. Decision

For all the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the Domain Name, <wetafx.com>, be transferred to the Complainant. In that regard the Panel notes for the record that the owner of the registered trade marks referred to in section 4 above has given its consent (if any such consent were needed) to the Domain Name being transferred to the Complainant.

Tony Willoughby
Sole Panelist
Date: December 10, 2010

_____

[1] During the course of its inquiry as to the change of registrars, the Center was informed by ICANN that Compana LLC was no longer an ICANN accredited registrar. The Center has received independent verification from Fabulous.com that it was acting as the concerned Registrar in this matter. Fabulous.com has confirmed that the registrant details for the disputed domain name <wetafx.com> have been restored to those previously confirmed by Compana LLC, and that the domain name will remain under registrar lock throughout the remainder of these proceedings

[2] The Complainant also refers to two United States registrations, for WETA and WETA DIGITAL, both filed on January 24, 2010. However, these appear to the Panel to be applications rather than registrations and thus the Panel has not found it necessary to take them into account in analyzing the claim made herein.

# Exhibit A-3

Skip to main content

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Public Storage v. Texas International Property Associates

## Case No. D2010-1782

### 1. The Parties

Complainant is Public Storage of Glendale, California, United States of America, represented by Lee, Tran, & Liang APLC, United States of America.

Respondent is Texas International Property Associates of Dallas, Texas, United States of America.

### 2. The Domain Names and Registrar

The disputed domain names <publicstorge.com>, <publicstroagejobs.com>, <pulicstorage.com>, and <puplicstorage.com> were registered with Compana LLC, and it was to Compana LLC that the WIPO Arbitration and Mediation Center (the "Center") directed the communications referred to in Section 3 below. During the course of its inquiry as to the change of registrars during the pendency of this proceeding, the Center was informed by ICANN that Compana LLC is no longer an ICANN accredited registrar. The Center has received independent verification from Fabulous.com and Compana LLC that Fabulous.com is acting as the concerned registrar in this matter. Fabulous.com has confirmed that the registrant details for the disputed domain names have been restored to those previously confirmed by Compana LLC, and that the domain names will remain under registrar lock throughout the remainder of this proceeding. Publicly available InterNIC information accessed by the Center on December 6, 2010, indicated that the disputed domain names are at present registered with Fabulous.com.

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on October 22, 2010. On October 25, 2010, the Center transmitted by email to Compana LLC a request for registrar verification in connection with the disputed domain names. On October 27, 2010, Compana LLC transmitted by email to the Center its verification response, confirming that Respondent is listed as the registrant and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain

Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified Respondent of the Complaint, and the proceedings commenced on November 1, 2010. In accordance with the Rules, paragraph 5(a), the due date for Response was November 21, 2010. Respondent did not submit any response. Accordingly, the Center notified Respondent's default on November 22, 2010.

The Center appointed Lynda J. Zadra-Symes as the sole panelist in this matter on December 6, 2010. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

## 4. Factual Background

Complainant operates 2,100 company-owned storage locations in the United States and Europe.

Complainant owns United States Trademark Registration No. 1,132,868 for the mark PUBLIC STORAGE for use in connection with the "renting of private storage spaces with limited access." The registration issued April 8, 1980, and claims a date of first use of April 20, 1973.

## 5. Parties' Contentions

### A. Complainant

Complainant contends that it is the world leader in rentable self-storage space, and has continuously used and owned the trademark PUBLIC STORAGE since 1973 in the United States in connection with private self-storage spaces. Complainant contends that it has established strong recognition in its PUBLIC STORAGE trademark that disputed domain names are confusingly similar to Complainant's PUBLIC STORAGE trademark that Respondent has no rights or legitimate interests in respect of the disputed domain names and that Respondent has registered and is using the disputed domain names in bad faith.

### B. Respondent

Respondent did not reply to Complainant's contentions.

## 6. Discussion and Findings

In order to succeed in its claim, Complainant must demonstrate that all of the elements enumerated in paragraph 4(a) of the Policy have been satisfied:

(i) the disputed domain names are identical or confusingly similar to a trademark or service mark in which Complainant has rights; and

(ii) Respondent has no rights or legitimate interests with respect to the disputed domain names; and

(iii) the disputed domain names have been registered and are being used in bad faith.

Paragraph 15(a) of the Rules instructs this Panel to decide a complaint "on the basis of the statements and documents submitted and in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

## A. Identical or Confusingly Similar

Complainant has shown that it is the owner of a valid United States trademark for the mark PUBLIC STORAGE. The disputed domain names are all examples of typographically misspelled domain names that closely resemble Complainant's registered United States trademark. With regard to the disputed domain name <publicstroagejobs.com>, the addition of the term "jobs" does not add any distinctive subject matter to assist in an evaluation of confusing similarity. The Panel finds that these misspelled domain names are confusingly similar to Complainant's PUBLIC STORAGE trademark.

## B. Rights or Legitimate Interests

Complainant contends that there is no connection between Complainant and Respondent and that Respondent has never been known by the name "Public Storage" or any of the misspelled versions of "public storage" used in the disputed domain names. Respondent is using the disputed domain names to promote various services that compete with Complainant.

There is no evidence that Respondent is or has been commonly known by any of the disputed domain names or has made preparations to use the disputed domain names in connection with a *bona fide* offering of goods or services.

Respondent is using the disputed domain names in connection with monetized parking pages that include links to websites offering services competitive with those offered by Complainant. Such use is not a *bona fide* offering of goods or services under the Policy.

Accordingly, the Panel finds that Complainant has satisfied the requirement of paragraph 4(a)(ii) of the Policy.

## C. Registered and Used in Bad Faith

Paragraph 4(b) of the Policy states circumstances which, if found, shall be evidence of the registration and use of the disputed domain names in bad faith:

(i) circumstances indicating that Respondent has registered or acquired the disputed domain names primarily for the purpose of selling, renting or otherwise transferring the domain name registrations to Complainant who is the owner of the trademark or service mark or to a

competitor of Complainant, for valuable consideration in excess of the documented out-of-pocket costs directly related to the domain names; or

(ii) Respondent has registered the domain names in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that Respondent has engaged in a pattern of such conduct; or

(iii) Respondent has registered the domain names primarily for the purpose of disrupting the business of a competitor; or

(iv) by using the domain names, Respondent has intentionally attempted to attract, for commercial gain, Internet users to Respondent's website or other on line location, by creating a likelihood of confusion with Complainant's mark as to the source, sponsorship, affiliation, or endorsement of Respondent's website or location of a product or service on Respondent's website or location.

Given Complainant's longstanding and widespread use of the PUBLIC STORAGE mark in the United States in connection with private storage facilities, it is highly likely that Respondent was aware of Complainant's mark before registering the disputed domain names.

This is supported by the fact that Respondent's websites are "parking pages" with links to other websites offering services that compete with Complainant. Respondent likely receives "click through" advertising fees from such links. Respondent is therefore relying on a likelihood of confusion between Complainant's PUBLIC STORAGE trademark in order to attract, for commercial gain, Internet users to Respondent's websites.

Accordingly, the Panel finds that Respondent has registered and is using the disputed domain names in bad faith.

## 7. Decision

For all the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the domain names <publicstorge.com>, <publicstroagejobs.com>, <pulicstorage.com>, and <puplicstorage.com> be transferred to Complainant

Lynda J. Zadra-Symes
Sole Panelist
Dated: December 20, 2010

# Exhibit A-4



# NATIONAL ARBITRATION FORUM

# DECISION

Fandango, Inc. and Daily Candy, Inc. v. Texas International Property Associates -

Claim Number: FA 1358961

## PARTIES

Complainant is **Fandango, Inc.** and **Daily Candy, Inc.** ("Complainant"), represented by **CitizenHawk, Inc.**, California, USA.  Respondent is **Texas International Property Associates - ** ("Respondent"), Texas, USA.

### REGISTRAR AND DISPUTED DOMAIN NAMES

The domain name at issue are **<dailycand.com>**, **<dailycandi.com>**, **<dailycandychicago.com>**, **<dailycandynyc.com>**, **<fanngo.com>**, **<jandango.com>**, and **<jobfandango.com>**, registered with **COMPANA, LLC.**

## PANEL

The undersigned certifies that he or she has acted independently and impartially and to the best of his or her knowledge has no known conflict in serving as Panelist in this proceeding.

Sandra J. Franklin as Panelist.

# PROCEDURAL HISTORY

Complainant submitted a Complaint to the National Arbitration Forum electronically on November 17, 2010; the National Arbitration Forum received payment on November 17, 2010.

On November 19, 2010, COMPANA, LLC confirmed by e-mail to the National Arbitration Forum that the **<dailycand.com>**, **<dailycandi.com>**, **<dailycandychicago.com>**, **<dailycandynyc.com>**, **<fanngo.com>**, **<jandango.com>**, and **<jobfandango.com>** domain names are registered with COMPANA, LLC and that Respondent is the current registrant of the names. COMPANA, LLC has verified that Respondent is bound by the COMPANA, LLC registration agreement and has thereby agreed to resolve domain disputes brought by third parties in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy (the "Policy").

On November 23, 2010, the Forum served the Complaint and all Annexes, including a Written Notice of the Complaint, setting a deadline of December 13, 2010 by which Respondent could file a Response to the Complaint, via e-mail to all entities and persons listed on Respondent's registration as technical, administrative, and billing contacts, and to postmaster@dailycand.com, postmaster@dailycandi.com, postmaster@dailycandychicago.com, postmaster@dailycandynyc.com, postmaster@fanngo.com, postmaster@jandango.com, and postmaster@jobfandango.com. Also on November 23, 2010, the Written Notice of the Complaint, notifying Respondent of the email addresses served and the deadline for a Response, was transmitted to Respondent via post and fax, to all entities and persons listed on Respondent's registration as technical, administrative and billing contacts.

Having received no response from Respondent, the National Arbitration Forum transmitted to the parties a Notification of Respondent Default.

On December 17, 2010, pursuant to Complainant's request to have the dispute decided by a single-member Panel, the National Arbitration Forum appointed Sandra J. Franklin as Panelist.

Having reviewed the communications records, the Administrative Panel (the "Panel") finds that the National Arbitration Forum has discharged its responsibility under Paragraph 2(a) of the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules") "to employ reasonably available means calculated to achieve actual notice to Respondent" through submission of Electronic and Written Notices, as defined in Rule 1 and Rule 2. Therefore, the Panel may issue its decision based on the documents submitted and in accordance with the ICANN Policy, ICANN Rules, the National Arbitration Forum's Supplemental Rules and any rules and principles of law that the Panel deems applicable, without the benefit of a response from Respondent.

# RELIEF SOUGHT

Complainant requests that the domain names be transferred from Respondent to Complainant.

# PARTIES' CONTENTIONS

A.  Complainant makes the following assertions:

1.  Respondent's **<dailycand.com>**, **<dailycandi.com>**, **<dailycandychicago.com>**, and **<dailycandynyc.com>** domain names are confusingly similar to Complainant's DAILYCANDY mark.

   Respondent's **<fanngo.com>**, **<jandango.com>**, and **<jobfandango.com>** domain names are confusingly similar to Complainant's FANDANGO mark.

2.  Respondent does not have any rights or legitimate interests in the **<dailycand.com>**, **<dailycandi.com>**, **<dailycandychicago.com>**, **<dailycandynyc.com>**, **<fanngo.com>**, **<jandango.com>**, and **<jobfandango.com>** domain names.

3.  Respondent registered and used the **<dailycand.com>**, **<dailycandi.com>**, **<dailycandychicago.com>**, **<dailycandynyc.com>**, **<fanngo.com>**, **<jandango.com>**, and **<jobfandango.com>** domain names in bad faith.

B. Respondent failed to submit a Response in this proceeding.

# FINDINGS

Complainant, Daily Candy, Inc., uses the DAILYCANDY mark for online entertainment services, including gossip news, merchandise events and services available in metropolitan areas. Complainant holds a trademark registration with the United States Patent and Trademark Office ("USPTO") for the DAILYCANDY mark (*e.g.*, Reg. No. 2,543,900 issued March 5, 2002). Complainant, Fandango, Inc., uses the FANDANGO mark for movie schedule, location and ticketing services. Complainant holds trademark registrations with the USPTO for the FANDANGO mark (*e.g.*, Reg. No. 2,769,579 issued September 30, 2003).

Respondent registered the disputed domain names on the following dates: **<dailycand.com>** on February 19, 2005; **<dailycandi.com>** on November 15, 2005; **<dailycandychicago.com>** on February 28, 2005; **<dailycandynyc.com>** on December 27, 2005; **<fanngo.com>** on July 11, 2005; **<jandango.com>** on February 19, 2005; and **<jobfandango.com>** on February 19, 2005. The disputed domain names resolve to directory websites that provide hyperlinks to third-party websites, some of which compete with Complainant's business.

# DISCUSSION

Paragraph 15(a) of the Rules instructs this Panel to "decide a complaint on the basis of the statements and documents submitted in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

In view of Respondent's failure to submit a response, the Panel shall decide this administrative proceeding on the basis of Complainant's undisputed representations pursuant to paragraphs 5(e), 14(a) and 15(a) of the Rules and draw such inferences it considers appropriate pursuant to paragraph 14(b) of the Rules. The Panel is entitled to accept all reasonable allegations and inferences set forth in the Complaint as true unless the evidence is clearly contradictory. *See Vertical Solutions Mgmt., Inc. v. webnet-marketing, inc.*, FA 95095 (Nat. Arb. Forum July 31, 2000) (holding that the respondent's failure to respond allows all reasonable inferences of fact in the allegations of the complaint to be deemed true); *see also Talk City, Inc. v. Robertson*, D2000-0009 (WIPO Feb. 29, 2000) ("In the absence of a response, it is appropriate to accept as true all allegations of the Complaint.").

Paragraph 4(a) of the Policy requires that Complainant must prove each of the following three elements to obtain an order that a domain name should be cancelled or transferred:

(1) the domain name registered by Respondent is identical or confusingly similar to a trademark or service mark in which Complainant has rights; and

(2) Respondent has no rights or legitimate interests in respect of the domain name; and

(3) the domain name has been registered and is being used in bad faith.

## Preliminary Issue: Multiple Complainants

The relevant rules governing multiple complainants are UDRP Rule 3(a) and the National Arbitration Forum's Supplemental Rule 1(e).  UDRP Rule 3(a) states, "Any person or entity may initiate an administrative proceeding by submitting a complaint."  The National Arbitration Forum's Supplemental Rule 1(e) defines "The Party Initiating a Complaint Concerning a Domain Name Registration" as a "single person or entity claiming to have rights in the domain name, or multiple persons or entities who have a sufficient nexus who can each claim to have rights to all domain names listed in the Complaint."

There are two Complainants in this matter.  Complainant Fandango, Inc. and Complainant Daily Candy, Inc. are both subsidiaries of Comcast Interactive Media, a division of Comcast Corporation.  The Panel finds that there is a sufficient nexus or link between Complainants and will treat Complainants as a single entity in this proceeding.  Hereinafter, the Panel will collectively refer to Complainants as "Complainant."

## Identical and/or Confusingly Similar

The Panel finds that Complainant's trademark registrations sufficiently prove Complainant's rights in the DAILYCANDY and FANDANGO marks pursuant to Policy ¶ 4(a)(i).  *See Expedia, Inc. v. Tan*, FA 991075 (Nat. Arb. Forum June 29, 2007) ("As the [complainant's] mark is registered with the USPTO, [the] complainant has met the requirements of Policy ¶ 4(a)(i)."); *see*

*also Microsoft Corp. v. Burkes*, FA 652743 (Nat. Arb. Forum Apr. 17, 2006) ("Complainant has established rights in the MICROSOFT mark through registration of the mark with the USPTO.").

Respondent's **<dailycand.com>**, **<dailycandi.com>**, **<dailycandychicago.com>**, and **<dailycandynyc.com>** domain names are confusingly similar to its DAILYCANDY mark. Respondent omits the second letter "y" from Complainant's mark in the **<dailycand.com>** domain name replaces it with the letter "i" in the **<dailycandi.com>** domain name. Respondent adds the letters "nyc," a common abbreviation for "New York City," and the geographic term "Chicago" to Complainant's mark in the **<dailycandychicago.com>** and **<dailycandynyc.com>** domain names. Finally, Respondent affixes the generic top-level domain ("gTLD") ".com" to Complainant's mark in all of the disputed domain names. The Panel finds that these slight alterations do not negate the finding of confusingly similar. *See Pfizer Inc. v. BargainName.com*, D2005-0299 (WIPO Apr. 28, 2005) (holding that the <pfzer.com> domain name was confusingly similar to the complainant's PFIZER mark, as the respondent simply omitted the letter "i"); *see also Belkin Components v. Gallant*, FA 97075 (Nat. Arb. Forum May 29, 2001) (finding the <belken.com> domain name confusingly similar to the complainant's BELKIN mark because the name merely replaced the letter "i" in the complainant's mark with the letter "e"); *see also Am. Online, Inc. v. Amigos On Line RJ*, FA 115041 (Nat. Arb. Forum Aug. 28, 2002) (finding that the <aolrj.com> domain name was confusingly similar to the complainant's AOL mark because "…the addition of a string of indiscriminate letters to a famous mark in a second level domain does not differentiate the domain name from the mark."); *see also Skype Ltd. v. Sacramento*, FA 747948 (Nat. Arb. Forum Aug. 30, 2006) ("The addition of the geographic term ["Brasil"] does not avoid confusing similarity pursuant to Policy ¶ 4(a)(i)."); *see also Reese v. Morgan*, FA 917029 (Nat. Arb. Forum Apr. 5, 2007) (finding that the mere addition of the generic top-level domain ".com" is insufficient to differentiate a disputed domain name from a mark). Therefore, the Panel finds that Respondent's **<dailycand.com>**, **<dailycandi.com>**, **<dailycandychicago.com>**, and **<dailycandynyc.com>** domain names are confusingly similar to Complainant's DAILYCANDY mark under Policy ¶ 4(a)(i).

Respondent's **<fanngo.com>**, **<jandango.com>**, and **<jobfandango.com>** domain names are confusingly similar to its FANDANGO mark. Respondent omits the letters "d" and "a" from Complainant's mark in the **<fanngo.com>** mark, and replaces the letter "f" in Complainant's mark with the letter "j" in the **<jandango.com>** domain name. Respondent adds the generic term "job" to Complainant's mark in the **<jobfandango.com>** domain name. Finally, Respondent attaches the gTLD ".com" to Complainant's mark in each of the disputed domain names. The Panel finds that these changes do not negate a finding of confusingly similar. *See Pfizer Inc. v. BargainName.com, supra*; *see also Belkin Components v. Gallant, supra*; *see also Arthur Guinness Son & Co. (Dublin) Ltd. v. Healy/BOSTH*, D2001-0026 (WIPO Mar. 23, 2001) (finding confusing similarity where the domain name in dispute contains the identical mark of the complainant combined with a generic word or term*); see also Reese v. Morgan, supra*. Therefore, the Panel finds that Respondent's **<fanngo.com>**, **<jandango.com>**, and

<jobfandango.com> domain names are confusingly similar to Complainant's FANDANGO mark under Policy ¶ 4(a)(i).

The Panel finds that Complainant has satisfied Policy ¶ 4(a)(i).

## Rights or Legitimate Interests

Complainant must first make a *prima facie* case showing Respondent lacks rights and legitimate interests in the disputed domain names under Policy ¶ 4(a)(ii). The burden then shifts to Respondent to prove it has rights or legitimate interests in the disputed domain names. The Panel may view Respondent's failure to submit a Response as evidence that Respondent lacks rights and legitimate interests. *See Intel Corp. v. Macare*, FA 660685 (Nat. Arb. Forum Apr. 26, 2006) (finding the "complainant must first make a *prima facie* case that [the] respondent lacks rights and legitimate interests in the disputed domain names under Policy ¶ 4(a)(ii), and then the burden shifts to [the] respondent to show it does have rights or legitimate interests."); *see also Do The Hustle, LLC v. Tropic Web*, D2000-0624 (WIPO Aug. 21, 2000) (holding that, where the complainant has asserted that the respondent has no rights or legitimate interests with respect to the domain name, it is incumbent on the respondent to come forward with concrete evidence rebutting this assertion because this information is "uniquely within the knowledge and control of the respondent"); *see also Am. Express Co. v. Fang Suhendro*, FA 129120 (Nat. Arb. Forum Dec. 30, 2002) ("[B]ased on Respondent's failure to respond, it is presumed that Respondent lacks all rights and legitimate interests in the disputed domain name."). Despite Respondent's failure to respond, the Panel will evaluate the record to determine whether Respondent has rights or legitimate interests in the disputed domain names under Policy ¶ 4(c).

Complainant asserts it has not licensed, authorized, or otherwise permitted Respondent to use its FANDANGO or DAILYCANDY marks. Furthermore, the WHOIS information lists "Texas International Property Associates" as the registrant of the disputed domain names, which the Panel finds is not similar to any of the disputed domain names. With no evidence to the contrary, the Panel finds that Respondent is not commonly known by the disputed domain names under Policy ¶ 4(c)(ii). *See Braun Corp. v. Loney*, FA 699652 (Nat. Arb. Forum July 7, 2006) (concluding that the respondent was not commonly known by the disputed domain names where the WHOIS information, as well as all other information in the record, gave no indication that the respondent was commonly known by the disputed domain names, and the complainant had not authorized the respondent to register a domain name containing its registered mark); *see also Coppertown Drive-Thru Sys., LLC v. Snowden*, FA 715089 (Nat. Arb. Forum July 17, 2006) (concluding that the respondent was not commonly known by the <coppertown.com> domain

name where there was no evidence in the record, including the WHOIS information, suggesting that the respondent was commonly known by the disputed domain name).

Complainant alleges the disputed domain names resolve to directory websites that provide hyperlinks to third-party websites, some of which directly compete with Complainant's business. Complainant further alleges that Respondent profits from its use of the disputed domain names through the receipt of pay-per-click fees.

Based on the evidence in the record, the Panel finds that the disputed domain names resolve to pay-per-click websites that provide hyperlinks to third-party websites that are unrelated to Complainant as well as third-party websites that compete with Complainant. Therefore, the Panel finds that Respondent does not use the <dailycand.com>, <dailycandi.com>, <dailycandychicago.com>, <dailycandynyc.com>, <fanngo.com>, <jandango.com>, and <jobfandango.com> domain names to make a *bona fide* offering of goods or services under Policy ¶ 4(c)(i) or a legitimate noncommercial or fair use under Policy ¶ 4(c)(iii). *See Royal Bank of Scotland Grp plc et al. v. Demand Domains*, FA 714952 (Nat. Arb. Forum Aug. 2, 2006) (finding that the operation of a commercial web directory displaying various links to third-party websites was not a use in connection with a *bona fide* offering of goods or services pursuant to Policy ¶ 4(c)(i) or a legitimate noncommercial or fair use pursuant to Policy ¶ 4(c)(iii), as the respondent presumably earned "click-through" fees for each consumer it redirected to other websites); *see also Metro. Life Ins. Co. v. Bonds*, FA 873143 (Nat. Arb. Forum Feb. 16, 2007) (concluding that using a confusingly similar domain name to divert Internet users to competing websites does not represent a *bona fide* offering of goods or services under Policy ¶ 4(c)(i) or a legitimate noncommercial or fair use under Policy ¶ 4(c)(iii)).

Complainant argues that Respondent has engaged in typosquatting. The Panel finds that Respondent incorporates common typographical errors in the <dailycand.com>, <dailycandi.com>, <fanngo.com>, and <jandango.com> domain names. Therefore, the Panel finds that this is additional evidence that Respondent lacks rights and legitimate interests in these disputed domain names pursuant to Policy ¶ 4(a)(iii). *See Microsoft Corp. v. Domain Registration Philippines*, FA 877979 (Nat. Arb. Forum Feb. 20, 2007) (concluding that by registering the <microsoft.com> domain name, the respondent had "engaged in typosquatting, which provides additional evidence that [the] respondent lacks rights and legitimate interests in the disputed domain name under Policy ¶ 4(a)(ii)."); *see also Diners Club Int'l Ltd. v. Domain Admin******It's all in the name*******, FA 156839 (Nat. Arb. Forum June 23, 2003) (holding that the respondent's <wwwdinersclub.com> domain name, a typosquatted version of the complainant's DINERS CLUB mark, was evidence in and of itself that the respondent lacks rights or legitimate interests in the disputed domain name vis á vis the complainant).

The Panel finds Complainant has satisfied Policy ¶ 4(a)(ii).

## Registration and Use in Bad Faith

The Panel finds that the disputed domain names resolve to websites that provide hyperlinks to Complainant's competitors, disrupting Complainant's business, which amounts to registration and use in bad faith under Policy ¶ 4(b)(iii). *See Tesco Pers. Fin. Ltd. v. Domain Mgmt. Servs.*, FA 877982 (Nat. Arb. Forum Feb. 13, 2007) (concluding that the use of a confusingly similar domain name to attract Internet users to a directory website containing commercial links to the websites of a complainant's competitors represents bad faith registration and use under Policy ¶ 4(b)(iii)); *see also Persohn v. Lim*, FA 874447 (Nat. Arb. Forum Feb. 19, 2007) (finding bad faith registration and use pursuant to Policy ¶ 4(b)(iii) where a respondent used the disputed domain name to operate a commercial search engine with links to the complainant's competitors).

Additionally, the Panel finds that Respondent has intentionally attempted to attract, for commercial gain, Internet users to its website, by creating a likelihood of confusion with Complainant's marks as to the source, sponsorship, affiliation, or endorsement of Respondent's website. Respondent likely profits from its use of the domain names through the receipt of pay-per-click fees. Therefore, the Panel finds Respondent has engaged in registration and use in bad faith pursuant to Policy ¶ 4(b)(iv). *See The Ass'n of Junior Leagues Int'l Inc. v. This Domain Name My Be For Sale*, FA 857581 (Nat. Arb. Forum Jan. 4, 2007) (holding that the respondent's use of the disputed domain name to maintain a pay-per-click site displaying links unrelated to the complainant and to generate click-through revenue suggested bad faith registration and use under Policy ¶ 4(b)(iv)); *see also Williams-Sonoma, Inc. v. Fees*, FA 937704 (Nat. Arb. Forum Apr. 25, 2007) (holding that the use of a confusingly similar domain name to display links to various third-party websites demonstrated bad faith registration and use pursuant to Policy ¶ 4(b)(iv)).

The Panel also finds that Respondent has engaged in typosquatting, further evidence of bad faith registration and use under Policy ¶ 4(a)(iii). *See Nextel Commc'ns Inc. v. Geer*, FA 477183 (Nat. Arb. Forum July 15, 2005) (finding that the respondent's registration and use of the <nextell.com> domain name was in bad faith because the domain name epitomized typosquatting in its purest form); *see also Computerized Sec. Sys., Inc. v. Hu*, FA 157321 (Nat. Arb. Forum June 23, 2003) (finding that the respondent engaged in typosquatting, which is evidence of bad faith registration and use under Policy ¶ 4(a)(iii)).

The Panel finds Complainant has satisfied Policy ¶ 4(a)(iii).

# DECISION

Having established all three elements required under the ICANN Policy, the Panel concludes that relief shall be **GRANTED**.

Accordingly, it is Ordered that the **<dailycand.com>**, **<dailycandi.com>**, **<dailycandychicago.com>**, **<dailycandynyc.com>**, **<fanngo.com>**, **<jandango.com>**, and **<jobfandango.com>** domain names be **TRANSFERRED** from Respondent to Complainant.

Sandra J. Franklin, Panelist

Dated:  December 23, 2010

Click Here to return to the main Domain Decisions Page.

Click Here to return to our Home Page

# Exhibit A-5

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Apple Inc. v. Oakwood Services Inc. - N/A N/A

## Case No. D2010-1917

### 1. The Parties

The Complainant is Apple Inc. of Cupertino, California, United States of America, represented by Kilpatrick Stockton LLP, United States of America.

The Respondent is Oakwood Services Inc. - N/A N/A of Dallas, Texas, United States of America, represented by Sid Chesnin.

### 2. The Domain Name and Registrar

The disputed domain name <aplle.com> was originally registered with Compana LLC and later transferred to Fabulous.com.

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on November 10, 2010. On November 10, 2010, the Center transmitted by email to Compana LLC a request for registrar verification in connection with the disputed domain name. On November 11, 2010, Compana LLC transmitted by email to the Center its verification response, confirming that the Respondent is listed as the registrant and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified the Respondent of the Complaint, and the proceedings commenced on November 12, 2010. In accordance with the Rules, paragraph 5(a), the due date for Response was December 2, 2010. The Response was filed with the Center on December 2, 2010 (CST)/December 3, 2010 (CET).

The Center appointed Dennis A. Foster as the sole panelist in this matter on December 14, 2010. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

On December 3, 2010, the Center received a request from the Respondent to suspend this matter for 30 days, so that a settlement between the Respondent and the Complainant could be reached. The Center communicated such request to the Complainant and gave the Complainant until December 7, 2010 to respond. On December 6, 2010, the Center received a response from the Complainant that it did not desire a suspension, explaining that no settlement discussions were underway. On December 6, 2010, the Center notified both the Complainant and the Respondent that no suspension of these proceedings would be granted.

## 4. Factual Background

The Complainant is an internationally renowned United States of America company that produces and sells computer and telephone and related products and services on a worldwide basis. Its APPLE trademark is registered with, among other national authorities, the United States Patent and Trademark Office ("USPTO") (i.e., Registration No. 1078312, issued November 29, 1977; Registration No. 1144147, issued December 23, 1980; etc.). The Complainant's owns the domain name, <apple.com>, as a host to one of the most visited websites in the world.

The disputed domain name, <aplle.com>, was registered on January 7, 2002. The domain name is used for a website that provides links to third party websites which offer a variety of products and services unrelated to those offered by the Complainant.

## 5. Parties' Contentions

### A. Complainant

- The Complainant introduced its personal computers for sale in the United States of America in 1977. Since then the Complainant's brand name, "Apple", has become one of the best known in the world, and the Complainant manufactures and sells a variety of computer and telephone related products and services on a worldwide basis. The Complainant has spent approximately USD$691 Million advertising its brand thus far in 2010 alone.

- The Complainant owns many trademark and service mark registrations with the USPTO for the mark, APPLE. The Complainant also possesses many such registrations with the appropriate authorities in a multitude of countries other than the United States.

- The Complainant has also registered the domain names, <apple.com> and <applecomputer.com>, to deliver information concerning its products and services. The websites found at those domain names are among the most visited on the Internet.

- The Complainant's APPLE mark is one of the most famous marks in the world, and is associated with high quality products and services that enjoy an exceedingly valuable reputation and goodwill.

- The Respondent is a prolific cyber-squatter who has registered many domain names based on third party marks. The Respondent uses these names to generate click-through revenues from sponsored links placed on the Respondent's corresponding websites.

- The disputed domain name, <aplle.com>, is confusingly similar to the Complainant's APPLE trademark. The name and the mark are nearly indistinguishable, the name merely substituting a letter "l" for the second letter "p" in the mark. The Respondent, invoking a classic typo-squatting procedure, intends to reach Internet users who, in seeking the Complainant's more popular <apple.com> domain name, accidentally type an extra "l" instead of a second "p".

- The Respondent has no rights or legitimate interests in the disputed domain name. The Complainant has given the Respondent no permission to use the Complainant's mark in any domain name.

- The Respondent is not commonly known by the disputed domain name. Moreover, the Respondent is not using the disputed domain name in connection with a *bona fide* offering of goods or services. Because the Respondent uses the disputed domain name to garner pay-per-click fees, the Respondent is also not using that name for noncommercial or fair use purposes.

- The Respondent has registered and is using the disputed domain name in bad faith. The Respondent is deliberately attempting to gain commercially based on exploitation of the goodwill associated with the Complainant's very famous trademark. The Respondent intends to divert Internet traffic to its website to profit from linking portals. Finally, the Respondent has exhibited a pattern of bad faith domain name registration and use, continually employing infringing domain names to redirect Internet users to its website for commercial gain.

## B. Respondent

- The disputed domain name, <aplle.com>, is not confusingly similar to the Complainant's APPLE trademark.

- For eight years, the Respondent has not used the disputed domain name to display or advertise goods or services that are similar to those of the Complainant.

- There is clear dissimilarity between the websites of the Complainant and the Respondent, and a reasonable Internet user would not mistake those websites for each other.

## 6. Discussion and Findings

In accordance with Policy paragraphs 4(a)(i) – (iii), these proceeding will result in a transfer of the disputed domain name, <aplle.com>, to the Complainant, if it can demonstrate that:

- The disputed domain name is identical or confusingly similar to a trademark or service mark in which the Complainant has rights; and

- The Respondent has no rights or legitimate interests in respect of the disputed domain name; and

- The disputed domain name has been registered and is being used in bad faith.

## A. Identical or Confusingly Similar

Given the world renown of the Complainant and its trademark, APPLE, the Panel finds no difficulty in following prior UDRP panels in determining that the Complainant has sufficient rights in that mark to satisfy the requirements of Policy paragraph 4(a)(i). See, *Apple Computer, Inc. v. Omar Acosta Rivera*, WIPO Case No. D2006-1118; and *Apple Computer, Inc. v. Apple-Computers c/o Marcus Grey*, NAF Claim No. FA535416 ("Complainant has established in this proceeding that it has rights to the APPLE mark as evidenced by its registration with the USPTO.").

The Complainant contends that the disputed domain name, <aplle.com>, if not identical to the mark, APPLE, is at least confusingly similar to that mark. The Panel agrees with the Complainant that the only difference is the substitution of a second letter "l" for the second letter "p" in the mark – the addition of the obligatory gTLD, ".com" offering no meaningful distinction whatsoever. Thus, the Panel finds that similarity is undeniable. While the Respondent argues that such similarity should not be confusing to reasonable Internet users, the Panel is cognizant of the practice of "typo-squatting", by which cyber-squatters intend to lure Internet users to their websites by relying on the commission of minor typographical errors by some users. In this case, only one such error would send a reasonable Internet user – seeking the Complainant's heavily trafficked site – to the Respondent's wholly unrelated website. Thus, the similarity becomes confusing in the opinion of the Panel. See, *Amazon.com, Inc. v. Steven Newman a/k/a Jill Wasserstein a/k/a Pluto Newman*, WIPO Case No. D2006-0517 (finding that <amazoh.com>, among other disputed domain names, was confusingly similar to the mark AMAZON, while stating that "[t]he disputed domain names differ from the Complainant's mark only by the change of a single letter...a practice known as 'typosquatting'...Given the foregoing, the Panel finds that the disputed domain names and the Complainant's mark, when directly compared, are confusingly similar."); and *Red Bull GmbH. v. Grey Design*, WIPO Case No. D2001-1035 (ruling the disputed domain name, <redbul.com>, to be confusingly similar to the trademark, RED BULL, and writing that "[t]his is a typical case of 'typo-squatting' where the infringing domain name is one letter less than or different from the Complainant's mark. Such attempts have been disapproved of in various WIPO decisions.").

As reasoned above, the Panel finds that the Complainant has succeeded in proving that the disputed domain name is identical or confusingly similar to a trademark in which the Complainant has rights.

## B. Rights or Legitimate Interests

The Complainant asserts that it has given the Respondent no authorization to use the Complainant's trademark as part of a domain name. Furthermore, the Complainant has demonstrated to the Panel's satisfaction that the disputed domain name is confusingly similar to

that trademark. The Panel finds that the Complainant has made a *prima facie* case that the Respondent has no rights or legitimate interests in the disputed domain name. The Panel now looks to the Respondent for an affirmation of such rights or interests. See, *Citizens Financial Group, Inc. v. Ron Alvarado*, NAF Claim No. FA897530 ("Once Complainant makes a *prima facie* case under Policy [paragraph] 4(a)(ii), the burden shifts to Respondent to show that it does have rights or legitimate interests."); and *Croatia Airlines d.d. v. Modern Empire Internet Ltd.*, WIPO Case No. D2003-0455 ("The Panel notes that Complainant bears the 'general burden of proof' under paragraph 4(a)(ii) of the Policy, which burden shifts to the Respondent once Complainant makes a *prima facie* showing that the Respondent lacks rights or legitimate interests").

The Respondent's contention in support of its rights or legitimate interests in the disputed domain name is essentially that the Respondent has used the name for eight years – clearly before the current dispute arose – to display and/or advertise goods and services that are dissimilar to those marketed by the Complainant. The Panel views this contention as an attempt to satisfy paragraph 4(c)(i) of the Policy, which requires a claim that, before the instant dispute, the Respondent was using the disputed domain name "in connection with a *bona fide* offering of goods or services". Unfortunately for the Respondent, the Panel is not persuaded by the Respondent's contention.

The Respondent's contention would have been stronger if "aplle" was a common word and the products and/or services found at the Respondent's website corresponded directly to the meaning of that word. See, *National Trust for Historic Preservation v. Barry Preston*, WIPO Case No. D2005-0424; and *Private Media Group, Inc., Cinecraft Ltd. v. DHL Virtual Networks Inc.*, WIPO Case No. D2004-0843. But "aplle" is not a word, common or otherwise, and the products and services do not so correspond.

Instead, the Panel has chosen to rely on the Complainant's uncontested assertion that the Respondent's website found at the disputed domain name is used merely to link Internet users to third party websites, presumably for the Respondent's pecuniary benefit through application of pay-per-click fees. Use of a domain name that is confusingly similar to another party's famous trademark for such purposes has been held by many prior Policy panels to fall short of a *bona fide* offering of goods or services. The Panel is inclined to apply those holdings to this case. See, *CBS Broadcasting Inc. f/k/a CBS Inc. v. Goldmark*, WIPO Case No. D2004-0330 ("Respondent has not used the [disputed] domain name in connection with a *bona fide* offering of goods or services…Click-through links to other websites is not enough to show a *bona fide* offering…"); The *Association of Junior Leagues International Inc. v. This Domain Name My Be For Sale c/o Legend .name*, NAF Claim No. FA857581 ("Moreover, <jl.org> resolves to a commercial web directory displaying links to various content unrelated to Complainant. Respondent's use of the domain name for commercial gain, presumably by earning click-through fees for diverting Internet users seeking information on Complainant to other websites, is not a *bona fide* offering of goods or services under Policy [paragraph] 4(c)(i)…"); and *Eurochannel, Inc. (f/k/a Multithematiques, Inc.) v. Papete.com*, WIPO Case No. D2005-0318.

With respect to the other rationales listed in paragraph 4(c) that might support its assertion of rights or legitimate interests in the disputed domain name, the Respondent has not claimed to be

commonly known by that name and, as a consequence of the linkage fees noted above, has not claimed to be engaged in noncommercial or fair use of the name. Accordingly, the Panel concludes that the Respondent has failed to rebut the Complainant's *prima facie* case.

In line with the above, the Panel rules that the Complainant has shown that the Respondent has no rights or legitimate interests in the disputed domain name.

## C. Registered and Used in Bad Faith

As the Complainant is an internationally pre-eminent computer company, the Complainant's APPLE mark is one of the most well-known in the world. In the Panel's estimation, the Complainant has cited correctly previous UDRP decisions where panels have found bad faith registration and use of disputed domain names that are confusingly similar to marks of such stature when the entities involved in said registration and use are unconnected to the owners of those marks. See, for example, *Veuve Clicquot Ponsardin, Maison Fondée en 1772 v. The Polygenix Group Co.*, WIPO Case No. D2000-0163 ("'VEUVECLICQUOT.ORG' is so obviously connected with such a well-known product that its very use by someone with no connection with the product suggests opportunistic bad faith."); and *Chanel, Inc. v. Buybeauty.com*, WIPO Case No. D2000-1126 ("CHANEL is an immediately recognizable and famous mark that exclusively identifies Complainant...Given that Respondent has no connection with Complainant and has never been authorized by Complainant to use the CHANEL mark, the very fact that Respondent has registered [<buychanel.com>] establishes bad faith use and registration.").

Moreover, in this case, the Complainant has also presented the Panel with plenty of prior Policy cases in which the Respondent was found to have registered and used other domain names in bad faith, suggesting to the Panel that the Respondent is a serial cyber-squatter with no respect for the trademark rights of others. See, *Graco Children's Products Inc. v. Oakwood Services Inc.*, WIPO Case No. D2009-0813; *Ubisoft Entertainment S. A. v. Oakwood Services Inc. - N/A N/A*, NAF Claim No. FA1298869; *Cable New Network, Inc. f/k/a Cable News Network, LP, LLLP v. Oakwood Services Inc. - N/A N/A*, NAF Claim No. FA1331735; *Laufer Media, Inc. v. Oakwood Services Inc.*, WIPO Case No. D2009-1180; and *The Trustees of the British Museum, The British Museum Company Limited v. Oakwood Services Inc.*, WIPO Case No. D2007-1145.

Therefore, given the fame of the Complainant's mark together with the prior pattern of abusive domain name registration engaged in by the Respondent, the Panel finds that the disputed domain name was registered and is being used in bad faith.

## 7. Decision

For all the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the domain name <aplle.com> be transferred to the Complainant.

Dennis A. Foster
Sole Panelist
Date: December 28, 2010

# Exhibit A-6



# NATIONAL ARBITRATION FORUM

# DECISION

HBI Branded Apparel Enterprises, LLC and HBI Branded Apparel Limited, Inc. v. URDMC
LLC

Claim Number: FA1012001361369

## PARTIES

Complainant is **HBI Branded Apparel Enterprises, LLC** and **HBI Branded Apparel
Limited, Inc.** ("Complainant"), represented by **Melissa G. Ferrario** of **Womble Carlyle
Sandridge & Rice, PLLC**, North Carolina, USA.  Respondent is **URDMC LLC**
("Respondent"), Texas, USA.

### REGISTRAR AND DISPUTED DOMAIN NAME

The domain name at issue is **<legshanesbali.com>**, registered with **Fabulous.com Pty Ltd.**

## PANEL

The undersigned certifies that he or she has acted independently and impartially and to the best
of his or her knowledge has no known conflict in serving as Panelist in this proceeding.

John J. Upchurch as Panelist.

# PROCEDURAL HISTORY

Complainant submitted a Complaint to the National Arbitration Forum electronically on December 2, 2010; the National Arbitration Forum received payment on December 3, 2010.

On December 8, 2010, Fabulous.com Pty Ltd. confirmed by e-mail to the National Arbitration Forum that the **<legshanesbali.com>** domain name is registered with Fabulous.com Pty Ltd. and that Respondent is the current registrant of the name. Fabulous.com Pty Ltd. has verified that Respondent is bound by the Fabulous.com Pty Ltd. registration agreement and has thereby agreed to resolve domain disputes brought by third parties in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy (the "Policy").

On December 14, 2010, the Forum served the Complaint and all Annexes, including a Written Notice of the Complaint, setting a deadline of January 3, 2011 by which Respondent could file a Response to the Complaint, via e-mail to all entities and persons listed on Respondent's registration as technical, administrative, and billing contacts, and to postmaster@legshanesbali.com. Also on December 14, 2010, the Written Notice of the Complaint, notifying Respondent of the email addresses served and the deadline for a Response, was transmitted to Respondent via post and fax, to all entities and persons listed on Respondent's registration as technical, administrative and billing contacts.

Having received no response from Respondent, the National Arbitration Forum transmitted to the parties a Notification of Respondent Default.

On January 6, 2011, pursuant to Complainant's request to have the dispute decided by a single-member Panel, the National Arbitration Forum appointed John J. Upchurch as Panelist.

Having reviewed the communications records, the Administrative Panel (the "Panel") finds that the National Arbitration Forum has discharged its responsibility under Paragraph 2(a) of the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules") "to employ reasonably available means calculated to achieve actual notice to Respondent" through submission of Electronic and Written Notices, as defined in Rule 1 and Rule 2. Therefore, the Panel may issue

its decision based on the documents submitted and in accordance with the ICANN Policy, ICANN Rules, the National Arbitration Forum's Supplemental Rules and any rules and principles of law that the Panel deems applicable, without the benefit of any response from Respondent.

# RELIEF SOUGHT

Complainant requests that the domain name be transferred from Respondent to Complainant.

# PARTIES' CONTENTIONS

A.  Complainant makes the following assertions:

1.  Respondent's **<legshanesbali.com>** domain name is confusingly similar to Complainant's L'EGGS, BALI, and HANES marks.

2.  Respondent does not have any rights or legitimate interests in the **<legshanesbali.com>** domain name.

3.  Respondent registered and used the **<legshanesbali.com>** domain name in bad faith.

B.  Respondent failed to submit a Response in this proceeding.

# FINDINGS

Complainant owns multiple trademark registrations with the United States Patent and Trademark Office ("USPTO") for its L'EGGS (*e.g.*, Reg. No. 891,626 issued August 8, 1969), BALI (*e.g.*, Reg. No. 861,054 issued September 21, 1967), and HANES marks (*e.g.*, Reg. No. 847,649 issued November 28, 1914).  Complainant is engaged in the manufacture, distribution, and sale of men's, women's, and children's apparel.

Respondent registered the <legshanesbali.com> domain name on February 4, 2005.  Respondent uses the disputed domain name to host a website featuring hyperlinks to third-party competitors of Complainant.

# DISCUSSION

Paragraph 15(a) of the Rules instructs this Panel to "decide a complaint on the basis of the statements and documents submitted in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

In view of Respondent's failure to submit a response, the Panel shall decide this administrative proceeding on the basis of Complainant's undisputed representations pursuant to paragraphs 5(e), 14(a) and 15(a) of the Rules and draw such inferences it considers appropriate pursuant to paragraph 14(b) of the Rules.  The Panel is entitled to accept all reasonable allegations and inferences set forth in the Complaint as true unless the evidence is clearly contradictory.  *See Vertical Solutions Mgmt., Inc. v. webnet-marketing, inc.*, FA 95095 (Nat. Arb. Forum July 31, 2000) (holding that the respondent's failure to respond allows all reasonable inferences of fact in the allegations of the complaint to be deemed true); *see also Talk City, Inc. v. Robertson*, D2000-0009 (WIPO Feb. 29, 2000) ("In the absence of a response, it is appropriate to accept as true all allegations of the Complaint.").

Paragraph 4(a) of the Policy requires that Complainant must prove each of the following three elements to obtain an order that a domain name should be cancelled or transferred:

(1) the domain name registered by Respondent is identical or confusingly similar to a trademark or service mark in which Complainant has rights; and

(2) Respondent has no rights or legitimate interests in respect of the domain name; and

(3) the domain name has been registered and is being used in bad faith.

**Preliminary Issue: Cyberflying**

While Complainant makes allegations that Respondent is not the correctly named Respondent, which is a result of actions conducted by a third-party constituting cyberflying, the Panel determines that there is insufficient evidence of cyberflying. Therefore, the Panel chooses to proceed with this case involving Complainant and the named Respondent, URDMC LLC.

## Identical and/or Confusingly Similar

Complainant holds multiple trademark registrations with the USPTO for its L'EGGS (*e.g.*, Reg. No. 891,626 issued August 8, 1969), BALI (*e.g.*, Reg. No. 861,054 issued September 21, 1967), and HANES marks (*e.g.*, Reg. No. 847,649 issued November 28, 1914). The Panel finds that such trademark registrations are sufficient to establish rights for Complainant in the L'EGGS, BALI, and HANES marks under Policy ¶ 4(a)(i). *See Expedia, Inc. v. Tan*, FA 991075 (Nat. Arb. Forum June 29, 2007) ("As the [complainant's] mark is registered with the USPTO, [the] complainant has met the requirements of Policy ¶ 4(a)(i)."); *see also Miller Brewing Co. v. Miller Family*, FA 104177 (Nat. Arb. Forum Apr. 15, 2002) (finding that the complainant had established rights to the MILLER TIME mark through its federal trademark registrations).

Complainant contends that Respondent's **<legshanesbali.com>** domain name is confusingly similar to Complainant's L'EGGS, HANES, and BALI marks. The disputed domain name combines all three of Complainant's marks and simply removes the letter "g" and the apostrophe from Complainant's L'EGGS mark before adding the generic top-level domain ("gTLD") ".com." The Panel finds that these additions fail to sufficiently distinguish the disputed domain name from Complainant's mark. *See Nintendo of Am. Inc. v. Pokemon*, D2000-1230 (WIPO Nov. 23, 2000) (finding confusing similarity where respondent combined the complainant's POKEMON and PIKACHU marks to form the <pokemonpikachu.com> domain name); *see also Victoria's Secret v. Internet Inv. Firm Trust*, FA 94344 (Nat. Arb. Forum May 9, 2000) (finding the domain name <victoriasecret.com> to be confusingly similar to the complainant's trademark, VICTORIA'S SECRET); *see also Chi-Chi's, Inc. v. Rest. Commentary*, D2000-0321 (WIPO June 29, 2000) (finding the domain name <chichis.com> to be identical to the complainant's CHI-CHI'S mark, despite the omission of the apostrophe and hyphen from the mark); *see also Trip Network Inc. v. Alviera*, FA 914943 (Nat. Arb. Forum Mar. 27, 2007) (concluding that the affixation of a gTLD to a domain name is irrelevant to a Policy ¶ 4(a)(i) analysis). Consequently, the Panel concludes that Respondent's **<legshanesbali.com>** domain name is confusingly similar to Complainant's L'EGGS, HANES, and BALI marks under Policy ¶ 4(a)(i).

The Panel finds Policy ¶ 4(a)(ii) has been satisfied.

## Rights or Legitimate Interests

Complainant has alleged Respondent does not have rights or legitimate interests in the <legshanesbali.com> domain name. Once Complainant makes a *prima facie* case in support of its allegations, the burden shifts to Respondent to prove that it does have rights or legitimate interests pursuant to Policy ¶ 4(a)(ii). The Panel finds Complainant has made a sufficient *prima facie* case. Due to Respondent's failure to respond to the Complaint, the Panel may assume that Respondent does not have rights or legitimate interests in the disputed domain name. However, the Panel will examine the record to determine whether Respondent has rights or legitimate interests in the <legshanesbali.com> domain name under Policy ¶ 4(c). *See Swedish Match UK Ltd. v. Admin, Domain*, FA 873137 (Nat. Arb. Forum Feb. 13, 2007) (finding that once a *prima facie* case has been established by the complainant, the burden then shifts to the respondent to demonstrate its rights or legitimate interests in the disputed domain name pursuant to Policy ¶ 4(c)); *see also Vanguard Group, Inc. v. Collazo*, FA 349074 (Nat. Arb. Forum Dec. 1, 2004) (finding that because the respondent failed to submit a Response, "Complainant's submission has gone unopposed and its arguments undisputed. In the absence of a Response, the Panel accepts as true all reasonable allegations . . . unless clearly contradicted by the evidence.").

Complainant alleges that Respondent has no connection or affiliation with Complainant, and that Complainant has not consented to or licensed Respondent's use of Complainant's mark. The WHOIS information identifies "URDMC LLC" as the domain name registrant. The Panel fails to find any evidence presented by Respondent, or in the record, that would indicate that Respondent is commonly known by the <legshanesbali.com> domain name. Therefore, the Panel determines that Respondent is not commonly known by the <legshanesbali.com> domain name pursuant to Policy ¶ 4(c)(i). *See Braun Corp. v. Loney*, FA 699652 (Nat. Arb. Forum July 7, 2006) (concluding that the respondent was not commonly known by the disputed domain names where the WHOIS information, as well as all other information in the record, gave no indication that the respondent was commonly known by the disputed domain names, and the complainant had not authorized the respondent to register a domain name containing its registered mark); *see also M. Shanken Commc'ns v. WORLDTRAVELERSONLINE.COM*, FA 740335 (Nat. Arb. Forum Aug. 3, 2006) (finding that the respondent was not commonly known by the <cigaraficionada.com> domain name under Policy ¶ 4(c)(ii) based on the WHOIS information and other evidence in the record).

Respondent uses the <legshanesbali.com> domain name to resolve to a website that contains hyperlinks to third-parties that sell competing apparel products. Complainant alleges that Respondent commercially benefits from these hyperlinks by receiving click-through fees. The Panel finds that Respondent's use of the disputed domain name does not constitute a *bona fide* offering of goods or services under Policy ¶ 4(c)(i) or a legitimate noncommercial or fair use of the disputed domain name under Policy ¶ 4(c)(iii). *See Meyerson v. Speedy Web*, FA 960409

(Nat. Arb. Forum May 25, 2007) (finding that where a respondent has failed to offer any goods or services on its website other than links to a variety of third-party websites, it was not using a domain name in connection with a *bona fide* offering of goods or services under Policy ¶ 4(c)(i) or a legitimate noncommercial or fair use pursuant to Policy ¶ 4(c)(iii)); *see also Skyhawke Techns., LLC v. Tidewinds Group, Inc.*, FA 949608 (Nat. Arb. Forum May 18, 2007) ("Respondent is using the <skycaddy.com> domain name to display a list of hyperlinks, some of which advertise Complainant and its competitors' products. The Panel finds that this use of the disputed domain name does not constitute a *bona fide* offering of goods or services under Policy ¶ 4(c)(i), or a legitimate noncommercial or fair use under Policy ¶ 4(c)(iii).").

The Panel finds Policy ¶ 4(a)(ii) has been satisfied.

## Registration and Use in Bad Faith

Complainant contends that Respondent's use of the disputed domain name to host hyperlinks to Complainant's third-party competitors disrupts Complainant's business. The Panel agrees and determines that Respondent's use of the <legshanesbali.com> domain name constitutes bad faith registration and use under Policy ¶ 4(b)(iii). *See Tesco Pers. Fin. Ltd. v. Domain Mgmt. Servs.*, FA 877982 (Nat. Arb. Forum Feb. 13, 2007) (concluding that the use of a confusingly similar domain name to attract Internet users to a directory website containing commercial links to the websites of a complainant's competitors represents bad faith registration and use under Policy ¶ 4(b)(iii)); *see also Persohn v. Lim*, FA 874447 (Nat. Arb. Forum Feb. 19, 2007) (finding bad faith registration and use pursuant to Policy ¶ 4(b)(iii) where a respondent used the disputed domain name to operate a commercial search engine with links to the complainant's competitors).

Respondent profits from its use of the <legshanesbali.com> domain name through the receipt of click-through fees from the aforementioned hyperlinks. Internet users may become confused as to Complainant's affiliation with the disputed domain name. Respondent is attempting to profit from that confusion. The Panel concludes that Respondent's registration and use provide evidence of bad faith under Policy ¶ 4(b)(iv). *See Univ. of Houston Sys. v. Salvia Corp.*, FA 637920 (Nat. Arb. Forum Mar. 21, 2006) ("Respondent is using the disputed domain name to operate a website which features links to competing and non-competing commercial websites from which Respondent presumably receives referral fees. Such use for Respondent's own commercial gain is evidence of bad faith registration and use pursuant to Policy ¶ 4(b)(iv)."); *see also Zee TV USA, Inc. v. Siddiqi*, FA 721969 (Nat. Arb. Forum July 18, 2006) (finding that the respondent engaged in bad faith registration and use by using a domain name that was

confusingly similar to the complainant's mark to offer links to third-party websites that offered services similar to those offered by the complainant).

The Panel finds Policy ¶ 4(a)(iii) has been satisfied.

# DECISION

Having established all three elements required under the ICANN Policy, the Panel concludes that relief shall be **GRANTED**.

Accordingly, it is Ordered that the **<legshanesbali.com>** domain name be **TRANSFERRED** from Respondent to Complainant.

John J. Upchurch, Panelist

Dated:  January 18, 2010

# Exhibit A-7

Skip to main content

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Johnson & Johnson, Korres S.A. v. Texas International Property Associates

## Case No. D2010-1996

### 1. The Parties

The Complainants are Johnson & Johnson of New Jersey, United States of America; and Korres S.A. of Athens, Greece represented by Fross Zelnick Lehrman & Zissu, PC, United States of America.

The Respondent is Texas International Property Associates of Dallas, Texas, United States of America.

### 2. The Domain Name and Registrar

The disputed domain name <korresproducts.com> ("the Domain Name") is registered with Fabulous.com.

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on November 19, 2010. On November 22, 2010, the Center transmitted by email to Compana LLC a request for registrar verification in connection with the disputed domain name. On November 23, 2010, Fabulous.com. transmitted by email to the Center its verification response confirming that the Respondent is listed as the registrant and providing the contact details. On December 6, 2010, Fabulous.com sent an e-mail to the Center, explaining that it was now the registrar of the disputed domain name.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified the Respondent of the Complaint, and the proceedings commenced on November 24, 2010. In accordance with the Rules, paragraph 5(a), the due date for Response was December 14, 2010.

The Respondent did not submit any response. Accordingly, the Center notified the Respondent's default on December 15, 2010.

The Center appointed Dawn Osborne as the sole panelist in this matter on January 5, 2011. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

## 4. Factual Background

Complainants own trade mark registrations for KORRES or marks including KORRES around the world. All non United States of America ("US") registrations are owned by Korres SA and all registrations in the US are owned by Johnson and Johnson, the exclusive licensee and distributor in the US. Korres SA is a Greek company which was founded in Athens as a homeopathic pharmacy in 1996. The Domain Name was registered in 2006 and has been used to point to third party heath and beauty products not connected to the Complainants.

## 5. Parties' Contentions

### A. Complainant

The Complainant's submissions can be summarized as follows:

The Complainants are Korres SA ("Korres") and Johnson and Johnson. Korres is a Greek company founded in 1996 as a homeopathic pharmacy which offers over 400 natural and certified organic products, featuring a skin and hair range, a make up line as well as suncare products and herbal preparations which are sold at leading department stores around the world and at 26 standalone Korres Stores. Johnson and Johnson, the world's eighth largest pharmaceuticals company, is the exclusive licensee and distributor for the USA where the products have been available since 2004. Johnson and Johnson own all registrations and applications for the KORRES mark in the USA and Korres own the registrations and applications for KORRES for the rest of the world including the Community Trade Mark. The Complainants own and operate web sites at "www.korres.com" and "www.korresusa.com".

Respondent registered the Domain Name on 2006 after the Complainants' trade marks were registered in the US and Greece and the Complainants had established rights in the KORRES mark through extensive use around the world. The Domain Name is confusingly similar to the Complainants' KORRES trade marks. The generic term "products" does nothing to distinguish the Domain Name from the Complainants' marks.

The Complainants have not authorised the Respondent to use or register the Domain Name. The Respondent is not commonly known by the Domain Name as has no legitimate right or interest in the Domain Name.

The Domain Name is being used to attract users looking for the Complainants in order to generate pay per click revenue as the page attached to the Domain Name contains links to

websites of other health and beauty companies not associated with the Complainant. Users may assume the Domain Name and the website associated with it are owned or approved by the Complainants. The only reason the Respondent could have for registering the Domain Name was that it knew of the Complainants' marks and wanted to trade on the Complainants' reknown to lure consumers to its web site. The Respondent is intentionally attempting to attract for commercial gain Internet users to a web site by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site.

The Respondent is a serial cybersquatter owning thousands of domain name registrations and has been found to have registered and used many domain names in bad faith under the UDRP in similar circumstances to this case.

### B. Respondent

The Respondent did not reply to the Complainant's contentions.

## 6. Discussion and Findings

According to paragraph 4(a) of the Policy, the Complainant must prove that:

The Domain Name is identical or confusingly similar to a trade mark or service mark in which the Complainant has rights; and

The Respondent has no rights or legitimate interests in respect of the domain name; and

The Domain Name has been registered and is being used in bad faith.

### A. Identical or Confusingly Similar

The Domain Name consists of the Complainants' KORRES registered mark and the generic word "products" which does not serve to distinguish the Domain Name from the Complainants' trade mark and the generic ".com" top level domain which is ignored for the purposes of the Policy. As such the Domain Name is confusingly similar to a trade mark in which the Complainants have rights for the purpose of the Policy.

### B. Rights or Legitimate Interests

The Respondent has not filed a Response, does not appear to have any trade marks associated with "korres", is not commonly known by this name and does not have any consent from the Complainants to use this name. Accordingly, the Panel finds that the Respondent does not have any rights or legitimate interests in the Domain Name.

### C. Registered and Used in Bad Faith

Paragraph 4(b) of the Rules sets out non-exclusive criteria which shall be evidence of the registration and use of a domain name in bad faith including circumstances where, by using the

domain name, the Respondent has intentionally attempted to attract, for commercial gain, Internet users to its web site or other on-line location, by creating a likelihood of confusion with the Complainant's mark as to the source, sponsorship, affiliation, or endorsement of its web site or location or of a product or service on its web site or location.

It does appear that the Respondent has attempted to attract and cause confusion amongst Internet users between the Complainants' marks and goods and the third party links on the site attached to the Domain Name for commercial gain.

It also appears that the Respondent has been found to have registered and used in bad faith several other Domain Names containing the trade marks of third parties under the UDRP.

Accordingly, the Panel finds that the Domain Name has been registered and used in bad faith.

## 7. Decision

For all the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the domain name <korresproducts.com> be transferred to the Complainant Johnson & Johnson.

Dawn Osborne
Sole Panelist
Dated: January 19,2011

# Exhibit A-8

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Eli Lilly and Company v. Texas International Property Associates

## Case No. D2010-1985

### 1. The Parties

Complainant is Eli Lilly and Company of Indianapolis, Indiana, United States of America, represented by Baker & Daniels, United States of America.

Respondent is Texas International Property Associates of Dallas, Texas, United States of America.

### 2. The Domain Name and Registrar

The disputed domain name <zigris.com> is registered with Fabulous.com.

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on November 19, 2010. On November 19, 2010, the Center transmitted by email to Compana LLC/Budgetnames.com a request for registrar verification in connection with the disputed domain name. On November 20 and 23, 2010, Compana LLC/Budgetnames.com transmitted by email to the Center its verification response confirming that the Respondent is listed as the registrant and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified Respondent of the Complaint, and the proceedings commenced on November 23, 2010. In accordance with the Rules, paragraph 5(a), the due date for Response was December 13, 2010. Respondent did not submit any response. Accordingly, the Center notified Respondent's default on December 14, 2010.

The Center appointed Timothy D. Casey as the sole panelist in this matter on January 24, 2011. The Panel finds that it was properly constituted. The Panel has submitted the Statement of

Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

On or about December 5, 2010, as a result of business issues with Compana LLC/Budgetnames.com, the Center became aware that the publicly available InterNic information, indicated that the domain name was now registered with Fabulous.com and was no longer registered with Compana LLC/Budgetnames.com. On December 6, 2010, Fabulous.com confirmed that it had become the Registrar of Record for the disputed domain name.[1]

## 4. Factual Background

Complainant has used the trademark XIGRIS since August 5, 1998 for a pharmaceutical preparation, namely, an antithrombotic agent, an anti-inflammatory agent, an anticoagulant agent, and a pro-fibrinolytic agent. The Xigris mark was registered with the United States Patent and Trademark Office on May 28, 2002, Reg. No. 2,574,061. In addition, Complainant owns 73 registrations for the Xigris mark covering more than 70 countries. The XIGRIS brand product was approved by the U.S. Food and Drug Administration (FDA) in November 2001. In the year 2005 alone, sales of the Xigris pharmaceutical preparation were USD 214.6 million dollars.

Complainant owns and has registered the domain name <xigris.com> through which users can obtain information as to the XIGRIS product sold by Complainant. The <xigris.com> domain name was created on May 9, 2001.

Based on the evidence submitted, Respondent does not seem to own any trademarks. The disputed domain name was registered on February 19, 2005. The disputed domain name resolves to a website including a number of web pages, with each of these web pages including a listing of links to third party commercial websites. Numerous domain name dispute complaints have been filed in the past against Respondent.

On or about January 27, 2011, the Center received a letter from an individual, Mr. Cox, notifying the Center of a pending United States District for the Northern District of Texas lawsuit styled *Netsphere v. Ondova*, Case Number 3:09-cv-0988 (the "Lawsuit"), that allegedly involved the "owner of the above-referenced domain name" along with a copy of a Receivership Order (the "Order") and a Stay ordered by the arbitrator in an unrelated NAF administrative proceeding (the "Stay"). According to Mr. Cox, the Order of the court stays all other persons and entities aside from the Receiver "from taking any action to establish or enforce any claim, right, or interest for, against, on behalf of, it, or in the name of, the Receivership Party, any of their partnerships, assets, documents, or the Receiver or the Receiver's duly authorized agents acting in their capacities as such, including, but not limited to, the following actions: 1. Commencing, prosecuting, continuing, entering, or enforcing any suit or proceeding, except that such actions may be filed to toll any applicable statute of limitations."

On or about January 28, 2011, the Center received further correspondence from Mr. Cox providing a copy of an Order Granting the Receiver's Motion to Clarify the Receiver Order in the above Lawsuit (the "Clarifying Order").

On or about January 29, 2011, in response to the Center's request that Mr. Cox identify himself and his relationship to the Parties, the Center received an email from Mr. Cox identifying himself as an attorney representing the "owners of the domains at issue" and including an attached copy of a Notice of Appearance in the Lawsuit by Mr. Cox, representing Quantec, LLC and Novo Point, LLC.

On or about February 1, 2011, the Center received an email from Complainant's attorney, indicating that neither the Lawsuit, the Order, the Stay nor the Clarifying Order made any reference to Respondent herein, and indicating that Complainant's counsel had attempted to contact Mr. Cox requesting clarification of his relationship with Respondent, to which there has been no reply.

## 5. Parties' Contentions

### A. Complainant

Complainant contends that the XIGRIS mark is an invented word that has a high degree of individuality, inherent distinctiveness, and no common colloquial use. Complainant contends that a domain name which differs slightly from a trademark has a greater tendency to be confusingly similar where that trademark is highly distinctive. Complainant further contends that the term "zigris" is substantially similar to the mark "XIGRIS" in its visual representation. Complainant lastly contends that the removal of the letter "x" and the addition of the letter "z" is nearly a phonetic equivalent for the letter "x".

Complainant contends that the act of typo-squatting a domain name depends upon consumer confusion or mistake, such that consumers who are not sure how to spell a name or make common typing or spelling errors will mistakenly enter the domain name instead of the mark. Complainant contends that in the present case the term "zigris" is arguably a common misspelling of the XIGRIS mark, particularly because the letters "z" and "x" are located next to each other on a standard keyboard.

Complainant contends that the website at the disputed domain name is a page providing several links to commercial websites, including websites that advertise and sell products that allegedly compete with a number of Complainant's products. Complainant argues that by linking consumers to the sponsored listing websites, Respondent is likely recognizing a financial gain, by likely receiving a payment each time it links a consumer to one of the third-party commercial websites or by using the disputed domain name in connection with a pay-per-click link website. Complainant has not given Respondent permission, authorization, consent or license to use its XIGRIS mark. Complainant contends that the XIGRIS mark is well-known due to the extensive marketing and advertisement of Xigris pharmaceutical product. Complainant lastly contends that the disputed domain name resolves to a website enabling Respondent to cash in on the strength of the XIGRIS mark and the reputation of the product with which the mark is associated.

As indicated in the factual background, Complainant contends that Respondent has a history of engaging in abusive domain name registrations. In addition, Complainant contends previous

panels have found the domain names registered by Respondent to have been registered and used in bad faith.

Complainant contends that Respondent's use of a confusingly similar variation of the XIGRIS mark in the disputed domain name is potentially harmful to the health of unsuspecting consumers, who may purchase unlawfully-sold pharmaceutical products advertised through Respondent's website under the mistaken impression that they are dealing with Complainant. The XIGRIS product is only available on a physician's prescription and is manufactured, labeled, and sold in strict compliance with the FDA and other health authority laws and regulations.

Complainant requests that the disputed domain name be transferred to Complainant.

**B. Respondent**

Respondent is in default and did not reply to Complainant's contentions.

## 6. Discussion and Findings

Before addressing the Panel's findings under paragraph 4(a) of the Policy, the Panel will address the relevancy and/or effect of the Lawsuit. As correctly noted by Complainant's counsel, the Lawsuit does not list Respondent, Texas International Property Associates, as a party to the Lawsuit nor does it provide any indication that any of the parties to the Lawsuit own or control Respondent. While Mr. Cox has stated that the disputed domain name is owned by the Receiver in the Lawsuit, there is no evidence in the document provided by Mr. Cox to support such a statement. For example, while the Stay does indicate that Texas International Property Associates is a respondent in an administrative proceeding before the NAF involving a different domain name than the disputed domain name, the Stay does not specify the pending federal litigation related to that administrative proceeding and provides no basis for connecting the respondent in that administrative proceeding with the present administrative proceeding. Further, Mr. Cox has not replied, or no reply was forwarded to the Center, to Complainant's alleged attempt to clarify the relationship between the parties to the Lawsuit and Respondent. Accordingly, the Panel finds the Lawsuit to be irrelevant to this administrative proceeding and that the Order is without effect. Even if Respondent was identified as a party in the Lawsuit and the disputed domain name was part of the estate in question, the Panel would still have questions about whether the administrative proceeding is subject to the jurisdiction of the court in that Lawsuit, but under the circumstances, there is no need to attempt to answer those questions.

In view of the default and the absence of any reply to the Complaint by Respondent, the discussion and findings will be based upon Complainant's contentions and any reasonable position that can be attributable to Respondent. Under paragraph 4(a) of the Policy, a complainant can only succeed in an administrative proceeding if the panel finds that:

(i) the domain name is identical or confusingly similar to a trademark or service mark in which complainant has rights; and

(ii) respondent has no rights or legitimate interests in the domain name; and

(iii) the domain name has been registered and is being used in bad faith.

All three elements must be present before Complainant can succeed in an administrative proceeding under the Policy.

## A. Identical or Confusingly Similar

As noted above, Complainant owns a registered trademark in the XIGRIS mark in over 70 countries. The XIGRIS mark was in use prior to registration of the disputed domain name. The fact that the disputed domain name has replaced the letter "x" with the letter "z" is of no merit, as the use of the letter "x" and "z" is phonetically equivalent in the English language when either letter is used as the first letter of a word. Specifically, the terms "Xigris" and "Zigris" in the English language are phonetically equivalent. The Panel also agrees with Complainant that due to the fact that the letters "Z" and "X" are located next to each other on a standard keyboard, combined with the phonetical equivalence of the letters "X" and "Z", the use of the term "Zigris" seems to be an attempt to confuse consumers who make common typing or spelling errors via typo-squatting. As a result, "Xigris" and "Zigris" are confusingly similar.

Also, the fact that Respondent's website includes specific references to "Sepsis," "Drug Xigris," "Xigris Therapy," and "Anticoagulation," indicate to the Panel that Respondent attempted to create a likelihood of confusion between the terms "Xigris" and "Zigris." Nothing in Respondent's website attempts to clarify this confusing similarity. Finally, the Panel agrees with Complainant that the XIGRIS mark is distinctive and has no meaning other than to function as the XIGRIS mark.

The Panel finds the disputed domain name to be confusingly similar to the XIGRIS mark and that this element of the Policy has been met by Complainant.

## B. Rights or Legitimate Interests

Respondent does not allege it has any rights or legitimate interests in the disputed domain name or any parts thereof. As indicated in the previous element of the Policy, the disputed domain name used by Respondent is confusingly similar to the XIGRIS mark. Respondent has not been authorized by Complainant to utilize the XIGRIS mark in the website associated with the disputed domain name. Respondent is not personally identified with, or commonly known by, the term "Xigris" in any fashion. The website associated with the disputed domain name appears to exist for the primary purpose of diverting legitimate consumers of Xigris to Respondent's website and consequently to divert such consumers to third-party commercial websites via the links provided in Respondent's website. Respondent's use is clearly commercial and does not appear to constitute any form of fair use.

The Panel finds that Respondent does not have any rights or legitimate interest in the disputed domain name and this element of the Policy to be met by Complainant.

## C. Registered and Used in Bad Faith

It is highly unlikely that Respondent was not aware of the XIGRIS mark, which has been in constructive use since 1998 and federally registered in the United States since 2002, prior to registering the disputed domain name. Respondent has used the disputed domain name for the bad faith purpose of driving commercial business to its website which presents users with a number of "sponsored listings," which subsequently redirect the user to third-party commercial websites. Based on the fact that Respondent's website includes these sponsored listings, the Panel agrees with Complainant that Respondent is likely deriving a financial benefit from posting the sponsored listings, either from the number of Internet users that visit Respondent's website or by the number of Internet users that are redirected from Respondent's website to one of the third-party commercial websites.

As indicated above, the disputed domain name is confusingly similar to the XIGRIS mark, with the disputed domain name creating confusion by using a domain name that is phonetically equivalent to the XIGRIS mark. The use of the XIGRIS mark throughout Respondent's website strengthens the association between the terms "Xigris" and "Zigris". Finally, the history of Respondent of registering domain names in bad faith reinforces the Panel's finding that, in the present case, Respondent registered and used the disputed domain name in bad faith. This element of the Policy has been met by Complainant.

## 7. Decision

For all the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the disputed domain name, <zigris.com>, be transferred to Complainant.

Timothy D. Casey
Sole Panelist
Dated: February 7, 2011

---

[1] During the course of its inquiry as to the change of registrars, it came to the Center's attention that Compana LLC was no longer an ICANN accredited registrar. The Center has received independent verification from Fabulous.com that it was acting as the concerned Registrar in this matter. Fabulous.com has confirmed that the registrant details for the disputed domain name have been restored to those previously confirmed by Compana LLC, and that the domain name will remain under registrar lock throughout the remainder of these proceedings.

# Exhibit A-9

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Amica Mutual Insurance Company v. Texas International Property Associates, URDMC LLC

## Case No. D2010-2144

### 1. The Parties

Complainant is Amica Mutual Insurance Company of Lincoln, Rhode Island, United States of America, represented by Scott & Bush Ltd., United States of America.

Respondent is Texas International Property Associates, URDMC LLC of Dallas, Texas, United States of America.

### 2. The Domain Name and Registrar

The disputed domain name <amicains.com> is registered with Fabulous.com.

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on December 10, 2010. On December 13, 2010, the Center transmitted by email to Fabulous.com a request for registrar verification in connection with the disputed domain name. On December 14, 2010, Fabulous.com transmitted by email to the Center its verification response disclosing registrant and contact information for the disputed domain name which differed from the named Respondent and contact information in the Complaint. In response to a notification by the Center that the Complaint was administratively deficient, Complainant filed an amended Complaint on December 27, 2010.

The Center verified that the Complaint together with the amended Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified Respondent of the Complaint, and the proceedings commenced on December 28, 2010. In accordance with the Rules, paragraph 5(a), the due date for Response was January 17, 2011. Respondent did not submit any response. Accordingly, the Center notified Respondent's default on January 18, 2011.

The Center appointed Timothy D. Casey as the sole panelist in this matter on January 24, 2011. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

## 4. Factual Background

Complainant began using the word mark AMICA in February 1911 in connection with the marketing and sale of insurance services and products. Complainant, in addition, owns the registration to three other AMICA trademarks, with the date of first use in commerce of these marks being 1911, September 1969, and January 2, 1998. Complainant services over 1.1 million insurance policies for customers throughout the United States. Finally, Complainant's customer service has been ranked "Highest in Customer Satisfaction Among National Homeowners Insurers" by J.D. Power and Associates for the past four years in a row in its National Homeowners Insurance Studies.

Based on the evidence submitted, Respondent does not seem to own the registration to any trademarks. The disputed domain name was created on January 4, 2005. The disputed domain name resolves to a website that lists links to the websites of various insurance companies. Numerous domain name dispute complaints have been filed in the past against Respondent. In a number of these cases, Respondent changed the spelling of a trademark or added a word or an abbreviation of a word to a trademark owned by another party.

On or about January 27, 2011, the Center received a letter from an individual, Mr. Cox, notifying the Center of a pending United States District for the Northern District of Texas lawsuit styled *Netsphere v. Ondova*, Case Number 3:09-cv-0988 (the "Lawsuit"), that allegedly involved the "owner of the above-referenced domain name" along with a copy of a Receivership Order (the "Order") and a Stay ordered by the arbitrator in an unrelated NAF administrative proceeding (the "Stay"). According to Mr. Cox, the Order of the court stays all other persons and entities aside from the Receiver "from taking any action to establish or enforce any claim, right, or interest for, against, on behalf of, it, or in the name of, the Receivership Party, any of their partnerships, assets, documents, or the Receiver or the Receiver's duly authorized agents acting in their capacities as such, including, but not limited to, the following actions: 1. Commencing, prosecuting, continuing, entering, or enforcing any suit or proceeding, except that such actions may be filed to toll any applicable statute of limitations."

On or about January 28, 2011, the Center received further correspondence from Mr. Cox providing a copy of an Order Granting the Receiver's Motion to Clarify the Receiver Order in the above Lawsuit (the "Clarifying Order").

On or about January 29, 2011, in response to the Center's request that Mr. Cox identify himself and his relationship to the Parties, the Center received an email from Mr. Cox identifying himself as an attorney representing the "owners of the domains at issue" and including an attached copy of a Notice of Appearance in the Lawsuit by Mr. Cox, representing Quantec, LLC and Novo Point, LLC.

On or about January 31, 2011, the Center received an email from Complainant's attorney, indicating that the current Registrant of the disputed domain name is "not listed, nor identified in, the documents Mr. Cox provided."

## 5. Parties' Contentions

### A. Complainant

As indicated above, Complainant has insured drivers of automobiles for nearly one hundred years. Complainant contends that it is the oldest mutual insurer of automobiles in the United States and currently services over 1.1 million insurance policies. Complainant has expended millions of dollars to advertise and promote the AMICA mark and its associated products and services. Complainant has developed considerable goodwill in its brand through promotion, advertising and quality of products and services. Complainant lastly contends that the AMICA marks are distinctive, have achieved fame, and embody substantial goodwill.

Complainant notified Respondent of its rights in the AMICA mark on October 12, 2010 and October 28, 2010, demanding that Respondent cease and desist from further use of the AMICA mark and transfer the disputed domain name to Complainant. Complainant contends that in both instances, the correspondences sent to Respondent were returned to the sender respectively as "address is incomplete/recipient no longer at address" and "forward time expired, return to sender." Complainant lastly contends that four days after the filing of the original Complaint by Complainant, Respondent modified the domain name registration, by changing the registrant's name and changing the registrar, in an effort to delay or derail these proceedings.

Complainant contends that the prominent component of the disputed domain name is the AMICA mark. Complainant contends that the addition of the letter string "ins" to the disputed domain name emphasizes the association between the AMICA mark and insurance products and services. Finally, Complainant contends that the website associated with the disputed domain name presents a list of links to various insurance websites that are direct competitors of Complainant.

Complainant contends that Respondent's registration and use of the disputed domain name is for the purpose of attracting intentionally, for commercial gain, Internet users to the website associated with the disputed domain name by creating a likelihood of confusion with the AMICA mark. Respondent's website contains the unauthorized use of the AMICA mark. Complainant further contends that Respondent pirates the goodwill associated with the AMICA mark in the disputed domain name to attract potential customers to its website, which presents potential customers which links to direct competitors of Complainant. Complainant lastly contends that Respondent is a recidivist typosquatter as evidenced by numerous domain name disputes filed against Respondent.

Complainant requests that the disputed domain name be transferred to Complainant.

### B. Respondent

Respondent is in default and did not reply to Complainant's contentions.

## 6. Discussion and Findings

Before addressing the Panel's findings under paragraph 4(a) of the Policy, the Panel will address the relevancy and/or effect of the Lawsuit. As correctly noted by Complainant's counsel, the Lawsuit does not list Respondent, Texas International Property Associates, URDMC LLC, as a party to the Lawsuit nor does it provide any indication that any of the parties to the Lawsuit own or control Respondent. While Mr. Cox has stated that the disputed domain name is owned by the Receiver in the Lawsuit, there is no evidence in the document provided by Mr. Cox to support such a statement. For example, while the Stay does indicate that Texas International Property Associates is Respondent in an administrative proceeding before the NAF involving a different domain name than the disputed domain name, the Stay does not specify the pending federal litigation related to that administrative proceeding and provides no basis for connecting respondent in that administrative proceeding with the present administrative proceeding. Accordingly, the Panel finds the Lawsuit to be irrelevant to this administrative proceeding and that the Order is without effect.

In view of the default and the absence of any reply to the Complaint by Respondent, the discussion and findings will be based upon Complainant's contentions and any reasonable position that can be attributable to Respondent. Under paragraph 4(a) of the Policy, a complainant can only succeed in an administrative proceeding under the Policy if the panel finds that:

(i) the domain name is identical or confusingly similar to a trademark or service mark in which complainant has rights; and

(ii) respondent has no rights or legitimate interests in the domain name; and

(iii) the domain name has been registered and is being used in bad faith.

All three elements must be present before Complainant can succeed in an administrative proceeding under the Policy.

### A. Identical or Confusingly Similar

As noted above, Complainant owns four registered trademarks for the AMICA marks. Each of the AMICA marks was in use in commerce prior to the creation of the disputed domain name. The disputed domain name contains the entire AMICA mark, plus "ins". The Panel agrees with Complainant that the use of the string "ins" reinforces the association that a consumer would make between the AMICA mark and the insurance services provided by Complainant, as a consumer would reasonably presume that the string "ins" is short for "insurance." The Amica name is distinctive and has no meaning other than to function as the AMICA mark.

The Panel finds the disputed domain name to be confusingly similar to the AMICA mark and this element of the Policy to be met by Complainant.

## B. Rights or Legitimate Interests

Respondent does not allege it has any rights or legitimate interests in the disputed domain name or any parts thereof. As noted above, the disputed domain name fully incorporates the AMICA mark, and the addition of the string "ins" is of no merit, and in fact reinforces the association between the disputed domain name and the AMICA mark. Respondent has not been authorized by Complainant to utilize the AMICA mark in the disputed domain name or in Respondent's website. In addition, Respondent is not personally identified with, or commonly known by, the term "Amica" in any fashion.

Respondent's website appears to exist for the primary purpose of diverting legitimate consumers of Complainant to Respondent's website, which presents the consumers with links to websites of direct competitors of Complainant, from which Respondent likely profits. Respondent's use is clearly commercial and does not appear to constitute any form of fair use.

The Panel finds that Respondent does not have any rights or legitimate interest in the disputed domain name and this element of the Policy to be met by Complainant.

## C. Registered and Used in Bad Faith

Considering Complainant's long commercial use of the AMICA mark, it is highly unlikely that Respondent was not aware of the AMICA mark at the time the disputed domain name was registered. As noted above, the AMICA mark has been in use since 1911, close to a century before the creation of the disputed domain name by Respondent. Even if it could be reasonably assumed that Respondent was not aware of the AMICA mark, the fact is that Respondent's website includes a listing of popular insurance companies, and the creation of Respondent's website would have reasonably led to the discovery by Respondent of the AMICA mark. Further, since Amica does not otherwise have any common meaning, it is hard to believe that Respondent just so happened to come up with the same name to associate with insurance services and products. Accordingly, Respondent's use is clearly in bad faith, which is best exemplified by the fact that the disputed domain name contains the AMICA mark in its entirety, yet the prominent and central listing of insurance companies on the home page of Respondent's website does not include a link to Complainant's website, but does include Complainant's direct competitors. Therefore, Respondent is clearly using the disputed domain name for the bad faith purpose of driving commercial business from Complainant to the websites of the direct competitors of Complainant.

The pattern of Respondent of registering domain names that are confusingly similar to trademarks owned by other parties, as evidenced by the domain name disputes previously filed against Respondent reinforces the view that Respondent registered the disputed domain name in bad faith.

The Panel notes Complainant's contentions of cyberflight. For the purposes of these proceedings, the Panel finds that the currently named Respondent is the appropriate Respondent. In this Panel's view the fact that Respondent modified the domain name registration, by changing the

registrant's name and changing the registrar, at the early stages of the proceedings, while noteworthy, is not, in this Panel's view, outcome determinative.

The Panel finds that Respondent registered and used the disputed domain name in bad faith. This element of the Policy has been met by Complainant.

## 7. Decision

For all the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the disputed domain name, <amicains.com> be transferred to Complainant.

Timothy D. Casey
Sole Panelist
Dated: February 7, 2011

# Exhibit A-10

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Ariens Company v. URDMC LLC

## Case No. D2010-2216

### 1. The Parties

Complainant is Ariens Company of Brillion, Wisconsin, United States of America, represented by Quarles & Brady LLP, United States of America.

Respondent is URDMC LLC of Dallas, Texas, United States of America.

### 2. The Domain Name and Registrar

The disputed domain name <gravelymowers.com> is registered with Fabulous.com.

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on December 16, 2010. On December 20, 2010, the Center transmitted by email to Fabulous.com a request for registrar verification in connection with the disputed domain name. On December 21, 2010, Fabulous.com transmitted by email to the Center its verification response disclosing registrant and contact information for the disputed domain name which differed from the named Respondent and contact information in the Complaint. The Center sent an email communication to Complainant on January 4, 2011 providing the registrant and contact information disclosed by the Registrar, and inviting Complainant to submit an amendment to the Complaint. In response to this invitation and a notification by the Center that the Complaint was administratively deficient, Complainant filed an amended Complaint on the same day, January 4, 2011.

The Center verified that the Complaint together with the amended Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified Respondent of the Complaint, and the proceedings commenced on January 6, 2011. In accordance with the Rules, paragraph 5(a), the due date for Response was January 26, 2011. Respondent did not submit any response. Accordingly, the Center notified Respondent's default on January 27, 2011.

The Center appointed Jeffrey D. Steinhardt as sole panelist in this matter on February 2, 2011. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

## 4. Factual Background

Complainant is owner of the GRAVELY trademark, United States Trademark Registration Number 2,376,777, used in association with lawn mowers among other things. The First Use of Complainant's GRAVELY trademark as noted by Complainant's United States trademark registration dates back to 1922. Complainant also owns and uses the domain name <gravely.com> which was registered in 1995, along with other registered trademarks containing the term "Gravely."

The disputed domain name was registered on November 28, 2004 and presently routes to a landing page displaying links to third-party websites promoting products of Complainant and products of Complainant's competitors.[1]

## 5. Parties' Contentions

### A. Complainant

Complainant alleges that "[i]n the last five years, Complainant has sold in excess of [USD] 450,000,000 dollars of outdoor power equipment, including tractors and lawn mower products, under its GRAVELY mark in North America alone . . . . "

Complainant details its trademark rights, but the Complaint's legal allegations respecting the first requirement under paragraph 4(a) of the Policy are limited to the statement that "[t]he domain name WWW.GRAVELYMOWERS.COM contains Complainant's valuable GRAVELY trademark."

In a brief manner, the Complaint also alleges that Respondent has no rights or legitimate interests in respect of the disputed domain name and that the disputed domain name was registered and is being used in bad faith.

Complainant's factual statements in support of the latter two elements of the Policy are limited, speculating that Respondent intended to confuse consumers and pointing out that the website to which the disputed domain name routes contains sponsored links to lawnmower and tractor products. The Complaint adds that "[u]pon information and belief, Respondent has registered the WWW.GRAVELYMOWERS.COM domain *primarily for the purpose of disrupting the business of* Complainant. By registering the domain name Respondent is not allowing Complainant to use the WWW.GRAVELYMOWERS.COM domain to advertise, promote and sell its products." [2]

On the basis of the above, Complainant requests transfer.

### B. Respondent

Respondent did not reply to Complainant's contentions.

## 6. Discussion and Findings

The Rules require the Panel to decide a complaint on the basis of the statements and documents submitted and in accordance with the Policy, the Rules and any rules and principles of law that it deems applicable. Rules, paragraph 15(a). Complainant must establish each element of paragraph 4(a) of the Policy, namely:

(i) the disputed domain name is identical or confusingly similar to a trademark or service mark in which Complainant has rights;

(ii) the respondent has no rights or legitimate interests in respect of the disputed domain name; and

(iii) the disputed domain name has been registered and is being used in bad faith.

Complainant must establish these elements even if the respondent does not reply. *The Vanguard Group, Inc. v. Lorna Kang*, WIPO Case No. D2002-1064. In the absence of a Response, the Panel may also accept as true the factual allegations in the Complaint. *E.g.*, *ThyssenKrupp USA, Inc. v. Richard Giardini*, WIPO Case No. D2001-1425 (citing *Talk City, Inc. v. Michael Robertson*, WIPO Case No. D2000-0009).

### A. Identical or Confusingly Similar

The Complaint states simply that the disputed domain name contains the GRAVELY trademark. As noted above, the UDRP requires, however, that the disputed domain name be identical or confusingly similar to a mark in which Complainant has rights. Policy, paragraph 4(a)(i). The Panel has considered this question and concludes that the disputed domain name is confusingly similar, as described below.

Panels disregard the domain name suffix in evaluating identity or confusing similarity. *E.g.*, *VAT Holding AG v. VAT.com*, WIPO Case No. D2000-0607; *Shangri-La International Hotel Management Limited v. NetIncome Ventures Inc.*, WIPO Case No. D2006-1315.

Removing the suffix, the disputed domain name wholly incorporates the GRAVELY trademark and adds a word descriptive of goods that have been associated with the trademark. The Panel concludes that the addition of the descriptive term "mowers" does not negate the confusion created by Respondent's complete inclusion of the GRAVELY trademark in the disputed domain name. *E.g.*, *Sanofi-aventis, Sanofi-Aventis Deutschland GmbH v. Andrey Mitrofanov*, WIPO Case No. D2007-1772; *Giata Gesellschaft für die Entwicklung und Vermarktung interaktiver Tourismusanwendungen mbH v. Keyword Marketing, Inc.*, WIPO Case No. D2006-1137; *Hoffmann-La Roche Inc. v. Aneko Bohner*, WIPO Case No. D2006-0629. In fact, given that Complainant's mark is associated with mowers, the Panel finds that the addition of the term "mowers" to Complainant's mark simply increases the confusion that Internet users would experience. *ACCOR, Société Anonyme à Directoire et Conseil de surveillance v. Tigertail*

*Partners*, WIPO Case No. D2002-0625 ("[c]onfusion is only heightened when the generic word added by Respondent is descriptive of the Complainant's goods or services marketed in relation to the trademark").

The Panel finds, therefore, that the disputed domain name is confusingly similar to Complainant's trademark and that the requirements of paragraph 4(a)(i) of the Policy therefore are fulfilled.

## B. Rights or Legitimate Interests

The Panel also concludes that Respondent has no rights or legitimate interests in the disputed domain name.

The Policy contains a non-exhaustive list of circumstances that may demonstrate when a respondent has rights or legitimate interests in a domain name. The list includes: (1) using the domain name in connection with a *bona fide* offering of goods and services; (2) being commonly known by the domain name; or (3) making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers. Policy, paragraphs 4(c)(i) – (iii).

A complainant must show a *prima facie* case that a respondent lacks rights or legitimate interests in a disputed domain name, after which the burden of rebuttal passes to the respondent. See, *e.g.*, *Croatia Airlines d.d. v. Modern Empire Internet Ltd.*, WIPO Case No. D2003-0455. The absence of rights or legitimate interests is established if a complainant makes out a *prima facie* case and the respondent enters no response. *Id.*, (citing *De Agostini S.p.A. v. Marco Cialone*, WIPO Case No. DTV2002-0005).

Respondent's website presently displays links to third-party websites promoting products including Complainant's products, as well as the products of others. By diverting traffic to third parties and their products, the Panel finds that Respondent is using Complainant's marks for its own commercial purposes. See, *e.g.*, *The Bear Stearns Companies Inc. v. Darryl Pope*, WIPO Case No. D2007-0593 ("[t]he Panel is free to infer that Respondent is likely receiving some pecuniary benefit . . . in consideration of directing traffic to that site" (citing *COMSAT Corporation v. Ronald Isaacs*, WIPO Case No. D2004-1082)). See also *Fat Face Holdings Ltd v. Belize Domain WHOIS Service Lt*, WIPO Case No. D2007-0626; *Sanofi-aventis v. Montanya ILtd*, WIPO Case No. D2006-1079.

In the absence of a response, the Panel accepts as true Complainant's allegations that Respondent has no authorization to use the GRAVELY mark in its domain name and that Respondent is not commonly known by the disputed domain name. Respondent is seeking to attract Internet users through Complainant's mark for Respondent's own commercial purposes.

The Panel therefore finds that Respondent's use of the disputed domain name demonstrates Respondent's lack of a legitimate noncommercial interest in, or fair use of, the disputed domain name. See, *e.g.*, *Pfizer Inc. v. jg a/k/a Josh Green*, WIPO Case No. D2004-0784. The Panel also

finds there is no *bona fide* offering of goods or services by Respondent and that the Complaint makes out a *prima facie* case.

Filing no response, Respondent has not rebutted Complainant's *prima facie* case or invoked any of the circumstances of paragraph 4(c) of the Policy to support the existence of its "rights or legitimate interests" in use of the disputed domain name.

Accordingly, the Panel concludes that paragraph 4(a)(ii) of the Policy is satisfied.

## C. Registered and Used in Bad Faith

The Panel finds that the third element of paragraph 4(a) of the Policy, bad faith registration and bad faith use, is also established by the record before it.

Using a domain name to intentionally attract Internet users, for commercial gain, by creating a likelihood of confusion, may be evidence of bad faith registration and use. Policy, paragraph 4(b)(iv). See, e.g., *L'Oréal, Biotherm, Lancôme Parfums et Beauté & Cie v. Unasi, Inc*, WIPO Case No. D2005-0623. Panels may draw inferences about bad faith registration or use in light of the circumstances, including the failure to reply to a complaint. *Telstra Corporation Limited v. Nuclear Marshmallows*, WIPO Case No. D2000-0003.

The Panel infers that the disputed domain name was registered with awareness of Complainant and its business for the following reasons: (1) the GRAVELY mark was registered in 1962 (with a first use in commerce in 1922), and (2) Complainant's website "www.gravely.com" promotes mowers and the domain name <gravely.com> was registered in 1995. The Panel's inference that registration of the disputed domain name was made with awareness of Complainant's rights is further supported by the content of Respondent's website, which includes commercial references to Complainant's products.[3]

The Panel finds therefore that the domain name registration was made with the intention of trading on the value of Complainant's trademark. The Panel concludes that Respondent deliberately attempted to attract Internet users to its website for commercial gain, by creating a likelihood of confusion with Complainant's mark. Under the circumstances, this constitutes registration in bad faith for purposes of the Policy.

The Panel also concludes that the circumstances show bad faith use of the disputed domain name, as elaborated below.

Respondent's website shows that the disputed domain name is used not only to promote sales of Complainants' products, but also to promote the products of competitors. The Panel concludes that this activity evidences bad faith use by Respondent. *Pfizer Inc. v. jg a/k/a Josh Green, supra* (citing *Google, Inc. v. wwwgoogle.com and Jimmy Siavesh Behain*, WIPO Case No. D2000-1240; *Casio Keisanki Kabushiki Kaisha (Casio Computer Co., Ltd.) v. Jongchan Kim*, WIPO Case No. D2003-0400; *Downstream Technologies, LLC v. Bartels System GmbH*, WIPO Case No. D2003-0088). Respondent's decision to refrain from filing a response to the Complaint provides further support for the Panel's finding of bad faith.

The Panel therefore concludes that the disputed domain name was registered and is being used by Respondent in bad faith under paragraph 4(b)(iv) of the Policy.

## 7. Decision

For all the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the domain name <gravelymowers.com> be transferred to Complainant.

Jeffrey D. Steinhardt
Sole Panelist
Dated: February 7, 2011

---

[1] The Panel has undertaken limited research by visiting the website to which the disputed domain name routes, see WIPO Overview of WIPO Panel Views on Selected UDRP Questions, section 4.5.

[2] The Panel has added italics to signal language in the Complaint taken from paragraph 4(b)(iii) of the Policy. The Panel notes, however, that the quoted section of the Policy refers to "competitors," not "Complainants." There is no substantial development of this ground in the Complaint, nor does it appear that Complainant attempted before institution of these proceedings informally to contact Respondent to recover the disputed domain name. In light of the Panel's disposition of this proceeding on other grounds, it is unnecessary to consider further the allegations of disruption to Complainant's business or Respondent's alleged intention to prevent Complainant from using the disputed domain name to advertise, promote and sell its products.

[3] This inference is *not* based on the Complaint's summary assertion that GRAVELY is a "famous" mark; while it is certainly conceivable that this may be the case, the Complaint provides no proof to support that assertion.

# Exhibit A-11



**WIPO**

WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

**ARBITRATION
AND
MEDIATION CENTER**

# ADMINISTRATIVE PANEL DECISION
## Judah Smith v. Whois Privacy Services Pty. Ltd. / URDMC LLC
## Case No. D2011-0397

### 1. The Parties

The Complainant is Judah Smith of Kirkland, Washington, United States of America, represented by Stokes Lawrence, P.S., United States of America.

The Respondent is Whois Privacy Services Pty. Ltd. / URDMC LLC of Fortitude Valley, Queensland, Australia and Dallas, Texas, United States of America, respectively.

### 2. THE DOMAIN NAME AND REGISTRAR

The disputed domain name <judahsmith.com> ("the Domain Name") is registered with Fabulous.com ("the Registrar").

### 3. PROCEDURAL HISTORY

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on March 1, 2011. On March 2, 2011, the Center transmitted by email to the Registrar a request for registrar verification in connection with the Domain Name. On March 3 and March 4, 2011, the Registrar transmitted by email to the Center its verification response disclosing registrant and contact information for the Domain Name which differed from the named Respondent and contact information in the Complaint. The Center sent an email communication to the Complainant on March 4, 2011, providing the registrant and contact information disclosed by the Registrar, and inviting the Complainant to submit an amendment to the Complaint. The Complainant filed an Amended Complaint on March 8, 2011.

The Center verified that the Amended Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified the Respondent of the Complaint, and the proceedings commenced on March 9, 2011. In accordance with the Rules, paragraph 5(a), the due date for Response was March 29, 2011. No response was submitted. On March 30, 2011, the Center informed the parties that it would proceed to appoint the Panel.

The Center appointed W. Scott Blackmer as the sole panelist in this matter on April 1, 2011. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

The Registrar and the Center have both received correspondence from a third party concerning pending litigation in Texas and requesting the suspension or termination of the administrative proceeding, as discussed further below.

## 4. FACTUAL BACKGROUND

JUDAH SMITH, NOW 31, HAS BEEN PREACHING TO EVANGELICAL CHRISTIAN CONGREGATIONS SINCE CHILDHOOD.  SINCE 2009, MR. SMITH HAS SERVED AS LEAD PASTOR OF THE CITY CHURCH, A CHURCH FOUNDED BY HIS FATHER WENDELL SMITH AND ORGANIZED AS A WASHINGTON NON-PROFIT CORPORATION.  THE CITY CHURCH HAS OVER 6000 MEMBERS AND CONDUCTS SERVICES AT SEVERAL LOCATIONS IN THE GREATER SEATTLE AREA, AS DESCRIBED IN THE COMPLAINT AND ON THE CHURCH'S WEBSITE AT "WWW.THECITY.ORG".  AS A YOUTH MINISTER FOR THE AFFILIATED GENERATION CHURCH, MR. SMITH REACHED 4,000 - 20,000 YOUNG PEOPLE MONTHLY IN THE PERIOD 2005 - 2009 THROUGH GENERATION CHURCH TV VIDEO PODCASTS DELIVERED ONLINE AND THROUGH THE APPLE ITUNES STORE.  HE HAS ALSO CULTIVATED A FOLLOWING OF TENS OF THOUSANDS OF FANS ON THE FACEBOOK AND TWITTER SOCIAL MEDIA NETWORKS.  MR. SMITH SPEAKS AT NATIONAL AND INTERNATIONAL RELIGIOUS CONFERENCES AND HAS WRITTEN THREE BOOKS.  ONE OF THESE, *DATING DELILAH: PURITY FROM A NEW PERSPECTIVE*, HAS SOLD NEARLY 15,000 COPIES SINCE IT WAS PUBLISHED IN 2007.

MR. SMITH HAS NOT OBTAINED A TRADEMARK REGISTRATION BASED ON HIS NAME.  IT DOES NOT APPEAR FROM THE COMPLAINT OR FROM A PERUSAL OF THE WEBSITE OPERATED BY THE CITY CHURCH THAT EITHER MR. SMITH OR THE CHURCH HAVE MADE A PRACTICE OF ASSERTING COMMON LAW TRADEMARK PROTECTION FOR THE NAME "JUDAH SMITH".

THE DOMAIN NAME WAS REGISTERED IN THE NAME OF THE FIRST RESPONDENT, A DOMAIN PRIVACY SERVICE, ON FEBRUARY 4, 2006.  FOLLOWING NOTICE OF THE COMPLAINT IN THIS PROCEEDING, THE REGISTRAR IDENTIFIED THE REGISTRANT AS THE SECOND RESPONDENT, URDMC LLC OF DALLAS, TEXAS, WHICH SHALL BE REFERRED TO HENCEFORTH IN THIS DECISION AS "THE RESPONDENT".  ACCORDING TO THE ONLINE DATABASE OF TAXABLE ENTITIES MAINTAINED BY THE TEXAS SECRETARY OF STATE, THE RESPONDENT IS REGISTERED AS A TEXAS LIMITED LIABILITY COMPANY, WITH THE SAME POSTAL ADDRESS SHOWN FOR THE DOMAIN NAME REGISTRATION.  MR. J. L. HARBIN, A CERTIFIED PUBLIC ACCOUNTANT AT THE SAME ADDRESS, IS LISTED AS THE REGISTERED AGENT OF THE COMPANY, BUT NO INFORMATION IS AVAILABLE ON THE STATE DATABASE CONCERNING THE COMPANY'S OFFICERS AND DIRECTORS.

THE RESPONDENT APPEARS TO BE A "DOMAINER", IN THE BUSINESS OF BUYING AND SELLING DOMAIN NAMES.  THESE ARE EVIDENTLY NOT, HOWEVER, LIMITED TO GENERIC WORDS AND PHRASES.  THE RESPONDENT WAS ORDERED TO TRANSFER DOMAIN NAMES IN THREE OTHER RECENT UDRP PROCEEDINGS WHERE THE DOMAIN NAMES APPEARED TO BE BASED ON DISTINCTIVE MARKS:  *AMICA MUTUAL INSURANCE COMPANY V. TEXAS INTERNATIONAL PROPERTY ASSOCIATES, URDMC LLC*, WIPO CASE NO. D2010-2144 (<AMICAINS.COM>);  *ARIENS COMPANY V. URDMC LLC*, WIPO CASE NO. D2010-2216 (<GRAVELYMOWERS.COM>);  AND *HBI BRANDED APPAREL ENTERPRISES, LLC AND HBI BRANDED APPAREL LIMITED, INC. V. URDMC LLC*, NAF CLAIM NO. FA1361369 (WHERE THE PANEL FOUND THAT THE DOMAIN NAME <LEGSHANESBALI.COM> TARGETED THE L'EGGS, HANES, AND BALI CLOTHING MARKS).

THE DOMAIN NAME RESOLVES TO AN ADVERTISING PORTAL HEADED, "WELCOME TO JUDAHSMITH.COM".  THERE IS A LINK NEAR THE TOP OF THE LANDING PAGE WITH THE

MESSAGE, "FOR INQUIRIES ON THIS DOMAIN, CLICK HERE", FOLLOWED BY "SPONSORED LISTINGS FOR PRAYER MINISTRY". THE TERM "SPONSORED LISTINGS" NORMALLY REFERS TO A PAY-PER-CLICK ("PPC") OR SIMILAR PAID ADVERTISING PROGRAM. THE FIRST LINK UNDER THIS HEADING ON THE WEBSITE ASSOCIATED WITH THE DOMAIN NAME RESOLVES TO THE WEBSITE OPERATED BY THE CHRISTIAN PRAYER CENTER, A "GROUP PRAYER NETWORK" HEADED BY PASTOR JOHN CARLSON IN SEATTLE, WASHINGTON. THE WEBSITE SOLICITS CASH DONATIONS FOR THE CHRISTIAN PRAYER CENTER AND ADVERTISES THE AVAILABILITY OF ITS SEATTLE-AREA CHURCH FOR SERVICES INCLUDING WEDDINGS AND FUNERALS. THAT WEBSITE ALSO INCLUDES AT LEAST ONE "ADS BY GOOGLE" LINK TO A COMMERCIAL WEBSITE THAT OFFERS "ONLINE PASTOR DEGREES" AND OTHER ONLINE DIPLOMA PROGRAMS. OTHER LINKS ON THE WEBSITE ASSOCIATED WITH THE DOMAIN NAME RESOLVE TO COMMERCIAL AS WELL AS NONCOMMERCIAL WEBSITES, MOST WITH A CHRISTIAN CONNECTION, SUCH AS CHRISTIAN BOOKSTORES AND "CHRISTIAN SINGLES" DATING WEBSITES. MANY OF THESE WEBSITES OFFER SOME FREE CONTENT OR SOCIAL NETWORKING CAPABILITIES BUT ALSO SELL CERTAIN GOODS OR SERVICES OR DISPLAY LINKS TO PURELY COMMERCIAL WEBSITES.

MR. SMITH'S FATHER-IN-LAW INQUIRED IN OCTOBER 2010 ABOUT PURCHASING THE DOMAIN NAME, USING THE CONTACT LINK ON THE WEBSITE ASSOCIATED WITH THE DOMAIN NAME. HE RECEIVED AN EMAIL IN RESPONSE FROM ONDOVA LIMITED COMPANY IN DALLAS (A MARKETING FIRM) SAYING THAT HIS INQUIRY WOULD BE FORWARDED TO "THE APPROPRIATE PARTIES" AND EXPLAINING, "THIS DOMAIN NAME IS PART OF A LARGE INVESTOR PORTFOLIO THAT IS IN THE PROCESS OF CHANGING RESISTRARS [SIC] AND MANAGEMENT." THE CORRESPONDENCE APPARENTLY DID NOT LEAD TO A CONCRETE OFFER, AND THIS PROCEEDING FOLLOWED.

## 5. PARTIES' CONTENTIONS

### A. Complainant

The Complainant argues that his name has acquired a secondary meaning as a mark and that the Domain Name is identical or confusingly similar to that mark.

The Complainant contends that the Respondent has no rights or legitimate interests in the Domain Name. The Complainant asserts that the Respondent registered and used the Domain Name in bad faith, in an attempt to profit from misleading Internet users to visit a PPC advertising website and ultimately to sell the Domain Name for an amount in excess of the Respondent's out-of pocket costs.

### B. Respondent

The Respondent did not reply to the Complainant's contentions.

## 6. DISCUSSION AND FINDINGS

Paragraph 4(a) of the Policy provides that, in order to divest a respondent of a domain name, a complainant must demonstrate each of the following:

(i)     the domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights;  and

(ii)    the respondent has no rights or legitimate interests in respect of the domain name;  and

(iii)   the domain name has been registered and is being used in bad faith.

Under paragraph 15(a) of the Rules:

"A Panel shall decide a complaint on the basis of the statements and documents submitted and in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

## A. Suspension or Termination

The Registrar and the Center have received communications from a Texas attorney named J.Cox concerning pending litigation in the United States District Court for the Northern District of Texas, Dallas Division and attaching two orders from that court. The proceeding has been variously styled *In re Ondava Limited Company* and *Netsphere, Inc., Manila Industries, Inc., and Munish Krishan v. Jeffrey Baron and Ondava Limited Company*, both shown as docket number Civ. No. 3:09-CV-0988. Mr. Cox did not identify his client or role in that proceeding. Mr. Cox furnished a copy of an Order Appointing Receiver for the assets of the debtor Ondava Limited Company and a subsequent order clarifying that order with respect to Novo Point, LLC and Quantec, LLC, two of the companies over which the appointed receiver was given exclusive control. Mr. Cox stated that Quantec, LLC is the registrant of the Domain Name, but that is not confirmed by the Registrar.

The Order Appointing Receiver, which was issued on November 24, 2010, includes the following provision:

> "The Court hereby enjoins any person from taking any action based upon any presently existing directive from any person other than the Receiver with regard to the affairs and business of the Receiving Parties, including but not limited to proceeding with the transfer of a portfolio of Internet domain names for which Ondava Limited Company ("Ondava") acted as registrar. Specifically, but without limitation, VeriSign Inc and the Internet Corporation for Assigned Names and Numbers ("ICANN"), and any other entity connected to the transfer of the Domain Names, shall immediately cease such efforts and terminate any movement of the Domain Names."

The Order does not specify the grounds for asserting jurisdiction over any and all non-parties with respect to the transfer of the (unidentified) domain names. In any event, the Respondent in the current UDRP administrative proceeding is not one of the "Receiving Parties" listed in the court's order, and the Domain Name in this proceeding is not identified as one of the assets under the control of the Receiver appointed by the court. Moreover, the court appears to be confused about the meaning of "registrar" in the domain name context. Ondava Limited Company is not an ICANN-accredited registrar (see "www.icann.org/en/registrars/accredited-list.html"). The Registrar of the Domain Name at issue in the current proceeding is Fabulous.com, an Australian company. In short, there is nothing in the text of the two orders or in the correspondence from Mr. Cox that establishes that the Domain Name at issue here is in fact the subject of pending litigation; therefore, there is no persuasive argument that the current administrative proceeding should be suspended or terminated in favor of the judicial proceeding. It is noteworthy that the UDRP panel in *Amica Mutual Insurance Company, supra,* reached the same conclusion following correspondence from Mr. Cox concerning the domain name at issue in that proceeding.

Paragraph 18(a) of the Rules ("Effect of Court Proceedings") provides as follows:

> "In the event of any legal proceedings initiated prior to or during an administrative proceeding in respect of a domain-name dispute that is the subject of the complaint, the Panel shall have the discretion to decide whether to suspend or terminate the administrative proceeding, or to proceed to a decision."

Thus, under the Rules, the Panel could exercise its discretion to continue to a decision on the merits even if the Domain Name were demonstrably implicated in pending litigation. In the Panel's view, that is the appropriate course of action here. The Complaint alleges that the current registrant of the Domain Name, the Respondent URDMC LLC, registered and used the Domain Name in bad faith, targeting the Complainant's mark. Nothing in the materials submitted by Mr. Cox indicates that those issues are likely to be addressed in the ongoing Texas litigation, even assuming the Domain Name is an asset subject to disposition in that proceeding. Thus, there is no compelling reason to defer to that proceeding in the

interests of judicial economy or to avoid imposing unnecessary burdens on the parties.

Accordingly, the Panel denies the third-party request to suspend or terminate this proceeding.

**B. Identical or Confusingly Similar**

The Domain Name is identical or confusingly similar to Mr. Smith's first and last name, disregarding the space between the two names (which cannot be included in a URL address in the Domain Name System for technical reasons) and the generic ".com" suffix.

The question arises, however, whether the personal name "Judah Smith", which has not been registered as a trademark, has acquired a secondary meaning associated with goods and services in commerce, subject to common law protection, thus giving Mr. Smith standing to pursue this UDRP Complaint. See WIPO Overview of WIPO Panel Views on Selected UDRP Questions, Second Edition (the "WIPO Overview"), sections 1.6 and 1.7 (and cases cited therein). It is not disputed that Mr. Smith earns income from his ministerial, speaking, and training services and from sales of his books and recordings. However, he acknowledges that he has never applied to register his personal name as a trademark, and there is no indication on the church's website that Mr. Smith or The City Church has previously claimed common law trademark protection for his name.

By contrast, The City Church has obtained United States trademark registrations for the mark THE CITY CHURCH in association with audio and video recordings, printed materials, entertainment services, charitable services, and church services including baptisms, communions, weddings, and funerals. The church owns at least two other registered United States trademarks used in association with activities in which Mr. Smith has been involved, GENERATIONCHURCH (a collective membership mark) and GENERATIONINTERNS (for educational and vocational training services). According to the "Terms of Use" page of its website, The City Church also has a pending trademark application for its design logo and claims common law trademark protection for at least four additional, unregistered word marks.

Nevertheless, it does appear from the available record that Mr. Smith's books, sermons, conference speaking and training services, video podcasts, audio CDs, video DVD recordings, and social media sites have effectively been branded or co-branded with his name, and not solely with the registered and unregistered marks owned by The City Church. Mr. Smith's audio and video podcasts are sold through the Apple iTunes Store, for example, under the title "The City Church with Judah Smith". As reflected in media articles and search engine results furnished with the Complaint, Mr. Smith's books, videos, and publicity for his speaking engagements prominently feature his name, with or without reference to The City Church.

The panel in *The Reverend Dr. Jerry Falwell and The Liberty Alliance v. Gary Cohn , Prolife.net, and God.info*, WIPO Case No. D2002-0184, concluded that the nationally famous minister and televangelist Dr. Jerry Falwell had not established common law trademark rights in his name. The panel noted that Dr. Falwell and his organization emphasized the noncommercial nature of his activities and failed to provide evidence of commercial marketing or advertising using his name.

The Complainant here is less reticent in referring to his well-advertised books, recordings, and speaking engagements. It appears from the record that some of these materials and activities are provided without charge, while others are clearly remunerative. The Complainant's church has obtained registered trademarks covering some of the same products and services, presumably on the ground that they have a commercial aspect and compete with goods and services offered by others. Like other authors, the Complainant seeks to associate his name with particular books and recordings that are sold in commerce, and he actively promotes his availability for speaking engagements and ministerial training sessions. See, e.g., *Sibyl Avery Jackson v. Jan Teluch*, WIPO Case No. D2002-1180 (a complainant who sold more than 5000 copies of her book and attracted media attention established sufficient "goodwill" in her name in literary circles to warrant the finding that her name was used as a common law mark).

Doubtless, the Complainant's activities have moral and religious objectives, but they also earn revenues and

represent the promotion of goods and services in commerce. His name has been associated with those goods and services in the minds of a substantial following over a period of several years. Mr. Smith has made out a *prima facie* case that his name would be protected as a mark under common law, and that the Domain Name is confusingly similar to such mark. The Panel concludes, therefore, that the first element of the Complaint has been established.

**C. Rights or Legitimate Interests**

It is undisputed that the Complainant has not authorized the Respondent to use his name as a domain name. The Policy, paragraph 4(c), lists nonexclusive circumstances under which a respondent could nevertheless demonstrate rights or legitimate interests in a domain name, including:

> "(i) before any notice to you of the dispute, your use of, or demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a bona fide offering of goods or services;  or
>
> (ii) you (as an individual, business, or other organization) have been commonly known by the domain name, even if you have acquired no trademark or service mark rights;  or
>
> (iii) you are making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue."

The PPC advertising website associated with the Domain Name is clearly commercial, and there is no indication on the website that the Respondent or its business has ever been known by the name "Judah Smith". The Panel considers that PPC advertising may constitute a legitimate commercial use of a domain name based, for example, on dictionary words, generic phrases, or geographic or personal names. In such cases, the key to establishing that the Domain Name is used "in connection with a *bona fide* offering of goods or services" is to determine whether the evidence points to the selection of the name for its generic value rather than for its potential to exploit a trademark. See the WIPO Overview, sections 2.2 and 2.6.

While the family name "Smith" is probably the most common in the English language, when combined with the relatively rare given name "Judah" the full name is distinctive. The Complainant has demonstrated that search engine queries using that name prominently produce results relating to the Complainant himself. Moreover, the content of the PPC website associated with the Domain Name is not devoted to any generic value of the name, such as information concerning genealogy or persons with the same name, but instead features organizations and businesses offering books, recordings, and religious and training services similar to those offered by the Complainant and in some respects competing with his products and services.

The Panel finds, accordingly, that the Domain Name was more probably selected for its trademark value than for the generic value of the name "Judah Smith". As such, the Respondent, which has not come forward in this proceeding, has no evident rights or legitimate interests in the Domain Name.

**D. Registered and Used in Bad Faith**

Paragraph 4(b) of the Policy gives a non-exhaustive list of circumstances indicative of bad faith:

> "(i) circumstances indicating that you have registered or you have acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant who is the owner of the trademark or service mark or to a competitor of that complainant, for valuable consideration in excess of your documented out-of-pocket costs directly related to the domain name;  or
>
> (ii) you have registered the domain name in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that you have engaged in a

pattern of such conduct;  or

(iii) you have registered the domain name primarily for the purpose of disrupting the business of a competitor;  or

(iv) by using the domain name, you have intentionally attempted to attract, for commercial gain, Internet users to your web site or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of your web site or location or of a product or service on your web site or location."

The Complainant refers to the website notice and email correspondence indicating that the Respondent was interested in selling the Domain Name, but there is no evidence that the Respondent approached the Complainant or stated a price in excess of reasonable out-of-pocket costs.

As noted above, however, the name "Judah Smith" is unusual, and the Complainant had attained a certain fame by 2006 which resulted in the name regularly drawing a large number of visitors to religious Internet websites, the Apple iTunes Store, and social media sites.  This would make the Domain Name potentially valuable for relevant PPC advertising.  On the available record, and in the absence of a reply from the Respondent, the Panel finds that there is no other plausible explanation for the Respondent's registration of the Domain Name and subsequent use of it for a PPC advertising website promoting relevant, and in many instances competing, goods and services.

The fact that this Respondent has also registered other distinctive marks as domain names, as discussed above, also suggests that the Respondent's choice of this Domain Name was an opportunistic attempt to exploit the recent fame of Mr. Smith's name.

Accordingly, the Panel finds that the Respondent more likely than not registered and used the Domain Name in bad faith, to mislead Internet users as to source or affiliation for commercial gain.

## 7. DECISION

For all the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the Domain Name <judahsmith.com> be transferred to the Complainant.

**W. Scott Blackmer**
Sole Panelist
Dated:  April 18, 2011

# Exhibit A-12



**WIPO**
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

ARBITRATION
AND
MEDIATION CENTER

## ADMINISTRATIVE PANEL DECISION

American Woodmark Corporation v. Whois Privacy Services Pty Ltd,
Texas International Properties Associates, URDMC LLC
Case No. D2011-0804

### 1. The Parties

Complainant is American Woodmark Corporation of Virginia, United States of America, represented by Gavin Law Offices, PLC, United States of America.

Respondent is Whois Privacy Services Pty Ltd of Queensland, Australia, Texas International Properties Associates of Dallas, Texas, URDMC LLC of Dallas, Texas.

### 2. The Domain Name and Registrar

The disputed domain name <americanwoodmarkcabinetry.com> (the "Domain Name") is registered with Fabulous.com.

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on May 6, 2011. On May 9, 2011, the Center transmitted by e-mail to Fabulous.com ( the "Registrar" ) a request for registrar verification in connection with the Domain Name. On May 10, 2011, the Registrar transmitted by e-mail to the Center its verification disclosing registrant and contact information for the Domain Name which differed from the named Respondent and contact information in the Complaint. The Center sent an e-mail communication to Complainant on May 16, 2011 providing the registrant and contact information disclosed by the Registrar, and inviting Complainant to submit an amendment to the Complaint. On May 19, 2011, Complainant filed an amendment to the Complaint.

The Center verified that the Complaint together with the amendment to the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified Respondent of the Complaint, and the proceedings commenced on May 25, 2011. In accordance with the Rules, paragraph 5(a), the due date for Response was June 14, 2011. Respondent did not submit any response.

page 2

Accordingly, the Center notified Respondent's default on June 16, 2011.

The Center appointed Robert A. Badgley as the sole panelist in this matter on June 23, 2011. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

On May 10, 2011, the Center received a "Notice of Receivership" and other materials from Attorney Joshua Cox. According to the materials, Texas International Property Associates ("TIPA") was a privacy service for a portfolio of domain names for which Quantec, LLC ("Quantec") is the registrant. Quantec is allegedly a "Receivership Party" in a proceeding pending in federal court in Texas, *In re Ondova Limited Company*. According to Attorney Cox, the Domain Name is subject to a receivership stay and he asked that the Center suspend this case. After some back-and-forth between the Center and Attorney Cox, the Center ultimately advised Attorney Cox by e-mail dated May 16, 2011 that "the determination of Respondent identity and related issues, and the effect, if any, of legal proceedings initiated prior to or during an administrative proceeding in respect of the instant domain-name dispute are properly a matter for the Administrative Panel, in its sole discretion."

The Panel has been provided with no evidence that actually links Respondent (under any of its names) in this proceeding with Quantec or Ondova. Accordingly, the Panel will proceed to apply the facts of this case to the three elements of the Policy and render a decision herein. In the event there is some link between Respondent and some entities purportedly subject to a stay, such entities, through Attorney Cox or otherwise, are free to take such action as is deemed necessary to protect their perceived interests.

Attorney Cox made a similar argument in connection with a prior case, *Amica Mutual Insurance Company v. Texas International Property Associates, URDMC LLC*, WIPO Case No. D2010-2144 (February 7, 2011). The panel in that case concluded that no evidence of a link between the domain name at issue there and the receiver in the lawsuit. It appears from the *Amica* decision that Attorney Cox made a similar presentation of assertions and documents to the Center in the instant case. Given that the panel in *Amica* had found Attorney Cox's presentation wanting several months ago, one might have expected Attorney Cox to "close the loop" and provide sufficient proof this time around.

## 4. Factual Background

Complainant has been a manufacturer and distributor of kitchen and bathroom cabinetry since 1980. It has operated under marks including the term AMERICAN WOODMARK since 1991, and has registered trademarks comprised of or including AMERICAN WOODMARK in connection with its cabinetry goods and services. Complainant's goods are offered for sale directly and through retail outlets such as Lowe's and Home Depot. Complainant has operated its main website at <americancabinetry.com> since 1996.

Respondent registered the Domain Name on February 19, 2005. The website to which the Domain Name resolves features the banner phrase "Welcome to americanwoodmarkcabinetry.com." The site provides hyperlinks under various rubrics, such as "American Woodmark Cabinetry," "Flamable Cabinets," "Custom kitchen cabinetry," and the like. It is alleged, and not disputed, that Respondent receives click-through revenue from these links, some of which send the Internet user to websites offering products and services in direct competition with Complainant.

Complainant has alleged, and provided evidence of, Respondent's registration of numerous domain names, and has noted that Respondent and its aliases have been held in bad faith under the Policy in several hundred prior cases. Respondent has not disputed these contentions.

**5. Parties' Contentions**

**A. Complainant**

Complainant's salient factual assertions are set forth above.  Complainant asserts that it has satisfied the three elements of the Policy and is entitled to a transfer of the Domain Name.

**B. Respondent**

Respondent did not reply to Complainant's contentions.

**6. Discussion and Findings**

Paragraph 4(a) of the Policy lists the three elements which Complainant must satisfy with respect to the Domain Name:

(i)     the Domain Name is identical or confusingly similar to a trademark or service mark in which Complainant has rights;  and

(ii)    Respondent has no rights or legitimate interests in respect of the Domain Name;  and

(iii)   the Domain Name has been registered and is being used in bad faith.

**A. Identical or Confusingly Similar**

The Panel finds that Complainant has rights in the mark AMERICAN WOODMARK, through registration and through use predating Respondent's registration of the Domain Name.  The addition of the descriptive word "cabinetry" to the mark in the Domain Name does not diminish the confusing similarity between the mark and the Domain Name.  If anything, the word "cabinetry" aggravates the confusion, since cabinetry is the core of Complainant's business.

Accordingly, the Panel finds that Policy paragraph 4(a)(i) is satisfied.

**B. Rights or Legitimate Interests**

Pursuant to paragraph 4(c) of the Policy, Respondent may establish its rights or legitimate interests in the Domain Name, among other circumstances, by showing any of the following elements:

(i)     before any notice to you [Respondent] of the dispute, your use of, or demonstrable preparations to use, the Domain Name or a name corresponding to the Domain Name in connection with a *bona fide* offering of goods or services;  or

(ii)    you [Respondent] (as an individual, business, or other organization) have been commonly known by the Domain Name, even if you have acquired no trademark or service mark rights;  or

(iii)   you [Respondent] are making a legitimate noncommercial or fair use of the Domain Name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue.

Complainant bears the burden of proof on the "rights or legitimate interests" issue (as it does for all three elements of the Policy).  *Louis de Bernieres v. Old Barn Studios Limited*, WIPO Case No. D2001-0122 (March 26, 2001).  Nevertheless, the panel in *PepsiCo, Inc. v. Amilcar Perez Lista d/b/a Cybersor*, WIPO Case No. D2003-0174 (Apr. 22, 2003), correctly observed: "A respondent is not obliged to participate in a domain name dispute proceeding, but its failure to do so can lead to an administrative panel accepting as

page 4

true the assertions of a complainant which are not unreasonable and leaves the respondent open to the legitimate inferences which flow from the information provided by a complainant."  As noted above, Respondent did not file a certified Response and hence did not effectively rebut any of Complainant's assertions.

There is no evidence that Respondent has ever been authorized to use Complainant's mark in a domain name or otherwise.  Likewise, there is no evidence that Respondent is commonly known by the Domain Name, or has made substantial preparations to use the Domain Name in connection with a *bona fide* offering of goods or services.

Accordingly, the Panel finds that Policy paragraph 4(a)(ii) is satisfied.

### C. Registered and Used in Bad Faith

Paragraph 4(b) of the Policy provides that the following circumstances, "in particular but without limitation," are evidence of the registration and use of the Domain Name in "bad faith" :

(i)  circumstances indicating that Respondent has registered or has acquired the Domain Name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to Complainant who is the owner of the trademark or service mark or to a competitor of that Complainant, for valuable consideration in excess of its documented out-of-pocket costs directly related to the Domain Name;  or

(ii)  that Respondent has registered the Domain Name in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that Respondent has engaged in a pattern of such conduct;  or

(iii)  that Respondent has registered the Domain Name primarily for the purpose of disrupting the business of a competitor;  or

(iv)  that by using the Domain Name, Respondent has intentionally attempted to attract, for commercial gain, Internet users to Respondent's website or other on-line location, by creating a likelihood of confusion with Complainant's mark as to the source, sponsorship, affiliation, or endorsement of Respondent's website or location or of a product or service on Respondent's website or location.

The Panel finds that Respondent is in "bad faith" under paragraphs 4(b)(ii) and 4(b)(iv) of the Policy.

As respects paragraph 4(b)(ii), the record contains ample evidence that Respondent is a serial cybersquatter.  The Panel finds that Respondent registered the Domain Name in order to prevent Complainant from reflecting its mark in the Domain Name, and that Respondent has engaged in a pattern of such conduct.

As respects paragraph 4(b)(iv), the Panel concludes that Respondent more likely than not had Complainant's AMERICAN WOODMARK mark in mind when registering the Domain Name.  This conclusion is reached because the Domain Name fully incorporates the AMERICAN WOODMARK mark and merely adds the word "cabinetry," which is as apt a single-word descriptor of Complainant's business as exists. Further, some of the offerings at the website to which the Domain Name resolves directly concern cabinetry and related offerings.  The commercial content at Respondent's website makes it reasonable to infer, particularly in the absence of any explanation or denial by Respondent, that Respondent has intentionally sought to attract, for commercial gain, Internet users to Respondent's site by creating a likelihood of confusion between the AMERICAN WOODMARK mark and the Domain Name.

Accordingly, the Panel finds that Policy paragraph 4(a)(iii) is satisfied.

page 5

**7. Decision**

For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the Domain Name <americanwoodmarkcabinetry.com> be transferred to Complainant.


**Robert A. Badgley**
Sole Panelist
Dated: June 28, 2011

# Exhibit A-13



**WIPO**

WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

ARBITRATION
AND
MEDIATION CENTER

*ADMINISTRATIVE PANEL DECISION*
**Eli Lilly and Company v. URDMC LLC**
**Case No. D2011-0715**

### 1. The Parties

Complainant is Eli Lilly and Company, Indianapolis, Indiana, United States of America, represented by Baker & Daniels, United States of America.

Respondent is URDMC LLC, Dallas, Texas, United States of America.

### 2. THE DOMAIN NAME AND REGISTRAR

The disputed domain name <lilycares.com> is registered with Fabulous.com.

### 3. PROCEDURAL HISTORY

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on April 22, 2011. On April 26, 2011, the Center transmitted by email to Fabulous.com a request for registrar verification in connection with the disputed domain name. On April 27, 2011, Fabulous.com transmitted by email to the Center its verification response confirming that the Respondent is listed as the registrant and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified Respondent of the Complaint, and the proceedings commenced on April 29, 2011. In accordance with the Rules, paragraph 5(a), the due date for Response was May 19, 2011. Respondent did not submit any response, but the Center received email correspondence referenced below from a third-party purporting to act on behalf of a receiver appointed to administer the affairs of Respondent, requesting that the administrative proceeding be stayed during pendency of the receivership.

The Center appointed Frederick M. Abbott as the sole panelist in this matter on June 8, 2011. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the

Rules, paragraph 7.

In response to an email communication with attached documents of May 4, 2011 from a Mr. Cox, not a named party to the dispute, referencing a lawsuit that had been filed in the United States District Court of the Northern District of Texas, the Center informed him that the Center's practice was not to engage in communication with third parties concerning ongoing UDRP disputes. Further, as he had not provided evidence of the relationship to Respondent on the matter, it would be a matter for the respective administrative panel in accordance with paragraph 18 of the UDRP Rules. The communications from Mr. Cox were included in the record of the proceedings transmitted to the Panel.

The Panel reviewed the documents transmitted by Mr. Cox and issued Administrative Procedural Order No. 1 on June 10, 2011, providing:

The Panel appointed in this matter is in receipt of correspondence and documents from Mr. Joshua Cox asserting he is an attorney retained by the Receiver (Jeffrey Baron) appointed in a federal district court proceeding, Netsphere v. Ondova, case no. 3:09-cv-0988, pending in the US District Court for the Northern District of Texas. The Receiver Order and Receiver Clarification Order concern, inter alia, the assets of Quantec, LLC. Mr. Cox has requested that this administrative proceeding be stayed during pendency of the receivership.

Mr. Cox asserts that Quantec, LLC is registrant-in-fact of the disputed domain name <lilycares.com>. In Mr. Cox's letter of March 11, 2011 to counsel for Complainant, Stephanie Gumm, he proposed that Complainant might be interested in purchasing the disputed domain name.

The correspondence from Mr. Cox does not include evidence supporting the asserted ownership by Quantec, LLC of registration of the disputed domain name. The correspondence from Mr. Cox does not include evidence of his appointment by the named Receiver.

Paragraph 18(a) of the Rules for Uniform Domain Name Dispute Resolution Policy accord to the Panel discretion to make a determination whether a proceeding should be suspended or terminated during the pendency of litigation involving a domain name dispute.

On the basis of the information so far provided by Mr. Cox, the Panel would not suspend this administrative proceeding. However, in order to clarify matters, the Panel invites Mr. Cox to submit satisfactory evidence of his appointment by the named Receiver in the aforesaid litigation, and satisfactory evidence that Quantec, LLC is current registrant of the disputed domain name. Mr. Cox shall transmit such evidence by email to the Center, which shall forward it to the Panel and Complainant. Mr. Cox has a period of five (5) calendar days from the date of transmittal of this Administrative Order to provide the information.

Following receipt of a responsive submission from Mr. Cox, Complainant shall have a period of five (5) calendar days to address whether, in its view, this administrative proceeding should be suspended or terminated. The Parties are reminded that direct communication with the Panel is not permitted.

The Panel issued Administrative Procedural Order No. 2 on June 21, 2011, providing:

Administrative Panel Procedural Order No. 1 was transmitted by the Center on June 10, 2011. That order provided Respondent and Mr. Joshua Cox five (5) calendar days from the date of transmittal to provide certain information. The Center has transmitted to the Panel an email dated June 21, 2011 received from Mr. Cox that attaches certain documents. Because the communication from Mr. Cox was not transmitted within the time period allotted by Administrative Panel Procedural Order No.1, the Panel does not accept this supplemental submission.

The Panel will transmit to the Center a determination in this proceeding within two weeks of the date of this order. Complainant is welcome to request the suspension or termination of this proceeding should it wish to do so.

The third-party alleging representing a receiver has failed to substantiate facts represented in his correspondence with the Center and Complainant. Without making any determination regarding the conclusions that might be drawn by the Panel had such facts been substantiated, the Panel does not take further account of correspondence from that third party in rendering its determination.

## 4. FACTUAL BACKGROUND

COMPLAINANT HAS REGISTERED THE WORD TRADEMARK LILLY ON THE PRINCIPAL REGISTER OF THE UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO), REGISTRATION NUMBER 1,226,434, DATED FEBRUARY 8, 1983, IN INTERNATIONAL CLASS (IC) 5, COVERING "MEDICINES, PHARMACEUTICAL PREPARATIONS AND DRUGS", CLAIMING DATE OF FIRST USE AND FIRST USE IN COMMERCE OF FEBRUARY 1, 1895, AND;  HAS REGISTERED THE WORD AND DESIGN TRADEMARK LILLY (CURSIVE SCRIPT WITHIN RECTANGULAR BOX), REGISTRATION NUMBER 1,318,867, DATED FEBRUARY 12, 1985 IN IC 5, COVERING "HOUSE MARK FOR A FULL LINE OF PHARMACEUTICAL PREPARATIONS", CLAIMING DATE OF FIRST USE AND FIRST USE IN COMMERCE OF FEBRUARY 1, 1895.  COMPLAINANT HAS SUBMITTED EVIDENCE OF REGISTRATION OF THE LILLY TRADEMARK IN A SUBSTANTIAL NUMBER OF COUNTRIES OTHER THAN THE UNITED STATES OF AMERICA.

COMPLAINANT IS A MAJOR ORIGINATOR PHARMACEUTICAL COMPANY BASED IN THE UNITED STATES OF AMERICA THAT DEVELOPS, MARKETS AND SELLS ITS PRODUCTS IN NUMEROUS COUNTRIES.  COMPLAINANT HAS BEEN IN BUSINESS IN THE UNITED STATES OF AMERICA SINCE THE LATE 1800S.  ALTHOUGH COMPLAINANT'S PHARMACEUTICAL PRODUCTS TYPICALLY ARE SOLD UNDER INDIVIDUAL TRADEMARK NAMES (*E.G.*, PROZAC, ZYPREXA AND CIALIS), THE PRODUCT PACKAGING AND PROMOTIONAL MATERIALS FOR SUCH PRODUCTS OFTEN INCLUDES THE LILLY TRADEMARK. BASED ON THE WIDE REGISTRATION AND GLOBAL USAGE OF THE LILLY TRADEMARK, THE VOLUME OF SALES OF COMPLAINANT'S PRODUCTS AND THE EXTENT OF ADVERTISING AND PROMOTION OF THE LILLY BRAND, IT IS REASONABLE TO CONCLUDE THAT THE LILLY TRADEMARK IS WELL-KNOWN AMONG PERSONS FAMILIAR WITH THE PHARMACEUTICAL INDUSTRY.

COMPLAINANT OPERATES A PATIENT ASSISTANCE PROGRAM IN THE UNITED STATES OF AMERICA INTENDED TO ENABLE ELIGIBLE INDIVIDUALS TO RECEIVE ITS MEDICATIONS FREE OF CHARGE.  THAT PROGRAM IS OPERATED BY THE LILLY CARES FOUNDATION, INC. AND IS REFERRED TO AS LILLY CARES.  ACCORDING TO COMPLAINANT, "[I]N 2008, THE LILLY CARES PROGRAM ASSISTED MORE THAN 142,000 PATIENTS AND DISTRIBUTED MEDICATIONS MANUFACTURED BY COMPLAINANT VALUED AT OVER $185 MILLION TO ELIGIBLE PATIENTS. COMPLAINANT HAS USED THE LILLY CARES NAME SINCE AT LEAST AS EARLY AS 2004.  AS OF THE DATE OF THIS ADMINISTRATIVE PROCEEDING, COMPLAINANT'S REGISTERED DOMAIN NAME <LILLYCARES.COM> REDIRECTS INTERNET USERS TO A WEBSITE HEADED "LILLY TRUASSIST" THAT PROVIDES INFORMATION CONCERNING A NUMBER OF COMPLAINANT'S ASSISTANCE PROGRAMS.[1]  NAVIGATING WITHIN THAT WEBSITE BRINGS INTERNET USERS TO AN INTERNAL WEBPAGE ON WHICH THE LILLY CARES PROGRAM IS DESCRIBED.  COMPLAINANT REGISTERED THE <LILLYCARES.COM> DOMAIN NAME ON JANUARY 7, 2002, AND CLAIMS TO HAVE OPERATED A WEBSITE ASSOCIATED WITH THAT DOMAIN NAME SINCE AS EARLY AS APRIL 2004.  AS OF THE DATE OF THIS ADMINISTRATIVE PROCEEDING, COMPLAINANT'S MAIN CORPORATE WEBSITE AT <LILLY.COM> REFERS TO THE LILLY FOUNDATION, BUT DOES NOT APPEAR TO REFER TO LILLY CARES DIRECTLY.[2]  COMPLAINANT HAS PROVIDED THREE EXAMPLES OF NEWS REPORTS THAT MAKE SOME REFERENCE TO THE LILLY CARES PROGRAM.

---

[1]    Panel visit of July 6, 2011.

[2]    Id.

ACCORDING TO THE FABULOUS.COM VERIFICATION REPORT, RESPONDENT IS REGISTRANT OF THE DISPUTED DOMAIN NAME. ACCORDING TO A FABULOUS.COM WHOIS REPORT GENERATED BY THE CENTER, THE RECORD OF REGISTRATION OF THE DISPUTED DOMAIN NAME WAS CREATED ON FEBRUARY 4, 2005.

RESPONDENT HAS USED THE DISPUTED DOMAIN NAME TO DIRECT INTERNET USERS TO A STANDARD FORMAT PAY-PER-CLICK LINK FARM PARKING PAGE.  THAT PARKING PAGE GENERATES LINKS TO COMPLAINANT'S LILLY CARES PROGRAM AND LILLY CARES FOUNDATION. IT ALSO GENERATES LINKS TO THIRD PARTIES INCLUDING FEE-BASED PRESCRIPTION MEDICINE SUPPORT PROGRAMS NOT ASSOCIATED WITH COMPLAINANT.  CLICKING THROUGH ON LILLY CARES ON RESPONDENT'S PARKING PAGE GENERATES ADDITIONAL LINKS, INCLUDING TO A PRESCRIPTION ASSISTANCE PROGRAM AT "WWW.MYRXADVOCATES.COM" WHICH OFFERS FEE-BASED THIRD-PARTY SERVICES FOR INDIVIDUALS SEEKING LOW-COST PHARMACEUTICALS. THE REGISTRATION AGREEMENT IN EFFECT BETWEEN RESPONDENT AND FABULOUS.COM SUBJECTS RESPONDENT TO DISPUTE SETTLEMENT UNDER THE POLICY.  THE POLICY REQUIRES THAT DOMAIN NAME REGISTRANTS SUBMIT TO A MANDATORY ADMINISTRATIVE PROCEEDING CONDUCTED BY AN APPROVED DISPUTE RESOLUTION SERVICE PROVIDER, OF WHICH THE CENTER IS ONE, REGARDING ALLEGATIONS OF ABUSIVE DOMAIN NAME REGISTRATION AND USE. (POLICY, PARAGRAPH 4(A)).

## 5. PARTIES' CONTENTIONS

## A. Complainant

Complainant alleges that it has rights in the trademarks LILLY and LILLY CARES based on use in commerce in the United States and other countries and, with respect to LILLY, as evidenced by registration at the USPTO.

Complainant contends that each of the LILLY and LILLY CARES trademarks is well-known.

Complainant argues that the disputed domain name is confusingly similar to its LILLY and LILLY CARES trademarks.

Complainant contends that Respondent lacks rights or legitimate interests in the disputed domain name because:  (1) Respondent is using the disputed domain name in connection with a pay-per-click parking page for commercial gain;  (2) Respondent's pay-per-click parking page is promoting products or services not associated with Complainant, and;  (3) Respondent has not been authorized to use Complainant's trademarks in the disputed domain name.

Complainant alleges that Respondent registered and has used the disputed domain name in bad faith because it is using Complainant's well-known trademarks for commercial gain to attract Internet users to its pay-per-click website by creating confusion as to Complainant as source, sponsor, affiliate or endorser of Respondent's website.  Moreover, Complainant argues that "typo-squatting" is recognized as a form of bad faith registration and use. Complainant finally argues that Respondent's website presents a risk to the health of Internet users who may mistakenly receive services other than from Complainant.

Complainant requests that the Panel direct the registrar to transfer the disputed domain name to Complainant.

## B. Respondent

Respondent did not reply to Complainant's contentions.

**6. DISCUSSION AND FINDINGS**

The Policy is addressed to resolving disputes concerning allegations of abusive domain name registration and use. The Panel will confine itself to making determinations necessary to resolve this administrative proceeding.

It is essential to Policy proceedings that fundamental due process requirements be met. Such requirements include that a respondent have notice of proceedings that may substantially affect its rights. The Policy and the Rules establish procedures intended to ensure that respondents are given adequate notice of proceedings commenced against them, and a reasonable opportunity to respond (see, *e.g.,* Rules, paragraph 2(a)).

The Center notified Respondent of the Complaint and commencement of the proceedings by means set forth in the Rules. There is no indication in the record of communications transmitted by the Center to the Panel that any difficulties were encountered in the notification process. The Panel is satisfied that Respondent received adequate notice of these proceedings and was afforded a reasonable opportunity to respond.

Paragraph 4(a) of the Policy sets forth three elements that must be established by a complainant to merit a finding that a respondent has engaged in abusive domain name registration and use, and to obtain relief. These elements are that:

(i)     respondent's domain name is identical or confusingly similar to a trademark or service mark in which complainant has rights; and

(ii)    respondent has no rights or legitimate interests in respect of the domain name; and

(iii)   respondent's domain name has been registered and is being used in bad faith.

Each of the aforesaid three elements must be proved by a complainant to warrant relief.

## A.    Identical or Confusingly Similar

Complainant has provided evidence of the registration of the trademark LILLY on the Principal Register of the USPTO and of use of that trademark in commerce in the United States of America and other countries. The Panel determines that Complainant has rights in the trademark LILLY.

Complainant has provided evidence sufficient to establish that the trademark LILLY is well-known among persons in the United States familiar with the pharmaceutical industry (see Factual Background, supra).

Complainant has provided evidence of use in commerce in the United States of the combination term LILLY CARES. Although Complainant has referred to a substantial number of participants in the LILLY CARES program and substantial dollar value of pharmaceutical products provided without charge under that program, the evidence provided concerning actual use of the term as a trademark or service mark is limited. At present, Internet reference to the Lilly Cares program is provided within a website denominated "TruAssist", and the Lilly Cares program as such is not referred to on Complainant's main corporate web page. Nonetheless, because Complainant's LILLY trademark is well-known and distinctive, and because LILLY CARES combines that well-known trademark with a term the public would reasonably associate with a corporate contribution program, the Panel considers that Complainant has established common law or unregistered trademark rights in the LILLY CARES combination in the United States. This is based on the strength of the dominant term "lilly". The Panel does not consider the combination LILLY CARES to be well-known.

The disputed domain name, <lilycares.com> represents a typographical variation on the LILLY and LILLY

CARES trademarks.  A single letter "l" is missing from the term LILLY in the disputed domain name. Although the term "lily" refers to a flower in the English language,[3] there is no common meaning associated with the combination "lily cares".  There is little room for the possibility that Respondent registered <lilycares.com> to refer to a flower evidencing empathetic characteristics.  The disputed domain name is nearly identical to Complainant's LILLY CARES trademark in visual impression and sound, and constitutes a likely Internet user misspelling of Complainant's trademark.  The Panel determines that the disputed domain name is confusingly similar to Complainant's LILLY CARES trademark within the meaning of the Policy.

Complainant has established that it has rights in the LILLY and LILLY CARES trademarks and that the disputed domain name is confusingly similar to the LILLY CARES trademark.


## B. Rights or Legitimate Interests

The second element of a claim of abusive domain name registration and use is that the respondent has no rights or legitimate interests in respect of the domain name (Policy, paragraph 4(a)(ii).  The Policy enumerates several ways in which a respondent may demonstrate rights or legitimate interests:

"Any of the following circumstances, in particular but without limitation, if found by the Panel to be proved based on its evaluation of all evidence presented, shall demonstrate your rights or legitimate interests to the domain name for purposes of paragraph 4(a)(ii):

(i)      before any notice to you of the dispute, your use of, or demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a *bona fide* offering of goods or services;  or

(ii)     you (as an individual, business, or other organization) have been commonly known by the domain name, even if you have acquired no trademark or service mark rights;  or

(iii)    you are making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue." (Policy, paragraph 4(c))

Complainant has argued that Respondent lacks rights or legitimate interests in the disputed domain name because Respondent has not made *bona fide* use of the disputed domain name prior to notice of the dispute, because Respondent has not made a legitimate noncommercial or fair use of the disputed domain name, and because Respondent has not been authorized by Complainant to use its trademark in the disputed domain name.  Complainant has made a *prima facie* showing that Respondent lacks rights or legitimate interests in the disputed domain name.

*Respondent's sole use of the disputed domain name has been in connection with a link farm parking page that advertises goods and services of Complainant and third parties, including goods and services of third parties that are competitive with those of Complainant.  Operating a link farm parking page using a trademark in a domain name, and providing connection to goods and/or services competitive with the trademark owner, does not establish rights or legitimate interests.  See, e.g., Development Credit Bank Limited v. Direct Privacy ID ED191, WIPO Case No. D2011-0786; Editorial Armonia, S.A, de C.V. v. Cagri Sadik Bayram, WIPO Case No. D2010-1963; Donald J. Trump v. Mediaking LLC d/b/a Mediaking Corporation and Aaftek Domain Corp., WIPO Case No. D2010-1404; VIVO S.A. and PORTELCOM PARTICIPAÇÕES S.A. v. Domains By Proxy - NA Proxy Account Niche Domain Proxy Manager, WIPO Case No. D2010-0925; Overstock.com, Inc. v. Metro Media, WIPO Case No. DME2009-0001; Fifth Third Bancorp v.Texas International Property Associates, WIPO Case No. D2007-0537; MasterCard International*

---

[3] See http://www.merriam-webster.com/dictionary/lily.

Incorporated v. Paul Barbell, *WIPO Case No. D2007-1139*, Shaw Industries Group, Inc., and Columbia Insurance Company v. Parth Shah, *WIPO Case No. D2007-1368, and* Alfa Laval AB and Alfa Laval Corporate AB v. Alfalava.com, *WIPO Case No. D2007-1881.*

Respondent has provided no justification for its registration and use of the disputed domain name that might establish rights or legitimate interests.

The Panel determines that Complainant has established that Respondent lacks rights or legitimate interests in the disputed domain name.

## C. Registered and Used in Bad Faith

Paragraph 4(b) of the Policy indicates that certain circumstances may, "in particular but without limitation", be evidence of the registration and use of a domain name in bad faith. These include that: "(iv) by using the domain name, [the respondent has] intentionally attempted to attract, for commercial gain, Internet users to [its] web site or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of [respondent's] web site or location or of a product or service on [respondent's] web site or location".

Respondent registered and has used a minor typographical variation of Complainant's LILLY and LILLY CARES trademarks in the disputed domain name to direct Internet users to a pay-per-click parking page that includes links to parties offering goods and services competitive with those of Complainant's patient assistance program. Although Complainant presumably does not operate its patient assistance program for a direct profit, the program likely promotes Complainant's corporate image and thereby serves a commercial purpose. Internet users entering a typographical variation of Complainant's trademarks in a web browser and expecting to be directed to its patient assistance program are instead directed to Respondent's pay-per-click parking page with links to third-party for-profit service providers and pharmaceutical vendors. Respondent has intentionally used Complainant's trademarks in the disputed domain name for commercial gain to create Internet user confusion regarding Complainant as source, sponsor, affiliate or endorser of Respondent's link farm website.

The Panel determines that Respondent registered and has used the disputed domain name in bad faith within the meaning of the Policy.

## 7. DECISION

For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the domain name, <lilycares.com>, be transferred to Complainant.

**Frederick M. Abbott**
Sole Panelist
Dated: July 6, 2011

# Exhibit A-14



**WIPO**
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

ARBITRATION
AND
MEDIATION CENTER

## ADMINISTRATIVE PANEL DECISION
I-TO-I International Projects Limited v. Quantec, LLC / Novo Point, LLC
Case No. D2011-1492

### 1. The Parties

The Complainant is I-TO-I International Projects Limited of Leeds, United Kingdom of Great Britain and Northern Ireland ("United Kingdom"), represented by SafeNames Ltd., United Kingdom.

The Respondents are Quantec, LLC / Novo Point, LLC (the "Respondents") of Dallas, United States of America ("US").

### 2. The Domain Name and Registrar

The disputed domain name <itoitravel.com> (the "Disputed Domain Name") is registered with Fabulous.com.

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") against Whois Privacy Services Pty Ltd on September 5, 2011. On September 6, 2011, the Center transmitted by email to Fabulous.com a request for registrar verification in connection with the Disputed Domain Name. On September 7, 2011, Fabulous.com transmitted by email to the Center its verification response disclosing registrant and contact information for the Disputed Domain Name which differed from the named Respondent and contact information in the Complaint. The Center sent an email communication to the Complainant on September 9, 2011 providing the registrant and contact information disclosed by the Registrar, and inviting the Complainant to submit an amendment to the Complaint. This email communication was copied to Ondova Limited, the administrative contact of the registrants, as disclosed by the Registrar. The Complainant filed an amended Complaint on September 12, 2011.

The Center verified that the Complaint together with the amended Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

On September 12, 2011, the Center received an email communication from an individual named Peter Loh, who identified himself as counsel to federal court appointed receiver Peter S. Vogel (the "Receiver"), and notified the Center that the Disputed Domain Name was subject to the jurisdiction of the Receiver, as they were part of the assets of the Respondents, who were now in liquidation. In the same email communication, Peter Loh introduced, amongst others, an individual named Joshua Cox as an attorney assisting the

Receiver, to whom such communication was copied.

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified the Respondents of the Complaint, and the proceedings commenced on September 13, 2011. In accordance with the Rules, paragraph 5(a), the due date for Response was October 3, 2011. The Respondents did not submit any Response. Accordingly, the Center notified the Respondents of their default on October 4, 2011. Although no formal Response was submitted, the Center did receive various communications from third parties not named as Respondents regarding the present dispute, principally from Joshua Cox (as detailed below under Respondents' contentions).

The Center appointed Gabriela Kennedy as the sole panelist in this matter on October 13, 2011. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

Following the Panel's review of the correspondence and documents received from Mr. Cox and other relevant parties, the Panel issued Administrative Panel Procedural Order No. 1 on October 26, 2011, in which the Panel raised a requisition for documentary evidence from the Respondents as follows:

> "In respect of the Respondents, the Panel requests submission of evidence:
>
> (a)    of the date(s) upon which Quantec, LLC and Novo Point, LLC became the registrants of the Disputed Domain Name; and
> (b)    that the Disputed Domain Name is within the scope of "Receivership Assets" for the purposes of the Receivership Order entered on November 24, 2010 by United States District Court Judge Royal Ferguson in the lawsuit styled In re Ondova Limited Company, Case No. 3; 09-cv-0988
>
> by no later than November 2, 2011."

Such Administrative Panel Procedural Order also invited supplemental submissions in response from the Complainant, to be submitted by November 9, 2011. The Center received supplemental submissions from Mr. Cox (on behalf of the Respondents) on November 3, 2011 and from the Complainant on November 9, 2011

## 4. Factual Background

The Complainant is an English company and subsidiary of TUI Travel PLC, incorporated in 1994, and is a provider of Teaching English as a Foreign Language (TEFL) / Teaching English to Speakers of Other Languages (TESOL) courses, which are offered to students in combination with opportunities for volunteer work abroad. The Complainant owns numerous trademark registrations for the I-TO-I mark around the world, including registrations in Canada dating from March 2004, Community Trademarks dating from May 2003, and registrations in the US dating from January 2005. The Complainant also registered various domain names incorporating I-TO-I as far back as 1996, including <i-to-i.com> and <i-to-i.co.uk>.

According to various court documents submitted by Mr. Cox (as discussed below in relation to submissions from Mr. Cox), the Respondents are companies incorporated in the US Virgin Islands and are amongst numerous other companies under the direct or indirect control of an individual named Jeffrey Baron and/or the company Ondova Limited Company, named as debtors in these documents.

The Disputed Domain Name was registered on December 31, 2005 or January 1, 2006 (depending on the relevant time zone). On the basis of the observations contained in the Complaint, it can be inferred that as at September 5, 2011 (the date of filing the Complaint), the Disputed Domain Name was active and resolved to a parking page featuring pay-per-click ("PPC") sponsored links. On September 20, 2011, the Center received another email communication from Peter Loh asserting, amongst other things, that the Receiver

had decided to deactivate the Disputed Domain Name in an effort to address the Complainant's concerns. On November 3, 2011, Mr. Cox confirmed in his supplemental submissions to the Center that such deactivation had been accomplished. As at the date of this decision, the Disputed Domain Name does not resolve to an active website.

### 5. Parties' Contentions

### A. Complainant

The Complainant's contentions can be summarised as follows:

(a)    The Disputed Domain Name is confusingly similar to the Complainant's I-TO-I mark:

  (i)    the Complainant is the sole proprietor of numerous trademark registrations for or incorporating I-TO-I, including in Europe, US, Canada and Australia. The Complainant also has common law rights in respect of the I-TO-I mark by virtue of its use of the mark for over 15 years;

  (ii)    the Complainant, its affiliates, subsidiaries and associated companies own domain names which incorporate the term "i-to-i", all of which were registered before the registration of the Disputed Domain Name;

  (iii)    the Disputed Domain Name can be said to be a derivative of the famous mark "I-TO-I", which it wholly incorporates, and the presence or absence of punctuation marks such as hyphens does not alter a finding of confusing similarity; and

  (iv)    the Respondents used the terms "itoi" and "travel" in the Disputed Domain Name, to cause confusion between the Disputed Domain Name and the Complainant's well-known mark as the word "travel" is not only a generic word but it is also descriptive of Complainant's business. The inclusion of the word "travel" in the Disputed Domain Name increases the likelihood of confusion between the Disputed Domain Name and the Complainant's I-TO-I trademark.

(b)    The Respondents do not have rights or legitimate interests in the Disputed Domain Name:

  (i)    the Disputed Domain Name was registered in 2006, 8 years after the Complainant created and developed their I-TO-I mark;

  (ii)    the Respondents have no registered trademarks for I-TO-I and as far as the Complainant is aware, the Complainant is the sole owner of the I-TO-I trademarks for products and services relating to travel;

  (iii)    before the notice of this dispute to the Respondents there was no use of, or demonstrable preparation to use, the Disputed Domain Name or a name corresponding to the Disputed Domain Name in connection with a *bona fide* offering of goods or services;

  (iv)    the Respondents attempted to increase the likelihood of confusion in the minds of Internet users directed to the PPC website by the addition of the word "travel" to ensure that users would be misled into believing the website is associated with the Complainant;

  (v)    the Disputed Domain Name was selected in order to take unfair advantage of and to trade on the fame of the Complainant's mark and such use does not establish rights or legitimate interests;

  (vi)    the Respondents have not been licensed or given permission by the Complainant to use any of its trademarks, or to incorporate any of those trademarks in a corresponding domain name;

  (vii)    the Respondents are acting solely as a conduit to third party goods and services, and are receiving click-through revenue by linking to such third party offers. The Respondents have registered the Disputed Domain Name in order to misleadingly divert consumers to their web page for commercial gain. Such use tarnishes the Complainant's trademarks as it creates a gateway between users who are more likely than not to be looking for the Complainant but instead are directed towards a website where the Complainant's competitors are advertised and where their services are freely available;

  (viii)    the Respondents are not making legitimate, noncommercial use of the Disputed Domain Name;

and

(ix)    the use of the Disputed Domain Name in connection with a PPC parking page does not constitute a *bona fide* offering of goods and services.

(c)    The Disputed Domain Name has been registered and is being used in bad faith:

(i)    the Respondents registered the Disputed Domain Name in order to prevent the owner of the trademark from reflecting the mark in a corresponding domain name, and the Respondents have engaged in a pattern of such conduct;

(ii)    the Respondents [sic.] have been involved in previous WIPO UDRP cases where they were found to have infringed upon the intellectual property rights of third parties (the Panel notes that the documentary evidence submitted in support of this contention relates to Texas International Property Associates ("TIPA"), the relevance of which entity the Complainant explains in its supplemental submissions, as set out below);

(iii)    the Respondents are no ordinary innocent Internet users but are professional domainers.  Thus the burden is on the Respondents to check that the domain names that they register do not infringe upon third party intellectual property rights.  An inference can be drawn from such conduct and is evidence that the Respondents were aware of the Complainant's trademark rights prior to registration of the Disputed Domain Name and intentionally registered the Disputed Domain Name in apparent bad faith;

(iv)    the Respondents have registered the Disputed Domain Name primarily for the purpose of disrupting the business of a competitor.  The Respondents are disrupting the Complainant's business as the Respondents are currently achieving financial gain through the click through links;

(v)    the Respondents are trading on the value of the Complainant's I-TO-I mark and are deriving an economic benefit from the use of the Disputed Domain Name, either by attracting Internet users to the website or other online location by creating a likelihood of confusion with the Complainant's mark as to the source, sponsorship, affiliation or endorsement of the website or location or a product or service on the website or location;

(vi)    the Respondents are responsible for all data on the web page to which the Disputed Domain Name resolves;

(vii)    an inference of bad faith can be drawn from the fact that the Respondents, when registering the Disputed Domain Name have used the privacy setting on the WhoIs details, thereby withholding their details;

(viii)    a simple cursory search of "itoi" on Yahoo or Google website would have revealed that it is a trademark and due to the Complainant's extensive use of the mark an inference can be drawn that at the time of registration the Respondents must have known of the Complainant's interest;

(ix)    the Respondents did not simply create the term "itoi" adding the descriptive term "travel" and then decide to register <itoitravel.com> creating a website which offers PPC links providing services of the Complainant and the Complainant's competitors without first having knowledge of the Complainant.  On the balance of probabilities, it can be inferred that the Respondents knew or should have known of the Complainant's trademark rights prior to the registration of the Disputed Domain Name;  and

(x)    the Complainant's trademark has a strong reputation and is widely known as is evidenced in its substantial use globally.

**B. Respondents**

The Respondents did not reply to the Complainant's contentions.

The fact that the Respondents have not submitted a Response does not automatically result in a decision in favour of the Complainant.  However, the failure of the Respondents to file a Response may result in the Panel drawing certain inferences from the Complainant's evidence.  The Panel may accept all reasonable and supported allegations and inferences following from the Complaint as true (see *Entertainment Shopping AG v. Nischal Soni, Sonik Technologies*, WIPO Case No. D2009-1437 and *Charles Jourdan Holding AG v.*

*AAIM*, WIPO Case No. D2000-0403).

Although no formal Response was submitted, submissions were made to the Center by the individual Joshua Cox on behalf of the Respondents, both before the Panel's issue of the Administrative Panel Procedural Order No. 1 ("Submissions from Mr. Cox") and thereafter ("Supplemental Submissions from Mr. Cox").

**Submissions from Mr. Cox**

On September 14, 2011, the Center received a letter from Mr. Cox notifying the Center of an ongoing US District Court for the Northern District of Texas lawsuit, *Netsphere v. Baron et al.*, Case No. 3; 09cv988, in which the Respondents were named as "Receivership Parties" and the Disputed Domain Name was alleged to be part of the "Receivership Assets". Copies of the relevant Order Appointing Receiver (dated November 24, 2010), Order Granting the Receiver's Motion to Clarify the Receiver's Order with Respect to Novo Point, LLC and Quantec, LLC (dated December 17, 2010) and Notice of Employment of Joshua Cox as Consultant to Receiver (dated December 29, 2010) (collectively the "Receivership Documents"), In respect of the US District Court for the Northern District of Texas Dallas Division lawsuit *Netsphere, Inc et al v. Jeffrey Baron and Ondova Limited Company / In re; Ondova Limited Company*, Case No. 3; 09-cv-0988[-F] (the "Lawsuit"), were also received by the Center. According to Mr. Cox, the Order Appointing Receiver mandated a stay of all actions against "Receivership Assets", including the Disputed Domain Name, during the pendency of the relevant receivership.

On October 6, 2011, the Center received a second letter from Mr. Cox in response to receipt of the Center's Notification of the Respondents' Default, In which Mr. Cox alleged that in accordance with the terms of the Order Appointing Receiver, the Center was prohibited from continuing any action with respect to the Disputed Domain Name during the pendency of the receivership, and requested that the Center suspend the present administrative proceedings. On October 6, 2011, the Center informed Mr. Cox through email communication of a panel's discretion to determine the effect of any court proceedings commenced prior to or in the course of any UDRP proceedings, under paragraph 18 of the Rules.

**C. Parties' Supplemental Submissions in Accordance with Administrative Panel Procedural Order No. 1**

**Supplemental Submissions from Mr. Cox**

The Supplemental Submissions from Mr. Cox reiterate the view that pursuant to the terms of the Order Appointing Receiver, the Center and the Complainant were prohibited from continuing to prosecute any action with respect to the Disputed Domain Name during the pendency of the receivership. Separately, Mr. Cox submitted that as an accommodation to the Center and the Complainant, the Receiver had authorised the deactivation of the Disputed Domain Name during the pendency of the receivership and confirmed that such deactivation had been accomplished.

The above submissions were accompanied by four enclosures. In addition to re-submitting two of the Receivership Documents, Mr. Cox also submitted two Whols history records for the Disputed Domain Name as of September 29, 2010 and September 12, 2011 respectively (discussed below under Receivership).

**Supplemental submissions from the Complainant**

The Complainant's supplemental contentions can be summarised as follows:

(a)     Issues pertaining to the registrant of the Disputed Domain Name:

(i)      the Whols history for the Disputed Domain Name provided by Joshua Cox (as a supplemental submission) provides that the Whols details were updated on September 6, 2011 to reflect the Respondents as the registrants of the Disputed Domain Name, which reflects a date subsequent to the filing of the Complaint on September 5, 2011. The Complainant asserts the

exact true details of the registrant is questionable and on a balance of probabilities most likely to be false;

(ii)   the registrant listed on the WhoIs details dating back to the registration date of the Disputed Domain Name is TIPA, prior to the use of WhoIs Privacy Services Pty Ltd.  It is more than probable that the registrant details were changed upon notice of the dispute to reflect Quantec, LLC / NOVO Point, LLC (the current information) where previously it reflected the registrant TIPA (the information prior to the privacy shield being lifted);

(iii)  it was held in prior WIPO UDRP cases (filed against TIPA) that there was no connection between TIPA and the Receivership Order and neither was there a connection between the Disputed Domain Name and the Receivership Order.  It is possible that the registrant details may have been altered at the time of receipt of the Complaint to reflect Quantec, LLC and Novo Point, LLC, Domain Admin;  Damon Nelson - Manager, so as not to encounter the same problem in this current dispute as was encountered by Joshua Cox in previous disputes. Joshua Cox has intervened in numerous cases involving TIPA;  and

(iv)  TIPA is a well-known habitual cybersquatter and its illegitimate and treacherous acts have been highly noted by panels in previous WIPO UDRP cases.

(b)   The Receivership Order is irrelevant to the present dispute:

(i)    the Disputed Domain Name is not a named asset in the Receivership Order, as decided by a prior WIPO UDRP panel given that the Receivership Order relates to a portfolio of Internet domain names for which Ondova Limited acted as registrar.  In the Receivership Order, movement and transfer of the domain names relate to domain names registered with Ondova Limited.  The Disputed Domain Name is registered with Fabulous.com and not Ondova Limited;

(ii)   the Receivership Order does not extend to the Disputed Domain Name licensed for use by Fabulous.com.  The relationship that exists in relation to the Disputed Domain Name is between Fabulous.com and the registrant, for which Ondova Limited has no relation.  The Respondents do not have any proprietary rights in the Disputed Domain Name and merely are granted a licence of use by Fabulous.com which was expressed in the registration agreement; and

(iii)  the UDRP Policy which is adopted by Fabulous.com is between the registrar and the registrant of the Disputed Domain Name <itoltravel.com>.  The Disputed Domain Name and the registrar Fabulous.com are not named in the receivership and therefore the jurisdiction of the court does not extend to either.

## 6. Discussion and Findings

### A. Receivership

Prior to discussing the Panel's findings under paragraph 4(a) of the Policy, the Panel will address the effect of the Lawsuit and the submissions from Mr. Cox (as mentioned under Procedural History).  The Panel notes that there are a number of domain name disputes decided by WIPO panels this year, in which the individual Joshua Cox has made submissions on behalf of the relevant respondents (which repeatedly involve the Texan entities URDMC LLC and/or TIPA) similar to those made in the present proceedings, including the submission of the Receivership Documents (in whole or in part) and assertions to the effect that the Disputed Domain Name in question constitute "Receivership Assets" and consequently cannot be transferred (see *Amica Mutual Insurance Company v. Texas International Property Associates, URDMC LLC*, WIPO Case No. D2010-2144;  *Eli Lilly and Company v. Texas International Property Associates*, WIPO Case No. D2010-1985;  *Judah Smith v. Whois Privacy Services Pty. Ltd. / URDMC LLC*, WIPO Case No. D2011-0397; *American Woodmark Corporation v. Whois Privacy Services Pty Ltd, Texas International Properties Associates, URDMC LLC*, WIPO Case No. D2011-0804;  and *Eli Lilly and Company v. URDMC LLC*, WIPO Case No. D2011-0715 (the "Previous Cases")).  In each instance, no formal response was submitted by the named respondent, the disputed domain name resolved to a parking page containing what appears to be sponsored links (including links to competitors of the relevant complainant) and in each instance, a decision

to transfer in favor of the relevant complainant was rendered.

Although the general facts of the present case are similar to the facts of such Previous Cases, an important distinguishing feature is that the Respondents are in fact named in the Order Appointing Receiver as "Receivership Parties" (whereas in the Previous Cases they were not). However, in line with the Previous Cases, the Panel found insufficient evidence to establish that the Disputed Domain Name comes within the scope of "Receivership Assets" or otherwise fell within the scope of the court Order, which merely makes reference to a "portfolio of internet domain names" belonging to a number of companies, including the Respondents, without providing a schedule or otherwise particularising the relevant domain names and/or whether they were registered in the name(s) of any of the Receivership Parties at the date of the court Order. As such, the Panel issued the Administrative Panel Procedural Order (mentioned above) in order to afford the Respondents the opportunity to provide supplemental submissions to redress this deficiency.

The Supplemental Submissions from Mr. Cox on behalf of the Respondents failed to satisfactorily answer the specific requisitions raised by the Panel. In addition to re-submitting two of the Receivership Documents, Mr. Cox submitted two Whols history records for the Disputed Domain Name, as of September 29, 2010 and September 12, 2011 respectively. The first purportedly shows that the Respondents registered the Disputed Domain Name on September 28, 2010 using a privacy service, but in fact, such record merely shows the Whols privacy service as the registrant as at September 28, 2010 and does not prove that the Respondents were the underlying registrants on this date. The second Whols record is likewise unsatisfactory, showing only that the Respondents were the registrants of the Disputed Domain Name as at September 12, 2011 (that is, after the Complaint was filed). As such, Mr. Cox (on behalf of the Respondents) has failed to prove that as at the date of the Order Appointing Receiver (November 24, 2010), the Disputed Domain Name came within the scope of "Receivership Assets" by virtue of being held in the name of "Receivership Parties", namely the Respondents. Further, no evidence has been forthcoming to prove that the Disputed Domain Name constitutes a part of the "portfolio of internet domain names" mentioned in the same Order.

It is therefore plausible, as argued by the Complainant, that the Respondents only became the registrants of the Disputed Domain Name on a date after November 24, 2010, such that it does not come within the scope of the relevant court Order. This argument is not without its merits given that; (i) a Whols record submitted by the Complainant as part of its supplemental submissions shows that TIPA (a frequent respondent in the Previous Cases) was the registrant of the Disputed Domain Name as at October 19, 2007; (ii) the Whols results indicate that a change was made to these results one day after the Complaint was filed in the present proceedings; and (iii) the individual Damon Nelson (identified as the Receiver's operations manager in Peter Loh's email communication to the Center, mentioned above) is named as the administrative contact in the latest Whols records for the Disputed Domain Name, which suggests that the Whols record was altered on or after the date of the Order Appointing Receiver. The Panel thus agrees with the Complainant in finding on balance that these cumulative facts indicate an attempt by the Respondents, or those acting on their behalf, to "close the loop" by creating a link between the "Receivership Assets" and the Disputed Domain Name as a lesson learned from the Previous Cases, in which such precise link was found wanting by the relevant panel, resulting in the transfer of the relevant domain name to the complainant in each case.

In light of the above and given that the Respondents' failure to prove that the Disputed Domain Name is a "Receivership Asset" arises despite being invited to do so by the Panel and despite Mr. Cox's extensive experience in such proceedings in the past year, and also given that access to and production of the requested documentary proof can reasonably be expected to be within the means of Mr. Cox, an attorney appointed as consultant to the Receiver specifically on domain name issues relating to the Respondents, the Panel finds that Mr. Cox has not provided sufficient evidence to substantiate his arguments in relation to the Lawsuit. The Panel shall therefore proceed to render its decision on this dispute, in exercise of its discretion to do so under paragraph 18(a) of the Rules.

Under paragraph 4(a) of the Policy, the burden of proof lies with the Complainant to show each of the following three elements:

(i)      the Disputed Domain Name is identical or confusingly similar to a trademark or service mark in which

the Complainant has rights;

(ii)     the Respondents have no rights or legitimate interests in respect of the Disputed Domain Name;  and

(iii)    the Disputed Domain Name has been registered and is being used by the Respondents in bad faith.

### B. Identical or Confusingly Similar

The Panel accepts that the Complainant has rights in respect of the I-TO-I trademark on the basis of the numerous trademark registrations owned by the Complainant for such marks, the earliest of which predates the registration of the Disputed Domain Name by 4 years.  The Panel further notes that the Complainant's rights in the "i-to-i" name and I-TO-I mark were accepted by the Panel in *i-to-i UK / i-to-i International Projects Limited v. Alan Thomas of the Alan and Miriam Thomas School of English and Cultural Exchange*, WIPO Case No. D2006-1087 on the basis of the Complainant's history of use of the "i-to-i" name in trade since at least 1996, and the present Panel accepts that the Complainant has the requisite rights on the same basis.

It is a well established rule that in making an enquiry as to whether a trademark is identical or confusingly similar to a domain name, the domain extension, in this case ".com", should be disregarded (*Rohde & Schwartz GmbH & Co. KG v Pertshire Marketing Ltd*, WIPO Case No. D2006-0762).

The Disputed Domain Name incorporates the I-TO-I mark in its entirety.  The only difference between the Disputed Domain Name and the Complainant's mark is the former's inclusion of the descriptive word "travel" as a suffix.  It is well established that in cases where the distinctive and prominent element of a disputed domain name is the complainant's mark and the only variation is the addition of a generic word, such variation does not negate the confusing similarity between the disputed domain name and the mark.  See *Oakley, Inc. v Joel Wong/Blue Host.com- INC*, WIPO Case No. 2010-0100;  *Diageo Ireland v. Guinessclaim*, WIPO Case No. D2009-0679;  and *The Coca-Cola Company v. Whois Privacy Service*, WIPO Case No. D2010-0088.  The Panel accordingly finds that "i-to-i" is the distinctive and prominent component of the Disputed Domain Name, such that the addition of the word "travel" does nothing to distinguish the Disputed Domain Name from the Complainant's I-TO-I mark.

The Panel further finds that given that the Complainant offers travel-related services under the I-TO-I mark, the "travel" component of the Disputed Domain Name, if anything, effects to increase the likelihood of confusion that the Disputed Domain Name is somehow associated with the Complainant (see *Harrods Limited v. Peter Pierre*, WIPO Case No. D2001-0456;  *Ansell Healthcare Products Inc. v. Australian Therapeutics Supplies Pty, Ltd*, WIPO Case No. D2001-0110;  and *Christie's Inc. v. Tiffany's Jewelry Auction Inc.*, WIPO Case No. D2001-0075, which support a finding that a domain name's incorporation as a suffix, of a word that describes the goods or services in respect of which the complainant's mark(s) are registered, increases the likelihood of confusion between such domain name and the complainant's mark(s)).

The Panel accordingly finds that "i-to-i" remains as the distinctive and prominent component of the Disputed Domain Name, which is confusingly similar to the Complainant's I-TO-I mark, such that paragraph 4(a)(i) of the Policy is satisfied.

### C. Rights or Legitimate Interests

Paragraph 2.1 of the WIPO Overview of WIPO Panel Views on Selected UDRP Questions Second Edition states that once a complainant makes a *prima facie* case in respect of the lack of rights or legitimate interests of the respondent, the respondent carries the burden of demonstrating it has rights or legitimate interests in the disputed domain name.  Where the respondent fails to do so, a complainant is deemed to have satisfied paragraph 4(a)(ii) of the Policy.

The Panel finds that there is no evidence to show that the Respondents have any rights in any trademarks or service marks which are identical, similar or related to the Disputed Domain Name.  Therefore, the Panel will assess the Respondents' rights in the Disputed Domain Name (or lack thereof) based on the Respondents' use of the Disputed Domain Name in accordance with the available record.

The Panel accepts that the Complainant has not authorised the Respondents to use the I-TO-I trademark and that there is otherwise no connection between the Complainant and the Respondents. The Panel further accepts that the Respondents have not become commonly known by the Disputed Domain Name and notes in this regard that the "i-to-i" name is not an ordinary word with a dictionary meaning and further, is not commonly used in conjunction with the word "travel."

At the time of this decision, the Disputed Domain Name does not resolve to an active website. An archived search for the Disputed Domain Name also failed to yield any results due to the existence of "robots.txt." However, a printout from the website to which the Disputed Domain Name resolved (the "Website") enclosed with the Complaint filed on September 5, 2011, shows that the Website contained numerous sponsored links to other websites involving travel-related services, including those of the Complainant. Although such Website printout is undated, the Panel finds it proper to infer that such printout accurately depicts the contents of the Website on or about September 5, 2011, considering the submissions contained in the Complaint regarding the Website contents, the absence of objections to the same from the Respondents or Mr. Cox, and considering the fact that the Disputed Domain Name and corresponding Website were not deactivated until at least September 20, 2011 (as mentioned above under Factual Background), which indicates that they were operational up until this point. Previous WIPO panels have found it proper to infer from the existence of such "link farms" that the relevant website operator collects financial remuneration for every sponsored link that is activated by Internet users, and such panels have established that such practice constitutes bad faith. The Panel concurs with such inferences, the drawing of which precludes a finding that any offering of services by the Respondents on the Website was *bona fide* (see *Madonna Ciccone p/k/a Madonna v Dan Parisi and "Madonna.com"*, WIPO Case No. D2000-0847; and *Viacom International, Inc., Paramount Pictures Corporation, and Blockbuster Inc. v TVdot.net, Inc. f/k/a Affinity Multimedia*, WIPO Case No. D2000-1253, which support such principle), and also precludes a finding that the Respondents' use of the Disputed Domain Name constitutes noncommercial or fair use.

The Panel accordingly finds that the Complainant has satisfied paragraph 4(a)(ii) of the Policy in respect of the Disputed Domain Name.

**D. Registered and Used in Bad Faith**

In the Complainant's supplemental submission (and supporting Whois history record), the Complainant asserts that the registrant of the Disputed Domain Name as at October 19, 2007 was TIPA. According to the other Whois records for the Disputed Domain Name submitted by both the Complainant and Mr. Cox, the Disputed Domain Name was subsequently registered under a privacy service (namely Whois Privacy Services Pty Ltd) as at September 29, 2010. The first record of the Respondents as the registrants of the Disputed Domain Name (as supplied by its registrar) is dated September 7, 2011 (according to which record the Complainant submitted the amended Complaint on September 12, 2011 to replace Whois Privacy Services Pty Ltd as respondent with the present Respondents). The Complainant's contentions, including those relating to bad faith, directed at TIPA would thus appear inapplicable as at the date of the Complaint, TIPA was not the registrant of the Disputed Domain Name. However, the Panel notes from the Previous Cases that TIPA is a frequently named respondent and in each such case, submissions made on TIPA's behalf (by Mr. Cox) include evidence relating to the present Respondents with respect to the Lawsuit, despite the fact that the relevant respondent in such cases is TIPA, which indicates some relationship or connection between TIPA and the Respondents. Taking into account this relationship or connection, together with the fact that TIPA was the former registrant of the Disputed Domain Name and the lack of concrete evidence of the actual date when the Respondents became the registrants of the same (despite the Panel's specific request for such evidence), it is reasonable to infer that as at November 24, 2010, the date of the Order Appointing Receiver, it was TIPA and not the Respondents who was the registrant of the Disputed Domain Name. Considering TIPA's experience in the Previous Cases (pursuant to which various domain names held under TIPA's registration were transferred to the relevant complainants due to the fact that TIPA is not one of the "Receivership Parties" named in the Receivership Documents) and the similarities between the facts of the Previous Cases and those of the present dispute in relation to the use of the relevant domain name, it can further be inferred that TIPA transferred the Disputed Domain Name to the Respondents (who *are* "Receivership Parties") in an attempt to safeguard the domain name under the guise

of a "Receivership Asset" and thereby avert a transfer to the Complainant. As such, the Panel finds that the registration of the Disputed Domain Name by the Respondents was clearly made in bad faith. On the basis of the relationship or connection between TIPA and the Respondents, the Panel is further prepared to find that TIPA's pattern of bad faith registration and use of domain names (discussed above under Receivership) as determined by various panels in various domain name disputes, can be imputed on the Respondents, who could not have been unaware of TIPA's history of bad faith registration and use at the time of assuming the registration of, and subsequently operating, the Disputed Domain Name.

Bad faith registration on the part of the Respondents can also be found independent of any relationship or connection with TIPA. The Panel is willing to accept that the Complainant's mark was well-known at least to the online community (which is where the Complainant appears to conduct a large part of its business) as at the date the Disputed Domain Name was registered, given the conduct of regular and significant online advertising by the Complainant (for example through "Google AdWords"), given that online search results (from Google and Yahoo) for "itoitravel" (and variations thereof) show that the overwhelming bulk of the results relate to the Complainant, and also given the size of the Complainant's business in value terms, with revenue of nearly GBP 5,000,000 as at 2006 (that is the year in which the Disputed Domain Name was registered). On balance, it would thus appear reasonable to infer that the Respondents did have notice of the Complainant's mark at the time of registration (see *Samsonite Corp. v. Colony Holding*, NAF Case No. FA 94313; *Caesar World, Inc. v. Forum LLC*, WIPO Case No. D2005-0517 and *The Gap, Inc. v. Deng Youqian*, WIPO Case No. D2009-0113, which support findings of bad faith registration on the part of a respondent based on actual or constructive knowledge of a complainant's mark at the time of registration). The fact that I-TO-I is a made-up mark coined by the Complainant and not commonly applied in the context of travel services, serves to strengthen the grounds for such presumption of bad faith registration (see *Sony Kabushiki Kaisha (also trading as Sony Corporation) v. Inja, Kil*, WIPO Case No. D2000-1409).

Bad faith use on the part of the Respondents can also be found independent of any relationship or connection with TIPA. As discussed above (in relation to rights and legitimate interests), the Panel accepts that the Respondents' use of the Website as a link farm (which includes links to other business providers of volunteer travel services that would be, at least, indirect competitors of the Complainant, as well as links to various pages of the Complainant's website at "www.i-to-i.com") is, in the absence of justifiable reasons to the contrary, sufficient evidence of bad faith use of the Disputed Domain Name. The Panel also considers the use of "robots.txt" as a means to circumvent access to archived website content (for instance from "www.archive.org") to be further supporting evidence of the Respondents' bad faith. Whilst the Panel notes that use of such circumvention mechanisms does not constitute conclusive evidence of bad faith, the Panel considers it proper to find that their employment in the present case, in combination with the other relevant facts as discussed above, is on balance suggestive of bad faith on the part of the Respondents (see *The iFranchise Group v. Jay Bean / MDNH, Inc. / Moniker Privacy Services [23658]*, WIPO Case No. D2007-1438).

The Panel accordingly finds that the Respondents have registered and used the Domain Name in bad faith, and paragraph 4(a)(iii) of the Policy has been satisfied.


**7. Decision**

For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the Disputed Domain Name <itoitravel.com> be transferred to the Complainant.

*Ghennes*

**Gabriela Kennedy**
Sole Panelist
Dated:  November 24, 2011