

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY 29 2013

CLERK, U.S. DISTRICT COURT
By _____
Deputy   9:43 A.M.

| | | |
|---|---|---|
| NETSPHERE, INC., | § | |
| MANILA INDUSTRIES, INC., AND | § | |
| MUNISH KRISHAN | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:09-CV-0988-F |
| | § | |
| JEFFREY BARON AND | § | |
| ONDOVA LIMITED COMPANY, | § | |
| | § | |
| DEFENDANTS. | § | |

## ORDER ON RECEIVERSHIP PROFESSIONAL FEES

BEFORE THE COURT are the following applications for fees of purported Receivership Professionals in the above-numbered case[1]:

First, the Chapter 11 Trustee in the Ondova Bankruptcy ("Trustee") filed its Chapter 11 Trustee's Application for Reimbursement of Fees and Expenses from the Receivership Estate on April 17, 2013 (Docket No. 1229).[2] All parties in interest have responded to this application, including: the Receiver and Dykema Gossett LLP ("Dykema") on April 25, 2013 (Docket Nos. 1248 and 1249 respectively); the Petitioning Creditors on May 6, 2013 (Docket No. 1268); Jeffrey Baron on May 8, 2013 (Docket No. 1269); and Netsphere on May 9, 2013 (Docket No. 1271). With the permission of this Court, the Trustee filed a post-trial brief on May 15, 2013 (Docket No. 1276). Jeffrey Baron responded to the post-trial brief on May 15, 2013 (Docket No. 1278)

---

[1] This resolves Docket Nos. 1035, 1075, 1096, 1116, 1117, 1125, 1229, 1232, 1233, and 1234.

[2] This motion encompasses those issues raised in pending motions: Second Motion for Reimbursement of Fees and Expenses from the Receivership Estate, filed October 19, 2012 (Docket No. 1075); Trustee's Motion for Partial Reimbursement of Fees and Expenses from Receivership Estate, filed December 21, 2012 (Docket No. 1096); and Third Motion of Daniel J. Sherman, Chapter 11 Trustee for Ondova Limited Company, for Reimbursement of Fees and Expenses from the Receivership Estate, filed December 31, 2012 (Docket No. 1125).

Second, Gardere Wynne Sewell LLP ("Gardere"), former counsel to the Receiver, filed its Motion for Attorney Fees for Gardere Wynne Sewell LLP on April 17, 2013 (Docket No. 1232).[3] The Petitioning Creditors filed a response on May 6, 2013 (Docket No. 1268). Jeffrey Baron filed a response on May 8, 2013 (Docket No. 1269). Netsphere filed a response on May 9, 2013 (Docket No. 1271).

Third, Peter S. Vogel, the Receiver, filed his Fee Application for the Receiver on April 17, 2013 (Docket No. 1233).[4] The Petitioning Creditors filed a response on May 6, 2013 (Docket No. 1268). Jeffrey Baron filed a response on May 8, 2013 (Docket No. 1269). Netsphere filed a response on May 9, 2013 (Docket No. 1271). The Receiver and its current counsel, Dykema, filed a consolidated post-trial brief on May 14, 2013 (Docket No. 1272). Jeffrey Baron responded to the post-trial brief on May 15, 2013 (Docket No. 1277).

Finally, Dykema, current counsel for the Receiver, filed its Motion for Attorney Fees on April 17, 2013 (Docket No. 1234). The Petitioning Creditors filed a response on May 6, 2013 (Docket No. 1268). Jeffrey Baron filed a response on May 8, 2013 (Docket No. 1269). Netsphere filed a response on May 9, 2013 (Docket No. 1271). The Receiver and its current counsel, Dykema, filed a consolidated post-trial brief on May 14, 2013 (Docket No. 1272). Jeffrey Baron responded to the post-trial brief on May 15, 2013 (Docket No. 1277). The Petitioning Creditors filed a supplemental objection to Dykema's application on May 23, 2013 (Docket No. 1283).

//

//

---

[3] This motion encompasses those issues raised in pending motion Receiver's Nineteenth Application for Gardere Fees, filed July 31, 2012 (Docket No. 1035).
[4] This motion encompasses those issues raised in the pending motions: Motion for Attorney Fees for Peter S. Vogel, filed December 21, 2012 (Docket No. 1116) and Amended Motion for Attorney Fees Twenty-Second Motion, filed December 21, 2012 (Docket No. 1117).

## I.    BACKGROUND

This case has been described by all involved as a "nightmare." What should have been a simple contract dispute between the Netsphere parties and Jeffrey Baron and Ondova has morphed into a four-year train-wreck involving numerous attorneys, millions of dollars in legal fees, thousands of docket entries, and massive frustrations for all parties, for this Court, for the Bankruptcy Court and for the Fifth Circuit.

This case was ongoing long before it was brought to this Court. At least seven lawsuits arose from a joint venture between Baron and Munish Krishan involving the ownership and sale of domain names. In April 2009, the parties were able to reach an agreement and signed a Memorandum of Understanding which settled all disputes between them. This agreement was short lived and only a month later, Netsphere filed this lawsuit to enforce the MOU after Baron and Ondova allegedly breached it.

Almost immediately after this case was initiated, Baron began to delay time sensitive discovery issues and to avoid deadlines imposed by the Court for the production of important documents. Just a few days before Baron was required to comply with discovery and deposition deadlines, his counsel withdrew from representation and new attorneys appeared. (Docket Nos. 15 and 16). The Friedman & Feiger lawyers, who would ultimately remain in the case for seven months, were understandably harried by the fast approaching deadlines to comply with massive discovery obligations. The same day that they appeared in the case (Docket No. 18), the Court entered a temporary restraining order and scheduled a hearing for the following week on Netsphere's motion for a Preliminary Injunction. (Docket Nos. 18, 20 and 21). In many ways, this hearing foreshadowed the eventual course of this litigation.

3

At this hearing, Netsphere's counsel informed the Court that Baron had used a change in counsel as a litigation delay tactic in the litigation underlying the settlement. There had already been seven sets of lawyers employed by Baron in those proceedings. This case was looking to be no different: not even a month after this case was filed in federal courts, Baron's counsel, Anthony Vitullo, James Bell and Caleb Rawls, withdrew from representing Baron and Ondova. (Docket No. 15) They were immediately replaced by the ninth set of lawyers, Friedman & Feiger. Given this information, the Court was justifiably concerned that Baron would continue to frustrate the judicial system by cycling through attorneys in order to cause delay. The Court's confidence was further shaken by Baron's testimony at the same hearing regarding access passwords to relevant domain names; despite a clear order regarding discovery on this issue, Baron continued to deny not only knowing necessary passwords, but to knowing the basic functions of his own business. Even more troubling was Baron's insistence on making his own determinations on what domain names were at issue and how to define the scope of discovery, again in order to avoid production. The Court was so concerned by Baron's unwillingness to cooperate that it even made the suggestion of a receiver to ensure that the companies were run correctly. Transcript July 1, 2009 hearing (49:15-17).

To alleviate its concerns that Baron would change attorneys to cause continual delay, especially during the critical discovery phase of the litigation, the Court implemented protective measures. First, the Court designated Baron's current attorneys as lead counsel and ordered that they obtain approval from the Court before employing new or additional counsel or from withdrawing from the case. Second, the Court ordered a large, nonrefundable retainer be placed in Friedman & Feiger's trust account that would not be returned if Baron chose to fire his attorneys.

4

Nevertheless, as the record in this case indicates, Friedman & Feiger eventually withdrew from their representation and Baron continued to add more lawyers to his representation. *See* Docket No. 81. When Baron placed Ondova into bankruptcy, this pattern continued, disrupting the bankruptcy proceedings and threatening to derail the orderly conclusion of the bankruptcy itself.

It was under these conditions that the Trustee and Bankruptcy Court suggested a Receivership to the Court. Under the circumstances, the Court believed that a short-term Receivership would enable both forums to speedily resolve the pending matters and curtail the disruptive revolving door of attorneys.

Unfortunately, the Receivership lasted significantly longer than anyone anticipated. The Receivership Order was appropriately appealed under 28 U.S.C. §1292(a)(2). The Court believed that the Fifth Circuit would make a ruling within a short time frame; however, Baron's appellate counsel continued to appeal every order entered by the Court with an accompanying motion to stay pending the appeal. All 17 motions to stay were denied and the appeals of over a hundred orders were consolidated before the Fifth Circuit. Yet a ruling on the Receivership was not immediately forthcoming. Although the Court can only speculate as to what caused delayed in the Fifth Circuit, the numerous and procedurally questionable appeals surely must have confounded the Court as it tried to sort through what was happening in the District Court.

Two years after the Court entered the Receivership Order, the Fifth Circuit held oral arguments on the various appeals in this case. On December 18, 2012 the Fifth Circuit issued its ruling, but withheld the Mandate, which issued months later.

//

//

5

## II.    FIFTH CIRCUIT OPINION AND THE COURT'S CHARGE

The Fifth Circuit defined the central issue in the appeal as "whether a court can establish a receivership to control a vexatious litigant" where the receiver was granted control over assets "that were not at issue in the underlying litigation over the domain names". *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012). Finding no authority to establish a receivership for that purpose, the Court ultimately concluded that the creation of the Receivership was an abuse of discretion.

The Fifth Circuit also found that "[t]here certainly was evidence that Baron's actions were disrupting, complicating, and making more expensive both the bankruptcy and the district court suit. We do not, though, find evidence that Baron was threatening to nullify the global settlement agreement by transferring domain names outside the court's jurisdiction...Rather, the receivership was established to pay the attorneys and to control vexatious litigation." *Id.* at 308.

The Fifth Circuit found no authority allowing a court to impose a receivership to pay attorneys' fees that were not the subject of the underlying litigation. Ultimately, "a court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy." *Id.* at 310 (citing *Cochrane v. W.F. Potts Son & Co.*, 47 F.2d 1026, 1029 (5th Cir. 1931). Because this Receivership encompassed Baron's personal property and property of entities not named as parties in the underlying lawsuit, the Receivership was deemed improper.

To the extent that the Receivership was imposed to control Baron's vexatious litigation tactics, the Fifth Circuit determined that there was no statutory authority to do so. Nevertheless, the Fifth Circuit recognized this Court's dilemma, finding that "Baron's longstanding vexatious litigation tactics presented the district court with an exceedingly difficult situation. The district court recognized that it has the inherent authority to address those tactics." *Id.* at 311.

Essentially, the Fifth Circuit agreed that the Court faced a real and challenging problem, but that it chose the wrong remedy. Instead, the Fifth Circuit found that this Court, rather than creating a receivership, should have "entered a sufficiently specific order", held Baron in contempt if he continued to violate the Court's directives, and issued fines or imprisonment as a penalty. *Id.* Alternatively, this Court "could have required Baron to proceed with the same lawyer or pro se at his choice." *Id.* Although this Court had determined that some of these remedies would be inadequate and that a receivership was the "most restrained path to ensure that its orders are followed and [that] justice can be administered," Docket No. 268, p. 21, the Fifth Circuit concluded that a complete failure to halt vexatious litigation tactics by traditional means does not then authorize a receivership.

While the Fifth Circuit did find the Receivership to be an abuse of discretion, the ruling did not vindicate Baron and his conduct. Normally when a receivership is improper, the party that sought the receivership may be held accountable for the receivership fees and expenses that did not benefit the fund. *See W.F. Potts*, 59 F.2d at 377-78. The party subjected to a wrongful receivership may be entitled, under equity principles, to recover costs from those who have provoked the receivership. *See Porter v. Cooke*, 127 F.2d 853 (5th Cir. 1942). Here, no party "provoked" the receivership—it was recommended by the Bankruptcy Court and moved for by the Trustee under that recommendation. Given that this case did not fit the norm, the Fifth Circuit decided that a different kind of equity analysis was required.

While the Circuit found that Baron received no benefit from the Receivership, it also concluded that equity warranted that Baron's own improper conduct and contributing role in the proceedings must be taken into account. "Here, the record supports that the circumstances that led to the appointment of a receiver were primarily of Baron's own making...[t]he manner in

7

which the district court responded to [the] circumstances was errant, but the court's perception was reasonable that a vigorous response was required....We also take into account that, to a large extent, Baron's own actions resulted in more work and more fees for the receiver and his attorneys. For those reasons, charging the current receivership fund for reasonable receivership expenses, without allowing any additional assets to be sold, is an equitable solution." *Netsphere*, 703 F.3d at 313.

This conclusion was bolstered by the Fifth Circuit's finding that there was no ill motive on the part of any one involved. The appointment of the Receiver was not collusive or in bad faith: "there was no malice nor wrongful purpose, and only an effort to conserve property". *Id.*

It is under this assessment that the Fifth Circuit issued its directive to this Court[5]: "in light of our ruling that the receivership was improper, equity may well require the fees to be discounted meaningfully from what would have been reasonable under a proper receivership. Fees already paid were calculated on the basis that the receivership was proper. Therefore, the amount of all fees and expenses must be reconsidered by the district court. Any other payments made from the receivership fund may also be reconsidered as appropriate." *Id.*

Baron contends that this Court must apply a slightly different standard: "the costs, expenses, and disbursements incurred by a receiver whose appointment was improvidently made, or who has taken wrongful possession of property, will, upon equitable principles, be charged by the court of jurisdiction against the property to the extent that they have inured to its benefit." *Speakman v. Bryan*, 61 F.2d 430, 431 (5th Cir. 1932). Baron argues that any Receivership professional claiming fees must show that those fees inured a benefit to the Receivership estate.

---

[5] The Fifth Circuit also directed this Court to wind up the Receivership and release assets to Baron and his entities; however, the Court is unable to do this with  involuntary bankruptcy proceedings still in process.

The Court, however, disagrees. Its equity calculus need not be so narrow. Although the Fifth Circuit did note that Baron did not receive any benefit from the Receivership, it did not limit the Court's analysis. To the contrary, the Circuit specifically observed that Baron's complicity in creating additional, and largely unnecessary, work for the Receivership professionals was a factor for this Court to consider. Given the unique circumstances of this case, the Fifth Circuit explicitly did not limit equity considerations to the benefit received by the estate. That being said, the benefit given is but one equity factor for the Court to consider.

Further, Baron argues Third and Seventh Circuit law for the proposition that fees incurred in the process of defending a Receivership or in defense of fees sought are not properly chargeable against the receivership estate. *U.S. v. Larchwood Gardens, Inc.*, 420 F.2d 531, 535 (3rd Cir. 1970); *In re Marcuse & Co.*, 11 F.2d 513, 516 (7th Cir. 1926) (denying fees where receiver acted as litigant and not neutral party). The Court finds these cases inapplicable and unpersuasive. Here, the Fifth Circuit was well aware of the expense incurred by the Receiver and Trustee in defending the Receivership; again the Court points to the finding of complicity by Baron in inflating these expenses. Indeed, given how Baron through his appellate counsel, Gary Schepps, swamped the Fifth Circuit with questionable appeals, the Court finds that it would be entirely inequitable to deny these fees. Accordingly, the Court sees no reason not to charge the Receivership estate for the additional expenses incurred by Baron and Schepps's conduct. To the extent that fees were incurred in defending the Receivership Order itself, the Court finds that charging the estate is proper under both the Fifth Circuit's ruling and principles of equity.

## III.    INVOLUNTARY BANKRUPTCY AND SUBSEQUENT PROCEEDINGS

The same day that the Fifth Circuit's opinion was issued, Baron's former counsel filed an involuntary bankruptcy against Baron. The automatic stay immediately went into effect; this,

9

combined with the fact that the Fifth Circuit issued its opinion without the Mandate, effectively prevented this Court from acting on the Circuit's instructions. Instead the Court filed an advisory outlining its initial intentions regarding how it would reduce fees to comply with the Fifth Circuit's directions.

The Bankruptcy Court has effectively managed this case since the December opinion, but it has also struggled to act in the absence of the Mandate; there was still a chance that the Fifth Circuit would grant a re-hearing and/or issue an en banc ruling. This was problematic as there were significant pressing issues, particularly regarding payment of professionals hired by the Receiver. A joint hearing was held on April 4, 2013 to discuss these issues before both the District and Bankruptcy Courts. It was during this hearing that the Fifth Circuit's ruling was received, denying the motions for a rehearing and issuing the Mandate without altering the initial December opinion, thereby clarifying how the case was to move forward.

At the April 4th hearing, the Bankruptcy Court announced that it would lift the automatic stay to allow this Court to determine reasonable receivership fees and expenses in accordance with the Fifth Circuit's opinion. The implementation of this ruling will depend upon the outcome of the involuntary bankruptcy. If the Bankruptcy Court finds that the Petitioning Creditors have established the requirements to bring an involuntary case against Jeff Baron, then the amounts authorized by this Court will be treated as administrative claims with priority under the Bankruptcy Code. Whether any unauthorized amounts may be payable in bankruptcy beyond those authorized by this Court as unsecured claims will be determined by the Bankruptcy Court at the appropriate time; this Court's determination will set the limits on administrative claims. If the Bankruptcy Court ultimately concludes that the conditions necessary to bring an involuntary

bankruptcy case have not been met, then the amounts allowed by this Court herein will be paid from the Receivership estate as part of the wind down plan.

## IV.   STATUS OF DISTRICT COURT ORDERS UNDER FIFTH CIRCUIT OPINION

Also at issue is the effect of the Fifth Circuit's opinion on all other Orders entered by the District Court. Baron contends that the Fifth Circuit specifically vacated many of the Orders that were appealed; however, the Court disagrees. In a subsequent clarifying Order, the Fifth Circuit wrote: "We point out that our opinion did not dissolve the receivership immediately. We ordered a remand for an expeditious winding up of the receivership. No assets that were brought under the control of the receiver will be released immediately from that control even when the mandate is issued. The district court will thereafter have the authority to manage the process for ending the receivership as quickly as possible." Fifth Circuit's Order, Dec. 31, 2012. This clarification, combined with the simultaneous issuance of the mandate on all the appeals with the direction that "the District Court is reversed, and the cause remanded to the District Court for further proceedings in accordance with the opinion of this Court", indicate that all Orders issued under the Receivership remain in effect until the Receivership is wound down. *See* Docket Nos. 1254-1263.

The Fifth Circuit did not vacate the Orders authorizing the payment of fees to Receivership professionals; instead it instructed the Court to reconsider these disbursements. As no other Orders were specifically vacated, the Court finds that all Orders remain in effect until the wind down.

## V.   DISCUSSION ON FEES

Before addressing the merits of each party's claim to fees, the Court desires to make one point regarding Mr. Baron and his many lawyers. At the hearing on these applications, Mr.

11

Baron's counsel expressed concern that Mr. Baron has been disparaged during court proceedings by unjustified claims that he "hired and fired" lawyers. His current counsel now insinuates that the frequent turnover of attorneys for Mr. Baron and his entities resulted from unethical abuses on the side of these attorneys; essentially they saw Baron as an easy mark to milk fees and Baron had no other option but to refuse to pay them the fees he believed they did not deserve or to fire them. Although the Court finds it difficult to believe that all of the twenty-plus lawyers engaged by Mr. Baron during the course of this litigation were negligent or abusive, it is not this Court's place, as clearly explained by the Fifth Circuit, to make determinations regarding the relationships between Baron and his counsel. These decisions are left either to the Bankruptcy Court or, if an involuntary bankruptcy is disallowed, to state courts. It is indeed possible that a straight forward legal dispute, which should have been resolved several years ago, may now continue for another decade.

While the Court takes no position regarding Baron's relationships with his former counsel, it instead points to the incontrovertible facts: regardless of Baron's motives in frequently changing his attorneys, the effect of this conduct was to essentially throw a wrench into the proceedings and grind the cases in this Court and the Bankruptcy Court to a halt. The record shows that this Court, opposing counsel and Baron's own counsel frequently found that he stifled the forward momentum of these cases. Baron's actions, whether with the intent to frustrate the court system or not, prevented this Court and the Bankruptcy Court from performing their primary obligation under Rule 1 of the Federal Rules of Civil Procedure: the just, speedy and inexpensive determination of disputes.

//

//

12

## A. TRUSTEE AND COUNSEL MUNSCH HARDT

The Ondova Trustee has filed an application for reimbursement for fees it incurred on behalf of the Receivership. The Trustee's legal work was performed by the law firm of Munsch, Hardt, Kopf & Karr P.C. Lead counsel was Raymond Urbanik and lead appellate counsel was Richard Hunt. Before the Court can address the reasonableness of these fees, it must first resolve what it has referred to as the "entitlement" issue. Unlike the other parties before the Court, the Trustee was not a professional or employee of the Receiver. The Court is tasked with determining reasonable "receivership fees and expenses"—implying that only those fees and expenses incurred by the Receivership itself should be paid.

The Trustee argues that the Fifth Circuit did not intend to limit this Court's ability to pay his fees. Rather, he argues that Fifth Circuit was unaware of who was performing the legal work for the Receiver and had it known that the Trustee was performing some of that work, it would have allowed for their payment. The Court disagrees with this assessment. Not only did Baron object to and appeal to the Fifth Circuit the order awarding legal fees to the Trustee, but the Fifth Circuit recognized that the Trustee and the Receiver were distinct parties based on their denial of the motion to substitute the Trustee as the named appellee in one of the many appeals. The Fifth Circuit could not have misunderstood that the Trustee performed the legal work to write the brief submitted under his own name.

Further the Trustee argues that the language used by the Fifth Circuit throughout the opinion speaks of receivership expenses very broadly; but this interpretation begs the question. Although the interpretation of "receivership expenses" may be broad, it does not necessarily require the inclusion of the Trustee merely because he was a participating party. The Court agrees that the term is broad and includes more than the Receiver and his attorney, but also

13

includes anyone employed by the Receivership. Although equity controls as to the allowed amount of fees, it does not equally apply to the determination of who is entitled to fees as a Receivership professional. In order to be classed as such a professional, there must be a legal basis to do so either in contract or under some quasi-contract theory.

The record presented to the Court at the evidentiary hearing is abundantly clear: there was no written or oral contract between the Receiver and the Trustee or his counsel for the services it performed in defending the Receivership at the Fifth Circuit.[6] The Receiver has provided ample evidence that all professionals and employees of the Receivership signed contracts with the Receiver; the Trustee is the only professional claiming to fall within the Receivership who did not have such a contract. The Receiver contracted with various parties, including several attorneys who performed legal work on behalf of the Receivership. Although the Trustee asserts that implications were made regarding these services, he willingly admits that no formal agreement was ever achieved. The Receivership Order empowered the Receiver to "choose, engage and employ attorneys, accountants, appraisers and other independent contractors and technical specialists (collectively 'Professionals') as each Receiver deems necessary or advisable in the performance of duties and responsibilities under the authority granted by this Order." Receivership Order, p.3 ¶ K, Docket No. 130. There was no engagement or employment of the Trustee or his counsel at any point during this litigation. Furthermore,

---

[6] The elements for establishing an oral contract under Texas law are the same as any other contract: the parties must show (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) a communication that each party accepts the terms, (5) execution and delivery of the contract with the intent that it be mutual and binding, and (6) consideration. *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000). However, when an oral contract is alleged, "the court looks to the communications between the parties and to the facts and circumstances surrounding those communications. The terms must be expressed with sufficient certainty so that there will be no doubt as to what the parties intended." *Copeland v. Alsobrook*, 3 S.W.3d 598, 605 (Tex. App.—San Antonio 1999).

there is no statutory authority to allow for "substantial contribution" payments in an equitable receivership. Therefore, in order to recover fees it would need to do so under a theory of *quantum meruit*.

### 1. Solvency Arguments

As a preliminary matter, the Court will address the arguments raised by all other parties regarding the solvency and cumulative assets of the Ondova estate at various times during this litigation. The general argument of the objecting parties is that the Trustee could have and should have settled claims with all Ondova creditors and shut down the bankruptcy at some earlier date. The evidence clearly establishes that the Trustee had, through his counsel, endeavored to do this, but was stymied by the continual influx of former Baron or Ondova attorneys making substantial contributions claims to the bankruptcy estate; unlike normal creditor claims, substantial contributions claims are not subject to the time bars imposed by the Bankruptcy Court for asserting a claim. Therefore, these claims may continue to trickle in during the course of a bankruptcy. Baron contends that the Trustee further exacerbated the problem by seeking out former attorneys and asking them to make additional claims. The Trustee, through his counsel, admits that it did contact former attorneys, not to ask them to file substantial contribution claims, but to determine whether they would be filing such claims in an effort to determine whether and when the bankruptcy could come to an end.

Given the situation, the Court finds the Trustee's conduct, primarily through the work of the Munsch Hardt law firm, to be reasonable and appropriate. The Court further finds that the Trustee, despite having the assets at various times to satisfy creditor claims, was prevented from closing the bankruptcy in large part due to the choices made by Baron and Ondova to either fire their attorneys or to refuse to pay them (for whatever reason) and thus create a new applicant for

15

priority payment from the estate. This conduct was the initial basis for the recommendation of a receivership from the Bankruptcy Court, which rightfully concluded that without an effective remedy to prevent additional changes in counsel, the Ondova bankruptcy would continue in perpetuity. The Court concludes that these objections are not relevant to the determination of fees as they relate to the Receivership; to the extent that they are relevant to any portion of the litigation, it is the reasonableness and necessity of the Trustee's fees in connection with the Ondova bankruptcy itself.

2.      *Docket History of Trustee Requests for Reimbursement*

The Trustee filed its First Motion for Reimbursement of Fees and Expenses on April 19, 2011 (Docket No. 467). Baron filed a response and objection to this motion on May 10, 2011 (Docket No. 556). The Court granted this motion on May 3, 2012 (Docket No. 896).

The Trustee filed its Second Motion for Reimbursement of Fees and Expenses from the Receivership Estate on October 19, 2013 (Docket No. 1075).

The Trustee filed Trustee's Motion for Partial Reimbursement of Fees and Expenses from the Receivership Estate on December 6, 2012 (Docket No. 1096). Baron filed an objection on December 27, 2012 (Docket No. 1119).

3.      *Quantum Meruit*

In Texas, the elements of *quantum meruit* require a showing that "1) valuable services and/or materials were furnished, 2) to the party sought to be charged, 3) which were accepted by the party sought to be charged, and 4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). "A party generally cannot recover under

16

quantum meruit when there is a valid contract covering the services or materials furnished." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005); *see also Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988).

    i.    *Value of Services*

The evidence clearly establishes that the Trustee and especially Trustee's counsel worked incredibly hard to defend the Receivership at the Fifth Circuit. The Court has been informed by the Trustee that he is not seeking reimbursement for work done in the defense of the Order Appointing Receiver (5th Cir. 10-11202) nor for the work done on behalf of the confirmation plan which was moot after the Fifth Circuit's opinion. As part of his fee application before the Court, the Trustee provided a narrative describing all the work it did following the implementation of the Receivership. Chapter 11 Trustee's Application for Reimbursement of Fees and Expenses from the Receivership Estate, Docket No. 1229, Exhibit A. The work conducted by the Trustee and his counsel regarding the Receivership can be categorized as follows: review and analysis of district court filings, conferring with Receiver and his counsel regarding the Receivership, and appellate work to defend Receivership and District Court orders. The latter category can be further distinguished between work done as the named appellee as opposed to work done as an amici.

All of the work performed by the Trustee, and especially his counsel, was valuable, yet for this inquiry, the Court must first determine whether the services were valuable to the Receivership. In this regard, the Court finds that the work done by the Trustee and his counsel in reviewing and analyzing all filings in the District Court provided little benefit to the Receivership. The Receiver was an active participant in District Court proceedings; there was no need, for the sake of the Receivership, for the duplication of efforts. The value of these actions to

the Ondova estate is another matter, which appears to have been resolved already by the Bankruptcy Court. Additionally, any work done by the Trustee or his counsel to defend his own role or legitimacy in the Receivership proceedings provided little benefit to the Receivership. Although both the Trustee and his counsel at Munsch Hardt were intelligent and thoughtful contributors in this case, the Receivership received no particular benefit from their appointment in the Ondova case that would distinguish him from any other potential appointee.[7] Nevertheless, any analysis that was communicated to the Receiver or his counsel was a valuable service, but only to the extent that the Trustee provided new insights as opposed to merely duplicating the efforts of the Receiver.

The appellate work conducted by the Trustee, through his counsel, was undoubtedly of value to the Receivership, even when it was the Trustee named as appellee. The Trustee's counsel filed extensive briefing on the appeal of the Order Appointing Receiver, No. 10-11202, on which he was the only named appellee; the Trustee seeks no reimbursement for this work, therefore the Court will ignore it as it proceeds to analyze this claim.

Baron's second appeal, No. 11-10113, challenged the Order Granting Receiver's Motion to Clarify the Receiver Order with Respect to Novo Point, LLC and Quantec, LLC (Docket No. 176) and Order Requiring Non-Renewal of Money Losing Domain Names (Docket No. 177). The Receiver moved to substitute the Trustee as the named appellee, but this motion was denied. Instead, the Trustee filed a responsive brief as Amicus Curaie on June 7, 2011. The Receiver filed a motion two days later adopting the Trustee's brief as his own. A month after Dykema was retained as the Receiver's counsel, it filed an omnibus brief on behalf of the Receiver, which included a response to this appeal. The Receiver clearly benefitted from the work of the Trustee

---

[7] Docket No. 171, Docket No.

18

on this appeal. Had the Trustee not written this brief, either Receiver's counsel or other hired counsel would have needed to respond.

Baron's third appeal, No. 11-10289, challenged sixteen orders entered by the District Court, including several orders clarifying the Receiver Order and various orders approving fee applications made by Receivership professionals and employees. The Trustee was the named appellee and only the Trustee filed briefing on this appeal. The brief filed in response to this appeal also addressed other appeals, including some in which the Receiver was named as appellee.[8] Although the Receiver was not the named appellee as to this appeal, the work done by the Trustee to defend these motions provided a valuable service to the Receivership; someone had to defend this appeal and failure to do so entirely would have subjected the Receivership to significant problems.

Baron's fourth appeal, No. 11-10290, challenged thirteen orders entered by the District Court. The Receiver was named as appellee. The Trustee's October brief addressed this appeal. The same day that the Trustee filed its brief responsive to this appeal, the Receiver filed a brief adopting the Trustee's brief in so much as they addressed appeals in which the Receiver was the named appellee. Dykema later filed an omnibus brief that addressed this appeal. The work done by the Trustee on this appeal was a valuable service, as explained above with regard to Appeal No. 11-10113.

Baron's fifth appeal, No. 11-10390, challenged sixteen District Court orders. Baron's sixth appeal, No. 11-10501, challenged thirty district court orders. Both the Receiver and Ondova were named as appellees on each of these appeals. Both appeals were addressed in the

---

[8] The brief in question, filed on October 21, 2011, addressed appeal numbers: 11-10289, 11-10290, 11-10390 and 11-10501. The Trustee also filed a brief almost a year later, on August 6, 2012, readdressing this appeal and further expanding on appeal numbers: 12-10489, 10-11202, 11-10390, 11-10501 and 12-10444.

Trustee's October brief, which was adopted by the Receiver. Both Ondova and the Receiver addressed these appeal in subsequent briefs filed in August 2012. The work done by the Trustee on these appeals was a valuable service, as explained above with regard to Appeal No. 11-10113.

Both the Receiver and the Trustee filed briefs on August 6, 2012 in response to Baron's eighth through eleventh appeals, Nos. 12-1044, 12, 10489, 12-10657 and 12-10804. As explained above, the work done by the Trustee in these briefs was a valuable service to the Receiver to the extent that the Trustee raised arguments that the Receiver did not raise or could not raise due to page limitations for briefs.

The Court finds that, as to the first element of its *quantum meruit* claim, the Trustee provided services that were valuable to the Receivership during its appellate activity defending the Receivership and the Orders of this Court. The Court also finds that in some instances, the Trustee provided valuable advisory services to the Receiver during the course of this litigation. The Receiver has acknowledged that the Trustee's work saved him time and money.

ii.    *Services were Not Furnished to the Receivership*

Although the Court finds that these services were valuable to the Receivership, the Court ultimately concludes that they were not furnished to or for the Receivership and were done in the course of the Trustee's independent duties to the Ondova estate as well as its duty to defend the Receivership as the moving party.

The theory underlying *quantum meruit* is to avoid unjust enrichment. Quantum meruit enables a party to recover "when non payment for the services rendered would 'result in an unjust enrichment to the party benefited by the work.'" *Vortt Exploration Co.*, 787 S.W.2d at 944 (quoting *City of Ingleside v. Stewart*, 554 S.W.2d 939, 943 (Tex. Civ. App.—Corpus Christi 1977)). "Unjust enrichment, itself, is not an independent cause of action, but rather 'characterizes

the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay.'"*Casstevens v. Smith*, 269 S.W.3d 222, 229 (Tex. App.—Texarkana 2008).

Here, the Receivership benefitted from the work done by the Trustee and his counsel, but it was not wrongfully or passively received. While it might be unfair to the Trustee and Munsch Hardt that their bankruptcy estate is unable to provide adequate compensation for their work, the Trustee was independently obligated to perform it. The Trustee in the Ondova case had a duty to keep abreast of all matters in the District Court proceedings. This duty was two-fold: as the party moving for the Receivership, the Trustee was exposed to the risk of responsibility for the costs of the Receivership; in addition, even if the Trustee had not moved for the Receivership, he would have been obligated to stay informed of the District Court proceedings as these proceedings would have undoubtedly affected the resolution of the bankruptcy.

Both the Trustee, as the moving party, and the Receiver, as ordered by this Court, had independent and overlapping duties to defend the Receivership at the Fifth Circuit and to participate in proceedings before this Court. Receivership law in this Circuit clearly provides for the possibility that the moving party be responsible for all Receivership costs. Munsch Hardt is very familiar with receivership law—members of their firm have acted as receivers in many cases. (Testimony of Urbanik). Although the Court is unaware of a requirement that the moving party know of this risk, the Court finds that Munsch Hardt should have and likely did know that the Trustee could potentially be held responsible for the Receivership if the Fifth Circuit overturned the Order. The fact that the idea for the Receivership originated with Bankruptcy Judge Jernigan would not necessarily override the Trustee's obligations; the Trustee adopted this idea as his own in promoting it to this Court.

The fate of the Receivership was intrinsically connected with the bankruptcy throughout its existence. The Trustee's narrative account of his work in the case admits as much: in reviewing documents, preparing for hearings and writing briefs in the District Court proceedings, the Trustee acknowledged that he was required to determine how they would affect "both the Ondova bankruptcy and the Receivership proceedings." *See e.g.*, Exhibit A, p. 4. Furthermore, the Receivership was created in part to aid the resolution of all matters in the Bankruptcy Court and to prevent the influx of additional lawyers that could stall the proceedings with substantial contribution claims. After the creation of the Receivership, the Court addressed the payment of former Baron attorneys. Some of this work would potentially reduce substantial contribution claims made on the Bankruptcy estate; therefore, the Trustee was obligated to promote the Receivership to reduce the amount of claims made on the bankruptcy estate. The Receivership also allowed the Trustee to develop the confirmation plan, now moot, to reach that resolution in the Ondova bankruptcy. Accordingly, the Trustee was interested in the fate of the Receivership; his participation at the Fifth Circuit, even when not named as the appellee, provided a benefit to his ability to perform his work as the Trustee.

This conclusion is bolstered by the Trustee's own arguments that the Bankruptcy Court already approved the fees requested as necessary and reasonable. Since the Bankruptcy Court only had jurisdiction over the bankruptcy estate, her ruling did not reach whether the Trustee's fees were necessary and reasonable to the Receivership estate. If the fees have been approved as part of the bankruptcy, then there could be no unjust enrichment by the Receiver—the Receiver merely took advantage of work that was necessarily done by another interested party. This was not in conflict with the Receiver's own duty to perform only that work which was necessary and reasonable for his own estate. As the testimony of the attorneys, including David Schenck and

22

Peter Loh, revealed, it is not unusual for counsel of parties with similar interests to work together or even to adopt each other's work to avoid duplicative efforts. Never had any of these attorneys, who have been practicing for many years, received from or made a request to the other party to be reimbursed for the work that was done to the benefited everyone. It would be highly unusual for this Court to find this collaborative effort to be any different.

The fact that the Trustee indicated that he expected to be reimbursed for its share of the work does not change this analysis. Instead of agreeing to pay the Trustee, the Receiver instructed him to file a motion in this Court for reimbursement. This could not be interpreted as an assent to pay, but a deferral to the Court to determine whether or not payment from the Receivership estate was appropriate. The fact that the Receiver did not object is irrelevant because the request that the Trustee file his own motion is enough; all other requests for payment from the Receivership, with the exception of those from Baron's own attorneys, were filed *by the Receiver*. If the Receiver believed that the Trustee was his professional or that he had hired the Trustee to perform legal work on behalf of the Receivership, the Receiver would have filed the motion himself. The Court granted the Motion under the presumption that the Receivership was valid. Now that this misconception has been corrected, the Court has to re-examine this disbursement. Hindsight reveals the Trustee's failure to obtain a valid contract with the Receiver to be a mistake, and a mistake that the Court can not correct.

### *iii.  Conclusion*

The Court concludes that although the Receivership benefitted from the valuable services rendered by the Trustee, they were not rendered or furnished to the Receivership; the benefit received was a side effect of the work done on the Trustee's own behalf. The responsibilities of

23

the Trustee and the Receiver overlapped; that either party benefitted from the work of the other does not create an obligation for payment.[9]

### 4. Payment of Trustee as "Other Payments"

Having found that the Trustee is not a Receivership professional, the Court may not reimburse the Trustee for fees incurred. It is therefore irrelevant to consider the *Johnson* factors or § 330(a)(1) of the Bankruptcy Code. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Although the Court ultimately concludes that the Trustee and his counsel were not Receivership professionals and should not be reimbursed from the Receivership estate for work that did benefit the Receivership, the Court has also been tasked with reviewing those non-receivership fees and expenses which have already been paid by this Court.

The Trustee argues that the Fifth Circuit's opinion authorizes additional payments of non-receivership expenses. The Court disagrees, however. The Fifth Circuit ordered that "other payments *made* from the receivership fund may also be reconsidered as appropriate." *Netsphere*, 703 F.3d at 313 (emphasis added). The intentional use of the past tense requires the court to make a retrospective analysis of what it has already distributed in light of the ruling, but surely does not authorize any additional payments. Further, the Court finds it appropriate to distinguish between the unpaid fees of the Receiver, his counsel and his other employees and the requested but unpaid fees of the Trustee. The Court agrees with the Fifth Circuit that the only motive behind the Trustee's motion for the Receivership was to stop the cycle of new attorneys to allow

---

[9] Baron has implied that the failure of this claim for reimbursement from the Trustee shows that the Trustee and Receiver were colluding and fabricating claims to execute the liquidating trust that was necessary to accomplish the confirmation plan. The Court finds that the Trustee legitimately brought this claim against the Receiver and that the subsequent settlement efforts were legitimately engaged in. That the Trustee was ultimately unsuccessful and that the Receiver did not *need* to settle, is hindsight. Given the circumstances, it was perfectly reasonable to assume that either party could be successful. The Court attributes no ill motive on the part of the Trustee or Receiver with regard to this matter.

both this Court and the Bankruptcy Court to efficiently resolve the matters pending before them; there was no malice or collusion and no intent to cause harm to Mr. Baron. Nevertheless, although the Court is not wholly bound by receivership law attributing all Receivership losses on the moving party, the Court cannot avoid the fact that the Trustee promoted the idea of the receivership to this Court. The Receiver, although involved in the litigation and consulted on this matter as the special master in this case, did not undertake the responsibility of the Receivership, except to the extent ordered in the Order Appointing Receiver.

Both the Fifth Circuit's directive and equity considerations prohibit payment of additional fees to the Trustee, but at the same time, the Court finds it would inequitable to require the Trustee to remit the funds it has already received. As Ray Urbanik's testimony at the hearing on this matter illuminated, Munsch Hardt, as Trustee's counsel, encountered daunting legal problems as they sought to do duty to their client and to both the District Court and the Bankruptcy Court. The representation proved much more arduous than the work that an attorney would normally encounter even in a protracted case. Yet, Munsch Hardt never faltered and performed at a very high level. In doing so, the work has undoubtedly benefitted the Receivership; therefore, the Court finds that the Trustee should keep the $379,761.18 it has been paid. This amount that has already been awarded and that Munsch Hardt is allowed to retain is in recognition of the valuable appellate work that was incurred as a result of Baron's excessive appeals. It in no way is designed to compensate the Trustee or his counsel for any work which they were obligated to do as the Trustee in the Ondova case, but to account for Baron's complicity in the additional fees that were incurred. Equity requires no less.

The result of this decision is that the Trustee's request for fees and expenses above the amount already paid, which equals $840,014.50, is disallowed. While the Court has no doubt that

25

the Trustee actually incurred the fees now disallowed, that the fees charged were reasonable in every way and that the fees were incurred in good faith, the Court also believes, for the reasons stated above, that these additional fees cannot be paid, in accordance with the direction of the Fifth Circuit.

## B. GARDERE WYNNE SEWELL

The Receiver retained Gardere as his counsel from November 24, 2010 to July 6, 2012. In this fee application, Gardere requests a total of $2,010,862.22 in fees and expenses.[10] They have already been paid $1,479,571.95[11] and thus request an additional disbursement of $531,290.27. Of course, the Court must reconsider all professional fees, even those which have already been paid.

Initially, this Court paid Gardere's fee requests in full. By the third application, the Court decided to reduce its payouts to 75% of the total request with the caveat that the Court would consider paying the additional 25% when the Receivership was closed, if there were sufficient funds to do so.

The controlling law when awarding attorneys' fees is found in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). In this case, the Fifth Circuit adopted the lodestar method combined with a variety of other factors to determine the reasonableness of fees requested. The Court agrees that this analysis controls the initial inquiry, but that after determining what fees were reasonable in general, the Court must then discount meaningfully those fees to account for the fact that this Receivership was improper.

---

[10] Gardere has already submitted fee applications for this period. Docket Nos. 193, 258, 324, 418, 491, 493, 606, 648, 678, 698, 713, 650, 781, 840, 853, 877, 879, 993 and 1035.

[11] These were approved by this Court in nine orders, Docket Nos. 276, 294, 386, 427, 533, 535, 807, 906 and 1009.

Turning first to the *Johnson* factors, the Court considers: (1) the time and labor required, (2) the novelty and difficult of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee for similar work in the community, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Id.* at 717-719. The Court notes that these factors are not fully binding, but serve as guidelines to the Court. *Id.*

Representing the Receiver required a great amount of time and labor. Initially, the Receivership estate was in disarray: both entities and assets needed to be located and controlled, unorganized documents needed to be sorted and reviewed, assets needed to be valued and plans needed to be enacted to manage the domain name portfolios. Gardere, in representing the Receiver, tackled this task immediately. During the course of their representation, Gardere located and acquired 17 additional parties that fell under the Receivership order and began to task of managing these businesses. To obtain these assets, Gardere needed to work with local counsel around the country and the world and file motions in various courts.

Even as the Receiver worked to put together the Receivership estate, he was bombarded with actual and threatened claims of cybersquatting or claims under the Uniform Domain Name Dispute Resolution Policy ("UDRP"). The Court had stayed, as part of the Receivership Order, all actions against any of the Receivership parties. Gardere worked to enforce this stay and, when efficiently possible, to resolve some of these claims. This task was further complicated when the Internet Corporation for Assigned Names and Numbers ("ICANN") refused to cooperate with

27

the Receiver. Gardere and the other attorneys it hired to accomplish this task were incredibly successful and no names were lost during their representation.

In addition to these practical tasks associated with organizing and managing the Receivership estate, Baron's prolific activity in the Bankruptcy Court, this Court and in appealing orders to the Fifth Circuit, required Gardere's constant attention. Many of Baron's motions and appeals required responses from the Receiver. Additionally, as part of the Receiver's duty to the Court, his counsel prepared detailed accounts of the work done for the Receivership. Baron's counsel argued that these reports, which could exceed 30 pages, were an unnecessary expense; however, given the circumstance, the Court concludes that Gardere was obligated to prepare these documents. Furthermore, they undercut Baron's other argument that Gardere's application is vague as the work performed has been attentively chronicled throughout the duration of their employment.

Moreover, Gardere's effort brought additional value to the estate. First, Gardere worked to reclaim names that Receivership parties had lost even prior to the invocation of the Receivership. Second, Gardere consolidated all the domain names with one monetizer, Domain Holdings, and negotiated a contract with particularly favorable terms; this resulted in considerable savings to the estate both in terms of the cost and time necessary to manage it. The arrangement with Domain Holdings established that Domain Holdings would perform certain programming services at no charge, guaranteed a minimum monthly monetization revenue and increased the overall monetization revenue. Third, Gardere developed a system for determining the value of domain names that allowed it to make choices regarding the fate of individual names: whether to develop, to park, to sell or to let lapse. This was critical particularly because it enabled counsel to make decisions when faced with cybersquatting or UDRP claims on certain

names and to identify money losing names that should be culled from the portfolios. Although Baron may have elected to run these businesses differently, all of these actions were reasonable and prudent; all of these actions, or some variation, would have required Baron to hire his own counsel to complete them.

Gardere performed this work in good faith and with an abundance of care. They were thoughtful in their presentations to the Court and in assisting in the management of the large estate, in spite of the impediments caused by Baron's obstructive conduct and relentless appeals.

While the Court is of the view that they should have given the appeals more direction and that they should have developed a quicker plan to end the Receivership, Gardere's management of the estate was exemplary. Once Gardere had established procedures for managing and running the estate and had resolved all the legal matters involved in doing so, however, it should have delegated these activities to less costly professional managers and shifted its focus. To the Court, it is clear that Gardere was distracted by the admittedly disruptive actions of Baron and found it difficult to transition to its other requirements. While the Court appreciates the challenges that Gardere faced, there was a great need in this case to push for a prompt decision on appeal and for an equally prompt resolution of the Receivership itself.

It is true that Receiver had no duty to defend the original appeal of the Receivership Order; however, it did have a duty under said Order to defend the subsequent appeals. This was particularly true for any appeals for which it was named as appellee. The evidence presented to the Court clearly shows that Gardere allowed the Trustee to take on the lion's share of the work in this regard. To some extent, this was justified as the Trustee was also obligated to defend the Receivership and duplicating work would have been detrimental to both estates. That being said, had Gardere truly collaborated with the Trustee, they could have split their briefing obligations

and possibly expanded on their arguments. Even at the time, and not just in hindsight, the Court was unclear why Gardere did not take a more proactive role in the appellate process and in moving more quickly toward a wind down. What Gardere did was, in the end, good work; it simply was not performed with a sense of urgency demanded by the circumstances.

There is one additional wrinkle in Gardere's representation. From time to time, they seemed distracted by the possibility that Baron would eventually sue the firm. Of course, such a prospect can always be disconcerting, but it can never be a basis for a lack of performance. Still, as the Court has reflected on the matter, it has not discerned any failure on Gardere's part during its representation of the Receiver in connection with this distraction.

Applying all of these facts to the *Johnson* factors, it is apparent that significant amounts of time and labor were required to control the estate at the outset of the Receivership; these requirements were amplified by the particular nature of the entities involved in the Receivership as the assets were scattered around the country and world. The time required necessarily precluded the particular Gardere attorneys assigned to this case, particularly Barry Golden and Peter Loh, from taking on other employment, though given its excellent reputation as a firm, Gardere as a whole likely did not lose substantial business and was in some capacity able to rearrange client assignments.

It is clear that Gardere undertook tasks that were quite difficult to resolve, particularly as they raised legal issues from a variety of fields—commercial litigation, receivership law, bankruptcy and intellectual property. Furthermore, the estate itself was worth millions of dollars, contained over 200,000 domain names, and several millions of dollars were at stake. Initially, and for some months after the Receivership estate was created, legal analysis was required for the daily management. Eventually, however, once these processes had settled somewhat, the

need to involve legal personnel diminished. Gardere should have delegated many of the tasks its lawyers handled sooner. When it did delegate, the Receiver selected appropriate substitutes. Mr. Cox and Mr. Eckels were adept at handling the UDRP claims in light of the stay. Damon Nelson, who worked for the Receivership during its duration, was a competent manager and was a proper choice given his familiarity with Baron's portfolios prior to the Receivership.

During its representation of the Receiver, Gardere charged on an hourly rate the fees customary for its regular corporate clients. These fees are comparable to those charged by other firms practicing in the community for similar kinds of work. These fees were also reasonable given that Mr. Loh and Mr. Golden have significant experience in commercial litigation and have excellent reputations that correspond to their abilities.

Given these factors, in addition to what the Court has discussed above, the Court finds that had the Receivership been proper, Gardere would have been entitled to approximately 80% of its fees once its billings related to tasks that could have been performed by others was appropriately reduced and several modifications made for duplicative billing when multiple attorneys participated in calls or meetings where one or two would have sufficed. Nevertheless, the Court must still meaningfully discount this award taking into account the directives of the Fifth Circuit. The Court concludes that equity requires that Gardere keep all the fees that it has been paid by this Court, but that no additional payments may be made. This essentially awards Gardere 73% of its requested fees and expenses.

The Court also finds that equity requires that Gardere keep all of its fees and expenses associated with the initial management of the estate; this work was superbly done, added value and comprised work that Baron or his employees would have needed to do in the absence of the Receivership. The only real charge laid against Gardere by Baron, beyond claims that more

31

attorneys participated in calls and meetings than was necessary, is that Gardere allowed 710 UDRP claims to accumulate and that Baron and his companies will need to resolve them once the Receivership is closed. This is not fairly attributed to Gardere or the Receiver. These claims would have arisen regardless of whether the domain names in question were under Baron's control or under the authority of the Receiver and the stay imposed by the Court. The Court finds that Gardere dealt with these claims in a reasonable manner given the circumstances of the stay. Further, the Court does not conclude, as Baron does, that he will necessarily be bombarded by these claims. Although the Court does not propose a solution at this time, it believes that a remedy can be achieved as part of the wind down process, such as a continuing stay for the necessary amount of time to efficiently address these pending claims.

As for the remainder of the fees, the Court finds that Gardere's duty was to take aggressive control of the appellate litigation in an effort to push it forward to a swifter resolution. While the Court still believes that the improper appeal of every order was the main cause of the unusually long delay in connection with the initial appeal, there is little evidence that Gardere was doing enough to educate the circuit on the problems with delay. All that being said, it is still clear to this Court that the circumstances of this case posed unusal difficulties that explain Gardere's inability to transition as expected; however, although this conduct was reasonable, it prevented Gardere from being as effective as it could have been. For this reason, the Court finds that a meaningful reduction in fees counsels against any additional disbursements, but similarly does not require any disgorgement.

The bottom line, of course, is this Order requires that Gardere forfeits $531,290.27 in fees where the work was expended and was done in good faith in a reasonable manner. While Gardere could have acted with more urgency, that fact does not discount that the work they did

was of high quality. In the end, however, the Court is of the view that this result is required under the directions from the Fifth Circuit.

### C. PETER S. VOGEL, RECEIVER

Peter Vogel served as special master in this case prior the creation of the Receivership. When the Receivership was created, the Court appointed him as the Receiver due to his recognized expertise in technology law and the internet. Vogel has served in this capacity since the Receivership Order issued on November 24, 2010 to the present. His fee application covers the fees of various parties, including himself. The Court will first address those fees by other parties not covered in this Court's previous Order Granting Motion for Fee Application for the Receiver in Regard to Certain Miscellaneous Receiver Professionals (Docket No. 1282), filed May 23, 2013. Then the Court will address the fees of the Receiver himself.

#### 1. *Other Receivership Professionals*

In the Court's previous Order, it authorized the payment in full of various employees of the Receiver as follows:

- Joshua Cox in the amount of $8,733.15. Mr. Cox served as counsel for Receivership party Quantec, LLC and was responsible for handling UDRP claims against domain names in the Quantec portofolio.
- James Eckles in the amount of $3,150. Mr. Eckles served as counsel for Receivership party Novo Point, LLC and was responsible for handling UDRP claims against domain names in the Novo Point portfolio.
- Jeffrey Harbin in the amount of $8,572. Mr. Harbin managed the Novo Point and Quantec parties from December 2010 and February 2011.
- Grant Thornton LLP in the amount of $12,089. Grant Thornton provided CPA services to the Receivership from December 2010 to the present.
- Damon Nelson in the amount of $18,300. Mr. Nelson managed the Novo Point and Quantec parties from February 2011 to the present.
- Matt Morris in the amount of $54,572.50. Mr. Morris served as a Receivership expert during the Ondova bankruptcy confirmation hearing.

33

As part of its ruling, the Court authorizes the payment of any additional fees and expenses incurred by these employees and professionals that accrue until the wind down and close of the Receivership estate. To the extent that the Court has authorized payment to these professionals in the past, the Court finds that these were also appropriate and need not be reduced in any way.

The Court also finds no need to reduce or adjust the payments previously authorized to pay the thirteen law firms outside of Texas which served as counsel for the filing of 28 U.S.C. §754 miscellaneous actions to reach Receivership assets; Thomas Jackson who served as counsel for Novo Point and Quantec between December 2010 and March 2011; Gary Lyon who has served as counsel to the Receiver from December 2010 to the present. All of these parties have been paid in full. Although the Court finds it unlikely that any of these parties will incur additional fees, it authorizes any fees that accrue until the wind down and close of the Receivership.

The Court does take a moment to address the $95,285.52 authorized and paid to Mr. Martin Thomas, who the Court appointed to represent Baron in the Ondova bankruptcy. Thomas was paid a flat fee of $5,000 a month for his services. This representation occurred for almost two years before the Court was informed by Thomas that although he had attended all the bankruptcy hearings and had worked with the other attorneys to promote Baron's interests, he never made an appearance before the Bankruptcy Court and never filed anything on Baron's behalf. The Court never intended that Thomas's participation be so limited and finds that he should have consulted both the Bankruptcy Court and this Court if he was confused about the extent of his authority to participate. Essentially, based on his own admission, he was paid for doing relatively little. To date, although Baron has objected to these fees, Thomas has not appeared to defend this payment in light of the revelation that he was not performing the work

34

that the Court believed him to be doing. At this time the Court neither approves of nor disapproves of the fees already paid to Thomas, but gives leave to Baron to file a motion to compel Thomas to appear before the presiding judge and give testimony as to his fees. The presiding judge will then issue an opinion on whether or not to disgorge any of Thomas's fees.

    *2. Peter Vogel*

    Vogel requests a total of $1,250,680 in fees. This Court has already authorized and paid $708,926, leaving $527,576 outstanding. Unlike the other professional fees considered by the Court in this Order, these are not attorney's fees. Vogel, although an attorney by trade, took on the non-attorney role of Receiver. His role was to investigate, conserve, hold and manage all the Receivership assets and to perform all acts necessary or advisable to preserve the value of those assets.

    Throughout the course of the Receivership, this Court has been impressed with Mr. Vogel's understanding of the domain name industry and the unique legal dynamics associated with it. He accepted and approached his obligations with great care and made thoughtful decisions that benefitted the property under his control. In addition, his task was hindered from the outset by Baron's uncooperative and disruptive litigation tactics.

    Baron has raised many objections to the Receiver's fees which the Court finds unpersuasive. The Court has already addressed some of these claims as they also relate to Gardere and will discuss some of these claims below as they relate to Dykema. Of those that apply primarily to the Receiver and not his counsel, the Court turns first to Baron's argument that the Receiver was obligated to distinguish and segregate the services rendered between the specific entities within the Receivership estate under Fifth Circuit law. *Bank of Commerce & Trust Co. v. Hood*, 65 F.2d 281 (5th Cir. 1933). The Court finds that in this regard the Receiver

35

acted appropriately. Not only did the majority of his activity benefit the estate generally, but the Court also specifically ordered the Receiver to charge his fees against particular accounts. As the Receiver complied with the Court's Orders, the Court finds that the Receiver did not act inappropriately in this regard.

Second, Baron argues that duplicative billings occurred after Dykema was retained when the Receiver would have meetings with three Dykema attorneys at once: Jeff Fine, a bankruptcy specialist; Chris Kratovil, a litigator; and David Schenck, an appellate specialist. Baron argues that there was no need to have all three present at once to advise the Receiver on the same issue. The Court disagrees. This was and is an extremely complex case with many moving parts. The expertise of all three attorneys was often necessary to fully understand the impact of various events in one proceeding on the others. This need extended to hearings before this Court as there were multiple occasions where all three attorneys would be called upon to explain or argue a situation to the Court. The Court finds that these meetings do not constitute duplicative billings.

Third, Baron asserts that no benefit was provided to the estate because the attorney fees for which the Receivership was created, in part, to resolve were never paid. This Court's order explicitly stayed and prohibited payment of those fees until the Fifth Circuit issued its opinion on the Receivership. This charge is irrelevant.

Finally, Baron argues that the Receiver should have quickly settled this case instead of prolonging the Receivership and incurring significant and unnecessary fees. While this would have indeed been a favorable outcome of the case, this Court concludes that any settlement negotiated by the Receiver would have been subject to an immediate objection and appeal to the Fifth Circuit. This objection presupposes that Baron would have complied with whatever settlement the Receiver made, but this Court's experience has been that Baron will often act

against his own self-interest, which likely would have included a rejection of even the most favorable settlement terms. The Court can find no fault with the Receiver's failure to reach a settlement given these circumstances.

Although the Court finds Vogel's work exemplary and entirely appropriate, there are legitimate objections raised by Baron and Netsphere which require the Court to substantially reduce his allowed fees. The major objection is that Vogel performed work as a lead litigator in this case in addition to his work as the Receiver. Mr. Vogel is a capable and well-respected attorney in this field and was certainly qualified to do this work; nevertheless, it was not the work he was appointed to do, especially given that he had retained trial attorneys to do it. As the Receiver, Vogel was to function as the client representative of the estate, meaning that his duties were akin to the general counsel of a corporation involved in a lawsuit. With regard to the litigation, his role was to stay informed of the proceedings before the Court, to appear and address the Court when needed, and to contribute to the general strategy of the litigation. Vogel did do this, but he also expended some time involved in the minutiae of the litigation which should have been left solely to his counsel. The result was that the estate was essentially billed for two lead litigators. This problem is confounded by the fact that Vogel's billings were often generic and repetitive[12], making it difficult to determine exactly what work was done when.

The Court has no doubt that Vogel's only objective as the Receiver was to ensure that the Receivership was run smoothly and that his expertise could be at the utmost advantage to the Court. Nevertheless, despite the competent work of the Receiver in this area, the Court must reduce the fees incurred for this extra, though unauthorized, activity. Accordingly the Court finds that equity requires the Receiver's fees to be paid at 70%. The Court thereby reduces the

---

[12] A majority of entries read "Review pleadings, files, emails, send emails, and related conversations with Receiver's counsel."

Receiver's allowed fees to $875,476. As the Receiver has already been paid $708,926, the Court authorizes an additional and final disbursement of $166,550. Additional fees in the amount of $361,026 are disallowed, as required by the direction of the Fifth Circuit and as explained herein.

### D. DYKEMA GOSSET

Dykema was retained as the Receiver's counsel from July 6, 2012 to the present. Dykema now seeks payment for fees and expenses totaling $1,473,183.12. The Court has already paid Dykema $398,893.91 and Dykema holds $737,276.73 in its trust account.

Dykema previously filed six fee applications with the Court.[13] The Court approved all of these applications; however, only two were approved prior to the release of the Fifth Circuit opinion.[14] On January 7, 2013, the Court approved Dykema's Third through Sixth Applications and ordered payment at a 95% rate based on the directive from the Fifth Circuit that the Court discount Receivership professional fees. These fees were paid, but as ordered, were to remain in Dykema's trust account until further order of the Court.

From the outset, the Court has been impressed by Dykema's work on this case, under the remarkable leadership of David Schenck. Until Dykema, it appeared to that Court that little could be done to lift the case above the chaos perpetuated by Baron. Yet, because of their prompt engagement with the issues and thoughtful approach to moving the case forward, Dykema refused to be distracted by all the noise surrounding this case and put it on an appropriate course. Granted, the Court recognizes that in many ways the timing of their entry and the structure developed by Gardere contributed to Dykema's success. Dykema entered the case right as the Fifth Circuit had finally agreed to hear the appeal. Additionally, Gardere's work to organize and

---

[13] Dykema filed four applications prior to the release of the Fifth Circuit opinion. Docket Nos. 1050, 1068, 1084 and 1095. Two were filed after the Fifth Circuit opinion. Docket No. 1113 and 1123.

[14] Docket Nos. 1050 and 1068 were approved and paid in full.

38

manage the Receivership estate allowed Dykema to delegate many tasks which Gardere initially needed to accomplish. Nevertheless, when Dykema came in with fresh eyes, they were able to triage the situation and effectively pursue their obligations.

The Dykema lawyers immediately assessed and developed a plan to tackle the key objectives at the time of their representation: the impending Fifth Circuit oral argument and the need to wind down the Receivership. Within a month of retention, Dykema drafted and filed a detailed omnibus brief defending the Receivership and various orders on appeal. They then prepared for and conducted the oral argument, which their appellate specialist, David Schenck, obviously performed with exceptional skill. In the meantime, Dykema also negotiated with the Trustee to resolve his claim that the Receivership should cover his legal expenses associated with defending the Receivership. A settlement agreement was reached conditioned upon the execution of a transfer of assets from one estate to the other. Having presumably reached an agreement on the issue of the Trustee's fees, Dykema worked with the Trustee to develop a Joint Plan that would close out the bankruptcy estate and return significant funds to Baron. Much of this work was the result of the superior efforts of Dykema's Jeffrey Fine.

This Plan involved the transfer of two domain name portfolios to the bankruptcy estate; this would allow the portfolios to be sold under the Bankruptcy Code and thereby preclude Baron from later attacking the sale. Dykema took a primary role in the auction procedures, working with interested bidders. The Plan was presented first to this Court for preliminary approval. Although the Court declined to specifically approve the plan, it noted that its terms seemed reasonable. An auction was held and the plan was submitted to the Bankruptcy Court for approval. A full confirmation hearing was held before Bankruptcy Judge Jernigan at which the Receiver and Dykema were major participants.

At this hearing, several objections to the plan were raised by Baron through his counsel, many of which were re-argued before this Court for the purposes of determining fees. Baron argued that he was denied adequate discovery regarding the auction and the plan, that the preliminary valuation of the domain names was tens of millions too low, that the auction procedures were improper, that legitimate bidders were denied an opportunity to participate, and that the top two bidders were owned by the same company overseas. Judge Jernigan was not persuaded by Baron's arguments. She found that discovery was provided as required, that the auction procedures were proper, that the valuation of the names was accurate and that no other factors warranted a denial of the plan. The plan was confirmed. It was not, however, ever executed because the Fifth Circuit had issued an interim order, before its final decision, that allowed the auction to occur, but that stayed any transfer of assets.

This Court finds that Baron has not presented any evidence to make this Court disagree with the findings of the Bankruptcy Court. Dykema's role during the auction and confirmation proceedings was proper. In addition to attacking the merits of the auction and Plan itself, which the Court has already found unconvincing, Baron also argues that both the Receiver and the Trustee should have waited to move forward with this plan until after the Fifth Circuit released its opinion; with oral arguments scheduled and heard, there was no need to spend hundreds of thousands in legal fees to move forward with a plan that could be, and was eventually shown to be, moot after the Circuit's ruling. The Court is sympathetic with this argument, but finds that because the Fifth Circuit declined to stay the auction or plan confirmation entirely, that these proceedings were implicitly allowed to continue. If the Fifth Circuit found no need to impose a broad stay, despite anticipating the direction of its own ruling, there was no reason for any of the parties to voluntarily abate, particularly as both this Court and the Bankruptcy Court were urging

prompt resolution and were operating under the impression that the Receivership Order would be affirmed.

After the Fifth Circuit rendered its opinion and the involuntary bankruptcy was filed, Dykema took an active role in that bankruptcy to attempt to preserve the Fifth Circuit's ability to have a rehearing or an en banc ruling. Netsphere has argued that the Receiver had no interest in whether the assets of the Receivership estate went to the involuntary bankruptcy or were returned to their original owner through a wind down process and therefore the Receiver should have had no interest in what happened in the involuntary bankruptcy. The Court concludes, however, that the Receiver did have a continuing obligation to ensure that the Fifth Circuit's opportunity for a rehearing or an en banc opinion was preserved as such an event could have potentially validated the Receivership. Even Baron agrees that the Receiver, by his counsel, had the obligation to protect the Receivership estate from the petitioning creditors, although the Court rejects Baron's assertion that the Receiver was obligated to pursue a show cause against the Petitioning Creditors for violation of the Court's stay. Docket No. 1269 at 12. Furthermore, Baron himself had requested a rehearing. Yet, the Court does find that Dykema's actions in the involuntary proceedings that related to their fees and not the ability of the Circuit to reconsider its opinion are not proper to be paid.

The Court finds that, except for those fees incurred relating solely to their own payment, Dykema's fees and expenses would have been paid in full had this been a proper Receivership. A significant amount of time and labor was required for Dykema to provide expert advice in this case. Not only did Dykema need to catch up with several years of activity in this complex case, but they also needed to prepare briefing for the Fifth Circuit under an extreme deadline. Dykema worked with exceptional diligence to accomplish this task and, at the same time, did so with a

41

performance of surpassing quality. Dykema also kept the Court informed of all progress and provided helpful insight as the Court proceeded with the case. Simultaneously, the firm's attorneys worked with the Trustee to develop the Joint Plan in the Ondova bankruptcy. This engagement was difficult and in some instances presented issues where there was no clear precedent in this Circuit. In order to perform these tasks within the short time period required, Dykema needed to engage some of its most experienced attorneys, who were then precluded from taking on additional work.

Dykema's fees in this case conform to those charged in the market for regular corporate clients billed at an hourly rate. The firm accepted this representation without any contingencies, except for final approval of all fees and expenses by this Court. The issues tackled and the particular circumstances of this case justify the number of hours that Dykema billed. Ultimately, the Court finds that the firm and its attorneys were diligent in fulfilling their obligations to the Receivership as the Receiver's counsel, and that they did so in an appropriate, thoughtful, highly skilled and efficient manner. None of Dykema's activity contributed in any way to the confusion that prolonged this case and, in fact, the Court believes that Dykema helped to clarify issues and gave helpful insight to all forums involved here. Further, David Schenck testified that in reviewing the final billings, Dykema was particularly conservative in reducing the number of billable hours. The Court therefore concludes that equity requires only a very modest reduction in fees.

The Court finds that Dykema's fees and expenses should be paid at a 98% rate for the period of July 6, 2012 to December 18, 2012. The Court finds that Dykema's fees and expenses incurred between December 18, 2012 and April 4, 2013, when the Mandate was issued, should be paid at a 90% rate to account for the fact that billing hours would have been reduced to some

extent given that the Receivership had been found to be improper and to account for the fees incurred solely defending Dykema's own interests as relates to their fees. Finally, the Court awards all fees and expenses incurred by Dykema during the month of April at a 95% rate as the majority of the work during this period was in an attempt to reach a global settlement in this case.

For the period between July 6 and December 18, 2012, Dykema billed $1,153,247.11.[15] The Court now reduces this amount to $1,130,182.17. For the period between December 18, 2012 and April 2013, Dykema billed $392,811.53. The Court now reduces this amount to $353,530.37. For the month of April, Dykema billed $82,095. The Court now reduces this amount to $77,990.25. The total allowed for Dykema is $1,561,702.79. The firm has already been paid $398,893.91, leaving the amount due to be $1,162,808.88. This figure will be rounded down to $1,130,000 to be certain of a conservative approach. Dykema is ordered to continue to maintain the $737,276.72 currently held in its trust account. If the involuntary bankruptcy is denied, then these trusts proceeds as well as other proceeds held by the Receiver in the sum of $392,724 will be paid to meet the requirements of this Order. If the involuntary bankruptcy is granted, then Bankruptcy Judge Jernigan will enter the necessary orders to finalize payment. Even then, despite the exceptional and exemplary performance of the firm's lawyers, Dykema's entitlements are still discounted by over $100,000. Given that David Schenck testified that he adjusted downward his billing statements by tens of thousands of dollars, this engagement

---

[15] Dykema submitted an invoice for the month of December that did not distinguish between fees incurred before and after the Fifth Circuit's opinion. During that month, Dykema billed 193.90 attorney and paralegal hours. 72.7 of those hours occurred on or after December 18. This means that approximately 62% of the billings were incurred prior to the ruling. The Court estimates that this amount was equal to approximately $63,407.1645.

certainly did not provide a premium that a first rate performance of this nature normally would call for.

In making this ruling, the Court denies Dykema's assertion that the funds in its trust account are earmarked for itself. The Court also orders that Dykema's priority be established pursuant to the Bankruptcy Code if an involuntary bankruptcy is approved. Dykema has claimed that its contract with the Receiver gives it priority over other professionals, but the Court finds that this agreement will be effectual if there is no order for relief in the involuntary bankruptcy; otherwise, the Bankruptcy Court will consider these terms under the Bankruptcy Code.

## VI.   GENERAL OBJECTION BY PETITIONING CREDITORS

The Petitioning Creditors did not file any specific objections to any of the fee applications before the Court. They did, however, file a general objection asking the Court to award fees such that the involuntary bankruptcy estate would have sufficient funds after the payment of priority parties to pay the Petitioning Creditors in full. These claims total approximately $1,400,000.

In support of this argument, the Petitioning Creditors point to the stay imposed by this Court with the creation of the Receivership that prohibited any attempts to collect their unpaid fees in any court proceedings. Further, although the Court initially intended to pay the former attorneys through the Receivership, it stayed its order and instructed the Receiver to refrain making such payments until the Fifth Circuit ruled on the Receivership. As part of this Order, the Court instructed the Receiver to segregate sufficient funds to pay these attorneys when the Fifth Circuit opinion was released. The Receiver, apparently, did not segregate these funds. In light of these considerations, the Petitioning Creditors assert that equity warrants a consideration of the impact any award of professional fees would have on their pending claims.

44

While the Court joins the former attorneys and every other participant in this matter with the frustrations engendered by the delay, caused by the appeal and the stay on actions against Baron, the Court does not find this sufficiently compelling to alter its determination on fees.[16] If the Bankruptcy Court had dealt with this issue, the Court believes it would not have taken into account the claims of the Petitioning Creditors.

## VII.   PAYMENT OF FEES IN ACCORDANCE WITH THIS ORDER

The Court understands that if an order for relief is entered in the Bankruptcy Court that these claims will have priority consideration under 11 U.S.C. §§ 330, 503 and 507 and will be paid under those sections accordingly. If an order for relief is denied and this Court must begin the wind down process as instructed by the Fifth Circuit, the Court ORDERS that any monies paid out during the wind down process be paid in the following order:

1. Dykema Gosset
2. Other unpaid Receivership professionals under the Order Granting Motion for Fee Application for the Receiver in Regard to Certain Miscellaneous Receivership Professionals (Docket No. 1282)
3. Receiver, Peter Vogel

Each claim is to be paid in full before the next claimant may receive anything. These fees must be paid from the available cash in the Receivership estate and no other assets may be sold to satisfy these claims.

## VIII.   CONCLUSION

As articulated above, the Court authorizes additional payments to the Receiver in the amount of $166,550 and to Dykema in the amount of $1,130,000. These additional allowed fees total $1,296,550. The Court understands that payment now depends on the cash reserves of the

---

[16] The Court is also of the opinion that the Receiver's failure to segregate the funds owed to the former attorneys is irrelevant as the Fifth Circuit found that this Court could not order the payment of these fees from the Receivership estate.

Receivership estate. The Court has allowed Gardere and the Trustee to retain the funds already distributed, but will authorize no more.

It is so ORDERED.

SIGNED this 29th day of May, 2013.

W. Royal Furgeson, Jr.

Senior United States District Judge