IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **NETSPHERE, INC.**; | § | |
| **MANILA INDUSTRIES, INC.; AND** | § | |
| **MUNISH KRISHAN**, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. **3:09-CV-0988-L** |
| | § | |
| **JEFFREY BARON AND** | § | |
| **ONDOVA LIMITED COMPANY**, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is The Receiver's Request for Approval of Final Accounting, Application

for Payment, and Request for Order of Final Discharge (Doc. 1397), filed April 4, 2014; and The

Receiver's Supplemental Application for Payment (Doc. 1398), filed April 15, 2014. The court refers

collectively to the Receiver's initial and supplemental applications as "the Receiver's Application."

The Receiver's Application is submitted by Receiver Peter S. Vogel (the "Receiver" or "Vogel") on

behalf of himself, his counsel, Dykema Gossett PLLC ("Dykema"), and the Receiver's other

professionals.   After considering the Receiver's Application, objections to the Receiver's

Application, evidence submitted in support of the Receiver's Application, and record, and in light

of the court's familiarity with this case, the receivership ("Receivership") established in this case,

and the litigation in related cases, the court **grants in part and denies in part** the Receiver's

Application (Docs. 1397 and 1398) as herein set forth.

**Memorandum Opinion and Order - Page 1**

## I.      The Receiver's Request for Payment of Receivership Expenses

### A.      Reasonableness of the Professional Fees and Expenses Sought

In ruling on a request for attorney's fees, the court first calculates the "lodestar" fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995). The court next considers whether the lodestar figure should be adjusted upward or downward depending on its analysis of the twelve factors established in *Johnson v. Georgia Highway Express, Incorporated*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 91-92 (1989). The twelve factors include: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Cobb v. Miller*, 818 F.2d 1227, 1231 n.5 (5th Cir. 1987) (citing *Johnson*, 488 F.2d at 717-19). "Many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate and should not be double-counted." *Jason D.W. ex rel. Douglas W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 209 (5th Cir. 1998) (internal citations omitted).

The Receiver seeks approval of a final payment in the amount of $907,100.62 for receivership fees and expenses incurred from May 1, 2013, through May 15, 2014, pursuant to this

court's February 28 and March 3, 2014 orders and the Fifth Circuit's opinion in *Netsphere, Inc. v.*

*Baron*, 703 F.3d 296, 317 (5th Cir. 2012). The amount sought is for the following amounts that were

actually invoiced and incurred by the Receiver and his professionals from May 2013 through March

2014, plus $40,000 for Dykema's anticipated fees and expenses through the close of the

Receivership:

| | | |
|---|---|---|
| 1. | Joshua Cox | $20,904.30 |
| 2. | Damon Nelson | $49,275.00 |
| 3. | Dykema | $632,219.25 |
| | | (includes additional $40,000) |
| 4. | Receiver | $197,485.21 |
| 5. | Henjum Goucher | $829.56 |
| 6. | Corona Court Reporting | $1,174.80 |
| 7. | James Eckels | $5,212.50 |
| | | Total: $907,100.62 |

The following chart sets forth the hourly rates, number of hours billed, and total dollar

amounts billed for fees and expenses by attorney or other Receivership professionals as calculated

by the court using the invoices submitted:

| Receivership Professional | Hourly Rate | Hours Billed | Fees Billed | Expenses Billed |
|---|---|---|---|---|
| Joshua Cox | $290 | 165 | $20,625.00 | $279.30 |
| Receiver<br>Karri S. Speck | $800<br>$220 | 240.9<br>18.2 | $192,724.00<br>$4,004.00 | $761.21 |
| James Eckels | $125 | 41.7 | $5,212.50 | |
| Damon Nelson | $100 | 492.75 | $49,275 | |
| Henjum Goucher | N/A | N/A | $829.56 | |
| Corona Court Reporting | N/A | N/A | $1,174.80 | |
| | | | | |
| **Dykema Gossett PLLC** | | | | |
| Jeffrey R. Fine | $560 | 475.4 | $266,224.00 | |
| Christopher D. Kratovil | $505 | 59.7 | $30,148.50 | |
| David J. Schenck | $570 | 419.8 | $239,286.00 | |

| Alison R. Ashmore | $320 $335 | 45.2 38 | $14,464.00 $12,730.00 | |
| Alexa L. Parnell | $235 $245 | 50.5 8 | $11,867.50 $1,960.00 | |
| William B. Finkelstein | $620 | 3 | $1,860.00 | |
| Michael J. Ringelheim | $295 | 22 | $6,490.00 | |
| Steven M. Baker | $290 | 9.5 | $2,755.00 | |
| Maria M. Razo | $125 | 2 | $250.00 | |
| Dykema additional anticipated fees | | | $40,000.00 | |
| Dykema expenses | | | | $4,054.48 |
| **Total Fees** | | | **$901,879.36** | |
| **Total Expenses** | | | | **$5,094.99** |
| **Total Fees & Expenses** | | | **$906,974.35[1]** | |

Vogel served as special master in this case prior to the creation of the Receivership. When the Receivership was created, Senior United States District Judge Royal Furgeson ("Judge Furgeson") appointed Vogel as the Receiver due to his recognized expertise in technology law and the Internet. Vogel has served in this capacity since the Receivership Order issued on November 24, 2010, to the present. Vogel's fee application covers the fees of various Receivership professionals, including himself and his paralegal Karri S. Speck. The fees charged by attorney James Eckels are for his management of Quasar services and support of the Receiver's day-to-day operations. Attorney Joshua Cox continued to assist with the handling of actual or threatened cybersquatting

---

[1] The court's calculation of the total amount for professional fees and expenses varies slightly from the amount sought by the Receiver because, in reviewing Dykema's invoices for attorney's fees and expenses, the court came up with a total amount of $632,088.98 [$588,034.50 (fees) + $40,000 + $4,054.48 (expenses) = $632,088.98], which it will use for purposes of ruling on the Receiver's Application. The court attributes the slight discrepancy between its calculation of $632,088.98 and the total amount requested by Dykema ($632,219.25) to the calculation of Dykema's expenses. According to the Receiver's Application submitted by Dykema, the total amount of attorney's fees requested by Dykema reflects a voluntary downward adjustment or reduction of approximately four percent. It appears to the court, however, that the amount billed before the referenced adjustment is what is being sought by Dykema in the Receiver's Application.

claims or claims under the Uniform Domain Name Dispute Resolution Policy ("UDRP").  Damon Nelson, who was familiar with the Receivership portfolio before the Receivership was put in place, managed the Receivership estate portfolio and worked closely with the Receiver, the Receiver's counsel, Cox, and third parties in overseeing the Receivership assets and UDRP complaints. Dykema was retained and substituted in as counsel for the Receiver on July 6, 2012, several months before Jeffrey Baron's ("Baron") former attorneys ("Petitioning Creditors") filed the involuntary bankruptcy against him to recover for services performed on behalf of Baron and his companies. Extensive litigation, that involved appeals to this court and the Fifth Circuit, regarding the involuntary bankruptcy and the impact of that bankruptcy proceeding on the Receivership continued throughout the time that Dykema acted as counsel for the Receiver.  The appeal to the Fifth Circuit involving the involuntary bankruptcy was only recently dismissed on January 23, 2015, by agreement between Baron and the Petitioning Creditors.  The following Dykema attorneys provided legal services on behalf of the Receivership: Jeffrey R. Fine, Christopher D. Kratovil, David J. Schenck, Alison R. Ashmore, Alexa L. Parnell, William B. Finkelstein, Michael J. Ringelheim, Steven M. Baker.  Dykema professional Maria M. Razo provided paralegal services.  Corona Court Reporting and Henjum Goucher provided court reporting services for two depositions taken at the request of the Receiver or the Receiver's counsel.

The court has significant experience in awarding attorney's fees in various matters and is familiar with rates charged by attorneys in the North Texas area. The rates charged by the attorneys who performed legal services on behalf of the Receivership are reasonable and customary for attorneys with their level of ability, experience, and skill.  Additionally, except for some duplication

of effort in the review of pleadings and the high hourly rate of $220 charged for paralegal Karri S. Speck, for which the court deducts 10% from the total amount requested by the Receiver, the record reflects that the hours expended by the Receiver and Receivership professionals, including the additional amount requested by Dykema, were reasonable and necessary in the management of the Receivership and Receivership estate, particularly given the novelty and difficulty of the Receivership and bankruptcy issues; the complex and litigious nature of the Receivership and related bankruptcy proceedings; the skill necessary to handle these difficult receivership and bankruptcy related issues; the amount of time required to manage the Receivership and the domain assets; and the undesirability of the case.[2]  In determining the reasonableness of the professional fees incurred, the court also takes into account the disruptive conduct of Receivership parties Jeffrey Baron ("Baron"), Novo Point LLC ("NovoPoint"), and Quantec LLC ("Quantec") (collectively, "LLCs"), which continued after the order establishing the Receivership was reversed and increased the Receivership expenses to which Baron now objects.[3]

---

[2] The Receiver downplays the significance of this last factor in his Application, which the court determines is relevant to the fees and expenses incurred in this case during the time in question, as the Receiver's current counsel agreed to substitute in as counsel late in the case despite the morass surrounding the Receivership that spilled over into the bankruptcy proceedings filed by and against Baron. Moreover, this case, and those involved in the case, including Judge Furgeson, United States Bankruptcy Judge Stacey G. C. Jernigan ("Judge Jernigan"), the bankruptcy trustee, the Receiver, and the Receiver's professionals, have received a fair amount of unwarranted negative publicity and treatment at the hands of Baron and his supporters.  Baron and the LLCs have also sued various persons and entities involved in this case or satellite litigation.  One such suit against the Receiver and his former counsel pertaining to the Receivership in this case is pending before this court in Civil Action No. 3:15-CV-232-L.

[3] Baron began interfering with the winding down of the Receivership immediately after the Fifth Circuit's December 18, 2012 opinion issued (and before the mandate issued in April 2013) by advising third-party monetizer Domain Holdings Group ("Domain Holdings") that the Receivership order had been vacated and requesting Domain Holdings to stop transferring funds to the Receiver or anyone acting pursuant to the Receivership order, including those acting on behalf of Receivership parties Novo Point and Quantec pursuant to such order. *See* Receiver's Mot. (Doc. 1148 and attachments); Order (Doc. 1155). As a result, Domain Holdings stopped making monetizer payments for a period of time.  While Baron's statement that the Fifth Circuit's December 18, 2012 opinion vacated the Receivership order was technically correct, it gave the false impression that the Receivership itself had been vacated or dissolved. Baron

Further, a large portion of the attorney's fees incurred by the Receiver's counsel Dykema is directly attributable to the involuntary bankruptcy filed against Baron by his former attorneys.  Like the Receivership, the involuntary bankruptcy proceeding came about as a result of Baron's conduct in hiring and firing numerous attorneys and ultimately prolonged the Receivership because of the numerous and complex disputed issues that arose regarding the impact of the involuntary bankruptcy

---

persisted in his efforts to seize control of the domain assets that were still subject to the Receivership and to redirect payments by Domain Holdings away from the Receivership that were needed by the Receiver to continue paying domain name fees to maintain the Receivership assets pending dissolution of the Receivership.  In doing so, Baron disregarded Judge Furgeson's December 20, 2012 order that the Receiver would continue to maintain all Receivership assets and pay all domain name renewals pending dissolution of the Receivership, as well as the Fifth Circuit's December 31, 2012 clarification, that its opinion did not dissolve the Receivership, and that the process for ending the Receivership would be managed by the district court on remand. As a result, Judge Furgeson threatened to impose sanctions against Baron by requiring him to pay the Receiver's and the Receiver's attorney's fees.

Baron and others acting on his and the LLCs' behalf engaged in similarly disruptive conduct before and after this court announced in January 2014 that it would begin the process of winding down the Receivership. Baron hired a new attorney who began filing materials on behalf of Baron before filing a notice of appearance and before being substituted as Baron's counsel.  In an attempt to manipulate the manner in which the Receivership assets were returned to the Receivership parties, Baron contended that the court should return the LLCs' Receivership assets to a yet-to-be designated representative of purported Village Trust trustee RPV Limited ("RPV").  After the court declined to do so and ordered the LLCs' assets returned to Lisa Katz ("Katz"), who was hired in 2011 by the former trustee of the Village Trust to act as the manager of Novo Point, the LLC with the most valuable domain name assets, Baron or others acting on his and the LLCs' behalf undertook last-minute efforts to change the manager of the LLCs to David McNair ("McNair") and terminate Katz, although Baron and the LLCs had never previously objected to Katz prior to this time, and they were uncooperative in proceedings requested by the Receiver and conducted by Judge Furgeson and Judge Jernigan in an effort to determine whether Katz or others had authority to act on behalf of the LLCs.  Baron then requested the court to reconsider its prior order and return the LLCs' assets to McNair, the LLCs' newly appointed manager. In support of this request, Baron submitted an affidavit from McNair and trust documentation that, prior to this time, were conveniently unavailable. In the meantime, Baron and his counsel requested the Receiver to disregard the court's orders and transfer the LLCs' Receivership domain name assets to Baron's designee or delay in turning over the LLCs' assets to Katz. In addition, McNair contacted Fabulous.com, the internet domain name registrar, insisting that he was the duly appointed manager of the LLCs despite the court's orders requiring the return of the LLCs' assets to Katz. Doc. 1378. McNair also contacted Domain Holdings in an attempt to take control of the Receivership assets. *Id*. When this failed, Baron's attorney and others acting on behalf of Baron or the LLCs resorted to threatening litigation against third parties, including Domain Holdings, if they provided Katz with access to the Receivership domain name accounts in accordance with the Receiver's instructions and this court's orders. Doc. 1380-1. This and other similar conduct by Baron and the LLCs in 2014 resulted in a significant amount of motion practice in this case and related cases, unnecessarily delayed the dissolution of the Receivership and discharge of the Receiver, increased the amount of Receivership expenses, and has given rise to yet more litigation in newly filed civil actions assigned to the court.

case on the winding down of the Receivership.  The court nevertheless discounts the total amount

of fees and expenses requested in the Receiver's Application (after the 10% reduction to the amount

requested by the Receiver as noted above) by an additional 15% in light of the Fifth Circuit's

determination that imposition of the Receivership was the wrong remedy to address Baron's

disruptive and vexatious conduct.  With these deductions, the total amount of requested professional

fees and expenses that remains is **$754,141.97**.  The court finds that this amount is reasonable and

necessarily incident to the Receiver's duties performed in this case and related proceedings.

> **B.**     **"Cash on Hand" as of December 18, 2012**

As recognized the Receiver, the total amount that the court may award for remaining

Receivership fees and expenses turns on its interpretation of the following directive in the Fifth

Circuit's December 18, 2012 opinion regarding the payment of remaining Receivership expenses:

> [E]verything subject to the receivership other than cash currently in the receivership, which Baron asserts in a November 26, 2012 motion amounts to $1.6 million, should be expeditiously released to Baron under a schedule to be determined by the district court for winding up the receivership. The new determination by the district court of reasonable fees and expenses to be paid to the receiver, should the amount be set at more than has already been paid, may be paid from the $1.6 million. To the extent the cash on hand is insufficient to satisfy fully what is determined to be the reasonable charges by the receiver and his attorneys, those charges will go unpaid. No further sales of domain names or other assets are authorized.

*Netsphere, Inc. v. Baron*, 703 F.3d 296, 313-14 (5th Cir. 2012).[4]  Based on this language, the

Receiver contends that the court has authority and discretion to order payment to the Receiver and

_____

   [4] The Fifth Circuit subsequently clarified that all Receivership assets other than cash currently in the Receivership should be returned, as appropriate, to Baron, the LLCs, or the persons/entities from whom the assets were obtained.

his professionals from the cash assets remaining in the Receivership as of December 18, 2012, even

though the establishment of the Receivership was held to be improper.  The court agrees.

As the Fifth Circuit explained:

[W]e hold, based on this record, that in creating the receivership "there was no malice nor wrongful purpose, and only an effort to conserve property in which [the court] believed" it was interested in maintaining for unpaid attorney fees and to control Baron's vexatious litigation tactics. We recognize that the district court was dealing with a conundrum when it decided to appoint the receiver—the problem was great, but standard remedies seemed inadequate. We also take into account that, to a large extent, Baron's own actions resulted in more work and more fees for the receiver and his attorneys. *For these reasons, charging the current receivership fund for reasonable receivership expenses, without allowing any additional assets to be sold, is an equitable solution*.

*Id.* at 313 (citation omitted and emphasis added).  Thus, the court must determine the amount of

"cash on hand" or "cash currently in the receivership" as of December 18, 2012, and whether this

amount should be limited to the $1.6 million referenced in the Fifth Circuit's opinion.  *Id.* at 313-14.

The Receiver asserts that the Fifth Circuit's reference to $1.6 million is not conclusive of the

amount of cash on hand because, as reflected in the Fifth Circuit's opinion, this amount was derived

from Baron's unsupported assertion that $1.6 million in cash assets remained in the Receivership

as of November 26, 2012. According to the Receiver, the amount of cash in the Receivership as of

December 18, 2012, actually ranged from $2.3 million to $4.1 million, depending on how the court

construes the term "cash."  Receivers's Appl. (Doc. 1397) 15.  The Receiver requests that the court

construe "cash on hand" or "cash currently in the receivership" as of December 18, 2012, as

including the following amounts:

the cash in Receivership accounts ($1,196,744.31); Accounts Receivable (totaling $1,147,761.18 including the 2012 Netsphere Settlement Payment ($600,000.00), the estimated amount due from the Ondova Bankruptcy Trustee for the disgorgement of

a prior payment ($379,761.18), and withholdings from Domain Holdings Group of monthly monetizer payments of approximately $150,000.00 for the month of December 2012); and the value of Mr. Baron's IRAs and brokerage accounts that were subject to and under the control of the Receivership ($1,761,509.59).

*Id.* at 4 n.8. The Receiver maintains that inclusion of these assets as "cash on hand" comports with the "letter and spirit" of the Fifth Circuit's opinion and takes into account the differing evidence on remand. The Receiver asserts that an exception to the "mandate rule" applies when, as here, the evidence is different upon remand. Receiver's Appl. 16.

In prior orders, the court was previously operating under the mistaken assumption that the amount of cash or money in the Receivership was a fairly static amount of either $1.6 million or another amount as of December 18, 2012, because it was not aware that money was coming into the Receivership as monetizer payments and being paid out for domain fees. Black's Law Dictionary defines "cash" as "[m]oney or its equivalent . . . [c]urrency or coins, negotiable checks, and balances in bank accounts." Black's Law Dictionary 260 (10th ed. 2014). Merriam-Webster's Collegiate Dictionary defines "cash" similarly as "money or its equivalent" or "ready money." Merriam-Webster's Collegiate Dictionary 191 (11th ed. 2003). Neither of these sources defines "cash on hand"; however, the court located the following definition of "cash on hand" from another source:

> "Cash on hand" is a term used to describe the current liquid assets of a company or individual. This includes actual cash as well as accessible balances in checking, savings, money market, and other such accounts. In some cases, available credit funds may also be included. These assets differ from total assets, which additionally include things such as equity in real estate and equipment, and can include invoiced monies as well.
>
> The main point of difference between cash on hand and other types of assets is the immediacy of access. The funds generally do not need to be physically present on the premises to be considered "on hand." As long as the business or individual has

access within a fairly immediate time frame, the funds are considered part of this category.

Further, funds considered "cash" do not have to be physical money. Electronic funds, such as those present in bank accounts, also count. In addition, the funds in credit accounts such as credit cards or home equity lines of credit may sometimes be included, provided they can be accessed quickly.

Any asset considered a part of cash on hand must be liquid. This means that it does not require the sale or transfer of a physical or intangible item in order to access its full or partial worth. For this reason, equity in a home, physical items of value, and stocks or shares are not considered to be either "cash" or "on hand."

http://www.wisegeek.com/what-is-cash-on-hand.htm. An online article in the small business section of the Houston Chronicle defines cash on hand similarly as follows: "Cash on hand is the total amount of any accessible cash. According to 'Entrepreneur' magazine, it refers to any available cash regardless of whether it is in your pocket or your bank account. Investments that you can convert to cash in 90 days or less are typically included when calculating your cash on hand." http://smallbusiness.chron.com/difference-between-petty-cash-cash-hand-51922.html.

The court finds these definitions instructive and consistent with the Fifth Circuit's directive that remaining Receivership expenses be paid from funds in the Receivership as of December 18, 2012, without selling any additional domain names or other Receivership assets. *Netsphere, Inc.*, 703 F.3d 313-14. Accordingly, applying this definition of "cash on hand" and the Fifth Circuit's express directive precluding the sale of additional Receivership assets after December 18, 2012, the court concludes, based on the Receiver's report and Inventory of Assets (Doc. 1161), filed January 8, 2013, that the following assets totaling $1,946,444.31 qualify as "cash on hand" in the Receivership as of December 18, 2012:

**Memorandum Opinion and Order - Page 11**

| | |
|---|---:|
| Receiver's Comerica Checking Account | $147,565.74 |
| Quantec BBVA Bank Account | $364,610.86 |
| Novo Point BBVA Bank Account | $665,563.51 |
| Baron Capitol One Savings Account | $4,025.68 |
| Baron Capitol One Checking Account | $141.84 |
| Baron Woodforest National Checking Account | $573.49 |
| Baron American Century Investments Prime Money Market Account | $3,115.56 |
| Comerica Investigating Netsphere check | $7,711.72 |
| TD Ameritrade Money Market Account | $3,035.91 |
| Manassas D. Comerica Bank Account | $100.00 |
| Domain Holdings Group (monetizer payment for December 2012) | $150,000.00 |
| Netsphere Settlement Payment under GSA | $600,000.00 |
| | **$1,946,444.31** |

All but two of the above listed assets represent amounts in checking, savings, money market, and similar bank accounts that would not require the sale of stock or other assets to liquidate.[5] Domain Holdings' monetizer payment of $150,000 for December 2012 is also included. The court, however, does not include any monthly monetizer payments that were made by Domain Holdings or due after December 18, 2012, because it determines that any monetizer payments to be made on a monthly basis by Domain Holdings *after* December 18, 2012, fall outside the scope of that permitted by the Fifth Circuit.

Based on the information available to it, the court also determines that the $379,761.18 previously paid to the Ondova bankruptcy trustee does not qualify as "cash on hand" and therefore was not included in the court's calculation. The Receiver's justification for including the $379,761.18

---

[5] The court determines for purposes of its analysis that the brokerage and IRA accounts listed in the Receiver's inventory and valued at approximately $1.7 million would require a sale of assets to liquidate the accounts. The value of these accounts was therefore not included as "cash on hand." Moreover, the Receiver does not include this amount as "cash on hand" as of December 18, 2012.

**Memorandum Opinion and Order - Page 12**

previously paid to the Ondova bankruptcy trustee as "cash on hand" is not entirely clear.  The Receiver indicates in his inventory that this is the "estimated amount[] due" from the trustee for "disgorgement of [a] prior payment."  Receiver's Inventory (Doc. 1161 at 6).  From this, the court concludes that $379.761.18 was awarded and paid to the trustee prior to December 18, 2012, but never disgorged.  It is unclear from the Receiver's Application, however, why the Receiver believes that the amount paid is "due" from the trustee or subject to disgorgement.  *Id.*  The court is not aware of any order as of December 18, 2012, that required the trustee to disgorge the $379,761.18 previously awarded by the district court.  While the Fifth Circuit directed the district court to reconsider *all* fees and expenses previously paid from the Receivership, it did not specifically order the district court to disgorge the $379,761.18 previously paid to the trustee.  *See Netsphere, Inc.*, 703 F.3d at 313. Moreover, in light of the Fifth Circuit's directive to reconsider all fees and expenses previously paid, Judge Furgeson subsequently revisited, on May 29, 2013, whether the $379,761.18 paid to the trustee and his attorneys should be reduced, and he determined, for equity considerations, that it should not, even though he indicated sometime earlier in 2013 that he might require the trustee to return the amount awarded.  May 29, 2013 Order (Doc. 1287 at 25).  Inclusion of this amount as "cash on hand" as of December 18, 2012, is therefore inappropriate.

The court, on the other hand, agrees with the Receiver that the $600,000 payment under "Netsphere Global Settlement" referenced in the Receiver's Application should be counted as "cash on hand" as of December 18, 2012.  The "Netsphere Global Settlement" refers to the Global Settlement Agreement ("GSA") dated July 2, 2010, that resolved domain name and creditor claims in this case and other cases, including the bankruptcy filed by Baron on behalf of his company

Ondova Limited Company ("Ondova"). Pursuant to the settlement, Manila Industries, Inc. ("Manila"), a Plaintiff in this case, agreed to pay the Village Trust, the Cook Islands entity that owns Novo Point and Quantec, $600,000, together with simple interest, on or before the second anniversary of the Transfer Date, which the GSA defines as: "the later of: (i) the date which is thirty (30) days after the Settlement Date or ninety (90) days after a 9019 motion is filed with the Bankruptcy Court to approve this Agreement." Ondova Bankruptcy (Doc. 368-1 at 5). The GSA was to become effective on the "'Settlement Date,' which was defined as 'the day after the date on which the Bankruptcy Court's order approving this Agreement becomes a Final Settlement Order.'" *Netsphere, Inc.*, 703 F.3d 303. On July 28, 2010, the bankruptcy court approved the GSA and ordered the settlement to be fully executed by July 30, 2010. *Id.* Thus, according to the GSA, the $600,000 payment was due no later than September 30, 2010 (90 days after the trustee filed his 9019 motion on July 2, 2010). The $600,000 payment, however, was never made.

Based on the Fifth Circuit's December 18, 2012 opinion, Judge Furgeson entered an order on January 2, 2013, requiring Netsphere, Inc. ("Netsphere") to deposit with the Receiver all monies due and owing to Baron under the GSA through December 31, 2012. On March 8, 2013, the Receiver sought to compel payment in accordance with Judge Furgeson's order. In response, Netsphere acknowledges that the $600,000 payment was owed by Manila under the GSA but contends that Manila's performance was excused because Baron and Ondova, Defendants in this case, materially breached the GSA. Netsphere also contends that the involuntary bankruptcy filed against Baron on December 18, 2012, automatically stayed the proceedings in this case.

The $600,000 payment was due under the GSA long before the involuntary bankruptcy was filed and before the Receivership was established in November 2010.  According to the bankruptcy court, Baron's and the LLCs' actions interfered with the full implementation of the GSA.  Baron and the LLCs, however, have recently taken the position that the GSA is enforceable, and that the assets assigned to the Village Trust under the GSA should be used to settle claims in the Ondovoa bankruptcy.  *See* February 9, 2015 Mot. to Confirm Settlement Auth. (Doc. 1198 at 4), Case No. 09-34784-sgj11 ("In an effort to resolve these seemingly never-ending proceedings that have been ongoing since 2009, Jeffrey Baron and the LLCs would welcome the opportunity to assist this Court in winding up the affairs of Ondova by filing a plan of reorganization designed to recover valuable assets that were assigned to the Village Trust pursuant to the GSA.").[6]  In light of Baron's and the LLCs' contention that the GSA is enforceable and the deadline for the payment under the GSA, the court concludes that it is appropriate to consider the $600,000 payment or receivable as "cash on hand" as of December 18, 2012.  Because Plaintiffs Netsphere, Manila, and Munish Krishan ("Krishan") (collectively, "Plaintiffs") contend in this case and allege in their amended pleadings that their performance under the GSA was excused due to Defendants' breaches, however, the court will not reduce the $600,000 to judgment against Netsphere or Manila in favor of the Receiver as requested by the Receiver.  The court instead only considers the $600,000 in calculating the amount of "cash on hand" as of December 18, 2012, for purposes of determining the maximum amount of remaining Receivership fees and expenses that can be awarded.

---

[6] The motion by Baron and the LLCs was withdrawn on March 17, 2015, after sanctions were sought in the bankruptcy against them, and this court remanded a related case to state court involving the LLCs and the issue as to whom has authority to manage the LLCs.

C.      **Funds Available to Pay Remaining Receivership Fees and Expenses**

As previously noted, the Fifth Circuit directed the district court on remand to reevaluate the Receivership fees and expenses to be paid and held that the amount of Receivership fees and expenses ultimately awarded must not exceed the amount of cash on hand in the Receivership as of December 18, 2012. *Netsphere, Inc.*, 703 F.3d at 313-14. To the extent that the cash on hand was insufficient to fully satisfy the amount of reasonable charges determined by the district court, the Fifth Circuit ordered that those charges would go unpaid. *Id.* at 314. Receivership expenses totaling $1,414,676.05 for the period of December 2012, through April 2013 were approved by Judge Furgeson in May 2013. In addition, this court approved $18,917.53 in additional Receivership expenses to be paid to accounting firm Lain Faulkner & Co., P.C., to enable the Receiver to prepare the final report requested by the court. The total amount of Receivership expenses approved and paid since December 18, 2012 therefore totals $1,433,593.58.

Subtracting this amount from the remaining cash on hand in the Receivership as of December 18, 2012 ($1,946,444.31), the court arrives at an amount of $512,850.73. Thus, by the court's calculation, any payment of remaining Receivership expenses from assets in the Receivership cannot exceed $512,850.73, even though the requested fees and expenses in the Receiver's Application exceed this amount. According to the Receiver, $424,857.76 in cash assets remain in the Receivership as of the date the Receiver's Application was filed. This amount is insufficient to pay all of the Receivership expenses that the court has determined were reasonably and necessarily incurred by the Receiver and his professionals in managing the Receivership in this case under the unusually difficult circumstances presented. Additional amounts that the court awards for remaining

Receivership expenses to be paid from Receivership assets is necessarily constrained by the Fifth

Circuit's December 18, 2012 directive and the court's interpretation of that directive.

Anticipating that there would be insufficient Receivership funds, the Receiver requests that

the remaining Receivership fees and expenses be awarded under the bankruptcy code as a sanction

against Baron's former attorneys who, according to the Receiver, filed the involuntary bankruptcy

in violation of the Receivership order entered by Judge Furgeson. The court acknowledges that a

majority of the fees and expenses sought was incurred as a result of the involuntary bankruptcy

proceedings. The court is also aware that, after the involuntary bankruptcy was filed against Baron,

the Receiver was ordered to remain in possession of the Receivership assets and continue maintaining

the assets until an order of relief was entered by the bankruptcy court. The bankruptcy court

ultimately concluded that the involuntary bankruptcy proceeding created an "intervening

circumstance" that required the turnover of the Receivership assets to the bankruptcy trustee in

accordance with section 543 of the bankruptcy code because, "in a typical situation of a receivership

predating a bankruptcy case, the protocol is clear: the receiver is superseded by a bankruptcy trustee

and simply turns over the receivership assets to the bankruptcy trustee pursuant to Section 543 of the

Bankruptcy Code." July 26, 2013 Sua Sponte Report of Bankruptcy Court (Doc. 1304-1 at 4-5). This

court, however, subsequently determined that application of section 543 of the bankruptcy code was

inappropriate because it is premised on the existence of a valid receivership, whereas the Receivership

in this case was determined to be improper. For this reason, the court concludes that awarding

Receivership fees and expenses under the bankruptcy code sections relied on by the Receiver would

not be appropriate.

**Memorandum Opinion and Order - Page 17**

Accordingly, the court awards the Receiver a total of **$424,857.76** for Receivership fees and expenses incurred from May 2013 through the close of the Receivership, which shall be paid from the remaining cash assets in the Receivership. The professional claims shall be paid in the same manner previously ordered by Judge Furgeson with payment to Dykema before other claimants. *See* May 29, 2013 Order (Doc. 1287 at 45).  The Receiver's request for additional fees and expenses in excess of $424,857.76 is **denied.**

## II.    The Receiver's Request for Approval of Final Accounting and Order of Final Discharge and Release

The Receiver requests that the court, upon final termination of the Receivership, enter an order approving his final accounting and discharging the Receiver and his professionals from their duties and from any and all liability that may have been incurred in the course of the Receivership.  In support of this request, the Receiver contends that receivers have qualified immunity from personal liability for actions that are taken with their receivership authority.  Receiver's Appl. 32 (citing *Morrison -Knudsen Co. v. CHG Int'l*, 811 F.2d 1209, 1222 (9th Cir. 1987)).

The Receivership order entered by Judge Furgeson contains the following limitation of liability provision that excludes acts of gross negligence:

> [E]xcept for an act of gross negligence, the Receiver and the [Receiver's] Professionals shall not be liable for any loss or damage incurred by any of the Receivership Parties, their officers, agents, servants, employees and attorneys or any other person, by reasons of any act performed or omitted to be performed by the Receiver and the Professionals in connection with the discharge of his or her duties and responsibilities.  Additionally, in the event of a discharge of the Receiver either by dissolution of the receivership or order of this Court, the Receiver shall have no further duty whatsoever.

Order Appointing Receiver (Doc. 130 at 8-9).  The court **grants** the Receiver's request for approval of final accounting and order of final discharge and release, except for acts of gross negligence, in accordance with the foregoing limitation of liability provision.  The court **approves** the Receiver's final accounting and report; **confirms** that the Receiver has complied with the orders of the court; and **concludes** that the Receivership was operated and concluded in keeping with the mandate of the Fifth Circuit and prior orders of this court and the bankruptcy court.[7]

The further **orders** as follows:

1.  The Receiver, his agents, employees, members, officers, independent contractors; the Receiver's current and former attorneys, including without limitation, the firm Dykema Gossett, PLLC and attorneys David J. Schenck, Jeffrey R. Fine, Christopher D. Kratovil, and Alison R. Ashmore; the firm Gardere Wynne Sewell, LLP and attorneys Peter Lo, Barry Golden, Richard Roberson, Diedre Ruckman, John David Blakley, Michael Newman, and Evan Baker; and the Receiver's retained or appointed professionals, including without limitation, Joshua Cox, James Eckels, Damon Nelson, Grant Thornton, Jeffrey Harbin, Matt Morris, Dickman Davenport, Equivalent Data, and Domain Holdings Group, and their respective agents and representatives ("Receiver Released Parties") shall be **discharged** and relieved of any and all further duties,

---

[7] In approving the Receiver's final accounting and report, the court considered the Receiver's supplemental filings regarding the status of certain Receivership domain assets, the Receiver's efforts in returning these assets, and the obstacles that the Receiver encountered in returning the assets.  The court is aware that the Receiver's efforts in turning over the Receivership assets to Baron and the LLCs were disrupted to a large extent as a result of the dispute as to whom has authority to manage the LLCs and their assets that arose after the court first announced that it would begin winding down the Receivership, and Baron undertook efforts to terminate Katz's employment and replace the manager of the LLCs.  The court, however, is satisfied that the Receiver and his professionals undertook reasonable efforts to return the Receivership assets in accordance with the court's orders, despite the difficult circumstances created by Baron, the LLCs, and their lawyers. Accordingly, the court **overrules** the various objections asserted regarding the manner in which the Receivership assets were turned over.

obligations, and responsibilities in connection with the Receivership and Receivership estate upon termination of the Receivership estate.

2.  Upon termination of the Receivership estate, the Receiver and Receiver Released Parties shall be **discharged** and **released**, except for acts of gross negligence, from all claims and liabilities arising out of or pertaining in any way to the Receivership and from all claims and liabilities that were asserted or could have been asserted in the Receivership or in connection with the Receiver's administration of the Receivership, including without limitation (a) all claims for relief and causes of action pertaining in any way to the Receivership that were asserted in or that could have been asserted by any of the parties to this case or their current or former counsel; (b) all claims for relief and causes of action pertaining in any way to the Receivership that were asserted in or that could have been asserted in or in connection with the involuntary bankruptcy against Baron; and (c) all claims for relief and causes of action that could have been asserted against the Receiver by creditors, claimants, consumers, consultants, experts, vendors, purchasers (actual or prospective), clients, and any other persons arising out of the Receiver's activities or those of his professionals in connection with the Receivership.

3.  In the light of pending litigation involving the Receivership, the Receiver **shall** store and maintain all books and records of the Receivership estate under his control until otherwise ordered by the court.[8]

---

[8] Baron previously requested that the court direct the Receiver to return all books and records pertaining to the Receivership assets in the Receiver's possession or control. Such request was denied by order dated February 28, 2014. *See* Order (Doc. 1368 at 5-7 and 12) (summarizing the relief requested by Baron as to the return of records and stating: "All other requests not expressly addressed herein are denied.").

**Memorandum Opinion and Order - Page 20**

4.  The court shall **retain** exclusive jurisdiction of this case over any disputes that may arise

concerning this or any earlier order, the wind down of the Receivership estate, and the relief provided

under this order, or any controversy that arises from or relates to the Receivership or actions of the

Receiver or his professionals.

5.  The court **authorizes** the **release** of the surety and the surety bond posted by the Receiver

in the amount of $1,000 (Doc. 131).

6.  All other requests or relief not expressly addressed herein is **denied.**

III.    **Objections to the Receiver's Application**

A number of objections were asserted to the Receiver's Application.  To the extent that the

objections asserted are inconsistent with the determination made in this memorandum opinion and

order, they are **overruled**.[9]

---

[9] The court set a deadline of April 22, 2014, for objections to the Receiver's Application.  A number of objections was filed after this deadline.  Some objections were filed *months* after the deadline set by the court.  The court does not consider these untimely objections, *all of which were filed without leave of court.*  As far as the court is concerned, as leave was not sought from the court to file the untimely objections, the right to object was waived or forfeited by those who filed untimely objections.  Moreover, the court's refusal to consider the untimely objections serves as a sanction for not complying with a valid court order.  Additionally, the court did not authorize Baron, the LLCs, or related persons or entities to file separate multiple objections.  The multiple filings by different lawyers, whether in the name of Baron, the LLCs, the Village Trust, or other offshore entities connected to the trust and Baron has been an ongoing tactic conveniently employed to delay, confuse, manipulate, and disrupt the proceedings in this case, the bankruptcies, and related cases, and the court strongly suspects, based on its familiarity with the record in this, the bankruptcies, and other related cases, that Baron and those acting on his behalf are the source of this disruptive conduct.  Accordingly, the court does not consider the additional objections to the Receiver's Application that were filed after April 22, 2014, by or on behalf of Baron or the LLCs without leave of court, including those filed by RPV Limited ("RPV") on May 28, 2014, as trustee of the Village Trust, whose only assets are those of the LLCs. The record in this and other related cases filed by the LLCs indicates that the Village Trust has been aware of an involved in the Receivership proceedings from the beginning, and that RPV, as trustee for the Village Trust, and those acting on its behalf were aware of the proceedings in this case, as well as the court's orders pertaining to the winding down of the Receivership.  The court similarly concludes that Baron's former attorneys, who initiated the involuntary bankruptcy ("Petitioning Creditors"), were aware of the April 22, 2014 deadline imposed by the court on March 3, 2014, because the court's electronic court filing ("ECF") system's records indicate that Pronske & Patel, P.C; Gary Lyon; and Powers Taylor, LLP all received notice via ECF of the court's March 3, 2014 order.  Accordingly, the court does not consider the objection filed by Gerrit Pronske on behalf of the Petitioning Creditors without leave of court on May 5, 2014.

**IV.     Conclusion**

For the reasons explained, the Receiver's Application (Docs. 1397 and 1398) is **granted in part and denied in part**.  The Receiver is awarded  **$424,857.76** in professional fees and expenses, which shall be paid from the remaining cash assets in the Receivership.  The Receiver's request for additional fees and expenses in excess of this amount is **denied.**  Upon payment of the Receivership fees and expenses approved by the court, the Receivership estate shall **terminate**; the Receiver and Receiver Released Parties are hereby **discharged** from any further duties, obligations, and responsibilities; and the surety bond paid by the Receiver and the sureties shall be **released**.

**It is so ordered** this 27th day of March, 2015.

_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge